UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **ALEUTIAN PRIBILOF ISLANDS** | ) | |
| **ASSOCIATION, INC.** | ) | |
| 201 E. 3rd Avenue | ) | |
| Anchorage, Alaska 99501 | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **DIRK KEMPTHORNE**, in his official capacity as | ) | |
| Secretary of the Interior, | ) | |
| U.S. Department of the Interior | ) | |
| 1849 C. Street, N.W. | ) | |
| Washington, DC 20240 | ) | |
| | ) | |
| **NILES CESAR**, in his official capacity as | ) | |
| Regional Director, Alaska Region, | ) | |
| Bureau of Indian Affairs, | ) | |
| U.S. Department of the Interior; | ) | Civil Action No. _____ |
| 709 W. 9th St. | ) | |
| Juneau, Alaska 99802 | ) | COMPLAINT |
| | ) | |
| **BUREAU OF INDIAN AFFAIRS** | ) | |
| **OFFICE OF SELF-GOVERNANCE**, | ) | |
| U.S. Department of the Interior, | ) | |
| 1849 C. Street, N.W., MS 4140 MIB | ) | |
| Washington, DC 20240 | ) | |
| | ) | |
| DEFENDANTS. | ) | |
| | ) | |

Served:     The Honorable Alberto R. Gonzales
            Attorney General of the United States
            Department of Justice
            950 Pennsylvania Avenue, NW
            Washington, D.C.  20530-0001

            The Honorable Jeffrey A. Taylor
            United States Attorney for the District of Columbia
            Judiciary Center Building
            555 Fourth Street, NW
            Washington, D.C.  20530

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

The Plaintiff, for its cause of action against the Defendants named above, alleges as follows:

### INTRODUCTION

1.    Plaintiff, the Aleutian Pribilof Islands Association ("APIA"), asks that this court review the decision of the United States Department of the Interior ("DOI") to remove certain funding from APIA's funding agreement with DOI under the Indian Self-Determination and Education Assistance Act, 25 U.S.C. § 450 *et seq.* ("ISDEAA"). The funding in question, which had been included in APIA's agreements for many years, was to carry out cultural heritage activities authorized by section 14(h)(1) of the Alaska Native Claims Settlement Act ("ANCSA"). The Bureau of Indian Affairs ("BIA"), an agency within the DOI, rejected APIA's proposal to continue to include the ANCSA activities and associated funding in its fiscal year ("FY") 2006 annual funding agreement ("AFA"). APIA contests this BIA decision on the grounds that the rejection of the proposal and reduction in funding from one year to the next violated the ISDEAA, the Department's own regulations implementing the ISDEAA, and BIA policy on the order of precedence among tribal contractors in Alaska. APIA asks that this court exercise its authority under section 110(a) of the ISDEAA, 25 U.S.C. § 450m-1(a), to reverse the BIA decision and compel the Secretary to award APIA the ANCSA funding for FY 2006 and on a recurring basis as proposed by APIA's AFA. Alternatively, APIA asks this court to set aside the BIA's actions as arbitrary and capricious, and remand to the BIA with instructions to apply the ISDEAA declination criteria and procedures and agency contracting preference policy.

PARTIES

2.      APIA is a tribal organization under the ISDEAA sanctioned by thirteen federally recognized tribal governments in its region to carry out a range of services for Alaska Native beneficiaries in the region.  APIA contracts with federal, state and local governments and secures private funding to provide a broad spectrum of services throughout the region.  These services include health, education, social, psychological, employment and vocational training, and public safety services.

3.      Secretary Kempthorne is the Secretary of Interior.  The DOI is an agency of the United States charged with protecting and managing the nation's natural resources and cultural heritage, providing scientific and other information about those resources, and honoring the United States' trust responsibilities and commitments to American Indians and Alaska Natives.

4.      Mr. Cesar is the Regional Director of the Alaska Region of the BIA, which enters into funding agreements with APIA under the ISDEAA.

5.      The DOI Office of Self-Governance ("OSG") carries out the Department's commitments to tribes and tribal organizations, including APIA, under Title IV of the ISDEAA.

JURISDICTION AND VENUE

6.      This Court has jurisdiction under section 110(a) of the ISDEAA, 25 U.S.C. § 450m-1(a) ("The United States district courts shall have original jurisdiction over any civil action or claim against the appropriate Secretary arising under this Act...."); 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1362 (actions brought by Indian tribes); and 5 U.S.C. § 702 (judicial review of adverse agency action).

7.      Venue is proper under 28 U.S.C. § 1391(e), since Defendants Secretary Kempthorne and OSG reside within the District of Columbia.

STATUTORY AND REGULATORY BACKGROUND

The Indian Self-Determination and Education Assistance Act

8.      The ISDEAA authorizes APIA and other tribes and tribal organizations to assume

responsibility to provide programs, functions, services and activities ("PFSAs") that the

Secretary would otherwise be obligated to provide under federal law to Indians and Alaska

Natives.  In return, the Secretary must provide APIA funding and other support.  The purpose of

the ISDEAA is to reduce federal domination of Indian programs and promote tribal self-

determination and self-governance.  25 U.S.C. § 450a(b); *Cherokee Nation v. Leavitt*, 543 U.S.

631, 639 (2005).  The ISDEAA reflects the United States' commitment "to supporting and

assisting Indian tribes in the development of strong and stable tribal governments, capable of

administering quality programs and developing the economies of their respective communities."

25 U.S.C. § 450a(b).

9.      "Indian tribes" and "tribal organizations" are eligible to enter ISDEAA

agreements.  The ISDEAA defines Indian tribes to include not only federally recognized tribes,

including Alaska Native villages, but also "regional or village corporation[s] as defined in or

established pursuant to [ANCSA]."  *Id*. § 450b(e).

10.     Tribal agreements with the Secretary under the ISDEAA may take two forms:

self-determination contracts under Title I, 25 U.S.C. § 450f *et seq*., and self-governance

compacts under Title IV, *id*. § 458aa *et seq*.  Self-governance agreements allow tribal

participants greater flexibility and freedom, for example to consolidate and redesign PFSAs to

best meet particular tribal needs.  In order to participate in the self-governance program, a tribe

or tribal organization must demonstrate financial stability and management capability.  *Id*.

§ 458aa(c)(3); 25 C.F.R. § 1000.17.

11.    When an eligible tribe or tribal organization submits a proposed agreement, "the Secretary shall, within ninety days after receipt of the proposal, approve the proposal and award the contract," unless he declines the proposal on one of the narrow grounds discussed below.

The Declination Process

12.    Recognizing agency reluctance to turn over resources to tribes, Congress in the ISDEAA carefully limited the Secretary's discretion throughout the contracting and funding process. *See, e.g.*, *Ramah Navajo School Bd. v. Babbitt*, 87 F.3d 1338, 1344 (D.C. Cir. 1996) ("Congress has clearly expressed in the ISD[EA]A ... its intent to circumscribe as tightly as possible the discretion of the Secretary...."). The agency decision whether to award or decline a contract proposal is no exception to this general rule. The Secretary "is directed, upon the request of any Indian tribe by tribal resolution" to enter into the agreement, 25 U.S.C. § 450f(a)(1), unless one of five exceptions, also known as declination criteria, applies, *id.* § 450f(a)(2). When the Secretary decides to decline a proposed ISDEAA agreement, whether in whole or in part, he must provide "written notification that clearly demonstrates that, or that is supported by a controlling legal authority that—

> **(A)**   the service to be rendered to the Indian beneficiaries of the particular program or function to be contracted will not be satisfactory;
> **(B)**   adequate protection of trust resources is not assured;
> **(C)**   the proposed project or function to be contracted for cannot be properly completed or maintained by the proposed contract;
> **(D)**   the amount of funds proposed under the contract is in excess of the applicable funding level for the contract, as determined under section 106(a); or
> **(E)**   the program, function, service, or activity (or portion thereof) that is the subject of the proposal is beyond the scope of programs, functions, services, or activities covered under paragraph (1) because the proposal includes activities that cannot lawfully be carried out by the contractor."

25 U.S.C. § 450f(a)(2); *see also* 25 C.F.R. § 900.22 (explaining that "[t]he Secretary may only decline to approve a proposal for one of five specific reasons," and reflecting the statutory

criteria of section 102(a)(2)).  The Secretary must provide "a detailed explanation of the reason

for the decision to decline the proposal."  25 C.F.R. § 900.29(a).[1]

13.     The restrictions on agency declination are even more stringent when the agency

has historically approved the contract, or portion thereof, at issue.  If a tribal organization's

proposed successor AFA is "substantially the same as the prior annual funding agreement

(except for funding increases included in appropriations acts or funding reductions as provided in

section 106(b) of the [ISDEAA]) and the contract is with DHHS or the BIA, the Secretary shall

approve and add to the contract the full amount of funds to which the contractor is entitled, and

may not decline, any portion of a successor annual funding agreement."  25 C.F.R. § 900.32

(emphasis added).

14.     The Secretary bears the burden of proof to clearly establish the validity of the

grounds for declining a contract proposal.  25 U.S.C. § 450f(e)(1); 25 C.F.R. § 900.163.

Funding Reductions from Year to Year

15.     Another provision of the ISDEAA promoting the stability of self-determination

and self-governance agreements—and restraining the Secretary's discretion—is section

106(b)(2), which requires that the amount of funds awarded under the agreement "shall not be

reduced by the Secretary in subsequent years except pursuant to –

> **(A)**  a reduction in appropriations from the previous fiscal year for the
> program or function to be contracted;
>> **(B)**  a directive in the statement of the managers accompanying a

---

[1] The ISDEAA section 102 and Part 900 declination criteria apply to APIA's Title IV agreements because the Title IV regulations incorporate by reference the appeals procedures of Title I, which in turn incorporate the substantive declination criteria of Section 102.  25 C.F.R. § 1000.432(a) (for Title I-eligible programs such as ANCSA 14(h)(1), "appeal may only be filed with IBIA [the Interior Board of Indian Appeals] under the provisions set forth in 25 C.F.R. 900.150(a) through (h), 900.152 through 900.169"); *id.* § 900.150(a) (specifying that Title I appeal regulations apply to decisions to decline an agreement, or a portion thereof, "under section 102 of the [ISDEAA]").  *See also* Recommended Decision at 7 n.3 (noting that the IBIA "determined that this appeal falls under 25 CFR 900.150(a), which specifically incorporates § 102 of the ISDEAA").

conference report on an appropriation bill or continuing resolution;

    **(C)**  a tribal authorization;

    **(D)**  a change in the amount of pass-through funds needed under a contract; or

    **(E)**  completion of a contracted project, activity, or program...."

25 U.S.C. § 450j-1(b)(2) (emphasis added); *see also* Exhibit A at 10 (Compact, Art. II § 15 ("Funding for successor agreements shall only be reduced pursuant to the provisions of Section 106(b) of [the ISDEAA].")).

    16.    The purpose of this provision is "to protect and stabilize tribal programs by protecting and stabilizing the funds for those programs from inappropriate administrative reduction by Federal agencies." S. Rep. 100-274, at 30 (Dec. 21, 1987), *reprinted in* 1998 U.S.C.C.A.N. 2620, 2649.

The Alaska Order of Contracting Precedence

    17.    As noted above, ANCSA regional and village corporations can be treated in very limited circumstances as "tribes" for purposes of contracting under ISDEAA, so it sometimes arises that more than one entity in Alaska may be eligible to contract or compact for particular PFSAs. To address such circumstances, the BIA many years ago established a hierarchy of contracting preference. In its original published list of federally recognized tribes, the Department of the Interior noted that "a number of non-tribal Native entities in Alaska … including ANCSA village and regional corporations," were eligible for federal contracts by statute, with one important limitation: "Under longstanding BIA policy, priority for contracts and services in Alaska is given to reorganized and traditional governments over non-tribal corporations."[2]

_____

[2] Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 58 Fed. Reg. 54364, 54366 n.2 (Oct. 21, 1993). The Indian Health Service ("IHS") has the same policy. The IHS has prioritized entities eligible to authorize ISDEAA contracting in the following order of preference: (1) the Indian Reorganization Act (IRA) Council, if it provides governmental functions; (2)

18.    As elaborated by the IBIA, the Alaska Order of Precedence applies the following

contracting hierarchy when faced with competing proposals:

1. Active Indian Reorganization Act (IRA) Council.
2. In the absence of an IRA, the formally established Traditional Council.
3. In the absence of either of the first two, the local ANCSA village/urban
   for-profit corporation.
4. In absence of all above, the ANCSA Regional for-profit corporation.

*Douglas Indian Ass'n v. BIA*, 27 IBIA 292 (1995).

19.    This policy is rooted in the ISDEAA, which is premised on the government-to-

government relationship between federal and tribal governments. *See, e.g.*, ISDEAA

Amendments of 1994, Pub. L. No. 103-413 § 202, 25 U.S.C. § 458aa note (describing purpose of

Title IV as follows: "transferring control to tribal governments, upon tribal request, over funding

and decision-making for Federal programs, services, functions and activities (or portions

thereof), is an effective way to implement the Federal policy of government-to-government

relations with Indian tribes") (emphasis added).

The Alaska Native Claims Settlement Act § 14(h)(1)

20.    Congress, in ANCSA, extinguished aboriginal title to lands in Alaska in exchange

for money and a complex mechanism for selection and eventual ownership of lands by Alaska

Native corporations. 43 U.S.C. § 1603(b) (claims to aboriginal title extinguished); § *id.* § 1613

(land selections). ANCSA also established regional corporations to do business for profit. *Id.*

§ 1606. The regional corporation representing the Aleutian and Pribilof Islands is The Aleut

Corporation ("TAC").

---

the traditional village council; (3) the village profit corporation; and, lastly, (4) the regional profit
corporation. Alaska Tribal Health Compact, Preamble; Alaska Area Guidelines for Tribal Clearances for
Indian Self-Determination Contracts, 46 Fed. Reg. 27178 (May 18, 1981).

21.    Section 14(h)(1) of ANCSA, as amended, provides in relevant part: "The Secretary may withdraw and convey to the appropriate Regional Corporation fee title to existing cemetery sites and historical places." 43 U.S.C. § 1613(h)(1)(A).

22.    The Department's 14(h)(1) regulations and guidelines limit the economic benefits the regional corporation may gain from the site to ensure that the cultural benefits reach the broader constituency of beneficiaries: tribes in the region and their members. The regional corporation must maintain and preserve the site and it takes title subject to a covenant running with the land prohibiting the corporation from authorizing mining or mineral activities of any kind, or any other use incompatible with the values of the area as a historical site. 43 C.F.R. § 2653.5(a); *id*. § 2653.11(b).

23.    The regulations implementing Section 14(h)(1) open up a broad range of cultural heritage issues. The essential inquiry is into "the quality of significance in Native history or culture" embodied in the site. Sites associated with significant events or persons, sites that possess "enduring symbolic value in the traditions and cultural beliefs and practices," sites that "embody the distinctive characteristics" of valued traditions of craftsmanship or art, and sites that "yield information important in prehistory or history" may all be eligible for conveyance to Native Corporations. 25 C.F.R. § 2653.5(d).

24.    In its annual budget, the BIA requests ANCSA section 14(h)(1) funds as a separate line under the Trust Services programs within the Tribal Priority Allocations (TPA) budget. *See* Exhibit B at BIA-COMP-1 (FY 2006 BIA Budget listing "ANCSA Historical and Cemetery Sites" among Trust Services within TPA). TPA are recurring funds and are the main resource for tribes to provide basic government services. As explained in the BIA's FY 2006 budget justification, "Tribal Priority Allocations (TPA) fund basic tribal services, such as social

services, adult vocational training, child welfare, natural resources management, and contract support." Exhibit B at BIA-SUM-15. In the same document, the BIA describes the ANCSA program as follows: "This program supports the Departmental goal of Serving Communities by fulfilling Indian fiduciary trust responsibilities by protecting cultural and natural heritage resources." *Id*. at BIA-TPA-47 to 48.

APIA'S AGREEMENTS AND THE PRESENT DISPUTE

25.    In 1995, APIA and the Secretary entered a self-governance compact under Title IV of the ISDEAA. Exhibit A (Compact of Self-Governance between the Aleutian/Pribilof Islands Association, Inc. and the United States of America) ("Compact"). In the Compact, still in effect, "the Secretary ... pledges that the Department will conduct all relations with the participating tribes on a government-to-government basis, recognizing that such tribes may act collectively through the Signatory." *Id*. Art. I § 2(c). The Compact was supported by authorizing resolutions from APIA's thirteen member tribes, as required by section 102(a)(1) of the ISDEAA. *See* 25 U.S.C. § 450f(a)(1); *id*. § 458aaa-2(c)(1).

26.    Pursuant to the Compact, APIA has entered a series of annual funding agreements ("AFAs") with the Secretary, through the OSG, in which APIA assumed a broad range of PFSAs. Since 1999, the BIA has interpreted § 14(h)(1) to benefit tribes as well as regional corporations. Based on that longstanding interpretation, the APIA AFA has since that time included activities related to implementation of ANCSA section 14(h)(1). As noted above, ANCSA funds are recurring TPA funds included each year in APIA's AFAs, and those funds would still recur each year but for the BIA decision contested in this action.

27.    APIA carried out ANCSA activities in conjunction with a Memorandum of Agreement ("MOA") with TAC, the ANCSA regional corporation, that spelled out how the

parties would "jointly conduct certain cultural heritage, preservation and related activities, and in particular, activities related to completing the ANSCA [sic] 14(h)(1) process." Exhibit C § 1. During the years that it has operated the cultural heritage program, APIA has submitted periodic work plans and activity reports to TAC. These reports reflect that the cultural heritage preservation activities undertaken by APIA include work directly related to the ANCSA 14(h)(1) conveyance process, as well as other activities such as repatriation of remains and artifacts from other museums and Aleut language classes. These activities are fully consistent with BIA guidelines on use of ANCSA § 14(h)(1) funding, even though some provide no economic or other benefit to TAC. Instead, they benefit the Alaska Native people of the region, the tribal governments that represent them, and APIA, which represents those people and governments. TAC stands to benefit from the end result of the process when it takes title to the sites—though even then, as noted above, it must maintain the sites undeveloped for the benefit of the people— but the cultural heritage activities benefit only the peoples, the cultures, and the governments charged with protecting them.

28.     On May 24, 2004, prior to the FY 2005 negotiations between BIA and Alaska tribal contractors, the Regional Solicitor's Office issued a memorandum on "Funding for implementation of ANCSA § 14(h)(1) included within Tribal Self-Governance annual funding agreement." Contrary to years of interpreting section 14 (h)(1) to benefit tribes, the Solicitor concluded that the regional corporation is sole the entity benefiting from the activities related to carrying out section 14(h)(1). The memo concludes that contracting for 14(h)(1) activities can be supported only by resolution of the appropriate regional corporation, and not by a tribal or village resolution. This conclusion gives the regional corporations not only the right to decide who will perform the work, but also the right to contract directly with the BIA.

29.    On May 20, 2005, TAC passed a resolution purporting to remove APIA as the entity to receive ANCSA 14(h)(1) funding on its behalf and resolving to contract directly with BIA for those funds and activities starting in FY 2006.

30.    In September 2005, APIA proposed to OSG a FY 2006 AFA that included, as in the previous seven years, funding for ANCSA section 14(h)(1) activities.  As in past years, the inclusion of these PFSAs and related funds in the agreement was supported by the resolutions of the thirteen tribes that sanction APIA.  The FY 2006 proposal was substantially identical to that agreed to by the BIA for FY 2005.  Nonetheless, on October 3, 2005, the BIA returned the proposal with the ANCSA funds deleted, on the ground that TAC had resolved to contract for the funds.

31.    The BIA would not release any funds under the FY 2006 AFA until APIA agreed to the withdrawal of the section 14(h)(1) funds.  APIA did not agree to the withdrawal of these PFSAs and funds, and the parties agreed on language contained in footnote 15 in the 2006 AFA that reflects BIA's unilateral decision to transfer the funds to TAC and preserves APIA's right to "appeal the BIA decision regarding these funds."  Exhibit D, 2006 AFA Reprogramming Request at 2 n.15.

32.    At no point prior to the initiation of this appeal did BIA send APIA a written explanation of the decision to withhold the ANCSA funding, nor did it notify APIA of its right to appeal, or the procedures for doing so.  Recommended Decision at 7-8.

33.    On June 26, 2006, APIA submitted to the BIA Alaska Region a proposed AFA that again contained the contested ANCSA § 14(h)(1) activities and associated funding.  In a letter dated July 7, 2006, the BIA Alaska Regional Director informed APIA that BIA and OSG may or may not include the ANCSA funding in APIA's FY 2007 AFA, depending on the

outcome of the appeal described below.  If the BIA were to prevail, the funding would again be

deleted.  If APIA were to prevail, the FY 2007 AFA would be approved as submitted.  The BIA

recognized a third possibility: the judge could uphold TAC's contracting priority, but find that

the procedures followed by the BIA and OSG violated the declination procedures, so APIA

would receive the FY 2006 funding.  Exhibit E.

## PROCEDURAL HISTORY

34.    In an initial attempt to resolve the dispute, APIA requested an informal

conference, pursuant to 25 C.F.R. § 900.154.  Following the conference, the presiding official,

Deputy Regional Director Charles F. Bunch, issued a recommended decision upholding the

initial decision to transfer the 14(h)(1) funding from APIA to TAC.  *See* Exhibit F (Letter to

Dmitri Philemonof Re: Informal Conference (Feb. 15, 2006)).

