# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **ALEUTIAN PRIBILOF ISLANDS** | ) | |
| **ASSOCIATION, INC.** | ) | |
| 201 E. 3rd Avenue | ) | |
| Anchorage, Alaska 99501 | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **DIRK KEMPTHORNE**, in his official capacity as | ) | |
| Secretary of the Interior, | ) | |
| U.S. Department of the Interior | ) | |
| 1849 C. Street, N.W. | ) | |
| Washington, DC 20240 | ) | |
| | ) | |
| **NILES CESAR**, in his official capacity as | ) | |
| Regional Director, Alaska Region, | ) | |
| Bureau of Indian Affairs, | ) | |
| U.S. Department of the Interior; | ) | Civil Action No. 06-2173 (CKK) |
| 709 W. 9th St. | ) | |
| Juneau, Alaska 99802 | ) | |
| | ) | |
| **BUREAU OF INDIAN AFFAIRS** | ) | |
| **OFFICE OF SELF-GOVERNANCE**, | ) | |
| U.S. Department of the Interior, | ) | |
| 1849 C. Street, N.W., MS 4140 MIB | ) | |
| Washington, DC 20240 | ) | |
| | ) | |
| DEFENDANTS. | ) | |
| | ) | |

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, the Aleutian Pribilof Islands Association ("APIA"), by and through undersigned

counsel, respectfully move pursuant to Rule 56 of the Federal Rules of Civil Procedure for

summary judgment in APIA's favor. The essential facts of this case, as set forth in the

accompanying Plaintiff's Statement of Material Facts Not in Genuine Dispute, have not been

contested by the Defendants.    Therefore, as demonstrated in the accompanying Memorandum of

Points and Authorities, APIA is entitled to judgment as a matter of law.

Specifically, APIA asks that this Court enter judgment as follows:

(1)    Declaring that the thirteen Alaska tribes on whose behalf APIA entered a compact

and funding agreements with the Secretary are beneficiaries of the cultural heritage preservation

activities authorized and funded under section 14(h)(1) of the Alaska Native Claims Settlement

Act ("ANCSA"), and therefore those tribes have the legal right to assume, through APIA, those

activities under the Indian Self-Determination and Education Assistance Act ("ISDEAA");

(2)    Declaring that the Defendants, the Secretary and his delegatees in the Department

of the Interior ("Department"), violated the ISDEAA by refusing to include the ANCSA funds in

APIA's fiscal year ("FY") 2006 Annual Funding Agreement ("AFA");

(3)    Declaring that the Secretary violated the ISDEAA by refusing to follow the

declination process, and failing to apply the declination criteria, prescribed in section 102(a)(2)

of the ISDEAA, 25 U.S.C. § 450f(a)(2);

(4)    Declaring that the Secretary violated section 106(b)(2) of the ISDEAA, 25 U.S.C.

§ 450j-1(b)(2), by reducing the amount of funding in APIA's FY 2006 AFA when none of the

five statutory reasons for reducing funding were present;

(5)    Declaring that the defendants violated the DOI regulations implementing the

ISDEAA by

(a)    failing to follow the declination process and apply the declination criteria

set forth in 25 C.F.R. Part 900, Subpart E, and

(b)    partially declining APIA's proposed FY 2006 AFA when APIA's proposed

AFA was substantially the same as the prior year's AFA, 25 C.F.R. §§ 900.32, 900.33;

(6)    Declaring that Defendants' refusal to apply the Department's longstanding Alaska Order of Contracting Precedence was arbitrary, capricious, and an abuse of discretion in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A);

(7)    Declaring that Defendants' refusal to follow the declination procedures and apply the declination criteria mandated by the ISDEAA exceeded statutory authority in violation of the APA, 5 U.S.C. § 706(2)(C);

(8)    Declaring that Defendants' refusal to follow the declination procedures and apply the declination criteria prescribed in the Department's own regulations was arbitrary, capricious, and an abuse of discretion, and without observance of procedure required by law, in violation of the APA, 5 U.S.C. §§ 706(2)(A), (D);

(9)    Ordering the Secretary, pursuant to the Court's authority under 25 U.S.C. § 450m-1(a), to award and fund APIA's FY 2006 AFA on a recurring basis as proposed by APIA;

(10)    Enjoining the Secretary from withholding the ANCSA funds, or any others, from APIA's AFA for FY 2007 or thereafter, until such time as the Secretary, following the declination procedures prescribed by the ISDEAA and Department regulations, meets his burden to clearly establish the validity of the grounds for declining the proposal or any portion thereof;

(11)    Awarding APIA interest from October 2, 2005 in accordance with the Prompt Payment Act, attorney fees and expenses, and such other relief as the Court deems appropriate.

In support of its Motion for Summary Judgment, APIA submits a Statement of Material Facts Not in Genuine Dispute and a Memorandum of Points and Authorities with exhibits attached or incorporated from the Record.  In addition, APIA requests an oral hearing on this motion pursuant to Local Rule 7(f).

Respectfully Submitted,


_____ /s/ _____
F. Michael Willis (D.C. Bar No. 467462)
Geoffrey D. Strommer
HOBBS, STRAUS, DEAN & WALKER, LLP

Attorneys for the Aleutian Pribilof Islands
Association


DATED: May 2, 2007.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **ALEUTIAN PRIBILOF ISLANDS** | ) | |
| **ASSOCIATION, INC.** | ) | |
| 201 E. 3rd Avenue | ) | |
| Anchorage, Alaska 99501 | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| vi. | ) | |
| | ) | |
| **DIRK KEMPTHORNE**, in his official capacity as | ) | |
| Secretary of the Interior, | ) | |
| U.S. Department of the Interior | ) | |
| 1849 C. Street, N.W. | ) | |
| Washington, DC 20240 | ) | |
| | ) | |
| **NILES CESAR**, in his official capacity as | ) | |
| Regional Director, Alaska Region, | ) | |
| Bureau of Indian Affairs, | ) | |
| U.S. Department of the Interior; | ) | Civil Action No. 06-2173 (CKK) |
| 709 W. 9th St. | ) | |
| Juneau, Alaska 99802 | ) | |
| | ) | |
| **BUREAU OF INDIAN AFFAIRS** | ) | |
| **OFFICE OF SELF-GOVERNANCE**, | ) | |
| U.S. Department of the Interior, | ) | |
| 1849 C. Street, N.W., MS 4140 MIB | ) | |
| Washington, DC 20240 | ) | |
| | ) | |
| DEFENDANTS. | ) | |
| | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

<u>**TABLE OF CONTENTS**</u>

TABLE OF CONTENTS ........................................................................................... ii

TABLE OF AUTHORITIES ................................................................................... iv

TABLE OF EXHIBITS .......................................................................................... viii

INTRODUCTION AND SUMMARY ......................................................................1

BACKGROUND ......................................................................................................2

STANDARD OF REVIEW ......................................................................................4

BURDEN OF PROOF .............................................................................................5

RULE OF CONSTRUCTION .................................................................................5

ARGUMENT ...........................................................................................................6

    I.  Tribal Authority Supersedes the Authority of ANCSA Corporations
       To Compact for those Activities Under the ISDEAA ...................................7

        A.  *Under the ISDEAA and BIA's Policies, Tribally Sanctioned Tribal
            Organizations Have Superior Rights to Compact over ANCSA Corporations*........7

        B.  *For Many Years, the BIA Included ANCSA 14(h)(1) PFSAs in APIA's
            ISDEAA Agreements Without an Authorizing Resolution from TAC, Recognizing
            the Legal Sufficiency of the Resolutions of APIA's Member Tribes.*......................10

        C.  *Even if TAC is also a Beneficiary of ANCSA 14(h)(1), APIA's Existing
            Agreements Gave it Temporal Priority in Contracting the ANCSA Activities
            under Administrative Case Law Interpreting the ISDEAA.* ...................................12

    II. The BIA's Rejection of APIA's Proposal to Renew its AFA Violated
       Section 102 of the ISDEAA and its Implementing Regulations at
       25 C.F.R. §§ 900.32 and 33. .......................................................................15

        A.  *The BIA's Withholding of the ANCSA Funding from APIA Was an Improper
            Declination Under Section 102 of the ISDEAA.* ...................................................15

        B.  *25 C.F.R. §§ 900.32 and 900.33 Prohibit the BIA from Declining Portions
            of a Successor AFA that Are "Substantially the Same" as the Prior Year's.* .........18

    III. The BIA's Unilateral Revocation of the ANCSA Funding Violates

ii

Section 106(b)(2) of the ISDEAA. .............................................................................21

IV. Alaska Tribes and their Members Are the Primary Beneficiaries of
ANCSA § 14(h)(1) Activities. ....................................................................................22

    A.   *Congress Intended 14(h)(1) Conveyances to Benefit Alaska Natives.* .................23

    B.   *The Department's Regulations Severely Limit the Benefits of the Conveyance*
        *to the Regional Corporations and Impose Duties to Preserve the Site's Values for*
        *Tribal Beneficiaries.* .........................................................................................24

    C.   *The BIA has Historically Justified the Appropriation and Authorized the*
        *Subsequent Expenditure of  Section 14(h)(1) Funds for a Range of Cultural*
        *Heritage Activities that Benefit All Alaska Tribes and their Members.*.................26

CONCLUSION.....................................................................................................................28

# TABLE OF AUTHORITIES

## CASES AND ADMINISTRATIVE DECISIONS

*Accord Service v. Dulles,* 354 U.S. 363, 388 (1957) .......................................................20

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)........................................5

*Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986) ........................................................4

*City of Edmunds v. United States,* 749 F.2d 1419, 1421 (9th Cir. 1984).......................20

*Delaware Tribe of Indians v. BIA*, IBIA No. 02-65-A at 12 (July 26, 2002) ................18

*Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 327 (1999) .........4

*Douglas Indian Ass'n v. BIA*, 27 IBIA 292 (1995) .........................................................8

*Morton v. Ruiz*, 415 U.S. 199, 235 (1974)..............................................................10, 20

*Neal v. Secretary of the Navy*, 639 F.2d. 1029, 1035 (3d Cir. 1981)............................20

*Orengo Caraballo v. Reich*, 11 F.3d 186, 193 (D.C. Cir. 1993) ...................................20

*Pennsylvania v. Weinburger*, 367 F. Supp. 1378 (D.D.C. 1973)...................................20

*Pit River Health Service, Inc. v. Indian Health Service*, DAB CR333 (1994),
1994 WL 596859 .....................................................................................................13, 14

*Ramah Navajo Chapter v. Lujan*, 112 F.3d 1455, 1462 (10th Cir. 1997) ...................5-6

*Rapid City Indian Health Board, Inc. v. Director, Aberdeen Area Office*, *IHS*,
No. IBIA 97-100-A (August 29, 1997)............................................................................20

*Reeves v. Andrus*, 465 F. Supp. 1065, 1069 (D. Alaska 1979)....................................20

*Samish Indian Nation v. United States*, 419 F.3d 1355, 1367 (Fed. Cir. 2005) ............5

*Shoshone-Bannock Tribes of the Fort Hall Reservation v. Shalala*, 988 F. Supp.
1306, 1318 (D. Or. 1997)................................................................................................5

*Shoshone-Bannock Tribes of the Fort Hall Reservation v. Thompson*, 279 F.3d
660 (9th Cir. 2002).........................................................................................................5

*Susanville Indian Rancheria v. Director, California Area Office, Indian Health Service*, IBIA
No. 97-89-A (April 6, 2001) (Recommended Decision), *aff'd as amended*, Dep't of Health &
Human Services Departmental Appeals Board, DAB No. A-02-30 (Feb. 6, 2002) ...............19, 21

*Vitarelli v. Seaton*, 359 U.S. 535, 539-540 (1959) .......................................................................20

## STATUTES

25 U.S.C. § 450a(b) ..................................................................................................................... 6

25 U.S.C. § 450b(e) .......................................................................................................................7

25 U.S.C. § 450b(*l*) .......................................................................................................................2

25 U.S.C. § 450f(a)(2) ...................................................................................................1, 16, 18, 20

25 U.S.C. § 450f(a)(2)(E) ...........................................................................................................21

25 U.S.C. § 450f(e)(1) ......................................................................................................5, 16, 18

25. U.S.C.§ 450j-1(b) ...................................................................................................................21

25 U.S.C. § 450j-1(b)(2) .........................................................................................................1, 21

25 U.S.C. § 450k(d) .....................................................................................................................20

25 U.S.C. § 450m-1 .......................................................................................................................1

25 U.S.C. § 450m-1(b).................................................................................................................13

25 U.S.C. § 458aa .........................................................................................................................8

43 U.S.C. § 1604 .........................................................................................................................25

43 U.S.C. § 1606(d) .....................................................................................................................10

43 U.S.C. § 1606(g)(1)(A) ..........................................................................................................25

43 U.S.C. § 1613(h)(1) ...................................................................................................... *passim*

43 U.S.C. § 1613(h)(1)(A)...........................................................................................................23

## REGULATIONS

25 C.F.R. § 900.8(d) ....................................................................................................................11

25. C.F.R. § 900.18 ................................................................................................................16, 17

25 C.F.R. § 900.20 ......................................................................................................17

25 C.F.R. § 900.22 ......................................................................................................16

25 C.F.R. § 900.29(a) .............................................................................................16, 17

25 C.F.R. §§ 900.32 and 33 ..........................................................................15, 18, 19, 20, 22

25 C.F.R. 900.150(a) through (h) ....................................................................................16

25 C.F.R. 900.152 through 900.169 .................................................................................16

25 C.F.R. § 900.154 ......................................................................................................4

25 C.F.R. § 900.158 ......................................................................................................4

25 C.F.R. § 900.163 .................................................................................................5, 16

25 C.F.R. § 1000.432(a) ...............................................................................................16

43 C.F.R. § 2653.5 .......................................................................................................3

43 C.F.R. § 2653.11(a)(b)(c) .....................................................................................24, 25

## OTHER AUTHORITIES

117 CONG. REC. 46964 (Dec. 14, 1971) ..........................................................................23

Alaska Native Claims Settlement Act, Pub. L. No. 92-203 § 14(h)(1), 85 Stat. 688, 704 (1971) ..................................................................................................................2

Alaska Tribal Health Compact, Preamble; Alaska Area Guidelines for Tribal Clearances for Indian Self-Determination Contracts, 46 Fed. Reg. 27178 (May 18, 1981) .............................8

