**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **ALEUTIAN PRIBILOF ISLANDS ASSOCIATION, INC.,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Civil Action No. 06-2173 (CKK)** |
| **DIRK KEMPTHORNE, Secretary of the Interior, United States Department of the Interior, et al.,** | ) | |
| **Defendants.** | ) | |

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT OF DEFENDANTS' PARTIAL MOTION TO DISMISS AND CROSS MOTION FOR SUMMARY JUDGMENT**

Defendants, Dirk Kempthorne, Secretary of the Interior, United States Department of the Interior, et al., respectfully move the Court, pursuant to Rule 12(b)(1) of the Federal Rule of Civil Procedure, for an order dismissing a portion of plaintiff's Complaint on the grounds that the Court lacks subject matter jurisdiction. In addition, defendants move the Court, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for an order granting defendants' motion for summary judgment on the grounds that no genuine issue of material fact exists, and defendants are entitled to judgment as a matter of law.

In support of this motion, defendants respectfully submit the attached Memorandum of Points and Authorities with Exhibits attached thereto, a Statement of Material Facts Not in Genuine Dispute, and a proposed Order.

Respectfully submitted,


/s/
JEFFREY A. TAYLOR, D.C. BAR #498610
United States Attorney


/s/
RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney


/s/
MARIAN L. BORUM, D.C. BAR #435409
Assistant United States Attorney
Civil Division
555 Fourth Street, N.W.
Washington, D.C.   20530
202-514-6531


Of Counsel:
Roger Hudson, Attorney
Office of the Regional Solicitor, Alaska Region
United States Department of the Interior
4230 University Drive, Suite 300
Anchorage, Alaska 99508-4626
907-271-4131

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **ALEUTIAN PRIBILOF ISLANDS ASSOCIATION, INC.,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Civil Action No. 06-2173 (CKK)** |
| **DIRK KEMPTHORNE, Secretary of the Interior, United States Department of the Interior, et al.,** | ) | |
| **Defendants.** | ) | |

**DEFENDANTS' STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE**

Pursuant to Local Rules 7(h) and 56.1, Defendants submit the following Statement of Material Facts Not in Genuine Dispute:

1. The Alaska Native Claims Settlement Act ("ANCSA"), 43 U.S.C. § 1601 et seq. permitted 12 Alaska Regional Native Corporations, organized pursuant to ANCSA § 7, to select for conveyance, pursuant to ANCSA § 14(h(1), cemeteries and historical sites within their regional boundaries and not otherwise conveyed to ANCSA Village Corporations. 43 C.F.R. § 2653.5.

2. The Aleut Corporation ("TAC") timely selected a number of such sites during the 1970s, in accordance with the regulations at 43 C.F.R. § 2653.5.

3. Although a lot of the work initially required of the BIA in connection with implementation of ANCSA § 14(h)(l) was completed by the mid-1990s, there were still various substantial tasks to be completed as of the mid-1990s, which varied from region to region. See Memorandum from the Department of Interior, Office of the Solicitor, Alaska Region, dated May

24, 2004 (Exhibit 17).

4. When Tribal Self-Governance Compacts were entered into with Alaska tribal consortia or regional non-profit Native corporations, including the Aleutian Pribilof Islands Association, Inc. ("APIA"), beginning around 1996, the funding for the ANCSA § 14(h)(1) conveyance program was improvidently included in the tribal priority allocation, meaning that the recipient entities had broad discretion as to how to spend the money. See Memorandum from the Department of Interior, Office of the Solicitor, Alaska Region, dated May 24, 2004 (Exhibit 17).

5. These funds were included in Annual Funding Agreements, including APIA's, without any initial requirement that ANCSA Regional Corporations submit resolutions to the Bureau of Indian Affairs ("BIA") requesting that the funding go to such entities. See May 12, 2006, Letter from The Aleut Corporation to Administrative Law Judge Harvey C. Sweitzer (APIA's Motion for Summary Judgment, Exhibit J).

6. The Bureau of Indian Affairs' ANCSA Program staff had immediate concerns about the lack of any apparent means of assuring that the conveyance-related work for which funds were appropriated would be undertaken. See May 24, 2004 Memorandum from the Office of the Solicitor, Alaska Region (Exhibit 17); see also Affidavit of Kenneth L. Pratt, Exhibit 19, § 4.

7. ANCSA Regional Corporations began to express similar concerns, and some ANCSA Regional Corporations, including TAC, attempted to protect their interest in making sure the funds were spent on necessary ANCSA conveyance-related activities, by entering into agreements with the funding recipient agencies, including specifically APIA. The August 7, 1998 TAC-APIA Memorandum of Agreement became the basis of a working relationship

between TAC and APIA for several years, during which time BIA funding continued to go directly to the APIA.  See Memorandum Agreement Between APIA and TAC (Exhibit 16).

8.  Following the suggestions in the 2004 Solicitor's Office Memorandum, the BIA and Office of Self-Governance encouraged the inclusion of procedures to establish specific ANCSA § 14(h)(1) work plans with ANCSA Regional Corporation participation in Annual Funding Agreements subsequently negotiated.

9.  On May 20, 2005, TAC passed a resolution stating that it no longer wanted APIA to carry out ANSCA-related work on TAC's behalf.  See The Aleut Corporation, Resolution 06-11, 14(h)1 Funding, dated August 25, 2006 (Exhibit 14).

Respectfully submitted,

/s/
JEFFREY A. TAYLOR, D.C. BAR #498610
United States Attorney

/s/
RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney

/s/
MARIAN L. BORUM, D.C. BAR #435409
Assistant United States Attorney
Civil Division
555 Fourth Street, N.W.
Washington, D.C.  20530
202-514-6531

Of Counsel:
Roger Hudson, Attorney
Office of the Regional Solicitor, Alaska Region
United States Department of the Interior
4230 University Drive, Suite 300
Anchorage, Alaska 99508-4626
907-271-4131

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **ALEUTIAN PRIBILOF ISLANDS ASSOCIATION, INC.,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Civil Action No. 06-2173 (CKK)** |
| **DIRK KEMPTHORNE, Secretary of the Interior, United States Department of the Interior, et al.,** | ) | |
| **Defendants.** | ) | |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE**

Pursuant to Local Rules 7(h) and 56.1, Defendants submit the following Response to Plaintiff's Statement of Material Facts Not in Genuine Dispute in Support of Motion for Summary Judgment.

1. Undisputed.

2. Undisputed.

3. Undisputed.

4. Undisputed.

5. Undisputed.

6. Undisputed.

7. Undisputed.

8. Disputed. Defendants agree that the Budget Justification document still categorizes the ANCSA § 14(h)(1) program as a Tribal Priority Allocation, but disagree as to whether it is still classified as a Trust Services Program. See Affidavit of Kenneth L. Pratt, Defendants'

Exhibit 19 at ¶ 10.

9. Defendants concede that the language is quoted correctly, but dispute its proper interpretation or implication.

10. Undisputed.

11. Defendants agree with most of these statements, but disagree with the statement that inclusion of the ANCSA § 14(h)(1) PFSAs "was supported by the resolutions of the thirteen tribes that sanction APIA." It is true that the tribes have submitted ISDEAA trial resolutions from time to time requesting that the BIA contract with APIA for all programs, but defendants do not believe that the resolutions specifically or explicitly refer to the ANCSA § 14(h)(1) program, and also dispute the legal conclusion that they "support" APIA contracting for that program in the same sense that they are legally sufficient ISDEAA § 102(a) tribal resolutions with respect to that particular program. This is a legal issue in dispute between the parties.

12. Undisputed.

13. Undisputed.

14. Undisputed.

15. Undisputed, except that the statement that "APIA did not appeal that decision to the IBIA within 30 days" does not reflect that fact that objections were filed, albeit not in a timely manner.

16. Undisputed.

Respectfully submitted,


/s/
JEFFREY A. TAYLOR, D.C. BAR #498610
United States Attorney


/s/
RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney


/s/
MARIAN L. BORUM, D.C. BAR #435409
Assistant United States Attorney
Civil Division
555 Fourth Street, N.W.
Washington, D.C.   20530
202-514-6531


Of Counsel:
Roger Hudson, Attorney
Office of the Regional Solicitor, Alaska Region
United States Department of the Interior
4230 University Drive, Suite 300
Anchorage, Alaska 99508-4626
907-271-4131

## TABLE OF AUTHORITIES

**CASES**

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) . . . . . . . . . . 7

Andrade v. Lauer, 729 F.2d 1475 (D.C. Cir. 1984) . . . . . . . . . . 9

Benn v. Unisys Corp., 176 F.R.D. 2 (D.D.C. 1997) . . . . . . . . . . 8

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) . . . . . . . . . . 7, 8

Cherokee Nation of Okla. v. United States, 190 F. Supp. 1248 (E.D. Okla. 2001) . . . . . . . . . . 8

Cherokee Nation v. Leavitt, 543 U.S. 631 (2005) . . . . . . . . . . 8

Cureton v. U.S. Marshal Serv., 322 F. Supp. 2d 23, 2004 WL. 1435124 (D.D.C. June 28, 2004) . . . . . . . . . . 7

Gardner v. U.S., No. Civ. A. 96-1467, 1999 WL. 164412 (D.D.C. Jan. 29, 1999), aff'd, 213 F.3d 735 (D.C. Cir. 2000) . . . . . . . . . . 6

Haase v. Sessions, 835 F.2d 902 (D.C. Cir.1987) . . . . . . . . . . 6

Harding v. Gray, 9 F.3d 150 (D.C. Cir. 1993) . . . . . . . . . . 8

Herbert v. Nat'l Acad. of Science, 974 F.2d 192 (D.C. Cir. 1992) . . . . . . . . . . 7

Laningham v. U.S. Navy, 813 F.2d 1236 (D.C. Cir. 1987) . . . . . . . . . . 7

Marine Mammal Conservancy, Inc. v. Dep't of Agriculture, 134 F.3d 409 (D.C. Cir. 1998) . . . . . . . . . . 9

Matsushita Elec. Industrial Co. v. Zenith Radio, 475 U.S. 574 (1986) . . . . . . . . . . 7

Mortensen v. First Fed. Sav. and Loan Ass'n, 549 F.2d 884 (3rd Cir. 1977) . . . . . . . . . . 7

Oglesby v. U.S. Dep't of Army, 920 F.2d 57 (D.C. Cir. 1990) . . . . . . . . . . 9, 11

Rowland v. Riley, 5 F. Supp. 2d 1 (D.D.C. 1998) . . . . . . . . . . 8

Tao v. Freeh, 27 F.3d 635 (D.C. Cir. 1994) . . . . . . . . . . 7

Wilbur v. CIA, 355 F.3d 675 (D.C. Cir. 2004) . . . . . . . . . . 9, 11

**STATUTES**

5 U.S.C. § 702 . . . . . . . . . . 9

25 U.S.C. § 450f . . . . . . . . . . 4

25 U.S.C. § 450f(a)(2) . . . . . . . . . . 15

25 U.S.C. 450j-1(b)(2) . . . . . . . . . . 16

25 U.S.C. § 450m-1 . . . . . . . . . . 11

25 U.S.C. § 450m-1(a) . . . . . . . . . . 4, 8,10

25 U.S.C. §§ 458 et seq. . . . . . . . . . . 4

28 U.S.C. §§ 1331 . . . . . . . . . . 9

42 U.S.C. § 1604(b) . . . . . . . . . . 3

43 U.S.C. § 1604(b) . . . . . . . . . . 3

43 U.S.C. §§ 1606, 1607 . . . . . . . . . . 3

43 U.S.C. §§ 1610, 1611 . . . . . . . . . . 17

25 C.F.R. §§ 900.32 . . . . . . . . . . 16

25 C.F.R. § 1000.420 et seq . . . . . . . . . . 8

25 C.F.R. § 1000.422(c) . . . . . . . . . . 4

25 C.F.R. §900.150 et seq . . . . . . . . . . 8

25 C.F.R. §§ 900.153-.157 . . . . . . . . . . 4

25 C.F.R. §§ 900.157-169 . . . . . . . . . . 5

25 C.F.R. § 900.164 . . . . . . . . . . 5

25 C.F.R. § 900.165 . . . . . . . . . . 12

25 C.F.R. § 900.166 . . . . . . . . . . 12

43 U.S.C. § 1613(h)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4,16

43 C.F.R. §§ 2653.5(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**MISCELLANEOUS**

Fed. R. Civ. P. 12(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Fed. R. Civ. P. 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**DEFENDANTS' EXHIBIT LIST**

1. Department of Interior, Office of Hearings and Appeals, Departmental Hearings Division, Recommended Decision, dated August 31, 2006

2. The Aleut Corporation Resolution No. 05-14, dated May 20, 2005

3. Undated Correspondence from Aleutian Pribilof Islands Association, Inc. to Charles Bunch, Deputy Regional Director, United States Department of the Interior (circa January 15, 2006)

4. Correspondence from Aleutian Pribilof Islands Association Inc. to Charles Bunch, Deputy Regional Director, United States Department of the Interior, dated January 26, 2006

5. Aleutian Pribilof Islands Association v. Northwest Representative, Office of Self-Governance, Bureau of Indian Affairs, Appellee's Opening Brief, IBIA 06-50-A

6. Aleutian Pribilof Islands Association v. Northwest Representative, Office of Self-Governance, Bureau of Indian Affairs, Appellant's Opening Brief, IBIA 06-50-A

7. Aleutian Pribilof Islands Association v. Northwest Representative, Office of Self-Governance, Bureau of Indian Affairs, Appellant's Reply to Appellee's Answer Brief, IBIA 06-50-A

8. Aleutian Pribilof Islands Association v. Northwest Representative, Office of Self-Governance, Bureau of Indian Affairs, Appellee's Answer Brief, IBIA 06-50-A

9. Aleutian Pribilof Islands Association v. Northwest Representative, Office of Self-Governance, Bureau of Indian Affairs, Appellant's Surreply, IBIA 06-50-A

10. Aleutian Pribilof Islands Association v. Northwest Representative, Office of Self-Governance, Bureau of Indian Affairs, Appellee's Notice of Continuation of Dispute, IBIA 06-50-A

11. Correspondence from Geoffrey D. Strommer to Interior Board of Indian Appeals, dated October 31, 2006

12. Department of Interior, Office of Hearings and Appeals, Interior Board of Indian Appeals, November 3, 2006 Order Dismissing Objection to Recommended Decision

13. Correspondence from Debra K. Mack, Chair, The Aleut Corporation Board of Directors to Tom Shirilla, Northwest Field Manager, Office of Self Governance, dated June 8, 2006

14. The Aleut Corporation, Resolution 06-11, 14(h)1 Funding, dated August 25, 2006

15. Memorandum of the Department of Interior, Office of the Regional Solicitor, Alaska Region, dated October 5, 1992

16. Memorandum of Agreement Between APIA and TAC, dated August 7, 1998

17. Memorandum from the Department of Interior, Office of the Solicitor, Alaska Region, dated May 24, 2004

18. Alaska Native Claims Settlement Act, ANCSA 1985 Study

19. Affidavit of Kenneth L. Pratt, Alaska Native Claims Settlement Act Program Manager

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **ALEUTIAN PRIBILOF ISLANDS ASSOCIATION, INC.,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Civil Action No. 06-2173 (CKK)** |
| **DIRK KEMPTHORNE, Secretary of the Interior, United States Department of the Interior, et al.,** | ) | |
| **Defendants.** | ) | |

**MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANTS' PARTIAL MOTION TO DISMISS AND FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

Plaintiff, Aleutian Pribilof Islands Association, Inc., ("APIA"), has moved for summary judgment, asking the court, inter alia, to declare that plaintiff is the proper beneficiary of funding "under Section 14(h)(1) of the Alaska Native Claims Settlement Act ("ANCSA"), and . . . ha[s] the legal right to assume activities under the Indian Self-Determination and Education Assistance Act ("ISDEAA").[1] See Plaintiff's Motion for Summary Judgment, Introduction ("Pltf's Motion Intro.") at p. 2. Plaintiff requests that defendants be ordered to award and fund plaintiff's Fiscal Year ("FY") 2006 Annual Funding Agreement ("AFA"), and be enjoined "from withholding

[1]Under the ISDEAA, Congress mandated that Indian tribes served by Department of Interior and Department of Health and Human Services programs for the benefit of Indians have a right to take over administration of those programs. These tribes may receive funds for that the agency otherwise would have spent on such programs, functions, services or activities. 25 U.S.C. §§ 450 et seq. Pursuant to Title IV of the ISDEAA, qualified tribes or tribal organizations can enter into Self-Governance Compacts which afford greater latitude in how federal dollars are expended. 25 U.S.C. § 458aa et seq. APIA has entered into such a compact with the Department of Interior.

ANCSA funds . . . from APIA's AFA for FY 2007 or thereafter . . . ." Id. at 3.

Under the 2006 Fiscal Year Annual Funding Agreement, $73,379 was withheld from APIA in response to the submission of a competing demand to contract for the same funds, by The Aleut Corporation ("TAC").[2] Thus, the question presented in this case is not whether the defendants acted properly in retaining funds which the plaintiff had an alleged right to receive under the ISDEAA, because the decision under review was not a decision to withhold the funds from being utilized by an Indian tribe under the ISDEAA. Rather, the question presented is whether the Bureau of Indian Affairs ("BIA") acted properly in deciding *which* potential beneficiary entity - - the APIA or TAC - - had the superior claim to administer the program and receive the funds in question.

The Bureau of Indian Affairs/Office of Self-Governance's ("OSG") decision to delete the disputed funds from the 2006 APIA AFA was based on a sound determination that the primary beneficiary tribe with respect to the program in question was TAC, not the APIA. In an August 31, 2006 Recommended Decision, Administrative Law Judge Harvey C. Sweitzer determined that TAC was not merely the primary beneficiary of the program in question but, in fact, the sole entity eligible to contract for the program under the ISDEAA. See Department of Interior, Office of Hearings and Appeals, Recommended Decision, attached hereto as Exhibit 1. Based on this determination, the judge correctly ruled that the deletion of funds from the APIA AFA was proper, notwithstanding APIA's procedural objections, because plaintiff, as an entity ineligible to contract for those funds, was not entitled to the procedural protections available under the

---

[2]The total amount of the Fiscal Year 2006 APIA AFA, including the disputed amount, was approximately $3,250,523. See Pltf's Motion, Exhibit K.

ISDEAA.

However, before reaching the question of the challenged Department of the Interior ("Department") actions, a threshold question must be considered: whether or not the Court has jurisdiction over this suit with respect to the FY 2006 funds. As pled in the Defendants' Answer, this portion of APIA's suit addressing FY 2006 funds is barred because APIA failed to exhaust its administrative remedies. See Amended Answer at p. 1.

## II. BACKGROUND

In 1971, Congress enacted the Alaska Native Claims Settlement Act. 43 U.S. § 1601(a) et seq. The purpose of the Act was to effect "a fair and just settlement of all claims by Natives and Native groups of Alaska, based on aboriginal land claims." Id. In order to effect such a settlement, Congress created two types of entities to receive land and money which would be distributed in accordance with ANCSA. These two entities were Regional Corporations[3] and Village Corporations.[4] 43 U.S.C. §§ 1606, 1607.

In 1976, The Aleut Corporation, a Regional Corporation for the Aleut region, filed ANCSA § 14(h)(1) applications with the BIA.[5] "In the late 1990s, APIA, a Native non-profit

[3]Alaska was divided into twelve regions to be represented by Regional Corporations. An additional Regional Corporation was established for natives of Alaska, not residing in Alaska. 43 U.S.C. § 1606(c). All living Alaska natives were enrolled in a Regional Corporation. 43 U.S.C. § 1604(b).

[4]"Native residents of each Native village entitled to receive lands and benefits under [ANSCA were] organize[d] as a business for profit or non-profit corporation . . . ." 43 U.S.C. § 1607(a). Only Alaska Natives who were residents of a village at the time of the 1970 census were enrolled in a village. 42 U.S.C. § 1604(b).

[5]ANSCA 14(h)(1) allowed newly created Native Regional Corporations to receive a portion of their acreage entitlement in the form of historical places and cemetery sites. See Affidavit of Kenneth L. Pratt at ¶ 2, attached hereto as Exhibit 19.

organization sanctioned by thirteen federally recognized tribal governments in its region, entered

into a Tribal Self-Governance Compact . . . with BIA . . . pursuant to the ISDEAA."  Exhibit 1 at

p. 3.  Under this compact, APIA was to conduct a broad range of activities related to ANCSA §

14(h)(1) in the same region as that of TAC.  Id. at 3-4.  The ANCSA § 14(h)(1) funds were

transferred to APIA without TAC's consent.  Id. at 4.  In 1998, APIA and TAC entered into a

Memorandum of Agreement ("MOA") so both parties could conduct ANCSA § 14(h)(1) related

activities.  Id.  Since then, APIA "compacted with the Bureau of Indian Affairs under Title IV of

the Indian Self-Determination and Education Assistance Act . . . , 25 U.S.C. §§ 458 et seq., to

carry out various programs, functions, services and activities ("PFSAs"), including those

authorized by § 14(h)(1) of ANSCA."  See id. at 1.  Certain funds expended had to be approved

by TAC.  Id.  On May 20, 2005, TAC "passed a resolution specifically stating that it no longer

wanted APIA to carry out ANCSA-related work on the corporations behalf."  Id.  Rather, TAC

wanted to contract on its own behalf with BIA to receive the ANCSA funding for FY 2006.  See

The Aleut Corporation, Resolution 05-14, attached hereto as Exhibit 2.  That resolution was

submitted to BIA, pursuant to ISDEAA § 102(a)(1), 24 U.S.C. § 450f.

     Because the BIA and OSG considered TAC to be the tribe directly benefitted by the

activities required to be carried out with the funding to implement Section 14(h)(1) of the Alaska

Native Claims Settlement Act, 43 U.S.C. § 1613(h)(1), the determination was made that the TAC

resolution had to be honored.  BIA then deleted the ANCSA § 14(h)(1) from APIA's Fiscal Year

("FY") 2006 AFA.  The ANCSA § 14(h)(1) funds were then held for inclusion in an ISDEAA

contract with TAC.

     APIA asked for an informal conference regarding this transfer of funds, pursuant to 25

C.F.R. § 1000.422(c) and 25 C.F.R. §§ 900.153-.157.[6]  BIA's Deputy Regional Director issued a

Recommended Decision upholding BIA's initial decision to transfer the ANCSA § 14(h)(1) FY

2006 funds.  See Exhibit 1.

APIA then sought to reach an accommodation with TAC. See Undated and January 26,

2006 letters seeking extension of the appeal deadline, attached hereto as Exhibits 3, 4.  When

APIA and TAC were unable to reach an arrangement allowing for APIA to continue receiving

the ANCSA § 14(h)(1) funds, APIA filed a formal administrative appeal pursuant to 25 C.F.R.

§§ 900.157-169.[7]  As agreed by the parties, the dispute was submitted to an administrative law

judge after extensive briefing.[8]  Following this exercise of appeal rights, on August 31, 2006,

Administrative Law Judge Sweitzer issued a Recommended Decision, in which he upheld the

BIA's and OSG's action in removing the ANCSA § 14(h)(1) funding from the 2006 APIA AFA.

See Exhibit 1.  According to the Recommended Decision, either party could file an objection to

the Recommended Decision with the Interior Board of Indian Appeals ("IBIA") within 30 days.

See id.

APIA failed to file an objection within the time allowed.  Rather, on October 31, 2006,

APIA filed a Notice of Appeal and Objection to the Recommended Decision.  APIA

acknowledged that the appeal was untimely, and asked that it be deemed timely.  See APIA's

---

[6]Pursuant to 25 U.S.C. § 450m-1(a), APIA could have commenced a lawsuit in district court immediately, but elected not to do so.

[7]Notably, those regulations, and 25 C.F.R. § 900.164 in particular, afforded APIA an extensive set of procedural rights.

[8]Attached hereto as Exhibits 5 through 10 are the six exhaustive briefs filed with the Department of the Interior Office of Hearings and Appeals.

October 31, 2006 letter to the IBIA, attached hereto as Exhibit 11. On November 3, 2006, the IBIA issued an Order Dismissing the Objection to the Recommended Decision as untimely. See Department of Interior, Office of Hearings and Appeals, Interior Board of Indian Appeals, Order Dismissing Objection to Recommended Decision, 44 IDIA 11 (2006), attached hereto as Exhibit 12; see also 44 IBIA 11 (2006).

During the pendency of the administrative appeal proceedings, the question of whether ANCSA § 14(h)(1) funding for FY 2007 should be provided to APIA or to the TAC arose. A latent ambiguity in the May 20, 2005 Resolution permitted APIA initially to argue that TAC had not requested a contract for the ANCSA § 14(h)(1) program for 2007. However, TAC, by a June 8, 2006 letter and August 25, 2006 confirming Resolution, clarified and reiterated its request for the 2007 contract. See Letter dated June 8, 2006, from Debra K. Mack, Chair, The Aleut Corporation Board of Directors, attached hereto as Exhibit 13; The Aleut Corporation Resolution 06-11, 14(h)1 Funding, attached hereto as Exhibit 14. In light of the Recommended Decision, the ANCSA § 14(h)(1) funding sought by APIA was not restored in its FY 2007 AFA. On or about December 21, 2006, the instant action was filed.

## III. STANDARDS OF REVIEW

### A. Standard for Motion to Dismiss for Lack of Subject Matter Jurisdiction

A motion to dismiss under Fed. R. Civ. P. 12(b)(1) "presents a threshold challenge to the court's jurisdiction." Gardner v. U.S., No. Civ. A. 96-1467, 1999 WL 164412, *2 (D.D.C. Jan. 29, 1999), aff'd, 213 F.3d 735 (D.C. Cir. 2000) and cert. denied, 531 U.S. 1153 (2001) (quoting, Haase v. Sessions, 835 F.2d 902, 906 (D.C. Cir.1987)); see also 4 Wright & Miller: Federal Prac. & Proc. § 1350 (R12)(2002 Supplement)(". . . subject matter jurisdiction deals with the

power of the court to hear the plaintiff's claims in the first place, and therefore imposes upon courts an affirmative obligation to ensure that they are acting within the scope of their jurisdictional power.") A court may resolve a motion to dismiss brought pursuant to Rule 12(b)(1) in two ways. First, the court may determine the motion based solely on the complaint. Herbert v. Nat'l Acad. of Science, 974 F.2d 192, 197 (D.C. Cir. 1992). Alternatively, to determine the existence of jurisdiction, a court may look beyond the allegations of the complaint, consider affidavits and other extrinsic information, and ultimately weigh the conflicting evidence. See id.; see also Cureton v. U.S. Marshal Serv., 322 F. Supp.2d 23, 2004 WL 1435124, *2 (D.D.C. June 28, 2004). "At issue in a factual 12(b)(1) motion is the trial court's jurisdiction - - its very power to hear the case." Mortensen v. First Fed. Sav. and Loan Assn, 549 F.2d 884, 891 (3rd Cir. 1977).

**B. Standard for Summary Judgment**

Summary judgment is appropriate when the record shows that no genuine issue exists as to any material fact and the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986); Tao v. Freeh, 27 F.3d 635, 638 (D.C. Cir. 1994); see Fed. R. Civ. P. 56. In determining whether a genuine issue of material fact exists, the trier of fact must view all facts, and reasonable inferences drawn therefrom, in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co., 475 U.S. at 587. The mere existence of a factual dispute, however, will not defeat summary judgment. The non-moving party must show that the dispute is genuine and material to the case. That is, the factual dispute must be capable of affecting the substantive outcome of the case and

supported by sufficiently admissible evidence that a reasonable trier of fact could find for the non-moving party. Anderson, 477 U.S. at 247-48; Laningham v. U.S. Navy, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987). If the evidence favoring the non-moving party is "merely colorable, or is not significantly probative, summary judgment may be granted." Id. (citing Anderson, 477 U.S. at 249-50). "[A] complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial[,] [and] [t]he moving party is 'entitled to judgment as a matter of law.'" Celotex Corp., 477 U.S. at 323 (citations omitted).

Moreover, mere conclusory allegations are not enough to survive a motion for summary judgment. Harding v. Gray, 9 F.3d 150, 154 (D.C. Cir. 1993); Rowland v. Riley, 5 F. Supp.2d 1, 3 (D.D.C. 1998); Benn v. Unisys Corp., 176 F.R.D. 2 (D.D.C. 1997). As the Supreme Court has instructed: "the plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Once the initial burden of the moving party is satisfied, the burden shifts to the responding party to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. See id. at 250.

## IV. ARGUMENT

### A. The Arbitrary and Capricious Standard of Review Applies

APIA argues that "defendants' should have applied the Department's "longstanding Alaska Order of Contracting Precedence" in determining which party would be granted the

ANSCA § 14(h)(1) funding.[9] See Pltf's Motion Intro. at p. 3. APIA states that defendants' failure to do so "was arbitrary, capricious, and an abuse of discretion in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A)[.]" Id. However, APIA argues that "[t]he standard of review in civil suits brought under the ISDEAA is de novo." Id. at 3; see 25 U.S.C. 450m-1(a). Plaintiff cites Shoshone-Bannock Tribes of Fort Hall v. Shalala, 998 F.Supp. 1306 (D.Or. 1997), rev'd on other grounds, Shoshone-Bannock Tribes of the Fort Hall Reservation v. Thompson, 279 F.3d 660 (9th Cir. 2002), to support this assertion. Plaintiff is incorrect. This case does not support the proposition that a court reviewing an APA challenge to agency action, when faced with a statute with no standard of review, should apply a de novo standard.

There is no dispute that Plaintiff brought this action pursuant to both the APA and the ISDEAA. See Complaint at ¶ 6. However, Shoshone-Bannock Tribes of the Fort Hall Reservation, 988 F.Supp. at 1313 (D.Or. 1997) states that ISDEAA provides ***no*** standard of review. When a statute provides for judicial review but fails to set-forth the standards for that review, it is well accepted that the court looks to the APA for guidance. United States v. Carlo Bianchi & Company, 373 U.S. 709, 715 (1963). See also Sierra Club v. Glickman, 67 F.3d 90, 96 (5th Cir.1995).

Thus, since the ISDEAA does ***not*** set forth the standard of review, the APA's arbitrary and capricious standard is the appropriate standard. See Al-Fayed v. C.I.A., 254 F.3d 300, 304

---

[9]The BIA Order of Contracting Precedence is as follows: 1- active Indian Reorganization Act("IRA") Council; 2- in the absence of an IRA, the formally established Traditional Council; 3- in the absence of the first two, the local ANSCA village/urban for-profit corporation; 4- in the absence of all others, the ANCSA Regional for-profit corporation. Douglas Indian Ass'n v. Bureau of Indian Affairs, 27 IBIA 292, 293 (1995).

(D.C. Cir. 2001) (quoting Dickson v. Sec'y of Defendant., 68 F.3d 1396, 1404 n. 12 (D.C. Cir.1995) and citing Workplace Health & Safety Council v. Reich, 56 F.3d 1465, 1467 (D.C. Cir.1995) ("The APA, however, 'provides a default standard of judicial review . . . where a statute does not otherwise provide a standard.'")). In fact, courts in this jurisdiction have applied the APA's arbitrary and capricious standard to challenges of IBIA decisions. See Ransom v. Babbitt, 69 F. Supp.2d 141, 149 (D.D.C. 1999); Feezor v. Babbitt, 953 F. Supp. 1 (D.D.C. 1996)). Thus, in this case, the Court should apply the arbitrary and capricious standard to the facts to determine whether or not the challenged decision is supported by the administrative record.

**B. APIA's Claims Regarding the FY 2006 AFA Should Be Dismissed for Failure to Exhaust Administrative Remedies**

The ISDEAA and its implementing regulations give a tribal organization which objects to a BIA or OSG decision a choice of either pursuing an immediate judicial lawsuit, or an administrative appeal. See 25 U.S.C. § 450m-1(a); 25 C.F.R. § 1000.420 et seq.; 25 C.F.R. § 900.150 et seq.; Cherokee Nation of Oklahoma v. United States, 190 F.Supp. 1248, 1258 (E.D. Okla. 2001); affirmed sub nom Cherokee Nation v. Thompson, 311 F.3d 1054 (10th Cir. 2002), reversed on other grounds sub nom Cherokee Nation v. Leavitt, 543 U.S. 631 (2005). The statutory provision allowing an immediate judicial action is fairly unusual in that it departs from the more typical model requiring exhaustion of administrative remedies before a case challenging agency action can be taken to court. Had APIA proceeded directly to court, and commenced this action after the ANCSA § 14(h)(1) funding was omitted from its FY 2006 contract, in September 2005, this Court would have had jurisdiction under the statute establishing "original

jurisdiction." Likewise, if APIA, having once elected to pursue administrative remedies first, had properly exhausted those remedies, this Court would have had Administrative Procedure Act ("APA") judicial review jurisdiction to consider APIA's claims. 5 U.S.C. § 702. In its Complaint, APIA alleges that this Court has jurisdiction under both the ISDEAA and APA jurisdictional grants. See Complaint at ¶ 6. In addition, APIA cites 28 U.S.C. §§ 1331 and 1362 as additional bases for the Court's jurisdiction over this action. However, plaintiff's claims with respect to FY 2006 funding are barred under any of these jurisdictional bases by the doctrine of failure to exhaust administrative remedies.

Exhaustion of administrative remedies is generally required before seeking judicial review "'so that the agency has an opportunity to exercise its discretion and expertise on the matter and to make a factual record to support its decision.'" Wilbur v. CIA, 355 F.3d 675, 677 (D.C. Cir. 2004) (quoting Oglesby v. United States Dep't of Army, 920 F.2d 57, 61 (D.C. Cir. 1990)); see also Marine Mammal Conservancy, Inc. v. Dep't of Agric., 134 F.3d 409, 412 (D.C. Cir. 1998) ("Administrative appeals permit agencies to correct mistakes by 'inferior' officers. Judicial review may thereby be entirely avoided."); Andrade v. Lauer, 729 F.2d 1475, 1484 (D.C. Cir. 1984) (explaining that exhaustion discourages the "frequent and deliberate flouting of administrative processes," allows an agency to "correct its own errors," and "promotes judicial economy by avoiding needless repetition of administrative and judicial factfinding, and by perhaps avoiding the necessity of any judicial involvement at all if the parties successfully vindicate their claims before the agency").

The key question in considering this jurisdictional defense is whether or not the ISDEAA provision allowing original jurisdiction in court excuses a plaintiff, which elects to first pursue

administrative remedies, from fully and effectively exhausting its administrative appeal rights.

Clearly, the doctrine of exhaustion applies in this circumstance, notwithstanding the fact that

Congress allows tribal organizations, at the outset, the choice of either pursuing an administrative

appeal or an immediate judicial lawsuit. See 25 U.S.C. § 450m-1(a). Any contrary interpretation

would lead to inefficient and duplicative proceedings, contrary to the rationale behind the normal

exhaustion requirement.

In this case, plaintiff elected to pursue an administrative appeal. The Recommended

Decision issued by the Administrative Law Judge indicated that either party could file an

objection with the Interior Board of Indian Appeals ("IBIA") within 30 days. See id. APIA

failed to do so within the time allowed. Rather, on October 31, 2006, APIA filed a Notice of

Appeal and Objection to the Recommended Decision. APIA acknowledged that the appeal was

untimely and asked that it be deemed timely. See Exhibit 11. On November 3, 2006, the IBIA

issued an Order Dismissing the Objection to the Recommended Decision as untimely. See

Exhibit 12 (order publish at 44 IBIA 11 (2006)).

By failing to file a timely objection to the Recommended Decision, the APIA failed to

exhaust its administrative remedies. Had it presented its objections to the IBIA in a timely

manner, as contemplated by Departmental regulations, if appropriate, administrative

modification or overturning of the Recommended Decision could have been possible. See 25

C.F.R. §§ 900.165 and 900.166. Such action would have obviated any need to consume the

Court's time with the present lawsuit. Indeed, and important purpose of the exhaustion

requirement is to relieve courts of the unnecessary burden of entertaining suits that might have

been resolved at the administrative level. Once an ISDEAA appellant elects to pursue

administrative appeal remedies, however, there is a substantial interest in requiring such an appellant to play by the rules it has selected to utilize. Surely Congress did not intend to sanction inefficiency and pointless multiplication of proceedings when it gave ISDEAA Indian organizations the option of sidestepping the administrative appeal process *at the outset*.[10]

Plaintiff should have exhausted its available administrative remedies by timely filing an appeal before seeking to adjudicate the matter in this Court. See, e.g., Wilbur, 355 F.3d at 677. Plaintiff, therefore, has deprived defendants of an opportunity "to exercise [their] discretion and expertise on the matter, and to make a factual record to support [their] decision.'" Id. (quoting Oglesby, 920 F.2d at 61. Accordingly, this Court should dismiss APIA's claims as they pertain to the FY 2006 ANCSA § 14(h)(1) funding, and deny plaintiff any form of relief with respect to that funding.

**C. The Sound Conclusions in the August 31, 2006 Recommended Decision Regarding the Fiscal Year 2007 Funding Should Be Adopted By This Court**

1. APIA Does Not Have a Superior Right to Contract or Compact for the ANCSA § 14(h)(1) Program Funds

APIA argues that its right under the ISDEAA to contract for the funds in question should take precedence over TAC's right to request a contract for the same program funding. Pltf's Motion at pp. 7-10. While defendants generally agree that an "Alaska Order of Precedence" is utilized for ISDEAA contracting purposes, there are a few key points of disagreement with

---

[10]Moreover, in Pueblo of Zuni v. United States, the Court rejected the argument that 25 U.S.C. § 450m-1 authorizes a tribal contractor to bypass administrative exhaustion. 467 F.Supp.2d 1099 (D.N.Mex. 2006). Although the procedural context was slightly different, the court in Zuni rightly recognized that other policies besides the § 450m-1 shortcut to court still apply in the ISDEAA context. Once an appellant voluntarily elects to utilize the administrative appeals process, it is obliged to pursue it in accordance with the rules it has selected. When it fails to do so, it forfeits its right to judicial review.

plaintiff's argument.[11]  First, while the general policy reflected in the order is broadly applied, it

does not have the force of law, and is not established by statute, regulation or other mandatory

means.  Therefore, there is no violation in departing from it.

Second, it is not a policy which has been applied without consideration of the nature of

the program, function, service, or activity to be undertaken under a proposed contract.  In fact,

adherence to the "Order of Precedence" may not always be appropriate, especially if the

particular PFSA is one primarily or exclusively benefitting a "lower ranking" Alaska Native

entity, such as in this case the TAC.  See Exhibit 1 at pp. 12-14.  As APIA admits, the TAC and

all other ANCSA Regional Corporations are clearly defined in the ISDEAA as  tribes eligible to

contract under the provisions of the law.   Pltf's Motion at p. 7, n.3.   Although the vast majority

of ISDEAA contracting in Alaska occurs, and always has, without need for reference to the order

(because no competing applications are submitted), departure from the order has in the past been

justified in a special case where the PFSA to be contracted directly benefits an ANCSA

corporation, rather than a governmental tribe.   See October 5, 1992 Memorandum of the Office

of the Solicitor, Alaska Region, attached hereto as Exhibit 15 (surveying of lands for conveyance

pursuant to the ANCSA).

APIA asserts that the "true beneficiaries" of the ANCSA § 14(h)(1) program are the

village councils whose resolutions support APIA's contracting status.  Pltf's Motion at p. 9.

However, this is simply incorrect.  "APIA's assertion .  .  .  is contradicted by the clear language,

---

[11]The BIA Order of Contracting Precedence is as follows: 1- active Indian Reorganization
Act("IRA") Council; 2- in the absence of an IRA, the formally established Traditional Council;
3- in the absence of the first two, the local ANSCA village/urban for-profit corporation; 4- in the
absence of all others, the ANCSA Regional for-profit corporation.  Douglas Indian Ass'n v.
Bureau of Indian Affairs, 27 IBIA 292, 293 (1995).

overall structure, and purpose of ANCSA." See Exhibit 1 at pp. 8-12. In short, the BIA/OSG decision to depart from the normal order in the present case was neither contrary to law nor unprecedented. Rather, it was a rationally and fully-supported action in keeping with both the spirit and the letter of the ISDEAA.

APIA next argues that the fact that APIA received the funding in past years, without benefit of a supporting resolution from the TAC, meant that its entitlement to the funding was beyond question. See Pltf's Motion at p. 10. However, what this argument fails to acknowledge is that the question of APIA contracting rights was never pointedly raised until a competing request to contract was received from the TAC. In fact, that inclusion of the ANCSA § 14(h)(1) funding in a succession of APIA AFAs had been erroneous, because the benefitted tribe (TAC) had not requested the contracting of that program by submission of a tribal resolution pursuant to ISDEAA § 102(a)(1). See Exhibit 1 at p. 14.

Another factor undermining APIA's argument is that APIA operated the program pursuant to an express Memorandum of Agreement ("MOA") with TAC. See Memorandum of Agreement between APIA and TAC, attached hereto as Exhibit 16. This agreement provided that APIA and TAC would "jointly conduct certain cultural heritage, preservation and related activities, and in particular, activities related to completing the ANSCA 14(h)(1) process." See id. at 1. The MOA also acknowledged that work product generated would be the sole property of TAC, not APIA. See id. at 3. In addition, pursuant to the MOA, APIA had to provide TAC with monthly financial statements as to all funds jointly administered. See id. Notably, APIA also saw fit to make efforts to reach an accommodation with TAC prior to commencing its formal appeal regarding the FY 2006 funding. This clearly undermines APIA's argument that its

entitlement to the funding was beyond question. See Exhibits 3, 4. As described in the May 24, 2004 Memorandum from the Department's Office of the Regional Solicitor, Alaska Region, the BIA, by that date, had come to recognize that inclusion of the 14(h)(1) funding in APIA's and other compacting entities' AFAs was not reliably fulfilling the purpose for which the funds were appropriated. See Memorandum from Office of Solicitor, Alaska Region, dated May 24, 2004, attached hereto as Exhibit 17. APIA's premise that Congress intends - - and has expressed through the provisions of the ISDEAA - - that a BIA mistake, once made and later recognized, must nevertheless be perpetuated, should be rejected.

APIA also argues that if both APIA (on the strength of resolutions submitted by village-based recognized tribes), *and* TAC (on the strength of its own resolution) were eligible to contract or compact the ANCSA § 14(h)(1) program, then APIA should be able to continue contracting on the basis of the principle of "first come-first served." See Pltf's Motion at p. 12. However, resolutions from the village-based tribal governing bodies, requesting that BIA and OSG contract the ANCSA § 14(h)(1) program to APIA, were not legally sufficient resolutions because the villages are not the tribes benefitting from the ANCSA § 14(h)(1) program. See Exhibit 1 at pp. 14 et seq.[12] Therefore, TAC is the only entity authorized to submit an ISDEAA § 102(a) resolution. See Exhibit 1 at p. 8.

---

[12]This clearly distinguishes the present case from the one addressed in the administrative decision in Pit River Health Serv. Inc. v. Indian Health Service, BAB CR333 (1994), discussed in plaintiff's motion. See Pltf's Motion at pp. 13-15.

2. Given the Determination That APIA's Expectation of Continued Funding to Administer the ANCSA § 14(h)(1) Program is Not Supported By a Tribal Resolution From the Benefitted Tribe, Plaintiffs' Allegations of Procedural Error Must Be Rejected

APIA, at pages 15 through 22 of its motion, identifies several specific provisions of the ISDEAA which it alleges were violated by the withdrawing of ANCSA § 14(h)(1) funding from APIA's 2006 AFA. See Pltf's Motion at pp. 15-22. These arguments are unavailing.[13]

First, APIA argues that the proper procedure for removing the funding in question would have been by partially declining its AFA proposal according to the procedure provided in ISDEAA §102(a)(2), 25 U.S.C. § 450f(a)(2). However, the declination process is only triggered when a legally sufficient tribal resolution is received. See Exhibit 1 at p. 14. Because the village-based tribes, whose resolutions support BIA and OSG contracting with non-tribe APIA, are not the beneficiaries of the ANCSA § 14(h)(1) program, their general resolutions do not support contracting of that program, and do not require utilization of the statutory declination process.[14] Although the 14(h)(1) funds were included in prior APIA AFAs, the receipt of TAC's May 2005 Resolution brought to light the incorrectness of that practice, which was then properly discontinued.

---

[13]The Administrative Law Judge also found each of these arguments to be meritless. See Exhibit 1 at pp. 14-20.

[14] In the event that the Court rules against defendants on this issue, defendants would be prepared to follow those declination procedures on remand. See Exhibit 10 (attaching the BIA's July 7, 2006 letter to APIA indicating that the BIA and OSG would comply with the final determination on the funding and procedural dispute, whatever it might be). However, if this case is so remanded, it should be noted that the BIA would likely decline the proposal on the basis of the ISDEAA § 102(a)(2)(E) criterion, because the fundamental problem would remain that the ANCSA § 14(h)(1) program is a conveyance related program, and TAC rather than APIA is the tribe benefitted. Compare Exhibit 1 at pp. 19-20 (citing the same statutory basis for declination).

APIA also argues, in reliance on ISDEAA § 106(b)(2), 25 U.S.C. 450j-1(b)(2), and 25 C.F.R. §§ 900.32 and 900.33, that defendants were prohibited from reducing its funding by recognizing TAC's superior right to contract for the 14(h)(1) program. See Pltf's Motion at pp. 18-20. However, pursuant to 25 C.F.R. § 900.32, if a tribe's proposed successor AFA is "'substantially the same' as the prior [AFA], . . . the Secretary shall approve and add to the contract the full amount of funds to which the contractor is entitled and may not decline any portion of the successor [AFA]." 25 C.F.R. § 900.32. The 2006 APIA proposal, however, was *not* the same as its proposal for prior years, because of the intervening submission of TAC's May 2005 tribal resolution, requesting that the BIA contract directly with it as the benefitted tribe, and cease contracting with APIA for the ANCSA § 14(h)(1) program. Therefore, the cited statutory provisions and regulations were not violated by the defendants' actions.

       3.  With Respect to the Conveyance-Related ANCSA § 14(h)(1) Program, it is TAC, Rather Than APIA, or its Constituent Villages, Which is the Tribe Benefitted By the Program for Purposes of ISDEAA Contracting Rights

APIA contends that "Alaska Tribes and their Members" are the primary beneficiaries of the ANCSA § 14(h)(1) program. See Pltf's Motion at p. 17. Defendants disagree, and this disagreement is precisely what led to the funding reallocation action at issue. Specifically, plaintiff asserts that Congress intended the primary beneficiaries of the ANCSA 14(h)(1) program to be the tribes for whom APIA performs services, rather than ANCSA Regional Corporations like TAC. However, this proposition is simply not supportable. ANCSA makes provision for protection of cemetery sites and historical places in a single sentence authorizing the Secretary to convey such sites "to the appropriate Regional Corporation[.]" ANCSA § 14(h)(1), 43 U.S.C. § 1613(h)(1). That specific provision of ANCSA not only makes no mention

of Alaska Tribes or their members, but the entire complex settlement act scheme is designed without any mention of tribes, or assignment to them of any role in the land claims settlement process. Nevertheless, APIA claims that Congress's intent was that these unmentioned entities and persons were the primary intended beneficiaries of a process by which 14(h)(1) lands were to be conveyed to TAC and all of the other ANCSA Regional Corporations.

In support of that dubious proposition, plaintiff places its reliance on a colloquy, quoted at page 23 of its Motion, between bill architects on the Senate floor a few days before ANCSA was enacted. See Pltf's Motion at p. 23. The quoted statement by Senator Stevens, to the extent it accurately reflects what the controlling legislation provides,[15] is not in any way at odds with the defendants' position, nor does it support APIA's claim that its constituent tribes should be regarded as the beneficiaries of the program for ISDEAA purposes. Senator Stevens identifies as goals the preservation of the cemeteries and historical sites, with regional corporations as their custodians. In fact, that intent has been carried out by administration of the program, and is furthered by the BIA's 2005 decision to honor the TAC resolution requesting that it directly contract with the BIA for the ANCSA §14(h)(1) funds.

Although APIA implies that recognizing the primacy and exclusivity of ANCSA regional corporation responsibility with respect to ANCSA § 14(h)(1) would somehow amount to taking

---

[15] Senator Stevens' statement reflects some confusion. All cemeteries and historical sites *near* villages were in fact conveyed directly to village corporations under *other* provisions of ANCSA, most notably §§ 11, 12, and 14(a), 43 U.S.C. §§ 1610, 1611, and 1613(a). Under Section 12(a), selection and conveyance to village corporations of *all* acreage in and near villages (including cemeteries and historical sites) was mandatory. Thus, ANCSA § 14(h)(1) only applied to locations relatively remote from villages, which might or might not easily be identified with a particular present-day community. Stevens' reference in line 9 of his quote to "village" rather than "regional corporations" appears to have been a mere slip of the tongue.

these important sites away from Native people or their tribes, see Pltf's Motion at p. 24, there is absolutely no merit to that view. Congress imposed on ANCSA Regional Corporations the responsibility for selecting such sites, receiving title to them, and serving long-term as custodians of them. This intent is fully realized in the Department's regulations, at 43 C.F.R. §§ 2653.5(a) and 2653.11(b). In fact, such lands are fully protected by these regulatory provisions, *and* by the good faith implementation and compliance by TAC and other Regional Corporations. Nothing about this legislatively and administratively crafted scheme suggests that Congress's choice to impose such duties on Regional Corporations has proved problematic. Instead, what has proved problematic is the completion of conveyance-related work when the funds to complete it have passed into the control of other entities such as APIA, without satisfactory mechanisms to insure the intended use of the funds. See, e.g., Exhibit 17.

Like the statutory provision, the regulations make no mention of any role in the ANCSA § 14(h)(1) conveyance process for organizations like APIA, or its constituent tribes. Yet APIA continues to argue that such entities, not even mentioned in ANCSA, and not assigned any role in carrying out ANCSA § 14(h)(1), are the primary beneficiaries, with superior rights to contract for the program under the ISDEAA. This argument is singularly unconvincing. The purposes of § 14(h)(1) are better served by the entity with the broadest base of Native members - - Regional Corporation. See supra n.1 and 2; see also Exhibit 1 at p. 12. Congress specifically gave the Regional Corporations the responsibility of identifying, applying for, and preserving § 14(h)(1) sites on behalf of their shareholders. See id. Therefore, TAC, not APIA, is the primary beneficiary of the ANCSA § 14(h)(1) program.

Moreover, APIA's arguments about who represents the Alaska Native population do not

suggest that defendants are wrong in determining that TAC is the tribe benefitted by the ANCSA § 14(h)(1) program, and entitled to contract for it under the ISDEAA. See Pltf's Motion at p. 24.

ANCSA was a settlement of land claims with the entire Alaska Native community as it existed when the law was passed in 1971. All Alaska Natives of 1/4 or greater degree of Native ancestry were eligible to enroll,[16] and all who did became shareholders of Regional Corporations, including TAC. It was perfectly natural for Congress to choose those broadly-owned entities as the ones who would select, own, and preserve cemeteries and historical places (*other than those located in the immediate vicinity of villages)* for the Alaska Native community. That is precisely what Congress did. It also was perfectly appropriate for the defendants to conclude that such Regional Corporations, including TAC, defined as tribe for purposes of the ISDEAA, are the entities to be benefitted by funding provided for implementation of the ANCSA § 14(h)(1) conveyance process. Compare Exhibit 15 (dealing with a similar issue faced by the Bureau of Land Management); see Affidavit of Kenneth L. Pratt, Alaska Native Settlement Claims Act Program Manager, at ¶¶ 4-5, attached hereto as Exhibit 19.[17]

Finally, in support of its assertion that its constituent tribes, rather than ANCSA Regional Corporations such as TAC, are the primary beneficiaries of the ANCSA § 14(h)(1) program, APIA argues that the authorized uses of the funds in question are not exclusively related to the

---

[16] Contrary to the census figure APIA cites, the final Alaska Native Roll of eligible persons alive when ANCSA was enacted, prepared pursuant to ANCSA § 43 U.S.C. § 1604, listed approximately 80,000 enrolled Alaska Natives, all of whom were shareholders of the Regional Corporations which Congress charged with the responsibility for implementation of ANCSA § 14(h)(1). See Excerpt from Department of the Interior-commissioned "ANCSA 1985 Study," attached hereto as Exhibit 18.

[17] As the most knowledgeable and experienced BIA official with respect to matters pertaining to ANSCA § 14(h)(1), Mr. Pratt's perspective is particularly valuable.

conveyance process itself, but are to be used for many other activities. But see Exhibit 20. APIA cites two documentary sources in support of this argument. First, it quotes language from a Departmental Budget Justification document, emphasizing wording referring to fulfillment of Indian trust responsibilities. However, this argument is without merit.

First, the very general language in this document is not directly at odds with the notions, reflected in ANCSA itself, that Regional Corporations could fulfill heritage preservation roles with respect to the broader Alaska Native community (since virtually all Alaska Natives were expected to, and did, become regional corporation shareholders). Second, vague language about trust responsibilities, while it may have been included in a budget justification document, is of no continuing relevance, because the ANCSA program funding never should have been considered a trust program, *and no longer is*. See id. at ¶ 10. Moreover, whether the § 14(h)(1) program is characterized as a trust program or not has little bearing on the question as to what tribe it benefits for ISDEAA contracting purposes. Third, the fact that the site identification and conveyance justification process yields as a byproduct other materials of continuing value does not mean that the program is not fundamentally a conveyance-centered one affording the central role exclusively to ANCSA regional corporations. See id. at ¶¶ 3-5, 7, 9. It is notable that, in its motion, APIA asserts that the program serves other values and beneficiaries, although APIA itself expressly agreed with TAC that all materials produced by APIA's administration of an ANCSA § 14(h)(1) contract would become the property of TAC. See Exhibit 16.

APIA also places reliance on an undated unsigned four paragraph document which it characterizes as "BIA Guidelines." Pltf's Motion, Exhibit M. As explained by the document's author, Kenneth L. Pratt, it has no official status, and does not alter the fact that the primary

purpose of the ANCSA § 14(h)(1) program is to support the conveyance process, and that any other activities would be of secondary priority. See Exhibit 19 at ¶¶ 7, 9.

While it is true, in the very broadest sense, that the residents of the villages which authorize APIA to contract with the BIA for a wide variety of programs do benefit indirectly from the Congressional mandate in ANCSA § 14(h)(1) that Regional Corporations select, acquire and retain remote cemetery and historical sites in protected status, it is only reasonable that the corporations be recognized as the sole direct beneficiaries of the 14(h)(1) program for ISDEAA contracting purposes. The experience of tribal consortium non-performance of necessary conveyance-related tasks once they received these program funds through imprudent BIA action eventually led to the dispute which is now before the Court. See Exhibits 17 and 19 (background information). Following the guidance in the May 24, 2004 Memorandum of the Office of the Regional Solicitor, Alaska Region, the BIA and OSG assisted most Regional Corporations (like TAC) and their counterpart tribal consortia (like APIA) in reaching satisfactory working relationships, whereby specific regional corporation-approved ANCSA 14(h)(1) work plans were incorporated into the tribal consortia's AFAs. See, e.g. Exhibit 19, Attachment B (Calista Corporations' Resolution No. 07-10 wherein the ANCSA Regional Corporation exercised its ISDEAA § 102(a)(1) right to direct the BIA to contract the 14(h)(1) program to AVCP, based on "program goals jointly determined by the BIA ANCSA Office, Calista Corporation and AVCP".) To date, the only case out of 12 in which the Native entities have been unable to cooperate has been the one now before the Court.

Given the primacy of the ANCSA § 14(h)(1) land conveyance mission,[18] which is the only activity explicitly authorized by Congress, and the central and exclusive role of ANCSA Regional Corporations in that process, the only reasonable conclusion the BIA could reach when the May 2005 TAC resolution was submitted was that TAC rather than APIA or its constituent tribal governments was the ISDEAA-defined tribe benefitted by the program. APIA's arguments to the contrary are unavailing as the Administrative Law Judge correctly concluded in the Recommended Decision. This court should likewise so conclude, and on that basis grant summary judgment to defendants.

## IV.  CONCLUSION

Funding to carry out remaining tasks under the ANCSA § 14(h)(1) conveyance program, which plaintiff APIA had previously received, was withheld from APIA's FY 2006 Annual Funding Agreement, issued pursuant to the ISDEAA. Faced with TAC's May 2005 ISDEAA § 102(a)(1) resolution seeking a contract for the same activities, BIA and OSG acted properly by withholding the ANSCA § 14(h)(1) funds from inclusion in APIA's AFA. APIA's complaint as to the 2006 funding should be dismissed with prejudice because of APIA's failure to exhaust its administrative remedies.

To the extent the same issues arise with respect to ANCSA § 14(h)(1) funding for 2007 or future years, and based upon the reasons set forth herein, this Court should deny APIA's motion for summary judgment in all its particulars, and grant defendants' cross-motion for summary

---

[18] As noted in ANCSA Program Manager Kenneth L. Pratt's Affidavit at ¶ 5, only about 25 percent of these conveyances have been completed, even though it is a matter of priority to both the Regional Corporations and Congress, which recently enacted the Alaska Land Transfer Acceleration Act of 2004.  See Exhibit 19 at ¶ 3.

judgment, upholding the BIA's and OSG's actions.[19]

Respectfully submitted,

/s/
JEFFREY A. TAYLOR, D.C. BAR #498610
United States Attorney

/s/
RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney

/s/
MARIAN L. BORUM, D.C. BAR #435409
Assistant United States Attorney
Civil Division
555 Fourth Street, N.W.
Washington, D.C. 20530
202-514-6531

Of Counsel:
Roger Hudson, Attorney
Office of the Regional Solicitor, Alaska Region
United States Department of the Interior
4230 University Drive, Suite 300
Anchorage, Alaska 99508-4626
907-271-4131

[19] In the event that the Court determines that the defendants have violated procedural restrictions imposed by the ISDEAA, the matter should be remanded to the Department of the Interior for issuance of a declination decision, and further proceedings concerning that declination, if necessary.

**Aleutian Pribilof Islands Association, Inc.**

**v.**

**Dirk Kempthorne, Secretary of the Interior, United States Department of the Interior, et al.**

**Civil Action No. 06-2173 (CKK)**

# Exhibit 1



United States Department of the Interior
OFFICE OF HEARINGS AND APPEALS
Departmental Hearings Division
405 South Main Street, Suite 400
Salt Lake City, Utah 84111
TELEPHONE (801) 524-5344

August 31, 2006

| | | |
|---|---|---|
| ALEUTIAN PRIBILOF ISLANDS ASSOCIATION (APIA), | : | IBIA 06-50-A |
| Appellant | : | Appeal of a decision issued by the Bureau of Indian Affairs, declining APIA's proposal in its 2006 annual funding agreement for funding to perform activities under 43 U.S.C. § 1613(h)(1) |
| v. | : | |
| NORTHWEST REPRESENTATIVE, OFFICE OF SELF-GOVERNANCE, BUREAU OF INDIAN AFFAIRS, | : | Indian Self Determination and Educational Assistance Act (ISDEAA), 25 U.S.C. §§ 450-450n |
| Appellee | : | |

## RECOMMENDED DECISION

Appearances: Geoffrey D. Strommer, Esq., Portland, Oregon, for Appellant

Roger L. Hudson, Esq., Anchorage, Alaska, for Appellee

Before: Administrative Law Judge Sweitzer

### Background

The Aleutian Pribilof Islands Association (APIA) has appealed a determination by the Bureau of Indian Affairs (BIA) to partially reject APIA's proposed fiscal year (FY) 2006 Tribal Self-Governance Annual Funding Agreement (AFA). BIA rejected that portion of the AFA that proposed funding for performing activities under Section 14(h)(1) of the Alaska Native Claims Settlement Act (ANCSA), as amended, 43 U.S.C. § 1613(h)(1).

Since the late 1990's, APIA has compacted with BIA under Title IV of the Indian Self-Determination and Education Assistance Act (ISDEAA), 25 U.S.C. §§ 458 et seq., to carry out various programs, functions, services and activities (PFSAs), including those authorized by § 14(h)(1) of ANCSA. On May 20, 2005, the ANCSA Regional Corporation for the Aleutian region, the Aleutian Corporation (TAC), passed a resolution specifically stating that it did not want APIA to carry out ANCSA-related work on the corporation's behalf, but wanted to itself contract with BIA to receive the ANCSA funding. BIA accordingly partially rejected APIA's proposed FY 2006 AFA on the basis that the requested ANCSA § 14(h)(1) funds were to be transferred to TAC pursuant to its May 20, 2005, resolution.

In an attempt to resolve this issue, APIA requested an informal conference pursuant to 25 CFR 1000.422(c) and 25 CFR 900.154. Following the January 6, 2006, informal conference, BIA's Deputy Regional Director Charles F. Bunch, who had been designated to conduct the conference as the Secretary's representative under 25 CFR 900.155(c), issued a Recommended Decision upholding BIA's initial decision to transfer the ANCSA § 14(h)(1) funding from APIA to TAC. Dissatisfied with the Recommended Decision, APIA filed on March 16, 2006, pursuant to 25 CFR 900.158 and 1000.432(a), a Notice of Appeal of BIA's initial decision to partially reject APIA's proposed FY 2006 AFA.

By Order dated March 27, 2006, the Interior Board of Indian Appeals (IBIA) referred APIA's appeal to the Hearings Division, Office of Hearings and Appeals, for assignment to an Administrative Law Judge (ALJ). This appeal was thereafter assigned to the undersigned for adjudication. A telephonic pre-hearing conference was held on April 6, 2006, during which the parties agreed to waive their right to an evidentiary hearing.[1] Accordingly, the following Recommended Decision is based solely upon the undersigned's consideration of the evidence in the record, applicable law, and the arguments set forth in the parties' briefs.

## Statement of Facts

ANCSA was implemented by Congress in 1971 for the purpose of effecting "a fair and just settlement of all claims by Natives and Native groups of Alaska, based on aboriginal land claims." 43 U.S.C. § 1601(a). To achieve this goal, Congress created two types of private corporate entities to receive the land and money provided to Alaska Natives under the Act: Regional Corporations and Village Corporations. 43 U.S.C. §§ 1606, 1607. Section 1606 of ANCSA divided the State of Alaska into twelve regions and provided that a for-profit corporation, or Regional Corporation, was to be incorporated under the laws of Alaska for each of the twelve regions. A thirteenth Regional Corporation was also provided for Alaska Natives who did not reside in Alaska. 43 U.S.C. § 1606(c).

To determine enrollment in the Regional Corporations, ANCSA required that the Secretary of the Interior create within two years from the enactment of ANCSA a roll of all Natives "born on or before, and who are living on, December 18, 1971." 43 U.S.C.§ 1604(a). This roll was to show for each Native, among other things, "the region and the village or other place in which he resided on the date of the 1970 census enumeration * * *." 43 U.S.C. § 1604(b). All living Alaska Natives were then enrolled in the Regional Corporation in which they resided at the time the roll was taken. Id. If an Alaska Native was not a permanent resident within the area encompassed by one of the twelve corporations, he or she would be

---

[1] APIA also agreed orally, in conjunction with a request to file a surreply brief (which brief was filed on July 11, 2006), that the 30-day regulatory deadline for issuance of a recommended decision could be extended to August 31, 2006.

allocated to one of the corporations based on a list of prioritized factors. Id. This ensured that all living Alaska Natives were enrolled in one of the Regional Corporations.

In addition to Regional Corporations, ANCSA also provides for the formation of Village Corporations. Section 1607(a) provides that the "Native residents of each Native village entitled to receive lands and benefits under this Act shall organize as a business for profit or nonprofit corporation under the laws of the State before the Native village may receive patent to lands or benefits under this Act * * *." Section 1610 of ANCSA provides a list of over 200 villages. as well as established criteria by which villages can be added or removed from the list by the Secretary of the Interior.

Unlike universal Native enrollment in Regional Corporations, not all Alaska Natives were enrolled in a Village Corporation. 43 U.S.C. § 1604(b). If, at the time of the 1970 census, an Alaska Native was not a resident of a particular village, that person would be enrolled in a Regional Corporation only. Id. Accordingly, although all Village Corporation shareholders were also Regional Corporation shareholders, not all Regional Corporation shareholders were also Village Corporation shareholders.

Section 14(h)(1) of ANCSA provides that the Secretary of the Interior "may withdraw and convey to the appropriate Regional Corporation fee title to existing cemetery sites and historical places." 43 U.S.C. § 1613(h)(1). The Departmental regulations issued to govern this process are found at 43 CFR 2653.5. Pursuant to this regulation, Regional Corporations were required to file applications for the conveyance of such sites with the Bureau of Land Management (BLM) by December 31, 1976. 43 CFR 2653.5(a), (f). Sites determined by the BLM to be located on available and unappropriated Federal lands at the time of application were then forwarded to the BIA. 43 CFR 2653.5(f), (g). The BIA is then responsible for investigating the cemetery sites or historical places requested to be conveyed. At the completion of its investigation. the BIA must report on its findings and certify whether the intended property does or does not meet the criteria for eligibility as a Native historical place or cemetery site. 43 CFR 2653.5(h)-(k). Relying on BIA's report and certification, the BLM issues a decision whether to convey the site to the applicant Regional Corporation. 43 CFR 2653.5(k).

TAC. the Regional Corporation for the Aleut region[2], timely filed ANCSA § 14(h)(1) applications with BLM by December 31, 1976. These applications were then processed by the Department of the Interior in accordance with 43 CFR 2653.5, and the BIA began performing the investigative tasks assigned to it in the regulations. In the late 1990's, APIA, a Native non-profit organization sanctioned to do business on behalf of thirteen federally recognized tribal governments in the Aleut region, entered into a Tribal Self-Governance Compact (Compact) with BIA pursuant to Title IV of the ISDEAA. Under this Compact,

[2] This geographic region covers the Aleutian Islands, Pribilof Islands, and that part of the Alaska Peninsula which is in the Aleut League. 43 U.S.C. § 1606(a)(8).

APIA compacted to carry out a broad range of PFSAs for beneficiaries in the region, including BIA-assigned tasks relating to ANCSA §14(h)(1), and the funds allocated by Congress for implementing the ANCSA § 14(h)(1) program were transferred to APIA.

TAC was not consulted about, or even given notice of, BIA's transfer of the ANCSA § 14(h)(1)-related PFSAs and funds to APIA. However, on August 7, 1998, APIA agreed to carry out the ANCSA § 14(h)(1) PFSAs in conjunction with a Memorandum of Agreement ("MOA") with the TAC that spelled out how the parties would "jointly conduct * * * activities related to completing the ANCSA 14(h)(1) process." (BIA Ex. 5, § 1) Pursuant to the MOA, it was agreed that "[a]ll funds appropriated to A[PIA] for ANCSA 14(h)(1) from BIA since the inception of the compact, are available to conduct ANCSA 14(h)(1) and Cultural Heritage activities under this agreement." (BIA Ex. 5, § 5(c)). In addition, it was agreed that "funds shall be expended based on written objective work plans that are based on the overall intent and purpose of the ANCSA process, and approved by TAC." (Id.) It was also agreed that "[a]ll ANCSA 14(h)(1) work product shall be the sole property of TAC, *provided that,* A[PIA] shall have the opportunity to reproduce ANCSA 14(h)(1) materials for its own purposes and any such reproductions shall remain the property of A[PIA]." (BIA Ex. 5, § 5(d)).

Funding for carrying out ANCSA § 14(h)(1) PFSAs was included in APIA's AFAs without objection until FY 2005. On May 24, 2004, just before the start of the BIA Alaska Region FY 2005 Self-Governance negotiations, the Office of the Regional Solicitor issued a memorandum to the BIA Alaska Region recommending that specific steps be taken in negotiating the inclusion of ANCSA § 14(h)(1) funding within Tribal Self-Governance AFA's. The memorandum first noted that because ANCSA § 14(h)(1) funding had been categorized as recurring Tribal Priority Allocation (TPA) funding, not all recipient entities had been using the funds for ANCSA-related work. The memorandum accordingly recommended that BIA rectify this problem by negotiating the "inclu[sion of] specific ANCSA-related tasks in the contracting entities' scopes of work, whereby they would agree after negotiations as to what activities they would undertake, and what ANCSA-related work product they would commit themselves to deliver." (BIA Ex. 1 at 2) The memorandum additionally noted that:

> [I]t is doubtful that contracting for the ANCSA conveyance work can properly be supported by a tribal or village resolution under the ISDA. Legally, the tribal entity benefitting from a program, function, service or activity, or portion thereof, is the entity which must provide the authorizing request to contract. In the case of ANCSA conveyance-related work, that entity would be the Regional Corporation * * * Indeed, the Regional Corporation would not only have the right to dictate who provides the services, but also the option of electing to contract directly with the Bureau to perform the work itself * * *.

(BIA Ex. 1 at 3) The memorandum accordingly recommended that BIA "require an ANCSA Regional Corporation resolution requesting that the BIA contract for performance of the relevant tasks." (Id.)

Negotiations for FY 2005 AFAs were conducted with the nine Alaska Self-Governance tribal consortia during the late Spring and early Summer of 2004. As part of the compact negotiations, BIA distributed copies of the May 24, 2004, Regional Solicitor's Office Memorandum (the Solicitor's Memorandum) to the tribal consortia. BIA also sent copies of the Solicitor's Memorandum to the affected Regional Corporations. BIA additionally requested that the tribal consortia include the following language in their Self-Governance AFAs or Multi-Year Funding Agreements:

> ANCSA: This program fulfills the mandate of the 1971 Alaska Native Claims Settlement Act (ANCSA [Section 14(h)(1), 14(h)(2), and 14(h)(5)], PL. 92-203) through investigation and certification of Alaska Native historical places and cemetery sites, native groups, and native primary places of residence. The program's remaining work, however, is focused on Section 14(h)(1) claims–the beneficiaries of which are ANCSA Regional Corporations. Program funds provided by this agreement are restricted in use to the performance of ANCSA-related work, the specific tasks of which will be jointly determined by [the consortium], the BIA ANCSA Office, and [the ANCSA Regional Corporation.]

BIA did not, however, require that any of the tribal consortia provide an ANCSA Regional Corporation tribal resolution requesting that BIA contract with the tribal consortia for performance of the ANCSA § 14(h)(1) PFSAs.

The negotiation meeting between BIA and APIA was held on June 10, 2004. As a result of the negotiation, APIA agreed to amend its existing "Self Governance Multi-Year Funding Agreement (10/01/03-09/30/08)" to include the above language. When APIA amended its Multi-Year Funding Agreement, however, it omitted the underlined portion of the provision from inclusion in the agreement.

In response to the Solicitor's Memorandum, the TAC Board of Directors passed a resolution on May 20, 2005, specifically "removing A[PIA] as the entity to receive ANCSA 14(h)1 funding on its behalf" and resolving to itself "directly contract with the Bureau of Indian Affairs for the ANCSA 14(h)1 Historical and Cemetery funding." (BIA Ex. 2) On June 30, 2005, BIA received from APIA a proposed FY 2006 AFA which included, as in previous years, funding for ANCSA § 14(h)(1) PFSAs. (BIA Ex. 6 at 2) The proposed FY 2006 AFA was not executed by the BIA's Office of Self Governance (OSG). (Id.) BIA communicated to APIA orally that it refused to sign the AFA as submitted because the ANCSA § 14(h)(1) funds were to be transferred to TAC pursuant to TAC's May 20, 2005,

Resolution. There is no evidence in the record as to what specific day BIA's decision was orally communicated to APIA.

On September 27, 2005, APIA submitted to BIA a revised FY 2006 AFA which reflected a deletion of funding for ANCSA § 14(h)(1) PFSAs. (BIA Ex. 7 at 2) Footnote 15 to the revised FY 2006 AFA further explained that "[the] [f]unds [are] to be transferred to The Aleut Corporation per resolution by the Aleut Corporation for FY 06. This is without prejudice to APIA[sic] to appeal the BIA decisions regarding these funds." (BIA Ex. 7 at 3 n.15) A letter accompanying the revised FY 2006 AFA and signed by the President/CEO of APIA, Dimitri Philemonof, additionally stated:

> Submitted herewith is a revised 2006 reprogramming request. We have modified line 15 to reflect the fact that the Aleut Corporation passed a resolution stating their intent to contact directly with the BIA for those funds for 2006. APIA makes this change in our reprogramming request without prejudice to filing an appeal of the BIA and Solicitor's opinion that the Aleut Corporation, rather than the tribes and their representative, APIA, can make the decision about how those funds can be spent.

(BIA Ex. 7 at 1) APIA's revised FY 2006 AFA was signed by OSG on October 3, 2005. APIA filed its Request for Informal Conference with BIA on November 14, 2005. (BIA Ex. 8)

## Discussion

### I. Timeliness of Appeal.

Before addressing the merits of the appeal, the undersigned must first address BIA's assertion that the appeal should be dismissed for lack of jurisdiction owing to the alleged untimeliness of APIA's initial pursuit of administrative remedies. BIA asserts that APIA's November 14, 2005, request for an informal conference was untimely as it was filed more than thirty days from the date that APIA was informed of BIA's decision to withhold the ANCSA § 14 (h)(1) funding from APIA's proposed FY 2006 AFA. BIA claims that APIA was informed of BIA's decision during the summer of 2005, at some point between the end of June and the beginning of September. It contends that at the very latest, APIA became aware of BIA's decision, as well as its right to appeal the decision, on September 27, 2005. On this date, APIA submitted its revised proposed FY 2006 AFA to BIA along with a cover letter stating that "APIA makes this change in our reprogramming request without prejudice to filing an appeal of the BIA and Solicitor's opinion that [TAC], rather than * * * APIA, can make the decision about how those funds can be spent." BIA concludes that APIA's November 14, 2005, request for an informal conference was submitted well outside of the permissible 30-day time period for filing such a request.

As APIA points out, however, the regulations provide that a tribe must file a request for an informal conference "within 30 days of the day it receives the decision," not within 30 days from the date it is informed of the decision. 25 CFR 1000.422; 25 CFR 900.154 (emphasis added). See also 25 CFR 1000.425. Upon deciding to decline a proposed AFA, BIA must "advise the Indian tribe or tribal organization in writing of the Secretary's objections * * * together with a detailed explanation of the reason for the decision to decline the proposal * * *." 25 CFR 900.29; 25 U.S.C. § 450f(b)(1) (emphasis added).[2] See also 25 CFR 2.7(a) (requiring that "[t]he official making a decision shall give all interested parties known to the decisionmaker written notice of the decision by personal delivery or mail.") Arguably, BIA's decision was never reduced to writing, as the only written statement of BIA's position is footnote 15 of the revised FY 2006 AFA signed by OSG. If this does not constitute a written decision, then APIA never "received" a decision. Accordingly, there is no date from which to begin calculating the 30-day period.

In addition, the ISDEAA regulations provide that BIA's written decision "shall contain information which shall tell the Indian tribe or tribal organization where and when to file the Indian tribe or tribal organization's appeal." 25 CFR 900.152. The general BIA regulations governing appeal similarly require that "[a]ll written decisions * * * shall include a statement that the decision may be appealed pursuant to this part, identify the official to whom it may be appealed and indicate the appeal procedures, including the 30-day time limit for filing a notice of appeal." 25 CFR 2.7. BIA clearly failed to provide the required appeal information.

BIA regulations provide that the absence of accurate appeal instructions tolls the running of the appeal time limit. See 25 CFR 2.7(b) (providing that the time to file a notice of appeal shall not begin to run until proper notice of appeal procedures has been given); see also Ramah Navajo School Board, Inc. v. BIA, 24 IBIA 104 (1993). BIA asserts that although APIA was not given formal notice of its appeal rights, the time for APIA to file an informal decision should not be tolled because it is clear from APIA's September 27, 2005, letter and revised FY 2006 AFA that APIA was aware of its right to appeal BIA's decision. The fact that APIA knew of its right to appeal does not excuse BIA of its regulatory duty. Although APIA may have been aware of its right to appeal, it was not notified of the specific procedures applying to the appeal of a BIA decision to decline a proposed AFA, including the

[2] As APIA points out in its Opening Brief, § 201 of the ISDEAA and the declination criteria at 25 CFR part 900 apply to APIA's Title IV Self-Governance Compact because the Title IV regulations incorporate by reference the appeals procedures of Title I, which in turn incorporates § 102 of the ISDEAA. (APIA Opening Brief at 13 n. 8) 25 CFR 1000.432(a) provides that "[f]or Title I-eligible PFSA disputes, appeal may only be filed with IBIA under the provisions set forth in 25 CFR 900.150(a) through (h), 900.152 through 900.169." Before referring this appeal to the Hearings Division for assignment, the Board of Indian Appeals determined that this appeal falls under 25 CFR 900.150(a), which specifically incorporates § 102 of the ISDEAA. See Order Referring Appeal to the Hearings Division for Assignment to an Administrative Law (March 27, 2006).

30-day time limit for filing a request for an informal conference. Accordingly, the time for APIA to file a request for an informal conference did not begin to run and APIA's November 14, 2005, request for an informal conference was timely filed.

## II. Validity of BIA's Decision to Partially Reject APIA's Proposed FY 2006 AFA.

As explained previously, BIA partially rejected APIA's proposed FY 2006 AFA on the basis that it proposed funding for conducting ANCSA § 14(h)(1) PFSAs. BIA determined that in light of TAC's Resolution specifically removing APIA as the entity to receive ANCSA § 14(h)(1) funding and resolving to itself directly contract with BIA, BIA was obligated to transfer the ANCSA § 14(h)(1) funds to TAC.

APIA has appealed BIA's decision to partially reject its proposed FY 2006 AFA, contending that it violates the terms of APIA's Tribal Self-Governance Compact, Titles I and IV of the ISDEAA, and applicable regulations. On appeal, APIA specifically challenges the validity of BIA's decision on the following four grounds: (1) APIA is the primary beneficiary of ANCSA § 14(h)(1) and thus has the right under the ISDEAA to compact to carry out the ANCSA § 14(h)(1) PFSAs; (2) APIA should be given contracting priority over TAC pursuant to BIA's longstanding "Order of Precedence"; (3) BIA's decision to partially reject APIA's proposed FY 2006 AFA was made in violation of ISDEAA's statutorily required declination criteria and procedures; and, (4) BIA's decision to partially reject APIA's proposed FY 2006 AFA was made in violation of § 106(b)(2) of the ISDEAA and the implementing regulations at 25 CFR 900.32 and 900.33. For the reasons discussed more fully below, the undersigned rejects APIA's arguments on appeal and recommends that BIA's decision to withhold the ANCSA § 14(h)(1) funding from APIA's FY 2006 AFA be upheld.

### A. TAC is the Primary Beneficiary of the ANCSA § 14(h)(1) Funding.

The ISDEAA directs the Secretary "upon the request of any Indian tribe by tribal resolution, to enter into a self-determination contract or contracts with a tribal organization to plan, conduct, and administer programs, or portions thereof * * * for the benefit of Indians because of their status as Indians * * *." 25 U.S.C. § 450f(a)(1)(E). The Indian tribe benefitting from the program must provide the authorizing request to contract. See 25 CFR 900.8(d) (requiring that an initial ISDA contract proposal contain "[a] copy of the authorizing resolution from the Indian tribe(s) to be served.") (emphasis added). For purposes of the ISDEAA, an "Indian tribe" is "[a]ny Indian tribe, band nation, or other organized group or community, including any Alaska Native village or regional or village corporation as defined in or established pursuant to [ANCSA] * * *." 25 U.S.C. § 450b(e) (emphasis added). Accordingly, ANCSA Regional Corporations are legally entitled to submit resolutions authorizing ISDEAA contracts pursuant to 25 U.S.C. § 450f(a). See Cook Inlet Native Assoc. v. Bowen, 810 F.2d 1471, 1476 (9th Cir. 1987) (specifically upholding the award of an ISDEAA contract pursuant to the authority of an ANCSA Regional Corporation resolution).

BIA argues that TAC's May 20, 2005, Resolution constitutes a request under 25 U.S.C. § 450f(a)(1) to enter into a self-determination contract to administer the ANCSA § 14(h)(1) program. BIA contends that TAC, as the Regional Corporation for the Aleut Region, is the entity which solely or primarily benefits from the ANCSA § 14(h)(1) program. Base upon this contenetion, BIA argues that TAC has the right to either elect to contract directly with the BIA to carry out the ANCSA § 14(h)(1) PFSAs, or authorize another entity to do so on their behalf.

Per its Resolution, TAC clearly elected to remove APIA as the entity to receive ANCSA § 14(h)(1) funding on its behalf and instead directly contract with BIA to receive the funding itself. In light of this clear request, BIA asserts that it had no choice but to withdraw the ANCSA § 14(h)(1) funding from APIA's FY 2006 AFA so that it could be transferred to TAC.

Contrary to BIA's interpretation, APIA asserts that the primary beneficiaries of the ANCSA § 14(h)(1) program are Alaska tribes and their members, not the Regional Corporations. It reasons that APIA, being a non-profit organization which represents thirteen Aleutian villages and the tribal members they serve, and not TAC, is the primary beneficiary of the ANCSA § 14(h)(1) program and thus has the superior right to contract for ANCSA § 14(h)(1) PFSAs.

APIA's assertion. however, is contradicted by the clear language, overall structure, and purpose of ANCSA. As explained previously, ANCSA was implemented by Congress in 1971 for the purpose of effecting "a fair and just settlement of all claims by Natives and Native groups of Alaska, based on aboriginal land claims." 43 U.S.C. § 1601(a). Section 14(h)(1) of ANCSA specifically provides a scheme under which the Secretary is authorized to withdraw from appropriation unreserved public land upon which a Native cemetery site or historical place is located. Under both ANCSA § 14(h)(1) and the implementing regulations, ANCSA Regional Corporations are the only entities authorized by law to file an application with BLM requesting the withdrawal and conveyance of existing cemetery sites or historical places. 43 U.S.C. § 1613(h)(1); 43 CFR 2653.5(f). The Regional Corporations must decide what lands to apply for, and have the sole authority to amend or withdraw applications. All application-related decision-making authority therefore lies with the Regional Corporations.

After BLM receives an application from a Regional Corporation, it is forwarded to BIA for investigation, report, and certification. 43 CFR 2653.5(h)-(k). Based on BIA's report and certification, BLM determines whether to issue a decision to convey. 43 CFR 2653.5(k). If BLM determines that the applied for site qualifies for conveyance, it "withdraw[s] and convey[s] to the appropriate Regional Corporation fee title" to the existing site. 43 U.S.C. § 1613(h)(1)(A). No other entities are qualified to receive conveyance or hold title to the site.

Unlike ANCSA § 14(c) conveyances to Village Corporations, which are subject to certain reconveyance requirements, the ANCSA § 14(h)(1) conveyances are permanently held by Regional Corporations. 43 U.S.C. §§ 1613(c), (h)(1). Regional Corporations take title to cemetery sites and historical places subject to a covenant running with the land which imposes on the Regional Corporation the responsibility of maintaining and preserving the sites solely as cemetery sites or historical places. 43 CFR 2653.5(a), 2653.11. The Regional Corporations therefore bear all of the expense and responsibility for not only acquiring Native cemetery sites and historical places, but for holding and maintaining these sites for the indefinite future.

APIA claims that despite the fact that Regional Corporations have been assigned the responsibility of identifying, applying for, owning, and protecting ANCSA § 14(h)(1) sites, Congress clearly intended the primary beneficiaries of ANCSA § 14(h)(1) to be Native peoples and Villages. In making this assertion, APIA relies primarily on floor statements made by Senators Stevens and Bible just prior to the passage of ANCSA.

As specifically regards ANCSA § 14(h)(1), Senator Stevens stated that:

> the intent of the conferees was not to take the places away from the village, to take away their cemeteries or their historical sites, but merely to place title in the regional corporation as the custodian of places properly identified as such sites * * * It is the intent of the conferees under this act that these areas will be preserved and that they are conveyed to the village corporations for that purpose and not for the purpose of commercial exploitation but to provide for the preservation of the cemeteries and historical sites.

117 Cong. Rec. 46964 (Dec. 14, 1971). Senator Stevens then yielded the floor to Senator Bible, who confirmed Senator Stevens' interpretation, stating that "[t]here is no intent whatever in the bill to take the last resting places or these historic sites away from the Native people or their village corporations." Id.

APIA asserts that in light of these floor statements, it is apparent that Congress simply intended the for-profit Regional Corporations to hold title to cemetery sites and historical places as trustees, or "custodians," on behalf of the true beneficiaries of ANCSA § 14(h)(1): Alaska Native peoples and Villages. APIA claims that consistent with Congress' intent to benefit tribal members, and not just corporate shareholders, the Department's regulations prohibit Regional Corporation's from using land conveyed under § 14(h)(1) for commercial purposes. In addition, the regulations impose on Regional Corporations the affirmative responsibility of maintaining and preserving the sites. 43 CFR 2653.5(a), 2563.11. APIA asserts that the de facto beneficiaries of the preservations of the sites are not the for-profit corporate shareholders of the Regional Corporation, but the Alaska Native peoples and Villages for whom the Regional Corporations simply act as "custodians." According to APIA, it is therefore APIA's member Villages, and the Native peoples they serve, which primarily benefit from the § 14(h)(1) PFSAs.

APIA's interpretation of these somewhat vague floor statements is, however, contradicted by both the clear language and overall scheme of ANCSA. As APIA correctly points out, it is obvious from both the floor statements as well as the regulations that Congress intended to convey cemeteries and historical sites to the Regional Corporations for the purpose of preservation instead of for commercial profit. However, contrary to APIA's further assertion, that fact does not demonstrate that village-based Native governments, or their members, are the primary beneficiaries of the ANCSA § 14(h)(1) conveyance program.[4]

In implementing ANCSA § 14(h)(1), Congress specifically chose Regional Corporations instead of Village Corporations or Village governments as the entity to carry out the acquisition and protection of cemeteries and historical sites. Although Regional Corporations are for-profit corporations, their shareholders are made up entirely of Alaska Native peoples. In fact, at the time ANCSA was implemented, Regional Corporations represented the broadest-based group of Alaska Natives of any tribal entity. This is because ANCSA mandated that all Alaska Natives living on December 18, 1971, be enrolled into one of the thirteen ANCSA Regional Corporations. 43 U.S.C. § 1604. Even non-resident Alaska Natives were included in this enrollment, thereby ensuring that all living Alaska Natives were enrolled in a Regional Corporation.

Unlike universal Native enrollment in Regional Corporations, not all Alaska Natives were enrolled in a Village Corporation because if a Native was not a resident of a particular village at the time of enrollment (i.e., the Native was living outside Village limits or the State of Alaska), the Native was excluded from enrolling in a Village Corporation. Thus, while all Native members of a Village were also Regional Corporation shareholders, not all Regional Corporation shareholders were members of a Village. Therefore, at the time of ANCSA's passage, Regional Corporations were much more representative of Alaska Natives as a whole than Village Corporations or Village governments.

ANCSA also provides that lands in the core townships in which villages are located are subject to mandatory selection by and conveyance to Village Corporations. 43 U.S.C. §§ 1610(a)(1), 1611(a), 1613(h). The cemeteries and historical sites to be conveyed under § 14(h)(1) therefore cannot be located within the immediate vicinity of villages.

[4] APIA's assertion that the primary beneficiaries of the ANCSA § 14(h)(1) program are Alaska Villages and their members, not the Regional Corporations, is further undercut by the fact that it itself recognized TAC, the ANCSA Regional Corporation for the Aleut Region, as the beneficiary of the ANCSA § 14(h)(1) program in its "Self Governance Multi-Year Funding Agreement (10/01/03-09/30/08). The agreement specifically states that "the program's remaining work, however, is focused on Section 14(h)(1) claims—the Native beneficiaries of which are ANCSA Regional Corporations."

Instead, the sites conveyed under § 14(h)(1) are not associated with any particular Village, but have a more regional focus which Congress recognized was better served by a regional entity. Accordingly, Congress provided for the conveyance of sites to Regional Corporations, the entities with the most regionally-based Native membership.

While Villages and their Native members may, in a broad sense, benefit from the preservation of § 14(h)(1) cemeteries and historical sites, there is nothing in the overall scheme of ANCSA which supports that Villages are the primary beneficiaries of § 14(h)(1) conveyances. These regionally located cemeteries and historical sites were to be selected for and preserved on behalf of all Alaska Natives affiliated with a region, not just those Alaska Natives who are members of a Village. Congress clearly recognized that the purposes of § 14(h)(1) would be best served by the entity with the broadest base of Native members—the Regional Corporation—and therefore gave each Regional Corporation the responsibility of identifying, applying for, and preserving § 14(h)(1) sites on behalf of its shareholders.

In conclusion, the undersigned finds that none of APIA's arguments fundamentally undermine the soundness of the BIA conclusion that ANCSA Regional Corporations, on behalf of their Alaska Native shareholders, are the primary and direct beneficiaries of the ANCSA § 14(h)(1) program. It is therefore TAC, and not APIA, that is the primary beneficiary of the ANCSA § 14(h)(1) program.

B. "Order of Precedence" is Inapplicable.

APIA asserts that even if TAC is the primary beneficiary of the ANCSA § 14(h)(1) program, APIA should be given contracting priority over TAC pursuant to BIA's longstanding "Order of Precedence." The "Order of Precedence" is a BIA-developed policy intended to apply in the case where there are competing requests by eligible tribes to contract under the ISDEAA to carry out the same PFSAs. Pursuant to this policy, BIA recognizes and requires supporting resolutions from tribal entities in order of their priority as follows:

1. Active Indian Reorganization Act (IRA) Council.
2. In the absence of an IRA, the formally established Traditional Council.
3. In the absence of either of the first two, the local ANCSA village/urban for-profit corporation.
4. In absence of all above, the ANCSA Regional for-profit Corporation.

Douglas Indian Assoc. v. BIA, 27 IBIA 292 (1995).[5]

[5] See also Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 58 Fed. Reg. 54364, 54366 n. 2 (Oct. 21, 1993) (stating that "[u]nder longstanding BIA policy, priority for contracts and services in Alaska is given to reorganized and traditional governments over non-tribal corporations.")

APIA claims that it has contracting priority over TAC under the "Order of Precedence" because it is the authorized representative of thirteen Aleut tribal governments. APIA therefore concludes that, with or without an authorizing resolution from TAC, it is the proper entity to compact under the ISDEAA to perform § 14(h)(1) PFSAs.

The undersigned is persuaded, however, that the "Order of Precedence" is inapplicable and non-binding in this instance. BIA's longstanding "Order of Precedence" is normally applied with respect to BIA programs designed to serve individuals or Native communities. In these instances, it is logical that contracts would be prioritized beginning at the most local tribal government level. The ANCSA § 14(h)(1) program constitutes an exceptional case in that it is specifically intended to benefit a broader group: ANCSA Regional Corporations and the shareholder class they represent.

As discussed previously in Subsection A of this decision, the Indian tribal organization most directly served by the ANCSA § 14(h)(1) program is the Regional Corporation. Section 14(h)(1) PFSAs are intended to primarily benefit the Regional Corporation and all of its shareholders, a substantially larger and different group of Alaska Natives than would be represented by the village governing bodies. Applying the "Order of Precedence" to the ANCSA § 14(h)(1) program would essentially circumvent this Congressional intent by allowing a local tribal government serving a narrower class of beneficiaries to contract for ANCSA § 14(h)(1) PFSAs instead of the intended Regional Corporation. Accordingly, the undersigned finds that the "Order of Precedence" is inapplicable and non-binding to requests to contract to carry out ANCSA § 14(h)(1) PFSAs.

As BIA points out, BLM similarly chose not to apply BIA's "Order of Precedence" when faced with an almost identical situation. In the early 1990's, BLM was confronted with competing requests to enter into ISDEAA contracts to perform ANCSA surveying work, including requests submitted by ANCSA Regional Corporations. BLM determined that ANCSA Regional Corporations, and the shareholder class they represent, rather than village-based tribal governments, were the direct beneficiaries of the ANCSA conveyance-related surveying activity. BLM reasoned that because Regional Corporations were clearly the Indian tribes to be served under the contract, they should have the first claim with respect to the right to contract to perform ANCSA-related surveys. (See October 5, 1992 Memorandum from Office of the Regional Solicitor to Division of Indian Affairs, BIA Ex. 3)

The undersigned is persuaded by the reasoned approach taken by BLM. Although the "Order of Precedence" reflects longstanding BIA policy, it should not be adhered to where its application has the effect of circumventing Congressional intent. See The Wilderness Soc'y, 106 IBLA 46, 55 (1988) (policy guidelines are not intended to provide inflexible constraints where variance from guidelines is justified); see also Kay Kayser-Meyring v. BLM, 152 IBLA 39 (2000) (policy is not binding on agency where it is contrary to any applicable law or

regulations). The "Order of Precedence" should therefore not be applied where, as in this instance, it is clear that the Regional Corporation is the Indian tribe to be served by the program to be contracted for. As the primary beneficiary of ANCSA § 14(h)(1), TAC should be given contracting priority over APIA.

C. BIA's Partial Rejection of APIA's Proposed FY 2006 AFA Did Not Violate ISDEAA Declination Procedures and Criteria.

APIA asserts that BIA's partial rejection of its proposed FY 2006 AFA was made in violation of ISDEAA's statutorily required declination procedures and criteria and should therefore be reversed. APIA contends that pursuant to § 102(a)(2) of the ISDEAA, BIA can reject APIA's proposal to amend its AFA only if one of five specific and limited conditions is met. 25 U.S.C. § 450f(a)(2); see also 25 CFR 900.22 (explaining that "[t]he Secretary may only decline to approve a proposal for one of five specific reasons"). APIA claims that BIA has failed to meet the statutory burden of producing "a specific finding that clearly demonstrates that, or that is supported by a controlling legal authority that" one of the five criteria exists. 25 U.S.C. § 450f(a)(2). Based on this claim, APIA argues for reversal of BIA's decision to partially reject APIA's proposed FY 2006 AFA.

Contrary to APIA's contention, a proposal to contract may also be properly declined if not supported by a legally sufficient tribal resolution. See Hannahville Indian Comm. v. BIA, 34 IBIA 4, 7-9 (1999) (holding that a legally sufficient tribal resolution is a statutorily necessary antecedent part of a request to enter into an ISDA contract). The submission of a tribal resolution is required by § 102(a)(1) of the ISDEAA which provides that "the Secretary is directed, upon the request of any Indian tribe by tribal resolution, to enter into a self-determination contract or contracts * * *." 25 U.S.C. § 450f(a)(1) (emphasis added). The implementing regulations further provide at 25 CFR 900.8(d) that "[a]n initial contract proposal must contain * * * a copy of the authorizing resolution from the Indian tribe(s) to be served." Whether a proposal to contract is supported by a legally sufficient tribal resolution is therefore a threshold issue to be determined prior to considering whether a contract proposal satisfies the five specific declination criteria set forth in § 102(a)(2).

Regarding the threshold requirement that an ISDEAA contract applicant have proper tribal authorization, the preamble to the final rule promulgating 25 CFR part 900 states:

> It should be clear, however, that Section 102(a)(2) of the Act[, 25 U.S.C. § 450f(a)(2),] only requires the Secretary to consider a proposal if "so authorized by an Indian tribe" pursuant to the tribal resolution required under Section 102(a)(1) of the Act[, 25 U.S.C. § 450f(a)(1)]. Therefore, although technically outside of the enumerated declination criteria in Section 102(a)(2) of the Act, it is also clear that the Act precludes the approval of any proposal and award of any self-determination contract absent an authorizing tribal resolution.

61 Fed. Reg. 32482, 32486 (June 24, 1996). Accordingly, if a proposal for contract funding is not authorized by resolution "from the Indian tribe(s) to be served," the Secretary's obligation to approve the proposal unless it demonstrates that one of the five specified declination criteria apply is not triggered.

BIA admittedly did not apply the declination criteria or procedures set forth in Section 102(a)(2) in arriving at its decision to reject APIA's proposal to include ANCSA § 14(h)(1) funds in its FY 2006 AFA. This is so because BIA determined that APIA lacked a legally sufficient tribal resolution before reaching the issue of whether the proposed FY 2006 AFA satisfied all of the declination criteria.

Just prior to APIA's submittal of its proposed FY 2006 AFA, TAC passed a tribal resolution in which it specifically removed APIA as the entity to receive ANCSA § 14(h)(1) funding on its behalf and resolved to itself directly contract with BIA for the funds. BIA determined that in the light of TAC's resolve to contract directly with the BIA, it had no choice but to withdraw the ANCSA § 14(h)(1) funding from APIA's FY 2006 AFA so that the funding could be transferred to TAC.

Because APIA's proposal failed to meet § 102(a)(1)'s threshold requirement that it be supported by a legally sufficient tribal resolution, BIA properly rejected it before reaching the issue of whether the proposal satisfied the specific declination criteria set forth in § 102(a)(2). As explained previously in detail, TAC, as the ANCSA Regional Corporation, is the Indian tribe to be served most directly by the ANCSA § 14(h)(1) program. Accordingly, TAC is given priority over all other tribal entities to enter into an ISDEAA contract to carry out ANCSA § 14(h)(1) PFSAs, or authorize another entity to do so on its behalf.[6] Given TAC's May 20, 2005, Resolution specifically denying APIA the authorization to contract on its behalf to carry out ANCSA § 14(h)(1) PFSAs, APIA's proposal to contract for ANCSA § 14(h)(1) funding in its FY 2006 AFA clearly was not supported by a legally sufficient tribal resolution.

APIA further argues that BIA was required, under § 102(a)(2) and 25 CFR 900.29(a), to provide APIA with its decision to partially decline its proposed FY 2006 AFA in writing

---

[6] As APIA points out, BIA has historically compacted with APIA to carry out ANCSA § 14(h)(1) PFSAs on the basis of sanctioning resolutions from the federally recognized tribes in the region, and has not required that APIA obtain a supporting resolution from TAC. Whether or not it was proper for BIA to compact with APIA to carry out ANCSA § 14(h)(1) PFSAs in the absence of a TAC resolution authorizing them to do so is, however, not the issue on appeal. At issue is whether it is proper for BIA to approve APIA's request to include ANCSA § 14(h)(1) funds in its proposed FY 2006 AFA in light of TAC's Resolution which expressly states TAC's intent to remove APIA as the entity to receive ANCSA § 14(h)(1) funding on its behalf.

within 90 days after receipt of the proposal. APIA contends that BIA's failure to do so resulted in the automatic acceptance of APIA's proposal to include ANCSA § 14(h)(1) funds in its FY 2006 AFA. See 25 CFR 900.18 (providing that "[a] proposal that is not declined within 90 days * * * is deemed approved).

However, § 102(a)(2) and 25 CFR 900.29(a) do not apply where, as here, the proposed funding agreement is submitted without a proper tribal resolution. As previously discussed, the Secretary's obligations under § 102(a)(2) are not triggered unless a proposal for contract funding is authorized by resolution "from the Indian tribe(s) to be served." See 25 CFR 900.8(d); 25 U.S.C. §§ 450f(a)(1)-(2). Because APIA's proposal was not supported by a legally sufficient tribal resolution as required by § 102(a)(1), the Secretary's obligation to approve the proposal within 90 days unless it provides APIA with written notice that one of the specified declination criteria apply was never triggered.

However, even assuming that those sections do apply, APIA's argument that its proposed FY 2006 AFA should be deemed approved because BIA failed to decline it in writing within 90 days cannot be sustained. BIA lacks authority to enter into an ISDEAA contract that is not authorized by a tribal resolution. See 25 U.S.C. §§ 450f(a)(1)-(2); 25 CFR 900.8(d). BIA therefore could not lawfully enter into an AFA with APIA because APIA's proposal for contract funding lacked a legally sufficient tribal resolution. BIA should not be required "to enter into an unlawful contract because no declination was made within 90 days of the submission" of APIA's proposed FY 2006 AFA. Hannahville Indian Community v. BIA, 37 IBIA 35, 43-44 (2001). Accordingly, even if BIA was required to provide a written decision declining APIA's proposal within 90 days of its submission, its failure to do so would not result in the approval of APIA's request to include ANCSA § 14(h)(1) funds in its proposed FY 2006 AFA.

In conclusion, the undersigned finds that BIA's rejection of APIA's proposed FY 2006 AFA on the basis that it included a request for ANCSA § 14(h)(1) funding did not violate the ISDEAA's declination procedures and criteria, as they were inapplicable in light of APIA's lack of proper tribal authorization.

D. BIA's Partial Rejection of APIA's Proposed FY 2006 AFA Did Not Violate § 106(b)(2) of the ISDEAA or the Implementing Regulations at 25 CFR 900.32 and 900.33.

APIA argues that BIA was required, under § 106(b)(2) of the ISDEAA, 25 U.S.C. § 450j-1(b)(2), and 25 CFR 900.32, to approve the proposed FY 2006 AFA because it is substantially the same as the prior AFA. Section 106(b)(2) states that the amount of funds initially provided under a self-determination contract shall not be reduced by the Secretary in subsequent years except in certain specified circumstances (such as reduction in federal appropriations for the contracted activity, tribal authorization for the reduction, or completion

of the activity). The implementing regulations at 25 CFR 900.32 provide that if a tribe's proposed successor AFA is "substantially the same" as the prior AFA, the Secretary shall approve and add to the contract the full amount of funds to which the contractor is entitled and may not decline any portion of the successor AFA.

Any portion of the proposed successor AFA which is not substantially the same as the prior AFA is subject to the declination criteria and procedures in 25 CFR part 900, subpart E (25 CFR 900.20-900.33). 25 CFR 900.32. BIA argues that the proposed AFA is not substantially the same as the prior AFA, and is thus subject to declination, because of TAC's intervening issuance of the resolution withdrawing its authorization for APIA to handle the ANCSA § 14(h)(1) functions.

However, 25 U.S.C. § 106(b)(2) and 25 CFR 900.32 do not apply where, as here, the proposed funding agreement is submitted without that which is required by § 102(a)(1) of the ISDEAA. 25 U.S.C. § 450f(a)(1), and 25 CFR 900.8(d): an authorizing resolution to contract to carry out ANCSA § 14(h)(1) PFSAs from the tribe to be served (TAC). As previously mentioned, a proposal for contract funding is not valid, and it does not trigger the Secretary's obligation to approve the proposal unless one of the specified declination criteria apply, if the proposal is not authorized by resolution "from the Indian tribe(s) to be served." See 25 CFR 900.8(d), 900.15; 25 U.S.C. §§ 450f(a)(1)-(2).

Likewise, the obligation of the Secretary to approve a proposed successor AFA if it is "substantially the same" as the prior AFA is contingent upon the submittal of a valid proposal, i.e., one supported by an authorizing resolution from the tribe(s) to be served. In this case the tribe to be served is TAC, which has specifically stated by resolution that APIA is not authorized to handle the ANCSA § 14(h)(1) PFSAs, and therefore APIA's proposal for ANCSA § 14(h)(1) funding is not valid and does not trigger application of 25 U.S.C. § 106(b)(2) and 25 CFR 900.32.

Assuming, arguendo, that those sections do apply, a review of the cogent analysis of the Departmental Appeals Board (DAB) of the Department of Health and Human Services (HHS) in Ninilchik Traditional Council, HHS DAB No. 1711, Docket No. A-2000-17 (IBIA 99-72-A) (Dec. 7, 1999), leads to the conclusion that APIA's proposed FY 2006 AFA is not "substantially the same" as the prior AFA. In Ninilchik, the Ninilchik Traditional Council (NTC) submitted to the Indian Health Service (IHS), HHS, a proposed AFA for FY 1999 under an existing ISDEAA contract. That contract provided that the allowable indirect contract support costs (CSC) shall be obtained by applying negotiated indirect cost rates to direct cost bases agreed upon by the parties.

Pursuant to this provision, an initial provisional indirect cost rate of 80% for FY 1996 and FY 1997 was negotiated by NTC and the HHS Division of Cost Allocation (DCA). A provisional rate is a temporary indirect cost rate applicable to a specified period which is used pending the establishment of a final rate for that period.

With regard to the proposed AFA for FY 1999, IHS denied some of the funding for indirect CSC because IHS found that some of the costs, in violation of § 106(a)(3)(A) of the ISDEAA, were not reasonable and allowable costs and were duplicative of direct program funding provided under § 106(a)(1) of the ISDEAA. On appeal, NTC argued that IHS had to approve the funding for indirect CSC pursuant to 25 CFR 900.32 because the proposed AFA provided for approximately the same amount of funding for indirect CSC as set forth in the prior AFA.

However, the means for determining indirect CSC in the proposed AFA differed from the means in the prior AFA. The DAB concluded that the proposed AFA could not reasonably be viewed as "substantially the same" as the prior AFA, notwithstanding the fact that the amount of indirect CSC under the two funding agreements happened to be approximately the same.

The DAB reasoned:

> * * * NTC's proposed fiscal year 1999 funding agreement differs from its prior year funding agreement in that its prior year funding agreement was not based on a final negotiated rate or methodology that had been reviewed or approved by any component of HHS. Although the prior year funding agreement purported to be based on an indirect cost rate of 80%, NTC had an 80% [negotiated,] provisional indirect cost rate for fiscal years 1996 and 1997 only. DCA unilaterally reduced NTC's 80% provisional rate to a final rate of 47.5% for fiscal year 1996 and NTC failed to submit a proposal for a final indirect cost rate for fiscal year 1997. Thus, although NTC's self-determination contract requires a "negotiated" indirect cost rate, the prior year funding agreement was not based on any current negotiated or approved rate or methodology. In contrast, NTC's proposed fiscal year 1999 funding agreement is based on a indirect type cost methodology that is subject to negotiation with IHS. I agree with IHS that NTC's decision to submit a proposed fiscal year 1999 funding agreement with an indirect type methodology directly to IHS after having a prior year funding agreement that was not based on a negotiated or final rate resulted in a proposal that was not "substantially the same" as the prior year funding agreement, thus giving IHS both the opportunity and the responsibility to examine the types of indirect CSC NTC was claiming.

Ninilchik, at 10.

The DAB also noted that 25 CFR 900.32 gives as examples of situations where a proposed funding agreement is not "substantially the same" as the prior year funding agreement "a redesign proposal; waiver proposal; different proposed funding amount; or

different program, service, function, or activity." It reasoned that "[t]hese examples suggest that a proposed funding agreement could be not 'substantially the same' as the prior year funding agreement even if the amounts are the same, e.g., a proposal for a different PFSA could still be for the same amount as the prior year funding agreement." Ninilchik, at 13.

The DAB also found:

> My conclusion that NTC's proposed fiscal year 1999 funding agreement was not "substantially the same" as the prior year funding agreement within the meaning of section 900.32 is also consistent with the requirements of section 106(a)( 3)(A) of the [ISDEAA]. As noted above, that section provides that CSC shall be "for reasonable and allowable costs" of operating the PFSAs pursuant to the contract, and "shall not duplicate" the direct program funding provided under section 106(a)(1). Assuming that IHS correctly determined that NTC's fiscal year 1999 proposed funding agreement included indirect type CSC which were duplicative and/or unreasonable, those costs would be unallowable under section 106(a)(3)(A). Thus, unless NTC's proposed fiscal year 1999 funding agreement is subject to the declination criteria pursuant to section 900.32, IHS would be required to award funding for costs that are clearly unallowable under the statute.

Id.

The proposed AFA in the present case is not "substantially the same" as the prior AFA because of TAC's intervening resolution passed on May 20, 2005, which specifically "remov[ed] APIA as the entity to receive ANCSA 14(h)[(1)] funding on its behalf" and provided that TAC would "directly contract with the Bureau of Indian Affairs for the ANCSA 14(h)[(1)] Historical and Cemetery funding." At that point any question as to whether APIA met the requirement of § 102(a)(1) and 25 CFR 900.8(d) of being authorized by resolution "from the tribe(s) to be served" to contract for ANCSA § 14(h)(1) activities was answered in the negative.

APIA's proposal to include ANCSA § 14(h)(1) funding in its FY 2006 AFA without authorization to contract is not "substantially the same" as its prior AFA for which it may have had such authorization by virtue of the resolutions from the 13 tribal organizations and the MOA between APIA and TAC. Unless APIA's proposed FY 2006 AFA may be declined with respect to the ANCSA § 14(h)(1) PFSAs, BIA would be required to award funding for PFSAs for which APIA is clearly no longer authorized to contract under 25 U.S.C. § 102(a)(1) and 25 CFR 900.8.

As such, declination of the proposal for ANCSA § 14(h)(1) funding is appropriate pursuant to § 102(a)(2)(E) of the ISDEAA, 25 U.S.C. § 450f(a)(2)(E), and 25 CFR 900.22(e), assuming, arguendo, that the declination criteria apply. Those sections allow for declination

where the Secretary clearly demonstrates that "the program, function, service, or activity (or portion thereof) that is the subject of the proposal is beyond the scope of programs, functions, services, or activities covered under [25 U.S.C. § 450f(a)(1)] because the proposal includes activities that cannot lawfully be carried out by the contractor." 25 U.S.C. § 450f(a)(2)(E); see also 25 CFR 900.22 (containing nearly identical wording). BIA has clearly demonstrated that without the requisite authorizing resolution, APIA cannot lawfully carry out the ANCSA § 14(h)(1) PFSAs. However, as discussed above, the declination criteria do not apply.

In conclusion, the undersigned finds that BIA's partial rejection of APIA's proposed FY 2006 AFA on the basis that it included a request for ANCSA § 14(h)(1) funding did not violate § 106(b)(2) of the ISDEAA or the implementing regulations at 25 CFR 900.32 and 900.33.

## Conclusion

Without belaboring this Recommended Decision with additional references to contentions of fact and law, I hereby advise that all contentions submitted by the parties have been considered and, except to the extent they have been expressly or impliedly adopted herein, are rejected on the ground that they are, in whole or in part, contrary to the facts and law or are immaterial. Based upon the foregoing, BIA's rejection of that portion of APIA's FY 2006 AFA proposing funding for the performance of ANCSA § 14(h)(1) PFSAs is hereby affirmed.

Harvey C. Sweitzer
Administrative Law Judge

## Appeal Information

Within 30 days of the receipt of this Recommended Decision, you may file an objection to the Recommended Decision with the Interior Board of Indian Appeals (IBIA) under 25 CFR 900.165(c). An appeal to the IBIA under 25 CFR 900.165(c) shall be filed at the following address: Interior Board of Indian Appeals, 801 North Quincy Street, Arlington, VA 22203-1905. You shall serve copies of your notice of appeal on the Secretary of the Interior, and on the official whose decision is being appealed. You shall certify to the IBIA that you have served these copies. If neither party files an objection to the Recommended Decision within 30 days, the Recommended Decision will become final.

See page 21 for distribution.

Distributed
By Facsimile and Certified Mail:

Hobbs, Straus, Dean & Walker, LLP
Attn: Geoffrey D. Strommer, Esq.
806 W.W. Broadway, Suite 900
Portland, Oregon 97205
(Counsel for Appellant)
Fax: 503-242-1072

Office of the Regional Solicitor
U.S. Department of the Interior
Alaska Region
Attn: Roger Hudson, Esq.
4230 University Drive, Suite 300
Anchorage, Alaska 99508-4626
(Counsel for Appellee)
Fax: 907-271-4143

By Facsimile and First Class Mail:

Lynn Allingham, Esq.
201 E. 3rd Ave.
Anchorage, Alaska 99501
Fax: 907-279-4351

Aleut Corporation
4000 Old Seward Hwy., Suite 300
Anchorage, Alaska 99503
Fax: 907-563-4328

**Aleutian Pribilof Islands Association, Inc.**

**v.**

**Dirk Kempthorne, Secretary of the Interior, United States Department of the Interior, et al.**

**Civil Action No. 06-2173 (CKK)**

# Exhibit 2



The Aleut Corporation

**Resolution No. 05-14**

A RESOLUTION OF THE ALEUT CORPORATION TO CONTRACT DIRECTLY WITH THE BUREAU OF INDIAN AFAIRS FOR ANCSA 14(h)1 HISTORICAL AND CEMETERY SITE FUNDING FOR FY 2006.

WHEREAS, The Aleut Corporation selected lands as historic and cemetery sites pursuant to Section 14(h)1 of the Alaska Native Land Claims Settlement Act; and

WHEREAS, these selections represent the physical evidence of the Region's peoples use of said lands for historic and prehistoric subsistence and occupation; and

WHEREAS, the Department of Interior, Bureau of Indian Affairs, ANCSA Office has been delegated the responsibility of determining the eligibility of the 14(h)1 selections for conveyance to the Native Regional Corporation; and

WHEREAS, the Department of the Interior, Office of the Solicitor, forwarded an Opinion on May 24, 2004 that requires the Native Regional Corporations to designate and approve proper use of those funds for 14(h)1 related activities; and

WHEREAS, Aleutian/Pribilof Islands Association currently compacts with BIA for ANCSA 14(h)1 funding on behalf of TAC; and

THEREFORE BE IT RESOLVED that TAC Board of Directors is removing A/PIA as the entity to receive ANCSA 14(h)1 funding on its behalf; and

BE IT FURTHER RESOLVED that TAC Board of Directors hereby asserts that TAC directly contract with the Bureau of Indian Affairs for the ANCSA 14(h)1 Historical and Cemetery funding for fiscal year 2006.

PASSED AND APPROVED this 20th day of May 2005, at a duly called meeting of the Directors of The Aleut Corporation, by a vote of 5 for, 1 opposing, and 3 absent.

Dick Jacobsen
President

ATTEST:

Dave Nevzuroff
Assistant Secretary/Treasurer

4000 Old Seward Hwy., Suite 300 Anchorage, Alaska 99503 (907) 561-4300 FAX (907) 563-4328
www.aleutcorp.com

**Aleutian Pribilof Islands Association, Inc.**

**v.**

**Dirk Kempthorne, Secretary of the Interior,**

**United States Department of the Interior, et al.**

**Civil Action No. 06-2173 (CKK)**

**Exhibit 3**

# Aleutian/Pribilof Islands Association, Inc.

201 E. 3rd Avenue
Anchorage, Alaska 99501
Phone: (907) 276-2700 • Fax: (907) 279-4351

Charles Bunch
Deputy Regional Director
US Dept. of the Interior
Bureau of Indian Affairs
Alaska Regional Office, Trust
3601 C St. Suite 1100
Anchorage, AK 99503-5947

Re Request for Extension of Time

Dear Mr. Bunch,

APIA would like to request a ten day extension of time of the decision period for the results of the informal conference. We are attempting to work out a contract with the Aleut Corporation and we need this additional time to negotiate and to have their board consider it. Therefore we request that the time for a decision be extended from January 16, 2006 to January 26, 2006.

Very truly yours,

ALEUTIAN PRIBILOF ISLANDS ASSOCIATION, INC.

Lynn M. Allingham
General Counsel

Cc: Geoffrey Strommer
    Roger Hudson
    Debra Mack

**Aleutian Pribilof Islands Association, Inc.**
**v.**
**Dirk Kempthorne, Secretary of the Interior, United States Department of the Interior, et al.**
**Civil Action No. 06-2173 (CKK)**

# Exhibit 4

# Aleutian/Pribilof Islands Association, Inc.

201 E. 3rd Avenue
Anchorage, Alaska 99501
Phone: (907) 276-2700 • Fax: (907) 279-4351

January 26, 2006                                              FAX 271-1750

Charles Bunch
Deputy Regional Director
US Dept. of the Interior
Bureau of Indian Affairs
Alaska Regional Office, Trust
3601 C St. Suite 1100
Anchorage, AK 99503-5947

             Re: Request for Extension of Time

Dear Mr. Bunch,

APIA would like to request a 20 day extension of time of the decision period for the results of the informal conference. We are attempting to work out a contract with the Aleut Corporation and we need this additional time to negotiate and to have their board consider it. Therefore we request that the time for a decision be extended from January 26, 2006 to February 15, 2006.

Very truly yours,

ALEUTIAN PRIBILOF ISLANDS ASSOCIATION, INC.

Lynn M. Allingham
General Counsel

Cc: Geoffrey Strommer
     Roger L. Hudson, US DOI Solicitors Office, Alaska Region
     Melvin Smith, TAC

# Aleutian Pribilof Islands Association, Inc.

# v.

# Dirk Kempthorne, Secretary of the Interior, United States Department of the Interior, et al.

# Civil Action No. 06-2173 (CKK)

# Exhibit 5

Roger L. Hudson, Attorney
Office of the Regional Solicitor, Alaska Region
4230 University Drive, Suite 300
Anchorage, Alaska 99508-4626
(907) 271-4131 (voice); 271-4143 (fax)

United States Department of the Interior

**OFFICE OF HEARINGS AND APPEALS**
**Departmental Hearings Division**
**405 South Main Street, Suite 400**
**Salt Lake City, Utah 84111**

| | |
|---|---|
| ALEUTIAN PRIBILOFF ISLANDS ASSOCIATION (APIA),<br><br>Appellant<br><br>v.<br><br>NORTHWEST REPRESENTATIVE, OFFICE OF SELF-GOVERNANCE, BUREAU OF INDIAN AFFAIRS,<br><br>Appellee | IBIA 06-50-A<br><br>Appeal of a decision by the Bureau of Indian Affairs, declining APIA's proposal in its 2006 annual funding agreement for funding to perform activities under 43 U.S.C. § 1613(h)(1)<br><br>Indian Self-Determination and Educational Assistance Act (ISDEAA), 25 U.S.C. §§ 450-450n |

APPELLEE'S OPENING BRIEF

COMES NOW APPELLEE, Northwest Representative, Office of Self-Governance (OSG), Bureau of Indian Affairs (BIA), by and through his undersigned counsel, and files this brief in response to the Notice of Appeal filed on behalf of the Aleutian Pribiloff Islands Association (hereafter APIA). In accordance with the previous understanding, documents relevant to consideration of this appeal are also provided as exhibits hereto.

I. INTRODUCTION

Appellant APIA in this appeal seeks review of the propriety of the Government's efforts to properly reconcile and carry out the goals of two legislative schemes; namely, the Alaska

Native Claims Settlement Act (ANCSA), 43 U.S.C. §§ 1601 *et seq.*, on the one hand; and the Indian Self-Determination and Education Assistance Act (ISDA), 25 U.S.C. §§ 450 *et seq.*, as amended, including provisions relating to Tribal Self-Governance, 25 U.S.C. §§ 458aa *et seq.*, on the other. The fundamental question to be answered is *which* Alaska tribe or tribes should have the controlling choice under the ISDA in dictating whom the Government should contract with, in the *specific* context of the performance of programs, functions, services, and activities relating to the implementation of the land conveyance program required by the ANCSA. Appellant APIA raises additional procedural issues, which must also be addressed, but Appellee believes that the central issue is the reasonableness of its application of the policy of recognizing an ANCSA regional corporation–in this case The Aleut Corporation–as the prime beneficiary of the ANCSA § 14(h)(1) land conveyance program, and therefore as the ISDA-defined tribe entitled to first priority in requesting a contract by submission of a tribal resolution pursuant to 25 U.S.C. § 450f(a).

Appellant APIA characterizes its appeal as an appeal from a partial declination of its Fiscal Year 2006 proposed Tribal Self-Governance Annual Funding Agreement, under which it proposed to receive funding for the performance of ANCSA § 14(h)(1) activities. The Government acknowledges that APIA sought to include these funds in its 2006 AFA, but Appellee did not base its action excluding such funds from the APIA AFA on an application of the ISDA declination criteria at 25 U.S.C. § 450f(a)(2). Rather, the Government's exclusion of such funds was based on the Appellee having received a 25 U.S.C. § 450f(a)(1) tribal resolution from The Aleut Corporation (TAC), specifically stating that tribe's desire that the program *not* be

contracted to the APIA, but rather directly to The Aleut Corporation itself. Believing then that it was legally required to honor The Aleut Corporation tribal resolution, the Government took the action under review. Still believing that conclusion to have been the proper one, Appellee urges that his interpretation be affirmed, and the APIA appeal denied.

II. BACKGROUND

A. The ANCSA § 14(h)(1) Program

1. Framework. The funds at issue in this appeal are funds which Congress appropriates for completion of an aspect of the ANCSA land conveyance process. Under ANCSA § 14(h)(1), 43 U.S.C. § 1613(h)(1), the Secretary was authorized to "withdraw and convey *to the appropriate Regional Corporation* fee title to existing cemetery sites and historic places." (Emphasis added.) The Departmental regulations issued to govern this process are found at 43 C.F.R. § 2653.5. Pursuant to those regulations, Regional Corporations were required to file applications for such sites with the Bureau of Land Management by December 31, 1976. Only sites determined by the BLM to be located on available and unappropriated Federal lands at the time of application were forwarded to the BIA for field investigation and certification. Significantly, the BLM rejected § 14(h)(1) applications that conflicted with Native allotments or *ANCSA Village Corporation selections*, because those claims took priority over historical places and cemetery sites.

Under the regulations, the Bureau of Indian Affairs is responsible for investigating, reporting on and certifying ANCSA § 14(h)(1) applications submitted by ANCSA Regional Corporations. To satisfy these responsibilities, the BIA established its "ANCSA Office" in 1978.

The task of researching, investigating and reporting on ANCSA §14(h)(1) sites has not been easy for many reasons. These include the following: (i) Regional Corporations' §14(h)(1) applications are often vague or confusing with regard to the exact natures and locations of the intended sites; (ii) conducting fieldwork in remote areas of Alaska is expensive, physically demanding and always subject to the vagaries of weather; and (iii) evaluating site significance in accordance with the §14(h)(1) eligibility criteria is complicated by the fact that the criteria are open to interpretation in several areas.

Each ANCSA §14(h)(1) investigation includes an archeological reconnaissance survey, the production of a detailed site map showing identified surface cultural features and their distribution, feature and site photographs, field notes about the site and its environmental setting, and a review of archival and published sources relevant to the site and/or immediate project area. When possible, the gathering of Native oral history about the selected sites is also emphasized, as oral accounts often prove to be the best (and sometimes the only) source of information available about the nature and extent of historical site use. Subsurface testing is also conducted at some sites, generally for the purpose of confirming the presence or absence of buried cultural remains, or to obtain organic samples for radiocarbon dating.

The primary objectives of every investigation are to verify the existence and physical location of the applied-for site, and to gather sufficient evidence to document the history of Native use and the site's significance in local/regional Native history. The investigative findings are critically analyzed and used by the BIA to produce accurate, professional reports—each of which includes a certification that the intended property does or does not meet the criteria for

eligibility as a Native historical place or cemetery site (see 43 C.F.R. 2653.5). Relying heavily on BIA findings and certifications, the BLM is responsible for issuing the Government's final decision on the conveyance or rejection of each ANCSA §14(h)(1) claim; and every such decision is subject to legal appeal.

2.  Status of Program Work.

Since 1978, the BIA has completed about 2300 ANCSA §14(h)(1) site investigations, reports and certifications; but some of this work must be redone. Implementation of the §14(h)(1) program has involved hundreds of different individuals, with varying backgrounds and experience doing the type of work required to document and evaluate the applied for sites. Combined with the basic difficulties associated with conducting §14(h)(1) field investigations, this explains why serious errors were made in some of the past program work. These errors ultimately led to the rejection and official closure of selected §14(h)(1) claims. Recognition of this fact, and a BIA commitment to trying to correct such errors, led to the passage of Department of the Interior Secretarial Order No. 3220 in January 2001. The Order provided for the potential reopening of 196 "closed" ANCSA §14(h)(1) case files.

A large proportion of the estimated 150 site investigations and 300 reports/certifications awaiting completion by the BIA are based on SO 3220. However, this workload may increase depending on the findings of administrative reviews of pending 14(h)(1) case files and/or legal appeals of future BLM final decisions. Obviously, an appeal cannot be filed until after BLM has issued a final decision on the given case; and such decisions have yet to be issued on about 1600 ANCSA §14(h)(1) claims for which the required BIA work was previously completed.

In December 2004, Congress passed The Alaska Lands Transfer Acceleration Act (PL. 108-452), the main objective of which is to expedite the Federal government's conveyance of lands pursuant to ANCSA and the Alaska Statehood Act. It was designed to complete all ANCSA land conveyances by 2009. The impact of this Act on the ANCSA Program is substantial, because to complete the §14(h)(1) conveyance process by 2009 the BLM will have to issue nearly 400 final decisions per year for the next four years. Procedures now in place require BIA staff to perform a "last check" review of previous work on a §14(h)(1) claim prior to the BLM issuing a final decision on the case. The purpose of these reviews is to identify and fix any problems that, if not corrected, may otherwise generate legal appeals of the subsequent BLM decisions, thereby delaying completion of the conveyance process.

Finally, the nearly 30-year period of implementation of the ANCSA §14(h)(1) Program has produced a massive collection of records. Commonly known as the "ANCSA §14(h)(1) Collection," it is nationally unique and largely irreplaceable. Virtually every topic imaginable concerning Alaska Native history and culture is represented; however, locating specific topical information within the collection is a difficult task, because much of the indexing work necessary to make the materials accessible has not been completed.

The collection includes several thousand detailed reports on historical places and cemetery sites across the state. Individual reports range in length from about 25-100 pages; but "overview" reports addressing multiple sites have also been produced and are substantially larger (the largest being 1,300 pages long). The collection also contains approximately 40,000-50,000 photographs, 14,000 artifacts, and a wide variety of associated records. But its most compelling

component is the oral history collection, consisting of nearly 2000 tape recordings based on interviews with more than 1000 different individuals (99% of whom were Native elders), plus notes on an additional 500-600 interviews that were not taped. Many of the oral history recordings contain extensive Native language dialogue, the content of which cannot be fully known or accurately evaluated until the interviews are translated and transcribed. It is extremely difficult (and expensive) to produce complete translations and transcriptions of ANCSA oral history tapes. The biggest problem faced in this regard is the comparatively limited pool of individuals who are professionally trained in the writing of Alaska Native languages and dialects. The incomplete processing of ANCSA §14(h)(1) records has been a contributing factor in many of the errors made by the BIA in its implementation of this program. Those errors often cannot be corrected, and future errors avoided, until key records within the collection (e.g., interview tapes) are adequately processed and the information within its component parts (e.g., site reports, photographs, oral history) has been cross-referenced. Current efforts to expedite the ANCSA lands conveyance process means completing these §14(h)(1) records processing tasks is especially critical. But also, in accordance with Chapter 411 of the Departmental Manual "Managing Museum Property" (411 DM), the BIA must complete these tasks to satisfy records management requirements flowing from the ANCSA §14(h)(1) Collection's official designation as "Museum Property."

   3.  Self-Governance Compacts and the ANCSA §14(h)(1) Program

Unlike every other program administered by the BIA—both in Alaska and nationwide—the beneficiaries of the ANCSA § 14(h)(1) program are Alaska Native Regional Corporations, not

federally recognized Indian tribes or individual Natives. In effect, this is a "Regional Corporation program" because those corporations are its principal clients. The program is driven by site applications filed by the Regional Corporations, which are the Native entities that stand to receive title to historical places and cemetery sites conveyed under ANCSA §14(h)(1). Along with the broader Alaska Native community, including tribes and individuals, indirect beneficiaries of the ANCSA Program include the Bureau of Land Management, Fish and Wildlife Service, National Park Service, and USDA Forest Service; that is, the Federal agencies with management jurisdiction over the lands from which ANCSA §14(h)(1) sites were selected and will be conveyed.

In the mid-1990s the BIA entered into a number of self-governance compacts that included funds allocated by Congress for the implementation of ANCSA §14(h)(1). When those compacts were being negotiated, the BIA negotiation team mistakenly believed the ANCSA §14(h)(1) program was nearly completed. That team (as well as the Office of Self-Governance) also failed to understand a fundamental distinction of this program; i.e., the fact that its beneficiaries are ANCSA Regional Corporations. The BIA did not consult with the Regional Corporations (or with the program's secondary clients) about the status of the §14(h)(1) program prior to starting the related compact negotiations. Nor were the Regional Corporations informed of the change or invited to participate in the negotiations. The end result can be summarized by four points. (1) ANCSA program funds contained in the subsequent compact agreements were not earmarked for §14(h)(1) program work. (2) The program's primary beneficiaries—the Regional Corporations—had no direct role in the compacts. (3) The Native parties to those

compacts—i.e., Tribes/Tribal Consortia—lacked the requisite knowledge of the ANCSA §14(h)(1) implementation process to evaluate program status, perform the remaining work, contribute to resolution of existing problems, and/or effectively interact with the principal parties involved in that process (e.g., Regional Corporations, Federal agencies). (4) The BIA initiated reduction-in-force and other employee termination/reassignment actions to accomplish a planned April 1996 shut-down of the ANCSA Office.

As the Regional Corporations and other involved Federal agencies began to realize what had transpired the Bureau was repeatedly asked to explain its rationale and how its remaining work on the ANCSA §14(h)(1) program was to be completed. The matter was soon elevated to the Office of the Special Assistant to the Secretary of the Interior for Alaska. In response, the BIA ultimately retained one ANCSA Office employee. Over the course of the next few years the BIA became very aware that its remaining ANCSA §14(h)(1) Program work was extensive and could not possibly be accomplished by a single employee. This highlighted problems associated with the aforementioned Self-Governance agreements, most notably the fact that ANCSA funds in those agreements were not earmarked for ANCSA §14(h)(1) program work.

In 2002, the BIA Alaska Regional Director requested legal guidance from the Office of the Solicitor, Alaska Region, to determine what actions could be taken to correct deficiencies in the existing Self-Governance agreements, to ensure the protection of Alaska Native Regional Corporation rights pursuant to ANCSA § 14(h)(1). Most of the related questions raised by the BIA were addressed in an Office of the Regional Solicitor memorandum dated May 24, 2004. [Exhibit 1] Issued just before the start of the BIA Alaska Region Fiscal Year (FY) 2005 Self-

Governance negotiations, the memorandum advised the BIA to take two specific steps: (I) negotiate "mutually acceptable terms with affected [Indian Self-Determination Act] contractors and Self-Governance compactors"; and (ii) "support that process by requiring 'tribal' resolutions from the affected ANCSA Regional Corporations." Accordingly, in the relevant compact negotiations the BIA distributed copies of the Regional Solicitor's Office memorandum, and supplemented it with full and honest verbal explanations of: (a) the ANCSA §14(h)(1) Program; (b) the role of the Regional Corporations relative to ANCSA §14(h)(1); (c) the genesis and amount of ANCSA funds in the compact; and (d) the BIA's commitment to correcting any existing deficiencies to facilitate completion of the remaining work on the program. Also discussed was the need for Regional Corporation resolutions requesting either that the BIA contract with the prospective service provider entities or resume responsibility for completing the remaining work. The potential that the corporations could instead choose to contract directly with the BIA to perform ANCSA-related work tied to their §14(h)(1) claims was mentioned as well.

Negotiations for FY 2005 AFAs were conducted with the nine Alaska Self-Governance tribal consortia, including APIA. With one exception not relevant here, all these consortia, APIA included, agreed during these negotiations to include the following language to their Self-Governance AFAs or Multi-Year Funding Agreements covering FY 2005:

> ANCSA: This program fulfills the mandate of the 1971 Alaska Native Claims Settlement Act (ANCSA [Sections 14(h)(1), 14(h)(2), and 14(h)(5)], PL. 92-203) through investigation and certification of Alaska Native historical places and cemetery sites, native groups, and native primary places of residence. The program's remaining work, however, is focused on Section 14(h)(1) claims—the beneficiaries of which are ANCSA Regional Corporations. Program funds provided by this agreement are restricted in use to

> the performance of ANCSA-related work, the specific tasks of which will be jointly determined by [the consortium], the BIA ANCSA Office, and [the ANCSA Regional Corporation].

By this means and with the cooperation of most Alaskan tribal consortia, the BIA and the Office of Self-Governance hoped to insure that the tasks associated with the ANCSA § 14(h)(1) conveyance process could be completed using the funds appropriated for that purpose.

The other message delivered to the tribal consortia during the negotiations in 2004 was that their use of the funds intended to complete the ANCSA § 14(h)(1) process would ideally be supported by an ANCSA Regional Corporation resolution submitted pursuant to 25 U.S.C. § 450f(a). When it came time in 2005 to negotiate the AFAs for 2006, two of the nine tribal consortia (Association of Village Council Presidents, and Kawerak, Inc.) receiving ANCSA § 14(h)(1) funds did in fact submit supporting resolutions from their ANCSA Regional Corporations.[1] *Only* in the case of APIA was an ANCSA Regional Corporation resolution received which did not request continued BIA contracting with the Self-Governance consortium. [Exhibit 2]

B. <u>Relevant Departmental Practice and Precedent in Administering the ISDA in Alaska</u>.

To a certain extent, Alaska is unique with respect to ISDA administration, because unlike the situation obtaining other states, the ISDA definition of "Indian tribe" includes not only "Any Indian tribe, band nation, or other organized group or community," but also "any Alaska Native village *or regional or village corporation as defined in or established pursuant to the Alaska Native Claims Settlement Act*[.]" (Emphasis added.) 25 U.S.C. § 450b(e). That

[1] The other consortia did not follow the suggestion to solicit and submit ANCSA Regional Corporation resolutions, although that step is being urged again in the negotiations for FY 2007 agreements presently underway.

ANCSA Regional and Village Corporations are legally entitled to submit resolutions authorizing ISDA contracts pursuant to 25 U.S.C. § 450f(a) is well-established. The plain statutory language so indicating, and the Department of the Interior's straightforward interpretation of it, were adopted and affirmed by the Ninth Circuit Court of Appeals in *Cook Inlet Native Association (CINA)v. Bowen*, 820 F.2d 1471, 1476 (9th Cir. 1987). In the *CINA* case, the courts specifically upheld the awarding of a contract pursuant to the authority of an ANCSA Regional Corporation resolution, over the claim of a competing contracting request.

At the conclusion of its opinion, the Ninth Circuit in *CINA v. Bowen* also made passing reference to agency-established priorities "for determining the governing body of a tribe from the eligible competing entities." *Id.* At 1476-77. Although not explained in detail in the opinion, this was a reference to an Alaska BIA-developed policy intended to apply in the case of competing ISDA requests to contract to deliver services to the same community, population, or beneficiary class. The announced standard Alaska priority among entities eligible to request an ISDA contract (i.e., entities defined as Indian tribes), relevant in the *atypical* case of the submission of *competing* tribal requests, was: first, villages organized under the Indian Reorganization Act (IRA); second, villages governed by traditional village councils; third, ANCSA Village Corporations; and lastly, ANCSA Regional Corporations.[2] This so-called "Order of Precedence" has generally been applied with respect to BIA programs designed to

[2] Special cases, not of concern in the present context, involved the regional multi-village IRA entities for the Kenaitze Tribe and the Inupiat Community of the Arctic Slope , as well as the legislatively-recognized tribe of the Central Council of Tlingit and Haida Indian Tribes of Alaska. In each of these case, it was determined that the priority would be given to a contract request by a governing body representing a single community over that submitted by a regional entity. See Federally Recognized Indian Tribe List Act of 1994, Title II, Section 205, 108 Stat. 4791, 4793.

serve individuals or tribes as governmental entities, even though it has never been promulgated in a regulation or statute.[3]

In any case, a variation on this Alaska Order of Precedence was developed by the Department of the Interior in the early 1990s when the Bureau of Land Management (BLM) began receiving requests to contract surveying work under the ISDA. The surveying work involved primarily Alaska Native allotment surveys and ANCSA land conveyance-related surveys. This BLM work was eligible to be contracted pursuant to tribal request under the ISDA because it was a program or portion thereof "for the benefit of Indian because of their status as Indians" within the meaning of 25 U.S.C. § 450f(a)(1)(E). As requests to enter into ISDA contracts to perform surveys began to come in, BLM found itself confronted with competing requests to contract, including requests submitted by ANCSA corporations. The policy which was developed to address this situation represented a partial departure from the BIA's informal Alaska Order of Precedence. That policy, and its rationale, is described in the accompanying Regional Solicitor's Office Memorandum of October 5, 1992. [Exhibit 3] In essence, BLM determined that it would consider contracting requests received from ANCSA corporations pursuant to 25 U.S.C. § 450f(a) to have the first claim with respect to the right to contract to perform ANCSA conveyance-related surveys. A primary underlying rationale of this policy was the fact that the ANCSA corporations, and the shareholder class they represent, rather village-based tribal governments, are the direct beneficiaries of the ANCSA conveyance related

[3] It would probably have been included in revised ISDA regulations which were being prepared for issuance in 1994 or 1995, but those regulations were never finalized, because they were superseded by statutory amendments to the ISDA, enacted in the fall of 1994 as Public Law 103-413, 108 Stat. 4250. Also, as noted by Appellant, it was adverted to in preamble to the October 21, 1993 Federal Register list of "Indian Entities Recognized and Eligible To Receive Services From the United States Bureau of Indian Affairs." 58 F.R. 54364.

surveying activity. *See* Exhibit 3at 2-3.

When the BIA and Office of Self-Governance were forced to grapple with the problems related to performance of ANCSA §14(h)(1)-related activities, they consulted with the Regional Solicitor's Office, and also looked to the existing BLM practice in reconsidering their own approach. This led to the adoption of the same policy, recognizing that the informal Alaska Order of Precedence should not be mindlessly and arbitrarily adhered to, but should instead be modified in the unusual case of a program, function, service, or activity (PFSA) as to which the ANCSA corporation rather than individuals or tribal governments was the direct beneficiary. Based on the discussion of approaches and options contained in the Regional Solicitor's Office Memorandum of May 24, 2004 [Exh. 1], the BIA and Office of Self-Governance did commit themselves during the 2004 round of tribal Consortium AFA negotiations to a course of action based on recognition that the ANCSA Regional Corporations are the primary direct beneficiaries of the tasks related to completion of the ANCSA § 14(h)(1) program. This policy choice played into the general developments described in the preceding section, and The Aleut Corporation and APIA- specific history set forth immediately below.

C. <u>ANCSA § 14(h)(1), The Aleut Corporation, and the APIA</u>.

Like the other ANCSA Regional Corporations, The Aleut Corporation (TAC) filed timely ANCSA § 14(h)(1) selections in the 1970s with the BLM. These applications were then processed by the Department of the Interior in accordance with 43 C.F.R. § 2653.5, with the BIA itself performing the tasks assigned to it in the regulations. This state of affairs continued until the mid 1990s, when the events described at pages 8-9 above took place. Through the mid-

1990s, the BIA-assigned tasks relating to ANCSA § 14(h)(1) were never contracted for or performed by the APIA, even though it had long contracted under the ISDA to perform many if not most BIA programs.

Not long after the funding for ANCSA-related work, including § 14(h)(1) tasks, was mistakenly rolled into the APIA compact, beginning with Fiscal Year 1996, The Aleut Corporation (TAC) learned of this development[4], and expressed concern to the BIA.  TAC was anxious to see the remaining §14(h)(1) work in its region completed as quickly as possible, and was concerned that the BIA no longer had the level of resources needed to proceed expeditiously. Therefore, soon after TAC first learned that APIA was receiving funds allocated by Congress for the implementation of ANCSA §14(h)(1), it sought to learn as much as it could about the ISDA process from the BIA.[5]  Then armed with that knowledge, TAC began—on its own initiative—a committed effort to make certain that the ANCSA funds which had been included in the APIA AFA would be used to accomplish ANCSA-related work in the region.

After several months of negotiations, in August 1998 the TAC and APIA signed a Memorandum of Agreement (MOA) to that effect, a copy of which is attached as Exhibit 5.

---

[4]  That TAC was not given advance notice of or consulted about this change is confirmed in the Regional Corporation's May 12, 2006 letter submitted to the Hearings Division in connection with this proceeding.

[5]  One of the issues related to this matter which was addressed by the BIA was the question of which funds, and in what amounts, were actually associated with ANCSA program performance.  Attached as Exhibit  is a letter provided to TAC which addressed this question.  Although not central to the present appeal, the question as to how much money is actually at stake in this appeal will probably have to be addressed sooner or later. The amended agreement also did not accurately identify the total amount of ANCSA funds involved: i.e., it failed to note that 60% of the funds received under cost code 39720 were also supposed to apply to the ANCSA 14(h)(1) Program.  A 2001 letter to TAC addressed this question. [Exhibit 4]  Depending on the outcome of this appeal, it may be necessary to resolve a disagreement about the *amount* of funding, since APIA and the others do not appear to agree on this point either.

Because they clearly indicate that A/PIA acknowledged TAC was the beneficiary of ANCSA § 14(h)(1) program, certain terms of this MOA merit special attention:

(1) It applied to "All funds appropriated to A/PIA for ANCSA 14(h)(1) from BIA since the inception of the compact": i.e., since FY 1996. [Exh. 5 at 3]

(2) It specified that, excluding the salary costs for an "ANCSA Program Assistant" position, "Such funds shall be expended based on written objective work plans that are based on the overall intent and purpose of the ANCSA process, and approved by TAC." [Exh. 5 at 3 ]

(3) "All ANCSA 14(h)(1) work product shall be the sole property of TAC, *provided that*, A/PIA shall have the opportunity to reproduce ANCSA 14(h)(1) materials for its own purposes and any such reproductions shall remain the property of A/PIA. Original works, materials or work product of any kind that can not be reproduced but is released, held or otherwise acquired by A/PIA for any purpose shall remain the property of TAC." [Exh. 5 at 3]

For several years after the MOA had been put in place the ANCSA Program in the Aleutian region progressed satisfactorily. By the Spring of 2004, however, the relationship between TAC and APIA concerning the ANCSA §14(h)(1) Program had again become strained, apparently due to disagreements about the appropriateness of the work APIA was performing with its ANCSA funds.[6] As described above, at pages 10-11, the § 14 (h)(1) issue was addressed during the BIA/OSG negotiations for FY 2005 AFAs, which occurred during the late Spring and early Summer of 2004. During this same period the BIA sent copies of the 24 May

[6] Since the BIA was not a signatory to the MOA and ANCSA funds in the A/PIA Self-Governance Compact were not yet earmarked, from FY 1996 through FY 2004 the Bureau had no role in determining what work A/PIA should perform with the ANCSA funding it received and no authority to affect any changes in that regard.

2004 Solicitor's memorandum to the affected Regional Corporations and explained the process being initiated to remedy the associated ANCSA Program problems.

The negotiation meeting with APIA was held on June 10, 2004. Like the other tribal consortia, APIA agreed to include language similar to that quoted at pages 10-11 above to its existing "Self-Governance Multi-Year Funding Agreement (10/1/03 – 9/30/08)."[7] However, the relations between APIA and TAC with respect to the ANCSA § 14(h)(1) program were still somewhat contentious.

On February 17, 2005 representatives of TAC, APIA, BIA and the Office of the Solicitor (Alaska Region) met to discuss the status of ANCSA §14(h)(1) work in the Aleutian region and ideas about how it might best be accomplished. A follow-up meeting between APIA and BIA took place on March 31, 2005, for the purpose of identifying with greater specificity the Aleutian region ANCSA §14(h)(1) cases and records on which APIA work could focus. These meetings occurred in advance of the BIA Alaska Region FY 2006 Self-Governance negotiations and seemed productive. However, on May 24, 2005 the TAC Board of Directors passed Resolution No. 05-14 [Exh. 2], stating that it did not want APIA to perform ANCSA-related work on the corporation's behalf. Subsequent concerted efforts by APIA to change the ANCSA Regional Corporation's position twice led the TAC Board of Directors to revisit its resolution, but in both instances the Board chose to stand by its original decision.

Therefore, in anticipation of the summer 2005 negotiation with APIA over the FY 2006

[7] However, when A/PIA added the new language to the agreement it omitted the second clause of the final sentence, an action that escaped immediate notice. The BIA did not become aware of this change until sometime after the amended agreement had been put into effect by signature of the authorized representatives of A/PIA (7/14/04), the St. George Traditional Council (8/2/04), and the Office of Self-Governance (8/20/04).

funding for continuation of its Multi-Year Funding Agreement, the BIA and OSG agreed on the basis of the May 2005 TAC Resolution No. 05-14 that ANCSA §14(h)(1) funding should be withheld from APIA for FY 2006.

D. Procedural History of the Appeal.

When representatives of the BIA and the OSG met with APIA and TAC in the Spring 2005, there was still some question as to whether APIA would succeed in convincing TAC to acquiesce in continued APIA operation of the § 14 (h)(1) program, and even after the Board of Directors of TAC adopted its May 20, 2005 Resolution No. 05-14, APIA still hoped to persuade them to rescind the Resolution. However, despite TAC's openness to considering APIA arguments to reverse course, TAC Resolution No. 05-14 was not rescinded.

Perhaps hoping that the issue would die, APIA on June 23, 2005 submitted a version of a 2006 FA, or "Reprogramming Request," for BIA signature, received by the BIA on June 30, which did not provide for reduction of its funding by deletion of the funds to conduct the ANCSA § 14(h)(1) program. [Exhibit 6]  That Reprogramming Request, which did not address itself to the ANCSA § 14(h)(1) issue, was not executed by the representative of the Office of Self-Governance.  OSG, having determined that TAC Resolution No. 05-14 constituted a tribal request under 25 U.S.C. §450f(a)(1) that the Government contract directly with the benefitted tribe (i.e. TAC), felt itself constrained to provide for the withholding of the ANCSA § 14(h)(1) funding from the FY 2006 APIA Funding Agreement (FA), and therefore communicated to the APIA that the Agreement as submitted in June was unacceptable.

Evidently concerned about an interruption in the flow of funding, APIA relented and on

September 27, 2005 submitted a replacement FA which included the following added language:

> Funding for the Section 14(h)(1) work is to be transferred to the Aleut Corporation per resolution by the Aleut Corporation for FY 2006. This is without prejudice to the APIAI (sic) to appeal the BIA decision regarding these funds.

[Exhibit 7, line item 15]. This FA, apparently prepared by APIA on September 2, 2005 and signed prior to submission to the Government, was upon receipt executed first by the BIA, and then by OSG on October 3, 2005.

Up to perhaps ten weeks after APIA's preparation of the above-quoted wording concerning appeal, and certainly more than six weeks after submission of the APIA-signed Reprogramming Request containing that language, the attorney for APIA composed and sent a November 14, 2006 letter requesting an informal conference "in accordance with 25 C.F.R. §§ 1000.432(a) and 900.154." [Exhibit 8] In that letter, notwithstanding these just-mentioned obvious indications of APIA's earlier awareness of the firm BIA/OSG position that APIA would not receive the ANCSA § 14(h)(1) funding for FY 2006, Appellant's counsel asserted: "This request is being submitted within 30 days of the BIA's refusal to include the PFSA and associated funds in the FY 2006 AFA. Id."[8]

Without second-guessing the assertion that the APIA request was timely, the Department proceeded to prepare for the requested informal conference. On December 22, 2005, Charles Bunch, who had been designated the Secretary's Representative to conduct the informal conference, notified the parties as to the agreed-upon time and place for the conference. [Exhibit

[8] It would appear that APIA started calculating the appeal period from the date that it received back a fully executed copy of the FY 2006 FA, even though it was informed of the Government's firm decision on the ANCSA § 14(h)(1) funding at a much earlier date.

9]  Then, a few days in advance of the hearing, APIA's counsel submitted a January 3, 2006

document entitled "Position Paper on ANCSA § 14(h)(1) Activities and Funding."  [Exhibit 10]

On January 6, 2006, the informal conference was held at the BIA Offices in Anchorage, with

representatives of all the concerned parties in attendance.   At the conclusion of the conference,

there seemed to be some cause for hope that TAC and APIA could reach an agreement

concerning the use of the funds in dispute, and the further discussions were evidently held

towards that possible end.

 To facilitate the possible consensual disposition of the dispute between real parties in

interest TAC and APIA, the due date for the preparation and distribution of the report and

recommended decision required by 25 C.F.R. §900.156(a) was delayed.  However, when a

negotiated resolution was not achieved, Mr. Bunch on February 15, 2006 issued his

recommended decision, a copy of which is attached hereto as Exhibit 11.

 According to that recommended decision, the removal of the ANCSA § 14(h)(1) funding

from the 2006 APIA Funding Agreement should be upheld.  Mr. Bunch concluded that TAC

was eligible to request the funds, had done so, and was entitled to receive them. [Exh. 11 at 3.]

As required by the regulations his recommended decision went on to inform the parties of their

appeal rights under 25 C.F.R. § 900.157.

 APIA did in fact elect to appeal and the present proceeding was instituted, by its

apparently timely Notice of Appeal dated March 16, 2006.  [Exhibit 12]  After referral of the

appeal to the Hearings Divisions, the parties opined during a telephonic Pre-Hearing Conference

that a hearing was unnecessary, and agreement was reached that the appeal would be decided on

the basis of three rounds of legal briefs, of which this is Appellee's Opening Brief.

## III. ARGUMENT

### A. This appeal should be dismissed as untimely.

When an affected entity disagrees with an ISDA-related action or decision by the BIA or OSG, it has several dispute resolution options, including: (1) to acquiesce in the decision; (2) to request an informal an informal conference within 30 days, under 25 C.F.R. §§ 1000.422(c) and 900.153-.157; or (3) to formally appeal pursuant to 25 C.F.R. § 1000.432-.437. In this case, counsel for Appellant APIA on November 14, 2005 wrote a letter to Acting Assistant Secretary James Cason, requesting "an informal conference in accordance with 25 C.F.R. §§1000.432(a) and 900.154." *See* letter attached as Exhibit 8, at 2. As the letter from APIA's counsel reveals, the action complained of was that the BIA "refused to sign the AFA as submitted" [by APIA in June 2005], and "withheld all funds for 2006 until APIA agreed to withdraw the request to continue to operate the Section 14(h)(1) program." [Exh. 8 at 2] This action or decision was obviously known to APIA during the summer of 2005, since it resulted in APIA's reluctant submission of a revised AFA, bearing the print-out date of September 2 [2005], and the signature of APIA representative Dimitri Philomenof, and sent to the Office of Self-Governance by cover letter dated September 27, 2005. [Exh. 7]

Therefore, the conclusion is inescapable that APIA was informed of the BIA "decision" now under review during the summer of 2005, at some point between the end of June and the beginning of September. Moreover, the revised AFA prepared, signed and submitted by APIA itself on September 27, 2005 reveals that APIA was well aware of, and indeed chose to

expressly reserve its right to appeal (or, as they eventually chose to do in the present case, to request an informal conference). Line item or note 15 to APIA's signed September 2005 revised AFA includes the statement: "This is without prejudice to APIAI (sic) to appeal the BIA decision regarding these funds." Thus, APIA can hardly be heard to say it was unaware of either the BIA/OSG action or its right of appeal from that action.

Nonetheless, neither a notice of appeal nor a request for informal hearing was submitted by or on behalf of APIA within the allowable time period. Even if one does not start the clock running until September 27, the APIA letter of November 14, 2005 was well outside of the permissible 30 day time period for requesting an informal conference. Although it is a little unclear which informal conference procedure APIA may have thought it was invoking[9], it is clear that each sets a 30 day time limit for making the request. 25 C.F.R. § 1000.425; 25 C.F.R. § 900.154.

Granted, the untimeliness of the informal hearing request was not called to Secretarial Representative Charles Bunch's attention, and he did not recognize it *sua sponte*. Granted also, the appeal [Exh. 12] *from* Mr. Bunch's February 15, 2006 Recommended Decision [Exh. 11] appears to have been timely (just barely), but the tardiness of the original request for an informal conference infects all further proceedings. Numerous decisions of the Interior Board of Indian Appeals state that appeal deadlines are jurisdictional, and that failure to file in a timely manner is

[9] Although the November 14, 2005 letter of counsel cites 25 C.F.R. § 900.154, both that regulation and § 1000.425 direct that the request be submitted to the person whose decision is being appealed, whereas APIA sent its request to the Assistant Secretary, to whom appeals are directed under 25 C.F.R. § 1000.433(c). [Exh. 8]

fatal to consideration of an appeal.[10] Although the parties did participate in a January 6, 2006 meeting, resulting in a recommended decision, there is no jurisdiction to review that decision, because there was no jurisdiction to issue it in the first place. Accordingly, this appeal should be dismissed for want of jurisdiction to consider it, owing to the untimely initial pursuit of administrative remedies by Appellant APIA.

B. If the merits are reached. Appellee's Decision should be affirmed for the reasons stated in the Recommended Decision of February 15, 2006.

In his February 15, 2006 Recommended Decision, Charles Bunch addressed each of the three issues brought up by APIA in both its January 3, 2006 Position paper, and at the January 6 informal conference meeting. The core issue, of course, is the question of what tribe is the beneficiary, or the primary beneficiary of the ANCSA § 14(h)(1) program, and how the BIA's Alaska Order of Precedence should be applied with respect to that program, in the face of competing tribal contracting requests–a recent and specific one from the Regional Corporation, TAC, and other more general requests from Native village governments, relied upon by APIA to support all their contracted PFSAs. Another important issue is the procedural one; did the Government improperly decline the June 27, 2005 APIA Funding Agreement proposal which would have maintained the flow of ANCSA § 14(h)(1) funds to APIA?

The third issue identified by APIA prior to the informal conference was the adequacy of past APIA performance of ANCSA § 14(h)(1) program requirements. This third issue has

[10] It is true that 25 C.F.R. 900.152 sets forth required language giving affected parties notice of appeal rights, and that IBIA decisions have held that absence of accurate appeal instructions tolls the running of the appeal time limit, but those holding should not be extended to a situation such as the present one, where the Appellant itself asserted and expressly reserved in writing its right to appeal, and was also represented by knowledgeable and experienced counsel. The IBIA's deadline tolling decisions undoubtedly reflect considerations of equity which do not apply with equal force in the present circumstances.

essentially dropped out of the case, at least insofar as appears, since it is not cited in APIA's March 16, 2006 Notice of Appeal. In his Recommended Decision, Mr. Bunch properly recognized that the adequacy of APIA's work was not the issue. Although it is certainly important to TAC, and to the Government, it was not the basis, except very indirectly[11] of the withholding of ANCSA funding from the APIA FY 2006 agreement. [Exh. 11 at 3] In its March 16, 2006 Notice of Appeal, APIA in effect splits the central issue into two–ANCSA §14(h)(1) tribal beneficiary status, and the administration of the Alaska Order of Precedence–and drops the adequacy of performance issue.

1. <u>ANCSA Regional Corporations, including TAC, *are* the primary beneficiaries of the ANCSA § 14(h)(1) program, whose contracting requests are therefore properly carried out by the Government</u>.

As indicated in both its January 3, 2006 and March 16, 2006 statements, Appellant APIA takes the position in effect that the ISDA should be administered in Alaska to *always* treat the IRA or traditional villages councils as the entities with first priority to submit 25 U.S.C. § 450f(a)(1) contracting requests, regardless of the nature of the program being contracted, but also argues that these tribal governmental entities are in fact the only or at least the primary beneficiaries of the ANCSA § 14(h)(1) program. This latter proposition is simply incorrect, as Mr. Bunch recognized in his Recommended Decision, at 2-3. There are a substantial number of reasons for concluding that the only or at very least the most direct and important beneficiary of

[11] APIA's performance was no doubt a factor in TAC's decision to exercise its authority to ask the Government by tribal resolution not to contract with APIA for the ANCSA § 14(h)(1) program, but to contract with TAC instead. After all, TAC concern about APIA utilization of the ANCSA funding was a central motivating factor behind both the creation and the content of the 1998 TAC-APIA MOA [Exh. 5]. But the Government's actions were not based on agreement or disagreement with TAC's judgment on that score, but rather on its obligation to honor the May 20, 2005 TAC tribal resolution.

the ANCSA § 14(h)(1) program is an ANCSA Regional Corporation, whether TAC or any other:

a. Applicant status. Under both the statute and regulations, ANCSA Regional Corporations are the *only* parties authorized by law to file applications for "existing cemetery sites and historical places." 43 C.F.R. § 2653.5(f). If the program existed for the benefit of community-based tribal governments, Congress or the Secretary could certainly have structured it differently than was done. Yet the simple fact is that *none* of the provisions of the § 2653.5 regulations providing the structure of the program provide *any* role for village governments. The Regional Corporations decided what lands to apply for, filed the applications, and have sole authority to amend or withdraw applications, or to appeal rejections of applications. Significantly, *all* application-related decision-making authority lies with the Regional Corporation, and a village-based tribe would have no legal recourse even if for example it objected to a decision not to apply for a particular site.

b. Location of lands subject to application and conveyance. As noted elsewhere, lands eligible for Regional Corporation selection under § 14(h)(1) do *not* include lands in the immediate vicinity of villages. Under the ANCSA scheme, lands in the core townships in which villages are located were subject to mandatory selection by and conveyance to village corporations, and were unavailable to Regional Corporations. 43 U.S.C. §§ 1610(a)(1) and 1611(a). Indeed given the withdrawal patterns, village corporations also typically selected other lands in relatively close proximity to the villages, where most cemeteries or historical places of most immediate concern or access to the local community would be located. This circumstance undercuts to a substantial degree APIA's assertion that the village governments had the

greatest interest and concern with those sites. Indeed, many such Regional Corporation-selected sites were located at some distance from any village, or from modern or ongoing association with a particular village, and actually had a more regional focus.

c. Conveyance receipt and ownership status. The ANCSA § 14(h)(1) sites applied for which qualified for approval and conveyance are conveyed to Regional Corporations, which continue to hold them for the indefinite future. No other entities are qualified to receive conveyance or hold title. 43 C.F.R. §§ 2653.0-3(a). Unlike conveyances to Village Corporations, which were subject to certain reconveyance requirements under ANCSA § 14(c), 43 U.S.C. § 1613(c), including reconveyances to municipal corporations representing the local community, the § 14(h)(1) conveyances are permanently held by the Regional Corporations.

d. Who holds property rights and responsibilities? Along with applying for and receiving conveyance of ANCSA § 14(h)(1) sites, the Regional Corporations bear all the expense and responsibility for both that acquisition process, and the conditions of holding the property. The final proviso of 43 C.F.R. § 2653.5(a) provides for a covenant in the land conveyance imposing on the Regional Corporation the responsibilities and expenses of site preservation, maintenance, and dedicated use. See also 43 C.F.R. § 2653.11(b) and (c). This places the Regional Corporations in the positions of having the most at stake in the original application process, and of having the dominant continuing role and responsibility in post-conveyance site administration.

Appellant APIA seeks to counter these fundamental legal realities with a vague argument about Congressional intent. Quoting floor statements by Senators Stevens and Bible near the

time of passage of ANCSA, Appellant argues that these statements show that ANCSA § 14(h)(1) was intended for the benefit of Alaska Native and villages. This is certainly true in a broad general sense. However, the Secretary in his regulations has adequately carried out that general intent by providing for a covenant imposing preservation and maintenance obligations on the Regional Corporation site owners, and precluding conflicting commercial use. In order to serve this purpose, no necessity was identified to treat village governments as the beneficiaries of the conveyance program. They were not the instruments of it, either by statute or regulation, and they are likewise not the sole repositories of cultural or community values or motives.

Moreover, the Senatorial statements relied upon themselves belie a certain amount of over-generalization. Apart from the slip of the tongue substitution of "village" for "region" in Senator Stevens' statement, his comments reflect no recognition that the bulk of active cemeteries and other sites in convenient proximity to villages were going to be conveyed to Village Corporations anyway, rather than Regional Corporations, and that as to those village-associated sites, control might well be reconveyed to a municipal government or other entity under 43 U.S.C. § 1613(c) in any case. Recall also that the comments relied upon by APIA were made several years before the enactment of the ISDA, and long before the development of the Alaska Order of Precedence. Moreover, even when the ISDA was enacted a few years after ANCSA, it unmistakably identified ANCSA corporations as eligible contracting entities. In short, there is nothing about the letter or intent of ANCSA that places the village-based tribal governments in a position of authority with regard to the ANCSA § 14(h)(1) program.

Another observation is worth advancing, and that has to do with the make-up and

distribution of Alaska Native people and institutions. The village governments, while given a leading role in the ISDA process generally, are not the sole representatives of Alaska Native people in all contexts. Many Alaska Natives do not reside in villages, or even the state, and those individuals might presumably have just as great an interest in their people's histories and burial places as other Alaska Natives who do happen to reside in rural communities. Therefore, it made sense to use the broadest based entities–the Regional Corporations–to implement the cultural heritage-related provisions of § 14(h)(1). At the time of passage of the ANCSA, part of the process was to provide for the mandatory enrollment of *every* Alaska Native to a Regional Corporation, while Village Corporation enrollment was permissive, and tribal membership was irrelevant. 43 U.S.C. § 1604. Appellant APIA's claim that village-based tribes should step to the front of the line, ahead of the Regional Corporations which represented *all* Alaska Natives, and were the entities statutorily selected to be the vehicles for implementation of the § 14(h)(1) program, is simply not persuasive.

2. A policy exception to the informal Alaska Order of Precedence is fully justified in the present context, and not contrary to law.

Appellant APIA seems to argue that no matter what the nature of a program for the benefit of Alaska Natives, the informal Alaska Order of Precedence must control when it comes to Government response to competing ISDA tribal requests to contract. The Appellee's position is more nuanced than that. While there is no doubt that with respect to the great majority of BIA programs, which serve individuals (such as scholarship programs, welfare programs, or programs serving individual land owners), or Native communities (such as aid to tribal government, or road construction), the IRA and traditional village councils are the most logical vehicles for

implementation of the broad self-determination policy.  No doubt this accounts for the development of the Alaska Order of Precedence.  However, the ANCSA § 14(h)(1) program, like the BLM ANCSA conveyance survey contracting program under the ISDA, constitutes the exceptional case.

The Department's means of reconciling the purposes of ANCSA and the ISDA in this particular context are decidedly not contrary to law, because no law compels the automatic or thoughtless  application of the Alaska Order of Precedence without regard to the circumstances. Congress has not legislated any such requirement, and there is also no regulation or judicial ruling which mandates it.  For the reasons already discussed, the Appellee initially, and Mr. Bunch in his subsequent Recommended Decision, were properly persuaded that 43 U.S.C. § 450f(a)(1) in fact required the opposite result; namely, that the Secretary's duty was to comply with the intent expressed in TAC Resolution No. 05-14, and make the ANCSA § 14(h)(1) funding available to The Aleut Corporation, rather than to APIA.

3.  The 25 U.S.C. § 450f(a)(2) declination criteria are inapplicable to the present situation.

In his February 15, 2006 Recommended Decision, Charles Bunch addressed the APIA argument that the withholding of the FY 2006 ANCSA § 14(h)(1) funds from APIA constituted a partial declination of Appellant's Funding Agreement.  As he recognized, the BIA/OSG action was not based on one of the declination criteria, but rather on a course of action driven by receipt of TAC Resolution No. 05-14.   Although the 25 U.S.C. § 450f(a)(2) declination criteria  are so broad that one or more might be argued to fit the circumstances, the true nature of the Government action under review was that it was a reallocation of resources dictated by the entity

(TAC) which should be recognized as having the first call as to how those funds are to be administered under 25 U.S.C. § 450f(a)(1).

The situation is actually unprecedented, in that the APIA § 14(h)(1) program had not prior to 2005 been operated under authority of a TAC tribal request, but once the BIA recognized the primacy of TAC's rights under 25 U.S.C.§ 450f(a)(1), it fell to the government to shape a means of vindicating TAC's rights. Although declination was not the means chosen, neither did any other process specifically provided for in the regulations squarely fit the circumstances. Mr. Bunch in his Recommended Decision drew the analogy to a withdrawal from participation in a consortium. This may be the closest analogy available, although treating the Regional Corporation's resolution as a retrocession request would also be a reasonably close fit, and was also discussed briefly by Mr. Bunch. Because neither the 25 C.F.R. §§ 1000.32-.35 process nor the 25 C.F.R. Part 900, Subpart P process seemed like a perfect match to the circumstances, neither was used by the Government as a procedural guide to effectuating the intent of TAC Resolution No. 05-14. The BIA and OSG simply proceeded to revise the APIA Annual Funding Agreement relationship in a way which accommodated TAC's exercise of its superior rights to request a contract under 25 U.S.C. § 450f(a)(1). All along, of course, the Government hoped that TAC and APIA would reach a new arrangement eliminating the conflict between their competing claims to the ANCSA § 14(h)(1) dollars, and that prospect has been revived from time to time, but to date not realized.

It is understandable that APIA would try to characterize the BIA/OSG action as a declination, since that label would place upon the Government the burden of "clearly establishing

the validity of the grounds" for its action. However, Appellee believes that the fundamental underlying judgment, to the effect that the ANCSA Regional Corporation resolution should control ISDA contracting for the ANCSA § 14(h)(1) program, is a reasonable and eminently sensible judgment, that should be upheld under a reasonableness standard of review.

C. If the means by which Appellee gave effect to TAC's priority request to contract directly are deemed procedurally inadequate, guidance should be offered and the matter remanded for an orderly transition of the program to TAC, the direct and primary beneficiary tribe.

Operating by analogy, Mr. Bunch in his review did not find the BIA/OSG withholding of funds from APIA to have been procedurally deficient. Even if it disagrees, the Hearings Division should affirm the fundamental principle that the ANCSA § 14(h)(1) is a program in connection with which a departure from the so-called Alaska Order of Precedence was fully justified, and should make provision for an alternative process for giving effect to that sound judgment.

## IV. CONCLUSION

For the reasons stated above, the actions under review should be upheld, and APIA's appeal dismissed as untimely, or on the merits.

RESPECTFULLY SUBMITTED this 12th day of June, 2006.

Roger L. Hudson, Office of the Regional Solicitor, Counsel for Appellee

**EXHIBIT LIST**

| | | |
|---|---|---|
| 1. | 5/24/04 | Regional Solicitor Memo Re: Funding Implementation |
| 2. | 5/20/05 | The Aleut Corporation - Resolution No. 05-14 |
| 3. | 10/5/92 | Regional Solicitor Memo Re: Indian Self-Determination Act Issues |
| 4. | 2/2/01 | Glenda Miller Letter Re: Level of Funding |
| 5. | 8/7/98 | Memo of Agreement Between Aleutian/Pribiloff Islands Association, Inc. (A/PIA) and The Aleut Corporation |
| 6. | 6/23/05 | Proposed APIA FY2006 Annual Funding Agreement or Reprogramming Request |
| 7. | 9/27/05 | APIA transmittal letter and Revised APIA FY2006 Annual Funding Agreement or Reprogramming Request |
| 8. | 11/14/05 | Letter of Counsel Requesting Informal Conference |
| 9. | 12/22/05 | Charles Bunch Letter Re: Informal Conference |
| 10. | 1/3/06 | APIA Position Paper |
| 11. | 2/15/06 | Recommended Decision |
| 12. | 3/16/06 | APIA Notice of Appeal |



# United States Department of the Interior

OFFICE OF THE SOLICITOR
ALASKA REGION
4230 University Drive
Suite 300
Anchorage, Alaska 99508-4626
(907) 271-4131

May 24, 2004

BIA.AK.0874

**MEMORANDUM**

**TO:** Roger Drapeaux, Program Analyst &
Ken Pratt, ANCSA Program Manager
Alaska Region, Bureau of Indian Affairs

**FROM:** Roger L. Hudson, Attorney
Office of the Regional Solicitor

**SUBJECT:** Funding for implementation of ANCSA § 14(h)(1) included within Tribal Self-Governance annual funding agreement

This is a follow-up to our recent telephone conference call, during which we discussed the problems associated with trying to insure that funding appropriated by Congress to carry out the administrative tasks required to complete the Alaska Native Claims Settlement Act (ANCSA) land conveyance process would be completed in a reasonably timely manner. You have asked for my views on this subject in advance of the BIA's upcoming annual negotiations with a number of tribal consortia and other contracting entities, beginning with the Tanana Chiefs Conference (TCC). Although this quick memo is far from exhaustive, I provide the following with the understanding that time is of the essence in preparing to handle the problem.

<u>Background</u>

One of the basic tasks involved in completing the ANCSA conveyance process is for the government (or Indian Self-Determination Act (ISDA) contractors) to evaluate and act upon Regional ANCSA Corporation applications for conveyance of title to existing cemetery sites and historical places, filed pursuant to ANCSA § 14(h)(1). A large number of these applications, which were timely filed, have not been processed, approved or rejected, or, in the case of approval, conveyed to the ANCSA corporation applicants. Although some aspects of the processing involve the Bureau of Land Management (BLM), the initial steps of site inspection, evaluation, and archaeological assessment were identified as tasks to be completed by the Bureau of Indian Affairs (BIA). The delay in completing the necessary work has been attributable in large measure to the fact that a substantial portion of the funding that Congress has provided to do the work has found its way into ISDA contracts, without the contracts themselves specifically binding the recipient entities to complete the work for which the funds were appropriated. The contracts and funding agreements into which these funds have been inserted have been entered into pursuant to ISDA § 102(a)(2), largely, if not exclusively, on the strength of resolutions provided by federally recognized tribes, as distinct from ANCSA Regional Corporations. You

EXHIBIT 1 (Pg. 1 of 3)

ask whether this is proper, and if not, how the situation might be corrected.

Analysis

You explain that the problem first arose out of the mistaken conclusion reached several years ago that the work required of the BIA to complete the ANCSA § 14(h)(1) program had already been completed. This is now clearly recognized not to have been an accurate assessment, but in the meantime, significant funding has been erroneously included in contracts and compacts as if it were properly categorized as recurring Tribal Priority Allocation (TPA) funding. Some recipient entities have carried out the spirit of the ANCSA program by in fact using the funds provided for ANCSA-related work. Others have not, but have instead utilized funds provided for non-ANCSA activities. ANCSA Regional Corporations are understandably impatient to see the work initiated or continued on their pending § 14(h)(1) applications.

The most immediate question is therefore what steps might be taken during the annual negotiation process to try to get the ANCSA work back on track. In my opinion, the most direct means to the desired end would be to include specific ANCSA-related tasks in the contracting entities' scopes of work, whereby they would agree after negotiation as to what activities they would undertake, and what ANCSA-related work product they would commit themselves to deliver. The utilization of qualified staff would of course be one of the points to be covered. To the extent that compacting or contracting entities would voluntarily agree to such commitments, and then fulfill them, the necessity for resort to any sort of formal procedures to retrieve the money in question could be dispensed with. This would save everyone time, money and legal uncertainty. It would also serve the best interests of ANCSA Regional Corporations[1] and their shareholders, who have already had to wait too long for the relevant conveyances (or the opportunity to appeal application rejections).

If a contracting entity which has already received ANCSA project money in prior years now refuses to either (1) agree to do the work for which the money was intended, or (2) agree to retrocede the funds and program to the BIA, so that the Bureau would have the resources to do the work in-house, then other remedies will have to be evaluated. Hopefully, we won't have to reach that question, but if we must, I think there are several legal theories on which the BIA might proceed. For one, I think the ANCSA funds are more properly viewed as a category of non-recurring funds, which should not be included in a tribal TPA to begin with. Unlike open-ended programs typically included in a TPA base, the ANCSA § 14(h)(1) application processing task is one which deals with a finite and limited scope of work, which is intended to be completed at a certain point in time, at which point the need for--and entitlement to--continued funding terminates.

[1] In fact, an ideal process would only proceed on the basis of a Regional Corporation resolution in hand, requesting that the BIA contract with the prospective service provider entity.

EXHIBIT 1 (Pg. 2 of 3)

Another legal problem with the status quo is that it is doubtful that contracting for the ANCSA conveyance work can properly be supported by a tribal or village resolution under the ISDA. Legally, the tribal entity benefitting from a program, function, service or activity, or portion thereof, is the entity which must provide the authorizing request to contract. In the case of ANCSA conveyance-related work, that entity would be the Regional Corporation. Precedent for this type of approach exists in the area of BLM cadastral survey work under the ISDA. Where the contractible work is for the benefit of a Regional or other ANCSA Corporation, the BLM has agreed to contract under the ISDA only at the request of the ANCSA corporate entity to be benefitted. (Note that the ISDA includes ANCSA corporations within its statutory definition of Indian tribe.) It would be my recommendation that even in the case of a negotiation to incorporate ANCSA tasks into an ISDA contract renewal or AFA, the BIA should require an ANCSA Regional Corporation resolution requesting that the BIA contract for performance of the relevant tasks. Indeed, the Regional Corporation would not only have the right to dictate who provides the services, but also the option of electing to contract directly with the Bureau to perform the work itself, save only those functions which might be considered inherently federal, or precluded by conflict of interest.

Still another non-consensus approach to retrieving the funds necessary to get the ANCSA work done would be to issue a partial declination under ISDA § 102(a)(2)(A), on the grounds that the service to be rendered (i.e., processing cemetery and historical place applications) to the Indian beneficiaries (i.e., the ANCSA Regional Corporations) will not be satisfactory, because of a demonstrated record of non-performance by the contracting entity.

Conclusion

Given the considerable recent Congressional interest in expediting completion of the ANCSA conveyance process, as witnessed by the active effort to enact the Alaska Land Transfer Acceleration Act of 2003, S. 1466, it is especially appropriate that the ANCSA § 14(h)(1) process be re-energized. I would strongly recommend that you try to address this problem by negotiating mutually acceptable terms with affected ISDA contractors and Self-Governance compactors. I would also recommend you support that process by requiring "tribal" resolutions from the affected ANCSA Regional Corporations. If you encounter an unwillingness to alter existing arrangements, let me know, and we can evaluate what other approach(es) to pursue to rectify the situation, and to make sure that funds appropriated for ANCSA purposes are actually applied to the intended activities.

Roger L. Hudson

EXHIBIT 1 (Pg. 3 of 3)

cc: Niles Cesar, Alaska Regional Director, BIA
Peggy Exendine, Contracting Officer, Alaska Region, BIA
Rich Myers, Assistant Solicitor, General Indian Legal Activities, Div. of Indian Affairs



*The* **Aleut Corporation**

**Resolution No. 05-14**

A RESOLUTION OF THE ALEUT CORPORATION TO CONTRACT DIRECTLY WITH THE BUREAU OF INDIAN AFAIRS FOR ANCSA 14(h)1 HISTORICAL AND CEMETERY SITE FUNDING FOR FY 2006.

WHEREAS, The Aleut Corporation selected lands as historic and cemetery sites pursuant to Section 14(h)1 of the Alaska Native Land Claims Settlement Act; and

WHEREAS, these selections represent the physical evidence of the Region's peoples use of said lands for historic and prehistoric subsistence and occupation; and

WHEREAS, the Department of Interior, Bureau of Indian Affairs, ANCSA Office has been delegated the responsibility of determining the eligibility of the 14(h)1 selections for conveyance to the Native Regional Corporation; and

WHEREAS, the Department of the Interior, Office of the Solicitor, forwarded an Opinion on May 24, 2004 that requires the Native Regional Corporations to designate and approve proper use of those funds for 14(h)1 related activities; and

WHEREAS, Aleutian/Pribilof Islands Association currently compacts with BIA for ANCSA 14(h)1 funding on behalf of TAC; and

THEREFORE BE IT RESOLVED that TAC Board of Directors is removing A/PIA as the entity to receive ANCSA 14(h)1 funding on its behalf; and

BE IT FURTHER RESOLVED that TAC Board of Directors hereby asserts that TAC directly contract with the Bureau of Indian Affairs for the ANCSA 14(h)1 Historical and Cemetery funding for fiscal year 2006.

PASSED AND APPROVED this 20th day of May 2005, at a duly called meeting of the Directors of The Aleut Corporation, by a vote of **5** for, **1** opposing, and **3** absent.

Dick Jacobsen
President

ATTEST:

Dave Nevzuroff
Assistant Secretary/Treasurer

EXHIBIT 2

4000 Old Seward Hwy., Suite 300 Anchorage, Alaska 99503 (907) 561-4300 FAX (907) 563-4328
www.aleutcorp.com



BLM.AK.1427

October 5, 1992

Memorandum

To: George Skibine & Penny Coleman
Division of Indian Affairs
Office of the Solicitor

From: Roger Hudson
Office of the Regional Solicitor
Alaska Region

Subject: Indian Self-Determination Act (ISDA) Issues

This memorandum and the attached materials are transmitted to you as a follow-up to our brief conversations last week about issues which the BLM is confronting with respect to proposed survey contracts submitted by various Alaska Native organizations. In order that the maximum appropriate degree of consistency be maintained between BIA and BLM approaches to contracting of ". . .programs for the benefit of Indians because of their status as Indians" pursuant to the Indian Self-Determination Act, I would appreciate your comments on the following positions, which the BLM has tentatively adopted in consultation with this office:

1. What entity should supply the required tribal resolution in support of the request to contract? There has been considerable debate about whether the BLM should: (1) follow the BIA order of precedence, probably soon to be formally adopted as part of the set of long-awaited ISDA regulations; or (2) should seek to get those regulations revised; or (3) should decide that the order of precedence is inapplicable, based on an interpretation of the phrase ". . .the Indian tribe or tribes to be served under the contract." For the reasons briefly explained below, BLM Cadastral Survey presently intends to elect the first course with respect to Native Allotment surveys, and the third with respect of surveys of Alaska Native Claims Settlement Act (ANCSA) Regional and Village Corporation conveyances. If you take strong exception to this course, please let us know as soon as possible, since BLM will otherwise probably be putting it into effect within the week.

Alaska Native entities which have approached BLM about contracting ANCSA and/or allotment surveys pursuant to the ISDA include several regional non-profit Native corporations, including Maniilaq, Tanana Chiefs Conference (TCC), and Copper River Native Association (CRNA), as well as one ANCSA Regional Corporation, Chugach Alaska Corporation (CAC), and two ANCSA Village Corporations from that region (Eyak Corporation and Tatitlek

EXHIBIT 3 (Pg. 1 of 5)

Corporation). BLM has already entered into a contract with CRNA to do allotment surveys in the geographic vicinity of Copper River villages, based on supporting resolutions from the village Indian Reorganization Act (IRA) or traditional councils representing those villages. The proposal for the 1993 season which has already been received by the BLM, and requires the most immediate response, comes at least indirectly from CAC; that is to say, it is a proposal supported by a tribal request to contract submitted in the form of a resolution from the CAC Board of Directors.

One possible position which the BLM has considered, and which the BIA has advocated, is that it could insist on receiving a tribal request to enter into an ISDA contract to perform the scheduled survey of Regional Corporation lands from each IRA and traditional village council in the region. In fact, it was on the basis of similar resolutions that BLM already entered into its first ISDA surveying contract with CRNA. However, that is not the course BLM presently intends to pursue with respect to the CAC request for a contract to perform ANCSA surveys. Instead, BLM plans to accept and contract on the basis of the CAC "tribal" resolution. The obvious difference between CRNA and CAC is that the former does not fit within the ISDA definition of an "Indian tribe," while the latter does. Cf. Cook Inlet Native Association v. Bowen, 810 F.2d 1471 (9th Cir. 1987). Given that critical distinction, there is no particular inconsistency in requiring a regional nonprofit Native corporation to present village council resolutions in support of its contract proposal, while not imposing a similar requirement on an ANCSA corporation, which is itself a tribe under the ISDA definition.

However, the draft ISDA regulations would seem to suggest that because there are IRA and traditional councils within the Chugach region, the resolutions of those entities would be required, and that standing alone the resolution of CAC, the Regional Corporation, would be an insufficient basis for entering into an ISDA contract. The problem with that reasoning, and the reason BLM intends to reject it, is that CAC is in fact an Indian tribe under the ISDA definition, whereas the BIA Juneau Area-developed order of precedence set forth in the draft regulations has no basis in the statutory language. In light of that circumstance, it is almost certain that CAC would challenge a BLM refusal to contract based on its failure to submit village council resolutions, and it also seems quite likely that its challenge would be successful. By comparison, the probability that the villages would formally contest an award of a contract for surveying ANCSA Regional Corporation lands based on the CAC resolution, or that such challenge would be successful, seems much smaller.

Another argument in favor of entering into an ISDA contract for surveying regional corporation lands without requiring village council resolutions is that §900.202(a)(1) of the draft regulations

EXHIBIT 3 (Pg. 2 of 5)

requires only the request of the Indian tribe or tribes ". . .to be served under the contract." We believe that it can be persuasively argued that an ANCSA conveyance survey serves the corporation to which the land is to be conveyed much more directly than it serves the village councils in the region. After all, the survey and resulting conveyance are of direct benefit to the corporation and all of its shareholder/owners, which is a substantially larger and somewhat different group of individuals than that which would be represented by the village governing bodies. Moreover, all of the lands to be surveyed in this particular case are located at a great distance from some of the villages, so an argument that those distant communities are " the tribes to be served under the contract" is a particularly difficult one to make.

Of course, BLM does not take lightly the step of departing from the uniform past BIA practice of applying the order of precedence, which is about to become a regulatory requirement. However, it is expected that BLM's approach to ANCSA survey contracts can be reconciled with the normal ISDA order of precedence by treating ANCSA surveys and allotment surveys differently in terms of the "tribal" resolution requirement. In the case of proposals to contract mixed survey projects (including both ANCSA conveyance and allotment surveys), BLM plans to require tribal organizations such as Maniilaq and TCC to submit both IRA and/or traditional council resolutions (for allotment surveys), <u>and</u> ANCSA village and/or regional corporation resolutions (for ANCSA conveyance surveys). Of course, the proposition that IRA and traditional councils should be deemed "the tribes to be served" by a program of surveying Native allotments is itself debatable, but the BIA already has a long-standing practice of ISDA contracting for realty and rights protection services to allotment owners through application of the order of precedence, and in this respect it seems defensible to follow not only BIA precedent, but the precedent BLM itself has established through its initial allotment survey contract with CRNA.

2. <u>How stringent is the definition of a "tribal organization?"</u> The other issue of first impression raised by the ISDA surveying contract proposal supported by the CAC resolution involves a determination as to whether the prospective contractor to which CAC has asked the BLM to award a contract is in fact an eligible "tribal organization" within the ISDA definition of that term. The pertinent language from 25 USC § 450b(l) is this:

> "'tribal organization' means. . .any legally established organization <u>of Indians</u> which is controlled, sanctioned, or chartered by such governing body. . ."

(emphasis added). CAC has requested that the BLM enter into an ISDA contract with Arctic Slope Consulting Group, Inc. (ASCG). ASCG is a wholly-owned subsidiary of the Arctic Slope Regional Corporation, an ANCSA Regional Corporation like CAC. Thus, at least for the time

EXHIBIT 3 (Pg. 3 of 5)

being ASCG is "controlled" by the governing body of a tribe, because ASRC itself fits the statutory definition of an Indian tribe which is set forth in 25 USC §450b(b). However, the point of uncertainty is whether or not ASCG is "a legally established organization of Indians," because there is nothing in its articles of incorporation which limits either ownership or control to tribes or individual Natives. The argument that it is not therefore an organization of Indians is presented in the enclosed three page memorandum from Bob Elliott of the BIA's Juneau Area Office to the BLM's Steve Hamrick. As a factual matter, the ASCG Board of Directors is composed entirely of Alaska Natives, which is not particularly surprising in light of its having been chosen by ASRC's management. But rather than focus on the purported tribal organization's present make-up, the BIA suggests that BLM conclude that ASCG does not qualify for tribal organization status because its organic documents present no legal impediment to the transfer of either ownership or day-to-day control to non-Natives.

While a distinction can legitimately be drawn between an organization of Indians such as a regional non-profit Native corporation, which is by its very nature controlled by Indians, and an organization that could be controlled by any owner, but happens to be owned by an ANCSA corporation, I have discovered nothing in the statutory language, legislative history, or draft regulations which compels any different treatment of the two types of organizations. Not only does ASCG, which is Native owned, and has an all-Native Board of Directors, and a Native CEO, arguably fit the literal definition of a "tribal organization," but the available legislative history and the basic thrust of the self-determination policy seem to favor a liberal interpretation of the term. In the Senate Report on the 1988 ISDA amendments the following statement appears:

> The Committee amendment does not change the definition in current law of the term "tribal organization". The Committee considered the possibility of changing the definition in order to prevent Federal agencies from using the requirement to obtain tribal resolutions as an obstacle to contracting. The Committee believes that the term may at times have been misinterpreted, but that an amendment is unnecessary. . .

S. Rep. No. 100-274, 100th Cong., 2nd Sess. 19, <u>reprinted in</u> 1988 U.S. Code Cong. & Admin. News 2620, 2638. It could be argued that a restrictive interpretation of the tribal organization definition would be just the sort of agency roadblock to contracting of which the Congress would disapprove, since it would amount to a diminution of tribal flexibility or discretion -- or self-determination -- as to what sort of tribally controlled entity the tribe could use as a contracting vehicle.

Although it is undoubtedly a close question, the course more in keeping with the underlying policy of self-determination is

EXHIBIT 3 (Pg 4 of 5)

probably to honor the CAC request that BLM enter into a contract with ASCG, which would implicitly amount to a recognition of ASCG's status as a tribal organization for ISDA purposes. One further argument in favor of that course is that a corporate subsidiary is the most common type of organization that a state-chartered corporation could be expected to "control, sanction, or charter." While that description of the tribe-tribal organization relationship was probably not developed with ANCSA corporations in mind, but rather in contemplation of the more typical structure where a tribe would sanction or charter a housing authority, board of education, or other single function operating arm, the recognition of ANCSA corporate subsidiaries as tribal organizations would seem to follow almost automatically from the Congress's decision to treat ANCSA corporations as Indian tribes for ISDA purposes in the first place. In keeping with this generally liberal construction, and the underlying self-determination philosophy, there would not appear to be any legal obstacle to one ANCSA corporation requesting that the government enter into an ISDA contract with a tribal organization controlled by another, even though that practice has not been a widespread one to date.

<u>Conclusion.</u> The BLM's tentative, but soon to be implemented, judgment calls on the two issues discussed above could be seen as inconsistent with BIA practice, but we do not so regard them. In contrast to the BLM, which is responsible for the ANCSA land conveyance program, the BIA rarely, if ever, has occasion to administer programs as to which the ANCSA village and regional corporations are the tribes to be served by the contract. Therefore, it does not appear likely that a BLM determination to enter into an ISDA contract with ASCG on the basis of a resolution submitted by CAC would as a practical matter be at odds with BIA administrative practice, or the draft ISDA regulations. If you disagree with this view please let me know as soon as possible.

Roger L. Hudson

encls: 1 page BLM issue summary
4 page ASCG submission
3 page BIA memorandum

cc: E. Lewis, BLM Cadastral
R. Elliott, JAO, BIA
N. Cesar, Area Director, JAO, BIA

EXHIBIT 3 (Pg. 5 of 5)



IN REPLY REFER TO:

**UNITED STATES**
**DEPARTMENT OF THE INTERIOR**
BUREAU OF INDIAN AFFAIRS

Alaska Region
P.O. Box 25520
Juneau, Alaska 99802-5520

February 2, 2001

Mr. Melvin Smith,
Facilities & Resource Manager
The Aleut Corporation
Via telefax

RECEIVED
JUN - 9 2006
Office of Regional Solicitor
Alaska Region

Subject: 14(h)1 compact funding

Dear ~~Mr. Smith:~~ Melvin

This is in response to your verbal and written request for clarification as to the 14(h)1 funding received by the Aleutian Pribilof Island Association (APIA). I have reviewed the reprogramming requests that contain the financial data and accompany annual funding agreements, beginning with the first, which was negotiated in 1995 for the 1996 compact. In that particular reprogramming request, in cost code: 34460, $73,379 was identified to be reprogrammed to APIA. Throughout the years, up to the 2001 agreement, that amount has remained the same; although the cost code has changed to 39760. This account is totally for the ANCSA program.

The more confusing cost code which funded the 14(h)1 office is 39720, which is identified as "Other Rights Protection – TPA/Area." It is confusing in that part of the funding was used for the ANCSA Program, part for the Subsistence Program, and part for the Rights Protection program. The historical split was 60% for ANCSA, 20% for Subsistence and 20% for Rights Protection.

Again, I went back to the 1996 reprogramming request and found that this cost code had been split into the three programs. $44,305 was identified for ANCSA; $2,877 was identified for Subsistence; and $742 was identified for Rights Protection. The total amount identified in the 1996 agreement was $47,924. So you see that the vast majority of that cost code is attributable to the ANCSA Program. Beginning with the next years reprogramming request, the three programs within the 39720 area account were lumped back into one cost code and the amount changed to $41,632. It has remained the same since then.

I will be in Anchorage and likely available to attend the requested meeting during the week of February 20. The only time I'm not available is Thursday afternoon (2/22). Please contact me at 586-7403 if I can be of further assistance.

Sincerely,

Glenda Miller
Regional Realty Officer

cc: Ken Pratt, ANCSA Program Manager, via fax
Dan Duame, APIA, via fax

EXHIBIT 4

**MEMORANDUM OF AGREEMENT**
**Between**
**ALEUTIAN/PRIBILOF ISLANDS ASSOCIATION, INC. (A/PIA)**
**and**
**THE ALEUT CORPORATION**

* * * * * * * * * * * * *

***Preamble***

*Whereas, the above Native organizations wish to cooperate in a joint effort to conduct certain cultural heritage and preservation activities intended to benefit the Aleut Region as a whole, including primarily ANCSA 14(h)(1) activities, and therefore have the need to establish an organizational and administrative framework to accommodate such an effort, now therefore the parties mutually agree as follows:*

**Section 1. Purpose.** The purpose of this agreement is to establish the organizational and administrative framework pursuant to which A/PIA and TAC may jointly conduct certain cultural heritage, preservation and related activities, and in particular, activities related to completing the ANSCA 14 (h)(1) process.

**Section 2. Relationship of the Parties.** A/PIA is a Native non-profit organization registered and doing business in the State of Alaska. TAC is a State chartered ANCSA profit corporation also registered and doing business in the State of Alaska. Except as specifically agreed to under this MOA, neither party shall act as agent for, or partner of the other, nor shall either incur any liability, represent, or make commitments on behalf of the other. The employees of one shall not be deemed the employees of the other. Nothing in this MOA shall be deemed to constitute, create, give effect or otherwise recognize a joint venture, partnership or formal business entity of any kind, and the rights and obligations of the parties shall be limited to those expressly provided herein or in other related but separate agreements entered into to conduct the activities contemplated under this MOA.

**Section 3. Term.** The term of this MOA shall be perpetual, subject only to termination under Section 9 below.

**Section 4. Program / Activity Funding.** Funds expended under this MOA shall come primarily from ANCSA 14(h)(1) funds provided to A/PIA pursuant to a P.L. 93-638 Title IV Agreement between A/PIA and the U.S. Department of the Interior. A/PIA and TAC may from time to time mutually agree to supplement such funds for specified projects or activities benefitting their respective members or shareholders.

EXHIBIT 5 (Pg. 1 of 4)

<u>Section 5. ANCSA (14)(h)(1) Program / Activity Administration:</u>

(a) **Contact Persons.** Each party to this MOA shall designate a contact person to act as a general point of contact on matters related to this MOA. Such designation is not intended to disrupt or in any way interfere with the normal exchange of information or contact between staff from either organization.

(b) **Project staff.** It is the intent of the parties to have a minimum of two staff persons engaged in conducting the ANCSA 14(h)(1) activity which is the subject of this MOA. One of the staff will be the A/PIA Cultural Heritage Director, the other the ANCSA Project Assistant.

(1) **Cultural Heritage Director (CHD).** The CHD shall be a full time employee of A/PIA under the direct supervision of A/PIA. The CHD shall have as one of her primary responsibilities the gathering, processing, indexing and cataloging of ANCSA data currently held by BIA, and making such information available and useable by both organizations for ANCSA and other purposes. The CHD shall work cooperatively with TAC to develop work plans for land conveyance and patents to TAC and the eventual completion of ANCSA 14(h)(1) activity. The CHD shall, within the scope of her professional experience and abilities, assist with ANCSA site report review and interpretation and where appropriate provide any required professional/technical assistance in the prosecution of any appeals that are undertaken. The CHD shall submit quarterly work reports to TAC on the progress of ANCSA 14(h)(1) work.

(2) **ANCSA Project Assistant (APA).** The APA shall be an A/PIA employee under the direct supervision of the CHD. A/PIA and TAC shall jointly prepare and approve a job description for the APA and shall jointly participate in interviews and recommendations for hire. The CHD will work closely with TAC to plan the work schedule for the APA.

(c) **Financial Administration.** A/PIA shall have sole responsibility for all accounting functions associated with implementation of this MOA except for those funds, if any, that TAC may commit as supplemental to the ANCSA related funds which the parties anticipate using to fund project activities on a recurring basis.

EXHIBIT 5 (Pg. 2 of 4)

A/PIA shall provide TAC with monthly financial statements as to all funds jointly administered by the parties. All funds appropriated to A/PIA for ANCSA 14(h)(1) from BIA since the inception of the compact, are available to conduct ANCSA (14(h)(1) and Cultural Heritage activities under this agreement.

It is the intent of the parties that $100,000 be made available, by A/PIA, as an initial sum to conduct ANCSA 14(h)(1) activities agreed to under this MOA. The costs associated with the APA position shall be included in this initial sum, but not those associated with the CHD position. A/PIA shall be solely responsible for CHD costs. The CHD shall administer program funds not expended on APA salary costs. Such funds shall be expended based on written objective work plans that are based on the overall intent and purpose of the ANCSA process, and approved by TAC. Work plans shall be revised and updated as appropriate, but no less than semi-annually. Funds in addition to the initial $100,000 shall be made available beginning October 1, 1998, assuming the work plans justify a demonstrated need. The amount of such additional funds shall be based on historic ANCSA funding levels. Funds that are provided shall be available until expended, or until the ANCSA process is brought to a conclusion. The availability of all funds associated with this MOA is contingent on continuing congressional appropriations.

**(d) Work Product Ownership.** All ANCSA (14)(h)(1) work product shall be the sole property of TAC, *provided that,* A/PIA shall have the opportunity to reproduce ANCSA (14)(h)(1) materials for its own purposes and any such reproductions shall remain the property of A/PIA. Original works, materials or work product of any kind that can not be reproduced but is released, held or otherwise acquired by A/PIA for any purpose shall remain the property of TAC.

**<u>Section 6.</u> Decision-making / Role of Participating Executive Staff & Boards.** The responsibility for keeping the respective Boards of each organization informed as to activity conducted under this MOA and seeking Board approval for any such activity, if deemed to be required, shall rest with the staff and executive officers of each organization, in accordance with procedures an policies each my independently establish. It is the intent of the parties that the primary responsibility for implementing this MOA and conducting the activity which is the subject of this MOA shall rest with the CHD and APA. Such staff and any other executive officers or staff authorizing contracts, activities or related expenditures of funds under this MOA shall be deemed to be acting within the scope of their authority.

**<u>Section 7. Disputes.</u>** Any disputes arising under this MOA shall be submitted for resolution to a neutral three (3) party panel, to be selected by mutual agreement of

EXHIBIT 5 (Pg. 3 of 4)

the parties. Decisions by the neutral panel shall be binding and final. It is the intent of the parties to avoid any formal legal process as to any disputes which may arise under this MOA.

**Section 8. Modifications/Amendments.** Any modifications and/or amendments to this MOA shall be in writing and effective only after approval and signature by both parties.

**Section 9. Termination.** The parties to this MOA may terminate this MOA at any time for any reason. However, the termination of this MOA shall have no effect on any outstanding independent contracts, written obligations, commitments or works in progress for which funds have been obligated. Such independent contracts, written obligations, commitments or works in progress in existence at the time of any termination of this MOA shall continue in effect until such time as they may expire under the individual terms and conditions of such agreements. Funds remaining after meeting the financial obligations of such agreements shall be returned to the party who originally obligated or committed such funds.

***In witness whereof the parties have executed, delivered and formed this Agreement, in duplicate, to be effective upon the date of signature of both parties:***

**ALEUTIAN/PRIBILOF ISLANDS ASSOCIATION, INC.**

[signature] 8-07-98

**Dimitri Philemonof, Executive Director** **Date**

**THE ALEUT CORPORATION**

[signature] 8-7-98

**Elary Gromoff, Jr., President/CEO** **Date**

EXHIBIT 5 (Pg. 4 of 4)

Office of Self Governance

Self Governance 2006 Annual Funding Agreement - Reprogramming Request

June 23 200
Page: 1

Tribe: ALEUTIAN PRIBILOF ISLANDS ASSOCIATION
Tribal OSG Compact Code: OSGT811
Tribal BIA Org. Code: E01810
BIA Regional Office: ALASKA REGION
BIA Field Office: ANCHORAGE FIELD OFFICE

| LINE # | PROGRAM TITLE | COST CODE | (Info) TRIBAL SHARE | A OSG CUM. BASE | B OSG SHORTFALL BASE | C OSG SHORTFALL REQUEST | D BIA REPROGRAM REQUEST | E=A+B+C+D TOTAL AFA | FN |
|---|---|---|---|---|---|---|---|---|---|
| 2 | Community Services, General - TPA/AGENCY | 39210 | 138,952 | 138,542 | 410 | 0 | 0 | 138,952 | 1 |
| 4 | Other Aid to Tribal Government - TPA/TRIBAL | 39220 | 107,730 | 201,682 | 13,550 | 0 | -107,502 | 107,730 | 2 |
| 6 | Other Aid to Tribal Government - TPA/AREA | 39220 | 11,217 | 9,511 | 3,279 | 0 | -1,573 | 11,217 | 3 |
| 7 | Consolidated Tribal Government Pro - TPA/TRIBAL | 39230 | 6,379 | 14,748 | 0 | 0 | -8,369 | 6,379 | 4 |
|  | Consolidated Tribal Government Pro - TPA/AGENCY | 39230 | 1,689 | 1,689 | 0 | 0 | 0 | 1,689 | |
| 10 | Self-Governance Compacts - TPA/TRIBAL | 39240 | -80,810 | -80,810 | 0 | 0 | 0 | -80,810 | |
| 12 | Contract Support (Ongoing) - TPA/AREA | 39270 | 889,118 | 0 | 0 | 0 | 889,118 | 889,118 | 5 |
| 17 | Small and Needy Tribes Distributio - TPA/TRIBAL | 39904 | 892,306 | 892,306 | 0 | 0 | 0 | 892,306 | 6 |
| 18 | Social Services - TPA/TRIBAL | 39310 | 35,891 | 41,383 | 0 | 0 | -5,492 | 35,891 | 7 |
| 19 | Social Services - TPA/AGENCY | 39310 | 6,552 | 1,290 | 5,262 | 0 | 0 | 6,552 | |
| 20 | Social Services - TPA/AREA | 39310 | 76,600 | 60,928 | 15,672 | 0 | 0 | 76,600 | |
| 21 | Indian Child Welfare Act - TPA/TRIBAL | 39320 | 318,431 | 318,431 | 0 | 0 | 0 | 318,431 | |
| 24 | Welfare Assistance Grants - TPA/TRIBAL | 39330 | 75,000 | 0 | 0 | 0 | 75,000 | 75,000 | 8 |
| 25 | Housing Improvement Program - TPA/TRIBAL | 39370 | 32,900 | 32,900 | 0 | 0 | 0 | 32,900 | 9 |
| 27 | Scholarships - TPA/TRIBAL | 39110 | 73,274 | 78,389 | 0 | 0 | -5,115 | 73,274 | 10 |
| 33 | Johnson-O'Malley Educational Assis - TPA/TRIBAL | 39140 | 7,600 | 7,600 | 0 | 0 | 0 | 7,600 | |
| 44 | Job Placement and Training - TPA/TRIBAL | 39535 | 123,100 | 139,085 | 0 | 0 | -15,985 | 123,100 | 11 |
| 46 | Job Placement and Training - TPA/AREA | 39535 | 8,141 | 8,944 | 295 | 0 | -1,098 | 8,141 | 12 |
| 49 | Economic Development - TPA/AREA | 39510 | 7,229 | 2,614 | 4,615 | 0 | 0 | 7,229 | |
| 55 | Natural Resources, General - TPA/AREA | 39605 | 2,868 | 1,888 | 980 | 0 | 0 | 2,868 | |
| 58 | Agriculture - TPA/AREA | 39610 | 1,179 | 536 | 643 | 0 | 0 | 1,179 | |
| 67 | Wildlife and Parks - TPA/AREA | 39650 | 1,238 | 588 | 650 | 0 | 0 | 1,238 | |
| 73 | Trust Services, General - TPA/AREA | 39710 | 4,221 | 4,149 | 72 | 0 | 0 | 4,221 | 13 |
| 76 | Other Rights Protection - TPA/AREA | 39720 | 41,632 | 40,501 | 1,131 | 0 | 0 | 41,632 | |
| 78 | Real Estate Services - TPA/AGENCY | 39770 | 9,088 | 9,088 | 0 | 0 | 0 | 9,088 | |
| 79 | Real Estate Services - TPA/AREA | 39770 | 2,255 | 1,323 | 121 | 0 | 811 | 2,255 | 14 |
| 86 | Environmental Quality Services - TPA/AREA | 39740 | 506 | 405 | 101 | 0 | 0 | 506 | |
| 19 | ANILCA - TPA/AREA | 39750 | 10,344 | 10,254 | 90 | 0 | 0 | 10,344 | |
| 92 | ANSCA - TPA/AREA | 39760 | 73,379 | 73,379 | 0 | 0 | 0 | 73,379 | |
| 94 | Executive Direction - TPA/AGENCY | 39810 | 11,067 | 5,916 | 5,151 | 0 | 0 | 11,067 | |
| 97 | Administrative Services - TPA/AGENCY | 39820 | 21,677 | 19,249 | 2,428 | 0 | 0 | 21,677 | |
| 102 | TPA General Increase - TPA/TRIBAL | 39901 | 92,847 | 92,847 | 0 | 0 | 0 | 92,847 | |
| 103 | 638 Pay Costs - TPA/TRIBAL | 39902 | 184,939 | 184,939 | 0 | 0 | 0 | 184,939 | |
| 106 | Area and Agency Technical Support - NON TPA | 30800 | 1,617 | 1,495 | 0 | 0 | 122 | 1,617 | 15 |
| 129 | Real Estate Services - NON TPA | 34300 | 978 | 0 | 0 | 0 | 978 | 978 | 16 |
| 130 | Environmental Management - NON TPA | 34730 | 4,420 | 0 | 0 | 0 | 4,420 | 4,420 | 17 |
| 149 | All Other Aid to Tribal Government - NON TPA | 36420 | 2,318 | 0 | 2,318 | 0 | 0 | 2,318 | |
| 151 | Housing Development - NON TPA | 36530 | 3,824 | 3,824 | 0 | 0 | 0 | 3,824 | |
| 152 | Adult Voc. Training (moved to TPA) - NON TPA | 36720 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 162 | Trust Services, General - NON TPA | 36910 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 163 | All Other Indian Rights Protection - NON TPA | 36920 | 568 | 527 | 41 | 0 | 0 | 568 | |
| 164 | Real Estate Services - NON TPA | 36940 | 1,009 | 199 | 50 | 0 | 760 | 1,009 | 18 |
| 166 | Land Records Improvement - NON TPA | 36960 | 4,368 | 0 | 0 | 0 | 4,368 | 4,368 | 19 |
| 168 | Executive Direction - NON TPA | 36100 | 2,335 | 0 | 2,335 | 0 | 0 | 2,335 | |
| 169 | Administrative Services - NON TPA | 36200 | 37,546 | 20,275 | 17,271 | 0 | 0 | 37,546 | |
| 197 | Preparedness - NON TPA | 92120 | 2,178 | 0 | 0 | 0 | 2,178 | 2,178 | 20 |
| 198 | Preparedness Program Mgmt (Indirec - NON TPA | 92121 | 823 | 0 | 0 | 0 | 823 | 823 | 21 |
|  | TOTAL |  | 3,250,523 | 2,340,614 | 76,465 | 0 | 833,444 | 3,250,523 | |

EXHIBIT 6 (Pg. 1 of 2)

AUTHORIZED FINANCIAL OFFICERS:

Bureau of Indian Affairs - Regional Office

Tribe

Office of Self Governance

1 Reference 96 & 97 non-residual left with BIA Anchorage Agency to carry out CDIB functions. $112,691 is False Pass tribal shares to be permanently base transferred to APIA.
2 $107,502 reduction repesents the Unalaska ATG amount that was put in the APIA AFA and then removed by tribal resolution. [this amount should be permanently reprogrammed to Unalaska]
3 $1,573 reduction for Unalaska ATG (39220-Area). Same rationale as f/n #2.[this amount should be permanently reprogrammed to Unalaska]
4 $8,369 reduction for Unalaska ATG CTGP (39230). Same rationale as f/n #2. [this amount should be permanently reprogrammed to Unalaska] $6,379 is False Pass tribal shares to be permanently base transferred to APIA.
5 Estimated amount. FY 06 funds will be distrubuted using similar methodology as was used last fiscal year.
6 See FY 03 AFA f/n #3 for village breakout.
7 $6,053 based on Unalaska reduction for Social Services (39310) [this amount should be permanently reprogrammed to Unalaska]- see f/n #2; and $$561 increase for False Pass Social Services funds which should have been base transferred to APIAs base. The base should be $35,891.
8 Estimate. Total funds for FY 06 will be distributed based upon estimated welfare assistance need as reflected in the current mid-year analysis of funds report.
9 Funds will be distributed based on HIP eligible applicant data and shall be used in accordance with HIP regulations unless waived.
10 $5,208 reduction based on Unalaska Scholarship funds being removed (see f/n #2)[this amount should be permanently reprogrammed to Unalaska]; and $93 increase for False Pass pay costs which should have been base transferred in FY 03.
11 $15,985 based on Unalaska reduction for JPT - Tribe (39535)[this amount should be permanently reprogrammed to Unalaska]- see f/n #2.
12 $1,098 based on Unalaska reduction for JPT - Tribe (39535) [this amount should be permanently reprogrammed to Unalaska]- see f/n #2.
13 APIA total share $4,468; $247 left with BIA for direct Archeology services.
14 $811 increase is minimum amount of APIA tribal share of BIA Realty increases based on data provided by BIA at 5/7/02 Realty meeting.
15 Amount based on 2% of JOM & Scholarship tribal shares.
16 Historical share amount based on combined total of Lease Compliance and prior Shortfall adjustments to cummulative base (see f/n #11 of FY 03 AFA).
17 Based on historical AFA tribal share amounts.
18 Minimum tribal share amount based on Realty data provided at meeting with BIA on 5/7/02. Same as FY 05 amount.
19 Same as f/n #18.
20 Best estimate at the time of negotiations and is subject to adjustment based on actual award, selection of project, or distribution methodology used by BIA provided SG Tribes, other Tribes and BIA agencies are treated similarly.
21 Estimate. To be adjusted based on APIA actual indirect rate at time of distribution of funds.

3 original Reprogram
3 original amendments
1 faxed Resolution

RECEIVED
JUN 30 2005
BUREAU OF INDIAN AFFAIRS

EXHIBIT 6 (Pg. 2 of 2)

**Aleutian/Pribilof Islands Association, Inc.**
201 E. 3rd Avenue
Anchorage, Alaska 99501
Phone (907) 276-2700
Fax (907) 279-4351

St. Paul
St. George
Nelson Lagoon
Sand Point
False Pass
Nikolski
King Cove
Akutan
Unalaska
Atka
Nikolski

September 27, 2005

RECEIVED
SEP 29 2005
BUREAU OF INDIAN AFFAIRS
OFFICE OF THE REGIONAL DIRECTOR

Tom Shirilla
OSG NW Field Office
1503 NE 78th Street, Suite 15
Vancouver, WA 98665

Re: Aleutian Pribilof Islands Association (APIA) 2006 Reprogramming Request

Dear Mr. Shirilla,

Submitted herewith is a revised 2006 reprogramming request. We have modified line 15 to reflect the fact that the Aleut Corporation passed a resolution stating their intent to contract directly with the BIA for those funds for 2006. APIA makes this change in our reprogramming request without prejudice to filing an appeal of the BIA and Solicitor's opinion that the Aleut Corporation, rather than the tribes and their representative, APIA, can make the decision about how those funds can be spent.

If you have any questions, please do not hesitate to contact me.

Very truly yours,

ALEUTIAN PRIBILOF ISLANDS ASSOCIATION

[signature]

Dimitri Philemonof
President/CEO

cc: Roger Drapeaux ✓
William Sinclair

EXHIBIT 7 (Pg. 1 of 3)

EXHIBIT 7 (Pg. 2 of 3)

Office of Self Governance

Self Governance 2006 Annual Funding Agreement - Reprogramming Request

September 2
Page: 1

Tribe: ALEUTIAN PRIBILOF ISLANDS ASSOCIATION
Tribal OSG Compact Code: OSGT811
Tribal BIA Org. Code: E01810
BIA Regional Office: ALASKA REGION
BIA Field Office: ANCHORAGE FIELD OFFICE

| LINE # | PROGRAM TITLE | COST CODE | (Info) TRIBAL SHARE | A OSG CUM. BASE | B OSG SHORTFALL BASE | C OSG SHORTFALL REQUEST | D BIA REPROGRAM REQUEST | E=A+B+C+D TOTAL AFA | FN |
|---|---|---|---|---|---|---|---|---|---|
| 2 | Community Services, General - TPA/AGENCY | 39210 | 138,952 | 138,542 | 410 | 0 | 0 | 138,952 | 1 |
| 4 | Other Aid to Tribal Government - TPA/TRIBAL | 39220 | 107,730 | 201,682 | 13,550 | 0 | -107,502 | 107,730 | 2 |
| 6 | Other Aid to Tribal Government - TPA/AREA | 39220 | 11,217 | 9,511 | 3,279 | 0 | -1,573 | 11,217 | 3 |
| 7 | Consolidated Tribal Government Pro - TPA/TRIBAL | 39230 | 6,379 | 14,748 | 0 | 0 | -8,369 | 6,379 | 4 |
| 8 | Consolidated Tribal Government Pro - TPA/AGENCY | 39230 | 1,689 | 1,689 | 0 | 0 | 0 | 1,689 | |
| 10 | Self-Governance Compacts - TPA/TRIBAL | 39240 | -80,810 | -80,810 | 0 | 0 | 0 | -80,810 | |
| 12 | Contract Support (Ongoing) - TPA/AREA | 39270 | 861,454 | 0 | 0 | 0 | 861,454 | 861,454 | 5 |
| 17 | Small and Needy Tribes Distributio - TPA/TRIBAL | 39904 | 892,306 | 892,306 | 0 | 0 | 0 | 892,306 | 6 |
| 18 | Social Services - TPA/TRIBAL | 39310 | 35,891 | 41,383 | 0 | 0 | -5,492 | 35,891 | 7 |
| 19 | Social Services - TPA/AGENCY | 39310 | 6,552 | 1,290 | 5,262 | 0 | 0 | 6,552 | |
| 20 | Social Services - TPA/AREA | 39310 | 76,600 | 60,928 | 15,672 | 0 | 0 | 76,600 | |
| 21 | Indian Child Welfare Act - TPA/TRIBAL | 39320 | 318,431 | 318,431 | 0 | 0 | 0 | 318,431 | |
| 24 | Welfare Assistance Grants - TPA/TRIBAL | 39330 | 75,000 | 0 | 0 | 0 | 75,000 | 75,000 | 8 |
| 25 | Housing Improvement Program - TPA/TRIBAL | 39370 | 32,900 | 32,900 | 0 | 0 | 0 | 32,900 | 9 |
| 27 | Scholarships - TPA/TRIBAL | 39110 | 73,274 | 78,389 | 0 | 0 | -5,115 | 73,274 | 10 |
| 33 | Johnson-O'Malley Educational Assis - TPA/TRIBAL | 39140 | 7,600 | 7,600 | 0 | 0 | 0 | 7,600 | |
| 44 | Job Placement and Training - TPA/TRIBAL | 39535 | 123,100 | 139,085 | 0 | 0 | -15,985 | 123,100 | 11 |
| 46 | Job Placement and Training - TPA/AREA | 39535 | 8,141 | 8,944 | 295 | 0 | -1,098 | 8,141 | 12 |
| 49 | Economic Development - TPA/AREA | 39510 | 7,229 | 2,614 | 4,615 | 0 | 0 | 7,229 | |
| 55 | Natural Resources, General - TPA/AREA | 39605 | 2,868 | 1,888 | 980 | 0 | 0 | 2,868 | |
| 58 | Agriculture - TPA/AREA | 39610 | 1,179 | 536 | 643 | 0 | 0 | 1,179 | |
| 67 | Wildlife and Parks - TPA/AREA | 39650 | 1,238 | 588 | 650 | 0 | 0 | 1,238 | |
| 73 | Trust Services, General - TPA/AREA | 39710 | 4,221 | 4,149 | 72 | 0 | 0 | 4,221 | 13 |
| 76 | Other Rights Protection - TPA/AREA | 39720 | 41,632 | 40,501 | 1,131 | 0 | 0 | 41,632 | |
| 78 | Real Estate Services - TPA/AGENCY | 39770 | 9,088 | 9,088 | 0 | 0 | 0 | 9,088 | |
| 79 | Real Estate Services - TPA/AREA | 39770 | 2,255 | 1,323 | 121 | 0 | 811 | 2,255 | 14 |
| 86 | Environmental Quality Services - TPA/AREA | 39740 | 506 | 405 | 101 | 0 | 0 | 506 | |
| 89 | ANILCA - TPA/AREA | 39750 | 10,344 | 10,254 | 90 | 0 | 0 | 10,344 | |
| 92 | ANSCA - TPA/AREA | 39760 | 0 | 73,379 | 0 | 0 | -73,379 | 0 | 15 |
| 94 | Executive Direction - TPA/AGENCY | 39810 | 11,067 | 5,916 | 5,151 | 0 | 0 | 11,067 | |
| 97 | Administrative Services - TPA/AGENCY | 39820 | 21,677 | 19,249 | 2,428 | 0 | 0 | 21,677 | |
| 102 | TPA General Increase - TPA/TRIBAL | 39901 | 92,847 | 92,847 | 0 | 0 | 0 | 92,847 | |
| 103 | 638 Pay Costs - TPA/TRIBAL | 39902 | 184,939 | 184,939 | 0 | 0 | 0 | 184,939 | |
| 106 | Area and Agency Technical Support - NON TPA | 30800 | 1,617 | 1,495 | 0 | 0 | 122 | 1,617 | 16 |
| 129 | Real Estate Services - NON TPA | 34300 | 978 | 0 | 0 | 0 | 978 | 978 | 17 |
| 130 | Environmental Management - NON TPA | 34730 | 4,420 | 0 | 0 | 0 | 4,420 | 4,420 | 18 |
| 149 | All Other Aid to Tribal Government - NON TPA | 36420 | 2,318 | 0 | 2,318 | 0 | 0 | 2,318 | |
| 151 | Housing Development - NON TPA | 36530 | 3,824 | 3,824 | 0 | 0 | 0 | 3,824 | |
| 152 | Adult Voc. Training (moved to TPA) - NON TPA | 36720 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 162 | Trust Services, General - NON TPA | 36910 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 163 | All Other Indian Rights Protection - NON TPA | 36920 | 568 | 527 | 41 | 0 | 0 | 568 | |
| 164 | Real Estate Services - NON TPA | 36940 | 1,009 | 199 | 50 | 0 | 760 | 1,009 | 19 |
| 166 | Land Records Improvement - NON TPA | 36960 | 4,368 | 0 | 0 | 0 | 4,368 | 4,368 | 20 |
| 168 | Executive Direction - NON TPA | 36100 | 2,335 | 0 | 2,335 | 0 | 0 | 2,335 | |
| 169 | Administrative Services - NON TPA | 36200 | 37,546 | 20,275 | 17,271 | 0 | 0 | 37,546 | |
| 197 | Preparedness - NON TPA | 92120 | 2,178 | 0 | 0 | 0 | 2,178 | 2,178 | 21 |
| 198 | Preparedness Program Mgmt (Indirec - NON TPA | 92121 | 821 | 0 | 0 | 0 | 821 | 821 | 22 |
| | TOTAL | | 3,149,478 | 2,340,614 | 76,465 | 0 | 732,399 | 3,149,478 | |

EXHIBIT 7 (Pg. 3 of 3)

AUTHORIZED FINANCIAL OFFICERS:

[signature]
Bureau of Indian Affairs - Regional Office

[signature] for Director
Title

[signature] 10/3/05
Office of Self Governance

1 Reference 96 & 97 non-residual left with BIA Anchorage Agency to carry out CDIB functions. $112,691 is False Pass tribal shares to be permanently base transferred to APIA.
2 $107,502 reduction repesents the Unalaska ATG amount that was put in the APIA AFA and then removed by tribal resolution. (this amount should be permanently reprogrammed to Unalaska)
3 $1,573 reduction for Unalaska ATG (39220-Area). Same rationale as f/n #2.(this amount should be permanently reprogrammed to Unalaska)
4 $8,369 reduction for Unalaska ATG CTGP (39230). Same rationale as f/n #2. (this amount should be permanently reprogrammed to Unalaska) $6,379 is False Pass tribal shares to be permanently base transferred to APIA.
5 Estimated amount. FY 06 funds will be distrubuted using similar methodology as was used last fiscal year.
6 See FY 03 AFA f/n #3 for village breakout.
7 $6,053 based on Unalaska reduction for Social Services (39310) (this amount should be permanently reprogrammed to Unalaska)- see f/n #2; and $5561 increase for False Pass Social Services funds which should have been base transferred to APIAs base. The base should be $35,891.
8 Estimate. Total funds for FY 06 will be distributed based upon estimated welfare assistance need as reflected in the current mid-year analysis of funds report.
9 Funds will be distributed based on HIP eligible applicant data and shall be used in accordance with HIP regulations unless waived.
10 $5,208 reduction based on Unalaska Scholarship funds being removed (see f/n #2)(this amount should be permanently reprogrammed to Unalaska); and $93 increase for False Pass pay costs which should have been base transferred in FY 03. see f/n #2.
11 $15,985 based on Unalaska reduction for JPT - Tribe (39535)(this amount should be permanently reprogrammed to Unalaska)- see f/n #2.
12 $1,098 based on Unalaska reduction for JPT - Tribe (39535) (this amount should be permanently reprogrammed to Unalaska)-
13 APIA total share $4,468; $247 left with BIA for direct Archeology services.
14 $811 increase is minimum amount of APIA tribal share of BIA Realty increases based on data provided by BIA at 5/7/02 Realty meeting.
15 Funds to be transferred to The Aleut Corporation per resolution by The Aleut Corporation for FY 06. This is without prejudice to APIAI to appeal the BIA decision regarding these funds.
16 Amount based on 2% of JOM & Scholarship tribal shares.
17 Historical share amount based on combined total of Lease Compliance and prior Shortfall adjustments to cummulative base (see f/n #11 of FY 03 AFA).
18 Based on historical AFA tribal share amounts
19 Minimum tribal share amount based on Realty data provided at meeting with BIA on 5/7/02. Same as FY 05 amount.
20 Same as f/n#19.
21 Best estimate at the time of negotiations and is subject to adjustment based on actual award, selection of project, or distribution methodology used by BIA provided SG Tribes, other Tribes and BIA agencies are treated similarly.
22 Estimate. To be adjusted based on APIA actual indirect rate at time of distribution of funds.

# HOBBS, STRAUS, DEAN & WALKER, LLP

OPTIONAL FORM 99 (7-90)

FAX TRANSMITTAL

| To Ken Pratt | From |
|---|---|
| Dept./Agency | Phone # |
| Fax # 271/1750 | Fax # |

NSN 7540-01-317-7368 5099-101 GENERAL SERVICES ADMINISTRATION

RECEIVED
NOV 14 2005
BUREAU OF INDIAN AFFAIRS
OFFICE OF THE REGIONAL DIRECTOR

*Via Telefax and Certified Mail*

James Cason, Acting Assistant Secretary for Indian Affairs
Department of the Interior
1849 C Street, NW
MS 4140 MIB
Washington, D.C. 20240
Fax: 202-208-6334

**RE:** ***Request for Informal Conference on FY 2005 Annual Funding Agreement***

Dear Mr. Cason:

On behalf of our client, the Aleutian Pribiloff Islands Association (APIA), we hereby request an informal conference with the Bureau of Indian Affairs (BIA) on the claim that APIA is entitled by operation of law and its Compact and FY 2006 Annual Funding Agreement (AFA) to funding for activities related to the implementation of section 14(h) (1) of the Alaska Native Claims Settlement Act (ANCSA). We discuss below the background to the matters in dispute that give rise to this request.

Background

For a number of years APIA has entered into a compact and annual AFAs with the BIA under Title IV of the Indian Self-Determination and Education Assistance Act (ISDEAA) for a broad range of programs, functions, services and activities (PFSAs) and associated funds. Since 1999, those PFSAs and related funds have included activities related to the implementation of section 14(h)(1) of ANCSA. APIA carried out these PFSAs in conjunction with a memorandum of agreement (MOA) with the Aleut Corporation (TAC) that spelled out how the parties jointly worked on cultural heritage, preservation and related activities, and in particular activities related to completing the ANSCA 14(h)(1) process.

During all the years that it has operated this program, APIA has submitted periodic work plans to TAC. Until 2004 there was no objection by BIA about the manner in which APIA was carrying out its responsibilities in connection with these PFSAs and they were included in all of APIA's AFAs from 1999 through 2005.

EXHIBIT 8 (Pg. 1 of 3)

On May 24, 2004 the Office of the Interior Regional Solicitor (the Regional Solicitor) wrote BIA objecting to the inclusion of Section 14(h)(1) activities in certain Alaska Native regional non-profit organizations' ISDEAA agreements on two principle grounds: (1) funding had been diverted to other purposes, resulting in a delay in the 14(h)(1) process; and (2) TAC is the sole beneficiary of the program and, thus, has the right to determine by resolution with whom the BIA will contract the program. The Regional Solicitor advised that the funding should not be included in recurring Tribal Priority Allocations (TPA) but should be treated as non-recurring funds.

On May 20, 2005, TAC adopted a resolution requesting that the BIA contract directly with TAC to perform ANCSA 14(h)(1) activities. Shortly thereafter, APIA submitted a request to the BIA for a 2006 AFA which, as in previous years, included the Section 14(h)(1) PFSAs and related funds. BIA not only refused to sign the AFA as submitted, but withheld all funds for 2006 until APIA agreed to withdraw the request to continue to operate the Section 14(h)(1) program. The 2006 FA, as signed by the parties, states that funding for the Section 14(h)(1) work is "to be transferred to the Aleut Corporation per resolution by the Aleut Corporation for FY 2006. This is without prejudice to APIAI (sic) to appeal the BIA decision regarding these funds." Apparently on the basis of the Regional Solicitor's opinion, the BIA declined to renew a proposal to include a program and related funds in a subsequent AFA that had been included in APIA's agreement for numerous years.[1]

The BIA's unilateral decision not to include these PFSAs and associated funds in the FY 2006 AFA, in reliance on the Regional Solicitor's advice, was apparently based on the premise that TAC is the sole beneficiary of these services and is, therefore, entitled to designate the tribe or tribal organization entitled to contract them or to submit an application to provide the service itself, as it has done. We disagree with the analysis and conclusions in the opinion and believe that the BIA's decision to unilaterally remove these PFSAs and associated funds from APIA's FY 2006 AFA violated APIA's compact and AFA as well as the provisions of Title IV of the ISDEAA and its implementing regulations.

In accordance with Title IV, applicable regulations and APIA's compact and AFA, APIA has the right to appeal the BIA's refusal to include these PFSAs and funds in its 2006 AFA. APIA hereby requests an informal conference with the BIA in accordance with 25 CFR §§ 1000.432(a) and 900.154. This request is being submitted within 30 days of receipt of the BIA's refusal to include the PFSA and associated funds in the FY 2006 AFA. Id. According to the regulations the conference must then be held within 30 days of the Tribe's request. 25 CFR § 900.155. We would appreciate hearing from the

---

[1] In the alternative, the BIA's refusal to include the Section 14(h)(1) program and related funds in the FY 2006 AFA can be viewed as a reassumption of the program and a suspension of the transfer of associated funds against the wishes of APIA and in violation of the ISDEAA and applicable regulations. These alternative theories will be discussed in a follow up position paper that APIA will submit to the hearing office prior to the informal conference.

EXHIBIT 8 (Pg. 2 of 3)

Secretary's designated representative who will be responsible for conducting the informal conference as soon as possible so we can schedule a hearing date and time.

Conclusion

In accordance with its Compact and AFA, as well as Title IV and applicable regulations, APIA has the right to request an informal conference with the BIA to address the matters associated with this dispute. On behalf of our client APIA we hereby request that you appoint a designated official with authority to conduct the conference and that a date for the conference be scheduled in accordance with the regulations at a mutually agreeable time.

Sincerely,

HOBBS, STRAUS, DEAN & WALKER, LLP

By: Geoffrey D. Strommer

Cc: Niles Cesar, AK Regional Office Director
William Sinclair, Director OSG
Tom Shirilla, OSG Vancouver
Dimitri Philemonof, APIA President/CEO
Lynn Allingham, APIA General Counsel

EXHIBIT 8 (Pg. 3 of 3)



IN REPLY REFER TO:
Deputy Regional Director - Trust

# UNITED STATES
# DEPARTMENT OF THE INTERIOR

BUREAU OF INDIAN AFFAIRS

Alaska Regional Office – Trust
3601 C Street, Suite 1100
Anchorage, Alaska 99503-5947

December 22, 2005

Office of the Regional Solicitor
Alaska Region
DEC 22 2005
Received

Mr. Dimitri Philemonof
President/CEO
Aleutian Pribilof Island Association
201 East 3rd Avenue
Anchorage, AK 99501

RE: Informal Conference

Dear Mr. Philemonof:

As the result of a request by Mr. Geoffery Strommer, Esq., I have been appointed the designated representative to hold an informal conference regarding the funding for activities related to the implementation of Section 14(h)(1) of the Alaska Native Claims Settlement Act (ANCSA).

I spoke earlier with Mr. Strommer and he was agreeable to a date of 6 January 2006, and when I spoke with you earlier today you stated that APIA was amenable to holding the conference at the Bureau of Indian Affairs (BIA) location. Therefore, this letter will serve as notification that an informal conference regarding the funding for 14(h)(1) program(s) will be held at 3601 C Street, Room 1130, Anchorage, Alaska, at 10:00 A.M. on the 6th of January 2006.

This conference is authorized by Title 25 of the Code of Federal Regulations (CFR) §1000.420, *et. seq.*, and will be held as set forth in 25 CFR §900.153-157. I will notify other interested parties by copy of this letter.

If you have any questions or if I may be of any assistance, do not hesitate to contact me at 271-4088.

Sincerely,

Charles F. Bunch
Deputy Regional Director (Trust)

cc: Niles Cesar, Regional Director
Geoffery D. Strommer, Esq.
Tom Shirilla, OSG Vancouver
Ken Pratt, ANCSA
✓ Roger Hudson, Office of the Solicitor
Debra Mack, The Aleut Corporation

EXHIBIT 9

Aleutian/Pribilof Islands Association, Inc.
201 E. 3rd Avenue
Anchorage, Alaska 99501
Phone (907) 276-2700
Fax (907) 279-4351

January 3, 2006

# Position Paper on ANCSA § 14(h)(1) Activities and Funding

## Introduction: Summary of Position

For several years, the Bureau of Indian Affairs (BIA) has been providing funding to the Aleutian/Pribilof Islands Association (APIA) to perform activities related to section 14(h)(1) of the Alaska Native Claims Settlement Act (ANCSA). Recently, however, the BIA revoked that funding and has contracted with the Aleut Corporation (TAC) to perform the ANCSA 14(h)(1) activities. APIA believes this unilateral withdrawal of funding by the agency was an improper partial declination of APIA's contract under the Indian Self-Determination and Education Assistance Act (ISDEAA). On November 14, 2005, APIA requested an informal conference to attempt to resolve this dispute. To clarify the basis for APIA's objections to the BIA action, we offer this position paper in advance of the informal conference.

In brief, we disagree with the apparent BIA position that TAC is the sole beneficiary of 14(h)(1) activities and thus the proper entity to contract for those activities under the ISDEAA. We think that the 14(h)(1) beneficiaries include the Villages and their members, so the organization they have designated to compact for them, APIA, should have priority over TAC under the ISDEAA and the BIA's withdrawal of funding was improper. None of the statutory declination criteria have been met, and the regulations prohibit declination of any portion of a successor annual funding agreement (AFA) where, as here, it is substantially the same as the prior year's AFA.[1] APIA's 2006 AFA should be amended immediately to restore the ANCSA funding.

## Background: ANCSA § 14(h)(1) and APIA's Agreements

ANCSA Section 14(h)(1) authorizes the Secretary of the Interior to withdraw and convey to regional corporations such as TAC fee title to existing cemetery sites and historical places.[2] Regulations at 43 C.F.R. § 2653.5 describe the process by which such

[1] 25 U.S.C. § 450j-1(b)(2); 25 C.F.R. § 900.32.

[2] Alaska Native Claims Settlement Act, Pub. L. No. 92-203 § 14(h)(1), 85 Stat. 688, 704 (1971), codified as amended at 43 U.S.C. § 1613(h)(1).

EXHIBIT 10 (Pg. 1 of 9)

sites are to be investigated, evaluated, and ultimately conveyed if they meet the criteria set forth in the regulations. The regional corporation identifies a site and submits an application to the Bureau of Land Management (BLM), which forwards the application to the BIA for investigation. The BIA prepares a site report and, if it certifies the site meets the criteria, sends the report and certification back to the BLM. If the land is available, the BLM issues a decision to convey.

For a number of years, APIA has entered into a compact and AFAs with the BIA under Title IV of the ISDEAA for a broad range of programs, functions, services and activities (PFSAs). Since 1999, those PFSAs have included activities related to implementation of ANCSA section 14(h)(1). APIA carried out ANCSA activities in conjunction with a Memorandum of Agreement (MOA) with the TAC that spelled out how the parties would "jointly conduct certain cultural heritage, preservation and related activities, and in particular, activities related to completing the ANSCA [sic] 14(h)(1) process." MOA § 1.

During the years that it has operated the cultural heritage program, APIA has submitted periodic work plans and activity reports to TAC. These reports indicate that the cultural heritage preservation activities undertaken by APIA include work directly related to the ANCSA 14(h)(1) conveyance process, but have also included such other activities as repatriation of remains and artifacts from other museums and Aleut language classes. Until 2004, there was no objection by either TAC or BIA to the manner in which APIA was carrying out its responsibilities related to ANCSA 14(h)(1), and these PFSAs were included in all of APIA's AFAs from 1999 through 2005.

On May 24, 2004, prior to the FY 2005 negotiations between BIA and Alaska tribal contractors, Roger Hudson of the Regional Solicitor's Office issued a memorandum to Roger Drapeaux, Program Analyst, and Ken Pratt, ANCSA Program Manager in the Alaska Region (Solicitor's Memo). The subject was "Funding for implementation of ANCSA § 14(h)(1) included within Tribal Self-Governance annual funding agreement." The Solicitor's Memo asserts that the 14(h)(1) conveyance process has been delayed because tribes and tribal organizations that have assumed these activities under ISDEAA agreements have used funds for "non-ANCSA activities." The memo asserts that contracting for 14(h)(1) activities can not be supported by tribal or village resolutions, only by resolution of the appropriate regional corporation, because the regional corporation is the entity benefiting from the activities. Thus the regional corporations not only have the right to decide who will perform the work, but could do it themselves by contracting directly with the BIA.

A year later, TAC did just that, with the BIA's approval. On May 20, 2005, TAC passed a resolution removing APIA as the entity to receive ANCSA 14(h)(1) funding on its behalf and resolving to contract directly with BIA for those funds and activities starting in FY 2006. In a series of letters to TAC, APIA explained that (1) all BIA ANCSA funds had been spent in accordance with BIA guidelines for the use of such

EXHIBIT 10 (Pg. 2 of 9)

funds; (2) APIA had completed all the conveyance-related work it could do until BLM surveyed the sites and BIA conducted re-examinations of several sites as well as 25 reports that BIA insisted it and not APIA must do; (3) APIA is best positioned to carry out any non-federal work that may be remaining in the 14(h)(1) process; and (4) APIA would be glad to meet with TAC, BIA and BLM to coordinate and expedite the process.

These attempts at reconciliation did not succeed. When APIA submitted its FY 2006 Annual Funding Agreement – Reprogramming Request (2006 AFA), it requested the ANCSA funds continue to be made available, but the BIA returned the request with those funds deleted. The BIA would not release any funds until APIA agreed, under protest, to the withdrawal of ANCSA funding. Footnote 15 in the 2006 AFA explains that the ANCSA funds are "to be transferred to the Aleut Corporation per resolution by the Aleut Corporation for FY 06. This is without prejudice to APIAI to appeal the BIA decision regarding these funds."

**Analysis: BIA Improperly Declined APIA's ANCSA Proposal**

We see three principle legal issues that need to be addressed.

- First, what parties are the legal beneficiaries of Section 14(h)(1), and thus have the right under the ISDEAA to contract or compact the activities and associated funding that section authorizes—and if both APIA and TAC are beneficiaries, which entity has priority?
- Second, did APIA properly carry out its Compact and AFA by using the ANCSA funds appropriately?
- Third, if APIA has the right to contract the ANCSA activities and associated funding, and properly carried out its ISDEAA agreement, what legal standard applies to the BIA's action in revoking that agreement?

We address each of these questions below.

*What Parties Are the Beneficiaries of ANCSA Section 14(h)(1)?*

Under the ISDEAA, the tribal entities benefiting from the program or activity are the entities entitled to contract/compact for it. Almost invariably, those entities are tribal governments, on behalf of their members, or tribal organizations under the delegated authority of tribal governments. As Congress stated in the Tribal Self-Governance Act of 1994, "transferring control to tribal governments, upon tribal request, over funding and decision-making for Federal programs, services, functions and activities (or portions thereof), is an effective way to implement the Federal policy of government-to-government relations with Indian tribes."[3] ANCSA regional corporations are also "tribes" for purposes of eligibility to contract/compact under the ISDEAA under very

[3] Pub. L. No. 103-413 § 202, 25 U.S.C. § 458aa note (emphasis added).

EXHIBIT 10 (Pg. 3 of 9)

limited circumstances.[4] If a regional corporation is the sole tribal beneficiary of a Section 14(h)(1) program, then TAC has the sole authority to assume the program and it may unilaterally withdraw its authorization from APIA and contract directly with BIA.[5] If, however, the Villages are (also) the beneficiaries of Section 14(h)(1), then APIA, which is authorized to contract on behalf of its member Village governments, is the proper party to compact the 14(h)(1) program and the BIA's action in redirecting the funds to TAC was improper.

The Solicitor assumed, without analysis, that regional corporations are the sole beneficiaries of Section 14(h)(1). "Legally, the tribal entity benefitting [sic] from a program, function, service or activity, or portion thereof, is the entity which must provide the authorizing request to contract. In the case of ANCSA conveyance-related work, that entity would be the Regional Corporation." Solicitor's Memo at 3. A look at the legislative history of ANCSA shows that this premise is mistaken: Congress clearly intended the primary beneficiaries of Section 14(h)(1) to be Native peoples and villages, not the corporations. The Department's regulations accord with this interpretation.

Section 14(h)(1), as amended, provides in relevant part: "The Secretary may withdraw and convey to the appropriate Regional Corporation fee title to existing cemetery sites and historical places." 43 U.S.C. § 1613(h)(1)(A). The legislative history strongly suggests that Congress intended Section 14(h)(1) to benefit primarily Alaska Natives and Villages, with the regional corporations acting as the trustees or "custodians" of the sites conveyed to them. In discussing the ANCSA bill just prior to the vote on it, Senator Stevens, a principle sponsor and author of ANCSA, singled out Section 14(h) as in need of clarification beyond that given in the conference report:

> I do believe, however, that there are some areas that need further explanation—for instance, section 14(h) regarding the conveyance of fee title to regional corporations for cemetery sites and historical places. I would hope that the manager of the bill would agree with me that the intent of the conferees was not to take the places away from the village, to take away their cemeteries or their historical sites, but merely to place title in the regional corporation as the custodian of places properly identified as such sites.... It is the intent of the conferees under this act that these areas will be preserved and that they are conveyed to the village [sic] corporations for that purpose and not for the purpose of commercial exploitation but to provide for the preservation of the cemeteries and historical sites.

---

[4] *See* 25 U.S.C. § 450b(e) (JSDEAA provision defining "Indian tribe" to include "any Alaska Native village or regional or village corporation as defined in or established pursuant to the Alaska Native Claims Settlement Act").

[5] Either party to the MOA "may terminate this MOA at any time for any reason." MOA § 9.

EXHIBIT 10 (Pg. 4 of 9)

117 CONG. REC. 46964 (Dec. 14, 1971). Senator Stevens then yielded the floor to Senator Bible, who confirmed that the entire ANCSA bill conference committee shared Senator Stevens' interpretation of Section 14(h). The meaning of that section "was very thoroughly discussed by [Senator Stevens] and by the members of the conference. The interpretation he places on the status of the cemeteries and historic sites is exactly correct. There is no intent whatever in the bill to take the last resting places or these historic sites away from the Native people or their village corporations." *Id.* Four days after this exchange, ANCSA became law. A clear consensus existed among the key legislators most intimately involved with making ANCSA that the purpose of Section 14(h)(1) was to convey title to the regional corporations <u>to preserve for the benefit of Alaska Native Villages and peoples.</u>[6]

The Department of the Interior (DOI) has recognized that Native Villages and their members benefit from Section 14(h)(1), as Senator Stevens insisted. The Department's 14(h)(1) regulations and guidelines limit the economic benefits to the regional corporation to ensure that the cultural benefits reach the broader constituency of beneficiaries. The regional corporation must maintain and preserve the site but takes title subject to a covenant running with the land prohibiting the corporation from authorizing mining or mineral activities of any kind, or any other use incompatible with the values of the area as a historical site. 43 C.F.R. § 2653.5(a); *id.* § 2653.11(b). Thus the BIA regulations, consistent with Senator Stevens' statement, reinforce that the primary purpose of the conveyance is not economic development, but preservation and maintenance of the land and cultural sites for the benefit of tribes and their members.

Even if the regional corporation is *a* beneficiary of Section 14(a)(1), then, it is not the *only* beneficiary. When both Native Villages and ANCSA corporations are eligible to contract/compact for activities under the ISDEAA, the BIA has always given priority to Village governments. In its original list of federally recognized tribes, the Department of the Interior noted that "a number of non-tribal Native entities in Alaska ... including ANCSA village and regional corporations," were eligible for federal contracts by statute, with one important limitation: "Under longstanding BIA policy, priority for contracts and services in Alaska is given to reorganized and traditional governments over non-tribal corporations."[7] This policy makes sense because the whole thrust of the ISDEAA, as shown in the sections quoted above, is premised on the government-to-government

---

[6] In 2004, Section 14(h)(1) was amended by the Alaska Land Transfer Acceleration Act, adding several subparagraphs and making changes meant to expedite the conveyance process. Pub. L. No. 108-452, 118 Stat. 3575 (Dec. 10, 2004). But nothing in the Act suggests that the original intent of Section 14(h), as explained by Senators Stevens and Bible, has changed.

[7] Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 58 Fed. Reg. 54364, 54366 n.2 (Oct. 21, 1993). The Indian Health Service (IHS) has the same policy. The IHS has prioritized entities eligible to authorize ISDEAA contracting in the following order of preference: (1) the Indian Reorganization Act (IRA) Council, if it provides governmental functions; (2) the traditional village council; (3) the village profit corporation; and, lastly, (4) the regional profit corporation. Alaska Tribal Health Compact, Preamble; Alaska Area Guidelines for Tribal Clearances for Indian Self-Determination Contracts, 46 Fed. Reg. 27178 (May 18, 1981).

EXHIBIT 10 (Pg. 5 of 9)

relationship between federal and tribal governments. Under this policy, APIA, the authorized representative of thirteen Aleut tribal governments, has priority over TAC even if TAC is, along with the villages in the region, a beneficiary of Section 14(h)(1).

In sum, we believe that the premise of the Solicitor's Memo—i.e. that regional corporations are the sole beneficiaries of Section 14(h)(1), so only they can authorize contracting those activities—is flat wrong. APIA was and is the proper entity with which to compact under the ISDEAA to perform the services authorized by Section 14(h)(1), with or without an authorizing resolution from TAC. The next question then becomes whether APIA properly carried out the compact by using the funds only for authorized activities.

*Use of ANCSA § 14(h)(1) Funds*

In its annual budget, the BIA requests ANCSA Section 14(h)(1) funds as a separate line under the Trust Services programs within the Tribal Priority Allocations (TPA) budget.[8] Congress appropriates TPA as part of the lump-sum appropriation for "Operation of Indian Programs," and has not imposed any restrictions in the appropriations bills on the amount of funds to be used, what entities may receive them, or how they may be used. APIA's Multi-Year Funding Agreement for FYs 2004-2008 (MYFA), however, does restrict use: "[ANCSA] Program funds provided by this agreement are restricted in use to the performance of ANCSA-related work." *See* 4(g). In addition, ANCSA funds are designated "restricted and earmarked" for those purposes. *Id.* § 4(c). Thus it is important that all APIA activities supported by the ANCSA funding be "ANCSA-related," so the issue comes back to the purpose of Section 14(h)(1) and the scope of activities allowed to carry out that purpose.

The regulations implementing Section 14(h)(1) open up a broad range of cultural heritage issues. The essential inquiry is into "the quality of significance in Native history or culture" embodied in the site. Sites associated with significant events or persons, sites that possess "enduring symbolic value in the traditions and cultural beliefs and practices," sites that "embody the distinctive characteristics" of valued traditions of craftsmanship or art, and sites that "yield information important in prehistory or history" may all be eligible for conveyance to Native Corporations. 25 C.F.R. § 2653.5(d). The regulatory eligibility criteria and BIA guidelines discussed above suggest what is implicit in Section 14(h)(1) itself, and explicit in Senator Stevens' explanation of it: the purpose of the conveyance is to preserve Alaska Native cultural heritage for the benefit of Native peoples, not merely to parcel out more land to the regional corporations.

Assessment of a site's eligibility under Section 14(h)(1), then, requires extensive knowledge of Aleut culture and history, precisely the kind of knowledge APIA's Cultural

[8] In his memorandum, Mr. Hudson states: "I think the ANCSA funds are more properly viewed as a category of non-recurring funds, which should not be included in a tribal TPA to begin with." Solicitor's Memo at 2. This personal opinion notwithstanding, the agency at present treats ANCSA funds as recurring TPA.

EXHIBIT 10 (Pg. 6 of 9)

Heritage Program is dedicated to. Many of the Program's activities that may appear at first blush to have little to do with land conveyance in fact directly support the 14(h)(1) process. For example, transcription of oral history tapes contributes generally to knowledge of the Aleut language, culture and traditions, but also may be used to identify particular places embodying this cultural heritage and to support the regional corporation's applications.

The BIA's guidelines on use of ANCSA funds confirm the agency's understanding that the purposes of ANCSA Section 14(h)(1) go far beyond conveyance of land to include the preservation and development of cultural heritage programs generally. In a February 2000 meeting with APIA, BIA ANCSA personnel distributed a document entitled "Some Potential Uses of ANCSA Program Funds by Compact Tribes." In addition to site investigations and reports, allowable uses cited by BIA included translating, transcribing and/or indexing ANCSA 14(h)(1) oral history tapes. The BIA noted that these tapes and other 14(h)(1) materials not only are useful in documenting the Native use of selected sites, but contain "information about virtually any subject one can think of regarding Alaska Native history and culture." The BIA suggested that the 14(h)(1) collection "could be profitably used to: develop educational curricula based on local Native history and traditions; support Native language retention programs; establish local/regional cultural resource management plans; produce Native place names maps or publications; and prepare claims based on the Native American Graves Protection and Repatriation Act (NAGPRA)." These guidelines interpret the ANCSA provision to benefit Native communities and peoples generally, and thus to authorize a wide range of cultural heritage activities of little if any value to a for-profit corporation whose primary purpose is to make money.

A review of the APIA Cultural Heritage Program's Activity Reports and Work Plans makes clear that all of its activities fit within the broad guidelines for use of ANCSA funds. APIA's non-conveyance activities centered on the development of Aleut language programs and curricula, NAGPRA repatriation, and cultural resource data bases and management plans, all allowable uses under BIA guidelines. It would be difficult for the BIA to argue, given its own ANCSA spending guidelines, that APIA has misused the funds in violation of its ISDEAA agreements. So far the BIA has not done so, relying instead on the argument, discussed above, that TAC is the sole beneficiary of the ANCSA funds.

*BIA's Unilateral Withdrawal of ANCSA 14(h)(1) Funding*

If APIA properly carried out its Compact and the FA by using ANCSA funds for legitimate purposes, and if Section 14(h)(1) benefits the Villages that have authorized APIA to compact for them under the ISDEAA, then the BIA could not legally unilaterally withdraw the ANCSA funding from the FY 2006 AFA – Reprogramming

EXHIBIT 10 (Pg. 7 of 9)

Request.[9] In our view, the BIA's action was a partial declination of the 2006 AFA, and the BIA can only decline proposals under specific and limited circumstances. Under Section 102(a)(2) of the ISDEAA, the Secretary must approve proposals unless, within 90 days of receipt, the Secretary provides written notification containing "a specific finding that clearly demonstrates that, or that is supported by a controlling legal authority that--

> (A) the service to be rendered to the Indian beneficiaries of the particular program or function to be contracted will not be satisfactory;
> (B) adequate protection of trust resources is not assured;
> (C) the proposed project or function to be contracted for cannot be properly completed or maintained by the proposed contract;
> (D) the amount of funds proposed under the contract is in excess of the applicable funding level for the contract, as determined under section 106(a); or
> (E) the program, function, service, or activity (or portion thereof) that is the subject of the proposal is beyond the scope of programs, functions, services, or activities covered under paragraph (1) because the proposal includes activities that cannot lawfully be carried out by the contractor.

25 U.S.C. § 450f(a)(2).[10] Although APIA did not receive written notification clearly demonstrating any of these five conditions applies, it appears the BIA declined under subparagraph E. Note 15 in the 2006 AFA states that the ANCSA funds are "to be transferred to The Aleut Corporation per resolution by The Aleut Corporation for FY 2006."

For the reasons set forth in the analysis above, however, we believe that APIA can lawfully carry out ANCSA activities without an authorizing resolution from TAC, because APIA is authorized to do so by resolution of the Tribes, who are also beneficiaries of Section 14(h)(1). Therefore, the BIA could not legally decline this portion of the 2006 AFA on the basis of subparagraph E.

The restrictions on agency declination are even more stringent when the agency has historically approved the contract, or portion thereof, at issue. If a tribal organization's proposed successor AFA is "substantially the same as the prior annual

---

[9] As noted above, APIA agreed to the removal of ANCSA funding when the BIA withheld *all* funds, but only under protest. APIA expressly reserved its right to appeal the BIA's decision regarding these funds. 2006 AFA – Reprogramming Request at n.15.

[10] The Section 102 declination criteria apply to APIA's Title IV agreements because the Title IV regulations incorporate by reference the appeals procedures of Title I, which in turn incorporate the substantive declination criteria of Section 102. 25 C.F.R. § 1000.432(a) (for Title I-eligible programs such as ANCSA 14(h)(1), "appeal may only be filed with IBIA under the provisions set forth in 25 C.F.R. 900.150(a) through (h), 900.152 through 900.169"); *id.* § 900.150(a) (specifying that Title I appeal regulations apply to decisions to decline an agreement, or a portion thereof, "under section 102 of the [ISDEAA]"). The term "Title I-eligible programs" is defined in section 1000.420 as PFSAs that the Secretary provides to Indians because of their status as Indians. The activities at issue here clearly fall within this definition.

EXHIBIT 10 (Pg. 8 of 9)

funding agreement (except for funding increases included in appropriations acts or funding reductions as provided in section 106(b) of the [ISDEAA]) and the contract is with DHHS or the BIA, the Secretary shall approve and add to the contract the full amount of funds to which the contractor is entitled, and may not decline, any portion of a successor annual funding agreement." 25 C.F.R. § 900.32 (emphasis added). APIA's ANCSA proposal was substantially the same as the prior year's—indeed, exactly the same, except for the amounts, since it was part of a multi-year AFA that did not change—so this blanket prohibition on such declinations applies. An agency is not permitted to violate its own regulations,[11] which the BIA did when it unilaterally revoked the ANCSA funding.[12]

Finally, it bears mentioning that the Secretary bears the burden of proof to clearly establish the validity of the grounds for declining the contract proposal. 25 U.S.C. § 450f(e)(1); 25 C.F.R. § 900.163. It is conceivable that the appeal could be treated not as a declination but as a reassumption, but in that case the standard that must be met by the BIA is even higher: it bears the burden of proving it correctly found imminent jeopardy to a physical trust asset, a natural resource or public health and safety. 25 C.F.R. § 1000.31. It is difficult to see how the BIA could meet that burden in this appeal.

**Conclusion**

The Aleutian people and their tribal governments are beneficiaries of ANCSA § 14(h)(1) and thus may contract with the BIA to assume those services and the associated funding under the ISDEAA. APIA was delegated authority, by resolution of 13 tribal governments, to contract on their behalf under the ISDEAA. APIA'a activities fell within the BIA's ANCSA spending guidelines, so the agency has no cause to revoke the funds. In fact, because APIA's ANCSA proposal was substantially the same as the prior year's, the BIA's own rules prohibit the agency from declining the proposal. APIA's FY 2006 AFA should be amended immediately to restore its ANCSA funding.

---

[11] *See, e.g.*, *Morton v. Ruiz*, 415 U.S. 199, 235 (1974) (BIA must "comply ... with its own internal procedures"); *Orengo Caraballo v. Reich*, 11 F.3d 186, 193 (D.C. Cir. 1993) ("the agency may not violate its own regulations"); *Neal v. Sec'y of the Navy*, 639 F.2d 1029, 1035 (3d Cir. 1981) ("an agency is bound to follow those [regulations] which it has adopted").

[12] We also note that BIA's unilateral withdrawal of ANCSA funding may also have violated Section 106(b) of the ISDEAA, made applicable by Article II Section 15 of the Compact. Section 106(b)(2) prohibits the Secretary from reducing funding for a particular program from one year to the next unless one of five narrow exceptions applies.

EXHIBIT 10 (Pg. 9 of 9)



IN REPLY REFER TO:
Deputy Regional Director - Trust

# UNITED STATES DEPARTMENT OF THE INTERIOR

BUREAU OF INDIAN AFFAIRS

Alaska Regional Office - Trust
3601 C Street, Suite 1100
Anchorage, Alaska 99503-5947

Office of the Regional Solicitor
Alaska Region
FEB 16 2006
Received

February 15, 2006

Mr. Demitri Philemonof
President
Aleutian/Pribilof Islands Association
201 East 3rd Avenue
Anchorage, Alaska 99501

Re: Informal Conference

Dear Mr. Philemonof:

This letter shall serve as my decision resulting from the Informal Conference that was held at the Bureau of Indian Affairs (BIA) Conference Room on January 6, 2006. The informal conference was requested by the Aleutian/Pribilof Islands Association (APIA) and I was designated to conduct the conference as the Secretary's representative under 25 CFR §§900.153, *et. seq.*, and 1000.422(c) Those in attendance at the conference included members representing the Aleut Regional Corporation (TAC), the Aleutian/Pribilof Islands Association, Hobbs, Straus, Dean & Walker, LLP, the Office of Self-Governance (OSG), the Regional Solicitor's Office, members of the BIA ANCSA Office, and myself as the designated representative of the Secretary. A copy of the attendance roster is attached as Enclosure 1. The purpose of the conference was to address APIA's concerns regarding funding for the ANCSA 14(h) program.

<u>BACKGROUND:</u> In accordance with the procedures found in 25 CFR §900.154, the initial conference was delayed to allow the representative from Hobbs, Straus, Dean & Walker to attend. The original decision was due on 16 January 2006. A request for a 10-day extension was granted to APIA to allow time to seek an agreement with TAC on issues pertaining to this matter. A second 10-day extension was requested by APIA but due to conflicts with the schedule of the designated representative, a 20-day final extension was granted. While it would be my preference that the involved parties reach an agreement on this matter, I have not been informed that an accord has been reached so a decision follows below.

At approximately 1:18 P.M. on January 6th, 2006, I called the informal conference to order. After a brief introduction and presentation of administrative matters, Mr. Geoffrey D. Strommer, Esq., from Hobbs, Straus, Dean & Walker, representing APIA as counsel, led off the conference with a discussion of APIA's position on the Bureau's decision to withhold funds from APIA's FY-2006 Annual Funding Agreement (AFA). The arguments forwarded by Mr. Strommer are contained in APIA's January 3, 2006 position paper, which is attached as Enclosure 2.

EXHIBIT 11 (1 of 5)
RH

Following, Mr. Strommer's presentation, I allowed members of APIA staff, the Regional Solicitor's office, the OSG, and the ANCSA staff to comment and provide any information they felt may be useful or pertinent to making an informed decision on this matter.

SUMMARY: In 1996, APIA entered into a Self-Governance Compact with BIA to perform those functions required by Section 14(h) of the Alaska Native Claims Settlement Act (ANCSA) (Pub. L. 92-203). This action is authorized by the Indian Self-Determination and Education Assistance Act (ISDEEA), Pub. L. 93-638, as amended. In 1998, APIA completed a Memorandum of Agreement (MOA) with TAC relating to activities to be performed under this compact and funding for the operation of ANCSA programs continued in APIA's AFA's until the negotiations for FY-2006. On May 20, 2005, TAC passed a resolution removing APAI as the entity to receive ANCSA funds and the Bureau withheld funds from APIA's FY-2006 AFA. This withholding led APAI to request the informal hearing that was held on January 6, 2006.

ANALYSIS: In their January 3rd position paper, APIA puts forth three legal issues they feel are relevant to the disposition of this matter. These issues are:

- What parties are the legal beneficiaries of Section 14(h)(1), and thus have the right under ISDEAA to contract or compact the activities and associated funding authorized by that legislation and if both APIA and TAC are beneficiaries, which entity has priority to contract/compact?
- Did APIA properly carry out its Compact and AFA by appropriate use of ANCSA funds?
- What legal standard applies to the BIA's action(s) in revoking APIA's ISDEEA agreement?

Neither "legal beneficiaries" nor "beneficiary" are included in the definitions found in 25 CFR § 900.6 or §1000.2. The Random House Dictionary of the English Language (Unabridged) defines beneficiary as "1. *one who receives, benefits, profits, or advantages.* 2. *a person designated as the recipient of funds or other property under a trust, insurance policy, etc.*" While not a "person", the entity designated by regulation to receive title to existing cemetery sites and historical places is "the regional corporations for regions in which the lands are located" (43 CFR § 2653.0-3). Further, the regulations implementing 43 U.S.C. §1613(h)(1), 43 CFR §2653.5, *et.seq.* make numerous reference to "appropriate regional corporation" or "regional corporation" without mention of tribes or villages. It would appear there are no provisions for either tribes or village corporations to file applications for historical places or cemetery sites or to file an amendment to a 14(h) (1) application, or to appeal a Bureau of Land Management (BLM) decision regarding the application. Regional corporation applications for sites that are determined to be located on village corporation lands are summarily rejected by the BLM as village corporation lands are not available for selection by, or conveyance to, regional corporations. Further, there does not appear to be any statutory or regulatory authority or requirement for regional corporations to consult with or obtain the concurrence of villages and their members prior to making decisions regarding 14(h)(1) applications or sites. Thus, if the Aleut Corporation chose to relinquish all of its 14(h)(1) applications it could probably do so without legal recourse under ANCSA from villages or their members. While I do not doubt that some cultural benefit may accrue to members of the tribes or villages located within the Aleut Region/APIA

EXHIBIT 11 (Pg. 2 of 5)

service area, it is the Aleut Corporation that is clearly defined by statute and regulation to be the recipient/beneficiary of property transferred under the provisions of 14(h)(1).

As the Bureau was not a party to the MOA between TAC and APIA, I have no idea of the level of performance required under that agreement nor how well APIA met these requirements or standards. The very fact that APIA entered into an agreement with TAC seems to undercut their argument that the villages/tribes are the beneficiaries. The ANCSA program does not involve trust lands or a trust asset so the monitoring of their performance under the compact would be a function of the Office of Self Governance (OSG). It is my understanding that performance, or a perceived lack of it, may have played a role in TAC's decision to rescind their resolution. This brings us to the crux of the problem.

Both 25 CFR §900.6 and §1000.2 define Indian Tribe as "*any Indian tribe, band, nation, or other organized group, community, including pueblos, rancherias, colonies and any Alaska Native Village, or* ***regional or village corporation*** *as defined in or established pursuant to the Alaska Native Claims Settlement Act...*" (emphasis added). A tribal organization, such as APIA, gets its authority to enter into an ISDEEA contract or compact through a tribal resolution authorizing the tribal organization to act on their behalf. The provisions of 25 CFR §900.8(d) requires a copy of the tribal resolution from the Indian tribe(s) to be served and §1000.17(b) requires that a Consortium obtain an authorizing tribal resolution from each tribe that specifies the scope of the Consortium's authority to act on behalf of the tribe. Here, TAC, acting as a tribe, has simply given a resolution revoking APIA's authority to act on their behalf regarding the ANCSA program. While counsel has equated the Bureau's retention of the funds associated with ANCSA as a declination it is actually only the transfer of the funds to the entity that is performing the function. This is very similar to the process we use when any tribe leaves a consortium. Here, the situation is made more complex by the fact that one of the entities is a regional corporation rather than a traditional or IRA tribal entity and APIA is correct insofar as the Alaska Region order of precedence policy for '638 contracting is tribal, non-profit corporation, and then profit corporation. However, in this situation the tribal entity and profit corporation are in fact the same. TAC has withdrawn its resolution that allows APIA to perform a function on its behalf and seeks to perform this function itself. This is not a case where the profit corporation is in competition with the non-profit for a third party interest that requires the Bureau to apply its hierarchy rules. It is exactly the same situation that would apply if any of APIA's other 13 tribes revoked their resolution for APIA to act on their behalf. In that situation, APIA would be hard pressed to argue the tribe does not have the authority to revoke or modify it's resolution and perform a contract/compact on it's own or authorize a third party to perform these functions. They would be equally hard pressed to argue they should receive the funds even after the tribe has taken responsibility for delivering goods or services under the contract/compact.

RECOMMENDED DECISION: Based on the fact that under the definition contained in ISDEEA, the Aleut Corporation fits the definition of Indian tribe, and as such, has the authority to allow either the Bureau or a third party to deliver services or to perform the delivery of services on its own behalf. In the instant case TAC has opted to perform the ANCSA functions on their own behalf and it is my recommendation they be allowed to perform this function. It is also my recommendation that the funds to perform the ANCSA functions be made available to TAC.

EXHIBIT 11 (Pg. 3 of 5)

Within 30 days of the receipt of this recommended decision, you may file an appeal of the initial decision of the DOI or DHHS agency with the Interior Board of Indian Appeals (IBIA) under 25 CFR 900.157. You may request a hearing on the record. An appeal to the IBIA under 25 CFR 900.157 shall be filed by certified mail or hand delivery at the following address: Board of Indian Appeals, U.S. Department of the Interior, 801 North Quincy Street, Arlington, VA 22203. You shall serve copies of your Notice of Appeal on the Secretary and on the official whose decision is being appealed. You shall certify to the IBIA that you have served these copies.

Even though I have included the appeal rights of the parties, I will reiterate my stance that it is far better for all concerned that some sort of agreement be reached at the local level and would encourage the parties to strive toward that end.

Sincerely,

Charles F. Bunch
Deputy Regional Director – Trust

cc: Niles Cesar, ARO
Tom Shirilla, OSG
Ken Pratt, ANCSA
Roger Hudson, Office of the Solicitor
Debra Mack, TAC
Lynn Allingham, APIA

EXHIBIT 11 (Pg. 4 of 5)

**Sign In Sheet**
**Informal Conference**
**January 6, 2006**

| Name (Print) | Address | Phone Number |
|---|---|---|
| Melvin Smith | The Aleut Corp. | 561-4300 |
| Elary Gromoff Jr. | The Aleut Corp. | 278-2311 |
| Geoff Strommen | 806 SW Broadway St Suite 900 Portland, OR 97205 | 503 242 1745 |
| Lynn Allingham | APIA | 222-4245 |
| Dan Duame | AHA | 563-2157 |
| Millie McKeown | APIA | 276-2700 |
| Allison McLain | APIA | 276-2700 |
| Roger C Drapeau | P.O. Box 25520 Juneau AK 99802 | 586-7571 |
| Tom Shirilla | OSG-NWFO, 500 W 12th St Suite 122 Vancouver, Wa. | 360-699-1011 |
| Ken Pratt | BIA ANCSA | 271-3695 |
| Roger Hudson | 4230 University Dr #300 Anchorage AK 99508 | 271 4131 |
| Rita Miraglia | BIA ANCSA Office | 271-4137 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

EXHIBIT 11 (Pg. 5 of 5)

ENCLOSURE 1

HOBBS, STRAUS, DEAN & WALKER, LLP
ATTORNEYS AT LAW
806 S.W. BROADWAY • SUITE 900 • PORTLAND, OR 97205
TEL: 503.242.1745 • FAX: 503.242.1072
WWW.HSDWLAW.COM

March 16, 2006

*Via Certified Mail Return Receipt Requested*

Interior Board of Indian Appeals
U.S. Department of the Interior
801 North Quincy Street
Arlington, VA 22203

***Re:*** ***Notice of Appeal of BIA Partial Declination of FY 2006 Annual Funding Agreement – ANCSA 14(h)(1) Program***

Dear Sir or Madam:

For many years, the Aleutian Pribiloff Islands Association (APIA) has entered into agreements with the Bureau of Indian Affairs (BIA) to carry out a variety of programs, functions, services and activities (PFSAs) under the Indian Self-Determination and Education Assistance Act (ISDEAA), including PFSAs authorized by section 14(h)(1) of the Alaska Native Claims Settlement Act (ANCSA). On October 14, 2005, the BIA declined APIA's proposal to renew its annual funding agreement (AFA) under Title IV of the ISDEAA with respect to the ANCSA 14(h)(1) PFSAs and associated funding. This letter serves as APIA's notice of appeal, pursuant to 25 C.F.R. § 900.158, of that BIA decision and of a subsequent recommended decision by Charles F. Bunch, Deputy Regional Director – Trust, upholding the initial decision. APIA specifically requests a hearing on the record as provided for in 25 C.F.R. § 900.158(c)(3).

**Background: The BIA Decision**

APIA is a nonprofit corporation authorized by the governments of thirteen Alaska Native Villages to enter agreements on their behalf with the federal government under the ISDEAA. Since 1999, APIA has implemented ANCSA 14(h)(1) activities pursuant to a self-governance compact and AFAs with the BIA, and in conjunction with a Memorandum of Agreement with the Aleut Corporation (TAC). Section 14(h)(1) authorizes the Secretary of the Interior to withdraw and convey to regional corporations such as TAC fee title to existing cemetery sites and historical places.[1] Regulations at 43 C.F.R. § 2653.5 describe the process by which such sites are to be investigated, evaluated, and ultimately conveyed if they meet the criteria set forth in the regulations. As part of its obligations under the compact and AFAs, APIA has conducted site investigation and evaluation, along with related cultural heritage

---

[1] Alaska Native Claims Settlement Act, Pub. L. No. 92-203 § 14(h)(1), 85 Stat. 688, 704 (1971), codified as amended at 43 U.S.C. § 1613(h)(1).

2120 L STREET, N.W. • SUITE 700 • WASHINGTON, DC 20037 • TEL 202.822.8282 • FAX 202.296.8834
117 PARK AVENUE • SECOND FLOOR • OKLAHOMA CITY, OK 73102 • TEL 405.602.9425 • FAX 405.602.9426
400 CAPITOL MALL • 11TH FLOOR • SACRAMENTO, CA 95814 • TEL 916.442.9444 • FAX 916.442.8344
EXHIBIT 12 (Pg. 1 of 10)

activities in accordance with the Department's regulations and BIA guidelines on the use of ANCSA program funds.

In September 2005, APIA proposed a FY 2006 AFA that included, as in the previous seven years, funding for ANCSA 14(h)(1) activities. On October 14, 2005, however, the BIA returned the request with those funds deleted. The BIA would not release any funds until APIA agreed, under protest, to the withdrawal of ANCSA funding. Footnote 15 in the 2006 AFA explains that the ANCSA funds are "to be transferred to the Aleut Corporation per resolution by the Aleut Corporation for FY 06. This is without prejudice to APIAI to appeal the BIA decision regarding these funds."

APIA requested an informal conference, pursuant to 25 C.F.R. § 900.154, in an attempt to resolve this issue. Following the conference, the presiding official, Charles F. Bunch, issued a recommended decision upholding the initial decision to transfer the 14(h)(1) funding from APIA to TAC. *See* enclosed Letter to Dmitri Philemonof Re: Informal Conference (Feb. 15, 2006). The premise of Mr. Bunch's analysis is that regional corporations, such as TAC, are the sole beneficiaries of ANCSA section 14(h)(1), so only regional corporations may contract with the BIA to carry out 14(h)(1) activities, or authorize another entity to do so on their behalf. Mr. Bunch pointed to a TAC resolution revoking APIA's authority to act on TAC's behalf with respect to section 14(h)(1), and concluded that the funds should be transferred to TAC.

**Grounds for Appeal**

The decision to unilaterally withdraw APIA's ANCSA funding for this program was based on errors of law concerning the proper interpretation of ANCSA and the ISDEAA. In particular, Mr. Bunch erred in (1) asserting that regional corporations are the sole beneficiaries of ANCSA section 14(h)(1), while ignoring clear evidence indicating that Village governments and members are the primary beneficiaries; (2) failing to apply the BIA's longstanding rule giving precedence for ISDEAA contracting/compacting to tribal entities and nonprofit corporations over regional for-profit corporations; and (3) failing to apply to the BIA decision the statutory and regulatory declination criteria, under which the decision cannot stand.

**1. Beneficiaries of ANCSA § 14(h)(1)**

The foundation of the BIA decision, as articulated by Mr. Bunch, is that regional corporations are the sole beneficiaries of ANCSA section 14(h)(1), so only TAC could authorize APIA to carry out 14(h)(1) activities. But if APIA's member Villages, and their enrolled tribal members, are also beneficiaries, those tribal governments could also authorize APIA to contract for 14(h)(1) activities, as indeed they have done.

Section 14(h)(1), as amended, provides in relevant part: "The Secretary may withdraw and convey to the appropriate Regional Corporation fee title to existing cemetery sites and historical places." 43 U.S.C. § 1613(h)(1)(A). But what is the purpose of these conveyances? Compelling evidence exists that Congress intended the regional corporations to hold title to 14(h)(1) sites as trustees or "custodians," in Senator Stevens' words, for the benefit of Alaska

 EXHIBIT 12 (Pg. 2 of 10)

Natives and Villages. "It is the intent of the conferees under this act," Senator Stevens continued, "that these areas will be preserved and that they are conveyed to the village [sic] corporations for that purpose and not for the purpose of commercial exploitation but to provide for the preservation of the cemeteries and historical sites." 117 CONG. REC. 46964 (Dec. 14, 1971).

Consistent with Congress's intent, the Department's regulations provide that the regional corporations take title to 14(h)(1) lands subject to various covenants running with the land and prohibiting mining and other commercial activities of the kind typically engaged in by for-profit corporations. *E.g.*, 43 C.F.R. § 2653.11(b), (c). In addition, the regional corporation must agree to accept a separate covenant imposing an affirmative duty to preserve and maintain the sites. *Id.* § 2653.5(a). Obviously the beneficiaries of these covenants are the Alaska Villages and peoples for whom the regional corporations act as "custodians."

Mr. Bunch completely ignored this legislative history and these regulations in concluding that TAC is the sole entity benefiting from the 14(h)(1) program. At a minimum, these authorities show that the tribal governments on whose behalf APIA acts are also beneficiaries, if not the primary ones. Thus APIA's member Villages can authorize APIA to assume PFSAs, including 14(h)(1) activities, on their behalf under the ISDEAA, and have done so by tribal resolution.

### 2. Priority of Tribally Authorized, Nonprofit Corporations over For-Profit Regional Corporations in ISDEAA Contracting

Because ANCSA regional corporations are designated "tribes" for purposes of the ISDEAA,[2] it sometimes arises that more than one entity in Alaska may be eligible to contract or compact for particular PFSAs. To deal with this situation, the BIA years ago established a hierarchy of contracting preference. In its original list of federally recognized tribes, the Department of the Interior noted that "a number of non-tribal Native entities in Alaska ... including ANCSA village and regional corporations," were eligible for federal contracts by statute, with one important limitation: "Under longstanding BIA policy, priority for contracts and services in Alaska is given to reorganized and traditional governments over non-tribal corporations."[3]

---

[2] *See* 25 U.S.C. § 450b(e) (ISDEAA provision defining "Indian tribe" to include "any Alaska Native village or regional or village corporation as defined in or established pursuant to the Alaska Native Claims Settlement Act").

[3] Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 58 Fed. Reg. 54364, 54366 n.2 (Oct. 21, 1993). The Indian Health Service (IHS) has the same policy. The IHS has prioritized entities eligible to authorize ISDEAA contracting in the following order of preference: (1) the Indian Reorganization Act (IRA) Council, if it provides governmental functions; (2) the traditional village council; (3) the village profit corporation; and, lastly, (4) the regional profit corporation. Alaska Tribal Health Compact, Preamble; Alaska Area Guidelines for Tribal Clearances for Indian Self-Determination Contracts, 46 Fed. Reg. 27178 (May 18, 1981).

EXHIBIT 12 (Pg. 3 of 10)

This policy makes sense because the whole thrust of the ISDEAA is premised on the government-to-government relationship between federal and tribal governments.[4] Under this policy, APIA, the authorized representative of thirteen Aleut tribal governments, has priority over TAC even if TAC is also a beneficiary of Section 14(h)(1). Mr. Bunch, however, refused to apply the precedence hierarchy because, in his view, "in this situation the tribal entity and profit corporation are in fact the same." But TAC is not a "tribal entity"; it is, as the BIA notice above recognized, a "non-tribal Native entit[y]." It is treated as a "tribe" by the ISDEAA so that it may contract in the event a tribal government or its delegatee elects not to do so. Mr. Bunch's clear misreading of the ISDEAA and misapplication of the BIA policy must not be allowed to stand. APIA, the authorized representative of thirteen Aleut tribal governments, has priority over the non-tribal entity TAC.

### 3. Application of Declination Criteria

Under section 102(a)(2) of the ISDEAA, the BIA can only decline proposals if one of five specific and limited conditions is met. 25 U.S.C. § 450f(a)(2)(E). Neither Mr. Bunch's recommended decision nor any other written notice received by APIA "clearly demonstrates that, or that is supported by a controlling legal authority that" any of the five conditions pertains, as required by the statute. Instead, Mr. Bunch attempts an end run around the declination criteria by focusing on TAC's withdrawal of authorization—which, as discussed above, makes no difference because APIA has independent tribal authorization—rather than on the BIA's action in revoking the funding. APIA proposed an AFA with terms virtually identical to those of prior years that the BIA had approved. When a tribal organization's proposed successor AFA is "substantially the same as the prior annual funding agreement ... and the contract is with DHHS or the BIA, the Secretary shall approve and add to the contract the full amount of funds to which the contractor is entitled, and may not decline, any portion of a successor annual funding agreement." 25 C.F.R. § 900.32 (emphasis added). The BIA's refusal to approve the APIA successor AFA violated its own regulations as well as section 102(a)(2).[5]

In sum, the BIA has not carried its burden of proof to clearly establish the validity of the grounds for declining APIA's proposal to continue carrying out ANCSA 14(h)(1) activities. 25 U.S.C. § 450f(e)(1); 25 C.F.R. § 900.163.

---

[4] *See, e.g.*, Pub. L. No. 103-413 § 202, 25 U.S.C. § 458aa note (describing purpose of Title IV as "transferring control to tribal governments, upon tribal request, over funding and decision-making for Federal programs, services, functions and activities (or portions thereof), is an effective way to implement the Federal policy of government-to-government relations with Indian tribes") (emphasis added).

[5] We also note that BIA's unilateral withdrawal of ANCSA funding may also have violated Section 106(b) of the ISDEAA, made applicable by Article II Section 15 of the Compact. Section 106(b)(2) prohibits the Secretary from reducing funding for a particular program from one year to the next unless one of five narrow exceptions applies.

EXHIBIT 12 (Pg. 4 of 10)

**Relief Requested**

In light of the above, APIA respectfully requests the Board to set aside the recommended decision of Mr. Bunch and order that APIA's FY 2006 AFA be amended immediately to restore its ANCSA funding.

**Certification of Counsel**

The undersigned certifies pursuant to 5 U.S.C. § 500(b) that he is a member in good standing of the bar of the Oregon Supreme Court and is authorized to represent APIA before this Board in this matter. As such, we are also entitled under 5 U.S.C. § 500(f) to receive copies of all notices or other written communications provided to APIA. The undersigned further certifies that a copy of this Notice of Appeal was served on March 17, 2006, by first-class mail, postage prepaid, upon the persons listed in the enclosed Certificate of Service.

Sincerely,

HOBBS, STRAUS, DEAN & WALKER, LLP

By: ______________________
Geoffrey D. Strommer

Enclosures

cc: Dmitri Philemonof, President, APIA
Lynn Allingham, General Counsel, APIA
James E. Cason, Associate Deputy Secretary of the Interior
Niles Cesar, Director, Juneau Area Office, BIA
Charles F. Bunch, Deputy Regional Director, Alaska Regional Office – Trust
Kenneth Reinfeld, Acting Director, BIA Office of Self-Governance
Tom Shirilla, Northwest Representative, BIA Office of Self-Governance
Roger Hudson, Solicitor's Office, Alaska Region

EXHIBIT 12 (Pg. 5 of 10)

Certificate of Service

I hereby certify that on this 16th day of March, 2006, a copy of the Aleutian-Pribiloff Islands Association's Notice of Appeal was served via first class mail, postage prepaid upon the following:

Ken Reinfeld, Acting Director
BIA Office of Self-Governance
U.S. Department of the Interior
1849 C Street, N.W., MS 4140 MIB
Washington, DC 20240

Charles F. Bunch
Deputy Regional Director – Trust
Alaska Regional Office
Bureau of Indian Affairs
3601 C Street, Suite 1100
Anchorage, AK 99503-5947

James E. Cason
Acting Assistant Secretary – Indian Affairs
U.S. Department of the Interior
1849 C Street, N.W.
Washington, DC 20240

Roger Hudson
DOI – Office of the Solicitor
4230 University Drive
Suite 300
Anchorage, AK 99508

Tom Shirilla, Field Manager
Office of Self-Governance
500 W 12th Street, Suite 102
Vancouver, WA 98660-2871

Niles Cesar, Regional Office Director
BIA-Juneau Area Office
Federal Building
709 W. 9th, 3rd Floor
Juneau, AK 99801

[signature]
Stephen D. Osborne

EXHIBIT 12(Pg. 6 of 10)



IN REPLY REFER TO:
Deputy Regional Director - Trust

# UNITED STATES
# DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS

Alaska Regional Office - Trust
3601 C Street, Suite 1100
Anchorage, Alaska 99503-5947

February 15, 2006

Mr. Demitri Philemonof
President
Aleutian/Pribilof Islands Association
201 East 3rd Avenue
Anchorage, Alaska 99501

Re: Informal Conference

Dear Mr. Philemonof:

This letter shall serve as my decision resulting from the Informal Conference that was held at the Bureau of Indian Affairs (BIA) Conference Room on January 6, 2006. The informal conference was requested by the Aleutian/Pribilof Islands Association (APIA) and I was designated to conduct the conference as the Secretary's representative under 25 CFR §§900.153, *et. seq.*, and 1000.422(c) Those in attendance at the conference included members representing the Aleut Regional Corporation (TAC), the Aleutian/Pribilof Islands Association, Hobbs, Straus, Dean & Walker, LLP, the Office of Self-Governance (OSG), the Regional Solicitor's Office, members of the BIA ANCSA Office, and myself as the designated representative of the Secretary. A copy of the attendance roster is attached as Enclosure 1. The purpose of the conference was to address APIA's concerns regarding funding for the ANCSA 14(h) program.

BACKGROUND: In accordance with the procedures found in 25 CFR §900.154, the initial conference was delayed to allow the representative from Hobbs, Strans, Dean & Walker to attend. The original decision was due on 16 January 2006. A request for a 10-day extension was granted to APIA to allow time to seek an agreement with TAC on issues pertaining to this matter. A second 10-day extension was requested by APIA but due to conflicts with the schedule of the designated representative, a 20-day final extension was granted. While it would be my preference that the involved parties reach an agreement on this matter, I have not been informed that an accord has been reached so a decision follows below.

At approximately 1:18 P.M. on January 6th, 2006, I called the informal conference to order. After a brief introduction and presentation of administrative matters, Mr. Geoffrey D. Strommer, Esq., from Hobbs, Straus, Dean & Walker, representing APIA as counsel, led off the conference with a discussion of APIA's position on the Bureau's decision to withhold funds from APIA's FY-2006 Annual Funding Agreement (AFA). The arguments forwarded by Mr. Strommer are contained in APIA's January 3, 2006 position paper, which is attached as Enclosure 2.

EXHIBIT 12 (Pg. 7 of 10)

Following, Mr. Strommer's presentation, I allowed members of APIA staff, the Regional Solicitor's office, the OSG, and the ANCSA staff to comment and provide any information they felt may be useful or pertinent to making an informed decision on this matter.

SUMMARY: In 1996, APIA entered into a Self-Governance Compact with BIA to perform those functions required by Section 14(h) of the Alaska Native Claims Settlement Act (ANCSA) (Pub. L. 92-203). This action is authorized by the Indian Self-Determination and Education Assistance Act (ISDEEA), Pub. L. 93-638, as amended. In 1998, APIA completed a Memorandum of Agreement (MOA) with TAC relating to activities to be performed under this compact and funding for the operation of ANCSA programs continued in APIA's AFA's until the negotiations for FY-2006. On May 20, 2005, TAC passed a resolution removing APAI as the entity to receive ANCSA funds and the Bureau withheld funds from APIA's FY-2006 AFA. This withholding led APAI to request the informal hearing that was held on January 6, 2006.

ANALYSIS: In their January 3rd position paper, APIA puts forth three legal issues they feel are relevant to the disposition of this matter. These issues are:

- What parties are the legal beneficiaries of Section 14(h)(1), and thus have the right under ISDEAA to contract or compact the activities and associated funding authorized by that legislation and if both APIA and TAC are beneficiaries, which entity has priority to contract/compact?
- Did APIA properly carry out its Compact and AFA by appropriate use of ANCSA funds?
- What legal standard applies to the BIA's action(s) in revoking APIA's ISDEEA agreement?

Neither "legal beneficiaries" nor "beneficiary" are included in the definitions found in 25 CFR § 900.6 or §1000.2. The Random House Dictionary of the English Language (Unabridged) defines beneficiary as "1. *one who receives, benefits, profits, or advantages.* 2. *a person designated as the recipient of funds or other property under a trust, insurance policy, etc.*" While not a "person", the entity designated by regulation to receive title to existing cemetery sites and historical places is "the regional corporations for regions in which the lands are located" (43 CFR § 2653.0-3). Further, the regulations implementing 43 U.S.C. §1613(h)(1), 43 CFR §2653.5, *et.seq.* make numerous reference to "appropriate regional corporation" or "regional corporation" without mention of tribes or villages. It would appear there are no provisions for either tribes or village corporations to file applications for historical places or cemetery sites or to file an amendment to a 14(h) (1) application, or to appeal a Bureau of Land Management (BLM) decision regarding the application. Regional corporation applications for sites that are determined to be located on village corporation lands are summarily rejected by the BLM as village corporation lands are not available for selection by, or conveyance to, regional corporations. Further, there does not appear to be any statutory or regulatory authority or requirement for regional corporations to consult with or obtain the concurrence of villages and their members prior to making decisions regarding 14(h)(1) applications or sites. Thus, if the Aleut Corporation chose to relinquish all of its 14(h)(1) applications it could probably do so without legal recourse under ANCSA from villages or their members. While I do not doubt that some cultural benefit may accrue to members of the tribes or villages located within the Aleut Region/APIA

EXHIBIT 12 (Pg. 8 of 10)

service area, it is the Aleut Corporation that is clearly defined by statute and regulation to be the recipient/beneficiary of property transferred under the provisions of 14(h)(1).

As the Bureau was not a party to the MOA between TAC and APIA, I have no idea of the level of performance required under that agreement nor how well APIA met these requirements or standards. The very fact that APIA entered into an agreement with TAC seems to undercut their argument that the villages/tribes are the beneficiaries. The ANCSA program does not involve trust lands or a trust asset so the monitoring of their performance under the compact would be a function of the Office of Self Governance (OSG). It is my understanding that performance, or a perceived lack of it, may have played a role in TAC's decision to rescind their resolution. This brings us to the crux of the problem.

Both 25 CFR §900.6 and §1000.2 define Indian Tribe as "*any Indian tribe, band, nation, or other organized group, community, including pueblos, rancherias, colonies and any Alaska Native Village, or regional or village corporation as defined in or established pursuant to the Alaska Native Claims Settlement Act...*" (emphasis added). A tribal organization, such as APIA, gets its authority to enter into an ISDEEA contract or compact through a tribal resolution authorizing the tribal organization to act on their behalf. The provisions of 25 CFR §900.8(d) requires a copy of the tribal resolution from the Indian tribe(s) to be served and §1000.17(b) requires that a Consortium obtain an authorizing tribal resolution from each tribe that specifies the scope of the Consortium's authority to act on behalf of the tribe. Here, TAC, acting as a tribe, has simply given a resolution revoking APIA's authority to act on their behalf regarding the ANCSA program. While counsel has equated the Bureau's retention of the funds associated with ANCSA as a declination it is actually only the transfer of the funds to the entity that is performing the function. This is very similar to the process we use when any tribe leaves a consortium. Here, the situation is made more complex by the fact that one of the entities is a regional corporation rather than a traditional or IRA tribal entity and APIA is correct insofar as the Alaska Region order of precedence policy for '638 contracting is tribal, non-profit corporation, and then profit corporation. However, in this situation the tribal entity and profit corporation are in fact the same. TAC has withdrawn its resolution that allows APIA to perform a function on its behalf and seeks to perform this function itself. This is not a case where the profit corporation is in competition with the non-profit for a third party interest that requires the Bureau to apply its hierarchy rules. It is exactly the same situation that would apply if any of APIA's other 13 tribes revoked their resolution for APIA to act on their behalf. In that situation, APIA would be hard pressed to argue the tribe does not have the authority to revoke or modify it's resolution and perform a contract/compact on it's own or authorize a third party to perform these functions. They would be equally hard pressed to argue they should receive the funds even after the tribe has taken responsibility for delivering goods or services under the contract/compact.

RECOMMENDED DECISION: Based on the fact that under the definition contained in ISDEEA, the Aleut Corporation fits the definition of Indian tribe, and as such, has the authority to allow either the Bureau or a third party to deliver services or to perform the delivery of services on its own behalf. In the instant case TAC has opted to perform the ANCSA functions on their own behalf and it is my recommendation they be allowed to perform this function. It is also my recommendation that the funds to perform the ANCSA functions be made available to TAC.

EXHIBIT 12 (Pg. 9 of 10)

Within 30 days of the receipt of this recommended decision, you may file an appeal of the initial decision of the DOI or DHHS agency with the Interior Board of Indian Appeals (IBIA) under 25 CFR 900.157. You may request a hearing on the record. An appeal to the IBIA under 25 CFR 900.157 shall be filed by certified mail or hand delivery at the following address: Board of Indian Appeals, U.S. Department of the Interior, 801 North Quincy Street, Arlington, VA 22203. You shall serve copies of your Notice of Appeal on the Secretary and on the official whose decision is being appealed. You shall certify to the IBIA that you have served these copies.

Even though I have included the appeal rights of the parties, I will reiterate my stance that it is far better for all concerned that some sort of agreement be reached at the local level and would encourage the parties to strive toward that end.

Sincerely,

Charles F. Bunch
Deputy Regional Director – Trust

cc: Niles Cesar, ARO
Tom Shirilla, OSG
Ken Pratt, ANCSA
Roger Hudson, Office of the Solicitor
Debra Mack, TAC
Lynn Allingham, APIA

TOTAL P.04

EXHIBIT 12 (Pg. 10 of 10)

**Aleutian Pribilof Islands Association, Inc.**

**v.**

**Dirk Kempthorne, Secretary of the Interior, United States Department of the Interior, et al.**

**Civil Action No. 06-2173 (CKK)**

# Exhibit 6

**INTERIOR BOARD OF INDIAN APPEALS**
801 N. Quincy Street
Arlington, VA 22203

| | |
|---|---|
| ALEUTIAN-PRIBILOF ISLANDS ASSOCIATION,<br><br>Appellant<br><br>v.<br><br>NORTHWEST REPRESENTATIVE, OFFICE OF SELF-GOVERNANCE, BUREAU OF INDIAN AFFAIRS,<br><br>Appellee | IBIA 06-50-A<br><br>**Appellant's Opening Brief** |

## INTRODUCTION

This is an appeal of a decision of the Bureau of Indian Affairs ("BIA") rejecting the proposal of appellant Aleutian-Pribilof Islands Association ("APIA") to enter into a successor annual funding agreement ("AFA") under the Indian Self-Determination and Education Assistance Act ("ISDEAA"). For many years, APIA has entered into agreements with the BIA to carry out a variety of programs, functions, services and activities ("PFSAs") under the ISDEAA, including PFSAs authorized by section 14(h)(1) of the Alaska Native Claims Settlement Act ("ANCSA"). On October 14, 2005, the BIA rejected APIA's proposal to renew its 2006 AFA under Title IV of the ISDEAA with respect to the ANCSA 14(h)(1) PFSAs and associated funding. The present appeal contests this BIA decision on the grounds that the rejection of the proposal and reduction in funding from one year to the next were improper under the ISDEAA and its implementing regulations.

**BACKGROUND**

APIA is a tribal organization under the ISDEAA sanctioned by thirteen federally recognized tribal governments in its region to carry out a range of services for beneficiaries in the region. APIA contracts with federal, state and local governments and secures private funding to provide a broad spectrum of services throughout the region. These services include health, education, social, psychological, employment and vocational training, and public safety services.

Since 1999, APIA has carried out ANCSA section 14(h)(1) activities pursuant to a self-governance compact and multi-year funding agreement negotiated with the BIA. Section 14(h)(1) authorizes the Secretary of the Interior to withdraw and convey to ANCSA regional corporations[1] fee title to existing cemetery sites and historical places.[2] 43 U.S.C. § 1613(h)(1). Regulations at 43 C.F.R. § 2653.5 describe the process by which such sites are to be investigated, evaluated, and ultimately conveyed if they meet certain criteria. As part of its obligations under the compact and AFAs, APIA has conducted site investigation and evaluation, along with related cultural heritage activities in accordance with the Department's regulations and BIA guidelines on the use of ANCSA program funds.

In its annual budget, the BIA requests ANCSA section 14(h)(1) funds as a separate line under the Trust Services programs within the Tribal Priority Allocations (TPA) budget. *See* Exhibit A at BIA-COMP-1 (FY 2006 BIA Budget listing "ANCSA Historical and Cemetery Sites" among Trust Services within TPA). TPA are recurring funds that provide the main source of tribal resources to provide basic government services for most tribes. As

[1] The ANCSA regional corporation in APIA's region is the Aleut Corporation ("TAC").

[2] Alaska Native Claims Settlement Act, Pub. L. No. 92-203 § 14(h)(1), 85 Stat. 688, 704 (1971), codified as amended at 43 U.S.C. § 1613(h)(1).

explained in the BIA's FY 2006 budget justification, "Tribal Priority Allocations (TPA) fund basic tribal services, such as social services, adult vocational training, child welfare, natural resources management, and contract support." Exhibit A at BIA-SUM-15. In the same document, the BIA describes the ANCSA program as follows: "This program supports the Departmental goal of Serving Communities by fulfilling Indian fiduciary trust responsibilities by protecting cultural and natural heritage resources." *Id.* at BIA-TPA-47 to 48.

In September 2005, APIA proposed a FY 2006 AFA that included, as in the previous seven years, funding for ANCSA section 14(h)(1) activities. As in past years, the inclusion of these PFSAs and related funds in the agreement was supported by the resolutions of the thirteen tribes that sanction APIA. On October 3, 2005, the BIA returned the proposal with those funds deleted, on the ground that TAC had resolved to contract for the funds. The BIA would not release any funds under the AFA until APIA agreed to the withdrawal of the section 14(h)(1) funds. APIA did not agree to the withdrawal of these PFSAs and funds, and the parties negotiated language contained in footnote 15 in the 2006 AFA that reflects BIA's unilateral decision to transfer the funds to TAC and preserves APIA's right to "appeal the BIA decision regarding these funds." Exhibit B, 2006 AFA Reprogramming Request at 2 n.15.

APIA initially exercised its appeal rights by requesting an informal conference, pursuant to 25 C.F.R. § 900.154. Following the conference, the presiding official, Deputy Regional Director Charles F. Bunch, issued a recommended decision upholding the initial decision to transfer the 14(h)(1) funding from APIA to TAC. *See* Letter to Dmitri

Philemonof Re: Informal Conference (Feb. 15, 2006), attached as Exhibit C. The present appeal followed.

## ARGUMENT

The BIA's withdrawal of PFSAs and related funds from APIA's AFA violates provisions in APIA's Compact and AFA, Titles I and IV of the ISDEAA and applicable regulations. In addition, the BIA's actions, for the first time, give priority for contracting activities funded with TPA funds to an ANCSA corporation, TAC, over the rights of a tribal organization like APIA, which has been sanctioned by the thirteen federally recognized tribes in the region. This decision to place the rights of ANCSA corporations above the rights of tribes violates the BIA's own contracting preference hierarchy, discussed below, which has been in place for decades and is rooted in the ISDEAA's purpose to promote tribal self-governance.[3]

In addition to the fundamental error of placing the rights of TAC above those of APIA's thirteen sanctioning tribal governments, the BIA's decision rests on misinterpretations of both ANCSA section 14(h)(1) and the ISDEAA. First, contrary to the BIA interpretation, the primary beneficiaries of section 14(h)(1) are Alaska tribes and their members, not the regional corporations, so APIA's member tribes properly authorized APIA to compact 14(h)(1) functions on their behalf. Second, the BIA's decision violates the regulatory prohibition against declining a successor agreement that is substantially the same as its predecessor, so the BIA lacked authority under the statute and its own regulations to

[3] *See, e.g.*, 25 U.S.C. § 450a(b) (policy animating ISDEAA reflects commitment "to supporting and assisting Indian tribes in the development of strong and stable tribal governments") (emphasis added); S. Rep. No. 100-274, 1988 U.S.C.C.A.N. 2620, 2622 ("The federal policy of Indian self-determination is premised upon the legal relationship between the United States and Indian tribal governments.") (emphasis added).

reject APIA's proposed renewal of the section 14(h)(1) provision. Third, the BIA's unilateral revocation of the section 14(h)(1) funding violates ISDEAA section 106(b)(2), which prohibits reductions in funding unless one of five narrow exceptions applies.

## I. Alaska Tribes and their Members Are the Primary Beneficiaries of ANCSA § 14(h)(1) Activities, and Tribal Authority Supersedes the Authority of ANCSA Corporations to Compact for those Activities under the ISDEAA.

The BIA's decision, as articulated by Mr. Bunch following the informal conference, is based on a flawed premise: that ANCSA regional corporations are the *sole* beneficiaries of 14(h)(1), so only TAC could authorize APIA to carry out 14(h)(1) activities. Exhibit C at 2-3. In fact, as we discuss below, the legislative history strongly supports the conclusion that APIA's member Villages, and the tribal members they serve, are *the primary beneficiaries* of the section 14(h)(1) PFSAs, and thus, under the ISDEAA and BIA's own priority policy, it is APIA's tribal governments that have a superior right to contract for section 14(h)(1) activities under the ISDEAA.

### *A. Section 14(h)(1) Benefits Tribes and Tribal Members More than Corporations.*

Congress clearly intended the primary beneficiaries of section 14(h)(1) to be Native peoples and Villages, not ANCSA for-profit corporations. The Department's regulations accord with this interpretation, as does the BIA's own policy and practice.

#### *1. Congress Intended 14(h)(1) Conveyances to Benefit Alaska Natives.*

Section 14(h)(1), as amended, provides in relevant part: "The Secretary may withdraw and convey to the appropriate Regional Corporation fee title to existing cemetery sites and historical places." 43 U.S.C. § 1613(h)(1)(A). But what is the purpose of these conveyances? Compelling evidence exists that Congress intended the regional corporations

to hold title to 14(h)(1) sites as trustees or "custodians," in Senator Stevens' words, for the benefit of Alaska Natives and Villages.

In discussing the ANCSA bill just prior to the vote on it, Senator Stevens, a principal sponsor and author of ANCSA, singled out Section 14(h) as needing clarification:

> I do believe, however, that there are some areas that need further explanation—for instance, section 14(h) regarding the conveyance of fee title to regional corporations for cemetery sites and historical places. I would hope that the manager of the bill would agree with me that the intent of the conferees was not to take the places away from the village, to take away their cemeteries or their historical sites, but merely to place title in the regional corporation as the custodian of places properly identified as such sites.... It is the intent of the conferees under this act that these areas will be preserved and that they are conveyed to the village [sic] corporations for that purpose and not for the purpose of commercial exploitation but to provide for the preservation of the cemeteries and historical sites.

117 CONG. REC. 46964 (Dec. 14, 1971) (attached as Exhibit D). Senator Stevens then yielded the floor to Senator Bible, who confirmed that the entire ANCSA bill conference committee shared Senator Stevens' interpretation of Section 14(h). The meaning of that section "was very thoroughly discussed by [Senator Stevens] and by the members of the conference. The interpretation he places on the status of the cemeteries and historic sites is exactly correct. There is no intent whatever in the bill to take the last resting places or these historic sites away from the Native people or their village corporations." *Id.* Four days after this exchange, ANCSA became law. A clear consensus existed among the key legislators most intimately involved with making ANCSA that the purpose of Section 14(h)(1) was to convey title to the regional corporations to preserve the sites for the benefit of Alaska Native Villages and peoples.[4]

---

[4] In 2004, Section 14(h)(1) was amended by the Alaska Land Transfer Acceleration Act, adding several subparagraphs and making changes meant to expedite the conveyance process. Pub. L. No. 108-452, 118 Stat. 3575 (Dec. 10, 2004). But nothing in the Act suggests that the original intent of Section 14(h), as explained by Senators Stevens and Bible, was changed.

### 2. *The Department's Regulations Severely Limit the Benefits of the Conveyance to the Regional Corporations and Impose Duties to Preserve the Site's Values for Tribal Beneficiaries.*

As TAC writes in its letter to Judge Sweitzer (May 12, 2006), once the conveyances are complete, "TAC will be the sole owner and manager of these lands." But that does not mean that TAC can do whatever it wants with them. Consistent with Congress's intent to benefit tribal members, not just corporate shareholders, the Department's regulations provide that the regional corporations take title to section 14(h)(1) lands subject to various covenants running with the land and prohibiting mining and other commercial activities of the kind typically engaged in by for-profit corporations. *E.g.*, 43 C.F.R. § 2653.11(b) (conveyance must contain covenant running with the land prohibiting mining or other uses in derogation of the values of the area as a cemetery or historical site); *id.* § 2653.11(c). Significantly, the non-derogation covenant must contain a provision "that the United States reserves the right to seek enforcement of the covenant in an action in equity." *Id.* § 2653.11(b). This reinforces the principle that the corporations hold title as "custodians," in Senator Stevens' words, as trustees with an enforceable fiduciary obligation toward the real beneficiaries: Alaska Natives whose culture and history is permanently a part of these lands.

In addition to the covenants against economic exploitation, the regional corporation must agree to accept a separate covenant imposing an affirmative duty to preserve and maintain the sites. *Id.* § 2653.5(a). Again, the obvious beneficiaries of these covenants are the Alaska Villages and peoples for whom the regional corporations act as "custodians." Consistent with Congress's intent, the regulations impose on the regional corporations more obligations and duties than they confer rights. TAC makes clear in its letter that it expects to benefit from being "sole owner and manager" of the lands, but the ultimate beneficiaries of

Aleut culture and heritage embodied in those lands are the Aleut people and the tribal governments representing them.

3. *The BIA has Historically Justified the Appropriation and Authorized the Subsequent Expenditure of Section 14(h)(1) Funds for a Range of Cultural Heritage Activities that Benefit All Alaska Tribes and their Members.*

A close examination of the BIA's justification for section 14(h)(1) funds over the years in the appropriation process as well as the range and types of activities that the BIA authorizes the use of these funds for underscores that the BIA itself does not view section 14(h)(1) to authorize only activities narrowly related to conveyance, but in fact that ANCSA work benefits a broad range of Native institutions and individuals beyond the regional corporations.

As discussed above, funds for the "ANCSA Historical and Cemetery Sites" program are appropriated under the umbrella of Trust Services in the recurring TPA fund, and the program "supports the Departmental goal of Serving Communities by fulfilling Indian fiduciary trust responsibilities." Exhibit A at BIA-TPA 47 to 48 (emphasis added). The Department does not have a unique government-to-government relationship with, and related fiduciary trust responsibilities to, ANCSA corporations, but it does have such responsibilities to tribes and their members. In its annual Budget Justification documents, the BIA describes the range of activities associated with the ANCSA program, including site investigations, report preparation and other conveyance-related activities, but also many others not related to conveyance and of little if any value to a for-profit regional corporation whose purpose is to make money.

For example, the FY 1999 document reports that "major components of the ANCSA museum property collection were inventoried in preparation for archiving"; that "cooperative

agreements have been developed with Alaska Native, federal and state organizations to produce a detailed topical index of the ANCSA oral history collection (including 1900 tape recordings)"; and that "ANCSA data on historical places and cemetery sites will be shared to support Alaska Native cultural heritage and educational programs, federal and state subsistence management programs, and the protection of Alaska's cultural resources." U.S. Dep't of the Interior Budget Justifications, F.Y. 1999, Bureau of Indian Affairs, at BIA-91. *See also* DOI Budget Justifications, F.Y. 2000 at BIA-74 ("digital copies of most ANCSA site records have been transferred to the Alaska State Historic Preservation Office; steady progress has been made toward establishing a long-term curation agreement for archiving ANCSA program records"); DOI Budget Justifications, F.Y. 2001 at BIA-78 ("The massive ANCSA collection is an unparalleled source of information about Alaska history and Alaska Native cultures."); Exhibit A, DOI Budget Justifications, F.Y. 2006 at BIA-TPA-48 ("This program managed ANCSA records (which constitute a museum property collection) in a manner that ensures their long-term preservation."). As the BIA itself has recognized, the ANCSA program creates and preserves values far more enduring and wide-ranging than the conveyance of title to the corporations, so the program is aptly included in Trust Services for the benefit of Alaska Native communities and peoples.

The legislative history, regulations, and BIA practice show that the federally recognized tribes and their members on whose behalf APIA acts are not only beneficiaries, but are in fact the primary beneficiaries of section 14(h)(1) as conceived by Congress and as administered by the Department. Thus APIA's member Villages can authorize APIA to assume PFSAs, including 14(h)(1) activities, on their behalf under the ISDEAA, and have

done so by tribal resolution. Even if TAC is also a beneficiary of 14(h)(1), APIA's right to contract under the ISDEAA supersedes TAC's, as discussed next.

*B. Under the ISDEAA and BIA's Policies Tribally Sanctioned Tribal Organizations Have Superior Rights to Compact over ANCSA Corporations.*

Because ANCSA regional and village corporations can be treated in very limited circumstances as "tribes" for purposes of contracting under ISDEAA,[5] it sometimes arises that more than one entity in Alaska may be eligible to contract or compact for particular PFSAs. The BIA many years ago established a hierarchy of contracting preference to address these circumstances. In its original published list of federally recognized tribes, the Department of the Interior noted that "a number of non-tribal Native entities in Alaska ... including ANCSA village and regional corporations," were eligible for federal contracts by statute, with one important limitation: "Under longstanding BIA policy, priority for contracts and services in Alaska is given to reorganized and traditional governments over non-tribal corporations."[6]

This policy makes sense because the ISDEAA is premised on the government-to-government relationship between federal and tribal governments. *See, e.g.*, ISDEAA Amendments of 1994, Pub. L. No. 103-413 § 202, 25 U.S.C. § 458aa note (describing purpose of Title IV as follows: "transferring control to tribal governments, upon tribal

[5] *See* 25 U.S.C. § 450b(e) (ISDEAA provision defining "Indian tribe" to include "any Alaska Native village or regional or village corporation as defined in or established pursuant to the Alaska Native Claims Settlement Act").

[6] Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 58 Fed. Reg. 54364, 54366 n.2 (Oct. 21, 1993). The Indian Health Service (IHS) has the same policy. The IHS has prioritized entities eligible to authorize ISDEAA contracting in the following order of preference: (1) the Indian Reorganization Act (IRA) Council, if it provides governmental functions; (2) the traditional village council; (3) the village profit corporation; and, lastly, (4) the regional profit corporation. Alaska Tribal Health Compact, Preamble; Alaska Area Guidelines for Tribal Clearances for Indian Self-Determination Contracts, 46 Fed. Reg. 27178 (May 18, 1981).

request, over funding and decision-making for Federal programs, services, functions and activities (or portions thereof), is an effective way to implement the Federal policy of government-to-government relations with Indian tribes") (emphasis added).

In his Informal Conference Decision, Mr. Bunch acknowledged that "the Alaska Region order of precedence policy for [ISDEAA] contracting is tribal, non-profit corporation, and then profit corporation." Mr. Bunch, however, refused to apply the precedence hierarchy because he concluded that "in this situation the tribal entity and profit corporation are in fact the same." Exhibit C at 3. This conclusion is factually incorrect: TAC is *not* APIA. TAC is an ANCSA for-profit corporation that may be treated as a "tribe" under the ISDEAA but *only* – under the BIA's own priority policy – if no federally recognized tribe, or tribal organization sanctioned by federally recognized tribes located in the relevant geographic area, chooses not to contract or compact directly with the agency. APIA, on the other hand, is a tribal organization sanctioned by the thirteen federally recognized tribes in the region and thus has a right to compact under the ISDEAA superior to TAC's.

Mr. Bunch also incorrectly concludes that "[t]his is not a case where the profit corporation is in competition with the non-profit for a third party interest that requires the Bureau to apply its hierarchy rules." *Id.* In fact, this is precisely such a case. APIA and TAC both seek to carry out the exact same activities under the ISDEAA, but the two organizations carry out their missions on behalf of very different constituencies and for different beneficiaries. APIA is a tribal organization directly sanctioned by the federally recognized tribes in the region that are made up and entirely politically controlled by the Aleut people for whom the cemetery and historical sites located on section 14(h)(1) lands are

to be preserved. By contrast, TAC is a for-profit corporation owned by shareholders who may or may not be members of the tribes located in the region and whose interests are to ensure the profitability of the corporation.[7]

The BIA's contracting preference recognizes that the beneficiaries of the programs that can be assumed under ISDEAA are more likely to be protected by tribal governments – or tribal organizations sanctioned by them – which are politically accountable directly to the primary beneficiaries of these cultural and historical sites, rather than by corporations whose primary allegiance is to the much more limited class of its shareholders. The BIA's misreading of the ISDEAA and misapplication of its own contracting preference policy must not be allowed to stand. APIA, the regional tribal organization sanctioned by the thirteen federally recognized tribal governments in the region clearly has priority over TAC, a for-profit ANCSA corporation.

## II. The BIA's Rejection of APIA's Proposal to Renew its AFA Violated Section 102 of the ISDEAA and its Implementing Regulations at 25 C.F.R. §§ 900.32 and 33.

The BIA's decision not to renew APIA's proposed AFA was improper for one or both of the following reasons: (1) The decision not to renew violated the BIA's own rules that prohibit the agency from declining proposals for successor AFAs that are substantially the same as a previous year's AFA; or (2) assuming that the declination process and criteria do apply, the BIA's decision in this case cannot be sustained under the ISDEAA.

[7] Shares of Native corporations may be alienated to other Natives, or non-Natives, if the corporation's articles so provide. 43 U.S.C. § 1629c(b); *cf.* DAVID S. CASE & DAVID A. VOLLUCK, ALASKA NATIVES AND AMERICAN LAWS 174 (2d ed. 2002) ("The idea that the relationship of the Natives to their land should be determined by stock ownership highlights the tensions between traditional Native values and relationships to the land and the free market values implicit in the Claims Act.").

### A. *25 C.F.R. §§ 900.32 and 900.33 Prohibit the BIA from Declining Portions of a Successor AFA that Are "Substantially the Same" as the Prior Year's.*

The BIA's own regulations severely limit its ability to decline a proposal such as APIA's that seeks to renew an existing AFA and proposes no substantial changes from a previous year's AFA.[8] 25 C.F.R. § 900.32 provides as follows:

> Sec. 900.32 Can the Secretary decline an Indian tribe or tribal organization's proposed successor annual funding agreement?
>
> No. If it is <u>substantially the same as</u> the prior annual funding agreement (except for funding increases included in appropriations acts or funding reductions as provided in section 106(b) of the Act) and the contract is with DHHS or the BIA, the Secretary shall approve and add to the contract the full amount of funds to which the contractor is entitled, and <u>may not decline, any portion of a successor annual funding agreement</u>. Any portion of an annual funding agreement proposal which is not substantially the same as that which was funded previously (e.g., a redesign proposal; waiver proposal; different proposed funding amount; or different program, service, function, or activity) . . . is subject to the declination criteria and procedures in subpart E. If there is a disagreement over the availability of appropriations, the Secretary may decline the proposal in part under the procedure in subpart E. [emphasis added]

An Administrative Law Judge ("ALJ") in this Department has recognized that section 900.32 eliminates agency discretion with respect to successor agreements that are "substantially the same" as their predecessors. *Susanville Indian Rancheria v. Director, California Area Office, Indian Health Service*, IBIA No. 97-89-A (April 6, 2001) (Recommended Decision), *aff'd as amended*, Dep't of Health & Human Services Departmental Appeals Board, DAB No. A-02-30 (Feb. 6, 2002).

---

[8] The ISDEAA section 102 and Part 900 declination criteria apply to APIA's Title IV agreements because the Title IV regulations incorporate by reference the appeals procedures of Title I, which in turn incorporate the substantive declination criteria of Section 102. 25 C.F.R. § 1000.432(a) (for Title I-eligible programs such as ANCSA 14(h)(1), "appeal may only be filed with IBIA under the provisions set forth in 25 C.F.R. 900.150(a) through (h), 900.152 through 900.169"); *id.* § 900.150(a) (specifying that Title I appeal regulations apply to decisions to decline an agreement, or a portion thereof, "under section 102 of the [ISDEAA]"). The term "Title I-eligible programs" is defined in section 1000.420 as PFSAs that the Secretary provides to Indians because of their status as Indians. The activities at issue here clearly fall within this definition.

In *Susanville*, the Indian Health Service argued that its partial declination and reduction in funding did not violate section 900.32 because the agency was free to recalculate each year "the full amount of funds to which the contractor is entitled." Judge Hammett rejected this reading as "unreasonable *per se*," because it would give the agency unfettered discretion to reduce funding at will in any given year, promoting uncertainty and instability for tribes in direct contravention of the regulation and section 102(b) of the ISDEAA. Instead, Judge Hammett held, for successor agreements substantially the same as their predecessors, section 900.32 prohibits declination and requires "the amount of funds which was in the prior AFA." *Susanville* at 15.[9]

25 CFR §900.33 further limits the ability of BIA to decline proposed AFA renewals as follows:

> Sec. 900.33 Are all proposals to renew term contracts subject to the declination criteria?
>
> The Department of Health and Human Services and the Bureau of Indian Affairs will not review the renewal of a term contract for declination issues where no material and substantial change to the scope or funding of a program, functions, services, or activities has been proposed by the Indian tribe or tribal organization. Proposals to renew term contracts with DOI agencies other than the Bureau of Indian Affairs may be reviewed under the declination criteria.

In *Rapid City Indian Health Board, Inc. v. Director, Aberdeen Area Office, IHS*, No. IBIA 97-100-A (August 29, 1997) this Board discussed the binding nature of 25 CFR §900.33 in the following terms:

> 11. The IHS must comply with its own regulations and failure to do so is arbitrary conduct on the IHS' part that is not permissible. *See Morton v. Ruiz*, 415 U.S. 199, 235 (1974) (the BIA must "comply ... with its own internal procedures" even where those procedures are more rigorous than required);

[9] This holding was affirmed by Judge Hammett on remand, *Susanville, supra*, Decision on Remand at 17 (Dec. 14, 2001), and by the DHHS Departmental Appeals Board, *Susanville Indian Rancheria*, DAB No. A-02-30 (Feb. 6, 2002). Like Judge Hammett, the DAB concluded "that section 900.32 prohibited IHS from declining any portion of the Tribe's proposed AFA for 1997 if that portion was substantially the same as in the tribe's [prior] AFA...." *Id.* at 11.

> *accord Service v. Dulles*, 354 U.S. 363, 388 (1957); *Vitarelli v. Seaton*, 359 U.S. 535, 539-540 (1959); *see also*, *Orengo Caraballo v. Reich*, 11 F.3d 186, 193 (D.C. Cir. 1993)("the agency may not violate its own regulations."); *Neal v. Secretary of the Navy*, 639 F.2d. 1029, 1035 (3d Cir. 1981)("an agency is bound to follow those [regulations] which it has adopted.").
>
> 12. 25 C.F.R. § 900.33 provides that the IHS "will not" review the request for renewal of a term contract for declination issues (25 U.S.C. § 450f(a)(2)) where no material and substantial change in the scope or funding has been proposed by the contractor.
>
> 13. This regulation was promulgated pursuant to the negotiated rule-making process required by the ISDEA (25 U.S.C. § 450k(d)) and its use of the phrase "will not" connotes a mandatory, non-discretionary duty on the part of the IHS not to subject renewal requests to the declination criteria. *See* BLACK'S LAW DICTIONARY 1598 (6th ed. 1990) ("will" is an "auxiliary very commonly having the mandatory sense of 'shall' or 'must'", rather than the discretionary "may"); *City of Edmunds v. United States*, 749 F.2d 1419, 1421 (9th Cir. 1984) (citation omitted) ("shall" denotes a mandatory intent absent a convincing argument to the contrary); *Reeves v. Andrus*, 465 F. Supp. 1065, 1069 (D. Alaska 1979) ("shall" is presumed to be mandatory); *Pennsylvania v. Weinburger*, 367 F. Supp. 1378 (D.D.C. 1973) ("shall" is mandatory in nature, depriving the official of discretion, and making the commanded act a ministerial duty).

*Id.* at 8.

There is no factual dispute that APIA's proposal was substantially the same as the prior year's – indeed, exactly the same, except for the amounts, since it was part of a multi-year AFA that did not change – so the blanket prohibitions of sections 900.32 and 900.33 on the BIA applying the declination process or criteria to the proposal apply. Therefore, the BIA's declination must be reversed as a matter of law for failure to follow agency regulations.

### *B. The BIA's Withholding of the ANCSA Funding from APIA Was an Improper Declination Under Section 102 of the ISDEAA.*

Section 102 of the ISDEAA "directs the Secretary to approve and award a proposed [ISDEAA] contract unless there is a <u>very good reason</u> not to do so." *Delaware Tribe of*

*Indians v. BIA*, IBIA No. 02-65-A at 12 (July 26, 2002) (Recommended Decision) (emphasis added). Those reasons are enumerated in the declination criteria in Section 102(a)(2) of the ISDEAA, which provides the relevant framework for evaluating the BIA action at issue in this appeal, in the event the Board does not find that 25 C.F.R. §§ 900.32 and 900.33 prohibit the BIA from declining portions of a successor AFA that are "substantially the same" as the prior year's, as we have argued above. A refusal to renew an existing contract, in whole or part, is a declination. *See* 25 C.F.R. § 900.20.

The BIA attempts an end run around the declination criteria by focusing on TAC's withdrawal of authorization—which, as discussed above, makes no difference because APIA never had a supporting resolution from TAC in the first place, and, more importantly APIA has always had sanctioning resolutions from all federally recognized tribes in the region to assume these PFSAs and associated funds on their behalf.[10] By refusing to analyze its action using the ISDEAA declination criteria, or even provide a formal notice of declination, the BIA made a "threshold" denial of exactly the kind Congress specifically sought to prevent. As stated in the Senate report accompanying the ISDEAA amendments of 1988:

> The intent of the Committee in retaining the declination criteria and the declination process is to insure that denials of requests for self-determination contracts are handled only through the declination process. The current practice of federal agencies that impose "threshold criteria" on a self-determination contract application is clearly inconsistent with the intent of the [ISDEAA].

S. Rep. 100-274, 1988 U.S.C.C.A.N. 2620, 2643 (1987).

[10] Mr. Bunch refused to characterize the BIA action as a declination: "While counsel has equated the Bureau's retention of the funds associated with ANCSA as a declination it is actually only the transfer of the funds to the entity that is performing the function." Exhibit C at 3. But under the ISDEAA there is no way to deny a contract other than through the declination process and for the narrowly circumscribed reasons set forth in the declination criteria of section 102.

The BIA's denial of APIA's proposal to renew its AFA, like any other denial of a contract or portion thereof under the ISDEAA, must meet the substantive and procedural requirements of section 102. The simple fact is that the BIA compacted the ANCSA program to APIA for many years—without requiring a TAC resolution—then unilaterally refused to continue doing so. That is a declination, and to be valid under the ISDEAA, the Secretary must provide APIA written notification containing

> a specific finding that clearly demonstrates that, or that is supported by a controlling legal authority that--
>
> (A) the service to be rendered to the Indian beneficiaries of the particular program or function to be contracted will not be satisfactory;
>
> (B) adequate protection of trust resources is not assured;
>
> (C) the proposed project or function to be contracted for cannot be properly completed or maintained by the proposed contract;
>
> (D) the amount of funds proposed under the contract is in excess of the applicable funding level for the contract, as determined under section 106(a); or
>
> (E) the program, function, service, or activity (or portion thereof) that is the subect of the proposal is beyond the scope of programs, functions, services, or activities covered under paragraph (1) because the proposal includes activities that cannot lawfully be carried out by the contractor.

25 U.S.C. § 450f(a)(2); *see also* 25 C.F.R. § 900.22 (explaining that "[t]he Secretary may only decline to approve a proposal for one of five specific reasons," and echoing the statutory criteria of section 102(a)(2)). The Secretary bears the burden of proof and must "clearly demonstrat[e] the validity of the grounds for declining the contract proposal (or portion thereof)." 25 U.S.C. § 450f(e)(1); 25 C.F.R. § 900.163.

In this case it is clear that the BIA did not provide APIA with any formal declination of its proposal that justifies the declination based on one of these statutory reasons. When declining a proposal or a portion thereof, the Secretary must provide "a detailed explanation of the reason for the decision," including "a specific finding that clearly demonstrates that (or

is supported by a controlling legal authority that) one of the [declination conditions] exists." 25 C.F.R. § 900.29(a). Therefore, any purported declination by BIA in this case was improper under section 102(a)(2) and its regulations, and the PFSAs and associated funding must be restored to APIA's AFA. "A proposal that is not declined within 90 days ... is deemed approved, and the Secretary shall award the contract or any amendment or renewal within that 90-day period and add to the contract the full amount of funds pursuant to section 106 of the Act." *Id.* § 900.18.

## III. The BIA's Unilateral Revocation of the ANCSA Funding Violates Section 106(b)(2) of the ISDEAA.

Another provision of the ISDEAA promoting the stability of self-determination and self-governance agreements—and restraining BIA discretion to disrupt it—is section 106(b)(2), which requires that the amount of funds awarded under the agreement "shall not be reduced by the Secretary in subsequent years except pursuant to –

> **(A)** a reduction in appropriations from the previous fiscal year for the program or function to be contracted;
> **(B)** a directive in the statement of the managers accompanying a conference report on an appropriation bill or continuing resolution;
> **(C)** a tribal authorization;
> **(D)** a change in the amount of pass-through funds needed under a contract; or
> **(E)** completion of a contracted project, activity, or program...."

25 U.S.C. § 450j-1(b)(2) (emphasis added).[11]

The purpose of this provision is "to protect and stabilize tribal programs by protecting and stabilizing the funds for those programs from inappropriate administrative reduction by Federal agencies." S. Rep. 100-274, at 30 (Dec. 21, 1987), *reprinted in* 1998 U.S.C.C.A.N. 2620, 2649. Judge Hammett of this Department has held that "§ 450j-1(b)'s restriction on

[11] Section 106(b) is incorporated by reference into Article II, section 15 of the Compact, so the BIA's violation of the statute is also a breach of that agreement.

reducing funding applies to individual funding categories which are set forth in a self-determination contract, including that contract's associated annual funding agreements." *Susanville, supra*, Decision on Remand at 12 (Dec. 14, 2001) (rejecting agency argument that section 106(b) protects only the "aggregate funding level" of the agreement). APIA's ANCSA funding is a separate category in the AFA, Exhibit B at line 92 ("ANCSA – TPA/AREA"), and thus is subject to the restrictions on funding reductions imposed by section 106(b).

None of the five exceptions to the stable-funding requirement applies here. Appropriations for the ANCSA program were not reduced (subparagraph A); the FY 2005 enacted figure was $414,000, while in FY 2006 it was $426,000 before two rescissions cut the figure to $419,760. There was no directive from Congress to reduce ANCSA funding (subparagraph (B)); there was no authorization by APIA or its member Tribes to reduce the funding (C); pass-through funds are not at issue (D); and the 14(h)(1) program has not been completed (E). Because none of the five exceptions to the stable-funding rule of section 106(b)(2) has been satisfied, the BIA's reduction of the ANCSA funding was unlawful and the funds must be restored to the AFA.

If the BIA is suggesting that the reduction—or rather, the complete elimination—of the ANCSA funding is justified under subparagraph (C) by TAC's "tribal authorization" revoking compacting authority from APIA, the BIA has completely missed the point of section 106(b)(2). TAC is not a party to the Compact or AFA between the United States and APIA, and cannot authorize a reduction in the funding associated with those agreements.[12]

[12] Similarly, Mr. Bunch's analogy of TAC to a tribe withdrawing from APIA misses the mark. "It is exactly the same situation that would apply if any of APIA's other 13 tribes revoked their resolution for APIA to act on their behalf." Informal Conference Decision at 3. The difference is that APIA's 13 tribes are participants in the Compact; their tribal resolutions are incorporated by reference in

The Department's regulation at 25 C.F.R. § 900.32 implements section 106(b)'s stable-funding requirement as well as section 102(b)'s restrictions on declination. Because section 900.32 prohibits reductions in funding except as provided in section 106(b), and because none of the exceptions to the stable-funding rule in that section apply, the BIA's revocation of APIA's ANCSA funding violates the Department's own regulations as well as the statute itself.

## CONCLUSION

For the reasons above, the BIA's rejection of APIA's proposal to renew the portion of its 2006 AFA that contained the section 14(h)(1) programs and funds violated the terms of the Compact, the AFA, and relevant provisions of the ISDEAA and its implementing regulations. The BIA's decision should be reversed, the Informal Conference Decision upholding it set aside, and the BIA directed to restore the section 14(h)(1) PFSAs and associated funding in the amount of $73,379 to APIA's 2006 AFA. APIA also seeks interest on these funds from October 2, 2005, in accordance with the Prompt Payment Act. *See* 31 U.S.C. § 3902(b) (interest to be paid from day after required payment date until date of payment).

Respectfully Submitted,

Geoffrey D. Strommer

Stephen D. Osborne
HOBBS, STRAUS, DEAN & WALKER, LLP

Article VI, Section 2. TAC is not a participant in the Compact, and TAC's resolution has no legal effect on the Compact, either for purposes of a declination under section 102(a)(2) or a reduction in funding under section 106(b)(2).

806 SW Broadway, Suite 900
Portland, OR 97205
(503) 242-1745

Attorneys for Appellant Aleutian-Pribilof
Islands Association

June 2, 2006

# Exhibit A

U.S. Dep't of the Interior, Budget Justifications
And Performance Information, Fiscal Year 2006,
Bureau of Indian Affairs (excerpt)



# BUDGET JUSTIFICATIONS

The United States Department of the Interior

and Performance Information
Fiscal Year 2006

# BUREAU OF INDIAN AFFAIRS

NOTICE: These budget justifications are prepared for the Interior and Related Agencies Appropriations Subcommittees. Approval for release of the justifications prior to their printing in the public record of the Subcommittee hearings may be obtained through the Office of Budget of the Department of the Interior.

## FY 2006 Bureau of Indian Affairs Budget

(Dollars in Thousands)

FINAL

| Activities, Subactivities, Program Element, Subelements | FY 2004 Enacted | FY 2005 Enacted | TOTAL UNCONTR. & RELATED CHANGES | TOTAL PROGRAM CHANGES | FY 2006 PRESIDENT'S BUDGET REQUEST | Change from FY 2005 |
|---|---|---|---|---|---|---|
| **TRIBAL PRIORITY ALLOCATIONS** | | | | | | |
| TRIBAL GOVERNMENT | | | | | | |
| Other Aid to Tribal Government | 34,873 | 34,394 | 2,853 | 0 | 37,247 | 2,853 |
| Consolidated Tribal Gov't Prog. | 64,901 | 64,629 | -2,361 | 0 | 62,268 | -2,361 |
| Self Governance Compacts | 135,359 | 135,894 | 4,247 | 0 | 140,141 | 4,247 |
| New Tribes | 863 | 1,098 | 5 | 320 | 1,423 | 325 |
| ISD Fund (New/Expanded Contracts) | 0 | 985 | 0 | 0 | 985 | 0 |
| Contract Support | 133,548 | 134,420 | 189 | 0 | 134,609 | 189 |
| Tribal Courts | 17,590 | 17,762 | 122 | 0 | 17,884 | 122 |
| SUBTOTAL, TRIBAL GOVERNMENT | 387,224 | 389,163 | 5,086 | 320 | 394,558 | 5,375 |
| HUMAN SERVICES | | | | | | |
| Social Services | 31,125 | 30,988 | 484 | 0 | 31,452 | 484 |
| Indian Child Welfare Act | 10,774 | 10,300 | 22 | 0 | 10,322 | 22 |
| Welfare Assistance | 65,853 | 86,420 | 42 | -6,420 | 80,042 | -6,378 |
| Housing Improvement Program | 18,370 | 19,068 | 43 | 0 | 19,111 | 43 |
| Other-Human Services (Tribal Design) | 621 | 611 | 23 | 0 | 634 | 23 |
| SUBTOTAL, HUMAN SERVICES | 147,743 | 147,387 | 584 | -6,420 | 141,581 | -5,828 |
| EDUCATION | | | | | | |
| Scholarships | 27,644 | 26,721 | -207 | 0 | 26,514 | -207 |
| Adult Education | 2,486 | 2,477 | 32 | 0 | 2,509 | 32 |
| TCU's Supplement to Grants | 1,299 | 1,288 | 12 | 0 | 1,311 | 12 |
| Johnson-O'Malley Assistance Grants | 16,588 | 16,510 | 105 | -8,838 | 7,777 | -8,733 |
| Other-Education (Tribal Design) | 1,209 | 1,293 | 62 | 0 | 1,355 | 62 |
| SUBTOTAL, EDUCATION | 49,374 | 48,300 | 4 | -8,838 | 39,466 | -8,834 |
| PUBLIC SAFETY AND JUSTICE | | | | | | |
| Community Fire Protection | 1,229 | 1,222 | -60 | -1,162 | 0 | -1,222 |
| SUBTOTAL, PUBLIC SAFETY AND JUSTICE | 1,229 | 1,222 | -60 | -1,162 | 0 | -1,222 |
| COMMUNITY DEVELOPMENT | | | | | | |
| Job Placement and Training | 8,572 | 8,566 | -44 | 0 | 8,522 | -44 |
| Economic Development | 3,821 | 4,878 | 24 | -431 | 4,472 | -407 |
| Road Maintenance | 27,376 | 26,967 | 883 | -55 | 27,795 | 828 |
| SUBTOTAL, COMMUNITY DEVELOPMENT | 39,869 | 40,412 | 863 | -486 | 40,789 | 377 |
| RESOURCES MANAGEMENT | | | | | | |
| Natural Resources | 4,834 | 4,819 | 180 | 0 | 4,999 | 180 |
| Agriculture | 22,288 | 22,164 | 429 | -25 | 22,568 | 404 |
| Forestry | 24,641 | 23,808 | 277 | -25 | 24,060 | 252 |
| Water Resources | 3,808 | 4,065 | 62 | 0 | 4,127 | 62 |
| Wildlife & Parks | 4,434 | 4,693 | 116 | 0 | 4,809 | 116 |
| Minerals and Mining | 2,449 | 2,450 | 136 | 0 | 2,586 | 136 |
| SUBTOTAL, RESOURCES MANAGEMENT | 62,252 | 61,999 | 1,200 | -50 | 63,149 | 1,150 |
| TRUST SERVICES | | | | | | |
| Trust Services | 4,027 | 9,014 | 420 | 1,800 | 11,234 | 2,220 |
| Other Rights Protection | 2,057 | 2,032 | 51 | 0 | 2,083 | 51 |
| Real Estate Services | 30,143 | 30,241 | 980 | 0 | 31,221 | 980 |
| Real Estate Appraisals | 10,420 | 0 | 0 | 0 | 0 | 0 |
| Probate | 7,572 | 11,436 | 205 | -3,700 | 7,943 | -3,495 |
| Environmental Quality Services | 2,436 | 2,395 | 140 | 0 | 2,535 | 140 |
| ANILCA Programs | 580 | 581 | 5 | 0 | 586 | 5 |
| ANCSA Historical and Cemetery Sites | 415 | 414 | 12 | 0 | 426 | 12 |
| SUBTOTAL, TRUST SERVICES | 57,854 | 56,115 | 1,823 | -1,900 | 56,038 | -77 |
| GENERAL ADMINISTRATION | | | | | | |
| Executive Direction | 10,863 | 11,412 | 539 | -700 | 11,251 | -161 |
| Administrative Services | 13,922 | 13,113 | 275 | -710 | 12,678 | -435 |
| Safety Management | 404 | 400 | 259 | 0 | 659 | 259 |
| SUBTOTAL, GENERAL ADMINISTRATION | 25,189 | 24,925 | 1,073 | -1,410 | 24,589 | -337 |
| TOTAL, TRIBAL PRIORITY ALLOCATIONS | 770,634 | 769,643 | 10,882 | -19,946 | 760,149 | -9,394 |

for school construction is reduced in order to allow the program to focus on building the schools already funded for construction. Between 2001 and 2005, funding was appropriated for 34 replacement schools. Nine of these are completed and operating. We anticipate completing eleven schools in 2005 and 2006.

The education facilities improvement and repair program is funded at $128.4 million. The 2006 request will fund four major facilities and improvement projects, annual maintenance needs, and minor repair projects to address critical health and safety concerns, non-compliance with code standards, and program deficiencies at existing education facilities.

In response to the PART findings, BIA has improved efficiency and performance accountability in the school construction program by establishing the following long-term goals: (1) Construct 100 percent of replacement schools in four years from planning and design through construction for 2006 (2) Increase the percentage of academic construction projects with costs within or below the target range (3) Reduce the percentage of BIA's building square footage identified as excess.

**Economic Development** - High unemployment rates on reservations are one of the greatest challenges facing Indian Country. The 2006 budget includes $500,000 to establish an Economic Development Commission to investigate impediments to tribal business development, and develop an operational model for tribal businesses. This increase supports Indian economic development and the BIA performance goal to reduce unemployment on Indian reservations.

The guaranteed and insured loan program is an integral component of BIA's efforts to expand economic development in Indian Country. Through this program the BIA provides loans to tribes, Alaska Natives, and individual Indian-owned businesses. The budget request of $6.3 million for the loan program supports BIA's performance goal to reduce unemployment on Indian reservations. The BIA guaranteed loan program makes it possible for Indian economic enterprises on or near Indian reservations, which otherwise would not have been able to get loans, to obtain loans from private lenders. Funding will finance $118.9 million in loans.

**Evaluation of Tribal Priority Allocation Distribution** – Tribal Priority Allocations (TPA) fund basic tribal services, such as social services, adult vocational training, child welfare, natural resources management, and contract support. TPA gives Tribes the opportunity to further Indian self-determination by establishing their own priorities and moving Federal funds among programs.

The funding process used today is a formula allocation based on historical funding levels established in the early 1970s, and has remained essentially the same. In an effort to improve program accountability and to ensure that funding is targeted to the areas of greatest need, the Department of the Interior will evaluate the allocation of funds within the TPA program and consult with Tribes to examine ways to better distribute TPA funding.

**Resolving Land and Water Claims** - The budget includes $24.8 million for payment of authorized Indian land and water claim settlements in Oklahoma, Nevada, Colorado, and New Mexico. These settlements resolve long-standing claims to water and lands by Indian Tribes. They are the result of negotiations between the Tribes, the Federal government, and other

**Environmental Quality Services (FY 2006: $2,535,000; FTE 17):** The Environmental Quality Services program supports the Departmental goal of Serving Communities by fulfilling Indian Fiduciary Trust responsibilities by improving the management of land and natural resource assets. The Environmental Quality Services program implements the Bureau's responsibility, as a federal agency, to comply with environmental and cultural resources statutes and procedures that apply to all Bureau actions. Program staff at the Regional and Agency level will perform, or coordinate the compilation and documentation of information to comply with the applicable statutes and procedures; review Regional and Agency compliance with those statutes and procedures; and provide technical assistance on environmental and cultural resources matters to Bureau managers and staff and to tribes within their Regions.

**ANILCA Programs (FY 2006: $586,000; FTE 1):** This program supports the Departmental goal of Serving Communities by fulfilling Indian Trust responsibilities by protecting and preserving trust lands and trust resources. This program upholds the directives prescribed in the Alaska National Interest Lands Conservation Act (ANILCA), which provides for the coordination and consultation with land managing agencies and the State of Alaska on subsistence preference for Alaska Natives and the administration of programs affecting Native allotments under the 1906 Native Allotment Act.

**Subsistence** – The Bureau is a member of the Federal Subsistence Board and Federal Staff Committee and is an advocate to ensure that Native subsistence users, as rural Alaskans, are accorded a priority over other users. Natives are often requested to provide written documentation of their "customary and traditional" use, which is part of the threshold criteria before the subsistence priority is recognized. Assistance has been provided to eligible native tribes and organizations for the study and education of the various needs, methods, and future requirements of a subsistence lifestyle. Most of the funds are provided to tribes as well as various commissions or regional advisory councils in the form of grants, contracts, or compacts.

**Native Allotments** – The Bureau assists Native allotment applicants in acquiring title to their lands and subsequent management. There were 15,000 parcels that met the December 18, 1971, deadline with approximately 2,800 applications pending adjudication. New Native Veteran Allotment applications have been filed and erroneously closed Native Allotment application is being reinstated; therefore, the number of parcels remaining to be adjudicated has increased. Acquisition services include collecting evidence of use and occupancy within prescribed timeframes; accompanying applicant and the Bureau of Land Management (BLM) staff on field exams; performing probates and contacting heirs to notify them of inherited claims; contesting appeals to the Interior Board of Land Appeals; and approving easements for trespass abatement. Of the work being completed in partnership with the BLM, Tribal Realty offices will address much of the work for Native Allotment parcels. Related funding was provided under Regional Office Operations, Land Records Improvement in the past.

**ANCSA Historical Places and Cemetery Sites (FY 2006: $426,000; FTE 5):** This program supports the Departmental goal of Serving Communities by fulfilling Indian fiduciary trust

responsibilities by protecting cultural and natural heritage resources. The program will provide for the thorough investigation and certification of Alaska Native historical places and cemetery sites, Native groups, and native primary places of residence. The program will produce fair and legally valid certifications that are based on field investigations of the claimed lands and associated historical, archeological, and ethnographic research—the combined findings of which are presented in final reports of investigation. The current, known backlog of field investigations and certifications is just over 200, but legal appeals of past program work will likely increase this workload. This program also managed ANCSA records (which constitute a museum property collection) in a manner that ensures their long-term preservation. To the maximum extent possible, data contained in the ANCSA collection are shared to support Alaska Native cultural heritage and educational programs, Federal and state subsistence management programs, and the protection of Alaska's cultural resources. Toward this end, digital copies of ANCSA site records have been transferred to the Alaska State Historic Preservation Officer, and cooperative agreements have been developed with Alaska Native Tribes and tribal entities to produce topical indexes of ANCSA oral history tapes and transcripts.

The completion of ANCSA reports and certifications is ongoing. The backlog of such work may increase in the process of systematically reviewing ANCSA case files. Implementation of Secretarial Order No. 3220, which provides for the potential reopening of 188 ANCSA 14(h)(1) case files that are presently closed will significantly increase the program's workload (e.g., requiring the reinvestigation and/or re-certification of associated ANCSA 14(h)(1) claims). Additionally, passage of proposed Senate Bill 1466 would likely result in a substantial increase in the number of required ANCSA 14(h) (1) field investigations.

## 2004 PROGRAM PERFORMANCE ACCOMPLISHMENTS

Trust Services, General and Real Estate Services accomplishments:

- Processed and approved 42,000 transactions; a 5,000 increase from FY 2003.
- 42 percent of title encumbrances were filed within 2 business days.
- Provided for land use and transaction technical advice and assistance on 33,000 transactions.   These transactions included regulation waiver requests and appeals on different transactions that require the coordination with DOI, Solicitors offices in seeking resolution.
- Representatives from the Regions, Agencies and Tribes participated with Central Office on National teams in the formulation and revision of Procedural Handbooks for Acquisition and Disposal, Leasing and Permitting, Rights-of-way. These Draft Handbooks are being developed to ensure that processes are defined accurately and reflect actual work performed on behalf of the beneficiaries.
- Staff from Central Office, Regions, Agencies, Tribes and OST participated on National teams for the completion of the first draft of the (DOI) Specification Requirements Systems (SRS). This effort is a mandate in the Trust Reform initiative to improve the automation of trust transaction accountability.
- Developed and implemented improved reporting processes for GPRA and Annual Caseload Reports.   These reports reflect quarterly and annual processing of transactions and the affects on annual acreages from land acquisitions and leases.

# Exhibit B

2006 Annual Funding Agreement
Reprogramming Request

**Aleutian/Pribilof Islands Association, Inc.**

201 E. 3rd Avenue
Anchorage, Alaska 99501
Phone (907) 276-2700
Fax (907) 279-4351

September 27, 2005

Tom Shirilla
OSG NW Field Office
1503 NE 78th Street, Suite 15
Vancouver, WA 98665

Re: Aleutian Pribilof Islands Association (APIA) 2006 Reprogramming Request

Dear Mr. Shirilla,

Submitted herewith is a revised 2006 reprogramming request. We have modified line 15 to reflect the fact that the Aleut Corporation passed a resolution stating their intent to contract directly with the BIA for those funds for 2006. APIA makes this change in our reprogramming request without prejudice to filing an appeal of the BIA and Solicitor's opinion that the Aleut Corporation, rather than the tribes and their representative, APIA, can make the decision about how those funds can be spent.

If you have any questions, please do not hesitate to contact me.

Very truly yours,

ALEUTIAN PRIBILOF ISLANDS ASSOCIATION

Dimitri Philemonof
President/CEO

cc: Roger Drapeaux
William Sinclair

Self Governance 2006 Annual Funding Agreement - Reprogramming Request — Office of Self Governance

September 2
Page: 1

Tribe:
Tribal OSG Compact Code: ALEUTIAN PRIBILOF ISLANDS ASSOCIATION
OSG7811
Tribal BIA Org. Code: K01810
BIA Regional Office: ALASKA REGION
BIA Field Office: ANCHORAGE FIELD OFFICE

| LINE # PROGRAM TITLE | COST CODE | (Info) TRIBAL SHARE | A OSG CUM. BASE | B OSG SHORTFALL BASE | C OSG SHORTFALL REQUEST | D BIA REPROGRAM REQUEST | E=A+B+C+D TOTAL AFA | FN |
|---|---|---|---|---|---|---|---|---|
| 2 Community Services, General - TPA/AGENCY | 39210 | 138,952 | 138,542 | 410 | 0 | 0 | 138,952 | 1 |
| 4 Other Aid to Tribal Government - TPA/TRIBAL | 39220 | 107,730 | 201,692 | 13,550 | 0 | -107,502 | 107,730 | 2 |
| 6 Other Aid to Tribal Government - TPA/AREA | 39220 | 11,217 | 9,511 | 3,279 | 0 | -1,573 | 11,217 | 3 |
| 7 Consolidated Tribal Government Pro - TPA/TRIBAL | 39230 | 6,379 | 13,740 | 0 | 0 | -8,369 | 6,379 | 4 |
| 8 Consolidated Tribal Government Pro - TPA/AGENCY | 39230 | 1,689 | 1,689 | 0 | 0 | 0 | 1,689 | |
| 10 Self-Governance Compacts - TPA/TRIBAL | 39240 | -80,810 | -80,810 | 0 | 0 | 0 | -80,810 | |
| 12 Contract Support (Ongoing) - TPA/AREA | 39270 | 861,454 | 0 | 0 | 0 | 861,454 | 861,454 | 5 |
| 17 Small and Needy Tribes Distributio - TPA/TRIBAL | 39904 | 892,386 | 892,386 | 0 | 0 | 0 | 892,306 | 6 |
| 18 Social Services - TPA/TRIBAL | 39310 | 33,891 | 41,383 | 0 | 0 | -5,492 | 35,891 | 7 |
| 19 Social Services - TPA/AGENCY | 39310 | 6,552 | 1,280 | 5,262 | 0 | 0 | 6,552 | |
| 20 Social Services - TPA/AREA | 39310 | 76,600 | 60,928 | 15,672 | 0 | 0 | 76,600 | |
| 21 Indian Child Welfare Act - TPA/TRIBAL | 39320 | 318,431 | 318,431 | 0 | 0 | 0 | 318,431 | |
| 24 Welfare Assistance Grants - TPA/TRIBAL | 39330 | 75,000 | 0 | 0 | 0 | 35,000 | 75,000 | 8 |
| 25 Housing Improvement Program - TPA/TRIBAL | 39370 | 32,900 | 32,900 | 0 | 0 | 0 | 32,900 | 9 |
| 27 Scholarships - TPA/TRIBAL | 39110 | 73,274 | 78,389 | 0 | 0 | -5,115 | 73,274 | 10 |
| 33 Johnson-O'Malley Educational Assis - TPA/TRIBAL | 39140 | 7,600 | 7,600 | 0 | 0 | 0 | 7,600 | |
| 44 Job Placement and Training - TPA/TRIBAL | 39535 | 123,100 | 139,086 | 0 | 0 | -15,985 | 123,100 | 11 |
| 46 Job Placement and Training - TPA/AREA | 39535 | 8,141 | 3,944 | 295 | 0 | -1,098 | 8,141 | 12 |
| 49 Economic Development - TPA/AREA | 39510 | 7,229 | 2,614 | 4,615 | 0 | 0 | 7,229 | |
| 55 Natural Resources, General - TPA/AREA | 39605 | 2,068 | 1,888 | 980 | 0 | 0 | 2,868 | |
| 58 Agriculture - TPA/AREA | 39620 | 1,179 | 536 | 643 | 0 | 0 | 1,179 | |
| 67 Wildlife and Parks - TPA/AREA | 39650 | 1,238 | 588 | 650 | 0 | 0 | 1,238 | |
| 73 Trust Services, General - TPA/AREA | 39710 | 4,221 | 4,149 | 73 | 0 | 0 | 4,221 | 13 |
| 76 Other Rights Protection - TPA/AREA | 39720 | 41,632 | 40,501 | 1,131 | 0 | 0 | 41,632 | |
| 78 Real Estate Services - TPA/AGENCY | 39770 | 9,083 | 9,088 | 0 | 0 | 0 | 9,088 | |
| 79 Real Estate Services - TPA/AREA | 39770 | 2,255 | 1,323 | 121 | 0 | 811 | 2,255 | 14 |
| 86 Environmental Quality Services - TPA/AREA | 39740 | 506 | 405 | 101 | 0 | 0 | 506 | |
| 89 ANILCA - TPA/AREA | 39750 | 10,344 | 18,254 | 90 | 0 | 0 | 10,344 | |
| 92 ANSCA - TPA/AREA | 39760 | 0 | 13,379 | 0 | 0 | -73,379 | 0 | 15 |
| 94 Executive Direction - TPA/AGENCY | 39810 | 11,067 | 5,916 | 5,151 | 0 | 0 | 11,067 | |
| 97 Administrative Services - TPA/AGENCY | 39820 | 21,577 | 19,249 | 2,428 | 0 | 0 | 21,677 | |
| 102 TPA General Increase - TPA/TRIBAL | 39901 | 92,847 | 92,847 | 0 | 0 | 0 | 92,847 | |
| 103 638 Pay Costs - TPA/TRIBAL | 39902 | 184,939 | 184,939 | 0 | 0 | 0 | 184,939 | |
| 106 Area and Agency Technical Support - NON TPA | 30800 | 1,617 | 1,195 | 0 | 0 | 122 | 1,617 | 16 |
| 129 Real Estate Services - NON TPA | 34300 | 978 | 0 | 0 | 0 | 978 | 978 | 17 |
| 130 Environmental Management - NON TPA | 34730 | 4,420 | 0 | 0 | 0 | 4,428 | 4,420 | 18 |
| 149 All Other Aid to Tribal Government - NON TPA | 36420 | 2,318 | 0 | 2,318 | 0 | 0 | 2,318 | |
| 151 Housing Development - NON TPA | 36530 | 3,824 | 3,824 | 0 | 0 | 0 | 3,824 | |
| 152 Adult Voc. Training (moved to TPA) - NON TPA | 36720 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 162 Trust Services, General - NON TPA | 36910 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 163 All Other Indian Rights Protection - NON TPA | 36920 | 568 | 527 | 41 | 0 | 0 | 568 | |
| 164 Real Estate Services - NON TPA | 36940 | 1,009 | 199 | 58 | 0 | 760 | 1,009 | 19 |
| 166 Land Records Improvement - NON TPA | 36960 | 4,362 | 0 | 0 | 0 | 4,368 | 4,368 | 20 |
| 168 Executive Direction - NON TPA | 36100 | 2,335 | 0 | 2,315 | 0 | 0 | 2,335 | |
| 189 Administrative Services - NON TPA | 36200 | 37,546 | 20,275 | 17,271 | 0 | 0 | 37,546 | |
| 197 Preparedness - NON TPA | 92120 | 2,178 | 0 | 0 | 0 | 2,178 | 2,178 | 21 |
| 199 Preparedness Program Mgmt (Indirec - NON TPA | 92121 | 821 | 0 | 0 | 0 | 821 | 821 | 22 |
| TOTAL | | 3,145,478 | 2,340,614 | 76,465 | 0 | 732,399 | 3,149,478 | |

AUTHORIZED FINANCIAL OFFICERS:

[signature]
Bureau of Indian Affairs - Regional Office

[signature]
Tribe

[signature] 10/3/05
Office of Self Governance

1 Reference 96 & 97 non-residual left with BIA Anchorage Agency to carry out CDIB functions. $112,691 is False Pass tribal shares to be permanently base transferred to APIA.

2 $107,502 reduction represents the Unalaska ATG amount that was put in the APIA AFA and then removed by tribal resolution. [this amount should be permanently reprogrammed to Unalaska]

3 $1,573 reduction for Unalaska ATG (39220-Area). Same rationale as f/n #2. [this amount should be permanently reprogrammed to Unalaska]

4 $8,369 reduction for Unalaska ATG UTGP (39230). Same rationale as f/n #2. (this amount should be permanently reprogrammed to Unalaska) $6,379 is False Pass tribal shares to be permanently base transferred to APIA.

5 Estimated amount. FY 06 funds will be distributed using similar methodology as was used last fiscal year.

6 See FY 03 AFA f/n #3 for village breakout.

7 $6,053 based on Unalaska reduction for Social Services (39310) [this amount should be permanently reprogrammed to Unalaska]- see f/n #2; and $4661 increase for False Pass Social Services funds which should have been base transferred to APIAs base. The base should be $35,891.

8 Estimate. Total funds for FY 06 will be distributed based upon estimated welfare assistance need as reflected in the current mid-year analysis of funds report.

9 Funds will be distributed based on HIP eligible applicant data and shall be used in accordance with HIP regulations unless waived.

10 $5,208 reduction based on Unalaska Scholarship funds being removed (see f/n #2) (this amount should be permanently reprogrammed to Unalaska); and $93 increase for False Pass pay costs which should have been base transferred in FY 03.

11 $15,995 based on Unalaska reduction for JPT - Tribe (39535) [this amount should be permanently reprogrammed to Unalaska]- see f/n #2.

12 $1,092 based on Unalaska reduction for JPT - Tribe (39535) (this amount should be permanently reprogrammed to Unalaska]- see f/n #2.

13 APIA total share $4,468; $247 left with BIA for direct Archeology services.

14 $811 increase is minimum amount of APIA tribal share of BIA Realty increases based on data provided by BIA at 5/7/02 Realty meeting.

15 Funds to be transferred to The Aleut Corporation per resolution by The Aleut Corporation for FY 06. This is without prejudice to APIAI to appeal the BIA decision regarding these funds.

16 Amount based on 2% of JOM & Scholarship tribal shares.

17 Historical share amount based on combined total of Lease Compliance and prior Shortfall adjustments to cumulative base (see f/n #11 of FY 03 AFA).

18 Based on historical AFA tribal share amounts

19 Minimum tribal share amount based on Realty data provided at meeting with BIA on 5/7/02. Same as FY 05 amount.

20 Same as f/n#19.

21 Best estimate at the time of negotiations and is subject to adjustment based on actual award, selection of project, or distribution methodology used by BIA provided SG Tribes, other Tribes and BIA agencies are treated similarly.

22 Estimate. To be adjusted based on APIA actual indirect rate at time of distribution of funds.

# Exhibit C

BIA Informal Conference Decision
February 15, 2006



IN REPLY REFER TO:
Deputy Regional Director - Trust

**UNITED STATES**
**DEPARTMENT OF THE INTERIOR**
BUREAU OF INDIAN AFFAIRS

Alaska Regional Office - Trust
3601 C Street, Suite 1100
Anchorage, Alaska 99503-5947

February 15, 2006

Mr. Demitri Philemonof
President
Aleutian/Pribilof Islands Association
201 East 3rd Avenue
Anchorage, Alaska 99501

Re: Informal Conference

Dear Mr. Philemonof:

This letter shall serve as my decision resulting from the Informal Conference that was held at the Bureau of Indian Affairs (BIA) Conference Room on January 6, 2006. The informal conference was requested by the Aleutian/Pribilof Islands Association (APIA) and I was designated to conduct the conference as the Secretary's representative under 25 CFR §§900.153, *et. seq*., and 1000.422(c) Those in attendance at the conference included members representing the Aleut Regional Corporation (TAC), the Aleutian/Pribilof Islands Association, Hobbs, Straus, Dean & Walker, LLP, the Office of Self-Governance (OSG), the Regional Solicitor's Office, members of the BIA ANCSA Office, and myself as the designated representative of the Secretary. A copy of the attendance roster is attached as Enclosure 1. The purpose of the conference was to address APIA's concerns regarding funding for the ANCSA 14(h) program.

<u>BACKGROUND:</u> In accordance with the procedures found in 25 CFR §900.154, the initial conference was delayed to allow the representative from Hobbs, Straus, Dean & Walker to attend. The original decision was due on 16 January 2006. A request for a 10-day extension was granted to APIA to allow time to seek an agreement with TAC on issues pertaining to this matter. A second 10-day extension was requested by APIA but due to conflicts with the schedule of the designated representative, a 20-day final extension was granted. While it would be my preference that the involved parties reach an agreement on this matter, I have not been informed that an accord has been reached so a decision follows below.

At approximately 1:18 P.M. on January 6th, 2006, I called the informal conference to order. After a brief introduction and presentation of administrative matters, Mr. Geoffrey D. Strommer, Esq., from Hobbs, Straus, Dean & Walker, representing APIA as counsel, led off the conference with a discussion of APIA's position on the Bureau's decision to withhold funds from APIA's FY-2006 Annual Funding Agreement (AFA). The arguments forwarded by Mr. Strommer are contained in APIA's January 3, 2006 position paper, which is attached as Enclosure 2.

Following, Mr. Strommer's presentation, I allowed members of APIA staff, the Regional Solicitor's office, the OSG, and the ANCSA staff to comment and provide any information they felt may be useful or pertinent to making an informed decision on this matter.

SUMMARY: In 1996, APIA entered into a Self-Governance Compact with BIA to perform those functions required by Section 14(h) of the Alaska Native Claims Settlement Act (ANCSA) (Pub. L. 92-203). This action is authorized by the Indian Self-Determination and Education Assistance Act (ISDEEA), Pub. L. 93-638, as amended. In 1998, APIA completed a Memorandum of Agreement (MOA) with TAC relating to activities to be performed under this compact and funding for the operation of ANCSA programs continued in APIA's AFA's until the negotiations for FY-2006. On May 20, 2005, TAC passed a resolution removing APAI as the entity to receive ANCSA funds and the Bureau withheld funds from APIA's FY-2006 AFA. This withholding led APAI to request the informal hearing that was held on January 6, 2006.

ANALYSIS: In their January 3rd position paper, APIA puts forth three legal issues they feel are relevant to the disposition of this matter. These issues are:

- What parties are the legal beneficiaries of Section 14(h)(1), and thus have the right under ISDEAA to contract or compact the activities and associated funding authorized by that legislation and if both APIA and TAC are beneficiaries, which entity has priority to contract/compact?
- Did APIA properly carry out its Compact and AFA by appropriate use of ANCSA funds?
- What legal standard applies to the BIA's action(s) in revoking APIA's ISDEEA agreement?

Neither "legal beneficiaries" nor "beneficiary" are included in the definitions found in 25 CFR § 900.6 or §1000.2. The Random House Dictionary of the English Language (Unabridged) defines beneficiary as "1. *one who receives, benefits, profits, or advantages.* 2. *a person designated as the recipient of funds or other property under a trust, insurance policy, etc.*" While not a "person", the entity designated by regulation to receive title to existing cemetery sites and historical places is "the regional corporations for regions in which the lands are located" (43 CFR § 2653.0-3). Further, the regulations implementing 43 U.S.C. §1613(h)(1), 43 CFR §2653.5, *et.seq.* make numerous reference to "appropriate regional corporation" or "regional corporation" without mention of tribes or villages. It would appear there are no provisions for either tribes or village corporations to file applications for historical places or cemetery sites or to file an amendment to a 14(h) (1) application, or to appeal a Bureau of Land Management (BLM) decision regarding the application. Regional corporation applications for sites that are determined to be located on village corporation lands are summarily rejected by the BLM as village corporation lands are not available for selection by, or conveyance to, regional corporations. Further, there does not appear to be any statutory or regulatory authority or requirement for regional corporations to consult with or obtain the concurrence of villages and their members prior to making decisions regarding 14(h)(1) applications or sites. Thus, if the Aleut Corporation chose to relinquish all of its 14(h)(1) applications it could probably do so without legal recourse under ANCSA from villages or their members. While I do not doubt that some cultural benefit may accrue to members of the tribes or villages located within the Aleut Region/APIA

service area, it is the Aleut Corporation that is clearly defined by statute and regulation to be the recipient/beneficiary of property transferred under the provisions of 14(h)(1).

As the Bureau was not a party to the MOA between TAC and APIA, I have no idea of the level of performance required under that agreement nor how well APIA met these requirements or standards. The very fact that APIA entered into an agreement with TAC seems to undercut their argument that the villages/tribes are the beneficiaries. The ANCSA program does not involve trust lands or a trust asset so the monitoring of their performance under the compact would be a function of the Office of Self Governance (OSG). It is my understanding that performance, or a perceived lack of it, may have played a role in TAC's decision to rescind their resolution. This brings us to the crux of the problem.

Both 25 CFR §900.6 and §1000.2 define Indian Tribe as "*any Indian tribe, band, nation, or other organized group, community, including pueblos, rancherias, colonies and any Alaska Native Village, or* ***regional or village corporation*** *as defined in or established pursuant to the Alaska Native Claims Settlement Act...*" (emphasis added). A tribal organization, such as APIA, gets its authority to enter into an ISDEEA contract or compact through a tribal resolution authorizing the tribal organization to act on their behalf. The provisions of 25 CFR §900.8(d) requires a copy of the tribal resolution from the Indian tribe(s) to be served and §1000.17(b) requires that a Consortium obtain an authorizing tribal resolution from each tribe that specifies the scope of the Consortium's authority to act on behalf of the tribe. Here, TAC, acting as a tribe, has simply given a resolution revoking APIA's authority to act on their behalf regarding the ANCSA program. While counsel has equated the Bureau's retention of the funds associated with ANCSA as a declination it is actually only the transfer of the funds to the entity that is performing the function. This is very similar to the process we use when any tribe leaves a consortium. Here, the situation is made more complex by the fact that one of the entities is a regional corporation rather than a traditional or IRA tribal entity and APIA is correct insofar as the Alaska Region order of precedence policy for '638 contracting is tribal, non-profit corporation, and then profit corporation. However, in this situation the tribal entity and profit corporation are in fact the same. TAC has withdrawn its resolution that allows APIA to perform a function on its behalf and seeks to perform this function itself. This is not a case where the profit corporation is in competition with the non-profit for a third party interest that requires the Bureau to apply its hierarchy rules. It is exactly the same situation that would apply if any of APIA's other 13 tribes revoked their resolution for APIA to act on their behalf. In that situation, APIA would be hard pressed to argue the tribe does not have the authority to revoke or modify it's resolution and perform a contract/compact on it's own or authorize a third party to perform these functions. They would be equally hard pressed to argue they should receive the funds even after the tribe has taken responsibility for delivering goods or services under the contract/compact.

RECOMMENDED DECISION: Based on the fact that under the definition contained in ISDEEA, the Aleut Corporation fits the definition of Indian tribe, and as such, has the authority to allow either the Bureau or a third party to deliver services or to perform the delivery of services on its own behalf. In the instant case TAC has opted to perform the ANCSA functions on their own behalf and it is my recommendation they be allowed to perform this function. It is also my recommendation that the funds to perform the ANCSA functions be made available to TAC.

Within 30 days of the receipt of this recommended decision, you may file an appeal of the initial decision of the DOI or DHHS agency with the Interior Board of Indian Appeals (IBIA) under 25 CFR 900.157. You may request a hearing on the record. An appeal to the IBIA under 25 CFR 900.157 shall be filed by certified mail or hand delivery at the following address: Board of Indian Appeals, U.S. Department of the Interior, 801 North Quincy Street, Arlington, VA 22203. You shall serve copies of your Notice of Appeal on the Secretary and on the official whose decision is being appealed. You shall certify to the IBIA that you have served these copies.

Even though I have included the appeal rights of the parties, I will reiterate my stance that it is far better for all concerned that some sort of agreement be reached at the local level and would encourage the parties to strive toward that end.

Sincerely,

Charles F. Bunch
Deputy Regional Director – Trust

cc: Niles Cesar, ARO
Tom Shirilla, OSG
Ken Pratt, ANCSA
Roger Hudson, Office of the Solicitor
Debra Mack, TAC
Lynn Allingham, APIA

# Exhibit D

Statement of Senator Stevens on
Meaning and Purpose of ANCSA § 14(h)(1)

In all urban and rural definitions, the population not classified as urban constitutes the rural population.

Mr. STEVENS. Mr. President, I call the particular attention of the Senate, for the purpose of establishing legislative history, to the fact that residence under the census concept is not necessarily residence under this bill, because the bill is talking about permanent residence, whereas the Census Bureau counted students where they were in the institutions where they were attending school and they counted persons overseas as not being included in the population of any State or the District of Columbia. Obviously, it is not the standard of the Census Bureau we are talking about in this bill but a concept of permanent residence in regard to section 5.

Mr. President. I invite the attention of the Senator to section 6, particularly section 6(b), with regard to the prohibition against using funds for political purposes that go to the regional corporations of the village corporations. These corporations are subject to the Corrupt Practices Act insofar as Federal elections are concerned. It is clear that the intent is that none of the funds shall be used for any election purposes, State, Federal, or local. This is a prohibition against using these funds from the corporations for any purpose involved in political campaigns.

In section 7, the bill wisely makes the regional corporations profit corporations. They are not government entities, but they are part of a profitmaking picture for the native people of Alaska for the future. I think that the intent is quite similar, and I point out this is mentioned in the report, that these corporations parallel the action of the Senate in regard to the investment corporation that was proposed by the Senate version of the bill. It is important for all to note that these are incorporated under the laws of Alaska to conduct business for profit.

They are not government bodies. We assume that as corporations they are doing business for profit and will not incur debts on behalf of any individual other than those debts that they have been authorized to incur pursuant to the corporate laws of the State of Alaska.

Particularly also I would call attention in that same section to subsection (h)(1), which permits transfer of stock pursuant to a court decree of separation and divorce or child support. It should be clearly identified as an exception to the prohibition against transfer of the stock of any of these corporate organizations for a period of 20 years.

In the same section, subsection (1) permits the regional corporations to withhold money from the villages, moneys that they are entitled to under the formula in the bill, either 50 percent of the money after 5 years or 40 percent during 5 years. These moneys may be withheld by the regional corporation until the village has submitted a plan for the expenditure of their funds.

I call particular attention to the fact that under section 8(b) of the bill, the budgets of the corporation may be reviewed in a period of 5 years. This is not the same power as the power to review the plans for spending; this is the power to request a plan in advance of expenditure but not to approve the village budget—that power is limited to 5 years.

The village corporations under section 8(a) are also corporations which are organized for profit, but they may on decision of the villages, be organized as nonprofit corporations under the laws of Alaska.

Under section 9(a), with regard to the revenue sharing provisions, the so-called 2 percent overriding royalty that applies to all lands in Alaska in Federal title today apply to all minerals that are subject to disposition under the Mineral Leasing Act.

This is one of the provisions of the Senate bill as passed, I am hopeful that that change will be duly noted by those people who administer this act after it has been passed.

In regard to section 10(a), the conference made it very clear that the district court of the district of Alaska is the only court that will have jurisdiction over actions in regard to any challenge with respect to the legality.

In subsection (b) it is clear—and this is a significant change—that only in the event the State initiates litigation or voluntarily becomes a party to the litigation to contest the authority of the United States to legislate on the subject matter or the legality of this act, will all rights of land selection granted to the State by the Alaska Statehood Act shall be suspended.

All of the lands under this act which are conveyed to the Native people of Alaska with the exception of hardship lands and those lands identified as the new lands will be within 25 townships.

I call attention to section 11(a). This is also a very significant compromise on the part of the conferees. It recognizes that the lands around the village areas in Alaska are the lands that the village people have wanted and claim as their own. There are no floating selection rights under the bill.

I would also like to call to the attention of the Senate that the revenue-sharing sections of the bill apply only to the revenues of the State of Alaska received after the date of this act. A very significant word in that section is the word "hereafter" and that is a change that means that the 2 percent overriding royalty will be paid when received from mineral resources of the State of Alaska from revenues received after the date of this act.

There are many significant changes in this bill that have been, I believe, to a great extent explained, and very well explained, I may add by the report that has been filed by the conference committee. I do believe, however, that there are some areas that need further explanation—for instance, section 14(h) regarding the conveyance of fee title to regional corporations for cemetery sites and historical places. I would hope that the manager of the bill would agree with me that the intent of the conferees was not to take the places away from the village, to take away their cemeteries or their historical sites, but merely to place title in the regional corporation as the custodian of places properly identified as such sites. For instance, I refer to some of the old Russian churches and some of the areas preserved by the village people. Title will be conveyed to the village corporations, for instance, of some of such places. It is the intent of the conferees under this act that those areas will be preserved and that they are conveyed to the village corporations for that purpose and not for the purpose of commercial exploitation but to provide for the preservation of the cemeteries and historic sites.

Mr. BIBLE. Mr. President, will the Senator yield to me at that point?

Mr. STEVENS. I yield.

Mr. BIBLE. Mr. President, the Senator from Alaska brought that point up during the conference. It was very thoroughly discussed by him and by the members of the conference. The interpretation he places on the status of the cemeteries and historic sites is exactly correct. There is no intent whatever in the bill to take the last resting places or these historic sites away from the Native people or their village corporations.

That was made very clear in the conference.

I am glad that the Senator clarified it by his discussion.

Mr. STEVENS. Mr. President, I thank the Senator from Nevada.

Lands to be made available under the same section, for areas such as Sitka, Kenai, Juneau, and Kodiak are made available under the particular section relating to hardship areas that treatment does not apply to any other area of the State. These lands are made available pursuant to a decision that these are historic villages that existed before a white man got to Alaska that no longer exist. They are to be included in this hardship category created under this act.

I point out particularly the provisions of section 14(h)(5) which deal with the conveyance of 160 acres of land occupied by the Native as a primary place of residence on August 31, 1971. That is a place of residence outside of village land. The subsurface state in such lands shall be conveyed to the appropriate regional corporations.

Mr. President, I would like to make a comment concerning the provisions of section 17(B), which is a provision that I would refer to as a revised Kyl amendment, does give the Secretary of the Interior the right to withdraw 80 million acres of land within the 9-month period following the date of the enactment of this act. It is the intent of the conferees, I believe, that these are to include the lands previously classified, such as the Iliamna classification, Brooks Range, or Copper River areas and that these lands comprise well over 50 million acres already. We have added land up to 80 million acres so that the Secretary could identify the land to be withdrawn by the Congress at some future date for specific Federal programs that is, national parks, forests, wildlife refuges, and wild and scenic rivers.

This amendment that was contributed to by Representative UDALL, of Arizona, with regard to the provisions of subsection (c) of this amendment, which requires the Secretary to report every 6 months for a period of 2 years his recommendations with regard to these lands

**CERTIFICATE OF SERVICE**

I hereby certify that on this 9th day of June, 2006, a copy of the Aleutian-Pribiloff Islands Association's Opening Brief was served via first class mail, postage prepaid upon the following:

Ken Reinfeld, Acting Director
BIA Office of Self-Governance
U.S. Department of the Interior
1849 C Street, N.W., MS 4140 MIB
Washington, DC 20240

Charles F. Bunch
Deputy Regional Director – Trust
Alaska Regional Office
Bureau of Indian Affairs
3601 C Street, Suite 1100
Anchorage, AK 99503-5947

James E. Cason
Acting Assistant Secretary – Indian Affairs
U.S. Department of the Interior
1849 C Street, N.W.
Washington, DC 20240

Roger Hudson
DOI – Office of the Solicitor
4230 University Drive
Suite 300
Anchorage, AK 99508

Tom Shirilla, Field Manager
Office of Self-Governance
500 W 12th Street, Suite 102
Vancouver, WA 98660-2871

Niles Cesar, Regional Office Director
BIA-Juneau Area Office
Federal Building
709 W. 9th, 3rd Floor
Juneau, AK 99801

Stephen D. Osborne

June 9, 2006

Roger L. Hudson, Attorney
Office of the Regional Solicitor, Alaska Region
4230 University Drive, Suite 300
Anchorage, Alaska 99508-4626
(907) 271-4131 (voice); 271-4143 (fax)

United States Department of the Interior

**OFFICE OF HEARINGS AND APPEALS**
**Departmental Hearings Division**
**405 South Main Street, Suite 400**
**Salt Lake City, Utah 84111**

| | | |
|---|---|---|
| ALEUTIAN PRIBILOFF ISLANDS ASSOCIATION (APIA),<br><br>Appellant<br><br>v.<br><br>NORTHWEST REPRESENTATIVE, OFFICE OF SELF-GOVERNANCE, BUREAU OF INDIAN AFFAIRS,<br><br>Appellee | : | IBIA 06-50-A<br><br>Appeal of a decision by the Bureau of Indian Affairs, declining APIA's proposal in its 2006 annual funding agreement for funding to perform activities under 43 U.S.C. § 1613(h)(1)<br><br>Indian Self-Determination and Educational Assistance Act (ISDEAA), 25 U.S.C. §§ 450-450n |

APPELLEE'S REPLY BRIEF

COMES NOW APPELLEE, Northwest Representative, Office of Self-Governance (OSG), Bureau of Indian Affairs (BIA), by and through his undersigned counsel, and files Appellee's Reply Brief, responding to the June 9, and June 23, 2006 Opening and Answering Briefs filed on behalf of the Aleutian Pribiloff Islands Association (hereafter APIA).

I. INTRODUCTION

Appellant APIA in its June 23, 2006 Answer Brief continues to cast the issue in this appeal as being one of Bureau of Indian Affairs/Office of Self-Governance (BIA/OSG) disregard

of the rights of the village-based tribes who have pursuant to the Indian Self Determination and Education Assistance Act (ISDA) requested that the Government contract with APIA, a tribal organization, for delivery of services. What this framing of the issue ignores is that Appellee, notwithstanding its ongoing contractual relationship with the APIA, also has duties under the ISDA to other ISDA-defined tribes. The problem confronting the BIA after it received a 25 U.S.C. § 450f(a)(1) resolution from The Aleut Corporation (TAC) was which entity should be recognized as having the priority entitlement to dictate how and by whom the ANCSA § 14(h)(1) program would be performed. It is properly with a view towards that question that the BIA's actions should be evaluated.

Contrary to Appellant's characterization, the BIA decision in the wake of submission of TAC's May 20, 2005 Resolution No. 05-14 was not a violation of or rewriting of its over-all Alaska Order of Precedence for ISDA contracting, but was rather a response to the necessity of applying that policy in the context of a situation which was a matter of first impression in two respects. First, the submission of TAC's resolution presented for the first time a situation of BIA receipt of multiple directly competing tribal resolutions calling for different contracting arrangements for a single program serving a single region. And secondly, that circumstance of competing resolutions was presented in relation to the ANCSA § 14(h)(1) program, which is unusual if not unique insofar as it relates to activities serving the interests of ANCSA corporations, rather than Alaska Native individuals or village-based communities. In light of these special circumstances, the BIA's determination to honor the ISDA contracting request of TAC was entirely justifiable.

## II. ARGUMENT

A. The Aleut Corporation was properly determined by the BIA to be the entity whose 25 U.S.C. § 450f(a)(1) resolution should be controlling.

Appellant in its June 23 , 2006 Answer Brief , at 3, asserts that prior to the development of present dispute, the BIA was properly providing the ANCSA § 14(h)(1) program funding to APIA. Appellee does not disagree. Prior to May of 2005, TAC, the ANCSA Regional Corporation, had not exercised its right under the ISDA to submit a resolution dictating contracting arrangements with respect to that program. Therefore, the BIA and OSG were up to that point acting consistently with existing policy and practice by including the ANCSA program funding in the APIA Compact and Funding Agreements, based upon the resolutions submitted by village-based tribes in the Aleut Region. However, in acknowledging that state of affairs, Appellee submits that it should also be noted that including the ANCSA funding in APIA's annual funding agreements beginning in the mid 1990s was *not* the result of any specific or explicit request from the village governments of the Aleut Region. Indeed, no special or separate resolutions were required from the villages in order to support addition of the ANCSA program-related dollars to APIA's funding, and village-based tribal resolutions that were submitted in support of APIA's compact make no mention of the ANCSA § 14(h)(1) program, or of any village's specific desire to have that program carried out on their behalf by the APIA. Instead, the village-based tribes' resolutions simply ask the BIA to contract with APIA in regard to all available programs for their benefit. Though APIA has consistently sought to contrast TAC's interests and desire to contract for the ANCSA § 14(h)(1) program with the allegedly conflicting wishes of the village-based tribes, there is really nothing before the Hearings Division

to indicate that the villages, which normally enjoy the first and second ranks in the Alaska Order of Precedence, have ever consciously requested that APIA operate the ANCSA § 14(h)(1) program in particular. As noted, their 25 U.S.C. § 450f(a)(1) resolutions, upon which APIA's compacting rights are based, while very broadly worded, make no specific mention of ANCSA § 14(h)(1) funding[1]. A similar situation exists in general with respect to the other Alaska consortia which have compacted with the BIA. Thus, in the absence of any Regional Corporation resolutions, APIA and the other tribal consortia have received the funding for the ANCSA § 14(h)(1) program by default.

As reported in Appellee's Opening Brief, at 11, this state of affairs continues with respect to all the Alaska Self-Governance compacts *except APIA's*. Though inclusion of ANCSA § 14(h)(1) funding in two of the other compacts and funding agreements is now supported by both village *and* Regional Corporation resolutions, most Self-Governance consortia are still receiving funding in the absence of any expression of contrary intent through submission of 25 U.S.C. § 450f(a)(1) resolutions by the affected ANCSA Regional Corporations. With respect to the APIA situation, things have changed, by virtue of the BIA's receipt of TAC's May 20, 2005 Resolution.

Until receipt of that resolution, the BIA and OSG were never put in the situation of having to decide how the so-called Alaska Order of Precedence would apply in the event of receipt of inconsistent expressions of tribal intent, submitted by multiple entities qualified under the ISDA to submit resolutions for the same program. In effect, APIA's argument is that the

---

[1] Most of these resolutions were submitted in 1995, just before the ANCSA funding was first made available to APIA by being included in its new Self-Governance Compact and Annual Funding Agreement. See Example attached hereto as Appellee's Exhibit 13.

BIA should have rejected TAC's contracting request, because the ISDA somehow incorporates a principle of "first come, first served," without regard to considerations of which tribe is the one most directly served by a particular program.   The BIA's rejection of that approach is the heart of the decision under review in this appeal.

The limited nature of the BIA/OSG determination under review also deserves comment. The action taken based on recognition of TAC's entitlement to exercise the decisive ISDA contracting choice with regard to the ANCSA § 14(h)(1) program does not suggest that the traditional Alaska Order of Precedence has been disturbed in any broad way.   Of course, TAC itself recognized the limited subject-matter with respect to which it would be entitled to priority consideration when it asked to contract *only* for the specific ANCSA conveyance-related program of which it is the primary beneficiary.   A TAC resolution requesting a contract for *other* BIA programs, serving primarily individuals or village governments, would have been rejected, just as the BLM in another context chose not to contract with ANCSA corporations for Native allotment surveys if a village-based resolution was also submitted asking for a contract to do the same work.   TAC of course submitted no such request to contract for any programs other than ANCSA§ 14(h)(1), and the funding for the vast majority of BIA programs continues to flow to ISDA tribal organization APIA on the strength of 25 U.S.C. § 450f(a)(1) resolutions submitted by village-based tribes.

1. The ANCSA § 14(h)(1) program *does* primarily benefit TAC and other ANCSA Regional Corporations, as Appellee rightfully determined.

Appellant APIA, at 4 and 5 of its Answer Brief, once again argues that village-based tribes rather than ANCSA Regional Corporations are the primary beneficiaries of the ANCSA §

14(h)(1) program, calling the BIA's contrary conclusion "unpersuasive." But thoughtful analysis reveals that it is APIA's own view which fails to persuade. Appellant's Answer Brief selects a couple "examples"[2] from Appellee's analysis to challenge, but does not come to grips with the several basic factors pointing to the conclusion that the BIA's position better reconciles the Congressional intent reflected in the two legislative schemes of ANCSA and the ISDA.

Appellant once more presents the argument that the Native village governments, though unacknowledged and *unmentioned* in ANCSA, were intended by Congress to be the "primary" beneficiaries of the §14(h)(1) program, and the primary repositories of cultural or broadly-held Native community values served by the acquisition and protection of cemetery and historical sites *by the Regional Corporations.* Appellant's Answer Brief argument fails to acknowledge or take account of the critical importance of the central role which Congress assigned to the Regional Corporations in carrying out this mission, one which is obviously unrelated to the Regional Corporations' separate economic development and profit-making agendas. See Appellee's Opening Brief at 25-28; Appellee's Answer Brief at 5-8. APIA also fails to address itself to, or explain away, the significant geographic distinction between village-vicinity sites, which were to be conveyed to the Village Corporations under the ANCSA scheme, and the § 14(h)(1) sites, located at greater distance from particular villages, and not necessarily even easily identified with a specific modern village or its current population. Appellee's Opening Brief at

---

[2] Appellee acknowledges and concedes APIA's point, at the bottom of p. 4 of its Answer Brief, to the effect that the interest of a village-based tribe or individual Alaska Native in the Regional Corporation's acquisition of title and protection of cemetery sites and historic places should not be equated with the interest of federal agencies in whose administrative areas those sites may become inholdings. However, conceding that point in no significant way undercuts the BIA's conclusion that ANCSA Regional Corporations are the tribes directly benefitted by ANCSA § 14(h)(1).

25. Clearly, these sites were to be selected for and preserved on behalf of *all* Alaska Natives affiliated with a region as of the time the selection rights arose, and not exclusively for the benefit of any particular, or even all, village governments or residents.

Appellant also argues that the significance of Congress having chosen Regional Corporations as the entities assigned rights and duties under the ANCSA § 14(h)(1) program should be regarded as having been diminished by the fact that since enactment many Native people have been born who have not yet or may never become shareholders of those Regional Corporations[3]. The observation that the Regional Corporations are no longer owned by all Alaska Natives changes neither the fact they were at the time of ANCSA's passage the entities most-broadly representative of the entire Alaska Native community, nor the fact that their cultural preservation duties towards that implicitly broadly-defined community continue by virtue of the obligations imposed on behalf of such community as a feature of the title conveyance process. 43 C.F.R. §§ 2653.5(a) and 2653.11(b). Given their Congressionally-assigned role, Regional Corporations including TAC have far and away the greatest interest in

[3] Appellant's Answer Brief at 5 asserts that ANCSA for-profit shares can be alienated to non-Natives, while tribal membership is inalienable. The facts are not quite as absolute as APIA makes them out to be on either point. First, with respect to corporate governance, Appellee is unaware of *any* ANCSA corporation out of roughly 200 that has altered its articles to allow for voluntary *inter vivos* alienation of stock to non-Natives. As to the tribal membership claim, while it is true that tribal membership cannot be transferred, it can certainly be lost or acquired in many Alaska Native tribes by member or tribal action, often related to changes in residence. This is in contrast to most tribes in the lower 48 states, where membership is in essence hereditary. At least three of the village-based tribes whose ISDA resolutions APIA relies upon are organized under a provision of the Indian Reorganization Act, 25 U.S.C. § 476, and the constitutions of those three (Atka, Nikolski, and St. Paul) all provide for the possibility of gaining or losing membership in connection with residence changes. A copy of the Membership Article of the Native Village of Atka Constitution & Bylaws, which is typical of the three mentioned, is attached hereto as Appellee's Exhibit 14. These overstatements by Appellant aside, the main point is that Congress's intent to charge ANCSA Regional Corporations--rather than any other category of Alaska Native entity--with an initial and open-ended continuing duty to acquire and protect ANCSA § 14(h)(1) sites, cannot be gainsaid.

seeing to the faithful and efficient completion of the conveyance process.[4]

APIA also claims that the ANCSA § 14(h)(1) duties of an ANCSA Regional Corporation, and its interest in cultural heritage, are "ancillary at best." This judgment is not reflected in any act of Congress, is inconsistent with the ANCSA legislative scheme, and also does not square with the actual history of implementation of the § 14(h)(1) program[5]. It is historical fact that the Regional Corporations, with no possible profit to be gained, did file and actively pursue well in excess of 2000 claims, and they have continued to be the entities in the Native community most active in pursuing completion of the implementation and conveyance process.

TAC's own performance is broadly illustrative on this point. When the BIA's ability to make progress towards completion of the conveyance process was crippled by the ill-conceived statewide shifting of ANCSA program funding to tribal consortia like APIA after 1995, TAC on its own initiative brought APIA to the bargaining table to hammer out an agreement [Appellee's Exhibit 5] which it hoped would assure completion of ANCSA § 14(h)(1) tasks by APIA. TAC's continued demonstration of a high level of concern for completion of the conveyance

---

4 As noted elsewhere, Regional Corporation-expressed concerns that ANCSA § 14(h)(1) functions were not being carried out as required was a prime factor leading the BIA to begin in 2004–and largely successfully–to negotiate specific scope of work requirements into the Funding Agreements of tribal consortia. See Appellee's Opening Brief at 9-11. There is no evidence that village-based tribes were even aware of the necessity to complete the ANCSA conveyance process, or the problem of some Alaska tribal consortia diverting funding to other purposes, much less that such village-based tribes were taking any steps to hold tribal consortia like APIA accountable.

5 In addition, it must be noted that Congress has not treated ANCSA corporations as entities having a stake in the cultural affairs of the Alaska Native community in ANCSA alone. In addition to the fact that the ISDA definition of tribes includes ANCSA corporations, such corporations are also defined as tribes in the National Historic Preservation Act, 16 U.S.C. § 470w(4); the Archaeological Resources Protection Act, 16 U.S.C. § 470bb(5); and the Native American Graves Protection and Repatriation Act, 25 U.S.C. § 3001(7). Clearly, Congress has continued to view ANCSA corporations, which are the major Alaska Native land owning entities, as having a stake in matters other than pure profit generation activities.

process is self-evident. Indeed, the very action which led to the BIA decision under review was TAC's May 2005 submission of a 25 U.S.C. § 450f(a)(1) resolution asking the BIA to contract the ANCSA § 14(h)(1) program directly to TAC. There is no reason to suppose that TAC's action was profit-motivated. In the face of all this evidence of Congressional intent and ANCSA Regional Corporation diligence, it is hard to give much credence to APIA's claim that the Regional Corporations are not the intended primary beneficiaries of the ANCSA § 14(h)(1) program.

   2. The BIA's "departure" from the Alaska Order of Precedence in the present case was indeed appropriate.

   APIA argues in its Answer Brief, at 6-8, that the description of the ANCSA program in the Department of the Interior's Budget Justification document precludes the interpretation set forth in the May 20, 2004 Regional Solicitor's Office memorandum concerning what tribe is the primary beneficiary of the ANCSA § 14(h)(1) program. The general language does no such thing, and is not a substitute for the type of reasoned analysis set forth in Appellee's Briefs in this appeal. Far from being a mere "personal opinion," that analysis is based on consideration of the Congressional choices made in the ANCSA legislation, which unmistakably places the opportunity for and burden of acquisition and protection of ANCSA § 14(h)(1) sites on Regional Corporations including TAC. Congress of course went on a short four years later to enact the ISDA, and in doing so specifically included ANCSA corporations in the definition of Indian tribe, thereby explicitly making such corporations eligible to obtain or dictate the awarding of contracts pursuant to 25 U.S.C. § 102(a)(1).

   While Appellant correctly cites statements to the effect that the general purpose of the

ISDA is the transfer of control to tribal governments, meaning in the Alaska context predominantly village-based tribal entities, but an interpretation that the ISDA limits contracts to those authorized by such entities would impermissibly render the inclusion of ANCSA corporations in the statutory definition as mere surplusage. In commenting on the complained of "departure" from the (informal) Alaska Order of Precedence, Appellant at p. 6 of its Answer Brief characterizes the situation as one where BIA "for many years ignored the BLM policy." That is not an accurate statement of the history. What both BLM and the BIA did was develop similar policies at different times when each was confronted with a similar unusual situation; that is, the receipt of competing resolutions requesting a contract for the same work, each submitted by a different ISDA-defined tribe with a claim to be the tribe served by the program. For the reasons set forth in this and Appellee's two prior briefs, the conclusion that an ANCSA Regional Corporation is the primary beneficiary of the ANCSA § 14(h)(1) program was the proper one to reach when the BIA was presented with the question *for the first time* as a result of submission of the TAC resolution. Contrary to the suggestion that this was somehow a change of course, or reversal of a prior policy, the simple fact is that BIA was never before presented with the precise question, because no ANCSA Regional Corporation had in the past submitted to the BIA a 25 U.S.C. § 450f(a)(1) request to contract a program, like the ANCSA § 14(h)(1) program, with respect to which it was clearly the primary and direct beneficiary entity.

Because the action taken by the BIA and OSG in giving precedence to the specific and explicit TAC request over the generic village-based tribal requests supporting APIA contracting of the same program was a matter of first impression, there was no reason it needed to be accomplished by some formal policy promulgation process. After all, the normal Alaska Order

of Precedence has not itself ever been formally established by statute or regulation, and there is no reason that the shaping of narrow exceptions to it in appropriate circumstances may likewise be accomplished by case-by-case decision-making.

B. Though the situation faced by the BIA and OSG was basically unprecedented, and not provided for in the procedural regulations, APIA was given ample notice of the BIA's interpretation of the law, and of the outcome to be expected, and the reasons for it.

   1. APIA was well aware of what the BIA was doing and why.

As described in Appellee's Opening Brief at 15-18, and in the Affidavit of Ken Pratt attached hereto, representatives of APIA were made aware of the BIA position that a request to contract submitted by TAC would be regarded as controlling in 2004, and the same message was conveyed again when the issue arose in the months leading up to the May 2005 negotiation for APIA's Fiscal Year 2006 AFA. Moreover, APIA had already been aware of the importance TAC placed on performance of ANCSA § 14(h)(1)-related tasks since at least 1998, when a TAC-APIA Agreement was negotiated–one which recognized TAC's ownership of the ANCSA work products. Thus, APIA cannot claim surprise when BIA and OSG insisted, in the wake of the May 24, 2005 TAC Resolution, that the funding which TAC requested to receive was to be removed from the 2006 APIA Funding Agreement.

APIA complains that it never received a decision setting forth the reasons for the BIA action. However, its own actions in preparing its September 27, 2005 revised AFA, including the item 15 note, belie the notion that it was not aware of the BIA's position or the reasons for it. APIA asserts that the February 15, 2006 Bunch Recommended Decision, issued following the informal conference, was the first time it was informed by a BIA decision of the determination

that in connection with the limited portion of its proposed AFA, TAC's resolution was to be honored over those village-based tribal resolutions under which APIA had been operating. Still another indication that APIA was completely aware of the BIA's and OSG's position was the fact that in its January 3, 2006 "Position Paper on ANCSA § 14(h)(1) Activities and Funding," supposedly prepared before being informed by any BIA decision, APIA's attorneys presented at considerable length the very same arguments it advances in this appeal [Appellee's Exh. 10].

That is not to say that issuance of a more formal written decision at any earlier date would not have been desirable, but the failure to provide such an instrument should not dictate the outcome of this appeal.[6]

2. Even if viewed as a declination issue vis-a-vis APIA, the BIA position would be defensible under the applicable criteria.

While not conceding that a formal declination procedure was appropriate or necessary in the unique circumstances of this case, Appellee would note that the BIA's substantive determination could have been shoe-horned into one or more of the very broad and general approved grounds for declination of a contracting request. Probably the closest fit would have been that stated in 25 U.S.C. §450f(a)(2)(C): "the proposed project or function to be contracted for cannot be properly completed or maintained by the proposed contract." While that stated basis for declination could certainly be deemed to describe the present circumstances, the very generality and vagueness of it demonstrates that treating the BIA determination that TAC's

[6] And even if the Hearings Division decision should be decided in favor of Appellant on procedural grounds, Appellee repeats his request that the decision on appeal also address the central question as to which tribe(s) (ANCSA Regional Corporation TAC or the individual village-based tribes who support the APIA compact generally) should have the controlling voice with respect to ISDA contracting of the ANCSA § 14(h)(1) program.

resolution was controlling as a declination decision would not have materially advanced the resolution of the core dispute.

C. <u>APIA's appeal should be regarded as untimely, and dismissed on that account.</u>

In its Answer Brief APIA first responds to the timeliness question, at 10-11, by arguing that there may be a deadline for filing a notice of appeal, but there is not an equivalent one relating to a request for an informal conference. Appellee believes that the better interpretation of the regulations is to the contrary. Under 25 C.F.R. §§ 1000.425 and 1000.432, the entity dissatisfied with a BIA decision has a choice of asking for an informal conference within 30 days, or filing a formal appeal, again within 30 days. Failure to file a timely appeal is jurisdictional, but failure to make a timely informal request must be as well. Otherwise, a party which missed the appeal deadline could revive or resurrect its lost appeal rights by asking for an informal conference beyond the 30 day limit, and then appealing from the outcome of that conference. Surely such a "loophole" is not intended.

Appellant also complains that it should not be penalized for delaying its request for an informal conference because it did not receive a written warning that the clock was running on its appeal rights. However, APIA's Answer Brief makes no reference to the fact, pointed out in Appellee's Opening Brief at 19, that the *APIA-prepared and signed* revised Annual Funding Agreement submitted on September 27, 2005, specifically stated that "This is without prejudice to the APIAI (sic) to appeal the BIA decision regarding these funds." That September 27, 2005 statement, submitted under the signature of APIA's own authorized representative, severely undercuts Appellant's position with regard to the timeliness issue in two respect: (1) it clearly

implies that APIA understood that there had been a BIA "decision," and what that decision was; and (2) it clearly demonstrates APIA's awareness of its right to appeal. Omitting to acknowledge its own statement against interest in its Answer Brief should not relieve Appellant of its consequences.

Appellant goes on to protest at 11, that it was "in the dark" about why the ANCSA § 14(h)(1) funds were being removed from its contract. The demonstrated facts, and APIA's own actions are at odds with this lament. Much of this ground has already been covered under the previous argument heading, but let us remind ourselves that APIA representatives participated in numerous meetings regarding the ANCSA § 14(h)(1) issue in the year and a month leading up to submission of the TAC resolution, and there is every reason to suppose those representatives were indeed aware of the key tribal beneficiary issue. See Appellee's Opening Brief at 16-19 and attached Affidavit of Ken Pratt. See also APIA's September 27, 2005 Revised FY 2006 AFA, note 15 ("Funds to be transferred to The Aleut Corporation per Resolution by The Aleut Corporation for FY 06.") [Appellee's Exh. 7]. See also APIA's January 3, 2006 "Position Paper" [Appellee's Exh. 10]. In sum, the record is quite clear that APIA management knew what the BIA's "decision" was, and they knew it well in advance of the time that they attempted belatedly to initiate an appeal process by filing the November 14, 2005 request for an informal conference. For that reason, Appellant's appeal should be dismissed as untimely.

## III. CONCLUSION

This appeal by APIA should be dismissed as untimely. If it is not, the BIA and OSG determination that the Government was obliged under the ISDA to honor TAC's 25 U.S.C. §

450f(a)(1) resolution requesting a contract to operate the ANCSA § 14(h)(1) program, instead of those village-based tribal resolutions supporting APIA, should be affirmed.    That core issue should be decided regardless of the Hearings Division's views on the procedural arguments presented by Appellant under provisions of the ISDA which don't reasonably fit the present *sui generis* circumstances.    For any or all of these reasons, APIA's appeal should be dismissed and the actions of the BIA and OSG should be affirmed.

RESPECTFULLY SUBMITTED this 30th day of June, 2006.

Roger L. Hudson, Office of the Regional
Solicitor, Counsel for Appellee

State of Alaska )
) ss.
Third Judicial District )

AFFIDAVIT OF KEN PRATT

I, Ken Pratt, being first duly sworn, depose and state as follows:

1. My name is Ken Pratt. I have worked for the BIA in Alaska since 1985, and have been involved in the fulfillment of the Bureau's duties relating to the Alaska Native Claims Settlement Act (ANCSA) throughout the period of my employment with the Bureau. I have been the Program Manager since 1996.

2. In my concern with seeing the tasks related to the ANCSA § 14(h)(1) program fulfilled, I began raising concerns about transfer of the ANCSA funding to Self-Governance tribes and tribal consortia, without any means of assuring that those entities would carry out the necessary work, as soon as that occurred in 1996. Later on, I was also instrumental in the BIA seeking the advice of the Regional Solicitor's Office, which led to the issuance of the May 24, 2004 memorandum. In large measure, that memorandum has been helpful in persuading Alaska Tribal Self-Governance tribes and consortia to include specific work plan commitments in the Annual Funding Agreements they have negotiated in subsequent years.

3. I am personally familiar with the pending appeal by the Aleutian Pribiloff Islands Association (APIA) from the BIA's and Office of Self-Governance's (OSG's) summer 2005 action removing funding for the ANCSA § 14(h)(1) program from APIA's FY 2006 Funding Agreement, which action was based on the BIA's receipt of a resolution form The Aleut Corporation (TAC) in late May of 2005, requesting that the program be contracted directly to TAC, and not to APIA.

4. I have seen the Appellant's Answer to Appellee's Opening Brief, filed by APIA's attorneys, in which they say at the bottom of page 10 that APIA was "in the dark" about why it would not be receiving the funds associated with the ANCSA § 14(h)(1) program for 2006. Contrary to that statement, it is my distinct impression that APIA officials understood full well what the basis of the BIA's action was at least as early as May or June of 2005. I base this conclusion on my personal involvement and on my attendance at meetings, described below, at which APIA representatives were also present.

5. On 8 or 9 June 2004, I hand-carried copies of the 5/24/04 Solicitor's Office memo to the APIA Office and had a short meeting on same with Lynn Allingham and Millie McKeown. The focus of our discussion concerned the future role TAC would have with regard to identifying specific work tasks APIA would be expected to perform with the ANCSA program funds it received. I also explained that this was a "statewide" issue, which would be individually discussed in the 2005 Self-Governance Negotiations with every other Tribe/Tribal consortia that received ANCSA program funds in their compacts.

6. On 10 June 2004, I attended the 2005 APIA Self-Governance Negotiation, at which I

distributed copies of the 5/24/04 Solicitor's Office memo and explained its genesis (i.e., what led to the BIA Alaska Regional Director's request for the opinion). I then discussed how the BIA was going to respond, making it clear that our position was that the ANCSA regional corporations would have the say as to who received ANCSA program funds and that they would also have a central role in determining the work tasks to be performed with those funds. I also distributed and discussed the following:

(1) new language the BIA was asking APIA to voluntarily agree to incorporate in its Annual Funding Agreement (AFA) for the purpose of: (a) earmarking ANCSA program funds for the sole performance of ANCSA §14(h)(1) related work; and (b) acknowledging the regional corporation roles in the program; and

(2) a summary statement explaining that the actual amount of ANCSA program funds received by APIA consisted of the entirety of funds identified in its AFA for the 39760 account, in addition to 60% of the funds identified for the 39720 account.

With the assistance of Roger Drapeaux (then BIA Management Analyst), I responded to questions tied to the information presented and/or to the ANCSA 14(h)(1) program generally. It was my impression that the APIA representatives present understood the information discussed and did not oppose the BIA positions. This impression seems reasonable given that APIA agreed to incorporate the new restrictive language into its 2005 AFA.

7. On 17 February 2005, I attended a meeting called by TAC that also included the following individuals: Allison McClain and Millie McKeown (APIA); Dick Jacobsen and Melvin Smith (TAC); and Roger Hudson (Solicitor's Office, Alaska Region). As I understood it, the purpose of this meeting was two-fold: first, to review the status of ANCSA 14(h)(1) program work in the Aleut region preparatory to identifying specific related work tasks APIA might perform in FY 2006; and, second, to assist TAC in gathering relevant information that could be provided to its Board of Directors for use in development of a resolution about FY 2006 ANCSA program funds and the APIA Self-Governance Compact. At TAC's request, Roger Hudson attended the first part of the meeting in order to summarize the 5/24/04 Solicitor's Office memo and answer any associated questions the meeting attendees might have about that document.

8. On 17 May 2005, the FY 2006 APIA Self-Governance Negotiation took place. Besides me, attendees who were present when the ANCSA program portion of the negotiation occurred included all of the following individuals: Lynn Allingham and Margaret Galovin (APIA); Dick Jacobsen and Melvin Smith (TAC); Tom Shirilla and Matt Kallappa (OSG-NWFO); and Roger Drapeaux (BIA). (On 12 May 2005 TAC had notified the BIA that it wanted to have representatives at the APIA negotiation to state the corporation's position relative to the ANCSA program funding). At the negotiation, TAC representatives explained that – although a resolution on the subject was still pending – they wanted to ensure that BIA, OSG and APIA understood that TAC was seriously considering contracting directly with BIA for the FY 2006 ANCSA program funds, rather than allowing APIA to receive those funds and perform work on the corporation's behalf. They further reported that their Board of Directors was scheduled to meet the following week and the resolution concerning ANCSA program funds was on the

agenda.

In response, BIA and OSG agreed that they would defer further action on the ANCSA program portion of the FY 2006 APIA funding agreement until a signed resolution stating TAC's position was received. That BIA and OSG would act in accordance with TAC's resolution on this matter was, in my estimation, clearly understood by all attendees, including the representatives of APIA.

9. In the weeks following BIA's receipt of TAC Resolution No. 05-14, a question was raised as to whether APIA was aware of the submission of the TAC Resolution, and of its contents. I then contacted TAC, which confirmed that APIA had been advised of the TAC resolution. My e-mail report on my contacts with TAC is attached hereto.

FURTHER YOUR AFFIANT SAYETH NAUGHT.

Ken Pratt

Subscribed and sworn to before me this 30th day of June, 2006, at Anchorage Alaska.

Roger L. Hudson, Notary Public for Alaska
My commission expires: 07/27/07

attachment: June 22, 2005 e-mail message



Kenneth Pratt/JUNEAU/BIA/DOI
06/22/2005 12:47 PM

To Roger Drapeaux/JUNEAU/BIA/DOI@BIA
cc
bcc
Subject A/PIA AFA

Melvin Smith of The Aleut Corporation (TAC) confirmed to me that A/PIA **definitely** was provided (and is known to have received) a copy of the corporation's resolution. In a letter dated 24 May 2005 TAC notified A/PIA that the resolution was forthcoming and described its content. The resolution was telefaxed to A/PIA immediately after it was signed by TAC's President; it was then mailed to A/PIA...which received it no later than the first week of June 2005.

**Native Village of Atk**

**Atka IRA Council**
P.O. Box 47030
Atka, Alaska 99547
Phone (907) 839-2229 • Fax (907) 839-2269

RESOLUTION NO. 95-07

A RESOLUTION AUTHORIZING THE ALEUTIAN / PRIBILOF ISLANDS ASSOCIATION, INC (A/PIA), TO IMPLEMENT A BIA SELF-GOVERNANCE COMPACT AND ANNUAL FUNDING AGREEMENT ON BEHALF OF THE NATIVE VILLAGE OF ATKA.

WHEREAS, the Native village of Atka is a federally recognized tribe in the Aleutian / Pribilof Islands region of Alaska; and

WHEREAS, the Atka IRA Council strongly supports maximum tribal control of BIA funded programs and services administered by tribes and tribal organizations; and

WHEREAS, A/PIA is the Alaska Native regional tribal organization authorized by tribal resolution to contract for and provide certain federal and state programs and services on behalf of tribal members of the Native village of Atka; and

WHEREAS, A/PIA is the Alaska Native Regional tribal organization authorized by tribal Resolution to contract for and provide certain federal and state programs and services on behalf of tribal members of the Native Village of Atka; and

WHEREAS, Congress recently passed the "Tribal Self-Governance Act of 1994," through which tribes and tribal organizations have been authorized to negotiate Self-Governance Compacts and Annual funding Agreements with the United States, which agreements are intended to improve and perpetuate the unique government to government relationship between Indian and Alaska Native Tribes and the United States, to strengthen tribal control over federal funding and program management, and to improve the quality of services provided to Native peoples: and

WHEREAS, the Atka IRA Council strongly supports promoting and strengthening the governing and administrative capacity of all IRA/Traditional Council through out the A/PIA region, while also maintaining and improving the ability of A/PIA to carry out its role and obligations at the regional level ; and

EXHIBIT 13

PAGE 1 OF 2

WHEREAS, a Self-governance Compact and Annual funding Agreement would specifically provide for the transfer of resourced from the federal government to A/PIA , and would authorize A/PIA to redesign programs, activities, functions and services, and to reallocate funds for such programs , activities, functions and services according to *tribally* determined needs and priorities;

NOW THEREFORE BE IT RESOLVED, that the Native Village of Atka hereby authorizes A/TIA to take any and all such action as may be required to implement a Compact of Self-governance and an Annual Funding Agreement on behalf of the Native Village of Atka, as provided by "The Tribal Self-Governance Act of 1994," which Compact and AFA shall include funding and program and service delivery responsibility for all programs, services, functions and activities not otherwise contracted by the Native Village of Atka under a P). L. 638 contract or otherwise restricted by the Tribe.

PASSED AND APPROVED this 20 day of June, 1995

Nick Nevzoroff
President
Native Village of Atka

CERTIFICATION

The foregoing resolution was adopted at a duly convened meeting of the Native Village of Atka, a quorum being present, by a vote of 4 in favor, ____ opposed, and 3 abstaining, this 19 day of June, 1995.

ATTEST:

Judy J. Zimmer
Secretary
Native Village of Atka

of St. Paul and St. George Islands hereby authorizes A/PIA to take any and all such

EXHIBIT 13
PAGE 2 OF 2

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS

# CONSTITUTION AND BY-LAWS

OF THE

# NATIVE VILLAGE OF ATKA ALASKA

RATIFIED MAY 23, 1939

UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON : 1957

EXHIBIT 14
PAGE 1 OF 2

# CONSTITUTION AND BY-LAWS OF THE NATIVE VILLAGE OF ATKA

We, a group of Aleuts having the common bond of living together in the Village of Atka, Territory of Alaska, in order to have better life and greater security, make for ourselves this Constitution and By-laws, by authority of the Act of Congress of June 18, 1934, as amended by the Acts of June 15, 1935 and May 1, 1936.

## ARTICLE I—NAME

This organization shall be called the "Native Village of Atka."

## ARTICLE II—MEMBERSHIP

SECTION 1. *First Members.*—All persons whose names are on the list of native residents, made according to the Instructions of the Secretary of the Interior for organization in Alaska, shall be members of the Village.

SEC. 2. *Children of Members.*—All children of any members shall be members of the Village.

SEC. 3. *Loss of Membership.*—Any member may willingly give up his membership, or his membership may be taken away for good reason by the Village, or if he moves away from the Village, intending not to return, he shall lose his membership.

SEC. 4. *New Membership.*—Any person who has lost his membership and any other native person may be made a member if he sets up a home in the Village.

SEC. 5. *Membership Rules.*—The Village may make rules to govern membership, either for the purpose of carrying out this Article or covering membership matters not taken care of in this Article.

## ARTICLE III—GOVERNING BODY

SECTION 1. *Choice of Governing Body.*—At a general meeting following the acceptance of this Constitution, the Village membership shall decide what kind of governing body it wishes to set up to speak and act for the Village and to use the powers of the Village. If there is a governing body already set up in the Village, at the time this Constitution is accepted, the membership may decide to keep that governing body, or it may choose a new form of government.

SEC. 2. *Choice of Officers.*—The Village shall at the same time decide how members and officers of the governing body shall be chosen and how long they shall serve. The Village shall then choose the members to serve on the governing body and such officers as may be thought necessary.

SEC. 3. *Meetings of Membership and Governing Body.*—The Village shall decide when and how often there should be meetings of the

236427—40

EXHIBIT 14

PAGE 2 OF 2

**Aleutian Pribilof Islands Association, Inc.**

**v.**

**Dirk Kempthorne, Secretary of the Interior, United States Department of the Interior, et al.**

**Civil Action No. 06-2173 (CKK)**

# Exhibit 7

**OFFICE OF HEARINGS AND APPEALS**
Departmental Hearings Division
405 South Main Street, Suite 400
Salt Lake City, Utah 84111

| | |
|---|---|
| ALEUTIAN-PRIBILOF ISLANDS ASSOCIATION,<br><br>Appellant<br><br>v.<br><br>NORTHWEST REPRESENTATIVE, OFFICE OF SELF-GOVERNANCE, BUREAU OF INDIAN AFFAIRS,<br><br>Appellee | IBIA 06-50-A<br><br>Appeal of a decision by the Bureau of Indian Affairs, declining APIA's proposal in its 2006 annual funding agreement for funding to perform activities under 43 U.S.C. § 1613(h)(1) |

**APPELLANT'S REPLY TO APPELLEE'S ANSWER BRIEF**

The Indian Self-Determination and Education Assistance Act ("ISDEAA") imposes on federal agencies very specific procedural and substantive requirements when they decline to renew all or any portion of an agreement with a tribe or tribal organization. These requirements, and the failure of the Bureau of Indian Affairs ("BIA") to follow them in this case, have been discussed in detail in the previous briefs of the Aleutian-Pribilof Islands Association ("APIA"). In its Answer Brief, the BIA continues to ignore the mandates of the ISDEAA and its implementing regulations, except to acknowledge that the agency has not complied with them. The BIA seeks to excuse its violation of controlling law by casting the declination as a discretionary "exception" to agency policy justified by a "retrocession analogy" consistent with the "spirit" of tribal self-determination. But the ISDEAA and its

A BIA. 0972 RH

implementing regulations, as well as the compact and funding agreements between APIA and BIA, consist not of analogies and spirits, but express requirements and contractual commitments in plain language. These the agency has not complied with, and does not even argue that it has.

**I. The BIA Erred in Failing to Apply its Alaska Order of Precedence, where APIA's Sanctioning Tribes Benefit from the ANCSA Program.**

*A. APIA's Sanctioning Tribes and their Members Benefit from the ANCSA Program, and thus May Compact that Program through APIA.*

Nothing in the BIA's briefs refutes APIA's arguments that Alaska Tribes and their members are the primary beneficiaries of the conveyance and preservation of sites embodying their cultural heritage. Senator Stevens' comments making this clear are called "misleading" by the BIA, but we are not told why. Appellee's Answer Brief at 6. The BIA emphasizes that tribal governments are not mentioned in the Alaska Native Claims Settlement Act ("ANCSA"), *id.* at 6 and 7 n.1, but this is neither surprising nor particularly significant. At the time ANCSA was enacted, the scope of tribal rights in Alaska was a highly-charged political subject that ANCSA studiously avoided. It does not follow from this that Alaska tribes and their members did not benefit from the statute, and in particular from section 14(h)(1). They did, and continue to do so, as discussed extensively in Appellant's previous briefs.

The BIA also points to APIA's agreement that work product from the ANCSA activities belongs to TAC as evidence that the Alaska Natives and governments APIA represents do not benefit from the program, or at least are not its primary beneficiaries. *Id.* at 8. A museum collection, however, benefits not only the owners—arguably not even primarily the owners—but rather the generations of peoples whose traditions are embodied in

that collection. There is no need to resort to caricature and contrast "profit-hungry culturally indifferent ANCSA Regional Corporations like TAC and the virtuous civic-minded village-based tribes"—those are the BIA's words. Appellee's Answer Brief at 5. APIA's arguments simply reflect the obvious: cultural knowledge and traditions are of more central concern to tribal governments than they are to the regional corporations whose central concerns are economic, and despite its attention-grabbing rhetoric quoted above the BIA does not really contest this assertion.

The bottom line is that as beneficiaries of the ANCSA section 14(h)(1) program, APIA's sanctioning tribes had the right to authorize APIA to compact that program on their behalf, and they did so. Once that was done and the program and associated funds were included in APIA's compact and funding agreement, the BIA's options to withdraw the program and funds from APIA were severely limited under the law, as we discuss below.

*B. The Alaska Order of Precedence Should Have Been Followed.*

The BIA objects to APIA's argument that the government-to-government relationship between the United States and federally recognized tribes, the relationship on which the ISDEAA is premised, dictates adherence to the normal Alaska Order of Precedence. Appellee's Answer Brief at 10. If this is so, the BIA complains, "it is hard to imagine when an ANCSA corporation might win a contract, except perhaps if a village-based governmental tribe elected not to apply."[1] That is exactly the point behind the Order of Precedence, as consistently implemented by the BIA for many years.

---

[1] A regional corporation could also "win a contract" if no federally recognized tribes were located in the service area, or in other circumstances. *See, e.g., Cook Inlet Treaty Tribes v. Shalala*, 166 F.3d 986 (9th Cir. 1999) (rejecting Native Villages' challenge to authority of regional corporation to compact health care services under ISDEAA, where Congress had mooted appeal by passing legislation expressly authorizing regional corporation to compact without authorizing resolutions of Villages).

For example, in a case involving overlapping service populations in Alaska, the

Interior Board of Indian Appeals ("IBIA") described the contracting hierarchy as follows:

> 1. Active Indian Reorganization Act (IRA) Council.
> 2. In absence of an IRA, the formally established Traditional Council.
> 3. In absence of either of the first two, the local ANCSA village/urban for-profit corporation.
> 4. In absence of all above, the ANCSA Regional for-profit Corporation.

*Douglas Indian Ass'n v. Juneau Area Director, BIA*, 27 IBIA 292, 293 (1995). "In [the]

absence of" a competing proposal from a federally recognized tribe (or village corporation),

the regional corporation may contract under the ISDEAA. Where, as here, the local tribes

that benefit from the program have authorized APIA to contract on their behalf, that

authorization takes precedence over the TAC resolution.

The BIA argues that its departure from the Order of Precedence is justified by the

"unique circumstances" presented here, and "is well within the Secretary's discretion."

Appellee's Answer Brief at 12. This position ignores that the Secretary has taken no action to

alter the longstanding and well-established Order of Precedence. Instead, the Alaska Region

decided on its own to make exceptions, on an ad hoc basis, based on the 2004 Regional

Solicitor's opinion, which, as APIA pointed out in its previous briefs, is based on significant

misstatements concerning the nature of the funds that are at issue here. In fact, as APIA has

pointed out in previous briefs, it is striking that the Department has acted contrary to the

Regional Solicitor's suggestion that ANCSA funds be removed from recurring Tribal Priority

Allocation ("TPA") funding and instead has continued to request from Congress that these

funds remain in the TPA account. *See* Appellant's Answer Brief at 6-7.

Most importantly, agency "discretion" to implement policy "exceptions" does not

allow an agency to breach its contracts. *See, e.g., Cherokee Nation v. Leavitt*, 543 U.S. 631

(2005) (promises in ISDEAA agreements legally binding, notwithstanding internal agency funding allocations and policies). As noted in APIA's Opening Brief, the Compact between BIA and APIA explicitly states that funding for successor agreements can only be reduced in accordance with section 106(b) of the ISDEAA, so the BIA's failure to meet or even apply the funding reduction criteria constitutes a breach of contract. Appellant's Opening Brief at 18 n.11. The BIA concedes that "none of the five stated statutory grounds for reduction of funding [in section 106(b)(2)] fit the present situation well." Appellee's Answer Brief at 17. Agencies simply do not have the "discretion" to break contractual promises under cover of policy "exceptions." *E.g., American Export Isbrandtsen Lines, Inc. v. United States*, 499 F.2d 552, 576 (Ct. Cl. 1974) (20-year contract with United States "governed by the principles of contract law and not by the auguries of agency discretion").

The BIA's belief—or at least the Alaska Region's belief—that it is justified in departing from the Alaska Order of Precedence to transfer the funding to TAC does not relieve the agency of meeting either its contractual commitments or the procedural and substantive requirements of the ISDEAA and its regulations, as discussed next.

**II. The BIA Failed to Follow the Statutorily Required Declination Procedures and Criteria, so the BIA Action and Recommended Decision Must be Reversed.**

Appellee concedes that "it did not follow the dictates of the declination process," and that if the action appealed was a declination, "the decision should go in favor of Appellant." Appellee's Answer Brief at 16. To avoid this result, the BIA focuses on the effect of TAC's resolution seeking to contract the ANCSA program directly, as though this single action relieved, or prevented, the BIA from following the entire statutory and regulatory scheme of safeguards with respect to APIA. But this rationale, as well as the action underlying it, contravenes not only "the essential spirit of the Self-Determination policy," Appellee's

Answer Brief at 14, but the specific terms of the Self-Determination Act and the BIA's own implementing regulations.

*A. Section 102 and 106 of the ISDEAA and 25 C.F.R. §§ 900.32 and 900.33 Prohibit the Revocation of the ANCSA Funds Notwithstanding TAC's Resolution.*

The BIA admits that the regulations at 25 C.F.R. §§ 900.32–.33 "do plainly bar the Government from partially declining a substantially unchanged successor annual funding agreement," but argues that the regulations "do not fit the circumstances of this case." Appellee's Answer Brief at 13. Because TAC resolved to contract the ANCSA activities directly, the BIA was not retaining the funds for its own purposes, but seeking to honor TAC's contracting rights. *Id.* at 14. This distinction is completely irrelevant in the context of determining whether the declination criteria apply and have been met.

The BIA appears to read the regulations as prohibiting declinations of successor annual funding agreements <u>if and only if the funds are to be retained by the agency</u>, but section 900.32 says no such thing. The BIA invites the IBIA to read into the regulations an exception when the funding is to be transferred to another tribal entity, but the IBIA has never done so and it should not do so in this case. In 1994 the Department of Health and Human Services Departmental Appeals Board ("DAB"), faced a very similar argument and specifically rejected this argument after looking at the exact same statutory and regulatory provisions at issue here.

In *Pit River Health Service, Inc. v. Indian Health Service*, DAB CR333 (1994), 1994 WL 596859, Pit River proposed to include in its contract funds associated with health care services to unaffiliated Indians residing within the Tribe's ancestral territory. The Tribe's ancestral territory overlapped or encompassed the service areas of at least two other tribal

health care providers operating under existing ISDEAA contracts. To approve the Pit River proposal, the IHS would have had to unilaterally reduce the funding of the other tribal contractors, which is prohibited by section 110 of the ISDEAA.[2] Moreover, approving Pit River's proposal at the expense of the other contractors would have violated the IHS's duty under section 106(b)(2) not to reduce funding to those contractors in the absence of one of five narrow exceptions. *Pit River* at *11.

Faced with this legal backdrop, the IHS did the right thing: it partially declined the Pit River proposal under the declination criterion at section 102(a)(2)(C) on the ground that the proposed project or function to be contracted for cannot be properly completed or maintained as proposed. The DAB affirmed this decision: "These [pre-existing] contracts enjoy specific statutory protections provided by [the ISDEAA] against unilateral modification of their terms by IHS. [The ISDEAA] protects contracts between IHS and Indian tribes or tribal organizations from unilateral modifications by IHS or from funding reductions, except in defined circumstances which are not applicable here." *Id.* at 12.

*Pit River* is instructive at several levels. Most obviously, the fact pattern is closely analogous to here, where TAC has proposed to contract to perform services already included in a pre-existing ISDEAA agreement with APIA. Pit River's resolution to contract with the IHS did not mean that the IHS had to reduce funding to other tribal organizations to accommodate that request. Pit River had an equal, even arguably a greater, right to contract for the services given the population's location in its ancestral territory. Yet the IHS, upheld by the DAB on appeal, adhered to the express terms of the ISDEAA and its implementing regulations rather than seek to create an exception that simply did not exist.

---

[2] 25 U.S.C. § 450m-1(b) ("The Secretary shall not revise or amend a self-determination contract with a tribal organization without the tribal organization's consent.").

The *Pit River* case also illustrates that, when two tribal organizations each have rights to contract certain services, contracting rights can be a simple matter of temporal priority (as well as agency policy, as in the Alaska Order of Precedence). If the health care services to unaffiliated Indians in the Pit River ancestral territory were not already under contract to authorized tribal organizations, the IHS would have been able to contract them to the Pit River Tribe without violating the provisions of the ISDEAA cited above. Similarly, TAC would have been able, in the absence of a pre-existing agreement with APIA and the tribal governments it represents, and assuming TAC is a beneficiary of the ANCSA program, to contract that program directly. But the tribal governments in APIA, through APIA, got there first. The ISDEAA and its implementing regulations protect the stability of self-determination and self-governance agreements even where other tribal entities may arguably have equal or even superior rights to contract.

Finally, *Pit River* illustrates the proper way for an agency to decline a tribal proposal under the ISDEAA—in marked contrast to the BIA's procedure in this case. The IHS did not force language concessions by threatening to withhold Pit River's entire funding. Nor did the IHS simply retain the funds with no explanation of its action. Instead, the IHS issued a timely partial declination decision, under section 102(a)(2)(C), identifying particular reasons that the agency could not approve the contested portion of the agreement without violating the ISDEAA.

In contrast, in this case the BIA seeks to evade the declination procedures and criteria spelled out by the ISDEAA and its implementing regulations simply by pointing to the TAC resolution and pledging its loyalty to the spirit of self-determination. These actions, which

flagrantly violate the letter and the spirit of the ISDEAA and its implementing regulations, cannot be sustained.

*B. The BIA Revocation of Funding Was a Literal Declination, Not a Retrocession by Analogy.*

Since the literal language of the ISDEAA and its regulations does not support the BIA's action, the agency resorts to metaphors and analogies. The revocation of funding from APIA, BIA argues, was "akin to the implementation of a retrocession decision by the primary beneficiary tribe," TAC. *Id.* The BIA acknowledges that "the retrocession concept does not fit perfectly, because APIA had not previously been acting under an explicit TAC authorizing resolution," but rather a voluntary Memorandum of Agreement. *Id.* at 15.[3] Nevertheless, the slender reed on which the BIA seeks to evade the declination criteria is "the retrocession analogy." *Id.* at 17. This attempt to justify actions that so clearly depart from what the law requires must fail.

First, TAC may not retrocede the ANCSA program to the BIA because it has never contracted the program to begin with. *See* 25 C.F.R. § 900.240–.241 (defining retrocession and who may retrocede). Thus "the retrocession analogy" is at best just that, and more accurately a distortion of the term.

Second, "the retrocession analogy" does not excuse the BIA from compliance with section 106(b)(2) of the ISDEAA, as the BIA argues. Appellee's Answer Brief at 17. That statute prohibits reductions in funding from year to year unless one of five narrow exceptions applies. 25 U.S.C. § 450j-1(b)(2). The BIA acknowledges that "none of the five stated

[3] The BIA seems to suggest that by voluntarily entering into the MOA with TAC, APIA somehow acknowledged TAC's superior right to contract for the ANCSA activities. This is incorrect. The ISDEAA neither requires nor prohibits such agreements, and the MOA has no legal significance to this case. The fact that APIA chose to cooperate with TAC has absolutely no bearing on whether the BIA violated its ISDEAA agreement with APIA, an agreement to which TAC was not a party.

statutory grounds for reduction of funding fit the present situation well," but argues that the BIA may nevertheless reduce funding when to do so is not "inappropriate"—i.e. when the funds are to be transferred to a different tribal entity benefited by the program. Appellee's Answer Brief at 17. The express terms of section 106(b)(2) do not support this argument, and the DAB's analysis of this issue in the *Pit River* case directly contradicts the BIA's reasoning. Moreover, the BIA's argument that it may circumvent the express terms of the ISDEAA and its implementing regulations whenever the agency believes it is "appropriate" is troubling, to say the least. Neither the ISDEAA nor its implementing regulations give the BIA the right to make up the rules as it goes on an ad hoc basis and, in the process, trample on the rights of tribes. Instead, the BIA should be directed by this Board to abide by section 106(b)(2) and the rest of the ISDEAA whether it wants to or not.

The BIA closes its Answer Brief by reverting to "the retrocession analogy," this time supported by a hypothetical. If the BIA had been operating the ANCSA program directly, and both TAC and APIA had requested simultaneously to contract the program, the BIA would have made an exception to the Alaska Order of Precedence and awarded the contract to TAC. Appellee's Answer Brief at 17-18. In fact, the BIA was not operating the ANCSA program directly in 2005, and APIA and TAC did not request to contract it simultaneously. Instead, the ANCSA activities and funding have been included in APIA's agreements for many years, and those agreements enjoy the specific statutory, regulatory and contractual protections noted above and detailed in APIA's previous briefs. These facts, which the BIA seeks to obscure through analogies and hypotheticals, have real consequences, as illustrated by the *Pit River* case and the actions that the IHS took in that case.

**CONCLUSION**

For the reasons set forth above, APIA requests that the BIA action, and the recommended decision upholding it, be reversed, and that this Board direct the BIA to restore the ANCSA funds to APIA's FY 2006 AFA.

Respectfully Submitted,

Geoffrey D. Strommer

Stephen D. Osborne
HOBBS, STRAUS, DEAN & WALKER, LLP
806 SW Broadway, Suite 900
Portland, OR 97205
(503) 242-1745

Attorneys for Appellant Aleutian-Pribilof Islands Association

June 30, 2006

**OFFICE OF HEARINGS AND APPEALS**
Departmental Hearings Division
405 South Main Street, Suite 400
Salt Lake City, Utah 84111

| | |
|---|---|
| ALEUTIAN-PRIBILOF ISLANDS ASSOCIATION,<br><br>Appellant<br><br>v.<br><br>NORTHWEST REPRESENTATIVE, OFFICE OF SELF-GOVERNANCE, BUREAU OF INDIAN AFFAIRS,<br><br>Appellee | IBIA 06-50-A<br><br>Appeal of a decision by the Bureau of Indian Affairs, declining APIA's proposal in its 2006 annual funding agreement for funding to perform activities under 43 U.S.C. § 1613(h)(1) |

**APPELLANT'S ANSWER TO APPELLEE'S OPENING BRIEF**

The Bureau of Indian Affairs ("BIA") decision at issue is its declination of the Aleutian-Pribilof Islands Association's ("APIA's") proposal, under the Indian Self-Determination and Education Assistance Act ("ISDEAA"), to carry out activities under section 14(h)(1) of the Alaska Native Claims Settlement Act ("ANCSA"), 43 U.S.C. § 1613(h)(1). This bears repeating because the BIA persists, in its opening brief, in attempting to evade the ISDEAA declination procedures and criteria. The simple fact is that APIA proposed to include the ANCSA activities, as it had done for many years with BIA approval, in its annual funding agreement ("AFA") in FY 2006, and the BIA refused. Under existing law the BIA was obligated to include the activities and related funds in the AFA, and if it

chose not to do so it was obligated to follow the procedures and criteria governing how and why to refuse.

By recasting the declination as the application of a new preference policy, the BIA seeks to get around a number of barriers erected by Congress, and by the agency itself in its regulations, that constrain the agency's ability to unilaterally refuse to renew proposed AFAs: (1) the declination procedures in 25 C.F.R. Part 900 Subpart E, including §§ 900.32-.33 prohibiting declination of successor agreements "substantially the same" as the prior agreement; (2) the declination criteria in section 102(a)(2) of the ISDEAA, 25 U.S.C. § 450f(a)(2); and (3) the stable-funding requirement of section 106(b)(2), 25 U.S.C. § 450 j-1(b)(2), which prohibits reductions in funding unless one of five narrow exceptions applies.

The BIA explains that its longstanding policy of including ANCSA activities and funding in ISDEAA agreements with tribally sanctioned organizations such as APIA, without requiring resolutions from the regional corporations, was wrong. Appellee's Opening Brief at 8 (asserting that BIA "failed to understand a fundamental distinction of [the 14(h)(1)] program"); *id.* at 15 (ANCSA work "mistakenly rolled into the APIA compact" beginning in FY 1996). The BIA erred, we are told, in applying its longstanding Alaska Order of Precedence, which gives tribes and tribally sanctioned organizations such as APIA precedence over regional corporations in contracting under the ISDEAA. In the case of 14(h)(1) activities, the BIA concludes, a "policy exception" to the Alaska Order of Precedence is justified, and regional corporations should be elevated above tribes in the hierarchy. *Id.* at 28. This new interpretation of the policy should be upheld, the BIA urges, so long as it is reasonable. *Id.* at 31.

In effect, the BIA seeks to recast a decision strictly constrained by the parameters of the ISDEAA declination process into a decision that is constrained only by policy considerations over which the agency has broad discretion. As we discuss more fully below, the BIA's efforts to recast the decision in this way are not persuasive. Moreover, it is clear that the BIA acted consistent with the law for many years when it compacted the ANCSA program, funded by Tribal Priority Allocation (TPA) funds for the benefit of tribal governments, to APIA and other self-governance organizations around the state of Alaska. The ANCSA program benefits tribal governments and members, and the BIA properly applied the Alaska Order of Precedence in favor of organizations sanctioned by those governments. If the BIA now believes its earlier longstanding practice violated the law and must be corrected, the BIA may only do so through the declination process as required by the ISDEAA and its implementing regulations. The BIA cannot avoid the narrow and specific statutory framework that Congress enacted in the ISDEAA that constrain the BIA's ability to unilaterally refuse to compact specific programs simply by styling its declination a "policy exception."

## I.    The BIA Properly Compacted the ANCSA Program to APIA Under the ISDEAA and the Alaska Order of Precedence.

Nothing in Mr. Bunch's recommended decision or in Appellee's Opening Brief establishes that ANCSA 14(h)(1) benefits the regional corporations only, or even primarily. Therefore the BIA should have continued to follow its longstanding Alaska Order of Precedence and included the ANCSA activities in APIA's FY 2006 AFA by virtue of the resolutions of APIA's member tribes, which are also ANCSA beneficiaries.

*A. The BIA Has Not Shown that Regional Corporations are the Only, or even the Primary, Beneficiaries of the ANCSA 14(h)(1) Program.*

For many years, the BIA compacted ANCSA activities to tribal organizations sanctioned by tribes in their region like APIA without requiring resolutions from regional for profit corporations. Appellee's Opening Brief at 8. The BIA now claims that its former practice was wrong, because the primary beneficiaries of ANCSA 14(h)(1) are the regional for profit corporations. The BIA points out that the regional for profit corporations control the application process, receive title to the lands, and hold property rights and responsibilities for site preservation and maintenance. Appellee's Opening Brief at 25-26. But all of this is consistent with the for profit corporations holding the sites as, in effect, trustees or "custodians" (in Senator Stevens' words) for the true beneficiaries: the Alaska Native peoples and the tribal governments that represent them. While the Villages and their governments may not be "the sole repositories of cultural or community values or motives," Appellee's Opening Brief at 27, they certainly are the primary repositories of such values and motives. Indeed, the Department's own budget justifications recognize this fact by including ANCSA 14(h)(1) funds within the Tribal Priority Allocation ("TPA") funding for essential governmental services, as discussed further below.

The BIA's attempt to minimize the significance of the 14(h)(1) program to tribes, and of tribes to the program, is completely unpersuasive. For example, the BIA states that tribes and individual Natives are merely "indirect beneficiaries of the ANCSA Program" on a par with the BLM, the Fish and Wildlife Service and other federal agencies with jurisdiction over the sites. Appellee's Opening Brief at 8. To equate a Tribe's or an individual tribal member's interest in sites embodying their own cultural heritage with the interest of a federal bureaucracy comprised primarily of non-Natives is absurd and wrong.

In another example, the BIA argues that that the regional for profit corporations are more representative than Tribes because not all Natives are tribal members but the for profit corporations "represented *all* Alaska Natives." Appellee's Opening Brief at 28 (Appellee's emphasis). The past tense is telling, because many Natives are no longer eligible to automatically become shareholders and many today are in fact *not* shareholders.[1] Moreover, for profit corporate shares can be alienated to non-Natives, if the corporation's articles so provide, while tribal membership is inalienable. *See* Appellant's Opening Brief at 12. The bottom line is that a for-profit corporation's motivation and interest is making money, and any interest it may have in cultural heritage is ancillary at best, while preservation and enhancement of culture is among the central purposes of tribal governments.

In sum, the BIA has not demonstrated that regional for profit corporations are the only, or even the primary, beneficiaries of the ANCSA 14(h)(1) program, such that they should take precedence for ISDEAA compacting purposes over the tribes in their regions for this program.

*B. The BIA Alaska Order of Precedence Reflects the Purpose of the ISDEAA and the Department's Characterization of the ANCSA Program and Funds as TPA to Congress, and the BIA's Departure from that Order Was Not Appropriate.*

As discussed in detail in Appellant's Opening Brief, the BIA's long-established contracting hierarchy gives precedence to tribal governments, and organizations sanctioned by tribal governments such as APIA, over regional corporations when both are eligible to

[1] ANCSA provided for 100 shares in the regional corporation for each Alaska Native alive on December 18, 1971. 43 U.S.C. § 1606(g)(1)(A); *id.* § 1604. Those born later, the so-called "afterborns," did not automatically become shareholders. Many have received shares through inheritance or other means, and some regional corporations have voted to issue shares to limited numbers of afterborns, but the number of Alaska Natives with no shares in regional corporations is substantial and growing. *See* David S. Case & David A. Voluck, ALASKA NATIVES AND AMERICAN LAWS 176-77 (2002 ed.) (describing corporations' dilemma of either diluting stock by issuing new shares to afterborns, or leaving the younger generations no stock and no control over ancestral lands held by corporations).

assume a given program. This hierarchy, known as the Alaska Order of Precedence, accurately reflects the purpose of the ISDEAA: "transferring control to tribal governments, upon tribal request, over funding and decision-making ... to implement the Federal policy of government-to-government relations with Indian tribes." Indian Self-Determination Act Amendments of 1994, Pub. L. No. 103-413 § 202, 25 U.S.C. § 458aa note (emphasis added).

Based on the Alaska Order of Precedence and the statutory purpose it reflects and carries out, the BIA since the mid-1990s has included ANCSA activities in compacts with tribal organizations in Alaska that are sanctioned by tribes in their region, including APIA. As recounted in Appellee's Opening Brief, the Bureau of Land Management ("BLM") has, since 1992, employed a different Order of Precedence with respect to contracts for ANCSA-related surveying work. Appellee's Opening Brief at 13. The BLM policy granted priority to regional for profit corporations over tribes on the theory that the conveyance-related surveying work most directly benefited the corporations. For many years the BIA ignored the BLM policy and continued to apply its own Order of Precedence and compact ANCSA activities to tribal organizations such as APIA that are sanctioned by tribes in their regions. Now the BIA claims that its longstanding policy and practice was all a big mistake.

On May 24, 2004, the Regional Solicitor issued a memorandum expressing his opinion that ANCSA regional corporations are the primary beneficiaries of the 14(h)(1) program and thus the proper entities to contract the program or authorize another entity to do so. The Regional Solicitor described the agency's mistake as one of funding characterization: "significant funding has been erroneously included in contracts and compacts as if it were properly categorized as recurring Tribal Priority Allocation (TPA) funding.... I think the ANCSA funds are more properly viewed as a category of non-recurring funds, which should

not be included in a tribal TPA to begin with." Appellee's Opening Brief, Exhibit 1 at 2. To correct this error, the Regional Solicitor concluded, the BIA should adopt the BLM order of precedence with respect to 14(h)(1) activities, and issue a partial declination to the tribally sanctioned organization. *Id.* at 3.

In fact, despite the personal opinions reflected in the Regional Solicitor's memorandum, the Department in 2004 characterized ANCSA funding to Congress as recurring TPA funds to be used for the benefit of Alaska Native communities. *See* Appellant's Opening Brief at 2-3 (explaining purpose of TPA funds and noting that BIA budget justification lists "ANCSA Historical and Cemetery Sites" among Trust Services within TPA). The practice continues to this day. As explained in the Department of the Interior Budget Justification for FY 2006, "This program supports the Departmental goal of Serving Communities by fulfilling Indian fiduciary trust responsibilities by protecting cultural and natural heritage resources." Appellant's Opening Brief, Exhibit A at BIA-TPA-47. The disconnect between the Regional Solicitor's personal opinion about these funds and how the Department explains the purpose of the funds to Congress extends to how the BIA has acted on the legal opinions contained in his memorandum. Despite the memorandum having been written over two years ago, the BIA has taken no steps at all at a policy level to adopt his legal conclusions and formally modify its Alaska Order of Precedence.

In sum, the Regional Solicitor's 2004 opinion reached incorrect conclusions that are not supported by the Department's stated views about the purpose and nature of ANCSA funds: the facts are clear that they <u>are</u> TPA funds that are recurring to tribal compactors like APIA. It is also clear that despite the Regional Solicitor's memorandum the BIA has taken no steps to modify its existing Alaska Order of Precedence. Thus, the Alaska Region's ad

hoc reversal of the Order of Precedence with respect to contracting of 14(h)(1) activities in this case not only departs from the unmodified and longstanding Alaska Order of Precedence policy but it conflicts with the Department's description to Congress about what the ANCSA program funds are to be used for. Until the BIA's contracting precedence policy is changed, the BIA is bound to follow it.[2]

## II The BIA Decision Must Be Reversed for Failure to Meet—or Even Apply—the ISDEAA Declination Criteria.

The ISDEAA provides the BIA only one way—and only five reasons—to refuse to renew a tribal organization's proposed AFA. *See* 25 U.S.C. § 450f(a)(2); 25 C.F.R. § 900.22. Despite the BIA's best arguments to the contrary, a newly minted "policy exception" is not one of these reasons.

The BIA acknowledges that it did not apply the declination criteria or procedures in arriving at its decision to unilaterally revoke the ANCSA funding. Appellee's Opening Brief at 30. In order "to shape a means of vindicating TAC's rights," the BIA revoked the ANCSA funding and then justified this action in retrospect by drawing an analogy to withdrawal from participation in a consortium. *Id.* But there was no need—and no right under the ISDEAA—to resort to analogy. However the BIA action may be characterized with regard to TAC, with respect to the rights of APIA it was quite simply and clearly a refusal to accept APIA's proposal—in a word, a declination. "The Secretary may only decline to approve a proposal for one of five specific reasons...." 25 C.F.R. § 900.22. To date, the BIA has failed to cite any of these specific reasons, and it has failed to meet the statutory burden of producing "a specific finding that clearly demonstrates that, or that is supported by a controlling legal authority that" one of the five reasons exists. 25 U.S.C. § 450f(a)(2). Ad hoc and newly

---

[2] *See Morton v. Ruiz*, 415 U.S. 199, 235 (1974) (the BIA must "comply ... with its own internal procedures" even where those procedures are more rigorous than required).

developed policy exceptions do not come close to satisfying this standard. Therefore the BIA understandably urges that its action be viewed as some kind of permissible though ill-defined exercise of agency discretion.

In the ISDEAA, however, Congress has pointedly limited agency discretion. "The Secretary is directed, upon the request of any Indian tribe by tribal resolution," to enter into an ISDEAA agreement, and "[t]he Secretary shall approve any severable portion of a contract proposal that does not support a declination finding...." 25 U.S.C. § 450f(a)(1), (4) (emphasis added). The intent of Congress could not be more clear: "to insure that denials of requests for self-determination contracts are handled only through the declination process." S. Rep. 100-274, 1988 U.S.C.C.A.N. 2620, 2643 (1987) (emphasis added).[3] The BIA's attempt to craft an alternative means of denying APIA's proposal flies in the face of the express terms of the ISDEAA and its implementing regulations.

The BIA justifies this extraordinary departure by suggesting that the declination procedures do not "squarely fit the circumstances." Appellee's Opening Brief at 30. The circumstances are that APIA proposed to include the ANCSA activities in its AFA, as it had for almost a decade, and the BIA refused to include them. These facts fit the declination procedures squarely. Simply calling the action a "reallocation of resources" pursuant to a "policy exception" does not convert a declination into something else, nor does it relieve the BIA of its burden of clearly demonstrating the validity of the action. The Regional Solicitor himself recognized the necessity of following the ISDEAA declination process when he suggested that the BIA issue a partial declination in order to retrieve ANCSA funds from

[3] These mandatory statutory directives reflect Congress's recognition of at least two facts: (1) the government's historic mistreatment of Tribes, especially given its trust responsibilities; and (2) the inherent tendency of any bureaucracy (like the BIA) to resist yielding its authority—and funding—to other entities (like Tribes).

compacting entities. Appellee's Opening Brief, Exhibit A at 3. The Regional Solicitor suggested declination under section 102(a)(2)(A), on the grounds that the contracting entity has a demonstrated record of non-performance, which is not the case here. *See* Appellee's Opening Brief at 24 (adequacy of APIA's work not at issue).

Several consequences flow from the BIA's refusal to follow the only means the ISDEAA affords to reject APIA's proposal. First, because the agency did not respond with a decision containing specific declination findings within 90 days of APIA's proposal, the proposal is deemed approved, and the ANCSA funds must be restored to the funding agreement. 25 C.F.R. § 900.18.

Second, because APIA's proposed agreement was substantially the same as that approved in previous years by the BIA, the agency cannot decline it or any portion of it, *id.* § 900.32, or even apply the declination criteria in reviewing the proposal, *id.* § 900.33.

Third, even if the declination criteria are applied, the BIA decision must be reversed because none of the five criteria are met, and the BIA does not even argue that they are.

For all of these reasons, the BIA recommended decision, and the revocation of ANCSA funding underlying it, must be reversed and the ANCSA funds restored to APIA's FY 2006 funding agreement.

## III. APIA's Appeal Was Timely.

Finally, the BIA belatedly argues that APIA's request for an informal conference was late. To the extent that this argument has not already been waived by the BIA by issuing a recommended decision on the merits, the argument lacks merit.[4] The BIA appears to read

[4] The BIA argues that the 30-day deadline is "jurisdictional," suggesting it cannot be waived, but when the Department wishes a regulatory deadline to be jurisdictional, it says so. *See, e.g.*, 43 C.F.R. § 4.320(b) ("A notice of appeal not timely filed will be dismissed for lack of jurisdiction."); *id.* § 4.432(a) (same). No such

the regulations as providing thirty days from the time a tribe or tribal organization first becomes aware of the BIA's intent to do something objectionable. The regulations, however, state that the request must be filed "within 30 days of the day [the tribe or tribal organization] receives the decision." 25 C.F.R. § 1000.425; *id.* § 900.154.

Because the BIA failed to follow the declination procedures set forth in the statute and regulations, it is not clear when, if at all, the thirty-day appeal period began to run in this case. It is clear, however, that APIA never received a notice explaining the nature and basis of the BIA decision to withhold the funds and APIA's appeal rights. The regulations require "a detailed explanation of the reason for the decision." 25 C.F.R. § 900.29(a); *see also id.* § 900.152 (mandating appeal information language to be included in decisions). A tribal organization must request an informal conference "within 30 days of the day <u>it receives the decision</u>." *Id.* § 900.154 (emphasis added). In fact, until Mr. Bunch's following the informal conference, the BIA never did issue a decision. APIA was left in the dark about the legal basis for the BIA's decision: Was it a reassumption based on deficient performance? A declination based on legal incapacity to carry out the program? Or something else altogether, as Mr. Bunch later argued? The BIA did not say. Without a decision to appeal, the regulations' limitations period simply did not begin to run.[5]

---

"jurisdictional" limitation is expressly imposed by 25 C.F.R. § 1000.425 or § 900.154, the regulations applicable here.

[5] Moreover, throughout October 2005 and into November, APIA and TAC were attempting to work out an agreement, with the BIA's active encouragement, that would have returned the ANCSA responsibilities and associated funding to APIA. Even if a limitations period would otherwise have begun to run, the Hearings Division should find it tolled by these attempts to resolve the dispute amicably. As explained in the BIA's opening brief, the due date for Mr. Bunch's recommended decision was set back, at APIA's request, well beyond the regulatory deadline due to ongoing negotiations. Appellee's Opening Brief at 20. The same rationale should apply to APIA's initial request for an informal conference.

The record is also clear that APIA filed its request within thirty days of receiving the BIA's final, signed version of the AFA, even though the appeal period is triggered by receipt of the written decision with a "detailed explanation" of its reasons. The BIA would start the clock on September 27, 2005 (at the latest), when APIA signed the revised AFA under threat of the BIA withholding all of its funding. Appellee's Opening Brief at 21. On October 3, the OSG signed the revised AFA, and as stated in the Notice of Appeal, on October 14 (a Sunday) APIA received the final signed version. Appellee's Opening Brief, Exhibit 12 at 2.[6] Thirty days from Monday, October 15, APIA requested an informal conference, on November 14, 2005.

The first BIA decision issued in this case was Mr. Bunch's on February 15, 2006. This appeal was filed within 30 days thereafter, and therefore is timely. Accepting the BIA's argument that the appeal was not timely and that this appeal must be dismissed because of a lack of jurisdiction is not only legally inappropriate but would reward the BIA for inappropriately ignoring its own regulations and not issuing a decision prior to Mr. Bunch's decision.

/////

/////

/////

/////

/////

/////

[6] Appellee's Opening Brief states that "[o]n October 3, 2005, the BIA returned the proposal with [the ANCSA] funds deleted," but that is the date on which OSG signed the AFA, not the date on which APIA received it.

## CONCLUSION

The BIA's rejection of APIA's proposal to renew the portion of its 2006 AFA that contained the section 14(h)(1) programs and funds should be reversed, as it violates the ISDEAA, its implementing regulations, and longstanding agency policy.

Respectfully Submitted,

Geoffrey D. Strommer

Stephen D. Osborne
HOBBS, STRAUS, DEAN & WALKER, LLP
806 SW Broadway, Suite 900
Portland, OR 97205
(503) 242-1745

Attorneys for Appellant Aleutian-Pribilof Islands Association

June 23, 2006

**CERTIFICATE OF SERVICE**

I hereby certify that on this 23rd day of June, 2006, a copy of the Aleutian-Pribiloff Islands Association's Answer to Appellee's Opening Brief was served via telefax and first class mail, postage prepaid upon the following:

Ken Reinfeld, Acting Director
BIA Office of Self-Governance
U.S. Department of the Interior
1849 C Street, N.W., MS 4140 MIB
Washington, DC 20240

Charles F. Bunch
Deputy Regional Director – Trust
Alaska Regional Office
Bureau of Indian Affairs
3601 C Street, Suite 1100
Anchorage, AK 99503-5947

James E. Cason
Acting Assistant Secretary – Indian Affairs
U.S. Department of the Interior
1849 C Street, N.W.
Washington, DC 20240

Roger Hudson
DOI – Office of the Solicitor
4230 University Drive
Suite 300
Anchorage, AK 99508

Tom Shirilla, Field Manager
Office of Self-Governance
500 W 12th Street, Suite 102
Vancouver, WA 98660-2871

Niles Cesar, Regional Office Director
BIA-Juneau Area Office
Federal Building
709 W. 9th, 3rd Floor
Juneau, AK 99801

Geoffrey D. Strommer

June 23, 2006

**Aleutian Pribilof Islands Association, Inc.**

**v.**

**Dirk Kempthorne, Secretary of the Interior, United States Department of the Interior, et al.**

**Civil Action No. 06-2173 (CKK)**

# Exhibit 8

Roger L. Hudson, Attorney
Office of the Regional Solicitor, Alaska Region
4230 University Drive, Suite 300
Anchorage, Alaska 99508-4626
(907) 271-4131 (voice); 271-4143 (fax)

United States Department of the Interior

**OFFICE OF HEARINGS AND APPEALS**
**Departmental Hearings Division**
**405 South Main Street, Suite 400**
**Salt Lake City, Utah 84111**

| | | |
|---|---|---|
| ALEUTIAN PRIBILOFF ISLANDS ASSOCIATION (APIA),<br><br>Appellant<br><br>v.<br><br>NORTHWEST REPRESENTATIVE, OFFICE OF SELF-GOVERNANCE, BUREAU OF INDIAN AFFAIRS,<br><br>Appellee | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | IBIA 06-50-A<br><br>Appeal of a decision by the Bureau of Indian Affairs, declining APIA's proposal in its 2006 annual funding agreement for funding to perform activities under 43 U.S.C. § 1613(h)(1)<br><br>Indian Self-Determination and Educational Assistance Act (ISDEAA), 25 U.S.C. §§ 450-450n |

APPELLEE'S ANSWER BRIEF

COMES NOW APPELLEE, Northwest Representative, Office of Self-Governance (OSG), Bureau of Indian Affairs (BIA), by and through his undersigned counsel, and files Appellee's Answer Brief, responding to the June 9, 2006 Opening Brief filed on behalf of the Aleutian Pribiloff Islands Association (hereafter APIA).

## I. INTRODUCTION

As explained in Appellee's Opening Brief, and the Exhibits thereto, this appeal arises out of the Bureau of Indian Affairs' (BIA's) and Office of Self-Governance's (OSG's) efforts to

overcome a previous mistake in including funding needed for ANCSA conveyance-related work in Annual Funding Agreements (AFAs) of Alaska Tribal Consortia, including the Appellant Aleutian Pribiloff Islands Association (APIA). Although the activities in question, essential to completion of the Alaska Native Claims Settlement Act (ANCSA) § 14(h)(1) cemetery sites and historical places conveyance program, are of primary benefit to ANCSA Regional Corporations, the needed funding was improvidently shifted to the AFAs of tribal consortia in the late 19990s without benefit of any supporting resolutions from the Regional Corporations. Even assuming that inclusion of such funds in tribal consortium compacts could be authorized by village governing body tribes, the BIA's action now under review resulted from the question of first impression which arose when The Aleut Corporation (TAC) submitted its own tribal resolution, asking to contract the work themselves, and also disapproving APIA's continued receipt of the ANCSA § 14(h)(1) funds.

Although the circumstances just described present a unique set of circumstances, which was understandably not foreseen or addressed by any specific procedure in the Indian Self-Determination and Education Assistance Act (ISDA), 25 U.S.C. §§ 450 *et seq.*, or its implementing regulations, at 25 C.F.R. Parts 900 and 1000, the BIA and OSG actions under review in the present case comply with the spirit of those laws, because they resulted in the wishes of the tribe most directly benefitted by the program–that is, The Aleut Corporation (TAC)– being allowed to exercise the intended self-determination.

II. ARGUMENT

A. <u>Nothing in APIA's Opening Brief casts doubt on the conclusion that its appeal was untimely.</u>

As set forth in Appellee's Opening Brief at 18-23, it appears that Appellant's November 14, 2005 request for an informal conference was submitted much more than 30 days after APIA knew of the BIA/OSG determination to withhold the ANCSA § 14(h)(1) funding from its 2006 Annual Funding Agreement (AFA). There are no facts revealed in APIA's Opening Brief which indicate otherwise, although some inaccuracies in characterizing the procedural history are apparent.

On page 3 of its Opening Brief, APIA refers to its proposed FY 2006 AFA as being substantially the same as that for the prior year, and asserts that it was proposed in September 2005. This characterization of the timing would seem to be at odds with the facts as Appellee understands them. BIA/OSG records indicate that the APIA AFA proposal, including the ANCSA § 14(h)(1) funds, was submitted in June rather than September. [Appellee's Exh. 6] The proposal that APIA submitted in September was a revised proposal, reflecting the fact that Appellant had already been informed it would not be receiving the ANCSA § 14(h)(1) funding. Therefore, the revised proposal which APIA submitted in September, under cover of a letter dated September 27[Appellee's Exh. 7] *already included* the item 15 note reflecting the BIA decision. This is clear evidence that APIA had been informed of the firm BIA decision at an earlier date.

APIA's Opening Brief, at 3, goes on to further mis-describe the sequence of events, as if to create the impression that the BIA/OSG action now under review had not already been

communicated to it in advance of September 27, 2005, when the APIA-prepared revised proposal, reflecting omission of the ANCSA § 14(h)(1) funds, was forwarded to the BIA. In fact, it appears that APIA, after learning of the BIA decision, had *already* negotiated the language of note 15 in its revised proposal. That negotiation with BIA and/or OSG did not occur after October 3, but rather at an earlier time in June, July, or August. On its face, the revised proposal reflects that it was signed by OSG on October 3, 2005, so it is possible that signed copy signed by all parties, including APIA, was provided to APIA on that date. [Appellee's Exh. 7] However, that copy already included the negotiated language of note 15, which APIA itself had included in the version it submitted on September 27, 2005.

Significantly, note 15 included specific reference to APIA's right to appeal. No explanation is provided as to why no attempt to exercise that claimed and acknowledged right was exercised until APIA on November 14, 2005, requested an informal conference. By that time, Appellant's appeal rights had expired, and this case should accordingly be dismissed.

Notwithstanding that conclusion, Appellee offers the following responses to APIA's arguments on the merits.

B. <u>TAC is in fact the tribe whose 25 U.S.C. § 102(a) (1) contracting request should be honored.</u>

The BIA and OSG action under review was prompted by TAC's submission of its May 20, 2005 Resolution No. 05-14 [Appellee's Exhibit 2]. APIA argues in its opening brief that TAC's resolution should not be controlling for two basic reasons. First, APIA asserts that the ANCSA § 14(h)(1) program does not primarily benefit ANCSA Regional Corporations, but is rather of primary benefit to village-based tribal governments and their members. Second, APIA

asserts that even if it is conceded that TAC is a tribe benefitted by the ANCSA § 14(h)(1) program, the traditional Alaska Order of Precedence for ISDA contracting should nonetheless be applied, so that the villages which have supported APIA's compact with resolutions submitted under 25 U.S.C. § 450f(a)(1), should be treated as having the superior right to prescribe how and by whom services are to be delivered. Neither proposition advanced by APIA should be accepted.

1. <u>ANCSA Regional Corporations, including TAC, should be regarded as the primary direct beneficiaries of the ANCSA § 14(h)(1) program</u>.

APIA asserts that Native peoples and villages, rather than ANCSA for-profit corporations are the intended beneficiaries of the ANCSA § 14(h)(1) program. Appellant relies heavily on 1971 floor statements from Senators Stevens and Bible as support for the proposition that Regional Corporations are not the primary beneficiaries of cemetery site and historical place conveyances. For reasons already noted in Appellee's Opening Brief at 26-27, this argument is unconvincing.

Appellant takes no account of the over-all ANCSA context in drawing a somewhat overstated contrast between the profit-hungry culturally indifferent ANCSA Regional Corporations like TAC and the virtuous civic-minded village-based tribes who have submitted their 25 U.S.C. § 450f(a)(1) resolution in support of APIA's compact. The overall structure of ANCSA treats Regional Corporations as a central–perhaps *the* central–vehicle for implementing the legislative settlement with Alaska Natives. They are central actors on behalf of the Alaska Native community in its broadest sense throughout the ANCSA scheme, not merely as profit-oriented entities. To cite a few instances:

- The only entities to which *all* Alaska Natives were provided membership by mandatory enrollment were the Regional Corporations.   43 U.S.C. § 1604.

- The Regional Corporations were given key roles in the distribution of the monetary settlement, 43 U.S.C. §§ 1605 and 1606, and the land settlement. E.g. 43 U.S.C. § 1611(b).

- The Regional Corporations had an initial role in advising the villages with regard to organizing themselves, 43 U.S.C. § 1607(a) and (b), and a continuing role in assuring a somewhat equitable statewide distribution of resource revenues.   43 U.S.C. § 1606(i).

But most significantly for present purposes, the ANCSA Regional Corporations are the entities which Congress itself chose to utilize in order to provide for Native ownership and preservation of cemetery sites and historical places, *other than* those in the vicinity of villages, which would be subject to conveyance to village corporations anyway, under 43 U.S.C. §§ 1610(a) and 1611(a).  Senator Stevens somewhat misleading comments to the contrary notwithstanding, there is nothing in ANCSA itself to suggest that the sites available under §14(h)(1) were to be selected and protected for the benefit only–or even primarily--of the *portion* all Alaska Native enrollees who lived in villages, much less for the governments of those villages. Those governments, after all, were *not even mentioned in*, much less assigned any formal role whatsoever, in the ANCSA settlement scheme.

At page 7 of its Opening Brief, APIA correctly points out that Regional Corporations are obliged under the ANCSA § 14(h)(1) regulations and conveyance covenants to protect the values on the basis of which the sites were eligible for selection.  However, contrary to APIA's further

assertion,[1] that fact does not demonstrate that village-based Native governments, or their members[2] are the sole or primary beneficiaries of the ANCSA § 14(h)(1) conveyance program. Indeed, at the time of enactment of ANCSA, Congress created a scheme in which the Regional Corporations, by virtue of their status as the *only* entities owned, controlled by, and representing *all* Alaska Natives, constituted the most broad-based of all Alaska Native organizations. Moreover, as the examples cited above illustrate, Congress assigned the Regional Corporations numerous non-profit-making responsibilities to the inclusively-defined Alaska Native community[3].

In light of all these circumstances, it was hardly remarkable that Congress designated the Regional Corporations as the entities responsible for protecting cultural heritage sites.  With the responsibility for identification of, application for, and ownership and protection of the ANCSA § 14(h)(1) sites, the Regional Corporations ought  surely also be recognized as the ISDA tribal entities in a position to maintain some control of the funding necessary to complete the conveyance process.  APIA's arguments that village-based tribal governments should be

---

[1]  In particular, Appellee is mystified by APIA's page 7 reference to "Congress's intent to benefit tribal members, not just corporate shareholders."   Perhaps this characterization is based on the Senator Stevens floor statement, but it seems to go well beyond that statement, which like ANCSA itself makes no reference to tribes. The Department has of course fully responded to Stevens' concerns by imposing land protection duties on the Regional Corporations through 43 C.F.R. §§ 2653.5(a) and 2653.11(b).

[2]  A very substantial portion of the Alaska Native population does not reside in villages, and does not enjoy membership in or direct representation by tribal governments. Indeed, Anchorage, Alaska, which is the seat of no federally recognized tribe, is Alaska's largest Alaska Native population center.

[3]  Although not indicative of Congressional intent, it can also be noted that the Statewide entity formed by the Regional Corporations – the Alaska Federation of Natives – functioned as and was for many years widely recognized as the *de facto* spokesbody for the entire Alaska Native community, including with respect to many issues only distantly related to corporate profits.

regarded as having a superior claim to decision-making control over the funds needed to complete the conveyance process, defies all logic. Indeed, it has been the BIA's experience that village government-sanctioned tribal consortia have *not* consistently utilized funds intended for completion of the conveyance process in the intended fashion[4]. That experience, described in Appellee's Opening Brief at 7-9, is what ultimately led us to the present impasse.

APIA presents a third argument in support of its assertion that village-based tribes and their members, rather than Regional Corporations, should be seen as the primary beneficiaries of the ANCSA § 14(h)(1) program. APIA's Opening Brief at 8-9. Quoting selectively from a budget justification document, and disparaging the Regional Corporations as mere profit -making entities, APIA once more ignores the essential points set forth above. APIA properly points out that activities not strictly tied to the land conveyance process have been funded and encouraged under the ANCSA § 14(h)(1) umbrella. However, its argument once more ignores the central legislatively-assigned role of the Regional Corporations in these federally-funded activities. Collection of historic records, including oral histories, for example, certainly has value apart from its relevance to the determination of the eligibility of sites for ANCSA § 14(h)(1) conveyance, but advancing those values has fundamentally been a by-product of the conveyance process. Moreover, the work product produced has been recognized as Regional Corporation property, not only by the BIA, *but by APIA itself.* It is noteworthy that in 1998 APIA when entered into its Memorandum of Agreement, it conceded explicitly in Section 5(d), that "[a]ll

[4] Is should be emphasized that APIA's particular performance record in this regard is not the issue in this appeal from the BIA/OSG decision to withhold ANCSA § 14(h)(1) funding. No doubt APIA's proper utilization of the ANCSA § 14(h)(1) funding was positively influenced by TAC activism, which led to the negotiation and execution of the 1998 TAC-APIA Agreement [Appellee's Exh. 5].

ANCSA § 14(h)(1) work product shall be the sole property of TAC[.]" [Appellee's Exh. 5 at 3]

Summing up, it must be concluded that none of Appellant's arguments fundamentally undermine the soundness of the BIA/OSG conclusion that ANCSA Regional Corporations are the primary direct beneficiaries of the ANCSA § 14(h)(1) program, and as ISDA-defined tribes are entitled to dictate via a 25 U.S.C. §450f(a)(1) resolution how the funds for that purpose shall expended, and by whom.

2. <u>The unique circumstances of the present context offer an entirely reasonable basis for making an exception to the Alaska Order of Precedence</u>.

There is no dispute between the parties as to the existence of the so-called Alaska Order of Precedence, usually observed for purposes of deciding what ISDA-defined tribe's resolution should dictate which the Secretaries of the Interior and Health and Human Services are obliged to contract with[5]. Of course, in practice, there is little occasion to apply the Order, because its existence and dictates are widely known, and ANCSA Regional and Village Corporation ISDA contracting requests are rarely submitted under 25 U.S.C. § 450f(a)(1). Instances involving the submission of competing requests are far and away the exception rather than the rule. However, the present situation presents just such an exception. Appellant asserts that the Alaska Order of Precedence should be applied. Appellee believes its conclusion to the contrary is a reasonable and correct one, and should therefore be upheld.

APIA at pages 10-12 of its Opening Brief argues that the nature of the government-to-

[5] Another apparent point of agreement is that the Alaska Order of Precedence, although it reflects a long-standing policy and practice, does not have the force of law, since it is not incorporated into any statute or regulation.

government relationship between the U.S. and federally-recognized (village-based) tribes dictates adherence to the normal Alaska Order of Precedence. By APIA's reasoning, it is hard to imagine when an ANCSA corporation might win a contract, except perhaps if a village-based governmental tribe elected not to apply. The decision under review, of course, reflects a different view. As the Bureau of Land Management (BLM) had done over a decade ago [Appellee's Exh. 3], the BIA and OSG approached the problem analytically, focusing on the question as to what ISDA-defined "tribe" was the primary beneficiary of the program in question, which is of course the only one addressed in the May 20, 2005 TAC Resolution. For the reasons already discussed, Appellee believes it was correct to conclude that the nature of the ANCSA § 14(h)(1) program dictates that TAC as a Regional Corporation be given priority as the primary beneficiary of that program.

APIA offers a critique of Charles Bunch's February 15, 2006 recommended decision, issued as a follow-up to the informal conference requested by APIA [Appellee's Exh. 11]. Appellee concedes that the explanation provided by Mr. Bunch for his recommendation (that the action withholding ANCSA § 14(h)(1) funds from APIA's FY 2006 AFA) be upheld, was not a clear as it might have been[6]. However, Mr. Bunch's bottom line was correct. APIA attacks the Bunch statement, "in this situation the tribal entity and the profit corporation are in fact the

[6] For example, Mr. Bunch's description of the Alaska Order of Precedence is itself somewhat inaccurate insofar as it is asserted to be "tribal, nonprofit corporation, and then profit corporation." [Appellee's Exh. 11 at 3] The correct statement of the order, for purposes of prioritizing competing requests to contract under the ISDA is: (1) IRA-organized Federally recognized tribe; (2) Federally recognized tribe governed by a traditional council; (3) ANCSA Village Corporation; (4) ANCSA Regional Corporation. APIA itself is not a tribe under the ISDA, and has no rank on the order of precedence. Rather it asserts a contracting priority based on supporting resolutions submitted by rank (1) and (2) village-based tribal governing bodies.

same." Appellee submits that all Mr. Bunch intended to convey by this observation was the legally accurate statement that the ISDA definition of "Indian tribe" includes ANCSA Regional Corporations, and the factually accurate statement that TAC Resolution No. 05-14 requested that a contract be awarded to TAC itself. Appellant is certainly correct when it states tautologically that TAC is not APIA, but semantic confusion should not be allowed to obscure the two basic points of the BIA/OSG decision which Mr. Bunch affirmed: (1) TAC is a tribe under the ISDA definition; and (2) TAC's narrow 25 U.S.C. § 450f(a)(1) contracting request should be honored because it is the tribe primarily benefitting from the ANCSA § 14(h)(1) program addressed in its tribal resolution.

APIA also attacks the Bunch Recommended Decision by attempting to contrast the constituencies and beneficiaries of APIA and TAC, at pages 11-12 of its Opening Brief. However, in the context of the choices made by Congress in the ANCSA, Appellant's characterizations are more than a little unfair to TAC and the other Regional Corporations. In APIA's view, the village-based tribes which have submitted resolutions supporting APIA "are made up and entirely politically controlled by the Aleut people for whom the cemetery and historical sites . . . are to be preserved." By contrast, according to Appellant, TAC is "owned by shareholders who may or may not be members of the tribes located in the region and whose interests are to ensure the profitability of the corporations.[7]" APIA's objections have already

[7] In a footnote 7, at page 12, Appellant's Opening Brief hints that ANCSA corporations may not even remain Native owned. However, this observation is purely hypothetical, in that none of over 200 original ANCSA corporation has ever acted to authorize voluntary *inter vivos* alienation of stock to non-Natives. Moreover, no matter how corporate ownership might change, the obligation to maintain and preserve the properties, confirmed by covenants incorporated in to the land conveyances, would remain enforceable.

largely been addressed above.  However, to briefly repeat, it must not be overlooked that it was

Congress which chose to require the ANCSA Regional Corporations to apply for, accept title to,

and preserve the ANCSA § 14(h)(1) sites under terms that precluded the pursuit of the profit

motive.  TAC and other Regional Corporations have in fact been carrying out such obligations in

good faith.  TAC even went so far as to insist that APIA enter into an Agreement setting

performance standards in 1998 [Appellee's Exh. 5], and there is no reason to suppose that its

submission of TAC Resolution No. 05-14 was motivated by any other purpose save to insure

satisfactory completion of the ANCSA § 14(h)(1) conveyance process.

On the subject of constituencies, as discussed above, at the time ANCSA was enacted, it

was required that all Alaska Natives be enrolled to a Regional Corporations, so that TAC's

original shareholder base, on whose behalf cemetery sites and historical places were selected,

include a substantially larger number of Aleut Region-affiliated Alaska Natives than were

resident in the villages which later achieved status and recognition as Indian tribes.  Since

cemeteries and historical sites in proximity to villages were conveyed to ANCSA Village

Corporations anyway, there is nothing unreasonable about the BIA's conclusion that the prime

beneficiaries of a program for the selection and preservation of more remote sites, selected on

behalf of a larger group of Alaska Natives, were indeed the Regional Corporations, who were

charged by Congress with that task and associated obligations.

In short, Appellee's judgment that a departure from the typical Alaska Order of

Precedence was justified in this context is well within the Secretary's discretion, and should be

upheld as a reasonable and proper reconciliation of the purposes of both the ANCSA and the

ISDA.

C. Though a procedure to deal with the situation which gave rise to this appeal is not one specifically provided for in the ISDA or its regulations, the Government's action were consistent with the spirit of the ISDA and its governing regulations, and should be upheld.

Prior to Appellee's receipt of TAC's May 20, 2005 tribal resolution, submitted pursuant to 25 U.S.C. § 450f(a)(1), the funding for the ANCSA § 14(h)(1) program had indeed been included within tribal consortium APIA's Annual Funding Agreements (AFAs). Appellant argues that it is Congress's intent, expressed through the ISDA, that it continue to receive such funding regardless of changed circumstances, or a clear expression of intent to the contrary by the tribe most directly benefitting from the program for which the funds are appropriated– in this case, TAC. It is true that provisions of the ISDA regulations, cited by APIA in its Opening Brief, appear to obstruct the outcome under review, but Appellee asserts that those provisions were not designed to apply to a unique situation such as the present one, and should not be applied to deny TAC, the beneficiary tribe, its own right to self-determination.

1. 25 C.F.R. §§ 900.32 and 900.33 do not fit the circumstances of this case, and should not be construed to deny TAC its rights to contract under 25 U.S.C. § 450f(a)(1).

As observed by Mr. Bunch in his February 15, 2006 Recommended Decision, the closer analogies to the present situation are tribal withdrawal from a consortium, or tribal retrocession of a portion of a tribal organization's contract [Appellee's Exh. 11 at 3]. While the regulations relied upon by Appellant do plainly bar the Government from partially declining a substantially unchanged successor annual funding agreement, it is important to recognize that the event which set the present dispute in motion was the submission of TAC's May 2005 tribal request to contract. This is not a case where the BIA or OSG has arbitrarily withdrawn funds from APIA

to use for its own purposes. Rather, Appellee is acting to honor and vindicate the ISDA contracting rights of TAC, which BIA and OSG have reasonably concluded to be the primary beneficiary tribe of the ANCSA § 14(h)(1) program in the Aleut Region.

In this regard it is noteworthy that the declination criteria of 25 U.S.C. § 450f(a)(2) are to be considered when a §450f(a)(1) tribal contracting request is received. The regulations cited by Appellant would therefore have been available to consider to aid in BIA/OSG consideration of TAC's May 2005 contracting request. But they might also arguably be applied to APIA's AFA proposal submitted in June. Although the content of APIA's proposal had not changed *internally* in regard to the ANCSA § 14(h)(1) program, the *context* was dramatically altered by the prior receipt of TAC's own request to contract for the same program. Unlike the situation where the federal agency might try to remove funds from a tribal AFA, in order to retain them for its own purposes,[8] the BIA/OSG action under review here was motivated by the desire to comply with the statutory mandate to contract with TAC in the absence of grounds to decline its May 20, 2005 tribal contracting request.

Given the seeming clash between its obligation to contract with TAC, the primary beneficiary of the ANCSA § 14(h)(1) program, and the *arguably* applicable prohibition of removing the funds from the APIA AFA, the BIA and OSG chose to honor what it believes to be the essential spirit of the Self-Determination policy, as reflected in statute and regulations. As noted elsewhere, the situation presented more closely resembled a retrocession of contracting

[8] Note that the *Rapid City* and *Susanville* decisions cited in APIA's Opening Brief at 13-14 were not cases where the challenged reduction of funding was for the purpose of satisfying the rights of another ISDA tribe, but rather involved Government efforts to retain the funds removed from the tribes' contracts.

authority by TAC than it does a prohibited stand-alone reduction of funding of an essentially unchanged ongoing AFA.

APIA correctly points out that the retrocession concept does not fit perfectly, because APIA had not previously been acting under an explicit TAC authorizing resolution. However, in practical effect, APIA had run the ANCSA § 14(h)(1) program with the conscious and explicit acquiescence of TAC. Recall for example that APIA had voluntarily entered into a 1998 Agreement with TAC which recognized TAC's primary authority and property interest in ANCSA § 14(h)(1) work products (as well as any land conveyed). [Appellee's Exh. 5] From APIA's arguments regarding the Alaska Order of Preference, one might infer that an ANCSA Regional Corporation could only contract where the higher ranking entities chose not to submit their own tribal requests for contracting. But what the BIA found itself faced with in the present case was the mirror image of that situation. Accepting the BIA's well-supported determination that ANCSA Regional Corporations are the primary beneficiaries of the ANCSA § 14(h)(1) program, it then becomes apparent that in the exceptional narrow context of that program, the tribal consortia, including APIA, have over the past number of years been allowed to contract the program on the basis of resolutions from village-based tribal governing bodies precisely because of ANCSA Regional Corporation inaction, and the lack of any contracting requests from such primary beneficiary tribes. Once the tribe (TAC in this case) with the dominant claim of program beneficiary status does express its contracting desires, that 25 U.S.C. § 450f(a)(1) expression of tribal contracting intent must over-ride the village-based tribal support for a different contractor (in this case APIA).

2. The BIA's insistence that the ANCSA § 14(h)(1) funding be removed from the FY 2006 APIA AFA was not strictly speaking a partial declination decision, but was rather akin to the implementation of a retrocession decision by the primary beneficiary tribe.

APIA beginning at page 15 of its Opening Brief asserts that the BIA/OSG action was an improper declination under the requirements of 25 U.S.C. § 450f(a)(2) and the implementing regulations. Appellee has not contested that it did not follow the dictates of the declination process. Indeed, but for the intervening TAC resolution submitted under 25 U.S.C. § 450f(a)(1), Appellee would not have declined renewal of APIA's AFA for 2006, and would not have had grounds for partially declining the proposed AFA submitted by APIA in June 2005 [Appellee's Exh. 6]. Therefore, *if* the central question on this appeal was whether the BIA and OSG partially declined the June 2005 APIA AFA proposal in the required manner, the decision should go in favor of Appellant.

However, that is not the central question. Rather, the question is whether TAC was entitled to exercise its superior right as the primary beneficiary tribe to request a contract from the BIA under 25 U.S.C. § 450f(a)(1), and whether the BIA was correct in taking necessary measures to comply with that tribal request. No doubt this is a difficult case, owing to the unique intersection between the ANCSA and the ISDA, the mistake in the mid-1990s of moving ANCSA § 14(h)(1) funding into the compacts of the tribal consortia like APIA, without consideration as to what tribes were the primary beneficiaries of that program. However, in the specific context of the ANCSA § 14(h)(1) program, the BIA and OSG have acted as they did out of a loyalty to the basic underlying spirit of the ISDA, in the best manner they could identify.

3. <u>25 U.S.C. § 106(b)(2) has no application in the instant context</u>.

Again with respect to the APIA's argument based on the cited provision of the ISDA, the question is not whether it was violated, but whether it should apply in the present context at all. APIA argues that Mr. Bunch's analogy to a participating tribe withdrawing from a consortium or compact is inapposite, because TAC was not a party to the APIA Compact and AFAs. The analogy is no doubt imperfect, for the reasons cited by APIA.

However, a mechanical application of the prohibition to overturn the BIA/OSG action is also unsatisfactory, given the uniqueness of the circumstances. It is true that none of the five stated statutory grounds for reduction of funding fit the present situation well, but it does not necessarily follow that the reduction is unlawful. Note that the statutory purpose of the provision, quoted by APIA in its Opening Brief at 18, is " to protect and stabilize tribal programs by protecting and stabilizing the funds for those programs from inappropriate administrative reduction by Federal agencies." The offending and prohibited action is *"inappropriate* administrative reduction [of funding]" a the the expense of tribal programs. But here the purpose was not to interfere with a tribal program, but rather *to allow* for operation of that program *by the tribe which it was primarily designed to serve.*

Again, one is attracted to the retrocession analogy. If the BIA had been operating the ANCSA § 14(h)(1) program in-house, and then both TAC and the APIA, supported by village-based tribal resolutions, both came to the BIA at the same time and asked to contract the program, the BIA would have recognized the appropriateness of an exception to the Alaska Order of Precedence in this specific narrow context, and awarded the contract to TAC rather than

to the APIA. In effect that is what the BIA was faced with in the summer of 2005. To construe the ISDA and its provisions as a tool to deprive a primary beneficiary tribe such TAC of its 25 U.S.C. § 450f(a)(1) right to request and receive a contract, in the name of protecting the stability of tribal programs, is to miss the essential thrust of the Self-Determination policy.

III. CONCLUSION

APIA asks for a ruling that the Government's actions were taken in violation of several specific requirements of the ISDA. Appellant has no obligation to suggest how the rights of TAC under the ISDA ought to be recognized or protected. However, recognition and accommodation of those rights were of primary concern in motivating the Government's actions, which were untainted with self-interest or animus towards APIA. The factual context is *sui generis*. Appellee asks for a ruling that affirms its determination that Alaska Regional Corporations are the primary beneficiaries of the ANCSA § 14(h)(1) program, funding for which is at issue in this appeal. Given that conclusion, Appellee believes its actions were defensible, and that APIA's appeal should be rejected.[9]

RESPECTFULLY SUBMITTED this 23rd day of June, 2006.

Roger L. Hudson, Office of the Regional Solicitor, Counsel for Appellee

---

[9] If this case is decided in favor of APIA, Appellant asks for an award of interest. That request should be denied. See, e.g. Appellant's own case, *Susanville Indian Rancheria v. Director, California Area Office, Indian Health Service*, Final Decision of DHHS Departmental Appeals Board, Docket No. A-02-30 (February 6, 2002), at 17; and *Dailey v. Billings Area Director, Bureau of Indian Affairs*, 34 IBIA 128, 129 (1999).

**Aleutian Pribilof Islands Association, Inc.**

**v.**

**Dirk Kempthorne, Secretary of the Interior, United States Department of the Interior, et al.**

**Civil Action No. 06-2173 (CKK)**

# Exhibit 9

**OFFICE OF HEARINGS AND APPEALS**
Departmental Hearings Division
405 South Main Street, Suite 400
Salt Lake City, Utah 84111

RECEIVED
JUL 13 2006
Office of Regional Solicitor
Alaska Region

| | |
|---|---|
| ALEUTIAN-PRIBILOF ISLANDS ASSOCIATION,<br><br>Appellant<br><br>v.<br><br>NORTHWEST REPRESENTATIVE, OFFICE OF SELF-GOVERNANCE, BUREAU OF INDIAN AFFAIRS,<br><br>Appellee | IBIA 06-50-A<br><br>Appeal of a decision by the Bureau of Indian Affairs, declining APIA's proposal in its 2006 annual funding agreement for funding to perform activities under 43 U.S.C. § 1613(h)(1) |

**APPELLANT'S SURREPLY BRIEF**

In Appellee's Reply Brief, the Bureau of Indian Affairs ("BIA") presents, for the first time in this appeal, three new arguments that warrant a brief response. First, the BIA argues that the tribal resolutions authorizing the Aleutian Pribilof Islands Association ("APIA") to compact on behalf of its member tribes do not specifically identify activities associated with section 14(h)(1) of the Alaska Native Claims Settlement Act ("ANCSA"). As discussed below, however, this is irrelevant because the resolutions authorize APIA's assumption of any and all programs the BIA has available. Second, the BIA argues that APIA understood the BIA's legal position on the ANCSA funding long before Mr. Bunch issued his Recommended Decision on February 15, 2006. As the record in this appeal shows, however, this is simply incorrect. Third, the BIA argues that it could have refused the ANCSA portion

A
RH
BIA 0972

of APIA's proposal under the declination criteria, but does not explain why this is so, or why BIA's failure to do so should not result in a reversal of the recommended decision.

## I. The Resolutions of APIA's Member Tribal Governments Fully Authorize APIA to Compact the ANCSA 14(h)(1) Activities.

The Indian Self-Determination and Education Assistance Act ("ISDEAA") requires the Secretary of the Interior to enter into agreements, "upon the request of any Indian tribe by tribal resolution," to assume agency responsibilities and the associated funding to carry them out. 25 U.S.C. § 450f(a)(1). The resolutions of the Native Villages represented by APIA grant APIA broad authority to implement a compact of self-governance and annual funding agreements ("AFAs") that include all BIA programs, functions, services and activities ("PFSAs") unless the Tribe specifically decides otherwise. For example, the resolution of the Native Village of Atka, included by the BIA in its Reply Brief as Exhibit 13, states that the "Compact and AFA shall include funding and program and service delivery responsibility for all [PFSAs] not otherwise contracted by the Native Village of Atka under [an ISDEAA] contract or otherwise restricted by the Tribe." Appellee's Exhibit 13 at 2. The BIA cites no requirement—because there is none—that the authorizing resolutions recite each and every PFSA the Tribes intend to authorize APIA to assume. Atka's authorizing resolution, like those of APIA's other member Tribes, fully authorizes APIA's assumption of the ANCSA activities at issue in this appeal.

Therefore the resolution of The Aleut Corporation ("TAC") to contract these same activities conflicts with the tribal resolutions. The BIA must apply its policy developed for precisely such a situation, the Alaska Order of Precedence, to award the funding to APIA. Even in the absence of the Order of Precedence, the BIA would be required to honor the pre-existing agreement with APIA and the tribal governments it represents rather than

unilaterally transfer the funding to a new applicant, as the Indian Health Service and the Departmental Appeals Board recognized in the *Pit River* case. *See* Appellant's Reply Brief at 7-8.

Nonetheless, the BIA asserts for the first time in its Reply Brief that it is somehow relevant that the Tribes' resolutions make no mention of the ANCSA activities and that "no special or separate resolutions" were adopted to support assumption of the ANCSA funding in the mid-1990s. Appellee's Reply Brief at 3. Neither were any special or separate resolutions adopted to support assumption of Social Services, the Housing Improvement Program, Real Estate Services, or any of the other PFSAs included in APIA's AFAs. The BIA's contention that APIA's authorizing Tribes have never "consciously requested that APIA operate the ANCSA § 14(h)(1) program in particular," Appellee's Reply Brief at 4, is a red herring that this Board should disregard. In fact, the Tribes consciously authorized APIA to assume <u>all</u> available PFSAs. The lack of a "special or separate" resolution focused solely on the ANCSA program simply has no legal import.

## II.   The BIA Did Not Make Clear the Legal Basis of its Action Until the Recommended Decision Following the Informal Conference.

In its Reply Brief, the BIA presents new evidence, in an affidavit attached to the brief, purporting to show that APIA knew the BIA's position "at least as early as May or June of 2005." Affidavit of Ken Pratt ¶ 4; *see also* Appellee's Reply Brief at 14 (arguing that affidavit shows APIA was aware of "the key tribal beneficiary issue" well in advance of appeal). The affidavit states Mr. Pratt's belief that APIA had received the Regional Solicitor's May 24, 2004 memorandum, knew that the BIA had adopted the (new) position that regional corporations would determine what entity received ANCSA funding, knew that TAC had resolved to contract directly for the ANCSA program, and understood that the BIA

intended to honor TAC's resolution. APIA has not denied these general statements. What APIA did not know, and what is still unclear, is the legal basis of the BIA's intended action, because the BIA never issued a decision on its partial declination of the FY 2005 AFA.

The Regional Solicitor's memorandum sets out several scenarios for revoking tribal consortia's ANCSA funding, from removing it from recurring Tribal Priority Allocation funds to issuing partial declinations under section 102(a)(2)(A) on the grounds of "a demonstrated record of non-performance by the contracting entity." Appellee's Exhibit 1 at 2-3. The memorandum, of course, did not apply these options to APIA's factual situation. To the extent that the Regional Solicitor's memorandum provided APIA some insight into the general legal framework that the BIA might apply, that framework shifted drastically when applied to APIA. In fact, the BIA did not issue a partial declination under section 102(a)(2)(A), and in retrospect has argued that the unilateral revocation of ANCSA funds was not a declination at all, but rather a withdrawal from a consortium, Appellee's Exhibit 11 at 3 (Mr. Bunch's Recommended Decision), a retrocession, Appellee's Answer Brief at 17, a reallocation of agency resources not subject to the declination criteria, Appellee's Opening Brief at 29, or even a partial declination under section 102(a)(2)(C)—not (A), Appellee's Reply Brief at 12.

It is difficult to see how APIA could have "understood full well what the basis of the BIA's action was," Affidavit of Ken Pratt ¶ 4, when the agency's justification for its action has shifted so often. Indeed, the record in this appeal reflects APIA's uncertainty, in the absence of any written decision by the BIA, as to the basis of the revocation of ANCSA funding. Although the BIA cites APIA's January 3, 2006 Position Paper to support Mr. Pratt's assertions that APIA was not "in the dark" as to the BIA's reasons, that document

actually illustrates APIA's understandable uncertainty. Based in part on the Regional Solicitor's suggestion that BIA could partially decline a tribal consortium's ANCSA proposal under section 102(a)(2)A) based on poor performance, APIA devoted two single-spaced pages in the Position Paper to arguing that APIA used the ANCSA funds in accordance with BIA regulations and guidelines. Appellee's Exhibit 10 at 6-7.[1] As it turns out, however, performance was never an issue in the decision, as the BIA acknowledges. Appellee's Opening Brief at 24 (adequacy of APIA's work not at issue). The newly introduced affidavit of Mr. Pratt merely shows that APIA knew that BIA planned to revoke the funding following TAC's resolution. Equally obvious from the record, however, is that APIA did not know the legal basis for that action, and thus how to respond or with certitude when any applicable appeal timeframe applied, because the BIA never issued a decision explaining the basis of the action, apparently because the agency was unsure of that basis itself.

Even if APIA had been able to read the BIA's mind and divine in advance the basis for the agency's action, the agency would still be bound by its own rules to issue a written decision explaining itself, which it did not do. 25 C.F.R. § 900.29(a). Thus Mr. Pratt's affidavit is irrelevant as well as demonstrably incorrect.

## III.    The Declination Was Not Justified Under the Declination Criteria.

The BIA argues for the first time in its Reply Brief that the unilateral revocation of ANCSA funds from the FY 2005 AFA could have been "shoe-horned" into one or more of the declination criteria. Appellee's Reply Brief at 12. In particular, the BIA suggests it could have declined under section 102(a)(2)(C), which allows declination when the proposed activity "cannot be properly completed or maintained by the proposed contract." *Id.* The

---

[1] *See also* APIA Request for Informal Conference at 2 n.1 (Nov. 14, 2005) (theorizing that BIA could be viewing its action as a reassumption rather than a declination).

BIA provides no evidence or analysis in support of this conclusory assertion, other than to suggest that the "generality and vagueness" of subparagraph (C) make it applicable to the present situation (and presumably a wide range of other situations). The BIA does not explain why TAC's resolution makes it impossible for the ANCSA activities to be "properly completed or maintained" by APIA's AFA when those same activities had been part of APIA's AFAs for many years and, as noted above, the recommended decision made clear that performance was not an issue.

In addition to its complete lack of analysis and support, this new BIA argument illustrates the BIA's disturbing tendency throughout this appeal to read the ISDEAA as if it imposes few if any substantive or procedural limitations on agency discretion. The BIA admits that it did not apply the declination procedures or criteria, but asserts that this makes no difference because the criteria are so "broad" and "vague" that the agency could "shoe-horn" virtually any refusal into one or more of these exceptions. *Id.* at 12-13. This reading of the ISDEAA is exactly wrong. As discussed extensively in APIA's previous briefs, Congress has painstakingly limited agency discretion in the ISDEAA in general, and the declination criteria in particular. Appellant's Opening Brief at 12-20; Appellant's Answer Brief at 9. The standard of review is whether the BIA has "clearly demonstrate[d]" that one of the declination criteria apply, not whether it can "shoe-horn" its action into an inapplicable criterion. The BIA's efforts to evade the ISDEAA's procedures, substantive criteria, and burden of proof in this case provide an excellent example of why Congress chose to limit agency discretion in this way.

As the *Pit River* case illustrates, an agency can successfully decline a tribal proposal under section 102(a)(2)(C), provided it issues a timely decision that meets the burden of

clearly demonstrating that the criterion is met. *See* Appellant's Reply Brief at 8. The BIA did not do that, and its new argument that it could have is both highly dubious and irrelevant.

**CONCLUSION**

The BIA's new arguments about the scope of APIA's authorizing resolutions, APIA's alleged constructive knowledge of the basis of BIA's decision, and the shoe-horn standard of review should be rejected. For the reasons detailed in its previous briefs, APIA requests that the BIA action on appeal, and the recommended decision upholding it, be reversed, and that this Board direct the BIA to restore the ANCSA funds to APIA's FY 2006 AFA.

Respectfully Submitted,

Geoffrey D. Strommer

Stephen D. Osborne
HOBBS, STRAUS, DEAN & WALKER, LLP
806 SW Broadway, Suite 900
Portland, OR 97205
(503) 242-1745

Attorneys for Appellant Aleutian-Pribilof Islands Association

July 10, 2006

**CERTIFICATE OF SERVICE**

I hereby certify that on this 10th day of July, 2006, a copy of the Aleutian-Pribiloff Islands Association's Surreply Brief was served via telefax and first class mail, postage prepaid upon the following:

Ken Reinfeld, Acting Director
BIA Office of Self-Governance
U.S. Department of the Interior
1849 C Street, N.W., MS 4140 MIB
Washington, DC 20240

Charles F. Bunch
Deputy Regional Director – Trust
Alaska Regional Office
Bureau of Indian Affairs
3601 C Street, Suite 1100
Anchorage, AK 99503-5947

James E. Cason
Acting Assistant Secretary – Indian Affairs
U.S. Department of the Interior
1849 C Street, N.W.
Washington, DC 20240

Roger Hudson
DOI – Office of the Solicitor
4230 University Drive
Suite 300
Anchorage, AK 99508

Tom Shirilla, Field Manager
Office of Self-Governance
500 W 12th Street, Suite 102
Vancouver, WA 98660-2871

Niles Cesar, Regional Office Director
BIA-Juneau Area Office
P.O. Box 25520
Juneau, AK 99802-5520

Stephen D. Osborne

July 10, 2006

**Aleutian Pribilof Islands Association, Inc.**

**v.**

**Dirk Kempthorne, Secretary of the Interior, United States Department of the Interior, et al.**

**Civil Action No. 06-2173 (CKK)**

# Exhibit 10

Roger L. Hudson, Attorney
Office of the Regional Solicitor, Alaska Region
4230 University Drive, Suite 300
Anchorage, Alaska 99508-4626
(907) 271-4131 (voice); 271-4143 (fax)

United States Department of the Interior

**OFFICE OF HEARINGS AND APPEALS**
**Departmental Hearings Division**
**405 South Main Street, Suite 400**
**Salt Lake City, Utah 84111**

| | | |
|---|---|---|
| ALEUTIAN PRIBILOFF ISLANDS ASSOCIATION (APIA),<br><br>Appellant<br><br>v.<br><br>NORTHWEST REPRESENTATIVE, OFFICE OF SELF-GOVERNANCE, BUREAU OF INDIAN AFFAIRS,<br><br>Appellee | : | IBIA 06-50-A<br><br>Appeal of a decision by the Bureau of Indian Affairs, declining APIA's proposal in its 2006 annual funding agreement for funding to perform activities under 43 U.S.C. § 1613(h)(1)<br><br>Indian Self-Determination and Educational Assistance Act (ISDEAA), 25 U.S.C. §§ 450-450n |

APPELLEE'S NOTICE OF CONTINUATION OF DISPUTE

COMES NOW APPELLEE, Northwest Representative, Office of Self-Governance (OSG), Bureau of Indian Affairs (BIA), by and through his undersigned counsel, and files this notice of the recurrence of the issue concerning what tribe's Indian Self-Determination Act (ISDA) § 102(a)(1) resolution should be given controlling effect by the Bureau of Indian Affairs (BIA) with regard to the Alaska Native Claims Settlement Act (ANCSA) § 14(h)(1) program for the Aleut Region. Attached as Appellee's Exhibit 15 is a copy of a July 10, 2006 letter sent to the Appellant Aleutian Pribiloff Islands Association (APIA) with regard to its proposed funding agreement for Fiscal Year 2007. Appellee supplements the record with submission of this letter to call to the attention of the

Hearings Division the fact that the order of precedence issue, briefed by both parties in the above-captioned appeal, currently pending decision, is likely to result in another disputed decision and appeal unless it is clearly addressed in the soon-to-be-issued recommended decision in the pending appeal relating to FY 2006 funding.

Assuming that the awaited recommended decision does set forth a finding or conclusion as to the correctness or incorrectness of Appellee's determination that ANCSA Regional Corporation is the tribe primarily benefitted by the ANCSA §14(h)(1) program, the parties can be guided by that determination with respect to their FY 2007 funding agreement. The circumstance that the same issue is arising again is specifically highlighted by the filing of this Notice in order to emphasize that a recommended decision which might be issued without addressing the so-called Alaska Order of Precedence issue would not be of maximum assistance to the parties in managing their future relationship.

RESPECTFULLY SUBMITTED this 17th day of July, 2006.

Roger L. Hudson, Office of the Regional
Solicitor, Counsel for Appellee



UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
ALASKA REGION
P.O. Box 25520
Juneau, Alaska 99802-5520

RECEIVED
JUL 10 2006
Office of Regional Solicitor
Alaska Region

July 7, 2006

Mr. Dimitri Philemonof, President
Aleutian Pribilof Islands Association, Inc.
201 East Third Avenue
Anchorage, Alaska 99501

Subject: APIA's FY 2007 Annual Funding Agreement (AFA) Proposal

Dear Mr. Philemonof:

This is in response to the AFA Proposal or Reprogramming Request submitted by Aleutian Pribilof Islands Association (APIA) on June 26, 2006. In regard to that request we note that APIA has again proposed to receive the funding available for carrying out the Alaska Native Claims Settlement Act (ANCSA) §14(h)(1) program in the coming fiscal year. As you are no doubt well aware, the differences of opinion between our organizations with respect to the Bureau of Indian Affairs (BIA) and Office of Self-Governance (OSG) obligations towards APIA and The Aleut Corporation (TAC) have not been resolved as of this writing. Briefing on the question as to whether the ANCSA funding in question should go to APIA or TAC was just completed on June 30, 2006. It would appear that under 25 C.F.R. § 900.165, we can expect the Administrative Law Judge (ALJ) to issue a recommended decision in your organization's pending administrative appeal by the end of July.

In the meantime, a question has also been raised concerning whether TAC's May 20, 2005 Resolution No. 05-14 was intended to request a contract for Fiscal Year 2006 only, or was instead intended to be open-ended. The BIA is in receipt of a June 8, 2006 letter from TAC Board Chair Debra K. Mack, confirming that TAC's intent "was to assume funding from the Aleutian/Pribilof Islands Association (A/PIA) for FY06, *and all subsequent years.*" (Emphasis added.) However, the actual wording of last year's TAC resolution could certainly be interpreted otherwise, and TAC has been told that it should clarify or reconfirm its position in a new resolution, which has not yet been submitted.

In light of these uncertainties, this is to alert you to the fact that the BIA and OSG may or may not ultimately include the ANCSA § 14(h)(1) funding in APIA's FY 2007 AFA, depending on the expected further actions by TAC's Board of Directors, and also on how ALJ Sweitzer rules on the pending appeal. There are several possible variations. If the ALJ's decision agrees with the Government that TAC's resolution should be afforded priority over the resolutions of the individual village councils, and upholds the FY 2006 action under review, then the ANCSA § 14(h)(1) funding will once more be deleted from APIA's AFA for FY 2007. If, on the other

EXHIBIT 15

PAGE 1 OF 2

hand, Judge Sweitzer adopts APIA's view that village resolutions should be controlling, and that APIA is still entitled to receive the FY 2006 funding, then your FY 2007 AFA will be approved as submitted.

The third possibility is that the ALJ's decision will recognize TAC's right to submit a 25 U.S.C. § 450f(a)(1) contracting request for the ANCSA § 14(h)(1) program, and that such request is entitled to priority, but will also conclude that the procedure followed by the BIA and OSG for FY 2006 was deficient, and that APIA should therefore receive the FY 2006 funding. In the case of such a decision, the BIA and OSG would of course comply with respect to the FY 2006 funding, but would also intend to honor TAC's contracting request for FY 2007. To the extent that the ALJ may agree with APIA's argument that partial declination is the procedure which should have been utilized to transfer the ANCSA § 14(h)(1) funding from APIA to TAC, you should be advised that we will issue such a partial declination decision at a later date *if* we are in receipt of an appropriate TAC resolution clarifying the request to contract the ANCSA § 14(h)(1) program for FY 2007, *and if* the ALJ's decision indicates the appropriateness of such a procedure.

In the meantime, we are processing your FY 2007 AFA as proposed, but we are advising you by this letter that we are reserving the right to modify our position depending on future developments as discussed above.

Sincerely,

Niles Cesar
Regional Director

cc: Debra Mack, The Aleut Corporation
Tom Shirilla, Northwest Field Manager, DOI Office of Self-Governance
Roger Drapeaux, Director, Division of Native Services, Alaska Region, BIA
Ken Pratt, ANCSA Program Manager, Alaska Region, BIA
Roger Hudson, Attorney, Office of the Regional Solicitor, Alaska Region

EXHIBIT 15
PAGE 2 OF 2

Roger L. Hudson, Attorney
Office of the Regional Solicitor, Alaska Region
4230 University Drive, Suite 300
Anchorage, Alaska 99508-4626
(907) 271-4131 (voice); 271-4143 (fax)

United States Department of the Interior

**OFFICE OF HEARINGS AND APPEALS**
**Departmental Hearings Division**
**405 South Main Street, Suite 400**
**Salt Lake City, Utah 84111**

| | | |
|---|---|---|
| ALEUTIAN PRIBILOFF ISLANDS ASSOCIATION (APIA), | : | IBIA 06-50-A |
| Appellant | : | Appeal of a decision by the Bureau of Indian Affairs, declining APIA's proposal in its 2006 annual funding agreement for funding to perform activities under 43 U.S.C. § 1613(h)(1) |
| v. | : | |
| NORTHWEST REPRESENTATIVE, OFFICE OF SELF-GOVERNANCE, BUREAU OF INDIAN AFFAIRS, | : | Indian Self-Determination and Educational Assistance Act (ISDEAA), 25 U.S.C. §§ 450-450n |
| Appellee | : | |

CERTIFICATE OF SERVICE/MAILING

I certify that I am an employee in the Office of the Regional Solicitor, Alaska Region, and I am a person of such age and discretion as to be competent to serve papers. I further certify that on July 17, 2006, I caused the foregoing original **APPLLEE'S NOTICE OF CONTINUATION OF DISPUTE**, to be served by facsimile and Certified Mail, Return Receipt Requested, postage paid to the Office of Hearings and Appeals at the address listed above, with a copy of the same to the following:

By facsimile and Certified (RRR):

Hobbs, Straus, Dean & Walker, LLP
Attn: Georffrey D. Strommer, Esq.
806 W. W. Broadway, Suite 900
Portland, OR 97205
Fax: 503-242-1072

Courtesy Copy:

Bureau of Indian Affairs
Attn: Ken Pratt
3601 C Street, Suite 1100
Anchorage, AK 99503-5947

By facsimile and Certified (RRR):

Lynn Allingham, Esq.
201 E. 3rd Avenue
Anchorage, AK 99501
Fax: 907-279-4351

Aleut Corporation
4000 Old Seward Hwy., Suite 300
Anchorage, AK 99503
Fax: 907-563-4328

Courtesy Copy:

Bureau of Indian Affairs
Attn: Roger Drapeaux
P.O. Box 25520
Juneau, AK 99801

Office of Self-Governance
Attn: Tom Shirilla
Northwest Field Office
500 West 12th, Suite 102
Vancouver, WA 98660

DATED: July 17, 2006

Breane S. Dooley, Secretary

**Aleutian Pribilof Islands Association, Inc.**

**v.**

**Dirk Kempthorne, Secretary of the Interior, United States Department of the Interior, et al.**

**Civil Action No. 06-2173 (CKK)**

# Exhibit 11

**HOBBS, STRAUS, DEAN & WALKER, LLP**
ATTORNEYS AT LAW
806 S.W. BROADWAY · SUITE 900 · PORTLAND, OR 97205
TEL: 503.242.1745 · FAX: 503.242.1072
WWW.HSDWLAW.COM

October 31, 2006

***Via Overnight Mail***

Interior Board of Indian Appeals
801 North Quincy Street
Arlington, VA 22203

***Re:*** ***Aleutian Pribilof Islands Association, Inc. v. Northwest Representative, Office of Self-Governance, Bureau of Indian Affairs; IBIA No. 06-50-A***

Dear Sir or Madam:

Enclosed please find a copy of the Aleutian-Pribilof Islands Association's Notice of Appeal and Objection to Recommended Decision in the above-captioned case.

The Notice of Appeal is dated September 29, 2006, or within the thirty day timeframe that the appeal was to have been filed. This morning I contacted the Board to determine the status of the Board's actions on the Notice and learned that the Board did not receive the appeal and no appeal file has been opened. As the enclosed affidavit from Lynne House, a member of our office staff, reflects, we faxed and sent copies of the Notice to all parties on the certified mailing list but it appears that due to a clerical error we inadvertently failed to mail the original to the Board and sent it somewhere else.

We apologize for this clerical oversight. None of the parties in this matter have been prejudiced by this oversight because they received copies of the Notice of Appeal and, if they had so chosen, they could have filed a response to the grounds raised in the Notice requesting a reversal of Judge Sweitzer's decision. Accordingly, we respectfully request that the Board accept the enclosed Notice of Appeal and deem it to have been filed timely under the appeal rules contained in 25 CFR 900.165(c).

If you have any questions about these issues please do hesitate to contact me. Thank you in advance for your attention to this matter.

Sincerely,

HOBBS, STRAUS, DEAN & WALKER, LLP

By: [signature]
Geoffrey D. Strommer

2120 L STREET, N.W. · SUITE 700 · WASHINGTON, DC 20037 · TEL 202.822.8282 · FAX 202.296.8834
117 PARK AVENUE · SECOND FLOOR · OKLAHOMA CITY, OK 73102 · TEL 405.602.9425 · FAX 405.602.9426
400 CAPITOL MALL · 11TH FLOOR · SACRAMENTO, CA 95814 · TEL 916.442.9444 · FAX 916.442.8344

Enclosures

cc:    Dmitri Philemonof, President, APIA
       Lynn Allingham, General Counsel, APIA
       Harvey C. Sweitzer, Administrative Law Judge
       Dirk Kempthorne, Secretary of the Interior
       Roger Hudson, Solicitor's Office, Alaska Region

# CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of October, 2006, a copy of the Aleutian-Pribiloff Islands Association's Notice of Appeal and Objection to Recommended Decision dated September 29, 2006, and a copy of correspondence to the Interior Board of Indian Appeals dated October 31, 2006 together with the Affidavit of Lynne L. House were served via overnight mail, postage prepaid upon the following:

Dirk Kempthorne, Secretary of the Interior
U.S. Department of the Interior
1849 C Street, N.W.
Washington, DC 20240

Hon. Harvey C. Sweitzer
U.S. Dept. of the Interior
Office of Hearings and Appeals
Departmental Hearings Division
405 South Main Street, Suite 400
Salt Lake City, Utah 84111

Roger Hudson
DOI – Office of the Solicitor
4230 University Drive
Suite 300
Anchorage, AK 99508

Geoffrey D. Strommer

October 31, 2006

**INTERIOR BOARD OF INDIAN APPEALS**
801 N. Quincy Street
Arlington, VA 22203

| | |
|---|---|
| Aleutian Pribiloff Islands Association, Inc.,<br><br>Appellant,<br>v.<br><br>Northwest Representative, Office of Self-Governance, Bureau of Indian Affairs<br><br>Appellees. | IBIA No. 06-50-A |

**AFFIDAVIT OF LYNNE L. HOUSE**

1. I, Lynne L. House, being first duly sworn, hereby attest that the following information is true:

2. I am the Administrative Legal Assistant in the Portland, Oregon office of Hobbs, Straus, Dean & Walker, LLP.

3. On September 29, 2006, I was given the original Notice of Appeal and Objection to Recommended Decision in the above-referenced case to photocopy and mail via certified mail, return receipt requested to the Interior Board of Indian Appeals and to fax and mail to the parties noted on the Certificate of Service.

4. Our records indicate that, in addition to mailing a copy via U.S. Mail to the parties on the Certificate of Service, I faxed a copy of the Notice of Appeal and Objection to Recommended Decision. A copy of the Transmission Verification Report is attached noting that the Notice of Appeal and Objection to Recommended Decision was

A

faxed to all parties on September 29, 2006 beginning at 14:52 p.m. and ending at 15:39 p.m.

5. I was advised today, October 31, 2006, that the Interior Board of Indian Appeals did not receive the original Notice of Appeal and Objection to Recommended Decision.

6. I reviewed our office records for photocopying, faxing and mailing, and I do not find any record indicating that the original Notice of Appeal and Objection to Recommended Decision was sent to the Interior Board of Indian Appeals. However, I have also reviewed our records and have not found the original Notice of Appeal and Objection to Recommended Decision. If, as it appears, this document was not sent to the Interior Board of Indian Appeals, then I must have mistakenly sent it somewhere else.

Dated this 31st day of October, 2006.

Lynne L. House
Administrative Legal Assistant
Hobbs, Straus, Dean & Walker, LLP
806 SW Broadway, Suite 900
Portland, OR 97205
503-242-1745

County of Multnomah )
) ss
State of Oregon )

The above-signed subscribed and swore to the truth of the above statements before me on this 31st day of October 2006.

OFFICIAL SEAL
ANDREA L COHEN
NOTARY PUBLIC-OREGON
COMMISSION NO. 403075
MY COMMISSION EXPIRES MARCH 24, 2010

Andrea L. Cohen
Notary Public for Oregon

My commission expires: 3/24/2010

**Aleutian Pribilof Islands Association, Inc.**

**v.**

**Dirk Kempthorne, Secretary of the Interior, United States Department of the Interior, et al.**

**Civil Action No. 06-2173 (CKK)**

# Exhibit 12



# United States Department of the Interior

OFFICE OF HEARINGS AND APPEALS
INTERIOR BOARD OF INDIAN APPEALS
801 NORTH QUINCY STREET
SUITE 300
ARLINGTON, VA 22203

RECEIVED
NOV - 7
Office of Regional Solicitor
Alaska Region

| | | |
|---|---|---|
| ALEUTIAN PRIBILOFF ISLANDS ASSOCIATION, Appellant, | : | Order Dismissing Objection to Recommended Decision |
| v. | : | |
| NORTHWEST REPRESENTATIVE, OFFICE OF SELF-GOVERNANCE, BUREAU OF INDIAN AFFAIRS, Appellee. | : | |

The Aleutian Pribiloff Islands Association (A[illegible] ust 31, 2006 Recommended Decision (Recommended Decision) issued by Administrative Law Judge (ALJ) Harvey C. Sweitzer, in this appeal brought under the Indian Self-Determination and Education Assistance Act (ISDA), 25 U.S.C. §§ 450 et seq. The Recommended Decision upheld a decision by the Bureau of Indian Affairs (BIA) to reject APIA's proposal to include funding in a fiscal year (FY) 2006 Tribal Self-Governance Annual Funding Agreement for APIA to perform activities under Section 14(h)(1) of the Alaska Native Claims Settlement Act (ANCSA). 1/ On November 1, 2006, the Board of Indian Appeals (Board) received from APIA a Notice of Appeal and Objection (Objection) to the Recommended Decision. For the reasons discussed below, the Board dismisses APIA's Objection as untimely.

---

1/ Section 14(h)(1) of ANCSA, as amended, 43 U.S.C. § 1613(h)(1), authorizes the Secretary to withdraw and convey to Alaska Native Regional Corporations fee title to cemetery sites and historical places. The criteria for evaluating applications for conveyances are promulgated at 43 C.F.R. § 2653.5.

APIA previously had received funding for ANCSA section 14(h)(1) activities in its Compact with BIA under Title IV of the Indian Self-Determination and Education Assistance Act, 25 U.S.C. §§ 458aa et seq. BIA rejected APIA's FY 2006 proposed funding on the grounds that the requested funds should instead be transferred to the Aleutian (Regional) Corporation. See Recommended Decision at 1. The facts of this case are set forth in detail in Judge Sweitzer's Recommended Decision.

On March 16, 2006, APIA filed an appeal to the Board, pursuant to 25 C.F.R. §§ 900.158 and 1000.432(a), from BIA's decision to reject its funding proposal for ANCSA section 14(h)(1) activities. On March 27, 2006, the Board referred APIA's appeal to the Hearings Division of the Office of Hearings and Appeals for assignment to an ALJ, as provided in 25 C.F.R. § 900.161(a).

On August 31, 2006, Judge Sweitzer issued a Recommended Decision to affirm BIA's rejection of APIA's request for funding for ANCSA Section 14(h)(1) activities. The Recommended Decision included correct appeal instructions for filing an objection with the Board, including the requirement to file any objection within 30 days from receipt of the Recommended Decision.

On October 31, 2006, APIA contacted the Board to determine the status of Board action on its Objection, and was advised that the Board had not received the Objection.

On November 1, 2006, the Board received from APIA a copy of its Objection. By cover letter to the Board dated October 31, 2006, counsel for APIA explains that its Objection is dated September 29, 2006 (within the 30-day time frame for filing an appeal) and that the Objection was served on interested parties, "but it appears that due to a clerical error we inadvertently failed to mail the original to the Board." Oct. 31, 2006 Letter from Strommer to Board. APIA apologizes for its oversight (which is further explained in an accompanying affidavit), contends that none of the parties has been prejudiced because each was timely served with the Objection, and requests that the Board accept the Objection as timely filed under 25 C.F.R. § 900.165(c).

Sections 900.165 and 900.166 of 25 C.F.R. set out the procedures for filing objections to an ALJ's recommended decision in an ISDA appeal. Subsection 900.165(c) provides language that must be included in an ALJ's recommended decision in an appeal involving the Department of the Interior, advising parties of their right of appeal by filing an objection with the Board. Section 900.166 provides that a party may file an objection to a recommended decision within 30 days from receipt of the recommended decision. In relevant part, section 900.166 further provides:

> The recommended decision shall become final 30 days after the Indian tribe or tribal organization receives the ALJ's recommended decision, unless a written statement of objections is filed with * * * the [Board] during the 30-

day period. If no party files a written statement of objections within 30 days, the recommended decision shall become final. 2/

In the present case, APIA does not contend that its Objection was timely filed with the Board. 3/ Instead, APIA explains the lack of timeliness as due to an oversight and requests that the Board accept the Objection as timely.

We conclude that the ISDA regulations do not allow the Board to accept and to consider untimely objections to an ALJ's recommended decision. Section 900.166 states that if no objection is filed within the time allowed, the recommended decision becomes "final." Section 900.167 authorizes the Board to modify, adopt, or reverse a recommended decision within 20 days from the date it receives "timely" written objections. Neither of these sections, nor any other provision in the ISDA regulations, gives the Board authority to excuse a party's failure to file a timely objection from an ALJ's recommended decision or to review such a decision after it has become final.

Our conclusion is strengthened by the fact for filing an initial ISDA appeal to the Board from an agency decision, the regulations expressly do allow the Board to grant an extension of time, if a tribe or tribal organization has a valid reason for not filing within the 30-day time period. See 25 C.F.R. § 900.159. No similar authority is granted to the Board with respect to filing an objection from an ALJ's recommended decision. Had the drafters of the regulations intended to allow the Board to excuse untimely objections, they could have done so.

When no timely objection was filed to Judge Sweitzer's Recommended Decision, it became final and the Board now lacks authority to accept or to consider APIA's Objection. 4/

---

2/ Objections in appeals involving the Department of Health and Human Services (HHS) are filed with the Secretary of HHS. Id.

3/ The record indicates that APIA received the Recommended Decision on September 5, 2006.

4/ For purposes of this order, we accept APIA's assertion and supporting evidence that its Objection was served on interested parties on or about September 29, 2006. Proper service, however, even if it occurs within 30 days from a party's receipt of a recommended decision, is not effective as proper and timely "filing" with the Board.

Therefore, pursuant to the authority delegated to the Board of Indian Appeals by the Secretary of the Interior, 43 C.F.R. § 4.1 and 25 C.F.R. § 900.167, the Board dismisses APIA's Objection as untimely.

I concur:

Steven K. Linscheid
Chief Administrative Judge

Debora G. Luther
Administrative Judge

Aleutian Pribiloff Islands Association v.
Northwest Representative, Office of Self-Governance, BIA
Docket No. IBIA 06-50-A
Order Dismissing Objection to Recommended Decision
Issued November 3, 2006
44 IBIA 11

Distribution:

Geoffrey D. Strommer, Esq.
for Aleutian Pribiloff Islands Association
Hobbs, Straus, Dean & Walker, LLP
806 S.W. Broadway, Suite 900
Portland, OR 97205
BY CERTIFIED MAIL

Aleut Corporation
4000 Old Seward Hwy., Suite 300
Anchorage, AK 99503

Lynn Allingham, Esq.
201 E. 3rd Ave.
Anchorage, AK 99501

Tom Shirilla
Northwest Representative
Office of Self-Governance
Bureau of Indian Affairs
500 W. 12th Street, Suite 102
Vancouver, WA 98660-2871

Charles F. Bunch
Deputy Regional Director – Trust
Alaska Regional Office, BIA
3601 C Street, Suite 1100
Anchorage, AK 99503-5947

Regional Director
Alaska Regional Office
Bureau of Indian Affairs
P.O. Box 25520
Juneau, AK 99802-5520

Roger Hudson, Esq.
Office of the Solicitor, Alaska Region
U.S. Department of the Interior
4230 University Drive, Suite 300
Anchorage, AK 99508-4626

Office of Self-Governance
Bureau of Indian Affairs
U.S. Department of the Interior
MS 4140-MIB
1849 "C" Street, N.W.
Washington, DC 20240

Harvey C. Sweitzer
Administrative Law Judge, First Judge Supervisory
Office of Hearings and Appeals
U.S. Department of the Interior
Elks Building
405 South Main Street, Suite 400
Salt Lake City, UT 84111

**Aleutian Pribilof Islands Association, Inc.**

**v.**

**Dirk Kempthorne, Secretary of the Interior, United States Department of the Interior, et al.**

**Civil Action No. 06-2173 (CKK)**

**Exhibit 13**



The Aleut Corporation

RECEIVED
JUN - 8 2006
Office of Regional Solicitor
Alaska Region

June 8, 2006

Tom Shirilla
Northwest Field Manager
Office of Self-Governance
1503 NE 78th St., Suite 15
Vancouver, WA 98665-9668

Re: ANCSA 14(h)1 Funding

Dear Mr. Shirilla,

I have been informed that there may be some misinterpretation in regards to Resolution 05-14 that The Aleut Corporation (TAC) Board of Directors adopted and forwarded to the Office of Self-Governance regarding the ANCSA 14(h)1 funding. This is to confirm that the intent of this Resolution was to assume funding from the Aleutian/Pribilof Islands Association (A/PIA) for FY06, and all subsequent years.

I also understand that an updated Resolution needs to be provided to the Office of Self-Governance, which states TAC's intention for the ANCSA 14(h)1 funds for FY07 and beyond. TAC will address this Resolution and forward as soon as possible. In the meantime, please note that TAC does not want the funding for FY07 to revert back to the Compact for A/PIA.

If you have questions or concerns in regards to this issue, can be reached at (907) 581-7704.

Sincerely,

Debra K. Mack
Chair, TAC Board of Directors

Cc: Ronald Lee, Interim CEO
Roger Hudson
Niles Cesar

4000 Old Seward Hwy, Suite 300 Anchorage, Alaska 99503 (907) 561-4300 FAX (907) 563-4328
www.aleutcorp.com

**Aleutian Pribilof Islands Association, Inc.**

**v.**

**Dirk Kempthorne, Secretary of the Interior, United States Department of the Interior, et al.**

**Civil Action No. 06-2173 (CKK)**

**Exhibit 14**



The Aleut Corporation

Resolution 06-11

14(H)1 FUNDING

WHEREAS, The Aleut Corporation (TAC) selected lands as Historic and Cemetery sites pursuant to Section 14(h)1 of the Alaska Native Land Claims Settlement Act; and

WHEREAS, those selections represent the physical evidence of the Region's peoples use of said lands for historic and prehistoric subsistence and occupation; and

WHEREAS, TAC has exercised its right and obligation to acquire and protect such lands on behalf of all the Aleut Region's Native peoples and communities; and

WHEREAS, the Department of Interior, Bureau of Indian Affairs, ANCSA Office has certain tasks remaining to perform in connection with implementation and administration of the ANCSA Section 14(h)1 program; and

WHEREAS, TAC, as the tribe in the Aleut Region directly served by the BIA's ANCSA Section 14(h)1 program, has the right pursuant to the Indian Self-Determination and Education Assistance Act (ISDA) to contract to perform many of those tasks for itself; and

WHEREAS, TAC, by submission of its Resolution No. 05-14, requested that the BIA contract with it for the performance of those tasks, in accordance with Section 102(a)(1) of the ISDA; and

WHEREAS, a question has arisen as to whether that resolution was intended as a request that the BIA contract with TAC for performance of the ANCSA Section 14(h)1 program for the single Fiscal Year 2006 (FY06), or for subsequent Fiscal Years as well; and

WHEREAS, it was the intent of TAC to request to contract to perform the ANCSA Section 14(h)1 program for FY06 and subsequent Fiscal Years as well, and to perform such contract in the place of the Aleutian/Pribilof Islands Association (A/PIA), a tribal organization which had previously administered the same program in the Aleut Region ; and

NOW THEREFORE BE IT RESOLVED, that TAC hereby reiterates its request, first intended to have been made by Resolution No. 05-14, pursuant to ISDA Section 102(a)(1), that the BIA award it a contract to perform the ANCSA Section 14(h)1 program for the Aleut Region, for Fiscal Year 2007, and for all subsequent Fiscal Years, until notice to the contrary is given.

PASSED AND APPROVED this 25th day of August, 2006, at a duly called meeting of the Directors of The Aleut Corporation, by a vote of 5 for, 1 opposing, and 3 absent.

Debra Mack
Chair

ATTEST:

Dave Nevzaroff
Assistant Secretary/Treasurer

4000 Old Seward Hwy., Suite 300 Anchorage, Alaska 99503 (907) 561-4300 FAX (907) 563-4328
www.aleutcorp.com

**Aleutian Pribilof Islands Association, Inc.**

**v.**

**Dirk Kempthorne, Secretary of the Interior, United States Department of the Interior, et al.**

**Civil Action No. 06-2173 (CKK)**

**Exhibit 15**



BLM.AK.1427


October 5, 1992


Memorandum

To:      George Skibine & Penny Coleman
           Division of Indian Affairs
           Office of the Solicitor

From:     Roger Hudson
           Office of the Regional Solicitor
           Alaska Region

Subject:    Indian Self-Determination Act (ISDA) Issues

        This memorandum and the attached materials are transmitted to you as a follow-up to our brief conversations last week about issues which the BLM is confronting with respect to proposed survey contracts submitted by various Alaska Native organizations. In order that the maximum appropriate degree of consistency be maintained between BIA and BLM approaches to contracting of ". . .programs for the benefit of Indians because of their status as Indians" pursuant to the Indian Self-Determination Act, I would appreciate your comments on the following positions, which the BLM has tentatively adopted in consultation with this office:

        1. <u>What entity should supply the required tribal resolution in support of the request to contract?</u> There has been considerable debate about whether the BLM should: (1) follow the BIA order of precedence, probably soon to be formally adopted as part of the set of long-awaited ISDA regulations; or (2) should seek to get those regulations revised; or (3) should decide that the order of precedence is inapplicable, based on an interpretation of the phrase ". . .the Indian tribe or tribes to be served under the contract." For the reasons briefly explained below, BLM Cadastral Survey presently intends to elect the first course with respect to Native Allotment surveys, and the third with respect of surveys of Alaska Native Claims Settlement Act (ANCSA) Regional and Village Corporation conveyances. If you take strong exception to this course, please let us know as soon as possible, since BLM will otherwise probably be putting it into effect within the week.

       Alaska Native entities which have approached BLM about contracting ANCSA and/or allotment surveys pursuant to the ISDA include several regional non-profit Native corporations, including Maniilaq, Tanana Chiefs Conference (TCC), and Copper River Native Association (CRNA), as well as one ANCSA Regional Corporation, Chugach Alaska Corporation (CAC), and two ANCSA Village Corporations from that region (Eyak Corporation and Tatitlek

Corporation). BLM has already entered into a contract with CRNA to do allotment surveys in the geographic vicinity of Copper River villages, based on supporting resolutions from the village Indian Reorganization Act (IRA) or traditional councils representing those villages. The proposal for the 1993 season which has already been received by the BLM, and requires the most immediate response, comes at least indirectly from CAC; that is to say, it is a proposal supported by a tribal request to contract submitted in the form of a resolution from the CAC Board of Directors.

One possible position which the BLM has considered, and which the BIA has advocated, is that it could insist on receiving a tribal request to enter into an ISDA contract to perform the scheduled survey of Regional Corporation lands from each IRA and traditional village council in the region. In fact, it was on the basis of similar resolutions that BLM already entered into its first ISDA surveying contract with CRNA. However, that is not the course BLM presently intends to pursue with respect to the CAC request for a contract to perform ANCSA surveys. Instead, BLM plans to accept and contract on the basis of the CAC "tribal" resolution. The obvious difference between CRNA and CAC is that the former does not fit within the ISDA definition of an "Indian tribe," while the latter does. Cf. Cook Inlet Native Association v. Bowen, 810 F.2d 1471 (9th Cir. 1987). Given that critical distinction, there is no particular inconsistency in requiring a regional nonprofit Native corporation to present village council resolutions in support of its contract proposal, while not imposing a similar requirement on an ANCSA corporation, which is itself a tribe under the ISDA definition.

However, the draft ISDA regulations would seem to suggest that because there are IRA and traditional councils within the Chugach region, the resolutions of those entities would be required, and that standing alone the resolution of CAC, the Regional Corporation, would be an insufficient basis for entering into an ISDA contract. The problem with that reasoning, and the reason BLM intends to reject it, is that CAC is in fact an Indian tribe under the ISDA definition, whereas the BIA Juneau Area-developed order of precedence set forth in the draft regulations has no basis in the statutory language. In light of that circumstance, it is almost certain that CAC would challenge a BLM refusal to contract based on its failure to submit village council resolutions, and it also seems quite likely that its challenge would be successful. By comparison, the probability that the villages would formally contest an award of a contract for surveying ANCSA Regional Corporation lands based on the CAC resolution, or that such challenge would be successful, seems much smaller.

Another argument in favor of entering into an ISDA contract for surveying regional corporation lands without requiring village council resolutions is that §900.202(a)(1) of the draft regulations

requires only the request of the Indian tribe or tribes ". . .to be served under the contract." We believe that it can be persuasively argued that an ANCSA conveyance survey serves the corporation to which the land is to be conveyed much more directly than it serves the village councils in the region. After all, the survey and resulting conveyance are of direct benefit to the corporation and all of its shareholder/owners, which is a substantially larger and somewhat different group of individuals than that which would be represented by the village governing bodies. Moreover, all of the lands to be surveyed in this particular case are located at a great distance from some of the villages, so an argument that those distant communities are " the tribes to be served under the contract" is a particularly difficult one to make.

Of course, BLM does not take lightly the step of departing from the uniform past BIA practice of applying the order of precedence, which is about to become a regulatory requirement. However, it is expected that BLM's approach to ANCSA survey contracts can be reconciled with the normal ISDA order of precedence by treating ANCSA surveys and allotment surveys differently in terms of the "tribal" resolution requirement. In the case of proposals to contract mixed survey projects (including both ANCSA conveyance and allotment surveys), BLM plans to require tribal organizations such as Maniilaq and TCC to submit both IRA and/or traditional council resolutions (for allotment surveys), <u>and</u> ANCSA village and/or regional corporation resolutions (for ANCSA conveyance surveys). Of course, the proposition that IRA and traditional councils should be deemed "the tribes to be served" by a program of surveying Native allotments is itself debatable, but the BIA already has a long-standing practice of ISDA contracting for realty and rights protection services to allotment owners through application of the order of precedence, and in this respect it seems defensible to follow not only BIA precedent, but the precedent BLM itself has established through its initial allotment survey contract with CRNA.

2. <u>How stringent is the definition of a "tribal organization?"</u> The other issue of first impression raised by the ISDA surveying contract proposal supported by the CAC resolution involves a determination as to whether the prospective contractor to which CAC has asked the BLM to award a contract is in fact an eligible "tribal organization" within the ISDA definition of that term. The pertinent language from 25 USC § 450b(l) is this:

> "'tribal organization' means. . .any legally established organization <u>of Indians</u> which is controlled, sanctioned, or chartered by such governing body. . ."

(emphasis added). CAC has requested that the BLM enter into an ISDA contract with Arctic Slope Consulting Group, Inc. (ASCG). ASCG is a wholly-owned subsidiary of the Arctic Slope Regional Corporation, an ANCSA Regional Corporation like CAC. Thus, at least for the time

being ASCG is "controlled" by the governing body of a tribe, because ASRC itself fits the statutory definition of an Indian tribe which is set forth in 25 USC §450b(b). However, the point of uncertainty is whether or not ASCG is "a legally established organization of Indians," because there is nothing in its articles of incorporation which limits either ownership or control to tribes or individual Natives. The argument that it is not therefore an organization of Indians is presented in the enclosed three page memorandum from Bob Elliott of the BIA's Juneau Area Office to the BLM's Steve Hamrick. As a factual matter, the ASCG Board of Directors is composed entirely of Alaska Natives, which is not particularly surprising in light of its having been chosen by ASRC's management. But rather than focus on the purported tribal organization's present make-up, the BIA suggests that BLM conclude that ASCG does not qualify for tribal organization status because its organic documents present no legal impediment to the transfer of either ownership or day-to-day control to non-Natives.

While a distinction can legitimately be drawn between an organization of Indians such as a regional non-profit Native corporation, which is by its very nature controlled by Indians, and an organization that could be controlled by any owner, but happens to be owned by an ANCSA corporation, I have discovered nothing in the statutory language, legislative history, or draft regulations which compels any different treatment of the two types of organizations. Not only does ASCG, which is Native owned, and has an all-Native Board of Directors, and a Native CEO, arguably fit the literal definition of a "tribal organization," but the available legislative history and the basic thrust of the self-determination policy seem to favor a liberal interpretation of the term. In the Senate Report on the 1988 ISDA amendments the following statement appears:

> The Committee amendment does not change the definition in current law of the term "tribal organization". The Committee considered the possibility of changing the definition in order to prevent Federal agencies from using the requirement to obtain tribal resolutions as an obstacle to contracting. The Committee believes that the term may at times have been misinterpreted, but that an amendment is unnecessary. . .

S. Rep. No. 100-274, 100th Cong., 2nd Sess. 19, reprinted in 1988 U.S. Code Cong. & Admin. News 2620, 2638. It could be argued that a restrictive interpretation of the tribal organization definition would be just the sort of agency roadblock to contracting of which the Congress would disapprove, since it would amount to a diminution of tribal flexibility or discretion -- or self-determination -- as to what sort of tribally controlled entity the tribe could use as a contracting vehicle.

Although it is undoubtedly a close question, the course more in keeping with the underlying policy of self-determination is

probably to honor the CAC request that BLM enter into a contract with ASCG, which would implicitly amount to a recognition of ASCG's status as a tribal organization for ISDA purposes. One further argument in favor of that course is that a corporate subsidiary is the most common type of organization that a state-chartered corporation could be expected to "control, sanction, or charter." While that description of the tribe-tribal organization relationship was probably not developed with ANCSA corporations in mind, but rather in contemplation of the more typical structure where a tribe would sanction or charter a housing authority, board of education, or other single function operating arm, the recognition of ANCSA corporate subsidiaries as tribal organizations would seem to follow almost automatically from the Congress's decision to treat ANCSA corporations as Indian tribes for ISDA purposes in the first place. In keeping with this generally liberal construction, and the underlying self-determination philosophy, there would not appear to be any legal obstacle to one ANCSA corporation requesting that the government enter into an ISDA contract with a tribal organization controlled by another, even though that practice has not been a widespread one to date.

Conclusion. The BLM's tentative, but soon to be implemented, judgment calls on the two issues discussed above could be seen as inconsistent with BIA practice, but we do not so regard them. In contrast to the BLM, which is responsible for the ANCSA land conveyance program, the BIA rarely, if ever, has occasion to administer programs as to which the ANCSA village and regional corporations are the tribes to be served by the contract. Therefore, it does not appear likely that a BLM determination to enter into an ISDA contract with ASCG on the basis of a resolution submitted by CAC would as a practical matter be at odds with BIA administrative practice, or the draft ISDA regulations. If you disagree with this view please let me know as soon as possible.

Roger L. Hudson

encls: 1 page BLM issue summary
4 page ASCG submission
3 page BIA memorandum

cc: E. Lewis, BLM Cadastral
R. Elliott, JAO, BIA
N. Cesar, Area Director, JAO, BIA

**Aleutian Pribilof Islands Association, Inc.**

**v.**

**Dirk Kempthorne, Secretary of the Interior, United States Department of the Interior, et al.**

**Civil Action No. 06-2173 (CKK)**

# Exhibit 16

# MEMORANDUM OF AGREEMENT
Between
ALEUTIAN/PRIBILOF ISLANDS ASSOCIATION, INC. (A/PIA)
and
THE ALEUT CORPORATION

* * * * * * * * * * * * *

*Preamble*

*Whereas, the above Native organizations wish to cooperate in a joint effort to conduct certain cultural heritage and preservation activities intended to benefit the Aleut Region as a whole, including primarily ANCSA 14(h)(1) activities, and therefore have the need to establish an organizational and administrative framework to accommodate such an effort, now therefore the parties mutually agree as follows:*

__Section 1. Purpose.__ The purpose of this agreement is to establish the organizational and administrative framework pursuant to which A/PIA and TAC may jointly conduct certain cultural heritage, preservation and related activities, and in particular, activities related to completing the ANSCA 14 (h)(1) process.

__Section 2. Relationship of the Parties.__ A/PIA is a Native non-profit organization registered and doing business in the State of Alaska. TAC is a State chartered ANCSA profit corporation also registered and doing business in the State of Alaska. Except as specifically agreed to under this MOA, neither party shall act as agent for, or partner of the other, nor shall either incur any liability, represent, or make commitments on behalf of the other. The employees of one shall not be deemed the employees of the other. Nothing in this MOA shall be deemed to constitute, create, give effect or otherwise recognize a joint venture, partnership or formal business entity of any kind, and the rights and obligations of the parties shall be limited to those expressly provided herein or in other related but separate agreements entered into to conduct the activities contemplated under this MOA.

__Section 3. Term.__ The term of this MOA shall be perpetual, subject only to termination under Section 9 below.

__Section 4. Program / Activity Funding.__ Funds expended under this MOA shall come primarily from ANCSA 14(h)(1) funds provided to A/PIA pursuant to a P.L. 93-638 Title IV Agreement between A/PIA and the U.S. Department of the Interior. A/PIA and TAC may from time to time mutually agree to supplement such funds for specified projects or activities benefiting their respective members or shareholders.

A/PIA shall provide TAC with monthly financial statements as to all funds jointly administered by the parties. All funds appropriated to A/PIA for ANCSA 14(h)(1) from BIA since the inception of the compact, are available to conduct ANCSA (14(h)(1) and Cultural Heritage activities under this agreement.

It is the intent of the parties that $100,000 be made available, by A/PIA, as an initial sum to conduct ANCSA 14(h)(1) activities agreed to under this MOA. The costs associated with the APA position shall be included in this initial sum, but not those associated with the CHD position. A/PIA shall be solely responsible for CHD costs. The CHD shall administer program funds not expended on APA salary costs. Such funds shall be expended based on written objective work plans that are based on the overall intent and purpose of the ANCSA process, and approved by TAC. Work plans shall be revised and updated as appropriate, but no less than semi-annually. Funds in addition to the initial $100,000 shall be made available beginning October 1, 1998, assuming the work plans justify a demonstrated need. The amount of such additional funds shall be based on historic ANCSA funding levels. Funds that are provided shall be available until expended, or until the ANCSA process is brought to a conclusion. The availability of all funds associated with this MOA is contingent on continuing congressional appropriations.

(d) Work Product Ownership. All ANCSA (14)(h)(1) work product shall be the sole property of TAC, *provided that*, A/PIA shall have the opportunity to reproduce ANCSA (14)(h)(1) materials for its own purposes and any such reproductions shall remain the property of A/PIA. Original works, materials or work product of any kind that can not be reproduced but is released, held or otherwise acquired by A/PIA for any purpose shall remain the property of TAC.

**<u>Section 6.</u> Decision-making / Role of Participating Executive Staff & Boards.** The responsibility for keeping the respective Boards of each organization informed as to activity conducted under this MOA and seeking Board approval for any such activity, if deemed to be required, shall rest with the staff and executive officers of each organization, in accordance with procedures an policies each my independently establish. It is the intent of the parties that the primary responsibility for implementing this MOA and conducting the activity which is the subject of this MOA shall rest with the CHD and APA. Such staff and any other executive officers or staff authorizing contracts, activities or related expenditures of funds under this MOA shall be deemed to be acting within the scope of their authority.

**<u>Section 7. Disputes.</u>** Any disputes arising under this MOA shall be submitted for resolution to a neutral three (3) party panel, to be selected by mutual agreement of

Section 5. ANCSA (14)(h)(1) Program / Activity Administration:

(a) **Contact Persons.** Each party to this MOA shall designate a contact person to act as a general point of contact on matters related to this MOA. Such designation is not intended to disrupt or in any way interfere with the normal exchange of information or contact between staff from either organization.

(b) **Project staff.** It is the intent of the parties to have a minimum of two staff persons engaged in conducting the ANCSA 14(h)(1) activity which is the subject of this MOA. One of the staff will be the A/PIA Cultural Heritage Director, the other the ANCSA Project Assistant.

(1) **Cultural Heritage Director (CHD).** The CHD shall be a full time employee of A/PIA under the direct supervision of A/PIA. The CHD shall have as one of her primary responsibilities the gathering, processing, indexing and cataloging of ANCSA data currently held by BIA, and making such information available and useable by both organizations for ANCSA and other purposes. The CHD shall work cooperatively with TAC to develop work plans for land conveyance and patents to TAC and the eventual completion of ANCSA 14(h)(1) activity. The CHD shall, within the scope of her professional experience and abilities, assist with ANCSA site report review and interpretation and where appropriate provide any required professional/technical assistance in the prosecution of any appeals that are undertaken. The CHD shall submit quarterly work reports to TAC on the progress of ANCSA 14(h)(1) work.

(2) **ANCSA Project Assistant (APA).** The APA shall be an A/PIA employee under the direct supervision of the CHD. A/PIA and TAC shall jointly prepare and approve a job description for the APA and shall jointly participate in interviews and recommendations for hire. The CHD will work closely with TAC to plan the work schedule for the APA.

(c) **Financial Administration.** A/PIA shall have sole responsibility for all accounting functions associated with implementation of this MOA except for those funds, if any, that TAC may commit as supplemental to the ANCSA related funds which the parties anticipate using to fund project activities on a recurring basis.

the parties. Decisions by the neutral panel shall be binding and final. It is the intent of the parties to avoid any formal legal process as to any disputes which may arise under this MOA.

<u>Section 8. Modifications/Amendments.</u> Any modifications and/or amendments to this MOA shall be in writing and effective only after approval and signature by both parties.

<u>Section 9. Termination.</u> The parties to this MOA may terminate this MOA at any time for any reason. However, the termination of this MOA shall have no effect on any outstanding independent contracts, written obligations, commitments or works in progress for which funds have been obligated. Such independent contracts, written obligations, commitments or works in progress in existence at the time of any termination of this MOA shall continue in effect until such time as they may expire under the individual terms and conditions of such agreements. Funds remaining after meeting the financial obligations of such agreements shall be returned to the party who originally obligated or committed such funds.

*In witness whereof the parties have executed, delivered and formed this Agreement, in duplicate, to be effective upon the date of signature of both parties:*

ALEUTIAN/PRIBILOF ISLANDS ASSOCIATION, INC.

[signature] 8-07-98

Dimitri Philemonof, Executive Director — Date

THE ALEUT CORPORATION

[signature] 8-7-98

Elary Gromoff, Jr., President/CEO — Date

**<u>Aleutian Pribilof Islands Association, Inc.</u>**

**v.**

**<u>Dirk Kempthorne, Secretary of the Interior, United States Department of the Interior, et al</u>.**

**Civil Action No. 06-2173 (CKK)**

**Exhibit 17**



# United States Department of the Interior

OFFICE OF THE SOLICITOR
ALASKA REGION

4230 University Drive
Suite 300
Anchorage, Alaska 99508-4626
(907) 271-4131

May 24, 2004

BIA.AK.0874

MEMORANDUM

TO: Roger Drapeaux, Program Analyst &
Ken Pratt, ANCSA Program Manager
Alaska Region, Bureau of Indian Affairs

FROM: Roger L. Hudson, Attorney
Office of the Regional Solicitor

SUBJECT: Funding for implementation of ANCSA § 14(h)(1) included within Tribal Self-Governance annual funding agreement

This is a follow-up to our recent telephone conference call, during which we discussed the problems associated with trying to insure that funding appropriated by Congress to carry out the administrative tasks required to complete the Alaska Native Claims Settlement Act (ANCSA) land conveyance process would be completed in a reasonably timely manner. You have asked for my views on this subject in advance of the BIA's upcoming annual negotiations with a number of tribal consortia and other contracting entities, beginning with the Tanana Chiefs Conference (TCC). Although this quick memo is far from exhaustive, I provide the following with the understanding that time is of the essence in preparing to handle the problem.

Background

One of the basic tasks involved in completing the ANCSA conveyance process is for the government (or Indian Self-Determination Act (ISDA) contractors) to evaluate and act upon Regional ANCSA Corporation applications for conveyance of title to existing cemetery sites and historical places, filed pursuant to ANCSA § 14(h)(1). A large number of these applications, which were timely filed, have not been processed, approved or rejected, or, in the case of approval, conveyed to the ANCSA corporation applicants. Although some aspects of the processing involve the Bureau of Land Management (BLM), the initial steps of site inspection, evaluation, and archaeological assessment were identified as tasks to be completed by the Bureau of Indian Affairs (BIA). The delay in completing the necessary work has been attributable in large measure to the fact that a substantial portion of the funding that Congress has provided to do the work has found its way into ISDA contracts, without the contracts themselves specifically binding the recipient entities to complete the work for which the funds were appropriated. The contracts and funding agreements into which these funds have been inserted have been entered into pursuant to ISDA § 102(a)(2), largely, if not exclusively, on the strength of resolutions provided by federally recognized tribes, as distinct from ANCSA Regional Corporations. You

ask whether this is proper, and if not, how the situation might be corrected.

Analysis

You explain that the problem first arose out of the mistaken conclusion reached several years ago that the work required of the BIA to complete the ANCSA § 14(h)(1) program had already been completed. This is now clearly recognized not to have been an accurate assessment, but in the meantime, significant funding has been erroneously included in contracts and compacts as if it were properly categorized as recurring Tribal Priority Allocation (TPA) funding. Some recipient entities have carried out the spirit of the ANCSA program by in fact using the funds provided for ANCSA-related work. Others have not, but have instead utilized funds provided for non-ANCSA activities. ANCSA Regional Corporations are understandably impatient to see the work initiated or continued on their pending § 14(h)(1) applications.

The most immediate question is therefore what steps might be taken during the annual negotiation process to try to get the ANCSA work back on track. In my opinion, the most direct means to the desired end would be to include specific ANCSA-related tasks in the contracting entities' scopes of work, whereby they would agree after negotiation as to what activities they would undertake, and what ANCSA-related work product they would commit themselves to deliver. The utilization of qualified staff would of course be one of the points to be covered. To the extent that compacting or contracting entities would voluntarily agree to such commitments, and then fulfill them, the necessity for resort to any sort of formal procedures to retrieve the money in question could be dispensed with. This would save everyone time, money and legal uncertainty. It would also serve the best interests of ANCSA Regional Corporations[1] and their shareholders, who have already had to wait too long for the relevant conveyances (or the opportunity to appeal application rejections).

If a contracting entity which has already received ANCSA project money in prior years now refuses to either (1) agree to do the work for which the money was intended, or (2) agree to retrocede the funds and program to the BIA, so that the Bureau would have the resources to do the work in-house, then other remedies will have to be evaluated. Hopefully, we won't have to reach that question, but if we must, I think there are several legal theories on which the BIA might proceed. For one, I think the ANCSA funds are more properly viewed as a category of non-recurring funds, which should not be included in a tribal TPA to begin with. Unlike open-ended programs typically included in a TPA base, the ANCSA § 14(h)(1) application processing task is one which deals with a finite and limited scope of work, which is intended to be completed at a certain point in time, at which point the need for--and entitlement to--continued funding terminates.

---

[1] In fact, an ideal process would only proceed on the basis of a Regional Corporation resolution in hand, requesting that the BIA contract with the prospective service provider entity.



Another legal problem with the status quo is that it is doubtful that contracting for the ANCSA conveyance work can properly be supported by a tribal or village resolution under the ISDA. Legally, the tribal entity benefitting from a program, function, service or activity, or portion thereof, is the entity which must provide the authorizing request to contract. In the case of ANCSA conveyance-related work, that entity would be the Regional Corporation. Precedent for this type of approach exists in the area of BLM cadastral survey work under the ISDA. Where the contractible work is for the benefit of a Regional or other ANCSA Corporation, the BLM has agreed to contract under the ISDA only at the request of the ANCSA corporate entity to be benefitted. (Note that the ISDA includes ANCSA corporations within its statutory definition of Indian tribe.) It would be my recommendation that even in the case of a negotiation to incorporate ANCSA tasks into an ISDA contract renewal or AFA, the BIA should require an ANCSA Regional Corporation resolution requesting that the BIA contract for performance of the relevant tasks. Indeed, the Regional Corporation would not only have the right to dictate who provides the services, but also the option of electing to contract directly with the Bureau to perform the work itself, save only those functions which might be considered inherently federal, or precluded by conflict of interest.

Still another non-consensus approach to retrieving the funds necessary to get the ANCSA work done would be to issue a partial declination under ISDA § 102(a)(2)(A), on the grounds that the service to be rendered (i.e., processing cemetery and historical place applications) to the Indian beneficiaries (i.e., the ANCSA Regional Corporations) will not be satisfactory, because of a demonstrated record of non-performance by the contracting entity.

Conclusion

Given the considerable recent Congressional interest in expediting completion of the ANCSA conveyance process, as witnessed by the active effort to enact the Alaska Land Transfer Acceleration Act of 2003, S. 1466, it is especially appropriate that the ANCSA § 14(h)(1) process be re-energized. I would strongly recommend that you try to address this problem by negotiating mutually acceptable terms with affected ISDA contractors and Self-Governance compactors. I would also recommend you support that process by requiring "tribal" resolutions from the affected ANCSA Regional Corporations. If you encounter an unwillingness to alter existing arrangements, let me know, and we can evaluate what other approach(es) to pursue to rectify the situation, and to make sure that funds appropriated for ANCSA purposes are actually applied to the intended activities.

Roger L. Hudson

cc: Niles Cesar, Alaska Regional Director, BIA
Peggy Exendine, Contracting Officer, Alaska Region, BIA
Rich Myers, Assistant Solicitor, General Indian Legal Activities, D

**Aleutian Pribilof Islands Association, Inc.**

**v.**

**Dirk Kempthorne, Secretary of the Interior, United States Department of the Interior, et al.**

**Civil Action No. 06-2173 (CKK)**

# Exhibit 18



# ALASKA NATIVE CLAIMS SETTLEMENT ACT (ANCSA)



# ANCSA 1985 STUDY

## JUNE 29, 1984 DRAFT

United States
Department of the Interior

Prepared by ESG
5201 Leesburg Pike
Falls Church, VA 22041

# PREFACE

Section 23 of the Alaska Native Claims Settlement Act (ANCSA) requires the Secretary of the Interior to submit to Congress in 1985 "a report of the status of the Natives and Native groups in Alaska, and a summary of actions taken under the Act, together with such recommendations as may be appropriate." This draft report of the "ANCSA 1985 Study" has been prepared for the Secretary by ESG under Contract No. K51C14201208.

The draft is organized in five parts, preceded by an executive summary and followed by several appendices. Parts I and II provide historical background and summarize the provisions contained in the legislation as enacted in December 1971. Part III traces the implementation process, ongoing as of June 1984, and discusses major amendments. Part IV addresses changes in the status of Alaska Native individuals since ANCSA's passage. Part V considers the current status of the corporations established by ANCSA and of other Alaska Native entities. Part VI, "Conclusions and Recommendations," is not included in this draft; it will be prepared following public comment on Parts I through V.

As the primary audience for the report consists of members of Congress and their staffs, many of whom lack familiarity with the act and with its Alaskan context, an effort has been made to provide ample background and to limit the discussion to salient points without failing to convey the complexities of the act and its ramifications.

took title to their former reserves were allowed to enroll to those corporations. The legislation stipulated that no changes in the roll resulting from these provisions—and no changes resulting from any disenrollment decisions—would affect prior cash distributions from the Alaska Native Fund, village or group eligibility determinations, or land entitlements.

## CREATION OF THE 13TH REGION

The Department's failure to create a 13th region, based on its determination that less than a majority of Natives voted for its creation, was another hotly contested enrollment issue. In deciding a suit brought against the Secretary,[12] the Federal District Court overruled the Department, finding that confused, contradictory, and one-sided instructions regarding the vote and failure to consider timely amendments had marred the election. The court ordered the Department to establish the 13th region and to set aside for it the funds to which it would have been entitled had it been established by December 1973.

Secretarial Order No. 2980, effective October 1, 1975, created the 13th region and gave all Natives residing out of State a final opportunity to "opt in or out" of the 13th region in late 1976. Table 6-1 shows the results of that election. As provided by P.L. 94-204, the results of that election did not affect previous cash distributions, village or group eligibility, or land entitlements. They did, however, affect the enrollment ratios upon which future cash distributions were based.

## FINAL ROLL

With the reopening of the roll, over 12,000 additional applications were filed. Nearly half were determined ineligible, and an additional 4,000 were duplicates. Roughly 2,000 names were actually added to the roll[13] (bringing the total to approximately 80,000).

The Department's disenrollment regulations[14] provided that enrollment status could be contested only on grounds of death prior to or birth after enactment of ANCSA, no Native ancestry, noncitizenship, or enrollment in the Metlakatla Indian Community.[15] All contests had to be initiated by July 31, 1977 (regarding names on the original 1973 roll) or by January 2, 1978 (regarding names on the reopened roll). Although the Secretary's disenrollment authority came under attack, it was upheld by the U.S. District Court in 1977 on grounds that providing benefits to those not entitled to them would undermine the intent of ANCSA.[16] Over 800 disenrollment complaints were filed by the enrollment coordinator on behalf of the Department or a Native corporation, but only 132 names were actually removed from the roll.[17] Table 6-2 shows the status of the roll on December 31, 1983 (at which time all disenrollment complaints had been resolved and only 7 requests for removal from Metlakatla members were still pending).

**Aleutian Pribilof Islands Association, Inc.**

**v.**

**Dirk Kempthorne, Secretary of the Interior, United States Department of the Interior, et al.**

**Civil Action No. 06-2173 (CKK)**

**Exhibit 19**

Third Judicial District )
) ss.
State of Alaska )

AFFIDAVIT OF KENNETH L. PRATT

I, Kenneth L. Pratt, being first duly sworn, depose and state as follows:

1. My name is Kenneth L. Pratt. I have worked for the BIA in Alaska since 1985, and have been in involved in the fulfillment of the Bureau's duties relating to Section 14(h)(1) of the Alaska Native Settlement Act (ANCSA) throughout the period of my employment with the Bureau. I have been the ANCSA Program Manager since 1996.

2. ANCSA was passed by the US Congress on December 18, 1971. In addition to a cash settlement, the ANCSA legislation granted Alaska's indigenous people fee simple title to 40 million acres of land; it also extinguished all claims of aboriginal right. ANCSA Sec. 14(h)(1) allowed newly-created Native Regional Corporations to receive a portion of their acreage entitlement in the form of historical places and cemetery sites. This is the only part of the settlement that affords Alaska Natives the right to claim lands based specifically on their significance in cultural history and traditions. Statutory responsibilities imposed on the BIA by Sec. 14(h)(1) were the genesis of its ANCSA Program, the main purpose of which is to investigate and certify the selected sites. The regulations outlining the Bureau's role in these particular land claims are found in 43 Code of Federal Regulations (CFR) 2653. Associated implementing regulations are found in 43 CFR 2650-2652.

3. The ANCSA Sec. 14(h)(1) regulations are exclusively focused on describing the formal steps and procedures to be followed in the process that culminates in the conveyance of historical places and cemetery sites *to Native Regional Corporations*. As identified in the regulations, the official parties to this process are the Native Regional Corporations, BIA, Bureau of Land Management (BLM), and several other federal land-managing agencies. The only other laws and legal policies that specifically address ANCSA Sec. 14(h)(1) claims are US Department of the Interior Secretarial Order No. 3220 (January 5, 2001 [amended February 11, 2005]) (copy attached), and the Alaska Land Transfer Acceleration Act (December 10, 2004 [Public Law 108-452]). These are also exclusively focused on the lands conveyance process, and both demonstrate the importance placed upon the accurate and speedy completion of that task.

4. In my concern with seeing the tasks related to the ANCSA Sec. 14(h)(1) conveyance process fulfilled, I began raising concerns about transfer of the ANCSA funding to Self-Governance tribes and tribal consortia, without any means of assuring that those entities would carry out the necessary work, as soon as that occurred in 1996. Later on, I was instrumental in the BIA seeking the advice of the Regional Solicitor's Office, which led to the issuance of the May 24, 2004 memorandum. In large measure, that memorandum has been helpful in persuading Alaska Tribal Self-Governance tribes and consortia to include language in Annual Funding Agreements they have negotiated in subsequent years that specifically restricts the expenditure of ANCSA funding to ANCSA-related work.

5. The status of ANCSA Program work in each region of Alaska was formally discussed with the Native Regional Corporations during a meeting organized by the BIA in February 2000. At that meeting, the Regional Corporations sought assurances from the BIA that the Tribal Self-Governance program in Alaska would not jeopardize or otherwise limit their legal rights under ANCSA Sec. 14(h)(1)—specifically, their expected land conveyances [only about one-quarter (25%) of which have been completed as of June 21, 2007]. They were particularly concerned about the fact that ANCSA Program funds had been transferred to Alaska Tribal Self-Governance tribes and consortia without the Regional Corporations' prior knowledge and consent, and that the funds were treated as discretionary by the recipient organizations. That is, ANCSA funds in the existing Self-Governance agreements were not restricted; thus, the BIA had no control over how they were expended by the recipient tribes and consortia. This was the funding situation from 1996 through 2004.

6. A tribal consortia's inquiry about the February 2000 meeting led the BIA to conduct a similar meeting in April 2000 with Alaska Tribal Self-Governance tribes and consortia who were then receiving ANCSA Program funding. For most of the participating tribes and consortia this was literally their first introduction to the ANCSA Program and the purpose of ANCSA Sec. 14(h)(1). In the hope of encouraging those parties to apply the ANCSA funds they received to work that at least had some connection to the ANCSA Program, an informational handout distributed at the April meeting listed a number of tasks they could potentially perform utilizing existing ANCSA Sec. 14(h)(1) records. That the document was purely informational is evidenced by the fact that it was unsigned and not on BIA letterhead.

7. I have seen the Plaintiff's Motion for Summary Judgment, filed by APIA's attorneys, in which on page 27 (cf. page 62) they incorrectly characterize the list discussed in item 6 as "the BIA's guidelines for tribes and tribal organizations that have assumed the ANCSA 14(h)(1) activities under the ISDEAA." *The BIA has never developed official guidelines for ANCSA Program work to be performed by Alaska Tribal Self-Governance tribes and consortia*, because both the volume and nature of ANCSA Program work remaining to be accomplished varies region-to-region across Alaska. This is why the restrictive language accepted for inclusion in the subject Annual Funding Agreements following issuance of the 2004 Regional Solicitor's Office memorandum states that the specific work tasks to be performed with ANCSA funds will be jointly determined by the BIA, the relevant Native Regional Corporation, and the tribe or consortia receiving those funds. (For example, see attached Calista Corporation Resolution 07-10).

8. The ANCSA regulations are silent on the matter of how official records generated through the implementation of Sec. 14(h)(1) are to be managed; they also do not cite other federal laws or regulations that, by reference, could be construed as guidelines for the management of these federal records. The regulations do not consider how ANCSA Sec. 14(h)(1) records might be used in the future by Alaska Natives or other interested parties. This highlights the fact that ANCSA Sec. 14(h)(1) is solely concerned with land conveyances.

9. ANCSA Program work concentrating on the Sec. 14(h)(1) records collection is principally done to extract and accurately interpret information necessary for completing outstanding site reports, certifications and field investigations. It is also done to confirm the adequacy of past BIA work prior to issuance of final Sec. 14(h)(1) conveyance decisions by the BLM.

The majority of this work is tied to Secretarial Order No. 3220 and the Alaska Land Transfer Acceleration Act. All other work with the Sec. 14(h)(1) records collection is secondary in importance to that which supports the ANCSA conveyance process.

10. Pages 26-27 of the Plaintiff's Motion for Summary Judgment erroneously cite past BIA annual budget justifications for the ANCSA Program, and its original placement within the Division of Trust Services, as evidence that it exists for the primary benefit of "federally-recognized tribes and their members" rather than for the Regional Corporations. Prior to 2004, BIA organizational charts placed the ANCSA Program under the Branch of Realty, within the Division of Trust Services. This was done because the program is focused on conveyances of real property and clearly did not fit anywhere in the Division of Native Services. From its inception, however, the BIA never considered the ANCSA Program to be a true "Trust" program—because its beneficiaries are Native Regional Corporations. Its awkward fit within the Division of Trust Services was rectified in the 2004 BIA Reorganization, which placed the ANCSA Program within the newly-created "Division of Environmental and Cultural Resources Management." Within each region of the Bureau, this new division reports to the BIA Regional Director and is officially separated from the divisions of Trust Services and Native Services.

FURTHER YOUR AFFIANT SAYETH NAUGHT.

Kenneth L. Pratt

Kenneth L. Pratt

Subscribed and sworn before me this 21 day of June, 2007 at Anchorage, Alaska.

Roger L. Hudson, Notary Public for Alaska
My commission expires July 27, 2007



THE SECRETARY OF THE INTERIOR
WASHINGTON

FEB 11 2005

Memorandum

To: Assistant Secretary - Indian Affairs
Assistant Secretary - Land and Minerals Management
Assistant Secretary - Fish and Wildlife and Parks
Director, Bureau of Indian Affairs
Director, Fish and Wildlife Service
Director, Bureau of Land Management

From: Secretary [signature]

Subject: Revisions to the Procedures for Reopening of Closed Applications for Historical Places and Cemetery Sites Filed Pursuant to Section 14(h)(1) of the Alaska Native Claims Settlement Act (ANCSA), 43 U.S.C. § 1613(h)(1).

The purpose of this memorandum are to advise you that Secretary's Order 3220 which expired January 5, 2003, is being reissued and amended with a new expiration date; and that the procedures have been revised for processing and considering reopening of closed applications filed under the Order.

The Order allows reopening of certain applications which were timely filed under Section 14(h)(1) of ANCSA but subsequently closed. Attached to the Order is a list of 196 applications eligible for reopening under the Order. The Order waives certain requirements that might bar reopening an application(s). It also requires a written request from an ANCSA regional corporation to initiate the process attendant to a reopening. Finally, the Order permits the Bureau of Indian Affairs (BIA) to review applications for land that is unavailable for conveyance, but not to reopen those applications.

Revisions have also been made to paragraph 12 of the procedures for reopening cases under the Order. These revisions allow applications located on lands selected by or previously conveyed to the State of Alaska to be reopened if the State concurs and is willing to relinquish its selection or reconvey the lands.

Each ANCSA regional corporation that has submitted a request to have an application reopened under this Order must be advised on the revised procedures outlined herein and must agree to have its request considered and processed in accordance with the amended Order and the revised procedures provided in the Attachment.

Attachment

ATTACHMENT A

ATTACHMENT

**Revised Procedures for Reopening of Closed Applications for Historical Places and Cemetery Sites Filed Pursuant to Section 14(h)(1) of the Alaska Native Claims Settlement Act (ANCSA), 43 U.S.C. § 1613(h)(1).**

1. Requests to reopen 14(h)(1) applications must include a statement of justification explaining why the application should be reopened. Examples of possibly sufficient justification include evidence that the BIA did not examine the place or site (site) claimed, the site could not be found previously but has now been located, or that evidence discovered later supports the eligibility of the application. Applications may only be reopened if the reasons given in the associated corporation requests are based on the BIA field investigation and certification process. Requests to reopen applications based on alleged land adjudication errors will be denied.

2. The submitting regional corporation must demonstrate that information submitted in support of a requested reopening is directly and clearly associated with the historical place or cemetery site claimed in its original application.

3. All new information submitted in support of reopening of a 14(h)(1) application must meet the following standards:

(A) As indicated in 2, above, all new information must be directly and clearly associated with the historical place or cemetery site the corporation claimed in the original application.

(B) Reported oral history or written accounts about the site in question must be submitted with sufficient references (e.g., names, documents, and other sources), to allow the BIA ANCSA staff to verify the accuracy of the reported accounts and their relevancy to the specific application. The BIA ANCSA staff must be provided access to recordings and documentation, if any exist, in order to effect the necessary verification and to determine the appropriate weight to give to such evidence.

(C) Information which reports the presence of buried cultural remains or surface artifacts in association with a given applied-for site must be documented to a degree adequate to allow BIA ANCSA archeological staff to (a) evaluate the authenticity of the material, and (b) physically locate the deposits in the event additional fieldwork is undertaken in connection with the site. Minimally, adequate documentation will include photographs or to-scale sketches of artifacts or areas containing the reported deposits, as well as accurate and precise legal or topographic descriptions (including map plots) of their field location. The requesting corporation is also encouraged to submit GPS or other coordinate information.

4. Applications for new sites or additions of new land to original sites will not be allowed. Corrections to the legal description of a 14(h)(1) site must be limited to established procedures and can only occur for such purposes as correcting a legal description mistake based on mapping or other technical description problems so that the description accurately describes the originally

applied-for site, conforming the boundaries to the actual on-the-ground position of the site, and to conform the boundaries to survey.

5. Applications will be reopened to the extent the requesting ANCSA regional corporation has adequate existing land entitlement. Nothing in the Order or this memorandum shall be construed to change or increase existing ANCSA 14(h)(1) land entitlement allocations for any ANCSA corporation.

6. Only the 196 applications listed in the attachment to the Order are eligible to be reopened.

7. The BIA may, at any time prior to expiration of the deadline set by the Order, on its own initiative, notify the appropriate ANCSA regional corporation that it has determined that a particular application appear to meet the criteria of the Order and this memorandum. The regional corporation may request reopening on the basis of BIA's determination any time within the time frame set by the Order.

8. The BIA may establish additional criteria for determining whether to reopen a 14(h)(1) application, provided that it may not change any of the criteria articulated in this memorandum and that it notifies the ANCSA regional corporation, the Bureau of Land Management (BLM), and any other affected federal land manager of the additional criteria.

9. In addition to meeting the criteria set out in the Order and this memorandum, no 14(h)(1) application filed by Chugach Alaska Corporation will be reopened unless reopening would also be consistent with the requirements of paragraph 16 of the 1982 CNI Agreement. Paragraph 16 provides in pertinent part that: ". . . CNI shall not apply for, nor shall it seek any waiver of regulations in order to make future selections under 14(h) of ANCSA . . . nor shall CNI assert or seek to acquire any other legal authority to make future selections pursuant to Section 14(h) of ANCSA within the national forests. Any selections on record on the date of this [1982 CNI] Agreement for a particular site, or any amendments thereto, shall not be regarded as a future selection for the purpose of this paragraph."

10. Prior to submitting an application to BLM for possible reopening, the BIA shall ensure that the location of the applied-for site has been properly identified, shall cure any defects in the prior investigation, and may correct mistakes in previously issued certificate of eligibility or ineligibility.

11. If BIA determines that an application should be further considered for reopening, BIA shall forward the application and relevant supporting documentation to BLM. The BIA shall simultaneously inform the requesting ANCSA regional corporation and any affected federal land managing agency that the application has been forward to BLM for possible reopening.

12. Upon receipt of an application and supporting documentation from BIA, BLM will review the legal description of the applied-for site to determine if the land was available at the time the original application was filed and that the land is still available for conveyance at the present time. If BLM finds that the land was not available at the time the original application was filed (e.g., the land was reserved at the time of the original application) or if the land is no longer

available for conveyance (e.g., the land is part of a congressionally-designated wilderness area), BLM shall notify the BIA, any affected federal land managing agency, and the requesting corporation that the application cannot be reopened. This is an exercise of discretion under the Order and this memorandum and is not an appealable action. If a site listed in the Order is certified eligible by the BIA in accordance with 43 C.F.R. 2653.5 and if BLM determines the land was available for conveyance at the time the original application was filed and is still available for conveyance, BLM shall issue a notice that the application has been reopened. The notice shall be served on the requesting ANCSA regional corporation and copies shall be sent to BIA, any affected federal land managing agency, and all other interested parties. If after BLM issues a notice of reopening, it is determined that the land is not available for conveyance, BLM shall issue a final, appealable decision. In the event the land containing the applied-for site has been conveyed to the State of Alaska after closure of the 14(h)(1) application or has been selected by the State, the BLM and BIA shall make a good faith attempt to facilitate a meeting between the State and the applicant regional corporation to discuss the case. The BLM is authorized to accept voluntary relinquishments of selection applications and voluntary reconveyances of title from the State of Alaska for the purpose of conveying the sites to the applicant regional corporations, and the original Sec. 14(h)(1) applications may be reopened for that purpose with the consent of the State of Alaska. The BLM is not authorized to pursue a suit to recover title.

13. If BLM determines that third-party interests (e.g., rights-of-way, leases or permits) have been created after the 14(h)(1) application was closed and prior to reopening and that conveyance of the applied-for historical place or cemetery site would impair that third party right, BLM shall notify the BIA, any affected federal land managing agency, and the requesting corporation that the application cannot be reopened. If the third party interest can be adequately protected by making the conveyance subject to the interest, then the application may be reopened and the conveyance, if otherwise proper, will be made subject to the third party interests. This is consistent with 43 C.F.R. § 2650.0-8 which provides for waiver of nonstatutory ANCSA regulations "when the rights of third parties will not be impaired."

THE SECRETARY OF THE INTERIOR

WASHINGTON

ORDER NO. 3220, Amendment No. 1 *(Amended material italicized)*

Subject: Reopening of Selected Applications for Historical Places and Cemetery Sites Under ANCSA

The purposes of this amendment are to reissue and extend the expiration date of Secretary's Order 3220, dated January 5, 2001. The amended Order provides authority for reopening certain applications for consideration and processing in accordance with revised procedures.

Sec. 7 **Expiration Date.** This Order is effective immediately and will remain in effect until *five* years from the date hereof or its conversion into the Departmental Manual or until it is superseded or revoked, whichever occurs earlier.

Secretary of the Interior

Date: FEB 1 1 2005



# United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, D.C. 20240

**ORDER NO.** 3220

**Subject:** Reopening of Selected Applications for Historical Places and Cemetery Sites Under ANCSA

**Sec. 1 Purpose.** The purpose of this Order is to permit the reopening of certain applications which were filed in a timely fashion under Section 14(h)(1) of the Alaska Native Claims Settlement Act (ANCSA), but which were subsequently closed.

**Sec. 2 Authority.** As provided in 43 CFR §2650.0-8, the Secretary has discretionary authority to waive any non-statutory regulation implementing ANCSA. There is no statutory deadline for filing or reopening Section 14(h)(1) applications.

**Sec. 3 Policy Decision.** Based on difficulties that occurred in the past adjudication of Section 14 (h)(1) applications, it is in keeping with the intent of ANCSA to reopen certain Section 14(h)(1) applications. Any Section 14(h)(1) applications for land that would be unavailable for conveyance may not be reopened; however, they are subject to administrative review by the Bureau of Indian Affairs. Furthermore, in order to be eligible for reopening hereunder, the application must be one of the 196 closed applications listed on the attachment to this Order.

**Sec. 4 Requests for Reopening.** All requests for reopening of Section 14(h)(1) applications under this Order must be submitted in writing by the selecting ANCSA regional corporation to the Bureau of Indian Affairs, ANCSA Office, Anchorage, Alaska within two years of the effective date of this Order. By submitting a request to reopen an application hereunder, the submitting regional corporation agrees to have the request considered and processed in accordance with this Order and any implementing procedures established by the Secretary. A request by the Chugach Alaska Corporation to reopen a 14(h)(1) application may be approved only if reopening would be consistent with the requirements of paragraph 16 of the 1982 CNI Agreement.

**Sec. 5 Waivers.** The following are waived:

a. 43 CFR §2653.4(b) to the extent it may set a regulatory deadline that prevents the reopening of closed Section 14(h)(1) applications at this time.

b. Specific extensions of the regulatory deadline to file applications under Section 14(h)(1) granted and published in the Federal Register (for example, extension for NANA

published in 43 Fed. Reg. 29818, July 20, 1976), to the extent such extensions may be construed as preventing reopening of Section 14(h)(1) applications under this Order.

**Sec. 6 Appeal Rights.** Nothing in this Order is intended to create new or additional rights, and actions taken under this Order on ANCSA regional corporations' requests to reopen closed application(s) shall not be appealable.

**Sec. 7 Effective Date.** This Order is effective immediately and will remain in effect until two years from the date hereof or its conversion into the Departmental Manual or until it is superseded or revoked, whichever occurs earlier.

Secretary of the Interior

Date: JAN 5 . 2001

Attachment

**ATTACHMENT TO SECRETARIAL ORDER ON REOPENING OF CLOSED ANCSA SECTION 14(h)(1) APPLICATIONS**

| AHTNA, INCORPORATED | ALEUT CORPORATION | BERING STRAITS NATIVE CORPORATION | |
|---|---|---|---|
| AA-58713 | AA-11923 | AA-10696 | F-21977 |
| AA-58724 | AA-11934 | AA-10699 | F-21980 |
| AA-58725 | AA-11935 | AA-10701 | F-21982 |
| AA-60733 | AA-12085 | AA-10705 | F-22002 |
| | AA-12086 | AA-10706 | F-22003 |
| | AA-12094 | AA-10707 | F-22007 |
| | AA-12103 | AA-11786 | F-22010 |
| | AA-12106 | AA-11792 | F-22011 |
| | AA-12112 | AA-11799 | F-22013 |
| | AA-12114 | F-21883 | F-22847 |
| | AA-12115 | F-21908 | F-22857 |
| | AA-12119 | F-21909 | F-22872 |
| | AA-12120 | F-21933 | F-22816 |
| | AA-12135 | F-21939 | F-22891 |
| | AA-12196 | F-21946 | F-22895 |
| | AA-12223 | F-21948 | F-22896 |
| | AA-12227 | F-21955 | F-22901 |
| | AA-12237 | F-21965 | F-22903 |
| | | F-21969 | F-22904 |
| | | F-21976 | |
| | | | |

| BRISTOL BAY NATIVE CORPORATION | CHUGACH ALASKA CORPORATION | CALISTA CORPORATION | |
|---|---|---|---|
| AA-10629 | AA-10753 | AA-9502 | AA-10079 |
| AA-11863 | AA-10785 | AA-9631 | AA-10182 |
| AA-11865 | AA-10791 | AA-9774 | AA-10188 |
| AA-11866 | AA-10962 | AA-9823 | AA-10220 |
| AA-11870 | AA-10986 | AA-9836 | AA-10232 |
| AA-11876 | AA-11011 | AA-9841 | AA-10233 |
| | AA-11030 | AA-9890 | AA-10285 |
| | AA-11041 | AA-9897 | AA-10332 |
| | AA-11059 | AA-9934 | AA-10336 |
| | AA-11066 | AA-9935 | AA-10339 |
| | AA-11084 | AA-9981 | AA-10349 |
| | AA-12434 | AA-9985 | AA-10367 |
| | AA-12437 | AA-10006 | AA-11388 |
| | AA-12438 | AA-10027 | AA-11422 |
| | AA-12455 | AA-10056 | AA-11484 |
| | AA-12551 | AA-10057 | AA-11582 |
| | AA-12587 | AA-10060 | AA-11639 |
| | AA-12620 | AA-10076 | AA-11753 |
| | AA-12621 | | |
| | | | |

| COOK INLET REGION, INC. | DOYON, LIMITED | | | |
|---|---|---|---|---|
| AA-11817 | AA-12296 | AA-12341 | F-22476 | F-22644 |
| AA-11819 | AA-12303 | AA-12355 | F-22495 | F-22645 |
| AA-11821 | AA-12311 | AA-12357 | F-22496 | F-22653 |
| | AA-12317 | AA-12358 | F-22497 | F-22662 |
| | AA-12320 | AA-12360 | F-22579 | F-22710 |
| | AA-12321 | AA-12365 | F-22583 | F-22711 |
| | AA-12322 | AA-12369 | F-22584 | F-22734 |
| | AA-12323 | AA-12371 | F-22597 | F-22768 |
| | AA-12324 | F-22451 | F-22600 | F-22772 |
| | AA-12327 | F-22456 | F-22604 | F-22790 |
| | AA-12335 | F-22461 | F-22605 | F-22791 |
| | AA-12337 | F-22465 | F-22609 | F-22794 |
| | AA-12338 | F-22473 | F-22611 | F-22795 |
| | AA-12339 | F-22474 | F-22626 | |

| KONIAG, INCORPORATED | NORTHWEST ALASKA NATIVE ASSOCIATION | SEALASKA CORPORATION |
|---|---|---|
| AA-10555 | F-22120 | AA-10471 |
| AA-10562 | F-22163 | AA-10484 |
| AA-10573 | F-22168 | |
| AA-10575 | F-22189 | |
| AA-11722 | F-22216 | |
| AA-11723 | F-22298 | |
| AA-11731 | | |
| AA-11732 | | |
| | | |



1401 Calista Court, Suite A · Anchorage, Alaska 99518-3028 · (907) 279-5516 · Facsimile (907) 272-5060 · Website: www.calistacorp.com

**RESOLUTION 07-10**

WHEREAS, The Association of Village Council Presidents (AVCP) is a recognized tribal organization and non-profit Alaska Native regional corporation representing fifty-six member Native villages and has received ANCSA Program funding from the BIA since 1996;

WHEREAS, The AVCP service area coincides with the Calista Corporation service area and AVCP has professional staff and funding to undertake ANCSA 14(h)(1) programmatic work;

WHEREAS, AVCP and Calista Corporation Land and Natural Resources department have worked cooperatively under an MOA since 2000 to achieve ANCSA 14(h)(1) program goals;

WHEREAS, During the FY 2007 Self-Governance Compact negotiated funding agreement, AVCP agreed that the Calista Corporation is the major beneficiary of the ANCSA Program and that work plans would be jointly determined by the BIA ANCSA Office, Calista Corporation and AVCP;

NOW THEREFORE BE IT RESOLVED that Calista Corporation designates AVCP to receive funding on its behalf for FY 2007 to execute ANCSA 14(h)(1) Program goals jointly determined by the BIA ANCSA Office, Calista Corporation and AVCP.

DATED this 12th day of April, 2007.

CALISTA CORPORATION

Felix P. Hess
Felix P. Hess, Corporate Secretary

(Corporate Seal) CALISTA CORPORATION CORPORATE SEAL ALASKA

ATTACHMENT B