35.    APIA then appealed to the Interior Board of Indian Appeals ("IBIA") under 25

C.F.R. § 900.158.  The IBIA assigned the case to Administrative Law Judge Sweitzer in the

Hearings Division of the Office of Hearings and Appeals.  The parties briefed the issues, and

Judge Sweitzer issued a Recommended Decision, dated August 31, 2006, upholding the BIA's

action.  *See* Exhibit G (Recommended Decision).

36.    Judge Sweitzer determined that the only beneficiaries of section 14(h)(1) are

ANCSA regional corporations rather than the Alaska Tribes that for many years have authorized

APIA to contract 14(h)(1) activities—and other BIA PFSAs—under the ISDEAA.  Therefore,

Judge Sweitzer concluded, APIA lacks the authority to contract the 14(h)(1) activities in the

absence of an authorizing resolution from the appropriate regional corporation, TAC, and the

BIA was correct in refusing to include the ANCSA PFSAs, and associated funding, in APIA's

AFA.

37.    APIA prepared a Notice of Appeal and Objection to Recommended Decision and served it on the parties on September 29, 2006.  On October 31, 2006, APIA's counsel contacted the IBIA to inquire about the status of the appeal, and was informed that it had never reached the IBIA.  Subsequent investigation indicated that, due to a clerical error, the Notice and Objection was never mailed to the IBIA.  On October 31, 2006, APIA filed the Notice of Appeal and Objection to Recommended Decision with the IBIA, explained the oversight, and asked that the appeal be deemed timely.  On November 3, 2006, the IBIA issued an Order Dismissing Objection to Recommended Decision, holding that, under the ISDEAA regulations, the Recommended Decision became final after 30 days.  Under the regulations, a tribal contractor may appeal a recommended decision to the IBIA, but if it does not appeal within 30 days, the recommended decision becomes final.  25 C.F.R. § 900.166.  Thus Judge Sweitzer's Recommended Decision is now final for the Department.

## CAUSES OF ACTION

### COUNT 1 – Declaratory and Injunctive Relief

38.    Paragraphs 1-37 are herein incorporated by reference.

39.    The BIA erroneously decided to revoke APIA's ANCSA funding.  This decision was based on the BIA position that TAC is the only beneficiary of ANCSA § 14(h)(1) capable of authorizing a tribe or tribal organization to contract for PFSAs authorized and funded under that statute.  As alleged above, the cultural heritage activities authorized and funded under § 14(h)(1) provide little if any benefit to TAC, a corporation charged with economic development.  Rather, the cultural heritage activities benefit those who share the culture: Alaska Natives of the region.  Those Natives, through their duly authorized tribal governments, authorized APIA to contract the ANCSA § 14(h)(1) activities on their behalf, and the BIA was correct for many years in

recognizing the legality and appropriateness of this authorization. TAC's resolution does nothing to change this. APIA, on behalf of the thirteen Alaska Tribes it represents, and the members of those Tribes, asks this court for a declaratory judgment, pursuant to 25 U.S.C. §450m-1(a), that the Tribes and their members are beneficiaries of ANCSA § 14(h)(1), and as such were and are fully authorized by the ISDEAA to authorize APIA to contract the ANCSA PFSAs on their behalf.

40.     The BIA's decision to reverse its longstanding practice and revoke the ANCSA funding failed to satisfy the substantive and procedural requirements of the ISDEAA, and APIA is entitled to "injunctive relief to compel the Secretary to award and fund" the FY 2006 and 2007 AFA as proposed by APIA. 25 U.S.C. § 450m-1(a). Moreover, since the ANCSA funds are recurring funds under APIA's agreements, this court should enjoin the BIA from removing them in the future.

COUNT 2 – Violation of ISDEAA § 102(a)

41.     The allegations in Paragraphs 1-40 are herein incorporated by reference.

42.     As in the previous seven years, APIA submitted its FY 2006 AFA proposal, including the ANCSA activities, supported by the tribal resolutions of the thirteen federally recognized tribes that APIA represents. At that point, the Secretary, through the BIA, had a clear duty, within 90 days, to either (1) approve and award APIA's FY 2006 AFA as proposed, or (2) issue a written declination decision that clearly demonstrated that, or was supported by a controlling legal authority that, one of the five declination criteria was met. 25 U.S.C. § 450f(a)(2); 25 C.F.R. § 900.16 ("The Secretary has 90 days after receipt of a proposal to review and approve the proposal and award the contract or decline the proposal in compliance

with section 102 of the Act and subpart E.")  The Secretary failed to do either within 90 days, thus violating the statute.

COUNT 3 – Violation of ISDEAA § 106(b) and Breach of Contract

43.     The allegations in Paragraphs 1-42 are herein incorporated by reference.

44.     The Secretary's reduction of APIA's funding in FY 2006, due to withholding the ANCSA funds, was not justified by any of the five reasons for which the Secretary may legitimately reduce funding under section 106(b)(2) of the ISDEAA, 25 U.S.C. § 450j-1(b)(2). The Compact promises that the Secretary will not reduce funding for successor agreements except pursuant to section 106(b).  Compact, Art. II § 15.  Therefore, by unilaterally reducing funding in FY 2006, the Secretary breached his contractual as well as statutory duties, and continues to do so with respect to the FY 2007 AFA.

COUNT 4 – Violation of Department Regulations

45.     The allegations in Paragraphs 1-44 are herein incorporated by reference.

46.     APIA's proposed FY 2006 AFA was substantially identical to the AFA approved by the BIA in FY 2005.  The Secretary's decision not to renew APIA's proposed FY 2006 AFA violated the Department's own rules that prohibit the agency from declining proposals for successor AFAs that are substantially the same as a previous year's AFA.  25 C.F.R. § 900.32; *id*. § 900.33.

COUNT 5 – Violation of APA

47.     The allegations in Paragraphs 1-46 are herein incorporated by reference.

48.  The BIA removed the ANCSA funding from APIA's AFA in order to award it to TAC, thus giving a regional corporation contracting priority over APIA, which is sanctioned by thirteen tribal governments to contract on their behalf under the ISDEAA.  The BIA refused to

- 16 -

apply the agency's own longstanding policy, the Alaska Order of Precedence, granting precedence to Alaska tribal governments over regional corporations when both represent beneficiaries of the ANCSA program. The BIA's deviation from its established policy was arbitrary, capricious, and an abuse of discretion in violation of the APA, 5 U.S.C. § 706(2)(A).

49. In addition, the BIA's refusal to follow the ISDEAA declination procedure exceeded statutory authority in violation of the APA, 5 U.S.C. § 706(2)(C).

50. Finally, the BIA's actions in failing to follow the agency's own regulatory criteria and procedures for declination were taken "without observance of procedure required by law," in violation of 5 U.S.C. § 706(2)(D).

## PRAYER FOR RELIEF

51. Section 110(a) of the ISDEAA provides this court the authority to grant "appropriate relief including money damages, injunctive relief against any action by an officer of the United States or any agency thereof contrary to this Act or regulations promulgated hereunder (including immediate injunctive relief to reverse a declination finding under section 102(a) or to compel the Secretary to award and fund an approved self-determination contract)." *Id*. § 450m-1(a). On this basis, plaintiff APIA respectfully prays that this Court:

A. Declare that APIA is a beneficiary of section 14(h)(1) of the ANSCA;

B. To enjoin and compel the Secretary, pursuant to this court's authority under 25 U.S.C. § 450m-1(a), to award and fund the AFA for FY 2006 on a recurring basis as proposed by APIA;

B. In the alternative, set aside the BIA's actions as arbitrary and capricious, and remand to the BIA with instructions to apply the ISDEAA declination criteria and procedures and the Alaska Order of Precedence.

C.    Award reasonable attorney fees and expenses in favor of APIA under the Equal

Access to Justice Act, 28 U.S.C. § 2412, and any other applicable law.

D.    Grant such other relief as it deems just.


                                        Respectfully Submitted,


                                        _____
                                        F. Michael Willis (D.C. Bar No. 467462)
                                        Geoffrey D. Strommer
                                        HOBBS, STRAUS, DEAN & WALKER, LLP

                                        2120 L Street, NW, Suite 700
                                        Washington, DC  20037
                                        202-822-8282
                                        202-296-8834 (Facsimile)

                                        Attorneys for the Aleutian Pribilof Islands
                                        Association


DATED this 21st day of December, 2006.

## CERTIFICATE OF SERVICE

I, F. Michael Willis, hereby certify that on this 21st day of December, 2006, I caused the Aleutian Pribiloff Islands Association's Summons and Complaint to be served by having copies shipped via certified mail upon the following:

Dirk Kempthorne, Secretary of the Interior
U.S. Department of the Interior
1849 C Street, N.W.
Washington, DC 20240

Niles Cesar, Regional Director, Alaska Region,
Bureau of Indian Affairs
U.S. Department of the Interior
709 W. 9th St.
Juneau, Alaska 99802

Ken Reinfeld
Bureau of Indian Affairs, Office of Self-Governance
U.S. Department of the Interior
1849 C. Street, N.W., MS 4140 MIB
Washington, DC 20240

The Honorable Alberto R. Gonzales
Attorney General of the United States
Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C.   20530-0001

The Honorable Jeffrey A. Taylor
United States Attorney for the District of Columbia
Judiciary Center Building
555 Fourth Street, NW
Washington, D.C.   20530

F. Michael Willis (Bar No. 467462)
Hobbs, Straus, Dean & Walker LLP
2120 L St. NW
Suite 700
Washington, DC  20037
(202) 822-8282
(202) 296-8834 (fax)

December 21 2006

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ALEUTIAN PRIBILOF ISLANDS** )<br>**ASSOCIATION, INC.** )<br>201 E. 3rd Avenue )<br>Anchorage, Alaska 99501 )<br> )<br>      PLAINTIFF, )<br> )<br>      v. )<br> )<br>**DIRK KEMPTHORNE**, in his official capacity as )<br>Secretary of the Interior, )<br>U.S. Department of the Interior )<br>1849 C. Street, N.W. )<br>Washington, DC 20240 )<br> )<br>**NILES CESAR**, in his official capacity as )<br>Regional Director, Alaska Region, )<br>Bureau of Indian Affairs, )<br>U.S. Department of the Interior; )<br>709 W. 9th St. )<br>Juneau, Alaska 99802 )<br> )<br>**BUREAU OF INDIAN AFFAIRS** )<br>**OFFICE OF SELF-GOVERNANCE**, )<br>U.S. Department of the Interior, )<br>1849 C. Street, N.W., MS 4140 MIB )<br>Washington, DC 20240 )<br> )<br>      DEFENDANTS. )<br> ) | Civil Action No.___ |

**EXHIBITS IN SUPPORT OF THE COMPLAINT**
**OF ALEUTIAN PRIBILOF ISLANDS ASSOCIATION, INC.**

| Exhibit | Description |
|:---:|:---|
| A | Compact of Self-Governance between the Aleutian/Pribilof Islands Association, Inc. and the United States of America |
| B | Bureau of Indian Affairs, Budget Justifications and Performance Information, Fiscal Year 2006 |
| C | Memorandum of Agreement between Aleutian/Pribilof Islands Association, Inc. and The Aleut Corporation to cooperate in a joint effort to conduct certain cultural heritage and preservation activities |
| D | Letter from Aleutian/Pribilof Islands Association, Inc. to Bureau of Indian Affairs, Office of Self-Governance, regarding the fiscal year 2006 reprogramming request and the preservation of the Association's right to appeal the Bureau of Indian Affairs' decision regarding those funds |
| E | Bureau of Indian Affairs, Alaska Region, letter to the Aleutian/Pribilof Islands Association, Inc. regarding the Association's fiscal year 2007 funding agreement proposal |
| F | Letter from Bureau of Indian Affairs, Alaska Region, to Aleutian/Pribilof Islands Association, Inc. regarding the agency's recommended decision from the informal conference held pursuant to 25 C.F.R. § 900.154 |
| G | Recommended Decision of the Department of Interior, Office of Hearings and Appeals, August 31, 2006 |

6011

(6)

# COMPACT OF SELF-GOVERNANCE

# BETWEEN

# THE ALEUTIAN/PRIBILOF ISLANDS ASSOCIATION, INC.

# AND

# THE UNITED STATES OF AMERICA

# COMPACT OF SELF-GOVERNANCE
## TABLE OF CONTENTS

**ARTICLE 1 - AUTHORITY AND PURPOSE**                                    Page

    Section 1  - Authority                                        1
    Section 2  - Purpose                                          1
    Section 3  - Choice of Law and Forum                          2
    Section 4  - Definitions                                      2

**ARTICLE II - TERMS, PROVISIONS AND CONDITIONS**

    Section 1  - Term and Tribal Resolutions                      3
    Section 2  - Effective Date                                   3
    Section 3  - Funding Amount                                   3
    Section 4  - Payment                                          3
    Section 5  - Reports to Congress                              4
    Section 6  - Audits                                           4
    Section 7  - Records                                          6
    Section 8  - Property                                         6
    Section 9  - Savings                                          7
    Section 10 - Federal Supply Sources                           8
    Section 11 - Regulatory Authority                             8
    Section 12 - Disputes                                         9
    Section 13 - Compact Participation and Retrocession          9
    Section 14 - Tribal Administrative Procedures                 10
    Section 15 - Successor Annual Agreement                       10
    Section 16 - Secretarial Review of Contracts                  10
    Section 17 - Matching Funds                                   11

**ARTICLE III - OBLIGATIONS OF THE SIGNATORY**

    Section 1  - Consolidation                                    11
    Section 2  - Amount of Funds                                  11
    Section 3  - Compact Programs                                 12
    Section 4  - Trust Services for Individual Natives            12
    Section 5  - Reallocation                                     12

TSG Table of Contents
Page 2

## ARTICLE IV - OBLIGATIONS OF THE UNITED STATES

Section 1 - Trust Responsibility                                12
Section 2 - Trust Evaluations                                   13
Section 3 - Programs Retained                                   14
Section 4 - Financial and other Information                     14

## ARTICLE V - OTHER PROVISIONS

Section 1 - Designated Officials                                15
Section 2 - Native Preference in Employment,                    15
             contracting and Subcontracting
Section 3 - Insurance and Federal Tort Claims Act               15
Section 4 - Compact Modifications or Amendments                 15
Section 5 - Construction                                        15
Section 6 - Officials Not To Benefit                            15
Section 7 - Covenant Against Contingent Fees                    16
Section 8 - Penalties                                           16
Section 9 - Mature Compact Status Upon Termination;             16
             Effective Date
Section 10 - Sovereign Immunity                                 16
Section 11 - Severability                                       16
Section 12 - Wage and Labor Standard                            16
Section 13 - Non-BIA Programs                                   17

## ARTICLE VI - ATTACHMENTS

Section 1 - List of Participating Tribes                        17
Section 2 - Tribal Resolutions                                  17
Section 3 - Annual Funding Agreement                            17

## ATTACHMENT 1 - LIST OF PARTICIPATING TRIBES

## ATTACHMENT 2 - TRIBAL RESOLUTIONS

## ATTACHMENT 3 - ANNUAL FUNDING AGREEMENT, COMPACT AND ANNUAL
               FUNDING AGREEMENT FOOTNOTES - FY 1996

# COMPACT OF SELF-GOVERNANCE
## BETWEEN
## THE ALEUTIAN\PRIBILOF ISLANDS ASSOCIATION, INC.
## AND
## THE UNITED STATES OF AMERICA

## ARTICLE I - AUTHORITY AND PURPOSE

### Section 1 - Authority.

This agreement, denoted a Compact of Self-Governance (hereinafter referred to as the "Compact"), is entered into by the Secretary of the Interior (hereinafter referred to as the "Secretary"), for and on behalf of the United States of America pursuant to the authority granted by Title IV of the Indian Self Determination and Education Assistance Act, P.L. 93-638, as amended, (hereinafter referred to as "P.L. 93-638, as amended") and by the Aleutian\Pribilof Islands Association, Inc. (hereinafter referred to as the "Signatory"), for and on behalf of certain federally recognized Alaska Native tribes identified in Attachment 1, acting jointly, pursuant to authorizing resolutions adopted by their tribal councils under the respective constitutions, traditional practices, and other enabling authorities of such tribes.

### Section 2 - Purpose.

This Compact shall be liberally construed to achieve its purposes:

(a)  This compact is to carry out Self-Governance as authorized by Title IV of P.L. 93-638, as amended, which built upon the Self Governance Demonstration Project, and transfers control to tribal governments, upon tribal request, over funding and decision-making of federal programs, services, functions, and activities as an effective way to implement the federal policy of government-to-government relations with Indian tribes.

(b)  This Compact is to enable the Signatory to redesign programs, activities, functions, and services of the Bureau of Indian Affairs; to reallocate funds for such programs, activities, functions, or services according to tribal priorities; to provide such programs, activities, functions and services as determined by tribal priorities; to enhance the effectiveness and long term financial stability of tribal governments; to plan, conduct, consolidate, and administer programs, services, functions, and activities, or portions thereof, administered by the Department of the Interior, other than through the Bureau of Indian Affairs, to the extent as provided in the annual funding agreement applicable to such non-BIA program, service, function, or activity; and to reduce the federal bureaucracy.

(c) This Compact is to enable the United States to maintain and improve its unique and continuing relationship with and responsibility to the Signatory and the participating tribes through tribal self-governance, which will allow such tribes to: take their rightful place in the family of governments in the federal constitutional system; remove federal obstacles to effective self-governance; reorganize tribal government programs and services; achieve efficiencies in service delivery; and provide a documented example for the development of future Federal Indian policy. This policy of tribal self-governance shall permit an orderly transition from federal domination of programs and services to allow Indian tribes meaningful authority to plan, conduct, and administer those programs and services to meet the needs of their people. To implement Self-Governance, the Department of the Interior is expected to reorganize to provide the same level of service to other tribal governments and to demonstrate new policies and methods to improve service delivery and address tribal needs. In fulfilling its responsibilities under the Compact, the Secretary hereby pledges that the Department will conduct all relations with the participating tribes on a government-to-government basis, recognizing that such tribes may act collectively through the Signatory.

## Section 3 - Choice of Law and Forum.

The Signatory functions as a regional consortium of tribes and contains multiple tribal jurisdictions within its service area. Accordingly, this Compact shall be governed by federal law, or to the extent applicable, tribal law. The policies and procedures of the Signatory shall be applied in the execution of this Compact and the decisions of its board of directors shall be respected, to the extent that federal law, construed in accordance with the applicable canons of construction and Title IV of P.L. 93-638, as amended, is not inconsistent. Disputes between the Signatory and any participating tribe or individual may be referred to a tribal court upon agreement by all parties to the dispute, in which case tribal law shall apply to the extent that federal law is not inconsistent.

## Section 4 - Definitions.

(a) **Compact Programs.** In this document "Compact programs" or "Compact functions" refer to the programs, activities, functions, and services included in the Annual Funding Agreement incorporated to this agreement as Attachment 3, and any subsequent funding agreements or amendments thereto.

(b) **Participating Tribe.** Participating tribes are tribes which have executed the necessary authorizing resolutions for this Compact and receive services under this Compact. See Attachments 1 and 2.

(c) **Subrecipient Tribe.** A subrecipient tribe is a participating tribe which enters into an

2

agreement with the Signatory to receive pass-through money to directly operate Compact programs or portions of programs.

**(d) Secretary.** In this Compact "Secretary" refers to the Secretary of Interior and to any authorized representative of the Secretary of Interior.

## ARTICLE II - TERMS, PROVISIONS AND CONDITIONS

### Section 1 - Term and Tribal Resolutions.

**(a) Term.** The term of this Compact begins October 1, 1995 and shall extend thereafter for so long as authorized by federal law, or until ended by mutual agreement of the Secretary and the Signatory. The withdrawal of one or more participating tribes from the Compact shall not effect its validity in regard to the remaining tribes.

**(b) Tribal Resolutions.** Tribes which intend to participate in this Compact and the applicable Annual Funding Agreement for F.Y. 1996 must have issued written authorizing resolutions (see attachment 2).

### Section 2 - Effective Date.

This Compact shall be effective when signed by the Secretary or an authorized representative and the Signatory. The Annual Funding Agreement required by Title IV of P.L. 93-638, as amended, and this Compact shall be signed by the Signatory and the Secretary or an authorized representative and be forthwith submitted to the Committee on Indian Affairs of the United States Senate, the Committee on Natural Resources of the United States House of Representatives and to the tribes served by the Anchorage Agency, and shall be effective ninety days after such submission, unless otherwise provided by law. Successor Annual Agreements shall be likewise submitted.

### Section 3 - Funding Amount.

Subject only to the appropriation of funds by the Congress of the United States and to adjustments pursuant to Section 403(g) of P.L. 93-638, as amended, the Secretary or an authorized representative shall provide the Signatory the total amount specified in the Annual Funding Agreement incorporated by reference as Attachment 3.

### Section 4 - Payment.

Payments shall be made as expeditiously as possible in compliance with applicable Treasury Department regulations and shall include financial arrangements to cover funding during periods under continuing resolutions to the extent permitted by such resolutions. To the extent authorized by law, for each fiscal year covered by the

3

Compact, the Secretary will pay to the Signatory the funds specified for that fiscal year by the Annual Funding Agreement, in advance, in the form of an annual payment, by using an instrument such as a letter of credit, or other method authorized by law, or a combination thereof, as may be specified in the Annual Funding Agreement. Each annual payment shall be made on or before ten calendar days of the date on which the Office of Management and Budget apportions the appropriations for that fiscal year for the programs, activities, functions and services subject to the Compact.