BLACK'S LAW DICTIONARY 1598 (6th ed. 1990) ..............................................................20

David S. Case & David A. Voluck, ALASKA NATIVES AND AMERICAN LAWS 390 (2002 ed) .............................................................................................................10, 25

Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 58 Fed. Reg. 54364, 54366 n.2 (Oct. 21, 1993) ....................................8

ISDEAA Amendments of 1994, Pub. L. No. 103-413 § 202 ....................................................8

Pub. L. No. 108-452, 118 Stat. 3575 (Dec. 10, 2004)...........................................................24

S. Rep. No. 100-274, 1988 U.S.C.C.A.N. 2620, 2622, 2643, 2649 (1987).........................6, 18, 21

Shareholder Mail Survey: The Future of the Aleut Corporation ..............................................10, 25

**TABLE OF EXHIBITS**

| | |
|---|---|
| A | Compact of Self-Governance between the Aleutian/Pribilof Islands Association, Inc. and the United States of America |
| B | Bureau of Indian Affairs, Budget Justifications and Performance Information, Fiscal Year 2006 |
| C | Memorandum of Agreement between Aleutian/Pribilof Islands Association, Inc. and The Aleut Corporation to cooperate in a joint effort to conduct certain cultural heritage and preservation activities |
| D | Letter from Aleutian/Pribilof Islands Association, Inc. to Bureau of Indian Affairs, Office of Self-Governance, regarding the fiscal year 2006 reprogramming request and the preservation of the Association's right to appeal the Bureau of Indian Affairs' decision regarding those funds |
| E | Bureau of Indian Affairs, Alaska Region, letter to the Aleutian/Pribilof Islands Association, Inc. regarding the Association's fiscal year 2007 funding agreement proposal |
| F | Letter from Bureau of Indian Affairs, Alaska Region, to Aleutian/Pribilof Islands Association, Inc. regarding the agency's recommended decision from the informal conference held pursuant to 25 C.F.R. § 900.154 |
| G | Recommended Decision of the Department of Interior, Office of Hearings and Appeals, August 31, 2006 |
| H* | February 1, 2001 Letter from Glenda Miller (BIA) to Melvin Smith (TAC) re: 14(h)1 compact funding |
| I* | 2005 Annual Funding Agreement – Reprogramming Request for Aleutian/Pribilof Islands Association |
| J* | May 12, 2006 Letter from Ronald Lee (TAC) to the Honorable Judge Sweitzer |
| K* | 2006 Annual Funding Agreement – Reprogramming Request for Aleutian/Pribilof Islands Association |

| L* | May 24, 2004 Memorandum from Roger Hudson (Regional Solicitor) to Roger Drapeaux and Ken Pratt (Alaska Region, BIA) re: Funding for implementation of ANCSA 14(h)(1) |
|----|----|
| M* | BIA Guidance re "Some Potential Uses of ANCSA Program Funds by Compact Tribes" |

**\* Newly filed with this Motion**

## INTRODUCTION AND SUMMARY

The Indian Self-Determination and Education Assistance Act ("ISDEAA") allows Indian tribes and tribal organizations to assume responsibility, and associated funding, for federal programs for the benefit of Indians that the Secretary of the Interior ("Secretary") would otherwise have been obligated to provide. Recognizing the inherent reluctance of the Department to cede its resources and authority to tribes, Congress mandated that the Secretary approve a tribal proposal unless the Secretary, following the statutory declination procedure, "clearly demonstrates" that one of five narrow statutory declination criteria is met. 25 U.S.C. § 450f(a)(2). In addition, the ISDEAA prohibits reductions in funding from one year to another unless one of five narrow exceptions applies. *Id.* § 450j-1(b)(2).

For ten years, Plaintiff, the Aleutian Pribilof Islands Association ("APIA") carried out, as part of its ISDEAA agreement, activities authorized and funded under section 14(h)(1) of the Alaska Native Claims Settlement Act ("ANCSA"), 43 U.S.C. § 1613(h)(1). In 2005, however, Defendants declined to renew the ISDEAA agreement with respect to the ANCSA activities and funding. In doing so, Defendants did not follow the declination process prescribed by Congress, nor did they follow the Department's own regulations governing declination and renewal of ISDEAA agreements, or the Department's published policy on contracting preference.

In this action under section 110 of the ISDEAA, 25 U.S.C. § 450m-1, APIA challenges the actions of the Secretary and his delegatees, the Bureau of Indian Affairs ("BIA") and Office of Self-Governance ("OSG"), on the grounds that the rejection of APIA's proposal and reduction in funding from FY 2005 to FY 2006 were improper under the ISDEAA, its implementing regulations, and Department policy.

## **BACKGROUND**

APIA is a tribal organization under the ISDEAA authorized by thirteen federally recognized tribal governments in its region to carry out a range of services for beneficiaries in the region.  *See* 25 U.S.C. § 450b(*l*).  APIA contracts with federal, state and local governments and provides a broad spectrum of services throughout the region, including health care, education, social, psychological, employment and vocational training, and public safety services. Since 1996, APIA has carried out a variety of programs, functions, services and activities ("PFSAs") pursuant to a Compact of Self-Governance and funding agreements negotiated with the Secretary of the Interior under Title IV of the ISDEAA.  *See* Exhibit A (Compact of Self-Governance Between the Aleutian/Pribilof Islands Association, Inc. and the United States of America).

Among these PFSAs are activities related to section 14(h)(1) of the ANCSA.  Section 14(h)(1) authorizes the Secretary of the Interior to withdraw and convey to ANCSA regional corporations fee title to existing cemetery sites and historical places.[1]  43 U.S.C. § 1613(h)(1). Regulations at 43 C.F.R. § 2653.5 describe the process by which such sites are to be investigated, evaluated, and ultimately conveyed if they meet certain criteria.  As part of its obligations under the Compact and AFAs, APIA has conducted site investigation and evaluation, along with related cultural heritage activities in accordance with the Department's regulations and BIA guidelines on the use of ANCSA program funds.

In its annual budget, the BIA requests ANCSA section 14(h)(1) funds as a separate line under the Trust Services programs within the Tribal Priority Allocations (TPA) budget.  *See*

---

[1] Alaska Native Claims Settlement Act, Pub. L. No. 92-203 § 14(h)(1), 85 Stat. 688, 704 (1971), codified as amended at 43 U.S.C. § 1613(h)(1).

Exhibit B at BIA-COMP-1 (FY 2006 BIA Budget listing "ANCSA Historical and Cemetery Sites" among Trust Services within TPA).  TPA are recurring funds that provide the main source of tribal resources to provide basic government services for most tribes.  As explained in the BIA's FY 2006 budget justification, "Tribal Priority Allocations (TPA) fund basic tribal services, such as social services, adult vocational training, child welfare, natural resources management, and contract support."  Exhibit B at BIA-SUM-15.  In the same document, the BIA describes the ANCSA program as follows: "This program supports the Departmental goal of Serving Communities by fulfilling Indian fiduciary trust responsibilities by protecting cultural and natural heritage resources."  *Id*. at BIA-TPA-47 to 48.  Consistent with these goals, APIA has used ANCSA funds to develop an archeological database, conduct Aleut language programs, repatriate remains, and research historical sites—all activities approved by BIA guidelines, as discussed below.

On June 23, 2005, APIA submitted a "Reprogramming Request" for FY 2006 that included, as in the previous ten years, funding for ANCSA section 14(h)(1) activities.  *See* Exhibit K (FY 2006 AFA Reprogramming Request).  As in past years, the inclusion of these PFSAs and related funds in the agreement was supported by the resolutions of the thirteen Tribes that sanction APIA.  The FY 2006 proposal was substantially identical to that agreed to by the BIA and OSG for FY 2005.  *Compare* Exhibit I and Exhibit K.  The BIA signed the proposal, but the OSG refused to do so.

On October 3, 2005, the OSG returned the proposal with the ANCSA funds deleted.  Although the Department issued no decision explaining its action, the Department has since explained that The Aleut Corporation ("TAC"), a regional for-profit corporation, had decided to contract for the ANCSA funds and the Department considered TAC's right to contract superior to

that of APIA.  The BIA would not release any funds to APIA under the FY 2006 AFA until

APIA agreed to the withdrawal of the ANCSA 14(h)(1) funds.  APIA did not agree to the

withdrawal of these PFSAs and funds, and the parties agreed on language contained in footnote

15 in the 2006 AFA that reflects BIA's unilateral decision to transfer the funds to TAC and

preserves APIA's right to "appeal the BIA decision regarding these funds."  Exhibit D, 2006

AFA Reprogramming Request at 2 n.15.

APIA initially exercised its appeal rights by requesting an informal conference, pursuant

to 25 C.F.R. § 900.154.   Following the conference, the presiding official, Deputy Regional

Director Charles F. Bunch, issued a recommended decision upholding the initial decision to

transfer the 14(h)(1) funding from APIA to TAC.  *See* Exhibit F.  APIA then appealed to the

Interior Board of Indian Appeals ("IBIA") under 25 C.F.R. § 900.158.  The IBIA assigned the

case to Administrative Law Judge Sweitzer in the Hearings Division of the Office of Hearings

and Appeals.  Judge Sweitzer issued a Recommended Decision, dated August 31, 2006,

upholding the BIA's action.  *See* Exhibit G (Recommended Decision).  APIA did not appeal that

decision to the IBIA within 30 days, and it became final for the Department.  This action

followed.

## **STANDARD OF REVIEW**

Summary judgment is appropriate where there are no genuine issues of material fact and

the moving party is entitled to a judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S.

317, 330 (1986); *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 329 (1999).

The movant bears the initial burden of "identifying those portions of 'the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it

believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp.*, 477 U.S. at

323 (quoting Fed. R. Civ. P. 56(c)).  "By its very terms, this standard provides that the mere

existence of *some* alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment; the requirement is that there be no *genuine*

issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis

in original).  A "material fact" is one that will "affect the outcome of the suit under the governing

law."  *Id*. at 248.

   The standard of review in civil suits brought under the ISDEAA is de novo.  *Shoshone-*

*Bannock Tribes of the Fort Hall Reservation v. Shalala*, 988 F. Supp. 1306, 1318 (D. Or. 1997),

*rev'd on other grounds*, *Shoshone-Bannock Tribes of the Fort Hall Reservation v. Thompson*,

279 F.3d 660 (9th Cir. 2002).

## BURDEN OF PROOF

   When declining all or part of a proposed ISDEAA agreement, "the Secretary shall have

the burden of proof to establish by clearly demonstrating the validity of the grounds for declining

the contract proposal (or portion thereof)."  25 U.S.C. § 450f(e)(1); *see also* 25 C.F.R. § 900.163

(Department regulation establishing same burden on Secretary).

## RULE OF CONSTRUCTION

   The ISDEAA and APIA's Compact must be "liberally construed to achieve its purposes:

... to carry out Self-Governance ... and [to] transfer[] control to tribal governments, upon tribal

request, over funding and decision-making of federal programs, services, functions, and

activities as an effective way to implement the federal policy of government-to-government

relations with Indian tribes."  Exhibit A, Compact of Self-Governance, Art. I § 2(a); *see also*

*Samish Indian Nation v. United States*, 419 F.3d 1355, 1367 (Fed. Cir. 2005) (ISDEAA to be

construed liberally in favor of tribes to advance its remedial purpose); *Ramah Navajo Chapter v.*

*Lujan*, 112 F.3d 1455, 1462 (10th Cir. 1997) (ISDEAA to be construed liberally in favor of tribes, even when contrary interpretation of agency would otherwise be entitled to deference).

## **ARGUMENT**

The BIA's withdrawal of PFSAs and related funds from APIA's AFA violates provisions in APIA's Compact and AFA, Titles I and IV of the ISDEAA and applicable regulations.  In addition, the BIA's actions, for the first time, give priority for contracting activities funded with TPA funds to an ANCSA corporation, TAC, over the rights of a tribal organization like APIA, which has been sanctioned by the thirteen federally recognized tribes in the region.  This decision to place the rights of ANCSA corporations above the rights of tribes violates the BIA's own contracting preference hierarchy, discussed below, which has been in place for decades and is rooted in the ISDEAA's purpose to promote tribal self-governance.[2]

In addition to the fundamental error of placing the rights of TAC above those of APIA's thirteen sanctioning tribal governments, the BIA's decision rests on misinterpretations of both ANCSA section 14(h)(1) and the ISDEAA.  First, the BIA's decision violates the statutory and regulatory prohibition against declining a successor agreement that is substantially the same as its predecessor, so the BIA lacked authority under the statute and its own regulations to reject APIA's proposed renewal of the section 14(h)(1) activities.  Second, the BIA's unilateral revocation of the section 14(h)(1) funding violates ISDEAA section 106(b)(2), which prohibits reductions in funding unless one of five narrow exceptions applies.  Third, contrary to the BIA interpretation, the primary beneficiaries of section 14(h)(1) are Alaska tribes and their members,

---

[2] *See, e.g.*, 25 U.S.C. § 450a(b) (policy animating ISDEAA reflects commitment "to supporting and assisting Indian tribes in the development of strong and stable <u>tribal governments</u>") (emphasis added); S. Rep. No. 100-274, 1988 U.S.C.C.A.N. 2620, 2622 ("The federal policy of Indian self-determination is premised upon the legal relationship between the United States and Indian <u>tribal governments</u>.") (emphasis added).

not the regional corporations, so APIA's member tribes properly authorized APIA to compact 14(h)(1) functions on their behalf.

## I. Tribal Authority Supersedes the Authority of ANCSA Corporations to Compact for those Activities under the ISDEAA.

The ISDEAA allows Tribes to authorize, by tribal resolution, tribal organizations such as APIA to assume PFSAs that benefit those Tribes and their members.  This is precisely what APIA's member Tribes did with respect to the ANCSA activities, along with all other PFSAs from which the Tribes benefit.  For ten years, the Department agreed that this delegation of authority to APIA to carry out ANCSA activities on behalf of its member Tribes was proper, and thus the Department included those PFSAs in APIA's funding agreements.  In doing so, the Department was following the mandates of the ISDEAA and its own regulations and policy, from which it now seeks to depart by giving a priority to contract PFSAs under the ISDEAA to administer TAC instead of the federally recognized tribal governments represented by APIA.