## Section 5 - Reports to Congress.

In order to implement section 405 of P.L. 93-638, as amended, on each January 1 throughout the period of the Compact, the Secretary shall make a written report to the Congress, which shall separately include the views of the Signatory and the participating tribes concerning the matters encompassed by Section 405(b) and (d).

## Section 6 - Audits.

(a) The Signatory shall provide to the Secretary an annual single organization-wide audit as prescribed by the Single Audit Act of 1984, 31 U.S.C. § 7501, et seq., and shall adhere to generally accepted accounting principles and Circular A-128 of the Office of Management and Budget as follow:

(i) The costs of this Compact consist of the direct and support costs, including indirect costs, actually incurred in the performance of this Compact, determined in accordance with the cost principles set forth in the OMB Circular A-87 or OMB Circular A-122, whichever is appropriate, in effect as of October 1, 1995; provided, however, that if the Office of Management and Budget revises any provisions of such Circulars:

1. The revisions shall not apply to the Compact unless agreed to by the Signatory or until the Secretary determines their applicability as provided below.

2. The Secretary shall immediately review the revisions in consultation with the Signatory to determine if the revisions are detrimental to the self-governance project or inconsistent with the intent of the Act.

3. If it is determined that the revisions are neither detrimental nor inconsistent with the intent of the Act, the Secretary will amend this Compact to include those revisions.

(ii) Section 106(k) of P.L. 93-638, as amended, allows the Signatory to expend funds provided under this Compact for the following purposes:

4

(1) Depreciation and use allowances not otherwise specifically prohibited by law, including the depreciation of facilities owned by the Signatory.

(2) Publication and printing costs.

(3) Building, realty, and facilities costs, including rental costs or mortgage expenses.

(4) Automated data processing and similar equipment or services.

(5) Costs for capital assets and repairs.

(6) Management studies.

(7) Professional services, other than services provided in connection with judicial proceedings by or against the United States.

(8) Insurance and indemnification, including insurance covering the risk of loss of or damage to property used in connection with the contract without regard to the ownership of such property.

(9) Costs incurred to raise funds or contributions from non-Federal sources for the purposes of furthering the goals and objectives of this Compact.

(10) Interest expenses paid on capital expenditures such as buildings, building renovation, or acquisition or fabrication of capital equipment, and interest expenses on loans necessitated due to delays by the Secretary in providing funds under the Compact.

(11) Expenses of the governing body of the Signatory that are attributable to the management or operation of programs under this Compact.

(12) Costs associated with the management of pension funds, self-insurance funds, and other funds of the Signatory that provide for participation by the federal government.

(b) No other audit or accounting standards, except as specified in Article IV, Section 2, shall be required by the Secretary of the Signatory. To the extent that tribal law is not inconsistent, small and minority business audit firms shall be afforded maximum practical opportunity to participate in fulfilling the requirements herein. The preference requirements of P.L. 93-638, as amended, Section 7(b) shall apply to such audits pursuant to Section 2 of Article V of this Compact.

5

A/PIA Self-Governance Compact - Page 6

The following provisions will supplement A/PIA's policies or laws on document disclosure and will govern record keeping associated with this Compact.

(a) Except for previously provided copies of tribal records that the Secretary demonstrates are clearly required to be maintained as part of the record keeping system of the Department of the Interior, tribal records shall not be considered federal records for purposes of Chapter 5 of Title 5, United States Code.

(b) A/PIA shall maintain a record keeping system, and provide the Secretary reasonable access to records, to enable the Department of the Interior to meet its minimum legal record keeping program requirements under the Federal Records Act, 44 U.S.C. § 3101, et seq., and to allow for retrocession of this Compact in whole or in part pursuant to Section 13 of this Article.

(c) A/PIA shall maintain in its record keeping system all documents necessary for the annual audit requirement in Section 6 of this Article, and shall provide reasonable access to records to the Secretary.

## Section 8 - Property.

(a) In general. At the request of A/PIA the Secretary shall make available, or transfer to A/PIA, all reasonably divisible real property, facilities, equipment, and personal property that the Department had previously utilized to provide the programs, activities, functions and services covered by this Compact and corresponding AFA. A mutually agreed upon list specifying the property, facilities and equipment so furnished shall also be prepared and periodically revised so that such property can be properly recorded in the Bureau of Indian Affair's Property Inventory.

(b) Records. A/PIA shall maintain a record of all property referred to in subparagraph (a), or other property acquired under this Compact, for purposes of replacement.

(c) Joint Use Agreement. Upon the request of A/PIA the Secretary and A/PIA shall enter into a separate joint use agreement to address the shared use by the parties of real or personal property that is not reasonably divisible.

(d) Acquisition of property. A/PIA Is granted the authority to acquire such B.I.A. surplus or excess property as may be appropriate in the judgment of A/PIA, to support the programs, activities, functions, or services of this Compact. Subject to the agreement of GSA, non-B.I.A. property may be similarly acquired.

(e) Confiscated or excess property. The Secretary shall assist A/PIA in obtaining such confiscated or excess property as may become available to tribes, tribal

A/PIA Self-Governance Compact - Page 7

organizations, or local governments.

**(f) Screener identification card.** Upon request, a screener identification card (General Administration Form 2946) shall be issued to A/PIA within 30 days of the request. The Designated Official shall, upon request, assist A/PIA in securing the use of the cards.

**(g) Capital equipment.** A/PIA shall determine the capital equipment, leases, rentals, property or services required to perform its obligations under this Compact and shall acquire and maintain records of such capital equipment, property rentals, leases, property or services through their applicable procurement procedures.

**(h) Replacement of property.** Property and equipment furnished by the federal government for use in the performance of the Compact and annual funding agreement or purchased with funds under any funding agreement that is utilized by A/PIA in the performance of the Compact shall remain eligible for replacement to the same extent as if title to such property was vested in the United States.

**(i) Reversion of title.** Title to property and equipment furnished by the federal government for use in the performance of this Compact and any annual funding agreement or which was purchased with funds provided under this Compact and any annual funding agreement which has a value in excess of $5,000 at the time of retrocession, rescission, or termination of the funding agreement, and is not donated, shall, at the option of the Secretary, revert to the United States.

**(j) Leasing of facilities.** Subject to the availability of appropriations for the implementation of Section 105(l)(1) & (2) of P.L. 638 as amended, the Secretary may enter into a lease with A/PIA for facilities owned by A/PIA and used in performance of Compact programs. This provision shall not apply to former federal facilities acquired by A/PIA as excess or surplus property, or to facilities constructed with federal funds.

## Section 9 - Savings.

If it becomes apparent that funds allocated by A/PIA pursuant to its budget process to any Compact activity as defined in the Annual Funding Agreement are in excess of that needed for such activity, A/PIA may reallocate that excess to any other activity under this Compact. Any funds not expended during the term of any of the fiscal years of this Compact may be carried over to the succeeding fiscal year, and such carry-over shall not diminish the amount of funds that A/PIA is authorized to receive in that succeeding fiscal year or in any subsequent fiscal year.

## Section 10 - Federal Supply Sources.

A/PIA Self-Governance Compact - Page 8

Subject to the approval of GSA[1], federal supply sources (including lodging, airline transportation, and other means of transportation including the use of the Interagency Motor Pool vehicles) shall be available to A/PIA and to their employees to the same extent as if A/PIA or tribe was a federal agency.

## Section 11 - Regulatory Authority.

The Secretary and A/PIA will utilize the following procedures governing the establishment and application of regulations under this Compact:

(a) Program Guidelines. Except as specifically provided in the Indian Self-Determination and Education Assistance Act (25 U.S.C. 450 et. Seq.) A/PIA is not required to abide by federal program guidelines, manuals, policy directives, of the Secretary, unless otherwise agreed to by APIA and the Secretary, or otherwise required by law. Copies of program policy guidleines or manuals may be provided to the Secretary or his designee upon request.

(b) Federal Regulations. A/PIA will abide by all federal regulations as published in the Federal Register unless waived in accordance with Section 403(i)(2) of P.L. 93-638, as amended.

(c) In order to put to good use the Secretary's waiver authority as authorized by Section 403(i)(2) of P.L. 93-638, as amended, the Secretary will expedite the waiver of any federal regulations which the Secretary or A/PIA determine presents an obstacle to carrying out the Compact and Annual Funding Agreement, their purposes, and the programs, activities, functions, and services pursuant to the Compact, under the following procedures:

(i) if at any time A/PIA determines that one or more specific federal regulations should be waived to more effectively carry out the Compact or Annual Funding Agreement, A/PIA may submit a written request for waiver to the Designated Official, identifying the regulation sought to be waived and the basis for the request.

(ii) Not later than 60 days after receipt by the Designated Official of a written request to waive application of a federal regulation for any funding agreement, the Secretary shall either approve or deny the requested waiver in writing to A/PIA. A denial of a request may be made only upon a specific finding by the Secretary that identified language in the regulation may not be waived

---

[1] APIA does not agree to the blanket approval of GSA on the approval of the transactions covered in this section, and the language as written is included under protest. It is APIA's position that GSA approval should be only be "applicable as required by law."

finding by the Secretary that identified language in the regulation may not be waived because such waiver is prohibited by federal law.  The Secretary's decision shall be final for the Department.

## Section 12 - Disputes.

(a)  Section 110 of P.L. 93-638, as amended, shall apply to disputes under this Compact and any annual funding agreement.

(b)  In addition or as an alternative to remedies and procedures prescribed by Section 110 of P.L. 93-638, as amended, the parties jointly may:

(i)  Submit disputes under this Compact to third-party mediation, which for purposes of this Section means that each party to the dispute nominates third parties who together choose a third party mediator ("third-party" means a person not employed by or significantly involved with either the Signatory, the tribe, if applicable, or the Secretary or the Department of the Interior); or

(ii)  Submit the dispute to the tribal court of a participating tribe; or

(iii)  Submit the dispute to mediation processes provided for under the policies and procedures of the Signatory or tribe.

(iv)  The Secretary shall accept decisions reached by the mediation processes or the tribal court, but shall not be bound by any decision which might be in conflict with the interests of the Native Americans being served or of the United States.

## Section 13 - Compact Participation and Retrocession.

(a) Additional Tribes.  The tribes choosing to participate in this Compact may change from time to time.  Additional tribes may participate by adopting an appropriate authorizing resolution delegating authority to the Signatory.  Such additions to the Compact shall be effective at the beginning of the fiscal year provided that the tribe's authorizing resolution is given to the Signatory at a date early enough to be accommodated during Annual Funding Agreement negotiations.  A different effective date may be mutually agreed between the Signatory, the tribe, and the Secretary.

(b)  New Co-Signers.  A tribe which meets the eligibility criteria of Section 402 of P.L. 93-638, as amended, may be added to this Compact as a co-signer, subject to board approval by the Signatory, and provided that it independently establishes its eligibility with the Secretary and that it notifies the Secretary and the Signatory of its intent to join the Compact as a co-signer at a date early enough to be accommodated during Annual

Funding Agreement negotiations.

**(c) Retrocession.** The retrocession provision of Section 105(e) of P.L. 93-638, as amended, and any regulations thereunder, shall apply to this Compact. When a retrocession is due to a participating tribe rescinding the authority of the Signatory to compact for that tribe, in whole or in part, the transitional amounts, the effective retrocession date and other transitional matters shall be negotiated jointly among the tribe, the Signatory, and, on behalf of the Secretary by the Area Director and the Secretary's Designated Official or their representatives.

## Section 14 - Tribal Administrative Procedure.

The Signatory shall provide administrative due process to fully protect the rights that persons, or groups of persons may have with respect to services, activities, programs, and functions that are provided pursuant to this Compact.

## Section 15 - Successor Annual Agreement.

Negotiations for a successor to the Annual Funding Agreement, as provided for in Article VI, Section 3, shall begin no later than 120 days in advance of the conclusion of the preceding Annual Agreement. Pursuant to Sections 403(b) and (g) and Section 404 of P.L. 93-638, as amended, the Secretary shall make best efforts to continue and to promote self governance in preparing his/her budgets for subsequent years. Funding for successor agreements shall only be reduced pursuant to the provisions of Section 106(b) of P.L. 93-638, as amended. The Secretary or an authorized representative agrees to prepare and supply relevant information, and to promptly comply with the Signatory's requests for information reasonably needed to determine the funds that may be available for successor Annual Funding Agreements.

## Section 16 - Secretarial Review of Contracts.

(a) Every contract entered into by the Signatory in connection with a program, activity, function, or service encompassed by this compact, shall be in writing, identify the interested parties, their authorities and purposes, state the work to be performed, the basis for any claim, the payments to be made, and the term of the contract which shall be fixed. Contracts which comport with the requirements of this section but which might be void without Secretarial approval under 25 U.S.C.§ 81, shall be expeditiously reviewed by the Secretary under the following procedure:

  (i) if at any time the Signatory determines that a contract may be subject to 25 U.S.C. § 81, the Signatory or tribe may submit a written request for approval to the Designated Official, and the Secretary shall render a written decision within thirty days of receipt of the request.

10

(ii) If the Secretary determines that 25 U.S.C. § 81 does not apply, he/she shall proceed to review the contract and shall make a determination indicating that he/she would not wish his/her view of 25 U.S.C. § 81 to subject the contract to an assertion it is null and void and, not wishing to disrupt legitimate contracting activity, has accommodated the Signatory by reviewing and approving (or disapproving) the contract.

(iii) For the period that an agreement entered into under Title IV of P.L. 93-638, as amended, is in effect, the provisions of section 2103 or the Revised Statutes of the United States (25 U.S.C. 81) and section 16 of the Act of June 18, 1934 (25 U.S.C. 476), shall not apply to attorney and other professional contracts of the Signatory.

## Section 17 - Matching Funds.

All funds provided under this Compact and any Annual Funding Agreement entered into pursuant to Title IV of P.L. 93-638, as amended, and all funds provided under contracts or grants made pursuant to P.L. 93-638, as amended, shall be treated as non-federal funds for purposes of matching requirements under any federal law.

# ARTICLE III - OBLIGATION OF THE SIGNATORY

## Section 1 - Consolidation.

With the exception of the specific responsibilities of the United States identified and retained in Article IV, Section 3, and the programs, activities, functions, and services identified in Section 403(b)(4) of P.L. 93-638, as amended, the Signatory will perform the programs, activities, functions and services as provided in the Annual Funding Agreement incorporated into this Compact as Attachment 3, and any subsequent Annual Funding Agreement. To the extent a program, activity, function, or service included within the Annual Funding Agreement was included within a contract or grant previously entered into by the Signatory pursuant to P.L. 93-638, as amended, or is subject to any obligation arising from such contract or grant, that contract or grant is terminated and the parties' obligations shall be governed by this Compact.

## Section 2 - Amount of funds.

The total amount of funds that the Secretary shall make available to the Signatory for the performance of its obligations under this Compact shall be established in an Annual Funding Agreement negotiated between the Secretary and the Signatory and

11

incorporated into this Compact as Attachment 3.

## Section 3 - Compact Programs.

The Signatory agrees to provide the programs, activities, functions, and services that are identified in the Annual Funding Agreement; provided that the Signatory may consolidate, redesign, and reallocate funds for such programs, activities, functions and services pursuant to Article I, Section 2. The Signatory pledges to practice utmost good faith in upholding their responsibility to provide such programs, activities, functions and services.

## Section 4 - Trust Services for Individual Natives.

To the extent that the Annual Funding Agreement endeavors to provide trust services to individual Alaska Natives that were formerly provided by the Secretary, the Signatory will maintain at least the same level of service as was previously provided by the Secretary. The Signatory pledges to practice utmost good faith in upholding their responsibility to provide such service. Trust Services for individual Alaska Natives means only services that pertain to land or financial management connected with restricted Native allotments and townsite parcels.

## Section 5 - Reallocation.

Reallocation of funds from one program, activity, function, or service to another within a General Budget Category, or from one General Budget Category to another shall be governed by the internal procedures and policies of the Signatory and shall not require Secretarial consent. In the event a reallocation involves 30% or more, on a cumulative annual basis, of funds for a physical resource trust or trust fund management function performed by the Signatory, the Signatory shall provide notice to the Designated Official, together with an explanation of how the trust function will continue to be fulfilled.

# ARTICLE IV - OBLIGATIONS OF THE UNITED STATES

## Section 1 - Trust Responsibility.

The United States reaffirms its trust responsibility to protect and preserve the trust resources of the participating tribes and of individual Alaska Natives. Nothing in this Compact is intended to, nor should be interpreted, to terminate, waive, modify, diminish or reduce the trust responsibility of the United States to the tribes or individual Alaska Natives. The Secretary pledges to practice utmost good faith in upholding said trust

12

responsibility.

## Section 2 - Trust Evaluations.

Pursuant to Section 403(d) of P.L. 93-638, as amended, the United States shall monitor through annual trust evaluations the trust functions performed by the Signatory pursuant to the Annual Funding Agreement.

Further, the United States shall reassume any programs, services, function, or activity, or portions thereof, if there is a finding of imminent jeopardy to a physical trust asset, natural resource, or to public health and safety.

In the absence of a definition of imminent jeopardy pursuant to negotiated rulemaking, imminent jeopardy shall mean significant devaluation and/or loss of a physical trust asset or natural resource or the intended benefit from such trust asset or resource; or significant diminishment of public health and safety caused by the tribe's action or inaction.

Evaluations shall not be burdensome and shall be conducted on a cost effective basis.

(a) For purposes of this section, a Trust Evaluation will entail a determination that trust functions assumed by the Signatory are carried out in compliance with all applicable laws and regulations, unless a regulation waiver has been approved in accordance with section 403(i)(2)(A), as may be verified through:

(1) A review of transactions.

(2) On-site inspections of those trust resources.

(3) Any other criteria, processes, or appropriate practices as may be negotiated in the Annual Funding Agreement.

(b) Information and analysis obtained by such evaluations shall be immediately provided to the Signatory's designated representative.

(c) If the United State's Designated Official makes findings which indicate a risk of imminent jeopardy, the Designated Official shall immediately notify the Signatory of the specific concerns.

(d) Unless there is imminent jeopardy, the United States shall not take back the responsibility for management of that program, service, function, or activity, or portion thereof. If, however, resources are available, the United States will provide appropriate assistance to the Signatory to enable the protection and

conservation of physical trust assets, natural resources and preservation of health and safety.

(e) If there is imminent jeopardy, as defined in this Section, the United States shall, upon two (2) days advance written notice to the Signatory, immediately take over the responsibility for the management of such endangered physical trust asset, natural resource, or public health and safety function, and may use a reasonable portion of funds remaining for such program for that purpose, notwithstanding any other provisions of this Compact.

## Section 3 - Programs Retained.

As specified in the Annual Funding Agreement, the United States hereby retains the programs, services, functions, and activities with respect to the participating tribes that are not specially assumed by the Signatory in the Annual Funding Agreement. The Secretary agrees that a Program Outcome Evaluation may be performed by a Compact Evaluation Teams, which shall consist of one representative of the Secretary, and one representative of the Signatory, annually as to each program, activity, function, or service which is retained by the United States pursuant to this Section. Evaluations shall not be burdensome and shall be conducted on a cost effective basis. The findings and recommendations of the Evaluation Team shall be reported to the Signatory and the Secretary.

## Section 4 - Financial and other Information.

The Signatory and participating tribes shall be eligible for new programs, activities, services and functions on the same basis as other tribes, and the Secretary shall advise the participating tribes and the Signatory of the funding available for such programs. The Secretary shall provide the Signatory and the participating tribes with:

(a) monthly copies of Bureau of Indian Affairs' Status of Obligations reports of the Central Office concerning Juneau Area obligations, or in the event a new reporting system is implemented by the BIA, the closest equivalent report; and

(b) monthly Status of Obligations reports by the Area Office concerning programs, activities, functions and services performed in the Juneau Area which are comparable to those performed by the Signatory under this Compact; and

(c) revisions in such program plans, guidelines or budgets as they are made.

Responses providing other information which may be requested by the Signatory shall be made within ten working days.

14

## ARTICLE V - OTHER PROVISIONS

### Section 1 - Designated Official.

The Designated Official for the United States Department of Interior shall be the Director of the Office of Self-Governance. On or before the effective date of this Compact, the Signatory shall provide the Director of the Office of Tribal Self-

Governance with a written designation of its representative\ liaison official for notices, proposed amendments to this Compact, and other purposes under this Compact.

### Section 2 - Native Preference In Employment, Contracting and Subcontracting.

The Native preference in employment, contracting and subcontracting provisions of Section 7(b) of P.L. 93-638, as amended, shall apply to the Signatory in the performance of its obligations under this Compact and the Annual Funding Agreement. Section 104 of P.L. 93-638, as amended, shall apply to individuals who leave federal employment for tribal employment.

### Section 3 - Insurance and Federal Tort Claims Act.

The Signatory shall be fully covered by such liability insurance or equivalent coverage that the Secretary provides or obtains pursuant to Section 102(c) of P.L. 93-638, as amended. Additionally, the Signatory and their employees shall be fully covered by all liability coverage under the Federal Tort Claims Act to the same extent as P.L. 93-638 contractors.

### Section 4 - Compact Modifications or Amendments.

To be effective any modification of this Compact shall be in the form of a written amendment to the Compact, and shall require the written consent of the Signatory and the United States.

### Section 5 - Construction.

In the implementation of this Compact the Secretary, to the extent feasible, shall interpret Federal laws and regulations in a manner that facilitates this Compact in accordance with Section 403(i) of P.L. 93-638, as amended.