### A. Under the ISDEAA and BIA's Policies, Tribally Sanctioned Tribal Organizations Have Superior Rights to Compact over ANCSA Corporations.

Because ANCSA regional and village corporations can be treated in very limited circumstances as "tribes" for purposes of contracting under the ISDEAA,[3] it sometimes arises that more than one entity in Alaska may be eligible to contract or compact for particular PFSAs. The BIA many years ago established a priority policy to address these circumstances.  In its original published list of federally recognized tribes, the Department of the Interior noted that "a number of non-tribal Native entities in Alaska … including ANCSA village and regional corporations," were eligible for federal contracts by statute, with one important limitation:

---

[3] *See* 25 U.S.C. § 450b(e) (ISDEAA provision defining "Indian tribe" to include "any Alaska Native village or regional or village corporation as defined in or established pursuant to the Alaska Native Claims Settlement Act").

"Under longstanding BIA policy, priority for contracts and services in Alaska is given to reorganized and traditional governments over non-tribal corporations."[4]

This policy derives from and accords with the ISDEAA, which is premised on the government-to-government relationship between federal and tribal governments. *See, e.g.*, ISDEAA Amendments of 1994, Pub. L. No. 103-413 § 202, 25 U.S.C. § 458aa note (describing purpose of Title IV as follows: "transferring control to <u>tribal governments</u>, upon <u>tribal</u> request, over funding and decision-making for Federal programs, services, functions and activities, or portions thereof, is an effective way to implement the Federal policy of <u>government-to-government</u> relations with Indian <u>tribes</u>") (emphasis added); *see also* Exhibit A, Compact of Self-Governance, Art. I § 2(a) (reciting purpose of Compact and of Title IV in same terms).

The Interior Board of Indian Appeals ("IBIA") has recognized and applied the BIA's Order of Precedence and expressed it as follows:

1. Active Indian Reorganization Act (IRA) Council.
2. In the absence of an IRA, the formally established Traditional Council.
3. In the absence of either of the first two, the local ANCSA village/urban for-profit corporation.
4. In absence of all above, the ANCSA Regional for-profit corporation.

*Douglas Indian Ass'n v. BIA*, 27 IBIA 292, 293 (1995). When two tribal entities, each a beneficiary of a particular program, both seek to contract that program, the ISDEAA and the Alaska priority policy dictate that tribal governments have priority over regional corporations. Thus APIA has a priority over TAC, and the BIA should have continued to award the ANCSA program funding to APIA.

---

[4] Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 58 Fed. Reg. 54364, 54366 n.2 (Oct. 21, 1993). The Indian Health Service (IHS) has the same policy. The IHS has prioritized entities eligible to authorize ISDEAA contracting in the following order of preference: (1) the Indian Reorganization Act (IRA) Council, if it provides governmental functions; (2) the traditional village council; (3) the village profit corporation; and, lastly, (4) the regional profit corporation. Alaska Tribal Health Compact, Preamble; Alaska Area Guidelines for Tribal Clearances for Indian Self-Determination Contracts, 46 Fed. Reg. 27178 (May 18, 1981).

- 8 -

The BIA decided, and Judge Sweitzer agreed, that the Alaska priority policy should not be applied in this case because TAC, and not APIA, is the "primary beneficiary" of the 14(h)(1) program. Even if TAC is the "primary beneficiary," which APIA disputes, the hierarchy should still be applied. There is no legal requirement—and neither the BIA nor Judge Sweitzer has cited one—that only the "primary" beneficiary of a program may contract for it under the ISDEAA. In fact, the priority policy is based on the recognition that more than one tribal entity may be authorized to contract; otherwise, there would be no need for a preference hierarchy. The conclusory designation of one entity as the "primary" beneficiary would end the analysis and render the hierarchy a nullity.

Moreover, in this case the true beneficiaries of ANCSA 14(h)(1) are neither TAC nor APIA, but the Alaska Natives whose cultural traditions are meant to be protected, preserved and enhanced by section 14(h)(1)—for example, the Aleut language programs, repatriation of remains, and archeological activities APIA has been conducting for ten years. The question is which organization is better able to deliver those benefits through carrying out these activities, precisely the kind of issue the priority policy was meant to resolve. APIA submits that any interest TAC may have in cultural heritage is ancillary at best, while preservation and enhancement of culture is among the central purposes of the tribal governments represented by APIA. The Department has recognized this in its characterization of ANCSA funding as TPA, *infra* § IV.A.3, and indeed it is widely recognized that Alaska tribal governments, not ANCSA corporations, best protect and promote the Native cultural heritage embodied in 14(h)(1) sites.

> Alaska Native villages and their tribal governments are and likely will remain the focus of Alaska Native cultural values. Unlike the village and regional corporations established under ANCSA, these governments are not enjoined either by statutory schemes or articles of incorporation to focus their attention on financial profit.

David S. Case & David A. Voluck, ALASKA NATIVES AND AMERICAN LAWS 390 (2002 ed.); *see also* 43 U.S.C. § 1606(d) (ANCSA regional corporation mandate is "to conduct business for profit"). The BIA's priority policy recognizes that the beneficiaries of the programs that can be assumed under ISDEAA are likely to be better served by tribal governments—or tribal organizations sanctioned by them—which are politically accountable directly to the primary beneficiaries. This is particularly the case with respect to the protection of these cultural and historical sites. In contrast, ANCSA corporations' allegiance is to the much more limited class of its shareholders, and their focus is appropriately to generate profits for those shareholders. *See* Shareholder Mail Survey: The Future of the Aleut Corporation at 5, *available at* http://www.aleutcorp.com/pdf/tacpocketbrochure4.pdf (stating that, by TAC's own estimate, TAC shareholders represent only one-half to one-third of all Aleuts).

The BIA's misreading of the ISDEAA and misapplication of its own contracting priority policy threatens the administration of the purposes of section 14(h)(1). APIA, the regional tribal organization sanctioned by the thirteen federally recognized tribal governments in the region, clearly has priority over TAC, a for-profit ANCSA corporation, both under the BIA policy which has followed for years, and under any rational view of the goals of section 14(h)(1) and the ISDEAA. In the absence of any rational justification for changing the priority policy and any BIA action to change the policy, the BIA is bound to follow it.[5]

> B.    *For Many Years, the BIA Included ANCSA 14(h)(1) PFSAs in APIA's ISDEAA Agreements Without an Authorizing Resolution from TAC, Recognizing the Legal Sufficiency of the Resolutions of APIA's Member Tribes.*

In 1995 APIA, as authorized by the tribal governments it represents, requested to assume responsibility, and associated funding, for ANCSA 14(h)(1) activities among other PFSAs. The

---

[5] *See Morton v. Ruiz*, 415 U.S. 199, 235 (1974) (the BIA must "comply ... with its own internal procedures" even where those procedures are more rigorous than required).

BIA Alaska Regional Office approved this request, and included in APIA's fiscal year FY 1996

funding agreement $73,379 for ANCSA PFSAs.  Exhibit H, Letter from Glenda Miller, BIA

Regional Realty Officer to Melvin Smith, The Aleut Corporation (Feb. 2, 2001).  This amount

recurred in APIA's funding agreements each year through FY 2005.  *See* Exhibit I at line 92

(ANCSA funding in FY 2005 Annual Funding Agreement ("AFA")).

    Before reprogramming the ANCSA funding to APIA in FY 1996, the BIA did not consult

with, or even notify, TAC, the ANCSA regional corporation for the Aleutian Region.  Exhibit J,

Letter from Ronald S. Lee to Judge Sweitzer, DOI Office of Hearings and Appeals (May 12,

2006).  The BIA correctly interpreted ANCSA 14(h)(1) to benefit Alaska Tribes and their

members, not just the regional corporations, so the resolutions of the tribal governments fully

authorized APIA and the agency to enter the agreements.  *See* 25 C.F.R. § 900.8(d) (proposed

ISDEAA agreement must include "the authorizing resolution from the Indian tribe(s) to be

served").

    Beginning in 1998, APIA voluntarily entered a Memorandum of Agreement ("MOA")

with TAC concerning the ANCSA 14(h)(1) activities.  Aware of the MOA, the BIA continued to

include ANCSA 14(h)(1) activities in APIA's funding agreements without seeking an authorizing

resolution from TAC.  This practice made sense, because the Department continued to request

appropriations for ANCSA 14(h)(1) activities as part of the recurring TPA budget for tribal

governments.  *See infra* Section I.A.3.

    In 2004, the Regional Solicitor issued a memorandum that set forth the novel conclusion

that ANCSA funds had been "erroneously included in contracts and compacts as if it were

properly categorized as recurring Tribal Priority Allocation (TPA) funding.... I think the ANCSA

funds are more properly viewed as a category of non-recurring funds, which should not be

included in a tribal TPA to begin with."  Exhibit L at 2.  The BIA did not implement this

recommendation in 2004, did not require that APIA obtain a resolution from TAC, and again

included ANCSA funding in APIA's FY 2005 AFA.  Exhibit I.  Despite the memorandum having

been written almost three years ago, the Department has taken no steps at all at a policy level to

change the status of ANCSA funding as TPA funds directed toward tribal governments, formally

modify its Alaska contracting priority policy, or otherwise adopt the Regional Solicitor's

conclusions—aside from the ad hoc partial declination of APIA's FY 2006 proposal.

In justifying its decision to reverse its longstanding practice and revoke APIA's ANCSA

funding, the BIA argued (and Judge Sweitzer agreed) that TAC's resolution of May 20, 2005

completely changed the legal landscape.  The effect of the resolution was to "revok[e] APIA's

authority to act on [TAC's] behalf regarding the ANCSA program."  Exhibit F at 3; *see also*

Exhibit G at 15 (TAC resolution "specifically denying APIA the authorization to contract on its

behalf to carry out ANCSA § 14(h)(1) PFSAs" was proper basis to revoke funding).  This logic

has serious flaws: TAC had <u>never</u> previously authorized APIA by resolution to carry out

ANCSA 14(h)(1) activities on its behalf—and BIA had never required that it do so—thus there

was nothing for TAC to revoke.  In fact, APIA and the Department had included the ANCSA

activities and funding in their ISDEAA agreements for a decade on the strength of the

resolutions of the tribal governments represented by APIA, and they were correct to do so.

C.    *Even if TAC is also a Beneficiary of ANCSA 14(h)(1), APIA's Existing*
      *Agreements Gave it Temporal Priority in Contracting the ANCSA Activities*
      *under Administrative Case Law Interpreting the ISDEAA.*

Even if TAC is a beneficiary of ANCSA 14(h)(1), such that TAC would be legally

entitled to contract 14(h)(1) activities itself, APIA, another beneficiary of the activities,

compacted them first.  Facing a closely analogous situation, the Departmental Appeals Board

"("DAB") of the Department of Health and Human Services ("DHHS"), the other federal agency with primary responsibility for carrying out the ISDEAA, held that a tribe's temporal priority defeated a second tribe's equal or even superior right to contract to provide the same services.[6]

In *Pit River Health Service, Inc. v. Indian Health Service*, DAB CR333 (1994), 1994 WL 596859, Pit River proposed to include in its contract funds associated with health care services to unaffiliated Indians residing within the Tribe's ancestral territory. The Tribe's ancestral territory overlapped or encompassed the service areas of at least two other tribal health care providers operating under existing ISDEAA contracts. To approve the Pit River proposal, the Indian Health Service ("IHS") would have had to unilaterally reduce the funding of the other tribal contractors, which is prohibited by section 110 of the ISDEAA.[7] Moreover, approving Pit River's proposal at the expense of the other contractors would have violated the IHS's duty under section 106(b)(2) not to reduce funding to those contractors in the absence of one of five narrow exceptions. *Pit River* at *11.

Faced with this legal backdrop, the IHS partially declined the Pit River proposal under the declination criterion at section 102(a)(2)(C) on the ground that the proposed project or function to be contracted for cannot be properly completed or maintained as proposed. The DHHS DAB affirmed this decision: "These [pre-existing] contracts enjoy specific statutory protections provided by [the ISDEAA] against unilateral modification of their terms by IHS. [The ISDEAA] protects contracts between IHS and Indian tribes or tribal organizations from unilateral modifications by IHS or from funding reductions, except in defined circumstances which are not applicable here." *Id*. at *12.

---

[6] In his Recommended Decision, Judge Sweitzer inexplicably completely ignored and failed to address APIA's argument on temporal priority or the *Pit River* case supporting it.

[7] 25 U.S.C. § 450m-1(b) ("The Secretary shall not revise or amend a self-determination contract with a tribal organization without the tribal organization's consent.").

*Pit River* is instructive at several levels. Most obviously, the fact pattern is closely analogous to the situation here, where TAC has proposed to contract to perform services already included in a pre-existing ISDEAA agreement with APIA. Pit River's resolution to contract with the IHS did not mean that the IHS had to reduce funding to other tribal organizations to accommodate that request. Pit River had an equal, even arguably a greater, right to contract for the services given the population's location in its ancestral territory. Yet the IHS, upheld by the DAB on appeal, adhered to the express terms of the ISDEAA and its implementing regulations rather than circumvent them.

The *Pit River* case also illustrates that, when two tribal organizations each have rights to contract certain services, contracting rights can be a simple matter of temporal priority. If the health care services to unaffiliated Indians in the Pit River ancestral territory were not already under contract to authorized tribal organizations, the IHS would have been required to contract such services to the Pit River Tribe without violating the provisions of the ISDEAA cited above. Similarly, TAC (assuming it is a beneficiary of the ANCSA program) would have been able, in the absence of the pre-existing agreement between APIA and BIA, to contract that program directly. But APIA got there first. As *Pit River* makes clear, the ISDEAA and its implementing regulations protect the stability of self-determination and self-governance agreements even where other tribal entities may arguably have equal or even superior rights to contract.

Finally, *Pit River* illustrates the proper way for an agency to decline a tribal proposal under the ISDEAA—in marked contrast to the BIA's procedure in this case. The IHS issued a timely partial declination decision, under section 102(a)(2)(C), identifying particular reasons that the agency could not approve the contested portion of the agreement without violating the ISDEAA. In contrast, in this case the BIA ignored the declination procedures and criteria

spelled out by the ISDEAA and its implementing regulations simply by pointing to the TAC resolution.  These actions cannot be sustained, because they flagrantly violate the letter and the spirit of the ISDEAA and its implementing regulations, as discussed below.