### Section 6 - Officials Not To Benefit.

No member of or delegate to Congress, or resident commissioner, shall be admitted to any share or part of any contract executed pursuant to this Compact, or to any benefit

15

that may arise therefrom; but this provision shall not be construed to extend to any contract under this Compact if made with a corporation for its general benefit.

## Section 7 - Covenant Against Contingent Fees.

The parties warrant that no person or selling agency has been employed or retained to solicit or secure any contract executed pursuant to this Compact upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bona fide established commercial or selling agencies maintained by the contractor for the purpose of securing business. For breach or violation of this warranty the Government shall have the right to annul any contract without liability or in its discretion

to deduct from the contract price or consideration, or otherwise recover, the full amount of such commission, percentage, brokerage, or contingent fee.

## Section 8 - Penalties.

The parties agree that the criminal penalties set forth in 25 U.S.C. 450d apply to all activities conducted pursuant to this Compact.

## Section 9 - Mature Contractor Status upon Compact Termination; Effective Date

Should the Signatory elect to convert all or some of the programs operated under the Compact to Title I ISDA contract status such conversion shall not effect the Signatory's status as a mature contractor. Conversion to mature contract status will be effective at the beginning of the next fiscal year unless another effective date is mutually agreed upon by the Signatory and the Secretary.

## Section 10 - Sovereign Immunity.

Nothing in this Compact or any Annual Funding Agreement shall be construed to affect the sovereign immunity of any Participating Tribe.

## Section 11 - Severability

This Compact shall not be considered invalid, void, or voidable if any section or provision of this document is found to be invalid or unlawful by a court of competent jurisdiction. The parties hereto agree to amend, revise or delete such invalid or unlawful section or provision.

## Section 12 - Wage and Labor Standard.

The parties agree that the wage and labor provisions set forth in Section 7(a) of P.L.

16

93-638, as amended, apply to all laborers and mechanics employed by contractors or subcontractors (excluding tribes and tribal organizations) in the construction, alteration, or repair, including the repainting or redecorating of buildings or other facilities in connection with this Compact.

## Section 13 - Non-BIA Programs.

Subject to the provisions of the regulations to be promulgated pursuant to Section 407 of P.L. 93-638, as amended, the administration of programs, services, functions or activities of Section 403 (b)(2), (b)(3), and (c) of P.L. 93-638, as amended, shall be controlled by the terms of the applicable annual funding agreements.

## ARTICLE VI - ATTACHMENTS

## Section 1 - List of Participating Tribes.

A list of initial Participating Tribes for this Compact is incorporated by reference into this Compact as Attachment 1.

## Section 2 - Tribal Resolutions.

The resolutions of the participating tribes authorizing this Compact and delegating the compacting authority to the Signatory are incorporated by reference into this Compact as Attachment 2.

## Section 3 - Annual Funding Agreement.

The negotiated and approved Annual Funding Agreement with respect to this Compact identifying those programs, services, functions and activities to be performed, the general budget categories assigned, and the funds to be provided, is incorporated by reference into this Compact in its entirety as Attachment 3. Successor Annual Funding Agreements shall be negotiated annually pursuant to Article II, Section 15. This Compact shall be in effect only during the term of any such Annual Funding Agreement.

17

DATED THIS _____ DAY OF _____, 1995.

THE ALEUTIAN\PRIBILOF ISLANDS ASSOCIATION, INC.

BY _____

Dimitri Philimonof, Exec. Dir.

THE UNITED STATES OF AMERICA, DEPARTMENT OF THE
INTERIOR

BY _____

18



# BUDGET JUSTIFICATIONS

The United States
Department of the Interior

# JUSTIFICATIONS

and Performance Information
Fiscal Year 2006

# BUREAU OF
# INDIAN AFFAIRS



NOTICE: These budget justifications are prepared for the Interior and Related Agencies Appropriations Subcommittees. Approval for release of the justifications prior to their printing in the public record of the Subcommittee hearings may be obtained through the Office of Budget of the Department of the Interior.



Printed on
Recycled Paper

## FY 2006 Bureau of Indian Affairs Budget
### (Dollars in Thousands)

| FINAL<br>Activities, Subactivities,<br>Program Element, Subelements | FY 2004<br>Enacted | FY 2005<br>Enacted | TOTAL<br>UNCONTR.<br>& RELATED<br>CHANGES | TOTAL<br>PROGRAM<br>CHANGES | FY 2006<br>PRESIDENT'S<br>BUDGET<br>REQUEST | Change<br>from<br>FY 2005 |
|---|---|---|---|---|---|---|
| **\*\*TRIBAL PRIORITY ALLOCATIONS\*\*** | | | | | | |
| TRIBAL GOVERNMENT | | | | | | |
| Other Aid to Tribal Government | 34,873 | 34,394 | 2,853 | 0 | 37,247 | 2,853 |
| Consolidated Tribal Gov't Prog. | 64,901 | 64,629 | -2,361 | 0 | 62,268 | -2,361 |
| Self Governance Compacts | 135,359 | 135,894 | 4,247 | 0 | 140,141 | 4,247 |
| New Tribes | 553 | 1,098 | 5 | 320 | 1,423 | 325 |
| ISD Fund (New/Expanded Contracts) | 0 | 986 | 0 | 0 | 986 | 0 |
| Contract Support | 133,648 | 134,420 | 189 | 0 | 134,609 | 189 |
| Tribal Courts | 17,890 | 17,762 | 122 | 0 | 17,884 | 122 |
| SUBTOTAL, TRIBAL GOVERNMENT | 387,224 | 389,183 | 5,055 | 320 | 394,558 | 5,375 |
| | | | | | | |
| HUMAN SERVICES | | | | | | |
| Social Services | 31,125 | 30,988 | 464 | 0 | 31,452 | 464 |
| Indian Child Welfare Act | 10,774 | 10,300 | 22 | 0 | 10,322 | 22 |
| Welfare Assistance | 85,953 | 86,420 | 42 | -6,420 | 80,042 | -6,378 |
| Housing Improvement Program | 18,370 | 19,068 | 43 | 0 | 19,111 | 43 |
| Other-Human Services (Tribal Design) | 621 | 611 | 23 | 0 | 634 | 23 |
| SUBTOTAL, HUMAN SERVICES | 147,743 | 147,387 | 594 | -6,420 | 141,561 | -5,826 |
| | | | | | | |
| EDUCATION | | | | | | |
| Scholarships | 27,544 | 26,721 | -207 | 0 | 26,514 | -207 |
| Adult Education | 2,466 | 2,477 | 32 | 0 | 2,509 | 32 |
| TCU's Supplement to Grants | 1,299 | 1,299 | 12 | 0 | 1,311 | 12 |
| Johnson-O'Malley Assistance Grants | 16,686 | 16,510 | 105 | -8,838 | 7,777 | -8,733 |
| Other-Education (Tribal Design) | 1,299 | 1,293 | 62 | 0 | 1,355 | 62 |
| SUBTOTAL, EDUCATION | 49,374 | 48,300 | 4 | -8,838 | 39,466 | -8,834 |
| | | | | | | |
| PUBLIC SAFETY AND JUSTICE | | | | | | |
| Community Fire Protection | 1,229 | 1,222 | -60 | -1,162 | 0 | -1,222 |
| SUBTOTAL, PUBLIC SAFETY AND JUSTICE | 1,229 | 1,222 | -60 | -1,162 | 0 | -1,222 |
| | | | | | | |
| COMMUNITY DEVELOPMENT | | | | | | |
| Job Placement and Training | 8,672 | 8,566 | -44 | 0 | 8,522 | -44 |
| Economic Development | 3,921 | 4,879 | 24 | -431 | 4,472 | -407 |
| Road Maintenance | 27,376 | 26,967 | 883 | -55 | 27,795 | 828 |
| SUBTOTAL, COMMUNITY DEVELOPMENT | 39,969 | 40,412 | 863 | -486 | 40,789 | 377 |
| | | | | | | |
| RESOURCES MANAGEMENT | | | | | | |
| Natural Resources | 4,834 | 4,819 | 180 | 0 | 4,999 | 180 |
| Agriculture | 22,288 | 22,164 | 429 | -25 | 22,568 | 404 |
| Forestry | 24,641 | 23,808 | 277 | -25 | 24,060 | 252 |
| Water Resources | 3,606 | 4,065 | 62 | 0 | 4,127 | 62 |
| Wildlife & Parks | 4,434 | 4,693 | 116 | 0 | 4,809 | 116 |
| Minerals and Mining | 2,449 | 2,450 | 136 | 0 | 2,586 | 136 |
| SUBTOTAL, RESOURCES MANAGEMENT | 62,252 | 61,999 | 1,200 | -50 | 63,149 | 1,150 |
| | | | | | | |
| TRUST SERVICES | | | | | | |
| Trust Services | 4,027 | 9,014 | 420 | 1,800 | 11,234 | 2,220 |
| Other Rights Protection | 2,057 | 2,032 | 61 | 0 | 2,093 | 61 |
| Real Estate Services | 30,143 | 30,241 | 980 | 0 | 31,221 | 980 |
| Real Estate Appraisals | 10,420 | 0 | 0 | 0 | 0 | 0 |
| Probate | 7,572 | 11,438 | 205 | -3,700 | 7,943 | -3,495 |
| Environmental Quality Services | 2,430 | 2,395 | 140 | 0 | 2,535 | 140 |
| ANILCA Programs | 590 | 581 | 5 | 0 | 586 | 5 |
| ANCSA Historical and Cemetary Sites | 415 | 414 | 12 | 0 | 426 | 12 |
| SUBTOTAL, TRUST SERVICES | 57,654 | 56,115 | 1,823 | -1,900 | 56,038 | -77 |
| | | | | | | |
| GENERAL ADMINISTRATION | | | | | | |
| Executive Direction | 10,863 | 11,412 | 539 | -700 | 11,251 | -161 |
| Administrative Services | 13,922 | 13,113 | 275 | -710 | 12,678 | -435 |
| Safety Management | 404 | 400 | 259 | 0 | 659 | 259 |
| SUBTOTAL, GENERAL ADMINISTRATION | 25,189 | 24,925 | 1,073 | -1,410 | 24,588 | -337 |
| | | | | | | |
| TOTAL, TRIBAL PRIORITY ALLOCATIONS | 770,634 | 769,543 | 10,552 | -19,946 | 760,149 | -9,394 |



for school construction is reduced in order to allow the program to focus on building the schools already funded for construction. Between 2001 and 2005, funding was appropriated for 34 replacement schools. Nine of these are completed and operating. We anticipate completing eleven schools in 2005 and 2006.

The education facilities improvement and repair program is funded at $128.4 million. The 2006 request will fund four major facilities and improvement projects, annual maintenance needs, and minor repair projects to address critical health and safety concerns, non-compliance with code standards, and program deficiencies at existing education facilities.

In response to the PART findings, BIA has improved efficiency and performance accountability in the school construction program by establishing the following long-term goals: (1) Construct 100 percent of replacement schools in four years from planning and design through construction for 2006 (2) Increase the percentage of academic construction projects with costs within or below the target range (3) Reduce the percentage of BIA's building square footage identified as excess.

**Economic Development** - High unemployment rates on reservations are one of the greatest challenges facing Indian Country. The 2006 budget includes $500,000 to establish an Economic Development Commission to investigate impediments to tribal business development, and develop an operational model for tribal businesses. This increase supports Indian economic development and the BIA performance goal to reduce unemployment on Indian reservations.

The guaranteed and insured loan program is an integral component of BIA's efforts to expand economic development in Indian Country. Through this program the BIA provides loans to tribes, Alaska Natives, and individual Indian-owned businesses. The budget request of $6.3 million for the loan program supports BIA's performance goal to reduce unemployment on Indian reservations. The BIA guaranteed loan program makes it possible for Indian economic enterprises on or near Indian reservations, which otherwise would not have been able to get loans, to obtain loans from private lenders. Funding will finance $118.9 million in loans.

**Evaluation of Tribal Priority Allocation Distribution** – Tribal Priority Allocations (TPA) fund basic tribal services, such as social services, adult vocational training, child welfare, natural resources management, and contract support. TPA gives Tribes the opportunity to further Indian self-determination by establishing their own priorities and moving Federal funds among programs.

The funding process used today is a formula allocation based on historical funding levels established in the early 1970s, and has remained essentially the same. In an effort to improve program accountability and to ensure that funding is targeted to the areas of greatest need, the Department of the Interior will evaluate the allocation of funds within the TPA program and consult with Tribes to examine ways to better distribute TPA funding.

**Resolving Land and Water Claims** - The budget includes $24.8 million for payment of authorized Indian land and water claim settlements in Oklahoma, Nevada, Colorado, and New Mexico. These settlements resolve long-standing claims to water and lands by Indian Tribes. They are the result of negotiations between the Tribes, the Federal government, and other

BIA SL26 13

**Environmental Quality Services (FY 2006: $2,535,000; FTE 17):** The Environmental Quality Services program supports the Departmental goal of Serving Communities by fulfilling Indian Fiduciary Trust responsibilities by improving the management of land and natural resource assets. The Environmental Quality Services program implements the Bureau's responsibility, as a federal agency, to comply with environmental and cultural resources statutes and procedures that apply to all Bureau actions. Program staff at the Regional and Agency level will perform, or coordinate the compilation and documentation of information to comply with the applicable statutes and procedures; review Regional and Agency compliance with those statutes and procedures; and provide technical assistance on environmental and cultural resources matters to Bureau managers and staff and to tribes within their Regions.

**ANILCA Programs (FY 2006: $586,000; FTE 1):** This program supports the Departmental goal of Serving Communities by fulfilling Indian Trust responsibilities by protecting and preserving trust lands and trust resources. This program upholds the directives prescribed in the Alaska National Interest Lands Conservation Act (ANILCA), which provides for the coordination and consultation with land managing agencies and the State of Alaska on subsistence preference for Alaska Natives and the administration of programs affecting Native allotments under the 1906 Native Allotment Act.

> **Subsistence** -- The Bureau is a member of the Federal Subsistence Board and Federal Staff Committee and is an advocate to ensure that Native subsistence users, as rural Alaskans, are accorded a priority over other users. Natives are often requested to provide written documentation of their "customary and traditional" use, which is part of the threshold criteria before the subsistence priority is recognized. Assistance has been provided to eligible native tribes and organizations for the study and education of the various needs, methods, and future requirements of a subsistence lifestyle. Most of the funds are provided to tribes as well as various commissions or regional advisory councils in the form of grants, contracts, or compacts.

> **Native Allotments** -- The Bureau assists Native allotment applicants in acquiring title to their lands and subsequent management. There were 15,000 parcels that met the December 18, 1971, deadline with approximately 2,800 applications pending adjudication. New Native Veteran Allotment applications have been filed and erroneously closed Native Allotment application is being reinstated; therefore, the number of parcels remaining to be adjudicated has increased. Acquisition services include collecting evidence of use and occupancy within prescribed timeframes; accompanying applicant and the Bureau of Land Management (BLM) staff on field exams; performing probates and contacting heirs to notify them of inherited claims; contesting appeals to the Interior Board of Land Appeals; and approving easements for trespass abatement. Of the work being completed in partnership with the BLM, Tribal Realty offices will address much of the work for Native Allotment parcels. Related funding was provided under Regional Office Operations, Land Records Improvement in the past.

**ANCSA Historical Places and Cemetery Sites (FY 2006: $426,000; FTE 5):** This program supports the Departmental goal of Serving Communities by fulfilling Indian fiduciary trust

responsibilities by protecting cultural and natural heritage resources. The program will provide for the thorough investigation and certification of Alaska Native historical places and cemetery sites, Native groups, and native primary places of residence. The program will produce fair and legally valid certifications that are based on field investigations of the claimed lands and associated historical, archeological, and ethnographic research—the combined findings of which are presented in final reports of investigation. The current, known backlog of field investigations and certifications is just over 200, but legal appeals of past program work will likely increase this workload. This program also managed ANCSA records (which constitute a museum property collection) in a manner that ensures their long-term preservation. To the maximum extent possible, data contained in the ANCSA collection are shared to support Alaska Native cultural heritage and educational programs, Federal and state subsistence management programs, and the protection of Alaska's cultural resources. Toward this end, digital copies of ANCSA site records have been transferred to the Alaska State Historic Preservation Officer, and cooperative agreements have been developed with Alaska Native Tribes and tribal entities to produce topical indexes of ANCSA oral history tapes and transcripts.

The completion of ANCSA reports and certifications is ongoing. The backlog of such work may increase in the process of systematically reviewing ANCSA case files. Implementation of Secretarial Order No. 3220, which provides for the potential reopening of 188 ANCSA 14(h)(1) case files that are presently closed will significantly increase the program's workload (e.g., requiring the reinvestigation and/or re-certification of associated ANCSA 14(h)(1) claims). Additionally, passage of proposed Senate Bill 1466 would likely result in a substantial increase in the number of required ANCSA 14(h) (1) field investigations.

## 2004 PROGRAM PERFORMANCE ACCOMPLISHMENTS

Trust Services, General and Real Estate Services accomplishments:

- Processed and approved 42,000 transactions; a 5,000 increase from FY 2003.
- 42 percent of title encumbrances were filed within 2 business days.
- Provided for land use and transaction technical advice and assistance on 33,000 transactions.  These transactions included regulation waiver requests and appeals on different transactions that require the coordination with DOI, Solicitors offices in seeking resolution.
- Representatives from the Regions, Agencies and Tribes participated with Central Office on National teams in the formulation and revision of Procedural Handbooks for Acquisition and Disposal, Leasing and Permitting, Rights-of-way.  These Draft Handbooks are being developed to ensure that processes are defined accurately and reflect actual work performed on behalf of the beneficiaries.
- Staff from Central Office, Regions, Agencies, Tribes and OST participated on National teams for the completion of the first draft of the (DOI) Specification Requirements Systems (SRS).  This effort is a mandate in the Trust Reform initiative to improve the automation of trust transaction accountability.
- Developed and implemented improved reporting processes for GPRA and Annual Caseload Reports.  These reports reflect quarterly and annual processing of transactions and the affects on annual acreages from land acquisitions and leases.

MEMORANDUM OF AGREEMENT
Between
ALEUTIAN/PRIBILOF ISLANDS ASSOCIATION, INC. (A/PIA)
and
THE ALEUT CORPORATION

\* \* \* \* \* \* \* \* \* \* \*

*Preamble*

*Whereas, the above Native organizations wish to cooperate in a joint effort to conduct certain cultural heritage and preservation activities intended to benefit the Aleut Region as a whole, including primarily ANCSA 14(h)(1) activities, and therefore have the need to establish an organizational and administrative framework to accommodate such an effort, now therefore the parties mutually agree as follows:*

**Section 1.  Purpose.**  The purpose of this agreement is to establish the organizational and administrative framework pursuant to which A/PIA and TAC may jointly conduct certain cultural heritage, preservation  and related activities, and in particular, activities related to completing the ANSCA 14 (h)(1) process.

**Section 2.   Relationship of the Parties.**  A/PIA is a Native non-profit organization registered and doing business in the State of Alaska.  TAC is a State chartered ANCSA profit corporation also registered and doing business in the State of Alaska. Except as specifically agreed to under this MOA,  neither party shall act as agent for, or partner of the other, nor shall either incur any liability, represent, or make commitments on behalf of the other.  The employees of one shall not be deemed the employees of the other.  Nothing in  this MOA shall be deemed to constitute, create, give effect or otherwise recognize a joint venture, partnership or formal business entity of any kind, and the rights and obligations of the parties shall be limited to those expressly provided herein or in other related but separate agreements entered into to conduct the activities contemplated under this MOA.

**Section 3.   Term.**   The term of this MOA shall be perpetual, subject only to termination under Section 9 below.

**Section 4.   Program / Activity Funding.**  Funds expended under this MOA shall come primarily from ANCSA 14(h)(1) funds provided to A/PIA pursuant to a P.L. 93-638 Title IV Agreement between A/PIA and the U.S. Department of the Interior. A/PIA and TAC may from time to time mutually agree to supplement such funds for specified projects or activities benefitting their respective members or shareholders.

## Section 5.    ANCSA (14)(h)(1) Program / Activity Administration:

    (a)    **Contact Persons.**  Each party to this MOA shall designate a contact person to act as a general point of contact on matters related to this MOA.  Such designation is not intended to disrupt or in any way interfere with the normal exchange of information or contact between staff from either organization.

    (b)    **Project staff.**    It is the intent of the parties to have a minimum of two staff persons engaged in conducting the ANCSA 14(h)(1) activity which is the subject of this MOA.  One of the staff will be the A/PIA Cultural Heritage Director, the other the ANCSA Project Assistant.

    (1)   Cultural Heritage Director (CHD).   The CHD shall be a full time employee of A/PIA under the direct supervision of A/PIA.    The CHD shall have as one of her primary responsibilities the gathering, processing, indexing and cataloging of ANCSA data currently held by BIA, and making such information available and useable by both organizations for ANCSA and other purposes.  The CHD shall work cooperatively with TAC to develop work plans for land conveyance and patents to TAC and the eventual completion of ANCSA 14(h)(1) activity.  The CHD shall, within the scope of her professional experience and abilities, assist with ANCSA site report review and interpretation and where appropriate provide any required professional/technical assistance in the prosecution of any appeals that are undertaken.   The CHD shall submit quarterly work reports to TAC on the progress of ANCSA 14(h)(1) work.

    (2)  ANCSA Project Assistant (APA).    The APA shall be an A/PIA employee under the direct supervision of the CHD.  A/PIA and TAC shall jointly prepare and approve a job description for the APA and shall jointly participate in interviews and recommendations for hire.  The CHD will work closely with TAC to plan the work schedule for the APA.