## II.    The BIA's Rejection of APIA's Proposal to Renew its AFA Violated Section 102 of the ISDEAA and its Implementing Regulations at 25 C.F.R. §§ 900.32 and 33.

The BIA's decision not to renew APIA's proposed AFA was improper for both of the following reasons: (A) The BIA failed to apply the declination process and criteria mandated by section 102 of the ISDEAA, and (B) the decision not to renew violated the BIA's own rules that prohibit the agency from declining proposals for successor AFAs that are substantially the same as a previous year's AFA.

### A.    *The BIA's Withholding of the ANCSA Funding from APIA Was an Improper Declination Under Section 102 of the ISDEAA.*

Section 102(a)(2) of the ISDEAA, and the regulations thereunder, prohibits the procedures followed by the BIA in this case.  The BIA's denial of APIA's proposal to renew its AFA, like any other denial of a contract or portion thereof under the ISDEAA, must meet the substantive and procedural requirements of section 102.  The BIA compacted the ANCSA program to APIA for many years—without requiring a TAC resolution—then unilaterally declined to continue doing so.  Under the ISDEAA, when he declines a proposal the Secretary must provide APIA written notification containing:

> a specific finding that clearly demonstrates that, or that is supported by a controlling legal authority that--
> **(A)**  the service to be rendered to the Indian beneficiaries of the particular program or function to be contracted will not be satisfactory;
> **(B)**  adequate protection of trust resources is not assured;
> **(C)**  the proposed project or function to be contracted for cannot be properly completed or maintained by the proposed contract;
> **(D)**  the amount of funds proposed under the contract is in excess of the applicable funding level for the contract, as determined under section 106(a); or

    **(E)** the program, function, service, or activity (or portion thereof) that is the subject of the proposal is beyond the scope of programs, functions, services, or activities covered under paragraph (1) because the proposal includes activities that cannot lawfully be carried out by the contractor.

25 U.S.C. § 450f(a)(2); *see also* 25 C.F.R. § 900.22 (explaining that "[t]he Secretary may only decline to approve a proposal for one of five specific reasons," and echoing the statutory criteria of section 102(a)(2)). The Secretary bears the burden of proof and must "clearly demonstrat[e] the validity of the grounds for declining the contract proposal (or portion thereof)." 25 U.S.C. § 450f(e)(1); 25 C.F.R. § 900.163.

    When declining a proposal or a portion thereof, the Secretary must provide "a detailed explanation of the reason for the decision," including "a specific finding that clearly demonstrates that (or is supported by a controlling legal authority that) one of the [declination conditions] exists." 25 C.F.R. § 900.29(a). In this case it is undisputed that the BIA did not provide APIA with any written declination of its proposal that justifies the declination based on one of these statutory reasons. Answer ¶ 32 (admitting that BIA never sent APIA a written explanation of its decision or notified APIA of its right to appeal). Therefore, the attempted declination by BIA in this case violated section 102(a)(2). "A proposal that is not declined within 90 days ... is deemed approved and the Secretary shall award the contract or any amendment or renewal within that 90-day period and add to the contract the full amount of funds pursuant to Section 106(a) of the Act." *Id*. § 900.18.[8]

---

[8] The ISDEAA section 102 and Part 900 declination criteria apply to APIA's Title IV agreements because the Title IV regulations incorporate by reference the appeals procedures of Title I, which in turn incorporate the substantive declination criteria of Section 102. 25 C.F.R. § 1000.432(a) (for Title I-eligible programs such as ANCSA 14(h)(1), "appeal may only be filed with IBIA [the Interior Board of Indian Appeals] under the provisions set forth in 25 C.F.R. 900.150(a) through (h), 900.152 through 900.169"); *id*. § 900.150(a) (specifying that Title I appeal regulations apply to decisions to decline an agreement, or a portion thereof, "under section 102 of the [ISDEAA]"). *See also* Exhibit G at 7 n.3 (noting that the IBIA "determined that this appeal falls under 25 CFR 900.150(a), which specifically incorporates § 102 of the ISDEAA").

Although the BIA concedes it did not decline APIA's proposal in accordance with section 102, Judge Sweitzer suggests that BIA could have done so: "declination of the proposal for ANCSA § 14(h)(1) funding is appropriate pursuant to § 102(a)(2)(E) of the ISDEAA."  Exhibit G at 19, citing 25 U.S.C. § 450f(a)(2)(E) (declination proper when PFSA "cannot lawfully be carried out by the contractor").  This is incorrect, however, because APIA presented a proposal supported by the tribal resolutions of its thirteen member tribes, which are beneficiaries of the ANCSA § 14(h)(1) program.  Moreover, even if Judge Sweitzer is correct that the BIA *could* have declined under subparagraph (E), the simple and uncontroverted fact is that BIA did not do so.  The BIA was required to provide APIA with a detailed written explanation for its reasons for declining, and it did not do so.  *See* 25 CFR § 900.29.  Therefore, the proposal was deemed approved after 90 days, and APIA should have been awarded the funds.  25 C.F.R. § 900.18.

The BIA attempts an end run around the declination criteria by focusing on TAC's withdrawal of authorization.[9]  As discussed above, APIA never had a supporting resolution from TAC, and APIA has always had sanctioning resolutions from all federally recognized tribes in the region to assume these PFSAs and associated funds on their behalf.  A refusal to renew an existing contract, in whole or part, is a declination.  *See* 25 C.F.R. § 900.20.  By refusing to analyze its action using the ISDEAA declination criteria, or even provide a formal notice of declination, the BIA made a "threshold" denial of exactly the kind Congress specifically sought to prevent.  As stated in the Senate report accompanying the ISDEAA amendments of 1988:

> The intent of the Committee in retaining the declination criteria and the declination process is to insure that denials of requests for self-determination contracts are handled only through the declination process.  The current practice

---

[9] Mr. Bunch refused to characterize the BIA action as a declination: "While counsel has equated the Bureau's retention of the funds associated with ANCSA as a declination it is actually only the transfer of the funds to the entity that is performing the function."  Exhibit F at 3.  But under the ISDEAA there is no way to decline a contract other than through the declination process and for the narrowly circumscribed reasons set forth in the declination criteria of section 102.

of federal agencies that impose "threshold criteria" on a self-determination
contract application is clearly inconsistent with the intent of the [ISDEAA].

S. Rep. 100-274, 1988 U.S.C.C.A.N. 2620, 2643 (Dec. 21, 1987); *cf.* Exhibit G at 15 (refusing to

apply declination criteria because APIA proposal failed to meet "threshold requirement" that it

be supported by TAC resolution).

Section 102 of the ISDEAA "directs the Secretary to approve and award a proposed

[ISDEAA] contract unless there is a <u>very good reason</u> not to do so." *Delaware Tribe of Indians*

*v. BIA*, IBIA No. 02-65-A at 12 (July 26, 2002) (emphasis added). In this case, the BIA did not

provide APIA with <u>any</u> written reasons for revoking the ANCSA funding, let alone an

explanation supported by "controlling legal authority" or "clearly demonstrating the validity of

the grounds" supporting its decision. 25 U.S.C. § 450f(a)(2); *id.* § 450f(e)(1). Thus the BIA

violated the statute and, as discussed next, its own regulations.

**B.    25 C.F.R. §§ 900.32 and 900.33 Prohibit the BIA from Declining Portions of a
Successor AFA that Are "Substantially the Same" as the Prior Year's.**

The restrictions on agency declination are even more stringent when the agency has historically

approved the contract, or portion thereof, at issue. The BIA's own regulations severely limit its ability

to decline a proposal such as APIA's that seeks to renew an existing AFA and proposes no substantial

changes from a previous year's AFA:

Sec. 900.32  Can the Secretary decline an Indian tribe or tribal organization's
proposed successor annual funding agreement?

No. If it is <u>substantially the same as</u> the prior annual funding agreement
(except for funding increases included in appropriations acts or funding
reductions as provided in section 106(b) of the Act) and the contract is with
DHHS or the BIA, the Secretary shall approve and add to the contract the full
amount of funds to which the contractor is entitled, and <u>may not decline, any</u>
<u>portion of a successor annual funding agreement</u>. Any portion of an annual
funding agreement proposal which is not substantially the same as that which
was funded previously (e.g., a redesign proposal; waiver proposal; different
proposed funding amount; or different program, service, function, or activity)

> . . . is subject to the declination criteria and procedures in subpart E. If there is a disagreement over the availability of appropriations, the Secretary may decline the proposal in part under the procedure in subpart E. [emphasis added]

The IBIA has held that this language eliminates agency discretion with respect to successor agreements that are "substantially the same" as their predecessors. *Susanville Indian Rancheria v. Director, California Area Office, Indian Health Service*, IBIA No. 97-89-A (April 6, 2001) (Recommended Decision), *aff'd as amended*, Dep't of Health & Human Services Departmental Appeals Board, DAB No. A-02-30 (Feb. 6, 2002). In *Susanville*, the IHS argued that its partial declination and reduction in funding did not violate section 900.32 because the agency was free to recalculate each year "the full amount of funds to which the contractor is entitled." The IBIA rejected this reading as "unreasonable *per se*," because it would give the agency unfettered discretion to reduce funding at will in any given year, promoting uncertainty and instability for tribes in direct contravention of the regulation and section 102(b) of the ISDEAA. Instead, the IBIA held, for successor agreements substantially the same as their predecessors, section 900.32 prohibits declination and requires "the amount of funds which was in the prior AFA." *Susanville* at 15.[10]

A separate regulation further limits the ability of the BIA to decline proposed AFA renewals:

Sec. 900.33    Are all proposals to renew term contracts subject to the declination criteria?

The Department of Health and Human Services and the Bureau of Indian Affairs will not review the renewal of a term contract for declination issues where no material and substantial change to the scope or funding of a program, functions, services, or activities has been proposed by the Indian tribe or tribal organization. Proposals to renew term contracts with DOI agencies other than the Bureau of Indian Affairs may be reviewed under the declination criteria.

---

[10] This holding was affirmed by the Administrative Law Judge ("ALJ") on remand, *Susanville*, *supra*, Decision on Remand at 17 (Dec. 14, 2001), and by the DHHS Departmental Appeals Board, *Susanville Indian Rancheria*, DAB No. A-02-30 (Feb. 6, 2002). Like the ALJ, the DAB concluded "that section 900.32 prohibited IHS from declining any portion of the Tribe's proposed AFA for 1997 if that portion was substantially the same as in the tribe's [prior] AFA...." *Id.* at 11.

In *Rapid City Indian Health Board, Inc. v. Director, Aberdeen Area Office*, *IHS*, No. IBIA 97-100-A (August 29, 1997) the IBIA discussed the binding nature of 25 CFR § 900.33 in the following terms:

> 11.     The IHS must comply with its own regulations and failure to do so is arbitrary conduct on the IHS' part that is not permissible. *See Morton v. Ruiz*, 415 U.S. 199, 235 (1974) (the BIA must "comply ... with its own internal procedures" even where those procedures are more rigorous than required); *accord Service v. Dulles*, 354 U.S. 363, 388 (1957); *Vitarelli v. Seaton*, 359 U.S. 535, 539-540 (1959); *see also*, *Orengo Caraballo v. Reich*, 11 F.3d 186, 193 (D.C. Cir. 1993)("the agency may not violate its own regulations."); *Neal v. Secretary of the Navy*, 639 F.2d. 1029, 1035 (3d Cir. 1981)("an agency is bound to follow those [regulations] which it has adopted.").
>
> 12.     25 C.F.R. § 900.33 provides that the IHS "will not" review the request for renewal of a term contract for declination issues (25 U.S.C. § 450f(a)(2)) where no material and substantial change in the scope or funding has been proposed by the contractor.
>
> 13.     This regulation was promulgated pursuant to the negotiated rule-making process required by the ISDEA (25 U.S.C. § 450k(d)) and its use of the phrase "will not" connotes a mandatory, non-discretionary duty on the part of the IHS not to subject renewal requests to the declination criteria. *See* BLACK'S LAW DICTIONARY 1598 (6th ed. 1990) ("will" is an "auxiliary very commonly having the mandatory sense of 'shall' or 'must'", rather than the discretionary "may"); *City of Edmunds v. United States,* 749 F.2d 1419, 1421 (9th Cir. 1984) (citation omitted) ("shall" denotes a mandatory intent absent a convincing argument to the contrary); *Reeves v. Andrus*, 465 F. Supp. 1065, 1069 (D. Alaska 1979) ("shall" is presumed to be mandatory); *Pennsylvania v. Weinburger*, 367 F. Supp. 1378 (D.D.C. 1973) ("shall" is mandatory in nature, depriving the official of discretion, and making the commanded act a ministerial duty).

*Id.* at 8.

There is no factual dispute that APIA's proposal was substantially the same as the prior year's. Answer ¶ 30 (admitting "[t]he FY 2006 proposal was substantially identical to that agreed to by the BIA for FY 2005."). Therefore, the blanket prohibitions of sections 900.32 and 900.33 on the BIA applying the declination process or criteria to the proposal apply, and the BIA declination was invalid as a matter of law for failure to follow agency regulations.

### III.    The BIA's Unilateral Revocation of the ANCSA Funding Violates Section 106(b)(2) of the ISDEAA.

Another provision of the ISDEAA promoting the stability of self-determination and self-governance agreements—and restraining BIA discretion to disrupt it—is section 106(b)(2), which requires that the amount of funds awarded under the agreement  "shall not be reduced by the Secretary in subsequent years except pursuant to –

> **(A)**  a reduction in appropriations from the previous fiscal year for the program or function to be contracted;
> **(B)**  a directive in the statement of the managers accompanying a conference report on an appropriation bill or continuing resolution;
> **(C)**  a tribal authorization;
> **(D)**  a change in the amount of pass-through funds needed under a contract; or
> **(E)**  completion of a contracted project, activity, or program...."

25 U.S.C. § 450j-1(b)(2) (emphasis added).[11]

The purpose of this provision is "to protect and stabilize tribal programs by protecting and stabilizing the funds for those programs from inappropriate administrative reduction by Federal agencies."  S. Rep. 100-274, at 30 (Dec. 21, 1987), *reprinted in* 1998 U.S.C.C.A.N. 2620, 2649.  The IBIA has held that "§ 450j-1(b)'s restriction on reducing funding applies to individual funding categories which are set forth in a self-determination contract, including that contract's associated annual funding agreements."  *Susanville*, *supra*, Decision on Remand at 12 (Dec. 14, 2001) (rejecting agency argument that section 106(b) protects only the "aggregate funding level" of the agreement).  APIA's ANCSA funding is a separate category in the AFA, Exhibit D at line 92 ("ANCSA – TPA/AREA"), and thus is subject to the restrictions on funding reductions imposed by section 106(b).