    (c)    **Financial Administration.**  A/PIA shall have sole responsibility for all accounting functions associated with implementation of this MOA except for those funds, if any, that TAC may commit as supplemental to the ANCSA related funds which the parties anticipate using to fund project activities on a recurring basis.

A/PIA shall provide TAC with monthly financial statements as to all funds jointly administered by the parties. All funds appropriated to A/PIA for ANCSA 14(h)(1) from BIA since the inception of the compact, are available to conduct ANCSA (14(h)(1) and Cultural Heritage activities under this agreement.

It is the intent of the parties that $100,000 be made available, by A/PIA, as an initial sum to conduct ANCSA 14(h)(1) activities agreed to under this MOA. The costs associated with the APA position shall be included in this initial sum, but not those associated with the CHD position. A/PIA shall be solely responsible for CHD costs. The CHD shall administer program funds not expended on APA salary costs. Such funds shall be expended based on written objective work plans that are based on the overall intent and purpose of the ANCSA process, and approved by TAC. Work plans shall be revised and updated as appropriate, but no less than semi-annually. Funds in addition to the initial $100,000 shall be made available beginning October 1, 1998, assuming the work plans justify a demonstrated need. The amount of such additional funds shall be based on historic ANCSA funding levels. Funds that are provided shall be available until expended, or until the ANCSA process is brought to a conclusion. The availability of all funds associated with this MOA is contingent on continuing congressional appropriations.

(d)    Work Product Ownership.    All ANCSA (14)(h)(1) work product shall be the sole property of TAC, *provided that*, A/PIA shall have the opportunity to reproduce ANCSA (14)(h)(1) materials for its own purposes and any such reproductions shall remain the property of A/PIA. Original works, materials or work product of any kind that can not be reproduced but is released, held or otherwise acquired by A/PIA for any purpose shall remain the property of TAC.

Section 6.    Decision-making / Role of Participating Executive Staff & Boards. The responsibility for keeping the respective Boards of each organization informed as to activity conducted under this MOA and seeking Board approval for any such activity, if deemed to be required, shall rest with the staff and executive officers of each organization, in accordance with procedures an policies each my independently establish.    It is the intent of the parties that the primary responsibility for implementing this MOA and conducting the activity which is the subject of this MOA shall rest with the CHD and APA. Such staff and any other executive officers or staff authorizing contracts, activities or related expenditures of funds under this MOA shall be deemed to be acting within the scope of their authority.

Section 7.  Disputes.    Any disputes arising under this MOA shall be submitted for resolution to a neutral three (3) party panel, to be selected by mutual agreement of

the parties. Decisions by the neutral panel shall be binding and final. It is the intent of the parties to avoid any formal legal process as to any disputes which may arise under this MOA.

**Section 8. Modifications/Amendments.**   Any modifications and/or amendments to this MOA shall be in writing and effective only after approval and signature by both parties.

**Section 9. Termination.**  The parties to this MOA may terminate this MOA at any time for any reason. However, the termination of this MOA shall have no effect on any outstanding independent contracts, written obligations, commitments or works in progress for which funds have been obligated. Such independent contracts, written obligations, commitments or works in progress in existence at the time of any termination of this MOA shall continue in effect until such time as they may expire under the individual terms and conditions of such agreements. Funds remaining after meeting the financial obligations of such agreements shall be returned to the party who originally obligated or committed such funds.

*In witness whereof the parties have executed, delivered and formed this Agreement, in duplicate, to be effective upon the date of signature of both parties:*

ALEUTIAN/PRIBILOF ISLANDS ASSOCIATION, INC.

_____          8-07-98
Dimitri Philemonof, Executive Director          Date

THE ALEUT CORPORATION

_____          8-7-98
Elary Gromoff, Jr., President/CEO          Date



# Aleutian/Pribilof Islands Association, Inc.

201 E. 3rd Avenue
Anchorage, Alaska 99501
Phone (907) 276-2700
Fax (907) 279-4351

September 27, 2005

Tom Shirilla
OSG NW Field Office
1503 NE 78th Street, Suite 15
Vancouver, WA 98665

Re: Aleutian Pribilof Islands Association (APIA) 2006 Reprogramming Request

Dear Mr. Shirilla,

Submitted herewith is a revised 2006 reprogramming request. We have modified line 15 to reflect the fact that the Aleut Corporation passed a resolution stating their intent to contract directly with the BIA for those funds for 2006. APIA makes this change in our reprogramming request without prejudice to filing an appeal of the BIA and Solicitor's opinion that the Aleut Corporation, rather than the tribes and their representative, APIA, can make the decision about how those funds can be spent.

If you have any questions, please do not hesitate to contact me.

Very truly yours,

ALEUTIAN PRIBILOF ISLANDS ASSOCIATION

Dimitri Philemonof
President/CEO

cc:    Roger Drapeaux
       William Sinclair

Self Governance 2006 Annual Funding Agreement - Reprogramming Request

Office of Self Governance

September 2
Page: 1

Tribe:
Tribal OSG Compact Code: OSGTS11
Tribal BIA Org Code: E01810
BIA Regional Office: ALASKA REGION
BIA Field Office: ANCHORAGE FIELD OFFICE

ALEUTIAN PRIBILOF ISLANDS ASSOCIATION

| LINE # | PROGRAM TITLE | COST CODE | (info) TRIBAL SHARE | A OSG CUM. BASE | B OSG SHORTFALL BASE | C OSG SHORTFALL REQUEST | D BIA REPROGRAM REQUEST | E=A+B+C+D TOTAL AFA | FN |
|---|---|---|---|---|---|---|---|---|---|
| 2 | Community Services, General - TPA/AGENCY | 39100 | 138,952 | 138,542 | 410 | 0 | 0 | 138,952 | 1 |
| 4 | Other Aid to Tribal Government - TPA/TRIBAL | 39210 | 201,582 | 201,582 | | 0 | -107,502 | 107,730 | 2 |
| 6 | Other Aid to Tribal Government - TPA/AREA | 39220 | 11,217 | 11,217 | | 0 | 0 | 11,217 | 3 |
| 7 | Consolidated Tribal Government Pro - TPA/TRIBAL | 39230 | 6,319 | 4,842 | | 0 | -1,563 | 3,279 | 4 |
| 9 | Consolidated Tribal Government Pro - TPA/AGENCY | 39230 | 14,748 | 14,748 | | 0 | 0 | 14,748 | 5 |
| 10 | Johnson-O'Malley Educational Assis - TPA/AGENCY | 39240 | 1,689 | 1,689 | | 0 | 0 | 1,689 | 6 |
| 12 | Self-Governance Compacts - TPA/TRIBAL | 39270 | -80,810 | -80,810 | | 0 | -8,369 | -8,369 | 7 |
| 12 | Contract Support (Ongoing) - TPA/TRIBAL | 39904 | 861,454 | 861,454 | | 0 | -80,810 | -80,810 | 8 |
| 19 | Small and Needy Tribes Distributio - TPA/AREA | 39520 | 892,306 | 892,306 | | 0 | 861,454 | 861,454 | 9 |
| 19 | Social Services - TPA/TRIBAL | 39310 | 35,891 | 35,891 | | 0 | 892,306 | 892,306 | |
| 20 | Social Services - TPA/AGENCY | 39310 | 41,383 | 41,383 | | 0 | -5,492 | 35,891 | 7 |
| 21 | Indian Child Welfare Act - TPA/TRIBAL | 39330 | 1,290 | 5,262 | | 0 | | 41,383 | 6 |
| 24 | Welfare Assistance Grants - TPA/TRIBAL | 39330 | 60,928 | 60,928 | 5,262 | 0 | -5,492 | 5,262 | 5 |
| 25 | Housing Improvement Program - TPA/TRIBAL | 39330 | 318,431 | 318,431 | 6,552 | 0 | | 76,600 | 8 |
| 27 | Scholarships - TPA/TRIBAL | 39110 | 76,600 | 76,600 | 15,672 | 0 | 75,000 | 118,431 | 9 |
| 28 | Johnson-O'Malley Educational Assis - TPA/TRIBAL | 39110 | 78,389 | 78,389 | | 0 | | 32,900 | 10 |
| 44 | Job Placement and Training - TPA/TRIBAL | 39535 | 73,274 | 73,274 | | 0 | | 73,274 | 11 |
| 44 | Job Placement and Training - TPA/AREA | 39535 | 32,900 | 32,900 | | 0 | | 32,900 | 12 |
| 49 | Economic Development - TPA/AREA | 39550 | 7,600 | 7,600 | | 0 | | 7,600 | |
| 55 | Natural Resources, General - TPA/AREA | 39610 | 123,100 | 123,085 | 8,944 | 0 | -15,985 | 123,100 | 11 |
| 58 | Agriculture - TPA/AREA | 39610 | 8,141 | 8,141 | 2,614 | 0 | -1,098 | 8,141 | 12 |
| 67 | Wildlife and Parks - TPA/AREA | 39660 | 7,229 | 4,615 | 295 | 0 | 7,229 | 7,229 | |
| 76 | Other Rights Protection - TPA/TRIBAL | 39710 | 2,868 | 2,868 | 1,238 | 0 | | 2,868 | 13 |
| 78 | Real Estate Services - TPA/AGENCY | 39720 | 1,179 | 1,179 | 588 | 0 | | 1,179 | |
| 79 | Real Estate Services - TPA/AREA | 39720 | 1,238 | 1,238 | 980 | 0 | | 1,238 | |
| 80 | Environmental Quality Services - TPA/AREA | 39740 | 650 | 650 | 644 | 0 | | 4,221 | |
| 88 | ANTICA - TPA/AREA | 39740 | 4,149 | 4,149 | 72 | 0 | -5,115 | 41,632 | 13 |
| 89 | ANTICA - TPA/AREA | 39760 | 40,501 | 40,501 | 1,131 | 0 | | 9,088 | |
| 92 | ANSCA - TPA/AREA | 39760 | 9,088 | 9,088 | 121 | 0 | | 2,255 | 14 |
| 94 | Executive Direction - TPA/AGENCY | 39820 | 2,255 | 1,323 | 101 | 0 | 811 | 506 | |
| 97 | Administrative Services - TPA/AGENCY | 39820 | 405 | 405 | 90 | 0 | | 10,344 | |
| 102 | TPA General Increase - TPA/TRIBAL | 39901 | 10,344 | 10,254 | | 0 | | 73,379 | 15 |
| 103 | 638 Pay Costs - TPA/TRIBAL | 39902 | 73,379 | | | 0 | -73,379 | 11,067 | |
| 106 | Area and Agency Technical Support - NON TPA | 30800 | 11,067 | 5,916 | 5,151 | 0 | 5,151 | 21,677 | |
| 129 | Environmental Management - NON TPA | 34300 | 21,677 | 19,249 | 2,428 | 0 | 2,428 | 92,847 | |
| 149 | All Other Aid to Tribal Government - NON TPA | 34730 | 92,847 | 92,847 | | 0 | | 184,939 | |
| 151 | Housing Development - NON TPA | 36620 | 184,939 | 184,939 | | 0 | | 1,617 | 16 |
| 152 | Adult Voc. Training (moved to TPA) - NON TPA | 36530 | 1,617 | 1,495 | | 0 | 122 | 978 | |
| 162 | Trust Services, General - NON TPA | 36720 | 978 | | | 0 | 978 | 4,420 | 17 |
| 163 | All Other Indian Rights Protection - NON TPA | 36910 | 4,420 | | | 0 | 4,420 | 2,318 | 18 |
| 164 | Real Estate Services - NON TPA | 36920 | 2,318 | | | 0 | 2,318 | 3,824 | |
| 166 | Land Records Improvement - NON TPA | 36940 | 3,824 | 3,824 | | 0 | 3,824 | 568 | |
| 168 | Executive Direction - NON TPA | 36960 | 568 | 527 | 41 | 0 | | 1,009 | 19 |
| 197 | Administrative Services - NON TPA | 36300 | 1,009 | 199 | 50 | 0 | 760 | 4,368 | 20 |
| 197 | Preparedness Program Mgmt (Indirec - NON TPA | 36100 | 2,335 | | 2,335 | 0 | 4,368 | 2,335 | 21 |
| 198 | Preparedness Program Mgmt - NON TPA | 36200 | 37,546 | | 17,271 | 0 | 20,275 | 37,546 | |
| | | 92120 | 2,178 | | | 0 | 2,178 | 2,178 | 21 |
| | | 92121 | 821 | | | 0 | 821 | 821 | 22 |
| | TOTAL | | 3,149,478 | 2,340,614 | 76,465 | 0 | 732,399 | 3,149,478 | |

AUTHORIZED FINANCIAL OFFICERS:

Bureau of Indian Affairs Regional Office

Office of Self Governance

10/3/05

1  Reference 96 & 97 non-residual left with BIA Anchorage Agency to carry out CDIB functions. $112,691 is False Pass tribal share to be permanently base transferred to APIA.

2  $105,002 represents the Unalaska ATG amount that was put in the APIA AFA and then removed by tribal resolution. (this amount should be permanently reprogrammed to Unalaska)

3  $1,573 reduction for Unalaska ATG (39220-Area). Same rationale as f/n #2.(this amount should be permanently reprogrammed to Unalaska)

4  $8,369 reduction for Unalaska ATG CMOP (39230). Same rationale as f/n #2. (this amount should be permanently reprogrammed to Unalaska) $6,379 is False Pass tribal shares to be permanently base transferred to APIA.

5  Estimated amount. FY 06 funds will be distributed using similar methodology as was used last fiscal year.

6  See FY 03 AFA f/n #3 for village breakout.

7  $6,053 based on Unalaska reduction for Social Services (39910) (this amount should be permanently reprogrammed to Unalaska)- see f/n #2; and $551 increase for False Pass Social Services funds which should have been base transferred to APIA base. The base should be $35,891.

8  Estimate. Total funds for FY 06 will be distributed based upon estimated welfare assistance need as reflected in the current mid-year analysis of funds report.

9  Funds will be distributed based on HIP eligible applicant data and shall be used in accordance with HIP regulations unless waived.

10  $5,208 reduction based on Unalaska Scholarship funds being removed (see f/n #2)(this amount should be permanently reprogrammed to Unalaska); and $93 increase for False Pass pay costs which should have been base transferred in FY 03. see f/n #2.

11  $15,985 based on Unalaska reduction for JFH - Tribe (39535)(this amount should be permanently reprogrammed to Unalaska)- see f/n #2.

12  $7,098 based on Unalaska reduction for JFH - Tribe (39515) (this amount should be permanently reprogrammed to Unalaska)- see f/n #2.

13  APIA total share $4,468; $247 left with BIA for direct Archeology services.

14  $811 increase is minimum amount of APIA tribal share of BIA Realty increases based on data provided by BIA at 5/7/02 Realty meeting.

15  Funds to be transferred to The Aleut Corporation per resolution by The Aleut Corporation for FY 06. This is without prejudice to APIA to appeal the BIA decision regarding these funds.

16  Amount based on 2% of JOM & Scholarship tribal shares.

17  Historical share amount based on combined total of Lease Compliance and prior Shortfall adjustments to cumulative base (see f/n 1 of FY 03 AFA).

18  Base share historical APA tribal share amounts

19  Minimum tribal share amount based on Realty data provided at meeting with BIA on 5/7/02. Same as FY 05 amount.

20  Same as f/n#19.

21  Best estimate at the time of negotiations and is subject to adjustment based on actual award, selection of project, or distribution methodology used by BIA provided SG Tribes, other Tribes and BIA agencies are treated similarly.

22  Estimate. To be adjusted based on APIA actual indirect rate at time of distribution of funds.



**UNITED STATES**
DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
ALASKA REGION
P.O. Box 25520
Juneau, Alaska 99802-5520





RECEIVED

JUL 10 2006

Office of Regional Solicitor
Alaska Region

July 7, 2006

Mr. Dimitri Philemonof, President
Aleutian Pribilof Islands Association, Inc.
201 East Third Avenue
Anchorage, Alaska 99501

Subject:  APIA's FY 2007 Annual Funding Agreement (AFA) Proposal

Dear Mr. Philemonof:

This is in response to the AFA Proposal or Reprogramming Request submitted by Aleutian
Pribilof Islands Association (APIA) on June 26, 2006.  In regard to that request we note that
APIA has again proposed to receive the funding available for carrying out the Alaska Native
Claims Settlement Act (ANCSA) §14(h)(1) program in the coming fiscal year.  As you are no
doubt well aware, the differences of opinion between our organizations with respect to the
Bureau of Indian Affairs (BIA) and Office of Self-Governance (OSG) obligations towards APIA
and The Aleut Corporation (TAC) have not been resolved as of this writing.  Briefing on the
question as to whether the ANCSA funding in question should go to APIA or TAC was just
completed on June 30, 2006.  It would appear that under 25 C.F.R. § 900.165, we can expect the
Administrative Law Judge (ALJ) to issue a recommended decision in your organization's
pending administrative appeal by the end of July.

In the meantime, a question has also been raised concerning whether TAC's May 20, 2005
Resolution No. 05-14 was intended to request a contract for Fiscal Year 2006 only, or was
instead intended to be open-ended.  The BIA is in receipt of a June 8, 2006 letter from TAC
Board Chair Debra K. Mack, confirming that TAC's intent "was to assume funding from the
Aleutian/Pribilof Islands Association (A/PIA) for FY06, *and all subsequent years.*" (Emphasis
added.)  However, the actual wording of last year's TAC resolution could certainly be interpreted
otherwise, and TAC has been told that it should clarify or reconfirm its position in a new
resolution, which has not yet been submitted.

In light of these uncertainties, this is to alert you to the fact that the BIA and OSG may or may
not ultimately include the ANCSA § 14(h)(1) funding in APIA's FY 2007 AFA, depending on
the expected further actions by TAC's Board of Directors, and also on how ALJ Sweitzer rules
on the pending appeal.  There are several possible variations.  If the ALJ's decision agrees with
the Government that TAC's resolution should be afforded priority over the resolutions of the
individual village councils, and upholds the FY 2006 action under review, then the ANCSA §
14(h)(1) funding will once more be deleted from APIA's AFA for FY 2007.  If, on the other

Mr. Dimitri Philemonof, President
APIA's FY 2007 AFA Proposal
July 7, 2006
Page 2 of 2

hand, Judge Sweitzer adopts APIA's view that village resolutions should be controlling, and that
APIA is still entitled to receive the FY 2006 funding, then your FY 2007 AFA will be approved
as submitted.

The third possibility is that the ALJ's decision will recognize TAC's right to submit a 25 U.S.C.
§ 450f(a)(1) contracting request for the ANCSA § 14(h)(1) program, and that such request is
entitled to priority, but will also conclude that the procedure followed by the BIA and OSG for
FY 2006 was deficient, and that APIA should therefore receive the FY 2006 funding. In the case
of such a decision, the BIA and OSG would of course comply with respect to the FY 2006
funding, but would also intend to honor TAC's contracting request for FY 2007. To the extent
that the ALJ may agree with APIA's argument that partial declination is the procedure which
should have been utilized to transfer the ANCSA § 14(h)(1) funding from APIA to TAC, you
should be advised that we will issue such a partial declination decision at a later date *if* we are in
receipt of an appropriate TAC resolution clarifying the request to contract the ANCSA § 14(h)(1)
program for FY 2007, *and if* the ALJ's decision indicates the appropriateness of such a
procedure.

In the meantime, we are processing your FY 2007 AFA as proposed, but we are advising you by
this letter that we are reserving the right to modify our position depending on future
developments as discussed above.

Sincerely,

Niles Cesar
Regional Director

cc:     Debra Mack, The Aleut Corporation
        Tom Shirilla, Northwest Field Manager, DOI Office of Self-Governance
        Roger Drapeaux, Director, Division of Native Services, Alaska Region, BIA
        Ken Pratt, ANCSA Program Manager, Alaska Region, BIA
        Roger Hudson, Attorney, Office of the Regional Solicitor, Alaska Region





IN REPLY REFER TO:
Deputy Regional Director - Trust

# UNITED STATES
# DEPARTMENT OF THE INTERIOR
### BUREAU OF INDIAN AFFAIRS

Alaska Regional Office - Trust
3601 C Street, Suite 1100
Anchorage, Alaska 99503-5947

February 15, 2006

Mr. Demitri Philemonof
President
Aleutian/Pribilof Islands Association
201 East 3rd Avenue
Anchorage, Alaska 99501

Re: Informal Conference

Dear Mr. Philemonof:

This letter shall serve as my decision resulting from the Informal Conference that was held at the Bureau of Indian Affairs (BIA) Conference Room on January 6, 2006. The informal conference was requested by the Aleutian/Pribilof Islands Association (APIA) and I was designated to conduct the conference as the Secretary's representative under 25 CFR §§900.153, *et. seq.*, and 1000.422(c) Those in attendance at the conference included members representing the Aleut Regional Corporation (TAC), the Aleutian/Pribilof Islands Association, Hobbs, Straus, Dean & Walker, LLP, the Office of Self-Governance (OSG), the Regional Solicitor's Office, members of the BIA ANCSA Office, and myself as the designated representative of the Secretary. A copy of the attendance roster is attached as Enclosure 1. The purpose of the conference was to address APIA's concerns regarding funding for the ANCSA 14(h) program.