---

[11] Section 106(b) is incorporated by reference into Article II, section 15 of the Compact, so the BIA's violation of the statute is also a breach of that agreement. *See* Exhibit A at 10.

None of the five exceptions to the stable-funding requirement applies here. Appropriations for the ANCSA program were not reduced (subparagraph A); the FY 2005 enacted figure was $414,000, while in FY 2006 it was $426,000 before two rescissions cut the figure to $419,760.  There was no directive from Congress to reduce ANCSA funding (subparagraph (B)); there was no authorization by APIA or its member Tribes to reduce the funding (C); pass-through funds are not at issue (D); and the 14(h)(1) program has not been completed (E).  Because none of the five exceptions to the stable-funding rule of section 106(b)(2) has been satisfied, the BIA's reduction of the ANCSA funding was unlawful and the funds must be restored to the AFA.

The Department's regulation at 25 C.F.R. § 900.32 implements section 106(b)'s stable-funding requirement as well as section 102(b)'s restrictions on declination.  Because section 900.32 prohibits reductions in funding except as provided in section 106(b), and because none of the exceptions to the stable-funding rule in that section apply, the BIA's revocation of APIA's ANCSA funding violates the Department's own regulations as well as the statute itself.

## IV. Alaska Tribes and their Members Are the Primary Beneficiaries of ANCSA § 14(h)(1) Activities.

The Department's about-face in 2005 was based on a newly minted and flawed premise: that ANCSA regional corporations are the *sole* beneficiaries of 14(h)(1), so only TAC could authorize APIA to carry out 14(h)(1) activities.  *See* Exhibit F at 2-3 (explaining BIA rationale). In fact, as we discuss below, the legislative history strongly supports the conclusion that APIA's member Villages, and the tribal members they serve, are *the primary beneficiaries* of the section 14(h)(1) PFSAs, and thus, under the ISDEAA and BIA's own priority policy, it is APIA's tribal governments that have a superior right to contract for section 14(h)(1) activities under the ISDEAA.

Congress clearly intended the primary beneficiaries of section 14(h)(1) to be Alaska Native peoples and Villages, not ANCSA for-profit corporations. The Department's regulations accord with this interpretation, as does the BIA's own policy and practice.

A.    *Congress Intended 14(h)(1) Conveyances to Benefit Alaska Natives.*

Section 14(h)(1), as amended, provides in relevant part: "The Secretary may withdraw and convey to the appropriate Regional Corporation fee title to existing cemetery sites and historical places." 43 U.S.C. § 1613(h)(1)(A).   But what is the purpose of these conveyances? Compelling evidence exists that Congress intended the regional corporations to hold title to 14(h)(1) sites as trustees or "custodians," in Senator Stevens' words, for the benefit of Alaska Natives and Villages.

In discussing the ANCSA bill just prior to the vote on it, Senator Stevens, a principal sponsor and author of ANCSA, singled out Section 14(h) as needing clarification:

> I do believe, however, that there are some areas that need further explanation—for instance, section 14(h) regarding the conveyance of fee title to regional corporations for cemetery sites and historical places.  I would hope that the manager of the bill would agree with me that the intent of the conferees was not to take the places away from the village, to take away their cemeteries or their historical sites, but merely to place title in the regional corporation as the custodian of places properly identified as such sites…. It is the intent of the conferees under this act that these areas will be preserved and that they are conveyed to the village [sic] corporations for that purpose and not for the purpose of commercial exploitation but to provide for the preservation of the cemeteries and historical sites.

117 Cong. Rec. 46964 (Dec. 14, 1971).  Senator Stevens then yielded the floor to Senator Bible, who confirmed that the entire ANCSA bill conference committee shared Senator Stevens' interpretation of Section 14(h).  The meaning of that section "was very thoroughly discussed by [Senator Stevens] and by the members of the conference. The interpretation he places on the status of the cemeteries and historic sites is exactly correct.  There is no intent whatever in the

- 23 -

bill to take the last resting places or these historic sites away from the Native people or their village corporations." *Id.* Four days after this exchange, ANCSA became law. A clear consensus existed among the key legislators most intimately involved with making ANCSA that the purpose of Section 14(h)(1) was to convey title to the regional corporations to preserve the sites for the benefit of Alaska Native Villages and peoples.[12]

> B.     *The Department's Regulations Severely Limit the Benefits of the Conveyance to the Regional Corporations and Impose Duties to Preserve the Site's Values for Tribal Beneficiaries.*

As TAC writes in its letter to Judge Sweitzer (May 12, 2006), once the conveyances are complete, "TAC will be the sole owner and manager of these lands." Exhibit J. But that does not mean that TAC can do whatever it wants with them. Consistent with Congress's intent to benefit tribal members, not just corporate shareholders, the Department's regulations provide that the regional corporations take title to section 14(h)(1) lands subject to various covenants running with the land and prohibiting mining and other commercial activities of the kind typically engaged in by for-profit corporations. *E.g.*, 43 C.F.R. § 2653.11(b) (conveyance must contain covenant running with the land prohibiting mining or other uses in derogation of the values of the area as a cemetery or historical site); *id.* § 2653.11(c). Significantly, the non-derogation covenant must contain a provision "that the United States reserves the right to seek enforcement of the covenant in an action in equity." *Id.* § 2653.11(b). This reinforces the principle that the corporations hold title as "custodians," in Senator Stevens' words, as trustees with an enforceable fiduciary obligation toward the real beneficiaries: Alaska Natives whose culture and history is permanently a part of these lands.

---

[12] In 2004, Section 14(h)(1) was amended by the Alaska Land Transfer Acceleration Act, adding several subparagraphs and making changes meant to expedite the conveyance process. Pub. L. No. 108-452, 118 Stat. 3575 (Dec. 10, 2004). But nothing in the Act suggests that the original intent of Section 14(h), as explained by Senators Stevens and Bible, was changed.

In addition to the covenants against economic exploitation, the regional corporation must agree to accept a separate covenant imposing an affirmative duty to preserve and maintain the sites. *Id*. § 2653.5(a). Again, the obvious beneficiaries of these covenants are the Alaska Villages and peoples for whom the regional corporations act as "custodians." Consistent with Congress's intent, the regulations impose on the regional corporations more obligations and duties than they confer rights. TAC makes clear in its letter that it expects to benefit from being "sole owner and manager" of the lands, but the ultimate beneficiaries of Aleut culture and heritage embodied in those lands are the Aleut people and the tribal governments representing them.

Of course, many members of APIA's thirteen sanctioning Tribes are also shareholders of TAC. But Natives of the region born after 1971—those under the age of 36—in many, if not most, cases are <u>not</u> TAC shareholders.[13] *See* 43 U.S.C. § 1606(g)(1)(A); *id*. § 1604 (providing, pursuant to ANCSA, 100 shares in the regional corporation for each Alaska Native *alive on December 18, 1971*). In 1970, there were 50,819 Alaska Natives; by 2000 there were 98,043. Census Data of 1970 and 2000 [Alaska], Bureau of Census (Washington, DC). Historical sites, and the cultural heritage they embody, belong to all Alaska Natives. Section 14(h)(1) should not be read to limit its benefits to a corporate shareholder class that is steadily becoming a smaller,

---

[13] Those born later, the so-called "afterborns," did not automatically become shareholders. Many have received shares through inheritance or other means, and a few regional corporations have voted to issue shares to limited numbers of afterborns, but the number of Alaska Natives with no shares in regional corporations is substantial and growing. *See* David S. Case & David A. Voluck, ALASKA NATIVES AND AMERICAN LAWS 176-77 (2002 ed.) (describing corporations' dilemma of either diluting stock by issuing new shares to afterborns, or leaving the younger generations no stock and no control over ancestral lands held by corporations). As of 2001, only three regional corporations had voted to allow admission of new shareholders, on widely varying terms. *Id*. at 391 n. 142. To date, TAC has not issued new shares to afterborns and has no plans to do so. *See* Shareholder Mail Survey: The Future of the Aleut Corporation at 5, *available at* http://www.aleutcorp.com/pdf/tacpocketbrochure4.pdf (acknowledging that "ANCSA has created two classes of Natives, depending on when they were born," but discussing stock dilution problem and estimating that issuance to afterborns would immediately double or triple the current number of TAC shareholders).

and less representative, segment of Alaska Natives.  Rather, as the authors of ANCSA clearly

intended, the provision benefits the Villages and <u>all</u> Native peoples.

C.      *The BIA has Historically Justified the Appropriation and Authorized the*
        *Subsequent Expenditure of  Section 14(h)(1) Funds for a Range of Cultural*
        *Heritage Activities that Benefit All Alaska Tribes and their Members.*

A close examination of the Department's justification for section 14(h)(1) funds over the

years in the appropriation process, as well as the range and types of activities for which the BIA

authorizes the use of these funds, underscores that the Department itself does not view

section 14(h)(1) to authorize only activities narrowly related to conveyance, but in fact that

ANCSA work benefits a broad range of Native institutions and individuals beyond the regional

corporations.

As discussed above, funds for the "ANCSA Historical and Cemetery Sites" program are

appropriated under the umbrella of Trust Services in the recurring TPA fund, and the program

"supports the Departmental goal of <u>Serving Communities</u> by fulfilling <u>Indian fiduciary trust</u>

<u>responsibilities</u>."  Exhibit B at BIA-TPA 47 to 48 (emphasis added).  The Department does not

have a unique government-to-government relationship with, and related fiduciary trust

responsibilities to, ANCSA corporations.  It <u>does</u> have such responsibilities, however, to

federally recognized Tribes and their members.  In its annual Budget Justification documents, the

BIA describes the range of activities associated with the ANCSA program, including site

investigations, report preparation and other conveyance-related activities, but also many others

not related to conveyance and of little if any value to a for-profit regional corporation whose

purpose is to make money.

For example, the FY 1999 document reports that "major components of the ANCSA

museum property collection were inventoried in preparation for archiving"; that "cooperative

agreements have been developed with Alaska Native, federal and state organizations to produce a detailed topical index of the ANCSA oral history collection (including 1900 tape recordings)"; and that "ANCSA data on historical places and cemetery sites will be shared to support Alaska Native cultural heritage and educational programs, federal and state subsistence management programs, and the protection of Alaska's cultural resources."  U.S. Dep't of the Interior Budget Justifications, F.Y. 1999, Bureau of Indian Affairs, at BIA-91.[14]  As the BIA itself has recognized, the ANCSA program creates and preserves values far more enduring and wide-ranging than the conveyance of title to the corporations, so the program is aptly included in Trust Services for the benefit of Alaska Native communities and peoples.

These broad values and benefits are also reflected in the BIA's guidelines for tribes and tribal organizations that have assumed the ANCSA 14(h)(1) activities under the ISDEAA.  In a February 2000 meeting with APIA's ANCSA Program Coordinator, BIA staff distributed written guidance on "Some Potential Uses of ANCSA Program Funds by Compact Tribes."  *See* Exhibit M.  These uses include such cultural heritage preservation activities as translation, transcription and indexing of oral history tapes, development of educational curricula, and preparation of claims based on the Native American Graves Protection and Repatriation Act.  Like the budget justifications, these guidelines on use of ANCSA funds demonstrate the Department's understanding that ANCSA 14(h)(1) authorizes a broad range of cultural resource preservation activities, not just conveyances of bare title to regional corporations.

---

[14] *See also* DOI Budget Justifications, F.Y. 2000 at BIA-74 ("digital copies of most ANCSA site records have been transferred to the Alaska State Historic Preservation Office; steady progress has been made toward establishing a long-term curation agreement for archiving ANCSA program records"); DOI Budget Justifications, F.Y. 2002 at BIA-66 ("The massive ANCSA collection is an uncomparable source of information about Alaska history and Alaska Native cultures."); Exhibit B, DOI Budget Justifications, F.Y. 2006 at BIA-TPA-48 ("This program also managed ANCSA records (which constitute a museum property collection) in a manner that ensures their long-term preservation.").

The legislative history, regulations, and BIA practice show that the federally recognized tribes and their members on whose behalf APIA acts are not only beneficiaries, but are in fact the primary beneficiaries of section 14(h)(1) as conceived by Congress and as administered by the Department.  Thus APIA's member Villages can authorize APIA to assume PFSAs, including 14(h)(1) activities, on their behalf under the ISDEAA, and have done so by tribal resolution. Even if TAC is also a beneficiary of 14(h)(1), it is hardly the only one, and APIA's right to contract under the ISDEAA supersedes TAC's under the ISDEAA and Department policy, as discussed earlier in Section I.

## **CONCLUSION**

For the reasons above, the Department's rejection of APIA's proposal to renew the portion of its 2006 AFA that contained the section 14(h)(1) programs and funds violated the terms of the Compact and the relevant provisions of the ISDEAA and its implementing regulations.  The material facts are not in dispute, and APIA therefore asks this Court to grant the accompanying Motion for Summary Judgment.

Respectfully Submitted,


_____/s/_____
F. Michael Willis (D.C. Bar No. 467462)
Geoffrey D. Strommer
HOBBS, STRAUS, DEAN & WALKER, LLP

Attorneys for the Aleutian Pribilof Islands
Association


DATED: May 2, 2007.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ALEUTIAN PRIBILOF ISLANDS** | ) |
| **ASSOCIATION, INC.** | ) |
| 201 E. 3rd Avenue | ) |
| Anchorage, Alaska 99501 | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| vii. | ) |
| | ) |
| **DIRK KEMPTHORNE**, in his official capacity as | ) |
| Secretary of the Interior, | ) |
| U.S. Department of the Interior | ) |
| 1849 C. Street, N.W. | ) |
| Washington, DC 20240 | ) |
| | ) |
| **NILES CESAR**, in his official capacity as | ) |
| Regional Director, Alaska Region, | ) |
| Bureau of Indian Affairs, | ) |
| U.S. Department of the Interior; | )     Civil Action No. 06-2173 (CKK) |
| 709 W. 9th St. | ) |
| Juneau, Alaska 99802 | ) |
| | ) |
| **BUREAU OF INDIAN AFFAIRS** | ) |
| **OFFICE OF SELF-GOVERNANCE**, | ) |
| U.S. Department of the Interior, | ) |
| 1849 C. Street, N.W., MS 4140 MIB | ) |
| Washington, DC 20240 | ) |
| | ) |
| DEFENDANTS. | ) |
| | ) |

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure and Local Civil Rules 7(h)

and 56.1, Plaintiff Aleutian Pribilof Islands Association, Inc. ("APIA") sets forth the following

material facts that are not in genuine dispute.