BACKGROUND: In accordance with the procedures found in 25 CFR §900.154, the initial conference was delayed to allow the representative from Hobbs, Straus, Dean & Walker to attend. The original decision was due on 16 January 2006. A request for a 10-day extension was granted to APIA to allow time to seek an agreement with TAC on issues pertaining to this matter. A second 10-day extension was requested by APIA but due to conflicts with the schedule of the designated representative, a 20-day final extension was granted. While it would be my preference that the involved parties reach an agreement on this matter, I have not been informed that an accord has been reached so a decision follows below.

At approximately 1:18 P.M. on January 6th, 2006, I called the informal conference to order. After a brief introduction and presentation of administrative matters, Mr. Geoffrey D. Strommer, Esq., from Hobbs, Straus, Dean & Walker, representing APIA as counsel, led off the conference with a discussion of APIA's position on the Bureau's decision to withhold funds from APIA's FY-2006 Annual Funding Agreement (AFA). The arguments forwarded by Mr. Strommer are contained in APIA's January 3, 2006 position paper, which is attached as Enclosure 2.

Page 2
Informal Conference

Following, Mr. Strommer's presentation, I allowed members of APIA staff, the Regional Solicitor's office, the OSG, and the ANCSA staff to comment and provide any information they felt may be useful or pertinent to making an informed decision on this matter.

SUMMARY: In 1996, APIA entered into a Self-Governance Compact with BIA to perform those functions required by Section 14(h) of the Alaska Native Claims Settlement Act (ANCSA) (Pub. L. 92-203). This action is authorized by the Indian Self-Determination and Education Assistance Act (ISDEEA), Pub. L. 93-638, as amended. In 1998, APIA completed a Memorandum of Agreement (MOA) with TAC relating to activities to be performed under this compact and funding for the operation of ANCSA programs continued in APIA's AFA's until the negotiations for FY-2006. On May 20, 2005, TAC passed a resolution removing APAI as the entity to receive ANCSA funds and the Bureau withheld funds from APIA's FY-2006 AFA. This withholding led APAI to request the informal hearing that was held on January 6, 2006.

ANALYSIS: In their January 3rd position paper, APIA puts forth three legal issues they feel are relevant to the disposition of this matter. These issues are:

- What parties are the legal beneficiaries of Section 14(h)(1), and thus have the right under ISDEAA to contract or compact the activities and associated funding authorized by that legislation and if both APIA and TAC are beneficiaries, which entity has priority to contract/compact?
- Did APIA properly carry out its Compact and AFA by appropriate use of ANCSA funds?
- What legal standard applies to the BIA's action(s) in revoking APIA's ISDEEA agreement?

Neither "legal beneficiaries" nor "beneficiary" are included in the definitions found in 25 CFR § 900.6 or §1000.2. The Random House Dictionary of the English Language (Unabridged) defines beneficiary as "1. *one who receives, benefits, profits, or advantages.* 2. *a person designated as the recipient of funds or other property under a trust, insurance policy, etc.*" While not a "person", the entity designated by regulation to receive title to existing cemetery sites and historical places is "the regional corporations for regions in which the lands are located" (43 CFR § 2653.0-3). Further, the regulations implementing 43 U.S.C. §1613(h)(1), 43 CFR §2653.5, *et.seq.* make numerous reference to "appropriate regional corporation" or "regional corporation" without mention of tribes or villages. It would appear there are no provisions for either tribes or village corporations to file applications for historical places or cemetery sites or to file an amendment to a 14(h) (1) application, or to appeal a Bureau of Land Management (BLM) decision regarding the application. Regional corporation applications for sites that are determined to be located on village corporation lands are summarily rejected by the BLM as village corporation lands are not available for selection by, or conveyance to, regional corporations. Further, there does not appear to be any statutory or regulatory authority or requirement for regional corporations to consult with or obtain the concurrence of villages and their members prior to making decisions regarding 14(h)(1) applications or sites. Thus, if the Aleut Corporation chose to relinquish all of its 14(h)(1) applications it could probably do so without legal recourse under ANCSA from villages or their members. While I do not doubt that some cultural benefit may accrue to members of the tribes or villages located within the Aleut Region/APIA

Page 3
Informal Conference

service area, it is the Aleut Corporation that is clearly defined by statute and regulation to be the recipient/beneficiary of property transferred under the provisions of 14(h)(1).

As the Bureau was not a party to the MOA between TAC and APIA, I have no idea of the level of performance required under that agreement nor how well APIA met these requirements or standards. The very fact that APIA entered into an agreement with TAC seems to undercut their argument that the villages/tribes are the beneficiaries. The ANCSA program does not involve trust lands or a trust asset so the monitoring of their performance under the compact would be a function of the Office of Self Governance (OSG). It is my understanding that performance, or a perceived lack of it, may have played a role in TAC's decision to rescind their resolution. This brings us to the crux of the problem.

Both 25 CFR §900.6 and §1000.2 define Indian Tribe as "*any Indian tribe, band, nation, or other organized group, community, including pueblos, rancherias, colonies and any Alaska Native Village, or regional or village corporation as defined in or established pursuant to the Alaska Native Claims Settlement Act…*" (emphasis added). A tribal organization, such as APIA, gets its authority to enter into an ISDEEA contract or compact through a tribal resolution authorizing the tribal organization to act on their behalf. The provisions of 25 CFR §900.8(d) requires a copy of the tribal resolution from the Indian tribe(s) to be served and §1000.17(b) requires that a Consortium obtain an authorizing tribal resolution from each tribe that specifies the scope of the Consortium's authority to act on behalf of the tribe. Here, TAC, acting as a tribe, has simply given a resolution revoking APIA's authority to act on their behalf regarding the ANCSA program. While counsel has equated the Bureau's retention of the funds associated with ANCSA as a declination it is actually only the transfer of the funds to the entity that is performing the function. This is very similar to the process we use when any tribe leaves a consortium. Here, the situation is made more complex by the fact that one of the entities is a regional corporation rather than a traditional or IRA tribal entity and APIA is correct insofar as the Alaska Region order of precedence policy for '638 contracting is tribal, non-profit corporation, and then profit corporation. However, in this situation the tribal entity and profit corporation are in fact the same. TAC has withdrawn its resolution that allows APIA to perform a function on its behalf and seeks to perform this function itself. This is not a case where the profit corporation is in competition with the non-profit for a third party interest that requires the Bureau to apply its hierarchy rules. It is exactly the same situation that would apply if any of APIA's other 13 tribes revoked their resolution for APIA to act on their behalf. In that situation, APIA would be hard pressed to argue the tribe does not have the authority to revoke or modify it's resolution and perform a contract/compact on it's own or authorize a third party to perform these functions. They would be equally hard pressed to argue they should receive the funds even after the tribe has taken responsibility for delivering goods or services under the contract/compact.

RECOMMENDED DECISION: Based on the fact that under the definition contained in ISDEEA, the Aleut Corporation fits the definition of Indian tribe, and as such, has the authority to allow either the Bureau or a third party to deliver services or to perform the delivery of services on its own behalf. In the instant case TAC has opted to perform the ANCSA functions on their own behalf and it is my recommendation they be allowed to perform this function. It is also my recommendation that the funds to perform the ANCSA functions be made available to TAC.

Page 4
Informal Conference

Within 30 days of the receipt of this recommended decision, you may file an appeal of the initial decision of the DOI or DHHS agency with the Interior Board of Indian Appeals (IBIA) under 25 CFR 900.157. You may request a hearing on the record. An appeal to the IBIA under 25 CFR 900.157 shall be filed by certified mail or hand delivery at the following address: Board of Indian Appeals, U.S. Department of the Interior, 801 North Quincy Street, Arlington, VA 22203. You shall serve copies of your Notice of Appeal on the Secretary and on the official whose decision is being appealed. You shall certify to the IBIA that you have served these copies.

Even though I have included the appeal rights of the parties, I will reiterate my stance that it is far better for all concerned that some sort of agreement be reached at the local level and would encourage the parties to strive toward that end.

Sincerely,

Charles F. Bunch
Deputy Regional Director – Trust

cc: Niles Cesar, ARO
Tom Shirilla, OSG
Ken Pratt, ANCSA
Roger Hudson, Office of the Solicitor
Debra Mack, TAC
Lynn Allingham, APIA



# United States Department of the Interior
## OFFICE OF HEARINGS AND APPEALS
### Departmental Hearings Division
405 South Main Street, Suite 400
Salt Lake City, Utah 84111
TELEPHONE (801) 524-5344

August 31, 2006

|  |  |
|---|---|
| ALEUTIAN PRIBILOF ISLANDS ASSOCIATION (APIA),<br><br>    Appellant<br><br>v.<br><br>NORTHWEST REPRESENTATIVE, OFFICE OF SELF-GOVERNANCE, BUREAU OF INDIAN AFFAIRS,<br><br>    Appellee | IBIA 06-50-A<br><br>Appeal of a decision issued by the Bureau of Indian Affairs, declining APIA's proposal in its 2006 annual funding agreement for funding to perform activities under 43 U.S.C. § 1613(h)(1)<br><br>Indian Self Determination and Educational Assistance Act (ISDEAA), 25 U.S.C. §§ 450-450n |

## RECOMMENDED DECISION

Appearances: Geoffrey D. Strommer, Esq., Portland, Oregon, for Appellant

Roger L. Hudson, Esq., Anchorage, Alaska, for Appellee

Before: Administrative Law Judge Sweitzer

## Background

The Aleutian Pribilof Islands Association (APIA) has appealed a determination by the Bureau of Indian Affairs (BIA) to partially reject APIA's proposed fiscal year (FY) 2006 Tribal Self-Governance Annual Funding Agreement (AFA). BIA rejected that portion of the AFA that proposed funding for performing activities under Section 14(h)(1) of the Alaska Native Claims Settlement Act (ANCSA), as amended, 43 U.S.C. § 1613(h)(1).

Since the late 1990's, APIA has compacted with BIA under Title IV of the Indian Self-Determination and Education Assistance Act (ISDEAA), 25 U.S.C. §§ 458 et seq., to carry out various programs, functions, services and activities (PFSAs), including those authorized by § 14(h)(1) of ANCSA. On May 20, 2005, the ANCSA Regional Corporation for the Aleutian region, the Aleutian Corporation (TAC), passed a resolution specifically stating that it did not want APIA to carry out ANCSA-related work on the corporation's behalf, but wanted to itself contract with BIA to receive the ANCSA funding. BIA accordingly partially rejected APIA's proposed FY 2006 AFA on the basis that the requested ANCSA § 14(h)(1) funds were to be transferred to TAC pursuant to its May 20, 2005, resolution.

In an attempt to resolve this issue, APIA requested an informal conference pursuant to 25 CFR 1000.422(c) and 25 CFR 900.154. Following the January 6, 2006, informal conference, BIA's Deputy Regional Director Charles F. Bunch, who had been designated to conduct the conference as the Secretary's representative under 25 CFR 900.155(c), issued a Recommended Decision upholding BIA's initial decision to transfer the ANCSA § 14(h)(1) funding from APIA to TAC. Dissatisfied with the Recommended Decision, APIA filed on March 16, 2006, pursuant to 25 CFR 900.158 and 1000.432(a), a Notice of Appeal of BIA's initial decision to partially reject APIA's proposed FY 2006 AFA.

By Order dated March 27, 2006, the Interior Board of Indian Appeals (IBIA) referred APIA's appeal to the Hearings Division, Office of Hearings and Appeals, for assignment to an Administrative Law Judge (ALJ). This appeal was thereafter assigned to the undersigned for adjudication. A telephonic pre-hearing conference was held on April 6, 2006, during which the parties agreed to waive their right to an evidentiary hearing.[1/] Accordingly, the following Recommended Decision is based solely upon the undersigned's consideration of the evidence in the record, applicable law, and the arguments set forth in the parties' briefs.

## Statement of Facts

ANCSA was implemented by Congress in 1971 for the purpose of effecting "a fair and just settlement of all claims by Natives and Native groups of Alaska, based on aboriginal land claims." 43 U.S.C. § 1601(a). To achieve this goal, Congress created two types of private corporate entities to receive the land and money provided to Alaska Natives under the Act: Regional Corporations and Village Corporations. 43 U.S.C. §§ 1606, 1607. Section 1606 of ANCSA divided the State of Alaska into twelve regions and provided that a for-profit corporation, or Regional Corporation, was to be incorporated under the laws of Alaska for each of the twelve regions. A thirteenth Regional Corporation was also provided for Alaska Natives who did not reside in Alaska. 43 U.S.C. § 1606(c).

To determine enrollment in the Regional Corporations, ANCSA required that the Secretary of the Interior create within two years from the enactment of ANCSA a roll of all Natives "born on or before, and who are living on, December 18, 1971." 43 U.S.C. § 1604(a). This roll was to show for each Native, among other things, "the region and the village or other place in which he resided on the date of the 1970 census enumeration * * *." 43 U.S.C. § 1604(b). All living Alaska Natives were then enrolled in the Regional Corporation in which they resided at the time the roll was taken. Id. If an Alaska Native was not a permanent resident within the area encompassed by one of the twelve corporations, he or she would be

---

[1/] APIA also agreed orally, in conjunction with a request to file a surreply brief (which brief was filed on July 11, 2006), that the 30-day regulatory deadline for issuance of a recommended decision could be extended to August 31, 2006.

allocated to one of the corporations based on a list of prioritized factors. Id. This ensured that all living Alaska Natives were enrolled in one of the Regional Corporations.

In addition to Regional Corporations, ANCSA also provides for the formation of Village Corporations. Section 1607(a) provides that the "Native residents of each Native village entitled to receive lands and benefits under this Act shall organize as a business for profit or nonprofit corporation under the laws of the State before the Native village may receive patent to lands or benefits under this Act * * *." Section 1610 of ANCSA provides a list of over 200 villages, as well as established criteria by which villages can be added or removed from the list by the Secretary of the Interior.

Unlike universal Native enrollment in Regional Corporations, not all Alaska Natives were enrolled in a Village Corporation. 43 U.S.C. § 1604(b). If, at the time of the 1970 census, an Alaska Native was not a resident of a particular village, that person would be enrolled in a Regional Corporation only. Id. Accordingly, although all Village Corporation shareholders were also Regional Corporation shareholders, not all Regional Corporation shareholders were also Village Corporation shareholders.

Section 14(h)(1) of ANCSA provides that the Secretary of the Interior "may withdraw and convey to the appropriate Regional Corporation fee title to existing cemetery sites and historical places." 43 U.S.C. § 1613(h)(1). The Departmental regulations issued to govern this process are found at 43 CFR 2653.5. Pursuant to this regulation, Regional Corporations were required to file applications for the conveyance of such sites with the Bureau of Land Management (BLM) by December 31, 1976. 43 CFR 2653.5(a), (f). Sites determined by the BLM to be located on available and unappropriated Federal lands at the time of application were then forwarded to the BIA. 43 CFR 2653.5(f), (g). The BIA is then responsible for investigating the cemetery sites or historical places requested to be conveyed. At the completion of its investigation, the BIA must report on its findings and certify whether the intended property does or does not meet the criteria for eligibility as a Native historical place or cemetery site. 43 CFR 2653.5(h)-(k). Relying on BIA's report and certification, the BLM issues a decision whether to convey the site to the applicant Regional Corporation. 43 CFR 2653.5(k).

TAC, the Regional Corporation for the Aleut region[2/], timely filed ANCSA § 14(h)(1) applications with BLM by December 31, 1976. These applications were then processed by the Department of the Interior in accordance with 43 CFR 2653.5, and the BIA began performing the investigative tasks assigned to it in the regulations. In the late 1990's, APIA, a Native non-profit organization sanctioned to do business on behalf of thirteen federally recognized tribal governments in the Aleut region, entered into a Tribal Self-Governance Compact (Compact) with BIA pursuant to Title IV of the ISDEAA. Under this Compact,

---

[2/] This geographic region covers the Aleutian Islands, Pribilof Islands, and that part of the Alaska Peninsula which is in the Aleut League. 43 U.S.C. § 1606(a)(8).

IBIA 06-50-A

APIA compacted to carry out a broad range of PFSAs for beneficiaries in the region, including BIA-assigned tasks relating to ANCSA §14(h)(1), and the funds allocated by Congress for implementing the ANCSA § 14(h)(1) program were transferred to APIA.

TAC was not consulted about, or even given notice of, BIA's transfer of the ANCSA § 14(h)(1)-related PFSAs and funds to APIA. However, on August 7, 1998, APIA agreed to carry out the ANCSA § 14(h)(1) PFSAs in conjunction with a Memorandum of Agreement ("MOA") with the TAC that spelled out how the parties would "jointly conduct * * * activities related to completing the ANCSA 14(h)(1) process." (BIA Ex. 5, § 1) Pursuant to the MOA, it was agreed that "[a]ll funds appropriated to A[PIA] for ANCSA 14(h)(1) from BIA since the inception of the compact, are available to conduct ANCSA 14(h)(1) and Cultural Heritage activities under this agreement." (BIA Ex. 5, § 5(c)). In addition, it was agreed that "funds shall be expended based on written objective work plans that are based on the overall intent and purpose of the ANCSA process, and approved by TAC." (Id.) It was also agreed that "[a]ll ANCSA 14(h)(1) work product shall be the sole property of TAC, provided that, A[PIA] shall have the opportunity to reproduce ANCSA 14(h)(1) materials for its own purposes and any such reproductions shall remain the property of A[PIA]." (BIA Ex. 5, § 5(d)).

Funding for carrying out ANCSA § 14(h)(1) PFSAs was included in AFIA's AFAs without objection until FY 2005. On May 24, 2004, just before the start of the BIA Alaska Region FY 2005 Self-Governance negotiations, the Office of the Regional Solicitor issued a memorandum to the BIA Alaska Region recommending that specific steps be taken in negotiating the inclusion of ANCSA § 14(h)(1) funding within Tribal Self-Governance AFA's. The memorandum first noted that because ANCSA § 14(h)(1) funding had been categorized as recurring Tribal Priority Allocation (TPA) funding, not all recipient entities had been using the funds for ANCSA-related work. The memorandum accordingly recommended that BIA rectify this problem by negotiating the "inclu[sion of] specific ANCSA-related tasks in the contracting entities' scopes of work, whereby they would agree after negotiations as to what activities they would undertake, and what ANCSA-related work product they would commit themselves to deliver." (BIA Ex. 1 at 2) The memorandum additionally noted that:

> [I]t is doubtful that contracting for the ANCSA conveyance work can properly be supported by a tribal or village resolution under the ISDA. Legally, the tribal entity benefitting from a program, function, service or activity, or portion thereof, is the entity which must provide the authorizing request to contract. In the case of ANCSA conveyance-related work, that entity would be the Regional Corporation * * * Indeed, the Regional Corporation would not only have the right to dictate who provides the services, but also the option of electing to contract directly with the Bureau to perform the work itself * * *.

4

IBIA 06-50-A

(BIA Ex. 1 at 3) The memorandum accordingly recommended that BIA "require an ANCSA Regional Corporation resolution requesting that the BIA contract for performance of the relevant tasks." (Id.)

Negotiations for FY 2005 AFAs were conducted with the nine Alaska Self-Governance tribal consortia during the late Spring and early Summer of 2004. As part of the compact negotiations, BIA distributed copies of the May 24, 2004, Regional Solicitor's Office Memorandum (the Solicitor's Memorandum) to the tribal consortia. BIA also sent copies of the Solicitor's Memorandum to the affected Regional Corporations. BIA additionally requested that the tribal consortia include the following language in their Self-Governance AFAs or Multi-Year Funding Agreements:

> ANCSA: This program fulfills the mandate of the 1971 Alaska Native Claims Settlement Act (ANCSA [Section 14(h)(1), 14(h)(2), and 14(h)(5)], PL. 92-203) through investigation and certification of Alaska Native historical places and cemetery sites, native groups, and native primary places of residence. The program's remaining work, however, is focused on Section 14(h)(1) claims–the beneficiaries of which are ANCSA Regional Corporations. Program funds provided by this agreement are restricted in use to the performance of ANCSA-related work, <u>the specific tasks of which will be jointly determined by [the consortium], the BIA ANCSA Office, and [the ANCSA Regional Corporation.]</u>

BIA did not, however, require that any of the tribal consortia provide an ANCSA Regional Corporation tribal resolution requesting that BIA contract with the tribal consortia for performance of the ANCSA § 14(h)(1) PFSAs.

The negotiation meeting between BIA and APIA was held on June 10, 2004. As a result of the negotiation, APIA agreed to amend its existing "Self Governance Multi-Year Funding Agreement (10/01/03-09/30/08)" to include the above language. When APIA amended its Multi-Year Funding Agreement, however, it omitted the underlined portion of the provision from inclusion in the agreement.

In response to the Solicitor's Memorandum, the TAC Board of Directors passed a resolution on May 20, 2005, specifically "removing A[PIA] as the entity to receive ANCSA 14(h)1 funding on its behalf" and resolving to itself "directly contract with the Bureau of Indian Affairs for the ANCSA 14(h)1 Historical and Cemetery funding." (BIA Ex. 2) On June 30, 2005, BIA received from APIA a proposed FY 2006 AFA which included, as in previous years, funding for ANCSA § 14(h)(1) PFSAs. (BIA Ex. 6 at 2) The proposed FY 2006 AFA was not executed by the BIA's Office of Self Governance (OSG). (Id.) BIA communicated to APIA orally that it refused to sign the AFA as submitted because the ANCSA § 14(h)(1) funds were to be transferred to TAC pursuant to TAC's May 20, 2005,

5

IBIA 06-50-A

Resolution. There is no evidence in the record as to what specific day BIA's decision was orally communicated to APIA.