1.      APIA is a nonprofit corporation sanctioned by thirteen federally recognized tribal governments in its region to carry out a range of services for beneficiaries in the region.  APIA contracts with federal, state and local governments and secures private funding to provide a broad spectrum of services throughout the region.  These services include health, education, social, psychological, employment and vocational training, and public safety services.

2.      Since fiscal year ("FY") 1996, APIA's thirteen member tribes have authorized APIA, by tribal resolution, to enter self-governance compacts with the United States, through the Secretary of the Interior, to carry out programs, functions, services and activities ("PFSAs") under Title IV of the Indian Self-Determination and Education Assistance Act, 25 U.S.C. § 450 *et seq.* ("ISDEAA").  Exhibit A (Compact of Self-Governance); Amended Answer ¶ 25.

3.      In 1995 APIA, as authorized by the tribal governments it represents, requested to assume responsibility, and associated funding, for PFSAs authorized and funded under the Alaska Native Claims Settlement Act ("ANCSA"), including activities related to section 14(h)(1) of the ANCSA.  The BIA Alaska Regional Office approved this request, and included in APIA's fiscal year ("FY") 1996 annual funding agreement ("AFA") $73,379 for ANCSA PFSAs.  Exhibit H, Letter of Glenda Miller, BIA Regional Realty Officer to Melvin Smith, The Aleut Corporation (Feb. 2, 2001).  This amount recurred in APIA's funding agreements each year through FY 2005.  *See* Exhibit I at line 92 (ANCSA funding in FY 2005 AFA).

4.      Before reprogramming the ANCSA funding to APIA in FY 1996, the BIA did not consult with, or even notify, The Aleut Corporation ("TAC"), the ANCSA regional corporation for the Aleutian Region.  Exhibit J, Letter from Ronald S. Lee to Judge Sweitzer, DOI Office of Hearings and Appeals (May 12, 2006).

5.       In August 1998, APIA entered a Memorandum of Agreement ("MOA") with TAC setting forth how the parties would "jointly conduct certain cultural heritage, preservation and related activities, and in particular, activities related to completing the ANSCA [sic] 14(h)(1) process."  Exhibit C § 1.

6.       From FY 1996 through FY 2005, APIA carried out ANCSA activities, including those under section 14(h)(1), pursuant to its self-governance compact and  funding agreements negotiated with the BIA and the DOI Office of Self Governance ("OSG").  Amended Answer ¶ 25; Exhibit I.

7.       From FY 1996-2005, TAC never provided a resolution to APIA.  APIA staff met periodically with BIA's ANCSA personnel to consult on appropriate tasks to carry out.  In a February 2000 meeting, BIA staff distributed written guidance on "Some Potential Uses of ANCSA Program Funds by Compact Tribes."  *See* Exhibit M.  These uses include such cultural heritage preservation activities as translation, transcription and indexing of oral history tapes, development of educational curricula, and preparation of claims based on the Native American Graves Protection and Repatriation Act.  *Id*. As part of its obligations under the compact and funding agreements, APIA assisted in site investigation and evaluation, along with related cultural heritage activities in accordance with the Department's regulations and the BIA guidelines on the use of ANCSA program funds.

8.       In its annual budget, the BIA requests ANCSA section 14(h)(1) funds as a separate line under the Trust Services programs within the Tribal Priority Allocations (TPA) budget.  Exhibit B at BIA-COMP-1 (FY 2006 BIA Budget listing "ANCSA Historical and Cemetery Sites" among Trust Services within TPA).  TPA are recurring funds that provide the main source of tribal resources to provide basic government services for most tribes.  As

explained in the BIA's FY 2006 budget justification, "Tribal Priority Allocations (TPA) fund basic tribal services, such as social services, adult vocational training, child welfare, natural resources management, and contract support."  Exhibit B at BIA-SUM-15; Amended Answer ¶ 24 (admitting the facts in this paragraph).

9.     In the same document, the BIA describes the ANCSA program as follows: "This program supports the Departmental goal of Serving Communities by fulfilling Indian fiduciary trust responsibilities by protecting cultural and natural heritage resources."  *Id*. at BIA-TPA-47 to 48; *see also* Amended Answer ¶ 24 (admitting the facts in this paragraph).

10.    On May 20, 2005, TAC adopted a resolution purporting to revoke APIA's authority to carry out the ANCSA activities on TAC's behalf, and resolving to contract directly with the BIA to receive the ANCSA funding.  Amended Answer ¶ 29 (admitting the facts in this paragraph).

11.    On June 23, 2005, APIA submitted a "Reprogramming Request" for FY 2006 that included, as in the previous ten years, funding for ANCSA section 14(h)(1) activities.  *See* Exhibit K (FY 2006 AFA Reprogramming Request).  As in past years, the inclusion of these PFSAs and related funds in the agreement was supported by the resolutions of the thirteen tribes that sanction APIA.  Amended Answer ¶ 30.  The FY 2006 proposal was substantially identical to that agreed to by the BIA and OSG for FY 2005.  *Compare* Exhibit I and Exhibit K; *see also* Amended Answer ¶ 30 (admitting FY 2006 proposal substantially identical to prior year's).  The BIA signed the proposal, but the OSG refused to do so.  Exhibit K at 2.

12.    On October 3, 2005, the BIA returned the proposal with the ANCSA funds deleted, on the ground that TAC had resolved to contract for the funds.  The BIA would not release any funds under the FY 2006 AFA until APIA agreed to the withdrawal of the section

14(h)(1) funds.  Amended Answer ¶ 31 (admitting facts in previous two sentences).  APIA did

not agree to the withdrawal of these PFSAs and funds, and the parties agreed on language

contained in footnote 15 in the 2006 AFA that reflects BIA's unilateral decision to transfer the

funds to TAC and preserves APIA's right to "appeal the BIA decision regarding these funds."

Exhibit D, 2006 AFA Reprogramming Request at 2 n.15; Amended Answer ¶ 31.

13.     At no point prior to the initiation of the appeal described below did BIA send

APIA a written explanation of the decision to withhold the ANCSA funding, nor did it notify

APIA of its right to appeal, or the procedures for doing so.  Amended Answer ¶ 32; s*ee also*

Exhibit G at 7-8 (Recommended Decision holding BIA failed to provide written decision

explaining its position and notifying APIA of its appeal rights as required by the ISDEAA and

Department regulations).

14.     In an initial attempt to resolve the dispute, APIA requested an informal

conference, pursuant to 25 C.F.R. § 900.154.   Following the conference, the presiding official,

Deputy Regional Director Charles F. Bunch, issued a recommended decision upholding the

initial decision to transfer the 14(h)(1) funding from APIA to TAC.  Amended Answer ¶ 34; *see*

*also* Exhibit F (Letter to Dimitri Philemonof Re: Informal Conference (Feb. 15, 2006)).

15.     APIA then appealed to the Interior Board of Indian Appeals ("IBIA") under 25

C.F.R. § 900.158.  The IBIA assigned the case to Administrative Law Judge Sweitzer in the

Hearings Division of the Office of Hearings and Appeals.  The parties briefed the issues, and

Judge Sweitzer issued a Recommended Decision, dated August 31, 2006, upholding the BIA's

action.  *See* Exhibit G (Recommended Decision).  APIA did not appeal that decision to the IBIA

within 30 days, and it became final for the Department.  Amended Answer ¶ 37.

16.     On June 26, 2006, APIA submitted to the BIA Alaska Region a Reprogramming Request for FY 2007 that again contained the contested ANCSA § 14(h)(1) activities and associated funding.  In a letter dated July 7, 2006, the BIA Alaska Regional Director informed APIA that BIA and OSG may or may not include the ANCSA funding in APIA's FY 2007 AFA, depending on the outcome of the appeal.  If the BIA were to prevail, the funding would again be deleted.  If APIA were to prevail, the FY 2007 AFA would be approved as submitted.  Exhibit E (BIA letter); Amended Answer ¶ 33 (admitting the facts in this paragraph).

Respectfully Submitted,

_____/s/_____
F. Michael Willis (D.C. Bar No. 467462)
Geoffrey D. Strommer
HOBBS, STRAUS, DEAN & WALKER, LLP

Attorneys for the Aleutian Pribilof Islands Association

DATED: May 2, 2007.



## UNITED STATES
## DEPARTMENT OF THE INTERIOR
### BUREAU OF INDIAN AFFAIRS

Alaska Region
P.O. Box 25520
Juneau, Alaska 99802-5520

February 2, 2001

Mr. Melvin Smith,
Facilities & Resource Manager
The Aleut Corporation
Via telefax



Subject:    14(h)1 compact funding

Dear Mr. Smith.

This is in response to your verbal and written request for clarification as to the 14(h)1 funding received by the Aleutian Pribilof Island Association (APIA). I have reviewed the reprogramming requests that contain the financial data and accompany annual funding agreements, beginning with the first, which was negotiated in 1995 for the 1996 compact. In that particular reprogramming request, in cost code: 34460, $73,379 was identified to be reprogrammed to APIA. Throughout the years, up to the 2001 agreement, that amount has remained the same; although the cost code has changed to 39760. This account is totally for the ANCSA program.

The more confusing cost code which funded the 14(h)1 office is 39720, which is identified as "Other Rights Protection — TPA/Area." It is confusing in that part of the funding was used for the ANCSA Program, part for the Subsistence Program, and part for the Rights Protection program. The historical split was 60% for ANCSA, 20% for Subsistence and 20% for Rights Protection.

Again, I went back to the 1996 reprogramming request and found that this cost code had been split into the three programs. $44,305 was identified for ANCSA; $2,877 was identified for Subsistence; and $742 was identified for Rights Protection. The total amount identified in the 1996 agreement was $47,924. So you see that the vast majority of that cost code is attributable to the ANCSA Program. Beginning with the next years reprogramming request, the three programs within the 39720 area account were lumped back into one cost code and the amount changed to $41,632. It has remained the same since then.

I will be in Anchorage and likely available to attend the requested meeting during the week of February 20. The only time I'm not available is Thursday afternoon (2/22). Please contact me at 586-7403 if I can be of further assistance.

Sincerely,

Glenda Miller
Regional Realty Officer

cc:    Ken Pratt, ANCSA Program Manager, via fax
       Dan Duame, APIA, via fax

EXHIBIT ___4___

Exhibit I

7/14/2004

360 699 1012          200  23-24   10:59   #325 P.07/08
                                            NO.638  P007/008

Self Governance 2005 Annual Funding Agreement - Reprogramming Request
Office of Self Governance

Tribe:                    ALEUTIAN PRIBILOF ISLANDS ASSOCIATION
Tribal OSG Compact Code:  OSAV811
Tribal BIA Org. Code:     BIO810
BIA Regional Office:      ALASKA REGION
BIA Field Officer:        ANCHORAGE FIELD OFFICE