On September 27, 2005, APIA submitted to BIA a revised FY 2006 AFA which reflected a deletion of funding for ANCSA § 14(h)(1) PFSAs. (BIA Ex. 7 at 2) Footnote 15 to the revised FY 2006 AFA further explained that "[the] [f]unds [are] to be transferred to The Aleut Corporation per resolution by the Aleut Corporation for FY 06. This is without prejudice to APIA[sic] to appeal the BIA decisions regarding these funds." (BIA Ex. 7 at 3 n.15) A letter accompanying the revised FY 2006 AFA and signed by the President/CEO of APIA, Dimitri Philemonof, additionally stated:

> Submitted herewith is a revised 2006 reprogramming request. We have modified line 15 to reflect the fact that the Aleut Corporation passed a resolution stating their intent to contact directly with the BIA for those funds for 2006. APIA makes this change in our reprogramming request without prejudice to filing an appeal of the BIA and Solicitor's opinion that the Aleut Corporation, rather than the tribes and their representative, APIA, can make the decision about how those funds can be spent.

(BIA Ex. 7 at 1) APIA's revised FY 2006 AFA was signed by OSG on October 3, 2005. APIA filed its Request for Informal Conference with BIA on November 14, 2005. (BIA Ex. 8)

## Discussion

### I.     Timeliness of Appeal.

Before addressing the merits of the appeal, the undersigned must first address BIA's assertion that the appeal should be dismissed for lack of jurisdiction owing to the alleged untimeliness of APIA's initial pursuit of administrative remedies. BIA asserts that APIA's November 14, 2005, request for an informal conference was untimely as it was filed more than thirty days from the date that APIA was informed of BIA's decision to withhold the ANCSA § 14 (h)(1) funding from APIA's proposed FY 2006 AFA. BIA claims that APIA was informed of BIA's decision during the summer of 2005, at some point between the end of June and the beginning of September. It contends that at the very latest, APIA became aware of BIA's decision, as well as its right to appeal the decision, on September 27, 2005. On this date, APIA submitted its revised proposed FY 2006 AFA to BIA along with a cover letter stating that "APIA makes this change in our reprogramming request without prejudice to filing an appeal of the BIA and Solicitor's opinion that [TAC], rather than * * * APIA, can make the decision about how those funds can be spent." BIA concludes that APIA's November 14, 2005, request for an informal conference was submitted well outside of the permissible 30-day time period for filing such a request.

6

Case 1:06-cv-02141-CKK   Document 1-9   Filed 12/21/2006   Page 7 of 21

As APIA points out, however, the regulations provide that a tribe must file a request for an informal conference "within 30 days of the day it <u>receives</u> the decision," not within 30 days from the date it is <u>informed</u> of the decision. 25 CFR 1000.422; 25 CFR 900.154 (emphasis added). <u>See also</u> 25 CFR 1000.425. Upon deciding to decline a proposed AFA, BIA must "advise the Indian tribe or tribal organization <u>in writing</u> of the Secretary's objections * * * together with a detailed explanation of the reason for the decision to decline the proposal * * *." 25 CFR 900.29; 25 U.S.C. § 450f(b)(1) (emphasis added).[3/] <u>See also</u> 25 CFR 2.7(a) (requiring that "[t]he official making a decision shall give all interested parties known to the decisionmaker written notice of the decision by personal delivery or mail.") Arguably, BIA's decision was never reduced to writing, as the only written statement of BIA's position is footnote 15 of the revised FY 2006 AFA signed by OSG. If this does not constitute a written decision, then APIA never "received" a decision. Accordingly, there is no date from which to begin calculating the 30-day period.

In addition, the ISDEAA regulations provide that BIA's written decision "shall contain information which shall tell the Indian tribe or tribal organization where and when to file the Indian tribe or tribal organization's appeal." 25 CFR 900.152. The general BIA regulations governing appeal similarly require that "[a]ll written decisions * * * shall include a statement that the decision may be appealed pursuant to this part, identify the official to whom it may be appealed and indicate the appeal procedures, including the 30-day time limit for filing a notice of appeal." 25 CFR 2.7. BIA clearly failed to provide the required appeal information.

BIA regulations provide that the absence of accurate appeal instructions tolls the running of the appeal time limit. <u>See</u> 25 CFR 2.7(b) (providing that the time to file a notice of appeal shall not begin to run until proper notice of appeal procedures has been given); <u>see also</u> <u>Ramah Navajo School Board, Inc. v. BIA</u>, 24 IBIA 104 (1993). BIA asserts that although APIA was not given formal notice of its appeal rights, the time for APIA to file an informal decision should not be tolled because it is clear from APIA's September 27, 2005, letter and revised FY 2006 AFA that APIA was aware of its right to appeal BIA's decision. The fact that APIA knew of its right to appeal does not excuse BIA of its regulatory duty. Although APIA may have been aware of its right to appeal, it was not notified of the specific procedures applying to the appeal of a BIA decision to decline a proposed AFA, including the

_____

[3/] As APIA points out in its Opening Brief, § 201 of the ISDEAA and the declination criteria at 25 CFR part 900 apply to APIA's Title IV Self-Governance Compact because the Title IV regulations incorporate by reference the appeals procedures of Title I, which in turn incorporates § 102 of the ISDEAA. (APIA Opening Brief at 13 n. 8) 25 CFR 1000.432(a) provides that "[f]or Title I-eligible PFSA disputes, appeal may only be filed with IBIA under the provisions set forth in 25 CFR 900.150(a) through (h), 900.152 through 900.169." Before referring this appeal to the Hearings Division for assignment, the Board of Indian Appeals determined that this appeal falls under 25 CFR 900.150(a), which specifically incorporates § 102 of the ISDEAA. <u>See Order Referring Appeal to the Hearings Division for Assignment to an Administrative Law</u> (March 27, 2006).

30-day time limit for filing a request for an informal conference. Accordingly, the time for APIA to file a request for an informal conference did not begin to run and APIA's November 14, 2005, request for an informal conference was timely filed.

## II. Validity of BIA's Decision to Partially Reject APIA's Proposed FY 2006 AFA.

As explained previously, BIA partially rejected APIA's proposed FY 2006 AFA on the basis that it proposed funding for conducting ANCSA § 14(h)(1) PFSAs. BIA determined that in light of TAC's Resolution specifically removing APIA as the entity to receive ANCSA § 14(h)(1) funding and resolving to itself directly contract with BIA, BIA was obligated to transfer the ANCSA § 14(h)(1) funds to TAC.

APIA has appealed BIA's decision to partially reject its proposed FY 2006 AFA, contending that it violates the terms of APIA's Tribal Self-Governance Compact, Titles I and IV of the ISDEAA, and applicable regulations. On appeal, APIA specifically challenges the validity of BIA's decision on the following four grounds: (1) APIA is the primary beneficiary of ANCSA § 14(h)(1) and thus has the right under the ISDEAA to compact to carry out the ANCSA § 14(h)(1) PFSAs; (2) APIA should be given contracting priority over TAC pursuant to BIA's longstanding "Order of Precedence"; (3) BIA's decision to partially reject APIA's proposed FY 2006 AFA was made in violation of ISDEAA's statutorily required declination criteria and procedures; and, (4) BIA's decision to partially reject APIA's proposed FY 2006 AFA was made in violation of § 106(b)(2) of the ISDEAA and the implementing regulations at 25 CFR 900.32 and 900.33. For the reasons discussed more fully below, the undersigned rejects APIA's arguments on appeal and recommends that BIA's decision to withhold the ANCSA § 14(h)(1) funding from APIA's FY 2006 AFA be upheld.

### A. TAC is the Primary Beneficiary of the ANCSA § 14(h)(1) Funding.

The ISDEAA directs the Secretary "upon the request of any Indian tribe by tribal resolution, to enter into a self-determination contract or contracts with a tribal organization to plan, conduct, and administer programs, or portions thereof * * * for the benefit of Indians because of their status as Indians * * *." 25 U.S.C. § 450f(a)(1)(E). The Indian tribe benefitting from the program must provide the authorizing request to contract. See 25 CFR 900.8(d) (requiring that an initial ISDA contract proposal contain "[a] copy of the authorizing resolution from the Indian tribe(s) to be served.") (emphasis added). For purposes of the ISDEAA, an "Indian tribe" is "[a]ny Indian tribe, band nation, or other organized group or community, including any Alaska Native village or regional or village corporation as defined in or established pursuant to [ANCSA] * * *." 25 U.S.C. § 450b(e) (emphasis added). Accordingly, ANCSA Regional Corporations are legally entitled to submit resolutions authorizing ISDEAA contracts pursuant to 25 U.S.C. § 450f(a). See Cook Inlet Native Assoc. v. Bowen, 810 F.2d 1471, 1476 (9th Cir. 1987) (specifically upholding the award of an ISDEAA contract pursuant to the authority of an ANCSA Regional Corporation resolution).

8

IBIA 06-50-A

BIA argues that TAC's May 20, 2005, Resolution constitutes a request under 25 U.S.C. § 450f(a)(1) to enter into a self-determination contract to administer the ANCSA § 14(h)(1) program. BIA contends that TAC, as the Regional Corporation for the Aleut Region, is the entity which solely or primarily benefits from the ANCSA § 14(h)(1) program. Base upon this contention, BIA argues that TAC has the right to either elect to contract directly with the BIA to carry out the ANCSA § 14(h)(1) PFSAs, or authorize another entity to do so on their behalf.

Per its Resolution, TAC clearly elected to remove APIA as the entity to receive ANCSA § 14(h)(1) funding on its behalf and instead directly contract with BIA to receive the funding itself. In light of this clear request, BIA asserts that it had no choice but to withdraw the ANCSA § 14(h)(1) funding from APIA's FY 2006 AFA so that it could be transferred to TAC.

Contrary to BIA's interpretation, APIA asserts that the primary beneficiaries of the ANCSA § 14(h)(1) program are Alaska tribes and their members, not the Regional Corporations. It reasons that APIA, being a non-profit organization which represents thirteen Aleutian villages and the tribal members they serve, and not TAC, is the primary beneficiary of the ANCSA § 14(h)(1) program and thus has the superior right to contract for ANCSA § 14(h)(1) PFSAs.

APIA's assertion, however, is contradicted by the clear language, overall structure, and purpose of ANCSA. As explained previously, ANCSA was implemented by Congress in 1971 for the purpose of effecting "a fair and just settlement of all claims by Natives and Native groups of Alaska, based on aboriginal land claims." 43 U.S.C. § 1601(a). Section 14(h)(1) of ANCSA specifically provides a scheme under which the Secretary is authorized to withdraw from appropriation unreserved public land upon which a Native cemetery site or historical place is located. Under both ANCSA § 14(h)(1) and the implementing regulations, ANCSA Regional Corporations are the only entities authorized by law to file an application with BLM requesting the withdrawal and conveyance of existing cemetery sites or historical places. 43 U.S.C. § 1613(h)(1); 43 CFR 2653.5(f). The Regional Corporations must decide what lands to apply for, and have the sole authority to amend or withdraw applications. All application-related decision-making authority therefore lies with the Regional Corporations.

After BLM receives an application from a Regional Corporation, it is forwarded to BIA for investigation, report, and certification. 43 CFR 2653.5(h)-(k). Based on BIA's report and certification, BLM determines whether to issue a decision to convey. 43 CFR 2653.5(k). If BLM determines that the applied for site qualifies for conveyance, it "withdraw[s] and convey[s] to the appropriate Regional Corporation fee title" to the existing site. 43 U.S.C. § 1613(h)(1)(A). No other entities are qualified to receive conveyance or hold title to the site.

9

Unlike ANCSA § 14(c) conveyances to Village Corporations, which are subject to certain reconveyance requirements, the ANCSA § 14(h)(1) conveyances are permanently held by Regional Corporations. 43 U.S.C. §§ 1613(c), (h)(1). Regional Corporations take title to cemetery sites and historical places subject to a covenant running with the land which imposes on the Regional Corporation the responsibility of maintaining and preserving the sites solely as cemetery sites or historical places. 43 CFR 2653.5(a), 2653.11. The Regional Corporations therefore bear all of the expense and responsibility for not only acquiring Native cemetery sites and historical places, but for holding and maintaining these sites for the indefinite future.

APIA claims that despite the fact that Regional Corporations have been assigned the responsibility of identifying, applying for, owning, and protecting ANCSA § 14(h)(1) sites, Congress clearly intended the primary beneficiaries of ANCSA § 14(h)(1) to be Native peoples and Villages. In making this assertion, APIA relies primarily on floor statements made by Senators Stevens and Bible just prior to the passage of ANCSA.

As specifically regards ANCSA § 14(h)(1), Senator Stevens stated that:

> the intent of the conferees was not to take the places away from the village, to take away their cemeteries or their historical sites, but merely to place title in the regional corporation as the custodian of places properly identified as such sites * * * It is the intent of the conferees under this act that these areas will be preserved and that they are conveyed to the village corporations for that purpose and not for the purpose of commercial exploitation but to provide for the preservation of the cemeteries and historical sites.

117 Cong. Rec. 46964 (Dec. 14, 1971). Senator Stevens then yielded the floor to Senator Bible, who confirmed Senator Stevens' interpretation, stating that "[t]here is no intent whatever in the bill to take the last resting places or these historic sites away from the Native people or their village corporations." Id.

APIA asserts that in light of these floor statements, it is apparent that Congress simply intended the for-profit Regional Corporations to hold title to cemetery sites and historical places as trustees, or "custodians," on behalf of the true beneficiaries of ANCSA § 14(h)(1): Alaska Native peoples and Villages. APIA claims that consistent with Congress' intent to benefit tribal members, and not just corporate shareholders, the Department's regulations prohibit Regional Corporation's from using land conveyed under § 14(h)(1) for commercial purposes. In addition, the regulations impose on Regional Corporations the affirmative responsibility of maintaining and preserving the sites. 43 CFR 2653.5(a), 2563.11. APIA asserts that the de facto beneficiaries of the preservations of the sites are not the for-profit corporate shareholders of the Regional Corporation, but the Alaska Native peoples and Villages for whom the Regional Corporations simply act as "custodians." According to APIA, it is therefore APIA's member Villages, and the Native peoples they serve, which primarily benefit from the § 14(h)(1) PFSAs.

IBIA 06-50-A

APIA's interpretation of these somewhat vague floor statements is, however, contradicted by both the clear language and overall scheme of ANCSA. As APIA correctly points out, it is obvious from both the floor statements as well as the regulations that Congress intended to convey cemeteries and historical sites to the Regional Corporations for the purpose of preservation instead of for commercial profit. However, contrary to APIA's further assertion, that fact does not demonstrate that village-based Native governments, or their members, are the primary beneficiaries of the ANCSA § 14(h)(1) conveyance program.[4]

In implementing ANCSA § 14(h)(1), Congress specifically chose Regional Corporations instead of Village Corporations or Village governments as the entity to carry out the acquisition and protection of cemeteries and historical sites. Although Regional Corporations are for-profit corporations, their shareholders are made up entirely of Alaska Native peoples. In fact, at the time ANCSA was implemented, Regional Corporations represented the broadest-based group of Alaska Natives of any tribal entity. This is because ANCSA mandated that all Alaska Natives living on December 18, 1971, be enrolled into one of the thirteen ANCSA Regional Corporations. 43 U.S.C. § 1604. Even non-resident Alaska Natives were included in this enrollment, thereby ensuring that all living Alaska Natives were enrolled in a Regional Corporation.

Unlike universal Native enrollment in Regional Corporations, not all Alaska Natives were enrolled in a Village Corporation because if a Native was not a resident of a particular village at the time of enrollment (i.e., the Native was living outside Village limits or the State of Alaska), the Native was excluded from enrolling in a Village Corporation. Thus, while all Native members of a Village were also Regional Corporation shareholders, not all Regional Corporation shareholders were members of a Village. Therefore, at the time of ANCSA's passage, Regional Corporations were much more representative of Alaska Natives as a whole than Village Corporations or Village governments.

ANCSA also provides that lands in the core townships in which villages are located are subject to mandatory selection by and conveyance to Village Corporations. 43 U.S.C. §§ 1610(a)(1), 1611(a), 1613(h). The cemeteries and historical sites to be conveyed under § 14(h)(1) therefore cannot be located within the immediate vicinity of villages.

---

[4] APIA's assertion that the primary beneficiaries of the ANCSA § 14(h)(1) program are Alaska Villages and their members, not the Regional Corporations, is further undercut by the fact that it itself recognized TAC, the ANCSA Regional Corporation for the Aleut Region, as the beneficiary of the ANCSA § 14(h)(1) program in its "Self Governance Multi-Year Funding Agreement (10/01/03-09/30/08). The agreement specifically states that "the program's remaining work, however, is focused on Section 14(h)(1) claims—the Native beneficiaries of which are ANCSA Regional Corporations."

11

IBIA 06-50-A

Instead, the sites conveyed under § 14(h)(1) are not associated with any particular Village, but have a more regional focus which Congress recognized was better served by a regional entity. Accordingly, Congress provided for the conveyance of sites to Regional Corporations, the entities with the most regionally-based Native membership.

While Villages and their Native members may, in a broad sense, benefit from the preservation of § 14(h)(1) cemeteries and historical sites, there is nothing in the overall scheme of ANCSA which supports that Villages are the primary beneficiaries of § 14(h)(1) conveyances. These regionally located cemeteries and historical sites were to be selected for and preserved on behalf of all Alaska Natives affiliated with a region, not just those Alaska Natives who are members of a Village. Congress clearly recognized that the purposes of § 14(h)(1) would be best served by the entity with the broadest base of Native members—the Regional Corporation—and therefore gave each Regional Corporation the responsibility of identifying, applying for, and preserving § 14(h)(1) sites on behalf of its shareholders.

In conclusion, the undersigned finds that none of APIA's arguments fundamentally undermine the soundness of the BIA conclusion that ANCSA Regional Corporations, on behalf of their Alaska Native shareholders, are the primary and direct beneficiaries of the ANCSA § 14(h)(1) program. It is therefore TAC, and not APIA, that is the primary beneficiary of the ANCSA § 14(h)(1) program.

B.    "Order of Precedence" is Inapplicable.

APIA asserts that even if TAC is the primary beneficiary of the ANCSA § 14(h)(1) program, APIA should be given contracting priority over TAC pursuant to BIA's longstanding "Order of Precedence." The "Order of Precedence" is a BIA-developed policy intended to apply in the case where there are competing requests by eligible tribes to contract under the ISDEAA to carry out the same PFSAs. Pursuant to this policy, BIA recognizes and requires supporting resolutions from tribal entities in order of their priority as follows:

1. Active Indian Reorganization Act (IRA) Council.
2. In the absence of an IRA, the formally established Traditional Council.
3. In the absence of either of the first two, the local ANCSA village/urban for-profit corporation.
4. In absence of all above, the ANCSA Regional for-profit Corporation.

Douglas Indian Assoc. v. BIA, 27 IBIA 292 (1995).[5]

_____

[5]  See also Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 58 Fed. Reg. 54364, 54366 n. 2 (Oct. 21, 1993) (stating that "[u]nder longstanding BIA policy, priority for contracts and services in Alaska is given to reorganized and traditional governments over non-tribal corporations.")

12

IBIA 06-50-A

APIA claims that it has contracting priority over TAC under the "Order of Precedence" because it is the authorized representative of thirteen Aleut tribal governments. APIA therefore concludes that, with or without an authorizing resolution from TAC, it is the proper entity to compact under the ISDEAA to perform § 14(h)(1) PFSAs.

The undersigned is persuaded, however, that the "Order of Precedence" is inapplicable and non-binding in this instance. BIA's longstanding "Order of Precedence" is normally applied with respect to BIA programs designed to serve individuals or Native communities. In these instances, it is logical that contracts would be prioritized beginning at the most local tribal government level. The ANCSA § 14(h)(1) program constitutes an exceptional case in that it is specifically intended to benefit a broader group: ANCSA Regional Corporations and the shareholder class they represent.

As discussed previously in Subsection A of this decision, the Indian tribal organization most directly served by the ANCSA § 14(h)(1) program is the Regional Corporation. Section 14(h)(1) PFSAs are intended to primarily benefit the Regional Corporation and all of its shareholders, a substantially larger and different group of Alaska Natives than would be represented by the village governing bodies. Applying the "Order of Precedence" to the ANCSA § 14(h)(1) program would essentially circumvent this Congressional intent by allowing a local tribal government serving a narrower class of beneficiaries to contract for ANCSA § 14(h)(1) PFSAs instead of the intended Regional Corporation. Accordingly, the undersigned finds that the "Order of Precedence" is inapplicable and non-binding to requests to contract to carry out ANCSA § 14(h)(1) PFSAs.

As BIA points out, BLM similarly chose not to apply BIA's "Order of Precedence" when faced with an almost identical situation. In the early 1990's, BLM was confronted with competing requests to enter into ISDEAA contracts to perform ANCSA surveying work, including requests submitted by ANCSA Regional Corporations. BLM determined that ANCSA Regional Corporations, and the shareholder class they represent, rather than village-based tribal governments, were the direct beneficiaries of the ANCSA conveyance-related surveying activity. BLM reasoned that because Regional Corporations were clearly the Indian tribes to be served under the contract, they should have the first claim with respect to the right to contract to perform ANCSA-related surveys. (See October 5, 1992 Memorandum from Office of the Regional Solicitor to Division of Indian Affairs, BIA Ex. 3)

The undersigned is persuaded by the reasoned approach taken by BLM. Although the "Order of Precedence" reflects longstanding BIA policy, it should not be adhered to where its application has the effect of circumventing Congressional intent. See The Wilderness Soc'y, 106 IBLA 46, 55 (1988) (policy guidelines are not intended to provide inflexible constraints where variance from guidelines is justified); see also Kay Kayser-Meyring v. BLM, 152 IBLA 39 (2000) (policy is not binding on agency where it is contrary to any applicable law or

13

regulations). The "Order of Precedence" should therefore not be applied where, as in this instance, it is clear that the Regional Corporation is the Indian tribe to be served by the program to be contracted for. As the primary beneficiary of ANCSA § 14(h)(1), TAC should be given contracting priority over APIA.