July 14 200
Page: 1

| LINE | PROGRAM TITLE | COST CODE | (Info) TRIBAL SHARE | A OSG CUM. BASE | B OSG SHORTFALL BASE | C OSG SHORTFALL REQUEST | D BIA REPROGRAM REQUEST | E=A+B+C+D TOTAL AFA | EN |
|---|---|---|---|---|---|---|---|---|---|
| 2 | Community Services, General - TPA/AGENCY | 39210 | 26,261 | 25,851 | 410 | 0 | -107,502 | 26,261 | 1 |
| 4 | Other Aid to Tribal Government - TPA/TRIBAL | 39220 | 187,132 | 201,692 | 13,550 | 0 | -1,573 | 301,710 | 2 |
| 7 | Other Aid to Tribal Government - TPA/AREA | 39220 | 11,217 | 8,368 | 3,279 | 0 | 0 | 11,217 | 3 |
| 8 | Consolidated Tribal Government Pro - TPA/TRIBAL | 39230 | 1,689 | 8,368 | 0 | 0 | -8,369 | 1,669 | 4 |
| 10 | Self-Governance Compacts - TPA/TRIBAL | 39210 | -49,351 | -48,351 | 0 | 0 | 856,598 | 856,598 | 5 |
| 12 | Contract Support (Ongoing) - TPA/TRIBAL | 39240 | 856,598 | 892,306 | 0 | 0 | -5,492 | 892,306 | 6 |
| 17 | Small and Needy Tribes Distribution - TPA/TRIBAL | 39270 | 35,891 | 41,383 | 0 | 0 | -5,492 | 35,891 | 7 |
| 18 | Social Services - TPA/TRIBAL | 39310 | 6,552 | 1,290 | 5,262 | 0 | 0 | 6,552 | |
| 20 | Social Services - TPA/AGENCY | 39310 | 76,600 | 60,928 | 15,672 | 0 | 0 | 76,600 | |
| 21 | Indian Child Welfare Act - TPA/TRIBAL | 39310 | 318,431 | 318,431 | 0 | 0 | 0 | 318,431 | |
| 24 | Welfare Assistance Grants - TPA/TRIBAL | 39320 | 75,000 | 0 | 0 | 0 | 75,000 | 75,000 | |
| 25 | Housing Improvement Program - TPA/TRIBAL | 39330 | 32,900 | 32,900 | 0 | 0 | 0 | 32,900 | 9 |
| 31 | Scholarships - TPA/TRIBAL | 39370 | 7,600 | 7,600 | 0 | 0 | 0 | 7,600 | 10 |
| 33 | Johnson-O'Malley Educational Assis - TPA/TRIBAL | 39116 | 73,274 | 73,274 | 0 | 0 | 0 | 73,274 | 11 |
| 44 | Job Placement and Training - TPA/TRIBAL | 39140 | 123,100 | 139,095 | 0 | 0 | -15,985 | 123,100 | 12 |
| 46 | Job Placement and Training - TPA/AGENCY | 39535 | 8,141 | 8,944 | 295 | 0 | -1,098 | 8,141 | 13 |
| 49 | Economic Development - TPA/AREA | 39535 | 7,229 | 7,229 | 0 | 0 | 0 | 7,229 | |
| 53 | Natural Resources, General - TPA/TRIBAL | 39510 | 2,868 | 2,614 | 4,615 | 0 | 0 | 2,868 | |
| 55 | Agriculture - TPA/AREA | 39605 | 1,179 | 1,880 | 636 | 0 | 0 | 1,179 | |
| 67 | Wildlife and Parks - TPA/AREA | 39610 | 1,238 | 1,238 | 643 | 0 | 0 | 1,238 | |
| 71 | Trust Services, General - TPA/AREA | 39650 | 4,221 | 4,149 | 72 | 0 | 0 | 4,221 | 14 |
| 76 | Other Rights Protection - TPA/AREA | 39710 | 41,571 | 40,501 | 1,131 | 0 | 0 | 41,571 | |
| 78 | Real Estate Services - TPA/AGENCY | 39710 | 9,080 | 9,080 | 0 | 0 | 0 | 9,080 | |
| 79 | Real Estate Services - TPA/AREA | 39720 | 2,255 | 2,253 | 121 | 0 | 0 | 2,255 | 15 |
| 89 | Environmental Quality Services - TPA/AREA | 39770 | 506 | 506 | 0 | 0 | 811 | 506 | |
| 92 | ANCSA - TPA/AREA | 39730 | 10,344 | 10,254 | 90 | 0 | 0 | 10,344 | |
| 94 | Executive Direction - TPA/AGENCY | 39760 | 73,379 | 73,379 | 0 | 0 | 0 | 73,379 | 16 |
| 97 | Administrative Services - TPA/AGENCY | 39810 | 11,067 | 5,916 | 5,151 | 0 | 0 | 21,677 | 17 |
| 103 | TPA General Increase - TPA/TRIBAL | 39820 | 21,677 | 19,249 | 2,428 | 0 | 0 | 21,677 | |
| 103 | 638 Pay Costs - TPA/TRIBAL | 39960 | 92,847 | 92,847 | 0 | 0 | 0 | 92,847 | |
| 106 | Area and Agency Technical Support - NON TPA | 39902 | 179,279 | 179,279 | 0 | 0 | 0 | 179,279 | |
| 170 | Real Estate Services - NON TPA | 30600 | 1,617 | 1,495 | 0 | 0 | 122 | 1,617 | 16 |
| 121 | Environmental Management - NON TPA | 34300 | 978 | 0 | 0 | 0 | 978 | 978 | 17 |
| 150 | All Other Aid to Tribal Government - NON TPA | 39370 | 4,420 | 0 | 0 | 0 | 4,420 | 4,420 | 18 |
| 152 | Housing Development - NON TPA | 16420 | 2,318 | 2,318 | 0 | 0 | 0 | 2,318 | |
| 153 | Adult - NON TPA | 16530 | 3,824 | 3,824 | 0 | 0 | 0 | 3,824 | |
| 163 | Trust Services, General - NON TPA | 36720 | 0 | 0 | 2,338 | 0 | 0 | 0 | |
| 164 | All Other Indian Rights Protection - NON TPA | 16910 | 568 | 527 | 41 | 0 | 760 | 568 | 19 |
| 165 | Real Estate Services - NON TPA | 16920 | 1,009 | 199 | 50 | 0 | 0 | 1,009 | 20 |
| 167 | Land Records Improvement - NON TPA | 36940 | 4,360 | 4,360 | 0 | 0 | 0 | 4,360 | |

FROM :                                      360 699 1012              20?  03-24   10:59   #325 P.08/08

| | | | | | | |
|---|---|---|---|---|---|---|
| 169 Executive Direction - NON TPA | 36100 | 2,335 | 0 | 2,335 | 0 | 2,335 |
| 170 Administrative Services - NON TPA | 36200 | 37,546 | 20,275 | 17,271 | 0 | 37,546 | 21
| 198 Preparedness - NON TPA | 92120 | 2,178 | 0 | 0 | 2,178 | 2,178 | 21
| 199 Preparedness Program Mgmt (Indirect - NON TPA | 92121 | 823 | 0 | 823 | 823 | 22
| TOTAL | | 3,125,732 | 2,248,343 | 76,465 | 860,924 | 3,125,732 |

AUTHORIZED FINANCIAL OFFICERS:

[signature]
Bureau of Indian Affairs - Regional Office

Tom Sheilla  8/19/04
Tribe
Office of Self Governance

1  Reference 9G & 97 non-residual left with BIA Anchorage Agency to carry out COTS functions.
2  $707,502 reduction represents the Unalaska ATG amount that was put in the A/P1A AFA and then removed by tribal resolution.
3  $15,546 reduction for Unalaska ATG (39220-Amzal. Same rationale as f/n #2.
4  $1,369 reduction for Unalaska ATG CTGP (39230)- see rationale as f/n #2.
5  Estimated amount. FY 05 funds will be distributed using similar methodology as was used last fiscal year.
6  See FY 03 NFR f/n #3 for village breakout.
7  $6,053 based on Unalaska reduction for Social Services (39310)- see f/n #2; and $561 increase for False Pass Social Services funds which should have been base transferred.
8  Estimate. Total funds for FY 05 will be distributed based upon estimated welfare assistance need as reflected in the current mid-year analysis of funds report.
9  Funds will be distributed based on NFP eligible applicant data and shall be used in accordance with NFP regulations unless waived.
10  $3208 reduction based on Unalaska Scholarship funds being removed (see f/n #2); and $93 increase for False Pass pay costs which should have been base transferred in FY 03.
11  $1,047 based on Unalaska reduction for JOM (39140)- see f/n #2.
12  $3,905 based on Unalaska reduction for JOM - ST? Tribe (39535) - see f/n #2.
13  $1,050 based on Unalaska reduction (or JPT (39535) - see f/n #2.
14  A/P1A total share $4,468; $247 left with BIA for direct Archeology services.
15  $91 increase is minimum amount of A/P1A tribal share of BIA Realty increases based on data provided by BIA at 5/7/02 Realty meeting.
16  Amount based on 1% of JOM & Scholarship tribal shares.
17  Historical share amount based on combined total of Lease Compliance and prior Shortfall adjustments to cumulative base (see f/n #11 of FY 03 NFR).
18  Based on historical AFA tribal share amounts.
19  Minimum tribal share amount based on Realty data provided at meeting with BIA on 5/7/02. Same as FY 04 amount.
20  Same as f/n #19.
21  Best estimate at the time of regulations and is subject to adjustment based on actual award, selection of project, or distribution methodology used by BIA provided SG Tribes, other Tribes and BIA agencies are treated similarly.
22  Estimate. To be adjusted based on A/P1A actual indirect rate at time of distribution of funds.

Exhibit J



*The* **Aleut Corporation**

May 12, 2006

Honorable Judge Sweitzer
U.S Department of Interior
Office of Hearings and Appeals
Departmental Hearings Division
405 South Main Street, Suite 400
Salt Lake City, Utah   84111                    VIA Mail & Fax (801) 524-5539

Re:    ANCSA 14(h)1 Funding

Honorable Judge Sweitzer:

Under ANCSA, all Native Regional Corporations are entitled to land that was applied for by the  Regional Corporations prior to December 31, 1976. Some of these lands are referred to as ANCSA 14(h)1 lands, or  Historical and Cemetery sites. In our Region these lands consist of sites throughout the Aleutians and Alaska Peninsula (Attu to Port Moller). Once The Aleut Corporation (TAC) selected these lands, Congress allocated funds for the process of selection to conveyance.  This funding was initially under the Alaska Region Bureau of Indian Affairs (BIA).

In  1996, the Office of Self-Governance declared Compacting open to Federally recognized Tribes to promote self-determination.  The ANCSA funding was then reverted from BIA to the Aleutian/Pribilof Islands Association. This process went into affect with no consultation whatsoever from TAC.

In 2004, the Office of the Solicitor, Department of Interior, concluded that ANCSA 14(h)1 funds should not be available for Compacting by the non-profits, unless the Regional Corporations pass a Resolution supporting such action.  After that determination, TAC Board of Directors passed a Resolution to withdraw the funds from the Aleutian Pribilof/Islands Association, so that TAC can do the ANCSA 14(h)1 work itself.

With the Alaska Lands Transfer Acceleration Act of 2004, the Bureau of Land Management is tasked with having all ANCSA land entitlements completed by 2009, including TAC's 14(h)1 site applications.  TAC, now more than ever needs to have control of its portion of the ANCSA 14(h)1 funding, to see that these entitlements are met and the subject lands conveyed to TAC.   Once this program is completed, TAC will be the sole owner and manager of these lands.

TAC takes a lot of pride in its Culture and Heritage and appropriately expects to have full oversight of the funding for ANCSA 14(h)1 work in the Aleut Region.

Sincerely,
THE ALEUT CORPORATION

Ronald S. Lee
Interim CEO

Cc:
    Roger DuBrock, TAC Corporate Counsel
    Geffrey D. Strommer                         Fax 503-242-1072
    Niles Cesar, BIA AK Regional Director   Fax 907-586-7252
    Roger Hudson                                 Fax 907-271-4143
    Lynn Allingham, A/PIA                      Fax 907-279-4351



4000 Old Seward Hwy., Suite 300   Anchorage, Alaska 99503   (907) 561-4300   FAX (907) 563-4328
www.aleutcorp.com

Exhibit K

EXHIBIT 6 (Q)(1) [handwritten, inverted]

Office of Self Governance
Self Governance 2006 Annual Funding Agreement - Reprogramming Request

Tribe: ALEUTIAN PRIBILOF ISLANDS ASSOCIATION
Tribal OSG Compact Code: OSGT811
Tribal BIA Org Code: E01810
BIA Regional Office: ALASKA REGION
BIA Field Office: ANCHORAGE FIELD OFFICE

| LINE # | PROGRAM TITLE | COST CODE | (info) TRIBAL SHARE | A OSG CUM. BASE | B OSG SHORTFALL BASE | C OSG SHORTFALL REQUEST | D BIA REPROGRAM REQUEST | E=A+B+C+D TOTAL AFA | FN |
|---|---|---|---|---|---|---|---|---|---|
| 2 | Community Services, General - TPA/AGENCY | 39210 | 138,952 | 138,542 | 410 | | | 138,952 | 1 |
| 4 | Other Aid to Tribal Government - TPA/TRIBAL | 39220 | 107,730 | 201,682 | 13,550 | | -107,502 | 107,730 | 2 |
| 6 | Other Aid to Tribal Government - TPA/AREA | 39220 | 11,217 | 9,511 | 3,279 | | -1,573 | 11,217 | 3 |
| 7 | Consolidated Tribal Government Pro - TPA/TRIBAL | 39230 | 6,379 | 14,748 | 0 | 0 | -8,369 | 6,379 | 4 |
| 12 | Consolidated Tribal Government Pro - TPA/AGENCY | 39230 | 1,689 | 1,689 | 0 | 0 | 0 | 1,689 | |
| | Self-Governance Compacts - TPA/TRIBAL | 39240 | -80,810 | -80,810 | 0 | 0 | 0 | -80,810 | |
| 17 | Contract Support (Ongoing) - TPA/AREA | 39270 | 889,118 | | | | 889,118 | 889,118 | 5 |
| 18 | Small and Needs Distributio - TPA/TRIBAL | 39904 | 892,306 | 892,306 | 0 | | | 892,306 | 6 |
| 19 | Social Services - TPA/AREA | 39310 | 35,891 | 61,383 | 0 | | -5,492 | 35,891 | 7 |
| 20 | Social Services - TPA/AGENCY | 39310 | 6,552 | 1,290 | 5,262 | | | 6,552 | |
| 21 | Social Services - TPA/AREA | 39310 | 76,600 | 60,928 | 15,672 | | | 76,600 | |
| 23 | Indian Child Welfare Act - TPA/TRIBAL | 39320 | 318,431 | 318,431 | 0 | | | 318,431 | 8 |
| 25 | Welfare Assistance Grants - TPA/TRIBAL | 39330 | 75,000 | 0 | | | 75,000 | 75,000 | 9 |
| 27 | Scholarships - TPA/TRIBAL | 39370 | 32,900 | 32,900 | 0 | | | 32,900 | |
| 33 | Johnson-O'Malley Educational Assis - TPA/TRIBAL | 39910 | 73,274 | 78,389 | 0 | | -5,115 | 73,274 | 10 |
| 46 | Job Placement and Training - TPA/TRIBAL | 39140 | 7,600 | 7,600 | 0 | | | 7,600 | |
| | Job Placement and Training - TPA/AREA | 39535 | 123,100 | 139,085 | 0 | | -15,985 | 123,100 | 11 |
| 49 | Economic Development - TPA/AREA | 39935 | 8,141 | 8,944 | 295 | | -1,098 | 8,141 | 12 |
| 55 | Natural Resources, General - TPA/AREA | 39510 | 7,229 | 2,614 | 4,615 | | | 7,229 | |
| 58 | Agriculture - TPA/AREA | 39605 | 2,868 | 1,888 | 980 | | | 2,868 | |
| 67 | Wildlife and Parks - TPA/AREA | 39650 | 1,179 | 536 | 643 | | | 1,179 | |
| 73 | Trust Services, General - TPA/AREA | 39510 | 1,238 | 588 | 650 | | | 1,238 | |
| 76 | Other Rights Protection - TPA/AREA | 39710 | 4,221 | 3,090 | 1,131 | | | 4,221 | 13 |
| 78 | Real Estate Services - TPA/AGENCY | 39920 | 41,632 | 40,501 | 1,131 | | | 41,632 | |
| 79 | Real Estate Services - TPA/AREA | 39770 | 9,088 | 9,088 | | | | 9,088 | |
| 86 | Environmental Quality Services - TPA/AREA | 39770 | 2,255 | 2,134 | 121 | | | 2,255 | 14 |
| 91 | ANTCA - TPA/AREA | 39940 | 506 | 405 | 101 | | | 506 | |
| 92 | ANSCA - TPA/AREA | 39750 | 10,344 | 10,254 | 90 | | | 10,344 | |
| 94 | Executive Direction - TPA/AGENCY | 39760 | 73,379 | 73,379 | 0 | | | 73,379 | |
| 97 | Administrative Services - TPA/TRIBAL | 39010 | 11,067 | 5,916 | 5,151 | | | 11,067 | |
| 102 | TPA General Increase - TPA/TRIBAL | 39820 | 21,677 | 19,249 | 2,428 | | | 21,677 | |
| 103 | 638 Pay Costs - TPA/TRIBAL | 39901 | 92,847 | 92,847 | | | | 92,847 | |
| 106 | Area and Agency Technical Support - NON TPA | 39902 | 184,939 | 184,939 | | | | 184,939 | |
| 129 | Real Estate Services - NON TPA | 34300 | 1,617 | 1,495 | | | 122 | 1,617 | 15 |
| 130 | Environmental Management - NON TPA | 34730 | 978 | | | | 978 | 978 | 16 |
| 149 | All Other Aid to Tribal Government - NON TPA | 36420 | 4,420 | | | | 4,420 | 4,420 | 17 |
| 151 | Housing Development - NON TPA | 36720 | 2,318 | | 2,318 | | | 2,318 | |
| 152 | Adult Voc. Training (moved to TPA) - NON TPA | 36530 | 3,824 | 3,824 | | | | 3,824 | |
| 163 | All Other Trust Services, General - NON TPA | 36910 | 0 | | | | | 0 | |
| 164 | Real Estate Services - NON TPA | 36920 | 568 | 527 | 41 | | | 568 | |
| 166 | Land Records Improvement - NON TPA | 36940 | 1,009 | 199 | 50 | | 760 | 1,009 | 18 |
| 168 | Executive Direction - NON TPA | 36960 | 4,368 | | | | 4,368 | 4,368 | 19 |
| 169 | Administrative Services - NON TPA | 36100 | 2,335 | | 2,335 | | | 2,335 | |
| 197 | Preparedness - NON TPA | 36200 | 37,546 | 20,275 | 17,271 | | | 37,546 | 20 |
| 198 | Preparedness Program Mgmt (Institu | 92120 | 2,178 | | | | 2,178 | 2,178 | 21 |
| | | 50212 | 823 | | | | 823 | 823 | |
| | TOTAL | | 4,250,523 | 3,340,614 | 75,465 | 0 | 833,444 | 4,250,523 | |