C.     BIA's Partial Rejection of APIA's Proposed FY 2006 AFA Did Not Violate ISDEAA Declination Procedures and Criteria.

APIA asserts that BIA's partial rejection of its proposed FY 2006 AFA was made in violation of ISDEAA's statutorily required declination procedures and criteria and should therefore be reversed. APIA contends that pursuant to § 102(a)(2) of the ISDEAA, BIA can reject APIA's proposal to amend its AFA only if one of five specific and limited conditions is met. 25 U.S.C. § 450f(a)(2); see also 25 CFR 900.22 (explaining that "[t]he Secretary may only decline to approve a proposal for one of five specific reasons"). APIA claims that BIA has failed to meet the statutory burden of producing "a specific finding that clearly demonstrates that, or that is supported by a controlling legal authority that" one of the five criteria exists. 25 U.S.C. § 450f(a)(2). Based on this claim, APIA argues for reversal of BIA's decision to partially reject APIA's proposed FY 2006 AFA.

Contrary to APIA's contention, a proposal to contract may also be properly declined if not supported by a legally sufficient tribal resolution. See Hannahville Indian Comm. v. BIA, 34 IBIA 4, 7-9 (1999) (holding that a legally sufficient tribal resolution is a statutorily necessary antecedent part of a request to enter into an ISDA contract). The submission of a tribal resolution is required by § 102(a)(1) of the ISDEAA which provides that "the Secretary is directed, upon the request of any Indian tribe by tribal resolution, to enter into a self-determination contract or contracts * * *." 25 U.S.C. § 450f(a)(1) (emphasis added). The implementing regulations further provide at 25 CFR 900.8(d) that "[a]n initial contract proposal must contain * * * a copy of the authorizing resolution from the Indian tribe(s) to be served." Whether a proposal to contract is supported by a legally sufficient tribal resolution is therefore a threshold issue to be determined prior to considering whether a contract proposal satisfies the five specific declination criteria set forth in § 102(a)(2).

Regarding the threshold requirement that an ISDEAA contract applicant have proper tribal authorization, the preamble to the final rule promulgating 25 CFR part 900 states:

It should be clear, however, that Section 102(a)(2) of the Act[, 25 U.S.C. § 450f(a)(2),] only requires the Secretary to consider a proposal if "so authorized by an Indian tribe" pursuant to the tribal resolution required under Section 102(a)(1) of the Act[, 25 U.S.C. § 450f(a)(1)]. Therefore, although technically outside of the enumerated declination criteria in Section 102(a)(2) of the Act, it is also clear that the Act precludes the approval of any proposal and award of any self-determination contract absent an authorizing tribal resolution.

14

61 Fed. Reg. 32482, 32486 (June 24, 1996). Accordingly, if a proposal for contract funding is not authorized by resolution "from the Indian tribe(s) to be served," the Secretary's obligation to approve the proposal unless it demonstrates that one of the five specified declination criteria apply is not triggered.

BIA admittedly did not apply the declination criteria or procedures set forth in Section 102(a)(2) in arriving at its decision to reject APIA's proposal to include ANCSA § 14(h)(1) funds in its FY 2006 AFA. This is so because BIA determined that APIA lacked a legally sufficient tribal resolution before reaching the issue of whether the proposed FY 2006 AFA satisfied all of the declination criteria.

Just prior to APIA's submittal of its proposed FY 2006 AFA, TAC passed a tribal resolution in which it specifically removed APIA as the entity to receive ANCSA § 14(h)(1) funding on its behalf and resolved to itself directly contract with BIA for the funds. BIA determined that in the light of TAC's resolve to contract directly with the BIA, it had no choice but to withdraw the ANCSA § 14(h)(1) funding from APIA's FY 2006 AFA so that the funding could be transferred to TAC.

Because APIA's proposal failed to meet § 102(a)(1)'s threshold requirement that it be supported by a legally sufficient tribal resolution, BIA properly rejected it before reaching the issue of whether the proposal satisfied the specific declination criteria set forth in § 102(a)(2). As explained previously in detail, TAC, as the ANCSA Regional Corporation, is the Indian tribe to be served most directly by the ANCSA § 14(h)(1) program. Accordingly, TAC is given priority over all other tribal entities to enter into an ISDEAA contract to carry out ANCSA § 14(h)(1) PFSAs, or authorize another entity to do so on its behalf.[6/] Given TAC's May 20, 2005, Resolution specifically denying APIA the authorization to contract on its behalf to carry out ANCSA § 14(h)(1) PFSAs, APIA's proposal to contract for ANCSA § 14(h)(1) funding in its FY 2006 AFA clearly was not supported by a legally sufficient tribal resolution.

APIA further argues that BIA was required, under § 102(a)(2) and 25 CFR 900.29(a), to provide APIA with its decision to partially decline its proposed FY 2006 AFA in writing

---

[6/] As APIA points out, BIA has historically compacted with APIA to carry out ANCSA § 14(h)(1) PFSAs on the basis of sanctioning resolutions from the federally recognized tribes in the region, and has not required that APIA obtain a supporting resolution from TAC. Whether or not it was proper for BIA to compact with APIA to carry out ANCSA § 14(h)(1) PFSAs in the absence of a TAC resolution authorizing them to do so is, however, not the issue on appeal. At issue is whether it is proper for BIA to approve APIA's request to include ANCSA § 14(h)(1) funds in its proposed FY 2006 AFA in light of TAC's Resolution which expressly states TAC's intent to remove APIA as the entity to receive ANCSA § 14(h)(1) funding on its behalf.

within 90 days after receipt of the proposal. APIA contends that BIA's failure to do so resulted in the automatic acceptance of APIA's proposal to include ANCSA § 14(h)(1) funds in its FY 2006 AFA. See 25 CFR 900.18 (providing that "[a] proposal that is not declined within 90 days * * * is deemed approved).

However, § 102(a)(2) and 25 CFR 900.29(a) do not apply where, as here, the proposed funding agreement is submitted without a proper tribal resolution. As previously discussed, the Secretary's obligations under § 102(a)(2) are not triggered unless a proposal for contract funding is authorized by resolution "from the Indian tribe(s) to be served." See 25 CFR 900.8(d); 25 U.S.C. §§ 450f(a)(1)-(2). Because APIA's proposal was not supported by a legally sufficient tribal resolution as required by § 102(a)(1), the Secretary's obligation to approve the proposal within 90 days unless it provides APIA with written notice that one of the specified declination criteria apply was never triggered.

However, even assuming that those sections do apply, APIA's argument that its proposed FY 2006 AFA should be deemed approved because BIA failed to decline it in writing within 90 days cannot be sustained. BIA lacks authority to enter into an ISDEAA contract that is not authorized by a tribal resolution. See 25 U.S.C. §§ 450f(a)(1)-(2); 25 CFR 900.8(d). BIA therefore could not lawfully enter into an AFA with APIA because APIA's proposal for contract funding lacked a legally sufficient tribal resolution. BIA should not be required "to enter into an unlawful contract because no declination was made within 90 days of the submission" of APIA's proposed FY 2006 AFA. Hannahville Indian Community v. BIA, 37 IBIA 35, 43-44 (2001). Accordingly, even if BIA was required to provide a written decision declining APIA's proposal within 90 days of its submission, its failure to do so would not result in the approval of APIA's request to include ANCSA § 14(h)(1) funds in its proposed FY 2006 AFA.

In conclusion, the undersigned finds that BIA's rejection of APIA's proposed FY 2006 AFA on the basis that it included a request for ANCSA § 14(h)(1) funding did not violate the ISDEAA's declination procedures and criteria, as they were inapplicable in light of APIA's lack of proper tribal authorization.

D.  BIA's Partial Rejection of APIA's Proposed FY 2006 AFA Did Not Violate § 106(b)(2) of the ISDEAA or the Implementing Regulations at 25 CFR 900.32 and 900.33.

APIA argues that BIA was required, under § 106(b)(2) of the ISDEAA, 25 U.S.C. § 450j-1(b)(2), and 25 CFR 900.32, to approve the proposed FY 2006 AFA because it is substantially the same as the prior AFA. Section 106(b)(2) states that the amount of funds initially provided under a self-determination contract shall not be reduced by the Secretary in subsequent years except in certain specified circumstances (such as reduction in federal appropriations for the contracted activity, tribal authorization for the reduction, or completion

IBIA 06-50-A

of the activity). The implementing regulations at 25 CFR 900.32 provide that if a tribe's proposed successor AFA is "substantially the same" as the prior AFA, the Secretary shall approve and add to the contract the full amount of funds to which the contractor is entitled and may not decline any portion of the successor AFA.

Any portion of the proposed successor AFA which is not substantially the same as the prior AFA is subject to the declination criteria and procedures in 25 CFR part 900, subpart E (25 CFR 900.20-900.33). 25 CFR 900.32. BIA argues that the proposed AFA is not substantially the same as the prior AFA, and is thus subject to declination, because of TAC's intervening issuance of the resolution withdrawing its authorization for APIA to handle the ANCSA § 14(h)(1) functions.

However, 25 U.S.C. § 106(b)(2) and 25 CFR 900.32 do not apply where, as here, the proposed funding agreement is submitted without that which is required by § 102(a)(1) of the ISDEAA, 25 U.S.C. § 450f(a)(1), and 25 CFR 900.8(d): an authorizing resolution to contract to carry out ANCSA § 14(h)(1) PFSAs from the tribe to be served (TAC). As previously mentioned, a proposal for contract funding is not valid, and it does not trigger the Secretary's obligation to approve the proposal unless one of the specified declination criteria apply, if the proposal is not authorized by resolution "from the Indian tribe(s) to be served." See 25 CFR 900.8(d), 900.15; 25 U.S.C. §§ 450f(a)(1)-(2).

Likewise, the obligation of the Secretary to approve a proposed successor AFA if it is "substantially the same" as the prior AFA is contingent upon the submittal of a valid proposal, i.e., one supported by an authorizing resolution from the tribe(s) to be served. In this case the tribe to be served is TAC, which has specifically stated by resolution that APIA is not authorized to handle the ANCSA § 14(h)(1) PFSAs, and therefore APIA's proposal for ANCSA § 14(h)(1) funding is not valid and does not trigger application of 25 U.S.C. § 106(b)(2) and 25 CFR 900.32.

Assuming, arguendo, that those sections do apply, a review of the cogent analysis of the Departmental Appeals Board (DAB) of the Department of Health and Human Services (HHS) in Ninilchik Traditional Council, HHS DAB No. 1711, Docket No. A-2000-17 (IBIA 99-72-A) (Dec. 7, 1999), leads to the conclusion that APIA's proposed FY 2006 AFA is not "substantially the same" as the prior AFA. In Ninilchik, the Ninilchik Traditional Council (NTC) submitted to the Indian Health Service (IHS), HHS, a proposed AFA for FY 1999 under an existing ISDEAA contract. That contract provided that the allowable indirect contract support costs (CSC) shall be obtained by applying negotiated indirect cost rates to direct cost bases agreed upon by the parties.

Pursuant to this provision, an initial provisional indirect cost rate of 80% for FY 1996 and FY 1997 was negotiated by NTC and the HHS Division of Cost Allocation (DCA). A provisional rate is a temporary indirect cost rate applicable to a specified period which is used pending the establishment of a final rate for that period.

17

IBIA 06-50-A

With regard to the proposed AFA for FY 1999, IHS denied some of the funding for indirect CSC because IHS found that some of the costs, in violation of § 106(a)(3)(A) of the ISDEAA, were not reasonable and allowable costs and were duplicative of direct program funding provided under § 106(a)(1) of the ISDEAA. On appeal, NTC argued that IHS had to approve the funding for indirect CSC pursuant to 25 CFR 900.32 because the proposed AFA provided for approximately the same amount of funding for indirect CSC as set forth in the prior AFA.

However, the means for determining indirect CSC in the proposed AFA differed from the means in the prior AFA. The DAB concluded that the proposed AFA could not reasonably be viewed as "substantially the same" as the prior AFA, notwithstanding the fact that the amount of indirect CSC under the two funding agreements happened to be approximately the same.

The DAB reasoned:

> * * * NTC's proposed fiscal year 1999 funding agreement differs from its prior year funding agreement in that its prior year funding agreement was not based on a final negotiated rate or methodology that had been reviewed or approved by any component of HHS. Although the prior year funding agreement purported to be based on an indirect cost rate of 80%, NTC had an 80% [negotiated,] provisional indirect cost rate for fiscal years 1996 and 1997 only. DCA unilaterally reduced NTC's 80% provisional rate to a final rate of 47.5% for fiscal year 1996 and NTC failed to submit a proposal for a final indirect cost rate for fiscal year 1997. Thus, although NTC's self-determination contract requires a "negotiated" indirect cost rate, the prior year funding agreement was not based on any current negotiated or approved rate or methodology. In contrast, NTC's proposed fiscal year 1999 funding agreement is based on a indirect type cost methodology that is subject to negotiation with IHS. I agree with IHS that NTC's decision to submit a proposed fiscal year 1999 funding agreement with an indirect type methodology directly to IHS after having a prior year funding agreement that was not based on a negotiated or final rate resulted in a proposal that was not "substantially the same" as the prior year funding agreement, thus giving IHS both the opportunity and the responsibility to examine the types of indirect CSC NTC was claiming.

Ninilchik, at 10.

The DAB also noted that 25 CFR 900.32 gives as examples of situations where a proposed funding agreement is not "substantially the same" as the prior year funding agreement "a redesign proposal; waiver proposal; different proposed funding amount; or

18

IBIA 06-50-A

different program, service, function, or activity." It reasoned that "[t]hese examples suggest that a proposed funding agreement could be not 'substantially the same' as the prior year funding agreement even if the amounts are the same, e.g., a proposal for a different PFSA could still be for the same amount as the prior year funding agreement." Ninilchik, at 13.

The DAB also found:

> My conclusion that NTC's proposed fiscal year 1999 funding agreement was not "substantially the same" as the prior year funding agreement within the meaning of section 900.32 is also consistent with the requirements of section 106(a)( 3)(A) of the [ISDEAA]. As noted above, that section provides that CSC shall be "for reasonable and allowable costs" of operating the PFSAs pursuant to the contract, and "shall not duplicate" the direct program funding provided under section 106(a)(1). Assuming that IHS correctly determined that NTC's fiscal year 1999 proposed funding agreement included indirect type CSC which were duplicative and/or unreasonable, those costs would be unallowable under section 106(a)(3)(A). Thus, unless NTC's proposed fiscal year 1999 funding agreement is subject to the declination criteria pursuant to section 900.32, IHS would be required to award funding for costs that are clearly unallowable under the statute.

Id.

The proposed AFA in the present case is not "substantially the same" as the prior AFA because of TAC's intervening resolution passed on May 20, 2005, which specifically "remov[ed] APIA as the entity to receive ANCSA 14(h)[(1)] funding on its behalf" and provided that TAC would "directly contract with the Bureau of Indian Affairs for the ANCSA 14(h)[(1)] Historical and Cemetery funding." At that point any question as to whether APIA met the requirement of § 102(a)(1) and 25 CFR 900.8(d) of being authorized by resolution "from the tribe(s) to be served" to contract for ANCSA § 14(h)(1) activities was answered in the negative.

APIA's proposal to include ANCSA § 14(h)(1) funding in its FY 2006 AFA without authorization to contract is not "substantially the same" as its prior AFA for which it may have had such authorization by virtue of the resolutions from the 13 tribal organizations and the MOA between APIA and TAC. Unless APIA's proposed FY 2006 AFA may be declined with respect to the ANCSA § 14(h)(1) PFSAs, BIA would be required to award funding for PFSAs for which APIA is clearly no longer authorized to contract under 25 U.S.C. § 102(a)(1) and 25 CFR 900.8.

As such, declination of the proposal for ANCSA § 14(h)(1) funding is appropriate pursuant to § 102(a)(2)(E) of the ISDEAA, 25 U.S.C. § 450f(a)(2)(E), and 25 CFR 900.22(e), assuming, arguendo, that the declination criteria apply. Those sections allow for declination

IBIA 06-50-A

where the Secretary clearly demonstrates that "the program, function, service, or activity (or portion thereof) that is the subject of the proposal is beyond the scope of programs, functions, services, or activities covered under [25 U.S.C. § 450f(a)(1)] because the proposal includes activities that cannot lawfully be carried out by the contractor." 25 U.S.C. § 450f(a)(2)(E); see also 25 CFR 900.22 (containing nearly identical wording). BIA has clearly demonstrated that without the requisite authorizing resolution, APIA cannot lawfully carry out the ANCSA § 14(h)(1) PFSAs. However, as discussed above, the declination criteria do not apply.

In conclusion, the undersigned finds that BIA's partial rejection of APIA's proposed FY 2006 AFA on the basis that it included a request for ANCSA § 14(h)(1) funding did not violate § 106(b)(2) of the ISDEAA or the implementing regulations at 25 CFR 900.32 and 900.33.

## Conclusion

Without belaboring this Recommended Decision with additional references to contentions of fact and law, I hereby advise that all contentions submitted by the parties have been considered and, except to the extent they have been expressly or impliedly adopted herein, are rejected on the ground that they are, in whole or in part, contrary to the facts and law or are immaterial. Based upon the foregoing, BIA's rejection of that portion of APIA's FY 2006 AFA proposing funding for the performance of ANCSA § 14(h)(1) PFSAs is hereby affirmed.

Harvey C. Sweitzer
Administrative Law Judge

## Appeal Information

Within 30 days of the receipt of this Recommended Decision, you may file an objection to the Recommended Decision with the Interior Board of Indian Appeals (IBIA) under 25 CFR 900.165(c). An appeal to the IBIA under 25 CFR 900.165(c) shall be filed at the following address: Interior Board of Indian Appeals, 801 North Quincy Street, Arlington, VA 22203-1905. You shall serve copies of your notice of appeal on the Secretary of the Interior, and on the official whose decision is being appealed. You shall certify to the IBIA that you have served these copies. If neither party files an objection to the Recommended Decision within 30 days, the Recommended Decision will become final.

See page 21 for distribution.

20

IBIA 06-50-A

Distributed
By Facsimile and Certified Mail:

Hobbs, Straus, Dean & Walker, LLP
Attn: Geoffrey D. Strommer, Esq.
806 W.W. Broadway, Suite 900
Portland, Oregon 97205
(Counsel for Appellant)
Fax: 503-242-1072

Office of the Regional Solicitor
U.S. Department of the Interior
Alaska Region
Attn: Roger Hudson, Esq.
4230 University Drive, Suite 300
Anchorage, Alaska 99508-4626
(Counsel for Appellee)
Fax: 907-271-4143

By Facsimile and First Class Mail:

Lynn Allingham, Esq.
201 E. 3rd Ave.
Anchorage, Alaska 99501
Fax: 907-279-4351

Aleut Corporation
4000 Old Seward Hwy., Suite 300
Anchorage, Alaska 99503
Fax: 907-563-4328

21

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

## I (a) PLAINTIFFS

Aleutian Pribilof Islands Association

**DEFENDANTS**

Dirk Kempthorne, Secretary of the Interior; Niles Cesar, Regional Director, Alaska Region, Bureau of Indian Affairs; Bureau of Indian Affairs Office of Self-Governance

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF**
**(EXCEPT IN U.S. PLAINTIFF CASES)**

88888

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

F. Michael Willis (D.C. Bar No. 467462)
Geoffrey D. Strommer
Hobbs, Straus, Dean & Walker, LLP
2120 L. Street, N.W., Suite 700
Washington, D.C. 20037
202-822-8282

CASE NUMBER  1:06CV02173

JUDGE: Colleen Kollar-Kotelly

DECK TYPE: Administrative Agency Rev

DATE STAMP: 12/21/2006

## II. BASIS OF JURISDICTION

(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff

◉ 2 U.S. Government Defendant

○ 3 Federal Question (U.S. Government Not a Party)

○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES
FOR PLAINTIFF

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV.  CASE ASSIGNMENT AND NATURE OF SUIT

(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

○ **A. Antitrust**

☐ 410 Antitrust

○ **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

◉ **C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))
**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☒ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

○ **E. General Civil (Other)**    OR    ○ **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G.** *Habeas Corpus/ 2255* | ○ **H.** *Employment Discrimination* | ○ **I.** *FOIA/PRIVACY ACT* | ○ **J.** *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ **K.** *Labor/ERISA (non-employment)* | ○ **L.** *Other Civil Rights (non-employment)* | ○ **M.** *Contract* | ○ **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**
⊙ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
25 U.S.C. 450m-1; 5 U.S.C. 706.  Review Deparment of the Interior Decision to partially decline contract proposal under Indian Self-Determination Act.

**VII. REQUESTED IN COMPLAINT**  ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   DEMAND $ [_____]  Check YES only if demanded in complaint
JURY DEMAND:  YES ☐  NO ☒

**VIII. RELATED CASE(S) IF ANY**  (See instruction)  YES ☐  NO ☒  If yes, please complete related case form.

DATE  Dec. 21, 2006   SIGNATURE OF ATTORNEY OF RECORD  _[signature]_

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I. COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III. CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV. CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI. CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.