Page 2 of 3

EXHIBIT 6 (Pg. 2 of 3)

RECEIVED
JUN 3 0 2005
BUREAU OF INDIAN AFFAIRS

3 original amendments
3 original agreement
1 faxed resolution

AUTHORIZED FINANCIAL OFFICERS:

Bureau of Indian Affairs - Regional Office

Tribe

## Office of Self Governance

1 Reference 96 & 97 non-residual left with BIA Anchorage Agency to carry out CDIB functions. $112,691 is False Pass tribal shares to be permanently transferred to APIA.
2 $107,502 reduction represents the Unalaska ATG amount that was put in the APIA AFA and then removed by tribal resolution. (this amount should be permanently reprogrammed to Unalaska)
3 $1,513 reduction for Unalaska ATG (39720-Area). Same rationale as f/n #2. (this amount should be permanently reprogrammed to Unalaska)
4 $8,369 reduction for Unalaska ATG CTGP (39720). Same rationale as f/n #2. (this amount should be permanently reprogrammed to Unalaska) $6,379 is False Pass tribal shares to be permanently transferred to APIA.
5 Estimated amount. FY 06 funds will be distributed using similar methodology as was used last fiscal year.
6 See FY 03 APA f/n #3 for village breakout.
7 $6,053 based on Unalaska reduction for Social Services (39310). (this amount should be permanently reprogrammed to Unalaska)- see f/n #2; and $5561 increase for False Pass Social Services funds which should have been base transferred to APIA base. The base should be $35,891.
8 Estimate. Total funds and/or FY 06 will be distributed based upon estimated welfare assistance need as reflected in the current mid-year analysis of funds report.
9 Funds will be distributed based on HIP eligible applicant data and shall be used in accordance with HIP regulations unless waived.
10 $5,208 reduction based on Unalaska Scholarship funds being removed (see f/n #2)(this amount should be permanently reprogrammed to Unalaska) and $93 increase for False Pass pay costs which should have been base transferred in FY 03.
11 $15,985 based on Unalaska reduction for JPT - Tribe (39535)(this amount should be permanently reprogrammed to Unalaska)- see f/n #2.
12 $7,098 based on Unalaska reduction for JPT - Tribe (39535). (this amount should be permanently reprogrammed to Unalaska)- see f/n #2.
13 APIA pay cost share $4,468; $247 left with BIA for direct Archaeology services.
14 $811 increase is minimum amount of APIA tribal share of BIA Realty increases based on data provided by BIA at 5/7/02 Realty meeting.
15 Amount based on 2% of JOM & Scholarship tribal shares.
16 Historical share amount based on combined total of Lease Compliance and prior Shortfall adjustments to cumulative base (see f/n #11 of FY 03 AFA)
17 Based on historical AFA tribal share amounts.
18 Minimum tribal share amount based on Realty data provided at meeting with BIA on 5/7/02. Same as FY 05 amount.
19 Same as f/n #18.
20 Best estimate at the time of negotiations and is subject to adjustment based on actual award, selection of project, or distribution methodology used by BIA provided SG Tribes, other Tribes and BIA agencies are treated similarly.
21 Estimate. To be adjusted based on APIA actual indirect rate at time of distribution of funds.

Exhibit L



# United States Department of the Interior

### OFFICE OF THE SOLICITOR
### ALASKA REGION

May 24, 2004

4230 University Drive
Suite 300
Anchorage, Alaska 99508-4626
(907) 271-4131

BIA.AK.0874

## MEMORANDUM

TO:        Roger Drapeaux, Program Analyst &
           Ken Pratt, ANCSA Program Manager
           Alaska Region, Bureau of Indian Affairs

FROM:      Roger L. Hudson, Attorney
           Office of the Regional Solicitor

SUBJECT:   Funding for implementation of ANCSA § 14(h)(1) included within Tribal Self-
           Governance annual funding agreement

This is a follow-up to our recent telephone conference call, during which we discussed the problems associated with trying to insure that funding appropriated by Congress to carry out the administrative tasks required to complete the Alaska Native Claims Settlement Act (ANCSA) land conveyance process would be completed in a reasonably timely manner. You have asked for my views on this subject in advance of the BIA's upcoming annual negotiations with a number of tribal consortia and other contracting entities, beginning with the Tanana Chiefs Conference (TCC). Although this quick memo is far from exhaustive, I provide the following with the understanding that time is of the essence in preparing to handle the problem.

Background

One of the basic tasks involved in completing the ANCSA conveyance process is for the government (or Indian Self-Determination Act (ISDA) contractors) to evaluate and act upon Regional ANCSA Corporation applications for conveyance of title to existing cemetery sites and historical places, filed pursuant to ANCSA § 14(h)(1). A large number of these applications, which were timely filed, have not been processed, approved or rejected, or, in the case of approval, conveyed to the ANCSA corporation applicants. Although some aspects of the processing involve the Bureau of Land Management (BLM), the initial steps of site inspection, evaluation, and archaeological assessment were identified as tasks to be completed by the Bureau of Indian Affairs (BIA). The delay in completing the necessary work has been attributable in large measure to the fact that a substantial portion of the funding that Congress has provided to do the work has found its way into ISDA contracts, without the contracts themselves specifically binding the recipient entities to complete the work for which the funds were appropriated. The contracts and funding agreements into which these funds have been inserted have been entered into pursuant to ISDA § 102(a)(2), largely, if not exclusively, on the strength of resolutions provided by federally recognized tribes, as distinct from ANCSA Regional Corporations. You



Roger Drapeaux and Ken Pratt
Funding for implementation of ANCSA § 14(h)(1)
May 24, 2004 - Page 2

ask whether this is proper, and if not, how the situation might be corrected.

Analysis

You explain that the problem first arose out of the mistaken conclusion reached several
years ago that the work required of the BIA to complete the ANCSA § 14(h)(1) program had
already been completed. This is now clearly recognized not to have been an accurate
assessment, but in the meantime, significant funding has been erroneously included in contracts
and compacts as if it were properly categorized as recurring Tribal Priority Allocation (TPA)
funding. Some recipient entities have carried out the spirit of the ANCSA program by in fact
using the funds provided for ANCSA-related work. Others have not, but have instead utilized
funds provided for non-ANCSA activities. ANCSA Regional Corporations are understandably
impatient to see the work initiated or continued on their pending § 14(h)(1) applications.

The most immediate question is therefore what steps might be taken during the annual
negotiation process to try to get the ANCSA work back on track. In my opinion, the most direct
means to the desired end would be to include specific ANCSA-related tasks in the contracting
entities' scopes of work, whereby they would agree after negotiation as to what activities they
would undertake, and what ANCSA-related work product they would commit themselves to
deliver. The utilization of qualified staff would of course be one of the points to be covered.
To the extent that compacting or contracting entities would voluntarily agree to such
commitments, and then fulfill them, the necessity for resort to any sort of formal procedures to
retrieve the money in question could be dispensed with. This would save everyone time, money
and legal uncertainty. It would also serve the best interests of ANCSA Regional Corporations[1]
and their shareholders, who have already had to wait too long for the relevant conveyances (or
the opportunity to appeal application rejections).

If a contracting entity which has already received ANCSA project money in prior years
now refuses to either (1) agree to do the work for which the money was intended, or (2) agree to
retrocede the funds and program to the BIA, so that the Bureau would have the resources to do
the work in-house, then other remedies will have to be evaluated. Hopefully, we won't have to
reach that question, but if we must, I think there are several legal theories on which the BIA
might proceed. For one, I think the ANCSA funds are more properly viewed as a category of
non-recurring funds, which should not be included in a tribal TPA to begin with. Unlike open-
ended programs typically included in a TPA base, the ANCSA § 14(h)(1) application processing
task is one which deals with a finite and limited scope of work, which is intended to be
completed at a certain point in time, at which point the need for--and entitlement to--continued
funding terminates.

---

[1] In fact, an ideal process would only proceed on the basis of a Regional Corporation resolution in hand,
requesting that the BIA contract with the prospective service provider entity.

Roger Drapeaux and Ken Pratt
Funding for implementation of ANCSA § 14(h)(1)
May 24, 2004 - Page 3


        Another legal problem with the status quo is that it is doubtful that contracting for the
ANCSA conveyance work can properly be supported by a tribal or village resolution under the
ISDA. Legally, the tribal entity benefitting from a program, function, service or activity, or
portion thereof, is the entity which must provide the authorizing request to contract. In the case
of ANCSA conveyance-related work, that entity would be the Regional Corporation. Precedent
for this type of approach exists in the area of BLM cadastral survey work under the ISDA.
Where the contractible work is for the benefit of a Regional or other ANCSA Corporation, the
BLM has agreed to contract under the ISDA only at the request of the ANCSA corporate entity to
be benefitted. (Note that the ISDA includes ANCSA corporations within its statutory definition
of Indian tribe.) It would be my recommendation that even in the case of a negotiation to
incorporate ANCSA tasks into an ISDA contract renewal or AFA, the BIA should require an
ANCSA Regional Corporation resolution requesting that the BIA contract for performance of
the relevant tasks. Indeed, the Regional Corporation would not only have the right to dictate who
provides the services, but also the option of electing to contract directly with the Bureau to
perform the work itself, save only those functions which might be considered inherently federal,
or precluded by conflict of interest.

        Still another non-consensus approach to retrieving the funds necessary to get the ANCSA
work done would be to issue a partial declination under ISDA § 102(a)(2)(A), on the grounds
that the service to be rendered (i.e., processing cemetery and historical place applications) to the
Indian beneficiaries (i.e., the ANCSA Regional Corporations) will not be satisfactory, because of
a demonstrated record of non-performance by the contracting entity.


Conclusion

        Given the considerable recent Congressional interest in expediting completion of the
ANCSA conveyance process, as witnessed by the active effort to enact the Alaska Land Transfer
Acceleration Act of 2003, S. 1466, it is especially appropriate that the ANCSA § 14(h)(1)
process be re-energized. I would strongly recommend that you try to address this problem by
negotiating mutually acceptable terms with affected ISDA contractors and Self-Governance
compactors. I would also recommend you support that process by requiring "tribal" resolutions
from the affected ANCSA Regional Corporations. If you encounter an unwillingness to alter
existing arrangements, let me know, and we can evaluate what other approach(es) to pursue to
rectify the situation, and to make sure that funds appropriated for ANCSA purposes are actually
applied to the intended activities.


                                Roger L. Hudson


cc:    Niles Cesar, Alaska Regional Director, BIA
       Peggy Exendine, Contracting Officer, Alaska Region, BIA
       Rich Myers, Assistant Solicitor, General Indian Legal Activities, D

## SOME POTENTIAL USES OF ANCSA PROGRAM FUNDS BY COMPACT TRIBES

-Assist in completing any remaining ANCSA 14(h)(1) site investigations. The amount of such work varies region-by-region but is subject to increase based on Regional Corporation efforts to have the BLM reopen selected 14(h)(1) case files that previously were rejected and closed. The work requires staff with expertise in archeology/anthropology, and would have to conform to ANCSA regulations and be consistent with established BIA ANCSA Office methodology. Associated tasks might include performing archeological surveys, background research (e.g., literature reviews, oral history interviews), writing site reports, and making recommendations about site significance based on 14(h)(1) eligibility criteria.

-Survey and document ANCSA 14(h)(1) sites located on village corporation lands. Many 14(h)(1) applications filed by the Regional Corporations identified sites determined by the BLM to fall within ANCSA village selections, which took precedence. Accordingly, the BLM rejected those applications and the BIA did not investigate the subject sites.

-Translate, transcribe and/or index ANCSA 14(h)(1) oral history tapes. Since 1975, over 1,900 tape recorded oral history interviews have been conducted with Native elders to help document the history of t-ative use of selected ANCSA 14(h)(1) sites. The recordings are rich in information about customary and traditional subsistence practices, among a wide variety of other topics. Some tapes are almost entirely in a Native language; others are predominantly in English. A great deal of "processing" work remains to be done with these recordings.

-Incorporate ANCSA 14(h)(1) data in local or regional cultural heritage/cultural resources programs. The ANCSA 14(h)(1) collection includes information about virtually any subject one can think of regarding Alaska Native history and culture. This collection could be profitably used to: develop educational curricula based on local Native history and traditions; support Native language retention programs; establish local/regional cultural resource management plans; produce Native place names maps or publications; and prepare claims based on the Native American Graves Protection and Repatriation Act (NAGPRA).