# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ALEUTIAN PRIBILOF ISLANDS ASSOCIATION, INC.** ) | |
| 201 E. 3rd Avenue ) | |
| Anchorage, Alaska 99501 ) | |
| ) | |
|     PLAINTIFF, ) | |
| ) | |
|     v. ) | |
| ) | |
| **DIRK KEMPTHORNE**, in his official capacity as ) | |
| Secretary of the Interior, ) | |
| U.S. Department of the Interior ) | |
| 1849 C. Street, N.W. ) | |
| Washington, DC 20240 ) | |
| ) | |
| **NILES CESAR**, in his official capacity as ) | |
| Regional Director, Alaska Region, ) | |
| Bureau of Indian Affairs, ) | |
| U.S. Department of the Interior; )      Civil Action No. 06-2173 (CKK) | |
| 709 W. 9th St. ) | |
| Juneau, Alaska 99802 ) | |
| ) | |
| **BUREAU OF INDIAN AFFAIRS** ) | |
| **OFFICE OF SELF-GOVERNANCE,** ) | |
| U.S. Department of the Interior, ) | |
| 1849 C. Street, N.W., MS 4140 MIB ) | |
| Washington, DC 20240 ) | |
| ) | |
|     DEFENDANTS. ) | |
| ) | |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND CROSS-MOTION FOR SUMMARY JUDGMENT AND
PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**Table of Contents**

Introduction and Summary ................................................................................1

Argument ...........................................................................................................2

I.    APIA Has Exhausted All Required Administrative Remedies,
      and Defendants' Motion to Dismiss Should Be Denied.............................2

II.   The Standard of Review Is *De Novo* .........................................................9

III.  The BIA Properly Compacted the ANCSA Program to APIA Under
      the ISDEAA and the Alaska Order of Precedence ...................................12

      A.    *APIA's Sanctioning Tribes and their Members Benefit
            from the ANCSA Program, and thus May Compact that
            Program through APIA* ..............................................................13

      B     *The Alaska Order of Contracting Precedence Should
            Have Been Followed* ...................................................................16

IV.   The BIA Failed to Follow the Statutorily Required Declination
      Procedures and Criteria, so the BIA Action Must be Reversed................17

      A.    *Defendants' About-Face on the Issue of Authorizing
            Resolutions, However Meritorious it May Be, Does Not Excuse
            Defendants' Blatant Disregard of the Declination Procedures,
            as Shown in the* Cheyenne River Sioux *Case* ...............................18

      B.    *The Declination Process in Section 102(a) Provides the
            Exclusive Means for Refusing a Proposal and Cannot Be
            Avoided by "Threshold" Rejections* ............................................20

      C.    *APIA's FY 2006 and 2007 Proposals Were Substantially
            the Same as that Approved by the BIA in Previous Years, So
            Declining the Proposals Violated BIA Regulations*......................22

      D.    *The ISDEAA's Statutory Protections Provide the Basis
            for the Temporal Priority Recognized in the* Pit River *Case* .........23

Conclusion .......................................................................................................24

## Table of Authorities

Cases

*Andrade v. Lauer*, 729 F.2d 1475 (D.C. Cir. 1984) ............................................................8

*Association of National Advertisers v. F.T. C.*, 627 F.2d 1151 (D.C. Cir. 1979) ...............8

*Atlantic Tele-Network, Inc. v. F.C.C.C.A.*, 59 F.3d 1384 (D.C. Cir. 1995) ........................3

*Career Education, Inc. v. Department of Education*, 6 F.3d 817 (D.C. Cir. 1993) .............3

*Chandler v. Roudebush*, 425 U.S. 840 (1976) .....................................................................9

*Cherokee Nation v. Leavitt*, 543 U.S. 631 (2005) .............................................................7, 9

*Cherokee Nation v. Thompson*, 311 F.3d 1054 (10th Cir. 2002) ......................................7, 9

*Cherokee Nation of Oklahoma v. United States*,
190 F.Supp.2d 1248 (E.D. Okla. 2001) ........................................................6, 9, 10, 11, 12

*Cheyenne River Sioux Tribe v. Kempthorne*,
2007 WL 2022180 (D.S.D. 2007) ............................................................9, 10, 12, 18, 19, 24

*Coit Independence Joint Venture v. Federal Savings and Loan Ins. Corp.*,
489 U.S. 561 (1989) ...............................................................................................................8

*Darby v. Cisneros*, 509 U.S. 137, 147 (1993) ..............................................................3, 5, 6

*Delaware Tribe of Indians v. Bureau of Indian Affairs*,
IBIA 02-65-A, (Nov. 26, 2001) ............................................................................................20

*Feezor v. Babbitt*, 953 F. Supp. 1 (D.D.C. 1996) ..............................................................11

*Gibson v. Berryhill*, 411 U.S. 564 (1973) .............................................................................8

*Marine Mammal Conservancy, Inc. v. Dep't of Agriculture*,
134 F.3d 409 (D.C. Cir. 1998) ...............................................................................................8

*Mechoopda Indian Tribe of Chico Rancheria, CA v. Education Programs Admr.,
Sacramento Area Office, Bureau of Indian Affairs*,
IBIA 97-9-A, IBIA 97-102-A, (Mar. 1, 2001) ....................................................................20

*Morton v. Ruiz*, 415 U.S. 199 (1974) ..................................................................................16

*North Haven Bd. of Educ. v. Bell*, 456 U.S. 512 (1982) ....................................................13

*Oglesby v. United States Dep't of Army*, 920 F.2d 57 (D.C. Cir. 1990) ..............................7

*Pit River Health Service, Inc. v. Indian Health Service*,
DAB CR333 (1994), 1994 WL 596859 ..............................................................23

*Pueblo of Zuni v. United States*, 467 F. Supp. 2d 1099 (D.N.M. 2006) ..........................7

*Ransom v. Babbitt*, 69 F. Supp. 2d 141 (D.D.C. 1999).....................................................11

*Shoshone-Bannock Tribes of the Fort Hall Reservation v. Shalala*,
988 F. Supp. 1306 (D. Or. 1997) .......................................................9, 11, 12, 18

*Shoshone-Bannock Tribes of the Fort Hall Reservation v. Thompson*,
279 F.3d 660 (9th Cir. 2002) ..................................................................................9

*Simmons v. Block*, 782 F.2d 1545 (11th Cir. 1986) .........................................................11

*Southern Ute Indian Tribe v. Leavitt,* Memorandum Opinion and Order on
Plaintiff's Motion for Preliminary Injunction and Defendants' Motion for
Summary Judgment, Civ. No. 05-988 WJ/LAM (D.N.M. June 15, 2007).................21, 24

*Telecommunications Research and Action Center v. F.C.C.*,
750 F. 2d 70 (D.C. Cir. 1984) .................................................................................8

*Wilbur v. CIA*, 355 F.3d 675 (D.C. Cir. 2004)...................................................................7

## Statutes

5 U.S.C. § 702...................................................................................................................3

5 U.S.C. § 704..............................................................................................................3, 5

5 U.S.C. § 7121(a)(1)........................................................................................................8

7. U.S.C. § 2149(c) ..........................................................................................................8

24 C.F.R. § 24.314(c)........................................................................................................6

25 U.S.C. § 450f(a) .........................................................................................................13

25 U.S.C. § 450f(a)(2) ........................................................................................17, 20, 21

25 U.S.C. § 450f(a)(2)(E) ...............................................................................................19

25 U.S.C. § 450(b) ........................................................................................................20

25 U.S.C. § 450f(b)(3) .............................................................................................3, 4, 6, 7

25 U.S.C. § 450j-1(b)(2) ...............................................................................................22

25 U.S.C. § 450m-1(a) ........................................................................................4, 6, 9, 18

25 U.S.C. § 450m-1(d) ..................................................................................................7

28 U.S.C. § 1331 ..........................................................................................................11

28 U.S.C. § 1361 ..........................................................................................................11

41 U.S.C. § 601 *et seq.* ...............................................................................................7

41 U.S.C. § 605(a) .......................................................................................................7

43 U.S.C. § 1613(h)(1) ........................................................................................ *passim*

Regulations

7 C.F.R. § 1.142(c)(4) ...................................................................................................8

25 C.F.R. § 900.8(d) .....................................................................................................13

25 C.F.R. § 900.18 .................................................................................................19, 20

25 C.F.R. § 900.29 ........................................................................................................20

25 C.F.R. § 900.32 ........................................................................................................22

25 C.F.R. § 900.150(a)...................................................................................................3

25 C.F.R. §§ 900.152 through 900.169........................................................................3

25 C.F.R. § 900.153 .......................................................................................................4

25 C.F.R. § 900.156 .......................................................................................................4

25 C.F.R. § 900.157 ....................................................................................................4, 5

25 C.F.R. § 900.158(c)(3) ..............................................................................................4

25 C.F.R. § 900.166........................................................................................3, 4, 5, 6, 8

25 C.F.R. § 900.167 ...........................................................................................8

25 C.F.R. § 900.167(b) .......................................................................................4

25 C.F.R. §§ 900.215-900.230............................................................................7

25 C.F.R. § 1000.432(a)......................................................................................3

32 C.F.R. § 1900.42(b) .......................................................................................7

Other

61 Fed. Reg. 32481, 32496 (June 24, 1996) .......................................................5

S. Rep. No. 100-274 (1987)..........................................................................12, 21

## INTRODUCTION AND SUMMARY

The Bureau of Indian Affairs ("BIA") and Office of Self-Governance ("OSG") properly compacted with the Aleutian Pribilof Islands Association ("APIA") to carry out activities authorized by section 14(h)(1) of the Alaska Native Claims Settlement Act ("ANCSA"), 43 U.S.C. § 1613(h)(1), from fiscal year ("FY") 1996 through FY 2005. Defendants then declined to include funds related to these activities in APIA's Annual Funding Agreement ("AFA") in FY 2006 or FY 2007.

The Indian Self-Determination and Education Assistance Act ("ISDEAA") places strict procedural and substantive limitations on agency discretion to decline contracts—limitations Defendants acknowledge they ignored. Defendants argue that these statutory safeguards do not apply because APIA's FY 2006 proposal was not supported by a valid tribal resolution, even

though the proposal was supported by the same tribal resolutions that the agency had determined were legally adequate from FY 1996 to FY 2005.

Defendants' Opposition to Plaintiff's Motion for Summary Judgment and Brief in Support of Defendants' Partial Motion to Dismiss and Cross Motion for Summary Judgment ("Def. Opp.") tells the story of an agency that made a mistake in FY 1996 that lasted close to ten years, and only in FY 2006 did it correct that mistake by unilaterally withdrawing the ANCSA funds from APIA's AFA in order to award them to The Aleut Corporation ("TAC"). Defendants assert that inclusion of ANCSA funds in APIA's AFAs was "erroneous," a "mistake," imprudent." Def. Opp. at 15-23.

In fact, no mistakes were made prior to FY 2005: the Tribes and tribal members represented by APIA benefit from ANCSA § 14(h)(1) activities, so APIA can legally carry out those activities on behalf of its constituents. Defendants were therefore right to include the ANCSA activities in APIA's AFAs from 1996 through 2005 because assumption of those activities was legally authorized by the Alaska Villages and their members whose cultures the 14(h)(1) sites embody. Mistakes were made, however, in FY 2006 and FY 2007: Defendants were wrong to unilaterally remove the 14(h)(1) activities and funding from APIA's FY 2006 AFA and then seek to justify that decision, as well as the complete disregard of the statutory and regulatory requirements for making such decisions, by insisting that the agency's decade-long history of compacting with APIA was all one big mistake.

Further, Defendants' current arguments are clearly "erroneous" and "mistaken." Defendants' motion to dismiss on the basis that APIA did not exhaust administrative remedies by filing an optional administrative appeal is contrary to Supreme Court precedent and must be denied. Likewise, Defendants' argument that this Court should apply an "arbitrary and

capricious" standard of review has been rejected by a number federal court decisions holding that the standard of review in the ISDEAA is *de novo*. Defendants' argument that TAC is the only beneficiary of ANCSA § 14(h)(1), and that therefore Defendants could ignore the statutory requirements for declining APIA's proposal, rests on serious misinterpretations of both the ANCSA and the ISDEAA. Finally, Defendants procedural violations alone require that APIA's AFAs for FY 2006 and 2007 be awarded and funded.

## **ARGUMENT**

### I.    **APIA Has Exhausted All Required Administrative Remedies, and Defendants' Motion to Dismiss Should Be Denied.**

The ISDEAA and BIA's implementing regulations permit but do not require an administrative appeal before seeking judicial review of the agency's decision to delete funds from APIA's compact. *See* 25 U.S.C. § 450f(b)(3).[1] The Administrative Law Judge's ("ALJ") decision in this case was "final" for the Department of the Interior ("DOI"), making it subject to review under the Administrative Procedure Act ("APA"). *See* 5 U.S.C. §§ 702, 704.

Defendants seek partial dismissal of APIA's FY 2006 funding claims on the grounds that APIA did not exhaust administrative remedies for purposes of 25 U.S.C. § 450f(b)(3). Defendants acknowledge that APIA could have proceeded directly to federal court after FY 2006 funding was omitted, or could have filed suit after exercising all administrative options provided in the regulations, but argue that once APIA elected to pursue the administrative appeal options provided in the regulations it could not file an action in federal court without completing all

---

[1] The ISDEAA sections 102 and 110 and Part 900 regulations apply to APIA's Title IV agreements because the Title IV regulations incorporate by reference the appeals procedures of Title I. 25 C.F.R. § 1000.432(a) (for Title I-eligible programs such as ANCSA § 14(h)(1), "appeal may only be filed with IBIA [the Interior Board of Indian Appeals] under the provisions set forth in 25 C.F.R. § 900.150(a) through (h), [and §§] 900.152 through 900.169"); *id.* § 900.150(a) (specifying that Title I appeal regulations apply to decisions to decline an agreement, or a portion thereof, "under section 102 of the [ISDEAA]").

administrative options.  *See* Def. Opp. at 10-11.  These arguments misread the ISDEAA and

applicable regulations, as well as case law that has addressed them in other contexts.

Generally final agency action is subject to judicial review except where the agency by

rule expressly requires an appeal and stays its action pending that appeal.[2]  APIA's appeal from

the ALJ's decision was permitted but not required.  *See* 25 C.F.R. § 900.166 (party "may" file

objections to written decision within 30 days; if not, decision becomes final).  Thus the ALJ

decision was final for purposes of APA review, and no further exhaustion of administrative

options was required.

The ISDEAA and BIA's own regulations permit but do not require an appeal. Defendants

do not cite, quote from, or analyze the language of 25 U.S.C. § 450f(b)(3), for good reason: it

does not support their theory.  Section 450f(b)(3) provides that whenever the Secretary declines

to enter into a contract or compact, "the Secretary shall:

> (3) provide the tribal organization with a hearing on the record with the right to
> engage in full discovery relevant to any issue raised in the matter and the
> opportunity for appeal on the objections raised, under such rules and regulations
> as the Secretary may promulgate, except that the tribe or tribal organization may,
> in lieu of  filing such appeal, exercise the option to initiate an action in Federal
> district court and proceed directly to such court pursuant to section 110(a) [of
> ISDEAA, 25 U.S.C. § 450m-1(a)]."

The regulations provide a tribal organization with several administrative options that may

be exercised, as well as the option of suing in federal district court.  A tribe or tribal organization

"may" request an informal conference, 25 C.F.R. § 900.153, resulting in a recommended

decision by an official designated to conduct the conference.  *Id*. § 900.156. With or without the

informal conference, the tribal organization "may" appeal the decision to the Interior Board of

---

[2] *Darby v. Cisneros*, 509 U.S. 137, 147 (1993); s*ee also Atlantic Tele-Network, Inc. v. F.C.C.C.A.*, 59
F.3d 1384, 1388 (D.C. Cir. 1995) (citing *Darby* for the proposition that courts may not require exhaustion
of optional appeals); *Career Education, Inc. v. Department of Education*, 6 F.3d 817, 820 (D.C. Cir.
1993) (exhaustion requirement may not be imposed by federal court if administrative adjudication is
otherwise final and available appeal is only a discretionary one)

Indian Appeals ("IBIA"), *id*. § 900.157, with the option of requesting a hearing on the record. *Id*. § 900.158(c)(3). If a hearing is conducted by an ALJ, the judge issues a recommended decision, and any party "may" file objections to the recommended decision, *id*. § 900.166, and the IBIA or the Secretary "may" consider issues raised in the objections and modify, adopt, or reverse the decision or take no action at all. *Id*. § 900.167(b).[3]

For each option that "may" be exercised by the tribal organization—informal conference, hearing with ALJ, or objections filed with the IBIA and the Secretary—the result is a decision that is "final" for the Department.[4] The fact that the decision point for each option is "final" and ripe for federal court review is reinforced by the question-answer format of the section headings in the regulations. In each instance the heading reads: "Is the recommended decision always final?" *See id*. § 900.157 (informal conference); *id*. § 900.166 (ALJ decision). The response is that the party "may" appeal and the decision is not "final" if the party in fact exercises that choice instead of opting for litigation in federal court.[5]

Clearly, the regulations do not make exercise of any of the options required or mandatory, and the resulting decision under any option is "final" for purposes of APA review. 5 U.S.C. § 704 provides in relevant part:

---

[3] The statute can be read to provide that the hearing, when it occurs, triggers the "opportunity for appeal" or, "in lieu" of such appeal, the option to initiate litigation in federal court. The regulation, however, clearly gives an additional option: a tribe or tribal organization "may" also request an informal conference, or choose to file in federal court even before the hearing and appeal provided in the statute. *See* 25 C.F.R. § 900.153. If the Defendants' theory is correct, then the waiver of the option to file suit until *all* optional appeals are completed occurs if a tribe or tribal organization seeks an informal conference. And there is nothing in the statute or regulations compelling such a waiver of the right to seek federal court review by requesting a conference, or by filing any other optional appeal.

[4] *See* 25 C.F.R. § 900.157 (decision after informal conference is "final" if no appeal taken); *id*. § 900.166 (ALJ decision is "final" if no objections filed); *id*. (decision is "final" with action or no action by IBIA or Secretary).
[5] It is also noteworthy that the drafters of the regulation rejected a comment that recommended that tribes be required to go through the administrative appeal process before being allowed to go to federal court. "This recommendation was not adopted because Section 110 of the Act specifically authorizes direct access to federal courts." 61 Fed. Reg. 32481, 32496 (June 24, 1996).

> Except as otherwise expressly required by statute, agency action otherwise final is
> final for the purposes of this section whether or not there has been presented or
> determined an application for a declaratory order, for any form of reconsideration,
> or, unless the agency otherwise requires by rule and provides that the action
> meanwhile is inoperative, for an appeal to superior agency authority.

Thus, a "final" agency action is subject to judicial review, unless the agency by rule expressly

requires an administrative appeal and stays its action pending that appeal.

The Supreme Court addressed this issue squarely in *Darby v. Cisneros*, 509 U.S. 137

(1993). In that case Darby appealed a Department of Housing and Urban Development (HUD)

ALJ's debarment decision to the district court under the APA. HUD argued that he failed to

exhaust administrative remedies under a regulation very similar to the one at issue in this case:

the decision was final unless appealed within 30 days.[6] The Supreme Court rejected HUD's

argument, interpreting section 704 as a statutory exhaustion provision that replaced the common-

law exhaustion doctrine when an APA action is brought, and held that courts may <u>not</u> impose

any additional exhaustion requirements beyond those <u>required</u> by Congress or the agency.

"Section [704] explicitly requires exhaustion of all intra-agency appeals mandated either by

statute or by agency rule; it would be inconsistent with the plain language of [section 704] for

courts to require litigants to exhaust optional appeals as well." *Id*. at 147. In cases "where the

APA applies, an appeal to 'superior agency authority' is a prerequisite to judicial review <u>only</u>

when expressly required by statute or when an agency rule requires appeal before review and the

administrative action is made inoperative pending that review." *Id*. at 154 (Court's emphasis).

The ISDEAA regulations allow, but do not expressly require, an appeal from the ALJ's decision,

---

[6] The HUD regulation provided that a "hearing officer's determination shall be final unless . . . the
Secretary . . . within 30 days of receipt of a request [for review] decides as a matter of discretion to review
the finding of the hearing officer." *Darby*, 509 U.S. at 141 (quoting 24 C.F.R. § 24.314(c) (1992)).
Compare the BIA regulation: "The recommended decision shall become final 30 days after the Indian
tribe or tribal organization receives the ALJ's recommended decision, unless a written statement of
objections is filed with . . . the IBIA" 25 C.F.R. § 900.166.

so the recommended decision ("final" by the terms of the regulation) is reviewable under section 704 of the APA and section 110 of the ISDEAA.[7]

Defendants cite no authority for their theory that the regulations require exhaustion of all administrative options before a party can seek federal court review. Two cases cited by the Defendants discuss Section 450f(b)(3) in passing, but without addressing the question whether exhaustion is required. In *Cherokee Nation of Oklahoma v. United States*, 190 F.Supp.2d 1248, 1258 (E.D. Okla. 2001),[8] the court merely describes the appeal options in Section 450f(b)(3), administrative and judicial, as part of its analysis in holding that Congress intended federal courts to exercise *de novo* review of claims brought under the ISDEAA.

Defendants also cite cases involving mandatory exhaustion procedures, which are clearly distinguishable from the optional appeal here. *Pueblo of Zuni v. United States*, 467 F. Supp. 2d 1099 (D.N.M. 2006), involved ISDEAA contract claims brought under the provisions of the Contract Disputes Act ("CDA"), 41 U.S.C. § 601 *et seq*., which applies to self-determination contracts by the terms of a separate ISDEAA provision, 25 U.S.C. § 450m-1(d). Disputes under this provision are governed by separate regulations at 25 C.F.R. §§ 900.215-900.230. The CDA contains a mandatory exhaustion scheme that is a prerequisite to federal court jurisdiction.[9] In fact, the court in *Pueblo of Zuni* distinguished the <u>mandatory</u> provisions of the CDA from the

---

[7] This conclusion is not altered by the fact that APIA initially *intended* to file the optional appeal of the ALJ's decision. Defendants try to capitalize on the clerical error acknowledged by APIA, *see* Complaint ¶ 37, by arguing that since APIA's administrative appeal was deemed untimely, the instant action is barred by failure to exhaust administrative remedies. Def. Opp. at 11. The exhaustion doctrine, as elucidated by *Darby*, does not require a party to exhaust all mandatory appeals *and all optional appeals the party intends, but for whatever reason fails, to file*. Under this rule APIA's intentions are irrelevant: when the period for the optional appeal expired, the ALJ's decision became final for the Department and was ripe for review in this Court. 25 C.F.R. § 900.166; 25 U.S.C. § 450m-1(a).

[8] *Cherokee Nation* was affirmed sub nom *Cherokee Nation v. Thompson*, 311 F.3d 1054 (10th Cir. 2002), reversed on other grounds sub nom *Cherokee Nation v. Leavitt*, 543 U.S. 631 (2005).
[9] "All claims by a contractor against the government relating to a contract <u>shall be in writing</u> and <u>shall be submitted</u> to the contracting officer for decision." 41 U.S.C. § 605(a) (emphasis added); *see also Pueblo of Zuni*, 467 F. Supp. 2d at 1106-1107 (citing cases).

optional procedures of section 450f(b)(3), which provide "the option of avoiding exhaustion and going directly to federal court." *Id.* at 1109.

The other cases cited by the Defendants also involve mandatory exhaustion requirements in other laws that are easily distinguishable from the optional provisions of the ISDEAA and BIA regulations. *Wilbur v. CIA*, 355 F.3d 675, 677 (D.C. Cir. 2004), and *Oglesby v. United States Dep't of Army*, 920 F.2d 57, 61 (D.C. Cir. 1990), involved the administration of the Freedom of Information Act (FOIA), which requires exhaustion of administrative remedies as a mandatory prerequisite to a lawsuit under FOIA. The CIA's FOIA regulation requires that an appeal "must be received" within 45 days of the initial decision denying the request. 32 C.F.R. § 1900.42(b). *See Wilbur*, 355 F.3d at 677 (quoting *Oglesby*, 920 F.2d at 65 n.9).

*Marine Mammal Conservancy, Inc. v. Dep't of Agriculture*, 134 F.3d 409 (D.C. Cir. 1998), involved a regulation that requires exhaustion of all appeal remedies because "no decision shall be final for purposes of judicial review except a final decision of the Judicial Officer upon appeal." 7 C.F.R. § 1.142(c)(4). Since the statute in that case, 7 U.S.C. § 2149(c), permits review of only "final" decisions, "the regulation is the equivalent of an agency rule stating, as a condition to judicial review, that an aggrieved party must first appeal to the judicial officer." 134 F.3d at 411. Similarly, *Andrade v. Lauer*, 729 F.2d 1475, 1484 (D.C. Cir. 1984), involved proceedings before the Federal Labor Relations Authority, under a statute that mandates that collective bargaining agreements contain a grievance procedure as an "exclusive" administrative remedy, 5 U.S.C. § 7121(a)(1). The court held that the appellants "were obligated to proceed in the first instance in accord with the statutory/contractual grievance procedure." *Andrade*, 729 F.2d at 1486. No such mandatory or exclusive administrative review procedures are applicable

in this case.  Far from expressly requiring exhaustion, the ISDEAA expressly provides the <u>option</u> of pursuing administrative appeal or seeking federal court review.[10]

Finally, Defendants make much of the purposes served by exhaustion, such as allowing the agency to create a record and promoting judicial efficiency and economy.  *See* Def. Opp. at 11-12.  While the general objectives of exhaustion may indeed promote judicial economy and efficiency, in the ISDEAA Congress deliberately chose to give tribes and tribal organizations the options to pursue either an administrative appeal or to file suit in federal court, in part to restrict the authority of the federal agencies to refuse to enter into agreements.  *See Cherokee Nation*, 190 F. Supp. 2d at 1258.  In *Cherokee Nation* the court interpreted the provisions of the ISDEAA broadly favorable to tribal interests in light of the Act's policies and objectives to promote self-determination.  *Id*. at 1258 n.5.

Congress in the Act and the DOI in its regulations deliberately chose to allow the option of administrative appeal or direct access to federal court.  The Defendants' arguments are baseless and their motion for partial dismissal should be denied.

## II.    The Standard of Review Is *De Novo*.

This suit was filed under the ISDEAA as well as the APA.  Defendants correctly note that when a substantive statute contains no standard of review, courts generally look to the APA for

---

[10]Arguably, if ISDEAA and the regulations are interpreted to require exhaustion of every optional appeal, exhaustion would have to be excused because the administrative remedies provided in the regulations are "inadequate," *see Coit Independence Joint Venture v. Federal Savings and Loan Ins. Corp.*, 489 U.S. 561, 587 (1989) (holding that exhaustion not required where administrative claims procedure inadequate due to lack of reasonable time limit), do not provide effective relief, *see Gibson v. Berryhill*, 411 U.S. 564, 575 n. 14 (1973) (citing cases), and contain serious "structural flaw[s]" that deny due process. *See Telecommunications Research and Action Center v. F.C.C.*, 750 F. 2d 70, 79 (D.C. Cir. 1984), citing *Association of National Advertisers v. F.T. C.*, 627 F.2d 1151, 1180 (D.C. Cir. 1979) (Leventhal, J., concurring). The optional appeal under section 900.166-900.167 takes the form of "objections" to the ALJ's recommended decision, thus delaying court review, without a reciprocal obligation on the part of the agency to actually consider and rule on the objections. The IBIA or the Secretary "may" consider the objections and modify, adopt, or reverse the decision or take no action at all. 25 C.F.R. § 900.167. Moreover, the regulations are internally inconsistent. An appeal under section 900.159 includes the option of seeking an extension of time to file an appeal which will be granted for any "valid reason," whereas an appeal under 25 C.F.R. § 900.166 does not provide a mechanism for seeking any extension of time to file objections.

guidance. Def. Opp. at 9. But numerous courts that have considered the question have concluded that the ISDEAA <u>does</u> supply a standard of review: *de novo*.[11]

Section 110(a) of the ISDEAA provides in pertinent part: "The United States district courts shall have original jurisdiction over any civil action or claim against the appropriate Secretary arising under this Act...." 25 U.S.C. § 450m-1(a). In *Shoshone Bannock*, the court noted that the phrase "civil action" has been read by the Supreme Court in other contexts to require *de novo* review. 988 F. Supp. 2d at 1314 (citing *Chandler v. Roudebush*, 425 U.S. 840, 96 S. Ct. 1949, 1952 (1976)). Especially in combination with the phrase "original jurisdiction," this language indicated to the court Congress's intent that review be *de novo*. *Id*. In addition, the fact that the ISDEAA authorizes money damages, which the APA does not, dispelled "any lingering doubt" that Congress intended *de novo* review. *Id*. at 1315.

The U.S. District Court for the Eastern District of Oklahoma reached the same conclusion: "this court finds the plain language of the [ISDEAA], along with its legislative history, indicates a *de novo* review of an action brought pursuant to the ISD[EA]A was intended by Congress." *Cherokee Nation*, 190 F. Supp. 2d at 1257. The court agreed with the *Shoshone-Bannock* court that the combination of the phrases "civil action" and "original jurisdiction," along with the power to award money damages, necessarily means that the ISDEAA requires *de novo* review of agency actions. *Id*. The court added that "the policy and objectives to be achieved through the ISD[EA]A and any alleged violations of the agency are best redressed by the right to *de novo* review." *Id*. at 1258. Given "Congress's repeated attempts to limit the

---

[11] *See e.g. Shoshone-Bannock Tribes of the Fort Hall Reservation v. Shalala*, 988 F. Supp. 1306, 1313-18 (D. Or. 1997) ("*Shoshone-Bannock*"), *rev'd on other grounds, Shoshone-Bannock Tribes of the Fort Hall Reservation v. Thompson*, 279 F.3d 660 (9th Cir. 2002); *Cherokee Nation of Oklahoma v. United States*, 190 F. Supp. 2d 1248, 1256-58 (E.D. Okla. 2001) ("*Cherokee Nation*"), *aff'd Cherokee Nation of Oklahoma v. Thompson*, 311 F.3d 1054 (10th Cir. 2002); *rev'd on other grounds, Cherokee Nation of Oklahoma v. Leavitt*, 543 U.S. 631 (2005); *Cheyenne River Sioux Tribe v. Kempthorne*, 2007 WL 2022180 (D.S.D. 2007) at *6.

- 10 -

Secretary's discretion," any other standard of review would be inappropriate. "This court holds that Congress intended a *de novo* review of claims brought under the ISD[EA]A." *Id.*

Yet another federal court, in a very recent decision, has agreed with the *Cherokee Nation* and *Shoshone-Bannock* courts. Noting the unusual burden of proof the ISDEAA imposes on the Secretary, the U.S. District Court for the District of South Dakota held that "Congress intended a *de novo* review for civil actions brought under the ISDEAA." *Cheyenne River Sioux*, 2007 WL 2022180 at *6-7 (copy attached as Plaintiff's Exhibit N).

Contradicting these unanimous and well-reasoned decisions, Defendants assert that the "ISDEAA provides **no** standard of review," so this Court should adopt the APA's standard. Def. Opp. at 9 (Defendants' emphasis). Both the *Shoshone-Bannock* and *Cherokee Nation* courts considered and rejected this argument. Defendants' cases applying the APA "default standard" are inapposite here, where the plain language of the ISDEAA provides for *de novo*.

Similarly unavailing is Defendants' reliance on this court's decisions in *Ransom v. Babbitt*, 69 F. Supp. 2d 141 (D.D.C. 1999) and *Feezor v. Babbitt*, 953 F. Supp. 1 (D.D.C. 1996). In both cases, the court applied the APA standard of review to decisions of the IBIA because both cases were brought only under the APA, with jurisdiction premised on the general federal question statute. *Ransom*, 69 F. Supp. 2d at 142 ("Plaintiffs invoke this Court's jurisdiction pursuant to [the APA] and 28 U.S.C. §§ 1331 and 1361."); *Feezor*, 953 F. Supp. at 4 (holding that 28 U.S.C. § 1331 grants court jurisdiction to review challenged agency action under APA). Here, by contrast, this Court has jurisdiction under Section 110 of the ISDEAA, a substantive statute that provides for *de novo* review. *Shoshone-Bannock*, 988 F. Supp. at 1313-18; *Cherokee Nation*, 190 F. Supp. 2d at 1257-58.[12]

---

[12] Defendants point out that APIA invokes the APA in its motion for summary judgment. Def. Opp. at 9. APIA believes Defendants' violations of the ISDEAA and its implementing regulations, and Defendants'

Reinforcing this conclusion is the fact that APIA can only be made whole in this case by an award of money damages, because the appropriation for FY 2006 has lapsed and the proposed FY 2006 contract can no longer be awarded. *See Shoshone-Bannock*, 988 F. Supp. at 1315 (although Tribe under ISDEAA generally seeks order to force agency to award contract, if appropriation has lapsed, remedy will be money damages). Similarly, by the time this case is decided the FY 2007 appropriations will have lapsed and no FY 2007 contract will be awarded. The APA does not afford this relief, again indicating that the standard of review should not be the APA's but the ISDEAA's, which is *de novo*. *Id.*; *Cherokee Nation*, 190 F. Supp. 2d at 1257; *Cheyenne River Sioux*, 2007 WL 2022180 at *6.

Defendants and their predecessors have fought for over thirty years against implementation of the ISDEAA, and Congress has worked almost as long to limit agency discretion to deny Tribes their rights under the Act.[13] With this history as a backdrop, it is understandable why Congress concluded that Tribes challenging actions of these recalcitrant agencies in federal court would be ill-served by the deferential APA standard of review, and therefore provided *de novo* review instead.

## III. The BIA Properly Compacted the ANCSA Program to APIA Under the ISDEAA and the Alaska Order of Precedence.

Defendants' argue that their ten-year history of compacting the ANCSA program to APIA was a terrible mistake. Defendants state that the ANCSA funds were "improvidently included"

---

refusal to apply the Department's own contracting preference policy, fail to pass muster under any standard of review. "The failure of an agency to comply with its own regulations constitutes arbitrary and capricious conduct." *Simmons v. Block*, 782 F.2d 1545, 1550 (11th Cir. 1986). APIA has invoked the APA standard only in the alternative, in the event this Court rules against APIA on the standard of review issue.

[13] *See, e.g., Shoshone-Bannock*, 988 F. Supp. at 1315-16 (detailing history of congressional frustration with agencies and consequent amendments of the ISDEAA); S. Rep. No. 100-274 at 37 (1987) (strong remedies provided in Section 110 required due to "agencies' consistent failures over the past decade to administer self-determination contracts in conformity with the law").

in the Tribal Priority Allocation ("TPA"), Def. Statement of Material Facts Not in Genuine
Dispute ¶ 4; inclusion of the funds in APIA's AFAs was "erroneous," Def. Opp. at 15, "a BIA
mistake," *id*. at 16, and an "imprudent BIA action," *id*. at 23; TAC's resolution "brought to light
the incorrectness" of APIA carrying out ANCSA activities, *id* at 17; and ANCSA functions
"never should have been considered a trust program" in the first place, *id*. at 22.  There was
nothing "imprudent" or "incorrect" about including the ANCSA program and related funds in
APIA's compact because APIA is a tribal consortium that represents the governments and
peoples the program benefits.

A.    *APIA's Sanctioning Tribes and their Members Benefit from the ANCSA Program, and thus May Compact that Program through APIA.*

The ISDEAA requires that proposals for ISDEAA contracts be accompanied by a tribal resolution requesting the Secretary to enter into the agreement.  ISDEAA § 102(a), 25 U.S.C. § 450f(a).  The Department's regulations state that the resolution must be "from the Indian tribe(s) to be served."  25 C.F.R. § 900.8(d).  APIA's FY 2006 proposal to carry out BIA programs, functions, services, and activities—including the ANCSA activities—was authorized by tribal resolutions from each of the Alaska tribal governments APIA represents.  APIA proposed to serve those tribes and their members, as it had for the previous ten years, by carrying out the ANCSA activities that would lead to conveyance of the historical sites to TAC and preservation of the cultural heritage of the region's peoples.  Defendants' argument that the tribal resolutions supporting APIA's proposal were legally inadequate under section 102(a) of the ISDEAA requires Defendants to argue that the region's tribal governments and (non-corporate-share-holding) Natives do not benefit from the 14(h)(1) activities, and that TAC is the only beneficiary of those activities.  This is patently incorrect.

Nothing in the Defendants' Opposition refutes APIA's arguments that Alaska Tribes and their members benefit from the conveyance and preservation of sites embodying their cultural heritage.  Defendants suggest that Senator Stevens' clarifying comments reflect "confusion," Def. Opp. at 19 n.15, but on this point the Senator was crystal clear.  *See* Pl. Memo. at 23-24.  This statement by the bill's sponsor and architect is authoritative and should be afforded substantial weight.  *See North Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 526-27 (1982).  Defendants emphasize that tribal governments are not mentioned in the ANCSA, Def. Opp. at 18-19, but this is not particularly significant.  At the time ANCSA was enacted, the scope and nature of tribal rights in Alaska was a highly charged political subject that ANCSA avoided.  It does not follow

from this that Alaska tribes and their members did not benefit from the statute, and in particular from section 14(h)(1). They did, and continue to do so, as discussed in APIA's Memorandum in Support of Plaintiff's Motion for Summary Judgment, pages 22-28.

Defendants also point to terms in the Memorandum of Agreement ("MOA") providing that work product from the ANCSA activities belongs to TAC as evidence that the Alaska Natives and governments APIA represents do not benefit from the program, or at least are not its primary beneficiaries. Def. Opp. at 15. A museum collection, however, benefits not only the owners—arguably not even primarily the owners—but rather the generations of peoples whose traditions are embodied in that collection. These beneficiaries include not only the generation who became TAC shareholders thanks to ANCSA in 1971, but also the "afterborn" Aleuts, an increasing percentage of whom may never own a single share of TAC. Pl. Memo. at 25-26; *infra* at 16. APIA's arguments simply reflect the obvious: cultural knowledge and traditions are of more central concern to tribal governments and tribal members than they are to the regional corporations whose central concerns are economic.

APIA does not dispute that one result of the 14(h)(1) process is the conveyance of the selected sites to TAC. For ten years, APIA worked toward that end, but also toward the broader goals of the statute as agreed to by APIA and TAC, and as articulated by the Department in its budget justifications to Congress. *See, e.g.*, Pl. Exh. C at 1 (Memorandum of Agreement under which APIA and TAC "jointly conduct certain cultural heritage, preservation and related activities, and in particular, activities relating to completing the ANSCA [sic] 14(h)(1) process"); Pl. Exh. B at BIA-TPA-47 to 48 (Department to use 14(h)(1) funding for "fulfilling Indian fiduciary trust responsibilities by protecting cultural and natural heritage resources"). Defendants hint that APIA should not receive 14(h)(1) funds because its commitment to

completion of the conveyance-related work was "problematic." Def. Opp. at 20. This is a red herring: the record is clear that APIA's performance has never been at issue in this case.[14]

Defendants also argue that the fact that APIA chose to enter an MOA with TAC, and later sought to settle the controversy with TAC short of litigation, somehow "undermines" APIA's position. Def. Opp. at 15. But APIA's attempts to get along with its neighbor are not inconsistent with its assertion of its legal rights. The two entities' cooperation resulted not from APIA's weakness, but simply from recognition that carrying out cultural heritage activities that benefit the Aleut region as a whole made good sense. *See* Pl. Exh. C at 1 (MOA Preamble). Moreover, APIA's cooperation with TAC has no bearing on whether Defendants violated the ISDEAA and their agreements with APIA, to which TAC was not a party.

Defendants continue to argue, without providing any factual support, that TAC is the entity with the "broadest base of Native members" in the region, and therefore should be deemed the "primary beneficiary" of the 14(h)(1) program. Def. Opp. at 20.[15] As APIA has explained, however, TAC's shareholders include only those Natives alive on December 18, 1971 (or who have received shares through inheritance or other means), TAC has not issued new shares to "afterborns," TAC shareholders represent only one half to one third of the region's Natives <u>by TAC's own estimate</u>, and that proportion is steadily <u>declining</u> as shares remain constant while the population rises. Pl. Memo. at 25-26; *supra* at 16. The entities representing the "broadest base of Native members" in the region are now the thirteen tribal governments represented by APIA. If TAC benefits from the 14(h)(1) activities, so do the tribal governments and individual Natives they represent—whether they happen to be among the minority TAC-shareholder class or not.

---

[14] *See* Def. Exh. 5 at 24 (acknowledging that adequacy of APIA's work has never been at issue during appeal and citing recommended decision to same effect).
[15] Nor do Defendants provide any authority for their legal argument that only the "primary" beneficiary can contract for a program under the ISDEAA. As APIA has pointed out, such a rule would render the Department's contracting hierarchy a nullity. Pl. Memo. at 9.

The bottom line is that as beneficiaries of the ANCSA section 14(h)(1) program, APIA's sanctioning tribes had the right to authorize APIA to compact that program on their behalf, and they did so.  Once that was done and the program and associated funds were included in APIA's compact and funding agreement, the BIA's options to withdraw the program and funds from APIA were severely limited under the law, as we discuss in Section IV below.  Even in the face of a conflicting proposal from TAC, Defendants should have applied their own policy for resolving such conflicts, as discussed next.

B.     *The Alaska Order of Contracting Precedence Should Have Been Followed.*

While acknowledging that the Alaska Order of Precedence is "broadly applied," Defendants argue that it lacks the force of law, so "there is no violation in departing from it." Def. Opp. at 14.  But as the Supreme Court has instructed, the BIA must "comply ... with its own internal procedures" even where those procedures are more rigorous than required, *Morton v. Ruiz*, 415 U.S. 199, 235 (1974).

Defendants assert that departure from the Order of Precedence is justified in "a special case," citing a memorandum involving the contracting of Bureau of Land Management ("BLM") surveying activities.  Def. Opp. at 14.  But for many years the BIA ignored the BLM policy and continued to apply its own Order of Precedence and compact ANCSA activities to tribal organizations, such as APIA, that are sanctioned by tribes in their regions. The Secretary has taken no action to alter the longstanding and well-established Order of Precedence.  Instead, the Alaska Region decided on its own to make exceptions, on an *ad hoc* basis, based on the 2004 Regional Solicitor's opinion, which is based on significant misstatements concerning the nature of the funds at issue here.[16]  It is striking that the Department has acted contrary to the Regional

---

[16] *See* Pl. Memo. at 11-12 (contrasting Solicitor's view of how funds should be categorized with Department's actual categorization)

Solicitor's suggestion that ANCSA funds be removed from recurring TPA funding and instead has continued to request from Congress that these funds remain in the TPA account. *Id*.[17]

The BIA's incorrect belief that it has the flexibility to depart from the Alaska Order of Precedence on an *ad hoc* basis to transfer the funding to TAC does not relieve the agency from following its own policy— or from meeting its contractual commitments and the procedural and substantive requirements of the ISDEAA and its regulations, as discussed next.

## IV.    The BIA Failed to Follow the Statutorily Required Declination Procedures and Criteria, so the BIA Action Must be Reversed.

APIA proposed to include the ANCSA activities, as it had done for many years with BIA approval, in its FY 2006 AFA (and again in its FY 2007 AFA), and the BIA refused.  Under existing law the BIA was obligated either to include those activities and related funds in the AFA or to follow the procedures and criteria governing how and why to refuse to do so.

It is undisputed that the Defendants did not follow the declination procedures prescribed by Section 102(a)(2) of the ISDEAA, 25 U.S.C. § 450f(a)(2).  At no point did the BIA send APIA written notification of the basis for declining to include the ANCSA funds.[18]  Nor do Defendants dispute that they did not apply the declination criteria set forth in Section 102.[19] Instead, Defendants argue that they <u>could</u> have declined under section 102(a)(2)(E), and promise

---

[17]Defendants contend that "the ANCSA program funding never should have been considered a trust program, *and no longer is*."  Def. Opp. at 22 (Defendants' emphasis).  As support, Defendants cite an affidavit that refers to a BIA reorganization in 2004 that moved the ANCSA program from the Division of Trust Services to a newly created Division of Environmental and Cultural Resources Management. (Although Defendants cite to Exhibit 20, they appear to mean Exhibit 19, Mr. Pratt's affidavit.)   This affidavit is not consistent with the clear fact that in FY 2006 the Department still requested—and Congress still provided—funding for the ANCSA program as part of "Trust Services" within the Tribal Priority Allocation.  Pl. Exh. B at BIA-COMP-1.  Moreover, the Department still justified the funds by reference to their use in "fulfilling Indian fiduciary trust responsibilities by protecting cultural and natural heritage resources."  *Id*. at BIA-TPA-47 to 48.  As APIA has pointed out, the Department does not have a fiduciary trust responsibility to regional corporations such as TAC, but only to federally recognized Tribes, such as those represented by APIA, and their members.  Pl. Memo. at 26.

[18] *See* Plaintiff's Statement of Material Facts Not in Genuine Dispute ¶ 13; Def. Response to Plaintiff's Statement of Material Facts Not in Genuine Dispute ¶ 13 (not disputing that BIA and OSG sent no declination notice); Def. Exh. 1 at 7-8.

[19] *E.g.*, Def. Exh. 8 at 17 ("Appellee has not contested that it did not follow the dictates of the declination process.")

that they will follow the declination procedures should this Court remand. Def. Opp. at 17 n.14; *id*. at 25 n.19. But that is not the remedy the statute and regulations afford; instead, the Court should grant "injunctive relief ... to compel the Secretary to award and fund an approved" self-governance agreement for FY 2007 (and 2008) as required by Section 110 of the ISDEAA. 25 U.S.C. § 450m-1(a).[20]

> A. *Defendants' About-Face on the Issue of Authorizing Resolutions, However Meritorious it May Be, Does Not Excuse Defendants' Blatant Disregard of the Declination Procedures, as Shown in the* Cheyenne River Sioux *Case.*

Defendants maintain that they must be able to correct their "erroneous" legal position in allowing APIA to carry out the ANCSA activities. Def. Opp. at 16. The ISDEAA requires that any such corrections be done in accordance with procedures and standards prescribed by statute and agency rules. This point was made very clear a few weeks ago in the *Cheyenne River Sioux* case, where the court held that the BIA's failure to follow the declination procedures required approval of the contract, whatever the merits of the BIA's underlying legal position might be.[21]

The facts in *Cheyenne River Sioux* are strikingly similar to those in this case. For years, the BIA had approved, in the Tribe's ISDEAA contracts, administration of funds for disadvantaged students on a schoolwide basis. Then the BIA received a letter from the Department of Education, much like the Regional Solicitor's memorandum here, indicating that this longstanding agency practice was inconsistent with the law and the funds had to be targeted to the students most at risk. When the Tribe proposed a successor AFA to operate the program

---

[20] For FY 2006, the only available remedy is damages. *See Shoshone-Bannock*, 988 F. Supp. at 1315 (if appropriation has lapsed, remedy for failure to award AFA under ISDEAA is money damages). Because a decision in this case will likely only be issued after the end of this fiscal year, for FY 2007 the only likely remedy will also be damages.

[21] *Cheyenne River Sioux Tribe v. Kempthorne*, 2007 WL 2022180 (D.S.D.) at *8 ("Given the Secretary's failure to comply with the declination statutes and regulations, the court need not address the merits of actions taken by the defendants.")

on a schoolwide rather than targeted basis, the BIA declined the contract on the ground (among others) that administration of the funds school wide could not lawfully be carried out.[22]

The BIA's declination letter failed to include, as required by section 102(a), specific findings clearly demonstrating that this or any other declination basis existed.  Finding "[t]he declination statutes and regulations are unambiguous," Judge Kornmann concluded that the BIA had failed to meet "the burden of proof on the Secretary to demonstrate the validity of his declination decision by clear and convincing evidence," and he went on to hold that:

> Given the Secretary's failure to comply with the declination statutes and regulations, the court need not address the merits of actions taken by the defendants.  The contract and successor AFA ... are deemed approved by operation of law.

*Id*. at *8.  Thus, even if the BIA and the Department of Education were correct that the funds could only be administered on a targeted basis, the BIA's failure to follow procedures, and meet standards, prescribed by law meant that the successor AFA must be deemed approved as proposed by the Tribe.  *Id*.[23]

As in *Cheyenne River Sioux*, Defendants here adopted a new legal position that conflicted with past agency practice.  The ISDEAA imposes strict procedural and substantive limitations on how the agency may implement a novel position.  In *Cheyenne River Sioux*, at least the BIA issued a declination decision, albeit an insufficient one.  Here, however, the BIA issued no decision at all; it simply unilaterally revoked the ANCSA funding with no explanation.  Defendants should have declined the proposal under section 102(a)(2)(E) and provided specific findings, a "detailed explanation of the reason for the decision," a disclosure of the facts or documents on which the agency relied in making the decision, and a description of APIA's

---

[22] *Id.*  at *4; *see also* 25 U.S.C. § 450f(a)(2)(E) (authorizing declination when "proposal includes activities that cannot lawfully be carried out by the contractor").
[23] *See also* 25 C.F.R. § 900.18 (proposal deemed approved after 90 days if not properly declined).

appeal rights.[24] Instead, Defendants chose to ignore the statute and regulations in favor of a "threshold" application of purported agency discretion. This decision clearly violated the ISDEAA, applicable regulations and the terms of APIA's AFA and, as a result, APIA's proposals, like the Cheyenne River Sioux Tribe's, should be found by this court to have been deemed approved by operation of law.[25]

> B.    *The Declination Process in Section 102(a) Provides the Exclusive Means for Refusing a Proposal and Cannot Be Avoided by "Threshold" Rejections.*

Defendants not only admit that they failed to follow the declination process, but they acknowledge that if the agency action was a declination, "the decision should go in favor of [APIA]." Def. Exh. 8 at 17. Therefore Defendants understandably seek to circumvent the declination procedures and criteria by asserting they were never "triggered" because APIA did not submit "a legally sufficient tribal resolution" in support of the proposal. Def. Opp. at 17.

First of all, APIA's proposal was supported by the tribal resolutions of each of its constituent Tribes. Because the Villages and their members benefit from the ANCSA activities, as discussed above in Section III, the tribal resolutions supporting APIA's assumption of those activities was legally sufficient, a conclusion that the BIA had never questioned prior to 2006.

Second, the ISDEAA does not allow the BIA to make threshold determinations that subvert the substantive and procedural protections built into the declination process. The statute's legislative history makes clear that Congress sought to preclude precisely the kind of pre-"trigger" decision that the BIA made in this case:

---

[24] 25 U.S.C. §§ 450f(a)(2), 450f(b); 25 C.F.R. § 900.29; *Cheyenne River Sioux* at *8.

[25] *Cheyenne River Sioux* at *8. *See also Delaware Tribe of Indians v. Bureau of Indian Affairs,* IBIA 02-65-A, (Nov. 26, 2001) at 10 (Tribe's contract proposal deemed approved by operation of law, despite containing terms agency believed contrary to law, because BIA failed to either approve or decline proposal within 90 days); *Mechoopda Indian Tribe of Chico Rancheria, CA v. Education Programs Admr., Sacramento Area Office, Bureau of Indian Affairs,* IBIA 97-9-A, IBIA 97-102-A, at 16 (Mar. 1, 2001) (ISDEAA proposal not declined within 90 days is deemed approved and Secretary shall award contract, citing 25 C.F.R. § 900.18).

> The current practice of Federal agencies that impose "threshold criteria" on a self-determination contract application is clearly inconsistent with the intent of the Indian Self-Determination Act.  Furthermore, it is contrary to the intent of the Indian Self-Determination Act for a Federal agency simply to fail to enter into a contract without providing to the tribal organization a formal notice of declination that states the grounds for declination and provides an opportunity and procedures for an appeal....

S. Rep. No. 100-274 at 24 (1987).[26]

Recently a federal court rejected a very similar "threshold" declination decision made by the Indian Health Service ("IHS").[27]  In that case, *Southern Ute Tribe v. Leavitt*, the Court expressly held that "the language of 25 U.S.C. § 450f(a)(2) clearly limits the discretion of the Government to decline an Indian tribe's proposal for a self-determination contract to those specific criteria listed,"[28] and rejected the IHS's decision to decline the contract proposal at issue because it did not fall under any of the listed criteria.[29]  In *Southern Ute*, the IHS, like Defendants here, argued that it could not enter into a contract that, in its opinion, was in violation of law (in that case, the Anti-Deficiency Act).  The court rejected that argument and held that "because the statutory scheme in ISDEA does not give the Secretary discretion" to decline a contract on a factor not listed in the statute, "the Executive Branch officers and employees will not be in violation of the Anti-Deficiency Act by carrying out their statutory obligations to approve Plaintiff's proposal."[30]  The judge's remarks in the *Southern Ute* case are equally

---

[26] *See also* S. Rep. No. 103-374 at 5-6 (1994) (condemning agency imposition of "'threshold' assessment[s]" that would allow the agency to "escape the critical procedural protections available under section 102").

[27] *Southern Ute Indian Tribe v. Leavitt,* Memorandum Opinion and Order on Plaintiff's Motion for Preliminary Injunction and Defendants' Motion for Summary Judgment, Civ. No. 05-988 WJ/LAM (D.N.M. June 15, 2007) (copy attached as Plaintiff's Exhibit O).

[28] *Id.* at 13.

[29] *Id.* at 13-19.

[30] *Id.* at 15.

applicable here: "the IHS may not unilaterally amend the ISDEA by altering the declination criteria in the ISDEA…."[31]

Defendants' misguided efforts to create a threshold "legal sufficiency" barrier to reject a subsequent year AFA directly contravenes Congress's intent and the ISDEAA and should be rejected by this Court.

     C.     *APIA's FY 2006 and 2007 Proposals Were Substantially the Same as that Approved by the BIA in Previous Years, So Declining the Proposals Violated BIA Regulations.*

The Secretary cannot decline a tribal organization's ISDEAA AFA proposal if it is "substantially the same" as the prior year's.[32]  The FY 2006 AFA that the BIA and OSG declined is substantially the same as the FY 2005 agreement BIA and OSG approved.  *Compare* Pl. Exh. I and K.  Defendants do not dispute this obvious fact.[33]  But Defendants argue in their Opposition that the FY 2006 proposal "was *not* the same as its proposal for prior years, because of the intervening submission of TAC's May 2005 tribal resolution...."  Def. Opp. at 18 (italics in original).  This makes no sense.  TAC's resolution changed nothing in APIA's proposal or in the tribal resolutions that supported it.

Because of the Regional Solicitor's May 2004 memorandum the Alaska Region looked at APIA's FY 2006 proposal differently than it had in the past, but that does not change the fact that APIA's proposal itself was substantially the same as it had been for ten previous years.  The ISDEAA and its regulations protect the stability of agreements and funding levels against shifting agency interpretations.  The test is an objective one allowing no exercise of discretion.  If the proposal is substantially the same, the Secretary <u>must</u> approve it.  25 C.F.R. § 900.32; Pl.

---

[31] *Id*. at 17.
[32] 25 C.F.R. § 900.32; Pl. Memo. at 18-19.
[33] Amended Answer ¶ 30 (admitting FY 2006 proposal substantially identical to prior year's); Def. Response to Plaintiff's Statement of Material Facts Not in Genuine Dispute ¶ 11 (same).

Memo. at 18-20.  And if none of the narrow exceptions apply, the Secretary must include (at least) the same amount of funding as the prior year.  25 U.S.C. § 450j-1(b)(2); Pl. Memo. at 21-22.  Defendants now believe that the agreements they approved were "improvident," but that does not negate the fact that they approved them for years, nor does it alter the fact that APIA's FY 2006 proposal was substantially the same and thus required to be approved as well.

> D.     The ISDEAA's Statutory Protections Provide the Basis for the Temporal Priority Recognized in the Pit River Case.

Defendants' opposition brief does not respond meaningfully to the *Pit River* case, which makes clear that when a tribal organization proposes to assume the same activities already carried out by another tribal contractor, the ISDEAA's statutory protections against unilateral modification require that the pre-existing agreement take priority.[34]  Defendants attempt to distinguish APIA's situation by asserting that the tribal government resolutions supporting APIA's proposal were not "legally sufficient," Def. Opp. at 16, despite the fact that those resolutions had been deemed legally sufficient for ten years, and despite the fact that the Tribes and their members benefit from the 14(h)(1) conveyance process and the cultural heritage resources it protects.

To distinguish *Pit River*—and to avoid the BIA's own contracting preference hierarchy— Defendants insist that "TAC is the only entity authorized to submit an ISDEAA § 102(a) resolution."  Def. Opp. at 16.  That is simply incorrect, and Defendants provide no support for this assertion other than the similarly unsupported conclusion of the ALJ.  Just as in *Pit River*, both APIA and TAC benefit from the activities proposed to be contracted.  In fact, as did the Pit River Tribe, TAC arguably has an equal (if not superior, according to Defendants) right to contract the activities.  Faced with the same situation, the Department of Health and Human

---

[34] *Pit River Health Service, Inc. v. Indian Health Service*, DAB CR333 (1994), 1994 WL 596859; Pl. Memo. at 12-15.

Services Departmental Appeals Board correctly held that the ISDEAA's statutory protections against unilateral modifications and reductions in funding prohibit revoking funding from the incumbent contractor, even when the new applicant arguably has the superior right.

## CONCLUSION

Defendants' interpretation of the ANCSA to benefit only TAC, and not the tribal governments and members represented by APIA, is incorrect.  Defendants' extensive hand-wringing over the "improvident" and "erroneous" agreements of the previous decade is unnecessary and misleading, because the BIA did not break the law for ten years by including the ANCSA program and related funds in APIA's compact, as it would now have this Court believe.  The BIA properly compacted the program to APIA, and those recurring agreements were and are protected by the ISDEAA's strict limitations on unilateral modifications and funding reductions by the agency.

Even if Defendants' new position is legally defensible, they failed to implement that position in accordance with the procedures and standards imposed by the ISDEAA and its regulations.  As recognized in the *Cheyenne River Sioux* case, even a meritorious legal position does not give the BIA license to ignore statutory requirements and its own regulations.  Defendants do not dispute that they ignored the ISDEAA declination procedures in section 102(a)(2), insisting instead that they were entitled to make a threshold decision of precisely the kind Congress sought to prohibit and the *Southern Ute* court rejected.  Nor do Defendants even attempt to argue that one of the exceptions to the stable-funding requirement in section 106(b)(2) apply.  Defendants simply ignored the terms of APIA's agreements, the ISDEAA, the applicable regulations and revoked the funds with no written explanation.

The material facts are not in dispute.  APIA therefore respectfully asks this Court to grant

Plaintiff's Motion for Summary Judgment, and deny Defendants' Partial Motion to Dismiss and

Cross Motion for Summary Judgment.

<div style="margin-left: 40%;">

Respectfully Submitted,


_____/s/_____
F. Michael Willis (D.C. Bar No. 467462)
Geoffrey D. Strommer
HOBBS, STRAUS, DEAN & WALKER, LLP

Attorneys for the Aleutian Pribilof Islands
Association

</div>

DATED: July 27, 2007

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **ALEUTIAN PRIBILOF ISLANDS** | ) | |
| **ASSOCIATION, INC.** | ) | |
| 201 E. 3rd Avenue | ) | |
| Anchorage, Alaska 99501 | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| vi. | ) | |
| | ) | |
| **DIRK KEMPTHORNE**, in his official capacity as | ) | |
| Secretary of the Interior, | ) | |
| U.S. Department of the Interior | ) | |
| 1849 C. Street, N.W. | ) | |
| Washington, DC 20240 | ) | |
| | ) | |
| **NILES CESAR**, in his official capacity as | ) | |
| Regional Director, Alaska Region, | ) | |
| Bureau of Indian Affairs, | ) | |
| U.S. Department of the Interior; | ) | Civil Action No. 06-2173 (CKK) |
| 709 W. 9th St. | ) | |
| Juneau, Alaska 99802 | ) | |
| | ) | |
| **BUREAU OF INDIAN AFFAIRS** | ) | |
| **OFFICE OF SELF-GOVERNANCE,** | ) | |
| U.S. Department of the Interior, | ) | |
| 1849 C. Street, N.W., MS 4140 MIB | ) | |
| Washington, DC 20240 | ) | |
| | ) | |
| DEFENDANTS. | ) | |
| | ) | |

## PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF
## MATERIAL FACTS NOT IN GENUINE DISPUTE

Pursuant to Local Civil Rules 7(h) and 56.1, Plaintiff Aleutian Pribilof Islands

Association, Inc. ("APIA") submits the following Response to Defendants' Statement of Material

Facts Not in Genuine Dispute:

     1.     Undisputed.

2.    Undisputed.

3.    Undisputed.

4.    Disputed.  Plaintiffs agree that since 1996 funding under § 14(h)(1) of the Alaska

Native Claims Settlement Act ("ANCSA") has been included among tribal priority allocation

("TPA") funds.  Plaintiffs dispute, however, that the funds were "improvidently" included in

TPA.  The Department's description of the purpose of the 14(h)(1) funding in its budget

justifications to Congress places the funds squarely within the purposes of TPA, which benefits

tribal governments.  Pl. Exh. B at BIA-TPA-47 to 48; Pl. Memorandum in Support of Motion for

Summary Judgment at 26-28.  Defendants' citation in support of this value judgment is a

Regional Solicitor's opinion on which the Department has yet to act.  In fact, ANCSA 14(h)(1)

funds are still categorized as TPA by the Department.  Pl. Exh. B at BIA-COMP-1.

5.    Undisputed.

6.    Undisputed, but APIA notes that the "immediate concerns" among ANCSA staff

related solely to the perceived lack of means to assure the funds were spent for an appropriate

purpose, not to the legality of including the funds in the Self-Governance agreements of APIA or

any other tribal consortium.  Not until nine years after the Defendants first included the ANCSA

14(h)(1) functions in APIA's compact and funding agreement did the Regional Solicitor raise

doubts about the sufficiency of the tribal resolutions authorizing APIA to carry out those

functions.  Def. Exh. 17 (May 24, 2004 Regional Solicitor's memorandum).

7.    Undisputed.

8.    Undisputed.

9.    Undisputed, except to note that the correct citation is The Aleut Corporation,

Resolution No. 05-14, Def. Exh. 2.

Respectfully Submitted,


_____/s/_____
F. Michael Willis (D.C. Bar No. 467462)
Geoffrey D. Strommer
HOBBS, STRAUS, DEAN & WALKER, LLP

Attorneys for the Aleutian Pribilof Islands
Association

DATED: July 27, 2007

EXHIBIT __N__
PAGE __1__ OF __8__

Westlaw.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2007 WL 2022180 (D.S.D.)
**(Cite as: --- F.Supp.2d ----)**

Page 1

**Cheyenne River Sioux Tribe v. Kempthorne**
D.S.D.,2007.
Only the Westlaw citation is currently available.
United States District Court,D. South
Dakota,Central Division.
**CHEYENNE RIVER SIOUX TRIBE**, Plaintiff,
v.
Dirk **KEMPTHORNE**, Secretary of the Interior, in
his official capacity, James Cason, Acting Assistant
Secretary, Indian Affairs, in his official capacity,
Thomas Dowd, Director, Bureau of Indian
Education, Bureau of Indian Affairs, in his official
capacity, and Cherie Farlee, Education Line Officer
Bureau of Indian Education, Bureau of Indian
Affairs, in her official capacity, Defendants.
**No. CIV 06-3015.**

July 10, 2007.

Carol L. Barbero, Marmaduke D. McCloud, Hobbs
Straus Dean & Walker, LLP, Washington, DC,
Margaret E. Bad Warrior, Cheyenne River Sioux
Tribe, Eagle Butte, SD, for Plaintiff.
Cheryl Schrempp Dupris, U.S. Attorney's Office
Pierre Office, Pierre, SD, for Defendants.

MEMORANDUM OPINION AND ORDER
KORNMANN, U.S. District Judge.

INTRODUCTION

*1 [¶ 1] Plaintiff, Cheyenne River Sioux Tribe ("
CRST" or "Tribe"), instituted this suit pursuant to
the Indian Self-Determination and Education
Assistance Act ("ISDEAA"), 25 U.S .C. §
450m-1(a) FN1, seeking an injunction and judicial
review of an adverse administrative decision.
Shortly thereafter, defendants filed an answer
requesting that plaintiff's complaint be dismissed for
failure to state a claim upon which relief could be
granted. At the court's suggestion, the parties agreed
to a Fed.R.Civ.P. 65(a)(2) consolidation of hearing

with the trial on the merits. The parties then agreed
to a partial payment of funds to plaintiff. As part of
this stipulation, defendants released $1,766,423.00
for Title I operations at the two schools in question
for School Year 2006-2007 ("SY"). With this
payment, CRST has received all but $303,368.00 of
the amount requested in their complaint. Per this
stipulation, the court entered an order (Doc. 19)
pursuant to Fed.R.Civ.P. 65(a)(2). The parties then
filed cross-motions for summary judgment (Docs.
27 and 30). This memorandum opinion and order
addresses these motions for summary judgment.

[¶ 2] However, subsequent to the cross-motions
for summary judgment, CRST filed a motion for
preliminary injunction and order extending the
period for obligation of funds (Doc. 42). This
motion sought an injunction prohibiting defendants
from expending any of the $303,368.00 in unpaid
funds for SY 06-07 and a petition for the court to
exercise its equitable powers to hold these funds
beyond their statutory lapse date of September 30,
2007, and through the final disposition of this
litigation and execution by defendants of any
actions ordered by a federal court.

[¶ 3] Shortly thereafter, CRST filed motions for
writ of *mandamus* and preliminary injunction (Doc.
48) and a motion to amend the complaint (Doc. 50).
CRST's motion for writ of *mandamus* and
preliminary injunction petitioned the court for an
order pursuant to Fed.R.Civ.P. 65 directing the
defendants to immediately award and fully fund
CRST's successor Annual Funding Agreement ("
AFA") for SY 07-08, which AFA was received by
the Bureau of Indian Education FN2 ("BIE") on
March 9, 2007. CRST's final motion seeks to amend
the complaint to add Mr. Norman Fourd as a party
defendant, to add a new Count V for *mandamus* and
injunctive relief, and to amend its prayer for relief.
This memorandum opinion and order will also
address these motions.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ---

Page 2

--- F.Supp.2d ----, 2007 WL 2022180 (D.S.D.)
**(Cite as: --- F.Supp.2d ----)**

## FACTUAL BACKGROUND

[¶ 4] Plaintiff is a federally recognized Indian Tribe with its headquarters in Eagle Butte, South Dakota, on the Cheyenne River Sioux Indian Reservation. By virtue of its federal status, the Tribe is entitled to contract with the Secretary of Interior ("Secretary") "to plan, conduct, and administer programs or portions thereof" under § 102 of ISDEAA. *See* 25 U.S.C. § 450f. The Secretary, through the Bureau of Indian Affairs (" BIA") has been contracting with CRST pursuant to the ISDEAA to administer what is commonly referred to as the "Title I" educational program at two BIA operated schools on the Cheyenne River Sioux Indian Reservation. These schools, Cheyenne-Eagle Butte School ("CEBS"), in Eagle Butte, South Dakota, and the Tiospaye Topa School ("TTS"), in Ridgeview, South Dakota, are operated by the Secretary through the BIE with funds appropriated to the Secretary by Congress.[FN3] School administrators who govern the school are employees of the BIE, which is ultimately accountable to the Secretary. CEBS is one of the largest schools in the BIA-funded school system with a total enrollment of approximately 900 students. TTS enrolls approximately 200 students.

*2 [¶ 5] Title I of the Elementary and Secondary Education Act of 1965 ("ESEA"), Pub.L. 89-10, 79 Stat. 27, more recently reauthorized as the No Child Left Behind Act of 2001 ("NCLBA"), Pub.L. No. 107-110, 115 Stat. 1425 (2001) (relevant sections codified at 20 U.S.C. §§ 6301-6578 (Supp. I 2001) ), provided federal grants-in-aid to support compensatory education for disadvantaged children in low-income areas. Based on the theory that poverty and low scholastic achievement are closely related, Title I allocated funds to local school districts based on their number of impoverished children and the state's average per-pupil expenditures.[FN4] H.R.Rep. No. 95-1137, pp. 4, 8 (1978), U.S.Code Cong. & Admin. News 1978, p. 4971; S.Rep. No. 95-856, p. 5 (1978); *see* 20 U.S.C. §§ 241a, 241c(a)(2) (1976 ed.); S.Rep. No. 146, 89th Cong., 1st Sess., 5-6 (1965), U.S.Code Cong. & Admin. News 1965, p. 1446. Prior to awarding these grant monies to state educational agencies, pursuant to a negotiated agreement[FN5]

between the Department of Education ("DOE") and the Secretary, DOE transfers funds to the Secretary for programs at BIA funded schools. *See* 20 U.S.C. § 6331; 20 U.S.C. § 7824.

[¶ 6] For the last ten years, CRST has administered the entire Title I program at CEBS and TTS[FN6], and has done so pursuant an ISDEAA "model contract" between the Tribe and the Secretary. Services that the Title I program provides to students include: additional teachers and classroom teaching assistants, extended school days, after school tutors, summer school programs, staff development funding, parent involvement programs, supplies and materials, and other services. The program is approved annually by the school board at each school, and the funding level for the contract is modified annually through a successor AFA based on a "Fund Distribution Document" supplied to CRST by the BIA. The model contract of the parties was amended in 2000 to incorporate changes in the model ISDEAA contract; however, the contract is still classified as a "mature" contract with an indefinite term. *See* 25 U.S.C. § 4501; 25 U.S.C. § 450j(c)(1). The amended model contract authorized CRST to carry-out a "Title I ECIA Program ." ECIA is an acronym for the Education Consolidation and Improvement Act of 1981, Pub.L.No. 97-35, 95 Stat. 445 et seq., which was a prior reauthorization of ESEA.

[¶ 7] Beginning in 2005, a dispute arose between the parties regarding the operational method CRST was utilizing for the contracted programs. In a January 5, 2006, memorandum, defendant Farlee, the education line officer at the BIA Cheyenne River Agency, informed the tribal chairman that she could not award CRST's Title I contract funds unless CRST switched their Title I operational model to a "targeted assistance program." On January 18, 2006, CRST sought an administrative hearing to resolve this dispute. *See* 25 C.F.R. 900.170 through 900.176. Shortly thereafter, BIA released the full amount of Title I funds for SY 05-06. CRST relied on tribal funds to continue operations until the Title I monies were released.

*3 [¶ 8] Congress created two distinct Title I

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT ___N___
PAGE _3_ OF _8_

Page 3

--- F.Supp.2d ----

--- F.Supp.2d ----, 2007 WL 2022180 (D.S.D.)
**(Cite as: --- F.Supp.2d ----)**

operational methods or programs for addressing the educational needs of disadvantaged children in low-income areas. Individual public schools with poverty rates above forty percent may use Title I funds, along with other funds, to operate a " schoolwide program" to upgrade the entire educational program at that particular school. *See* 20 U.S.C. § 6314. Schools with poverty rates below forty percent, or those choosing not to operate a schoolwide program, implement a "targeted assistance program" where the school must identify students who are failing, or most at risk of failing, to meet the state's standards, and then create an instructional program to address the needs of those students. *See* 20 U.S.C. § 6315.

[¶ 9] On April 11-13, 2006, Stan Holder ("Holder"), Chief of the Division of Compliance, Monitoring and Accountability for the BIE, and his colleague, Lynn Lafferty ("Lafferty"), Branch Chief for Title I Programs, conducted a site visit. According to Holder, the focus of the site visit was to determine if CRST could provide "schoolwide" services under the provisions of the existing contract or if the contract needed to be amended for CRST to provide "targeted assistance services." Holder identified several issues, during the site visit, which he believed would inhibit the implementation of a schoolwide program. These issues were: (1) Title I teacher supervision was separated from the non-Title I teachers; (2) Title I funds were not being used as part of a schoolwide budget that included all supplemental program funds and Title I funds were not managed by the school administrators; (3) the Title I Director's authority over Title I teachers superseded the authority of the school administrators; (4) Title I dollars were separated from other program dollars for procuring materials for Title I teachers under the contract; (5) professional development was not administered across the entire school staff in all cases, but was in some cases limited to Title I staff employed by CRST; and (6) administrators were unable to consolidate funds and to use Title I funds with other school funds.

[¶ 10] Also, sometime during this site visit, Holder and Lafferty held a meeting with the Tribal Chairman, the Bureau's Education Line Officer,

school board members, and the Tribal attorney. Holder and his colleague informed the meeting participants that CRST could not continue to operate their Title I program on a schoolwide basis and that the tribe could only operate the program on a "targeted assistance" basis because CRST did not operate the entire school under its contract. Someone also reportedly asked a question, at the meeting, about why the BIA was pursuing these changes. As Holder explained to them, the BIA had made assurances to the DOE that changes brought on by ESEA's reauthorization under the NCLBA would be implemented by the BIA before funds were transferred to the Secretary for use by Bureau-funded schools.

*4 [¶ 11] On April 12, 2006, the BIA received CRST's proposed contract amendments and AFA for SY 06-07. The Title I funds sought to be allocated to CEBS and TTS for SY 06-07 were $1,683,100 and $386,700, respectively. The Title I plan for that year called for funding for new initiatives and for six new positions at CEBS (teachers, teaching assistants, and a computer support specialist) and four new positions at TTS (a teacher and teaching assistants), and for continued funding for 23 permanent positions. More importantly, the proposed contract amendments [FN7] and AFA [FN8] called for monies to operate a Title I schoolwide program rather than a targeted assistance program.

[¶ 12] Upon receipt of an ISDEAA contract proposal, by law the Secretary must approve or decline the proposal within ninety days, unless the Secretary obtains a voluntary and express written consent from the tribe or tribal organization to extend the deadline. *See* 25 U.S.C.A. § 450f; 25 C.F.R. §§ 900.16 & 900.17. Defendants maintain that one of the items they relied upon, in conducting their review, was a June 23, 2006, opinion letter from Ms. Jacquelyn Jackson ("Jackson"), the Director of Student Achievement and Accountability Programs, Office of Elementary and Secondary Education, Department of Education. Ms. Jackson's letter stated, "unless the contractor is managing the whole school, then it is not possible for the contractor to implement a schoolwide program because the contractor would not have

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT ___N___

PAGE _4_ OF _8_

--- F.Supp.2d ----                                                                Page 4

--- F.Supp.2d ----, 2007 WL 2022180 (D.S.D.)
**(Cite as: --- F.Supp.2d ----)**

authority (fiduciary or otherwise) over the operations of the whole school. A contractor that manages just the Title I component of a BIA or tribal school would need to operate as a targeted assistance program because of the limited authority it would have in the school. For instance, the contractor would not have the authority to consolidate Federal funds, which is one of the key ingredients of a schoolwide program." On June 27, 2006, Dr. Farlee faxed Ms. Jackson's letter to the Tribe and sent a memorandum to the then Tribal Chairman, Harold Frazier ("Frazier"), restating the salient information from Ms. Jackson's letter. Three days later, Dr. Farlee sent Mr. Frazier a letter declining CRST's proposed amendments and AFA.

[¶ 13] Dr. Farlee's declination letter begins by reciting her approval authority and by referring generally to previous correspondence and meetings where the BIA explained why they were declining CRST's proposal. In addition, the letter then restates that CRST is eligible to run a targeted assistance Title I program and that the proposal submitted is not consistent with this. Further, the letter cites three declination criteria for the decision. These criteria were (1)the service to be rendered to the Indian beneficiaries of the particular program or function to be contracted will not be satisfactory; (2) the proposed project or function to be contracted for cannot be properly completed or maintained by the proposed contract; and (3) the program, function, service, or activity (or portion thereof) that is the subject of the proposal is beyond the scope of the programs, functions, services, or activities covered under Section 102(a)(1) of the Act because the proposal includes activities that cannot lawfully be carried out by the contractor. *See* 25 U.S.C. § 450f; 25 C.F.R. § 900.22. Dr. Farlee's letter failed to advise the Tribe of its appeal rights or to include a specific finding clearly demonstrating that one of the declination conditions exists. *See* 25 C.F.R. §§ 900.29 and 900.31. Moreover, the letter did not include a detailed explanation for the decision to decline the proposal nor did it include any of the documents the Secretary relied on in making the decision. *Id.*

*5 [¶ 14] On July 6, 2006, Dr. Farlee informed the Tribe by letter that the funding cycle for CRST's

Title I contract ended on June 30, 2006. Further, the letter stated, "if staff continues to perform Title I functions, they would have to be compensated with tribal administrative cost dollars or carry-over funding as a new contract is not in place." On August 1, 2006, CRST instituted this suit pursuant to the ISDEAA, seeking to reverse the declination decision and to restore funding for their Title I program.

**DISCUSSION**

**I. Summary Judgment Standard**

[¶ 15] The summary judgment standard is well known and has been set forth by this court in numerous opinions. *See Hanson v. North Star Mutual Insurance Co.,* 1999 DSD 34 ¶ 8, 71 F.Supp.2d 1007, 1009-1010 (D.S.D.1999), *Gardner v. Trip County,* 1998 DSD 38 ¶ 8, 66 F.Supp.2d 1094, 1098 (D.S.D.1998). *Patterson Farm, Inc. v. City of Britton,* 1998 DSD 34 ¶ 7, 22 F.Supp.2d 1085, 1088-89 (D.S.D.1998), and *Smith v. Horton Industries,* 1998 DSD 26 ¶ 2, 17 F.Supp.2d 1094, 1095 (D.S.D.1998). Summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Donaho v. FMC Corporation,* 74 F.3d 894, 898 (8th Cir.1996) . The United States Supreme Court has held that:
The plain language of Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corporation v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). "A material fact dispute is genuine if the evidence is sufficient to allow a reasonable jury to return a verdict for the non-moving party." *Landon v. Northwest Airlines, Inc.,* 72 F.3d 620, 634 (8th

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2007 WL 2022180 (D.S.D.)
(Cite as: --- F.Supp.2d ----)

Cir.1995). "[T]he burden on the moving party may be discharged by 'showing'-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case." *Celotex Corporation v. Catrett,* 477 U.S. at 325, 106 S.Ct. at 2554. Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Id.* at 324, 106 S.Ct. at 2553. In considering the motion for summary judgment, this Court must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *Donaho,* 74 F.3d at 897-98. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## II. The Federal Government's Legacy on Indian Education

*6 [¶ 16] The court is mindful in writing this opinion of the legacy of the federal government's involvement in Indian education.[FN9] The legacy is characterized by inadequate resource allocation, systematic exclusion of Indian parents and communities from any role in the education of their children, and a one-way transmission of white American education to the Indian child as a means to remove the child from his aboriginal culture and assimilate him into the dominant white culture. Allison M. Dussias, 43 Ariz. L.Rev. 819, 822, *Let No Native American Child be Left Behind: Re-envisioning Native American Education for the Twenty-First Century* (2001) (*citing* Estelle Fuchs & Robert J. Havighurst, *To Live on This Earth: American Indian Education* (1972)). Put another way, Native Americans have endured generations of inadequate and inappropriate education. F. Cohen, *Handbook of Federal Indian Law,* § 22.03(1)(a) at 1358 (2005 ed.).

[¶ 17] This legacy is borne out in contemporary measures of Indian achievement. For example, " Indian children are among the most likely of any group to drop out of school, with studies revealing drop-out rates ranging from 20 percent to highs of 90 percent." *Id.* (*citing* Karen Swisher & Michelle Hoish, 31 J. Am. Indian Educ. 2 (1992)). Further, " achievement levels on nationally standardized tests lag well behind national averages, and in reading have even worsened since 1990." *Id.* (*citing* Nat'l Ctr. for Educ. Statistics. *Average Math Scores by Race/Ethnicity Grades 4 and 8, 1990-2003* (2004) and *Average Reading Scores by Race/Ethnicity Grades 4 and 8, 1990-2003* (2004)). Finally, " Indian adults continue to have the lowest education levels of any group, and are only half as likely to graduate from high school or college as other adults. " *Id.* (*citing* U.S. Census Bureau, *Educational Attainment in the United States: March 2000 Current Population Reports P20-536* at 1, 13, 25 (2000) and U.S. Census Bureau, *P148C, Educational Attainment for the Population 25 Years and Over* (2000)).

[¶ 18] Inadequate funding of Indian educational initiatives by the federal government has also limited the efficacy of many education laws. *Id.* The government has fallen far short of its responsibility to provide Indian children with an education that is at least equal to that afforded other children, and in recognizing their unique educational needs. In short, "education has been the source of both some of the greatest aspirations of federal Indian policy and some of the greatest damage to the Indian people." *Id.*

## III. Sufficiency of the Declination

### A. Standard of Review

[¶ 19] "Judicial review of federal agency administrative decisions is, unless expressly stated otherwise, governed by the Administrative Procedures Act (APA)." *Friends of Boundary Waters Wilderness v. Bosworth,* 437 F.3d 815, 821 (8th Cir.2006) (*citing* 5 U.S.C. § 706 and *In re Sac & Fox Tribe of Miss. in Ia./Meskwaki Casino Litig.,*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2007 WL 2022180 (D.S.D.)
**(Cite as: --- F.Supp.2d ----)**

340 F.3d 749, 755 (8th Cir.2003)). This general principle suggests that judicial review of administrative decisions taken pursuant to the ISDEAA should be governed under the APA because the ISDEAA does not expressly state a standard of review. However, courts looking at this issue have determined that Congress intended a *de novo* review for civil actions brought under the ISDEAA. *Cherokee Nation of Oklahoma v. U.S.,* 190 F.Supp.2d 1248, 1258 (E.D.Okla.2001), *rev. on other grds. by Cherokee Nation of Oklahoma v. Leavitt,* 543 U.S. 631, 125 S.Ct. 1172, 161 L.Ed.2d 66 (2005); *Shoshone-Bannock Tribes of the Fort Hall Reservation v. Shalala et al.,* 988 F.Supp. 1306, 1318 (D.Or.1997). The court is persuaded by reasoning in these cases. Accordingly, the standard of review to be applied in this case is *de novo.*

*7 [¶ 20] Further, "[u]nlike the usual civil case in which the plaintiff bears the burden of proof by a preponderance of the evidence, the ISDEA places the burden of proof in any hearing or on appeal on the Secretary 'to establish by clearly demonstrating the validity of the grounds for declining the contract proposal (or portion thereof.)' " *Shoshone,* 988 F.Supp. at 1318 (*quoting* 25 U.S.C. § 450f(e)).

### B. Declination Procedures

[¶ 21] The Secretary has 90 days after receipt of a proposal to review and approve the proposal and award the contract or decline the proposal. 25 C.F.R. § 900.16. Should the Secretary choose not to act on the proposal within the allotted 90 day period (or within any agreed extension) then the proposal is deemed approved by default. 25 C.F.R. § 900.18. Following approval by default or otherwise, the Secretary must award the contract and disburse the full amount of funds. 25 C.F.R. § 900.18.

[¶ 22] Alternatively, should the Secretary decide to decline the proposal in part or in its entirety, the Secretary must do so based on one of these five specific reasons:
(a) The service to be rendered to the Indian beneficiaries of the particular program or function to be contracted will not be satisfactory; (b) Adequate protection of trust resources is not assured; (c) The proposed project or function to be contracted for cannot be properly completed or maintained by the proposed contract; (d) The amount of funds proposed under the contract is in excess of the applicable funding level for the contract, as determined under section 106(a) of the Act; or (e) The program, function, service, or activity (or a portion thereof) that is the subject of the proposal is beyond the scope of programs, functions, services, or activities covered under section 102(a)(1) of the Act because the proposal includes activities that cannot lawfully be carried out by the contractor.

25 C.F.R. § 900.22; 25 U.S.C § 450f(2).

[¶ 23] Concerning the successor AFA portion of the proposal, the Secretary may not decline a proposed successor AFA if it is substantially the same as the prior AFA. 25 C.F.R. § 900.32. Any portion of an AFA proposal that is not substantially the same as that which was funded previously (e.g., a redesign proposal, waiver proposal, different proposed funding amount, or different program, service, function, or activity) is subject to the declination criteria and procedures. *Id.*

[¶ 24] When the Secretary declines all or a severable part of the proposal, the Secretary is required:
(a) To advise the Indian tribe or tribal organization in writing of the Secretary's objections, including a specific finding that clearly demonstrates that (or that is supported by a controlling legal authority that) one of the conditions set forth in § 900.22 exists, together with a detailed explanation of the reason for the decision to decline the proposal and, within 20 days, any documents relied on in making the decision; and (b) To advise the Indian tribe or tribal organization in writing of the rights described in § 900.31.

*8 25 C.F.R. § 900.29; 25 C.F.R. § 900.152; 25 U.S.C. § 450f(b). Additionally, the Secretary must provide additional technical assistance to overcome the stated objections and must provide any necessary requested technical assistance to develop any modifications to overcome the Secretary's stated objections. 25 C.F.R. § 900.30; 25 U.S.C. §

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                Page 7

--- F.Supp.2d ----, 2007 WL 2022180 (D.S.D.)
**(Cite as: --- F.Supp.2d ----)**

450f(b).

### C. Procedural Propriety of the Declination

[¶ 25] In this case, the parties disagree over whether the Secretary satisfied his burden of proof for declining the contract proposal and the successor AFA. The defendants' view is that the Secretary's decision complied with all the statutory and regulatory requirements for declination, although they readily admit that the declination letter had some shortcomings. They concede that the Secretary's declination decision failed to apprise CRST of its appeal rights. Nevertheless, defendants contend that this omission caused no injury to CRST given that the Tribe was well aware of its appeal rights. They also acknowledge the law requires specific findings and a detailed explanation. Nonetheless, they feel the letter's findings and explanation were sufficient. Further, according to the defendants, previous correspondence and meetings between the parties also provided CRST with adequate notice and explanation.

[¶ 26] The declination statutes and the regulations are unambiguous in this case. Further, any agency action taken without statutory authorization or which frustrates the congressional policy which underlies a statute is invalid. *Oglala Sioux Tribe of Indians v. Andrus,* 603 F.2d 707, 715 (8th Cir.1979). The Secretary acknowledges his technical failure to comply with the statutes and regulations but argues these omissions were inconsequential. The court disagrees. The ISDEAA puts the burden of proof on the Secretary to demonstrate the validity of his declination decision by clear and convincing evidence. Simply reciting the declination criteria is absolutely insufficient. The law requires a detailed explanation of the Secretary's rationale for his decision and a disclosure of the facts or documents on which he relied for his decision. Neither of these requirements were met by the Secretary. Therefore, the court finds that the Secretary failed to satisfy his burden of proof for declining the contract proposal.

[¶ 27] Given the Secretary's failure to comply with the declination statutes and regulations, the court

need not address the merits of actions taken by the defendants. The contract and successor AFA for SY 06-07 are deemed approved by operation of law. The defendants are to be ordered to forthwith pay to the plaintiff $303,368 in SY 06-07 funds. Added to the $1,766,432 previously paid to the Tribe, the total for SY 06-07 is $2,069,800 as an approved allocation amount.

[¶ 28] As to CRST's SY 07-08 proposal, defendants have waived all rights to object to the contract proposed by the plaintiff. That contract is also approved by operation of law and will be effective for the period in question. Defendants have also waived all rights to object to the payment to the Tribe of both direct and indirect costs. Accordingly, CRST's motions for summary judgment and for writ of *mandamus* and preliminary injunction should be granted.

### ORDER

*9 [¶ 29] Now, therefore, based on the foregoing,

[¶ 30] IT IS ORDERED:
(1) The motion of defendants for summary judgment (Doc. 27) is denied.
(2) Plaintiff's motion for summary judgment (Doc. 30) is granted.
(3) Plaintiff's motion for preliminary injunction and order extending the period for obligation of funds (Doc. 42) is moot.
(4) Plaintiff's motion for writ of *mandamus* and preliminary injunction (Doc. 48) is granted.
(5) Plaintiff's motion to amend the complaint (Doc. 50) is denied as moot.

FN1. The ISDEAA provides original jurisdiction to the federal district courts over "any civil action or claim" against federal agencies under the Act.

FN2. The Bureau of Indian Education is responsible for BIA-funded elementary and secondary schools, tribally controlled colleges, higher education grants, and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT ____A____
PAGE _8_ OF _8_

--- F.Supp.2d ----                                                                    Page 8

--- F.Supp.2d ----, 2007 WL 2022180 (D.S.D.)
(Cite as: --- F.Supp.2d ----)

Johnson-O'Malley contracts. While this Bureau is under the auspices of the BIA, it operates with a degree of independence from the BIA as a whole.

FN3. Less than 10 percent of Indian children currently attend elementary and secondary schools receiving basic BIA funding. F. Cohen, *Handbook of Federal Indian Law*, § 22.03 (1982 ed.) (*citing* GAO, *BIA and DOD Schools: Student Achievement and Other Characteristics Often Differ from Public Schools*, 3 (2001)). Of the 185 BIA-funded schools and dormitories, moreover, only about one-third are still operated directly by the BIA, while the rest are in community control, whether as "contract" schools under the ISDEAA, or "grant" schools run by tribes or Indian organizations under the Tribally Controlled Schools Act. *Id.* (*citing* BIA, OIEP, 2002 Fingertip Facts 3 (2003)).

FN4. According to the DOE, more than 50,000 schools across the country benefit from Title 1 funds, and these funds reach about 12.5 million students enrolled in both public and private schools. *See* U.S. Dept. of Educ., Title I, Part A Program, available at *http:// www.ed.gov/programs/t itleiparta/index.html* (last visited July 5, 2007). "Title I funds may be used for children from preschool age to high school, but most of the students served (65 percent) are in grades 1 through 6; another 12 percent are in preschool and kindergarten programs." *Id.*

FN5. This negotiated agreement between the Departments is commonly referred to as the "Final Agreement."

FN6. The remainder of the educational and other programs are operated by the Secretary.

FN7. CRST's proposed contract amendment states: [t]he parties

acknowledge that the Title I programs at both the Cheyenne Eagle Butte School and the Tiospaye Topa School were operated on a schoolwide basis on the day before enactment of the No Child Left Behind Act of 2001, and that Sec. 1114(b)(2)(B)(i)(II) of the NCLBA [20 USC § 6314(b)(2)(B)(i)(II) ] allows such a school to continue to operate a schoolwide program but such school is required to develop amendments to its existing plan to reflect the provisions of Sec. 1114 as contained in the NCLBA.

FN8. CRST's proposed AFA states: [t]he purpose of this annual funding agreement is to provide that the United States of America, through the Secretary of the Interior, Bureau of Indian Affairs shall supply the Cheyenne River Sioux Tribe (" Contractor") with all funds to which the Contractor is entitled pursuant to section 106(a) of the Indian Self-Determination and Education Assistance Act (25 U.S.C. § 450j-1) and Contract no. CTA01T34022 (" the Contract") to carry out 'the programs, services, functions, and activities (PFSA) described in the Contract and this annual funding agreement.

FN9. The impact of the federal government's involvement in Indian Education is well documented in two government reports, the Meriam and Kennedy Reports. *See* Inst. for Gov't Research, *The Problem of Indian Administration* 8 (1928) (Lewis Meriam, Technical Director); Senate Special Subcomm. on Indian Educ, Comm. on Labor & Public Welfare, *Indian Education: A National Tragedy-A National Challenge*, S.Rep. No. 91-501, at xi (1969)

D.S.D.,2007.
Cheyenne River Sioux Tribe v. Kempthorne
--- F.Supp.2d ----, 2007 WL 2022180 (D.S.D.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

EXHIBIT___○_____
PAGE_/_OF⟨20⟩

SOUTHERN UTE INDIAN TRIBE,

     Plaintiff,

v.                                             Civil No. 05-988 WJ/LAM

MICHAEL O. LEAVITT, Secretary of the
United States Department of Health and Human
Services, et al.,

     Defendants.

## MEMORANDUM OPINION AND ORDER ON
## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

THIS MATTER comes before the Court pursuant to Plaintiff's Motion for Preliminary

Injunction (Doc. 3) and Defendants' Motion for Summary Judgment (Doc. 14). After reviewing

the briefs in both parties' motions, I issued an Order to Show Cause why the preliminary

injunction should not be consolidated with the merits of the case (Doc. 37). The parties agreed

that consolidation was appropriate. Additionally, at a hearing on February 8, 2007, the parties

agreed that the legal issues are fully briefed and may be decided without further argument.

Accordingly, I decide here the purely legal issue whether the Defendants had discretion under the

Indian Self-Determination and Education Assistance Act, 25 U.S.C. §§ 450 through 458bbb-2

("ISDEA"),to decline to enter into a contract with the Plaintiff Tribe to assume control over and

management of the programs, functions services and activities of the Southern Ute Health Center.

EXHIBIT ___O___
PAGE _2_ OF _20_

## INTRODUCTION

Plaintiff, Southern Ute Indian Tribe, is a federally recognized Indian tribe organized

pursuant to Section 16 of the Indian Reorganization Act of 1934 (codified at 25 U.S.C. § 476).

Congress enacted the ISDEA in recognition of "the Federal government's historical and special

legal relationship with, and resulting responsibilities to, American Indian people . . .." 25 U.S.C.

§ 450. Congress set forth a method within the ISDEA for Indian Tribes to assume control over

certain federally provided programs. Relevant to the instant case, the ISDEA directs the

Secretary of the United States Department of Health and Human Services ("HHS"), upon request

of an Indian tribe, to enter into a contract by which the Tribe assumes direct operation of an HHS

federal Indian Health care program. 25 U.S.C. § 450f(a)(1). Under the ISDEA, if an Indian tribe

submits a proposal for a self-determination contract, "the Secretary shall, within 90 days after

receipt of the proposal, approve the proposal and award the contract . . .." 25 U.S.C. §

450f(a)(2). The secretary has very little discretion to decline to award a contract proposed by an

Indian tribe.

On or about January 25, 2005, Plaintiff submitted a proposal pursuant to 25 U.S.C. § 450f

to contract for the administration of the Southern Ute Health Center ("Clinic"), a facility of the

Indian Health Services ("IHS") that is the primary health care facility for the Plaintiff Tribe's

members. By letter dated February 28, 2005, a Contract Proposal Liaison Officer ("CPLO") with

IHS notified Plaintiff that some portions of the proposal required further clarification. Pl's. Ex. 2.

The letter noted that IHS was continuing to review Plaintiff's proposal for contract support costs

("CSC"), but stated that Congress had not appropriated any new money for CSC and it was

unlikely that any start-up costs would be paid.

Case 1:06-cv-02173-CKK    Document 22-3    Filed 07/27/2007    Page 3 of 20
Case 1:05-cv-00988-WJ-LAM    Document 50    Filed 06/15/2007    Page 3 of 20

EXHIBIT_____ O

PAGE__3__ OF_20

On March 1, 2005, the United States Supreme Court decided <u>Cherokee Nation of Okla. v</u>

<u>Leavitt</u>, 543 U.S. 631 (2005). In that case, the Government had not fully paid CSC to tribes that

had existing ISDEA contracts that included an agreement to pay CSC. <u>Id.</u> at 635. While the

Government acknowledged its contractual promise to pay the CSC and its failure to fully pay, it

argued that it was not legally bound by its promise because Congress had not appropriated

sufficient funds to fully pay CSC to all tribes with ISDEA contracts. <u>Id.</u> The Supreme Court

found that Congress had appropriated sufficient unrestricted funds to pay CSC for the particular

contracts at issue for the Fiscal Years at issue. <u>Id.</u> at 637. The Court held that the Government

was bound by its promise to pay CSC. <u>Id.</u> at 647.

For Fiscal Year 2005, Congress appropriated $263,638,000 to IHS to pay contract

support costs and stated that money expended for contract support costs was not to exceed this

amount. Medrano Dec. (attached to Def's. Mem. in Support of Summary Judgment). This

amount does not represent sufficient money to pay contract support costs for any new or

expanded program assumption under the ISDEA. <u>Id.</u>

On March 24, 2005, Plaintiff responded to the CPLO's letter with the requested

clarifications. Pl's. Ex. 3. Under the ISDEA, IHS had 90 days to approve the proposal or

provide written notification of declination of the contract for one of five permissible reasons.

However, the 90 day period may be extended with consent of the tribe. 25 U.S.C. § 450f(a)(2).

Prior to the expiration of the 90 day period in this case, the IHS Acting Director of the Office of

Tribal Support ("Acting Director") sent a letter to Plaintiff requesting a thirty day extension due

to restructuring within IHS of the contract proposal review process. Pl's. Ex. 4. Plaintiff

responded that it would like some indication that the tribe had adequately addressed the CPLO's

3

Case 1:06-cv-02173-CKK   Document 22-3   Filed 07/27/2007   Page 4 of 20
Case 1:05-cv-00988-WJ-LAM   Document 50   Filed 06/15/2007   Page 4 of 20

EXHIBIT   O

PAGE 4 OF 20

concerns and would also like some details regarding any effect of the restructuring on Plaintiff's particular contract proposal. Pl's. Ex. 5. The Acting Director responded back with some additional detail with regard to portions of Plaintiff's proposal that were not sufficiently clarified. Pl's. Ex. 6. The letter also reiterated a request for Plaintiff's consent to the thirty day extension and stated that, in the absence of an extension, IHS would proceed to approve the contract to the extent the proposal was satisfactory, and provide Plaintiff with a timely partial declination letter to the extent the proposal was not sufficient as indicated. Id.

Plaintiff responded to this latest letter with its interpretation of the statutory requirements for a declination, i.e., that refusing to grant an extension was not a valid reason for declination, that IHS had never provided Plaintiff with a clear explanation of potential declination issues, and that IHS was required to inform Plaintiff within the 90 days of any potential declination issues and provide technical support which it had not done. Pl's. Ex. 7. Plaintiff expressed concern that IHS was not following these rules with respect to Plaintiff's proposal. Id. However, Plaintiff gave its consent to a thirty day extension. Id.

The Acting Director responded by letter agreeing with Plaintiff that refusal to consent to an extension was not grounds for declination. Pl's. Ex. 8. He then proceeded to outline specific areas of potential declination with regard to Plaintiff's proposal and made recommendations for modifications. Id. He stated that,

> The Area[1] has made the decision to decline the tribe's request to contract for the CEO, the Health Center Director, the Clinical Director, the Chief Pharmacist, and the Administrative Officer positions based on 25 U.S.C. [§] 450f(a)(2)(A)-(E) Declination Criteria "The program, function, service or activity (or portion thereof) that is the subject of this proposal is beyond the scope of programs,

---

[1]Presumably, this refers to the Albuquerque Area Office of the Indian Health Service.

Case 1:06-cv-02173-CKK    Document 22-3    Filed 07/27/2007    Page 5 of 20
Case 1:05-cv-00988-WJ-LAM    Document 50    Filed 06/15/2007    Page 5 of 20

EXHIBIT____O
PAGE__5_ OF_20

functions, services or activities under section 102(a)(1) of the ISDEAA because
the proposal includes activities that cannot lawfully be carried out by the
contractor". More specifically, a Tribal employee cannot by law manage and
obligate the services and funding of Federal Programs and Federal employees. By
contracting only the decision making and administrative aspects of any service
program and not including the p,f,s,a's[2] that go along with each of these positions
the tribe is asking the Area to approve an unlawful act. If the Tribe were to
modify the proposal to include the p,f,s,a's under the direction of each of these
positions the Area would have a proposal that could more easily be approved.

Id. The Acting Director further stated that areas of recommended changes with regard to other

concerns could be discussed during the first negotiation and should be easily resolved. The letter

concluded with a statement that the dollar amount Plaintiff was requesting "exceeds the Tribal

Shares the Tribe has available for the Southern Ute Health Center." Id.

The first negotiation occurred on May 27, 2005. Pl's. Ex. 9. Present were the Acting

Director and several representatives for Plaintiff. Plaintiff's counsel explained the details of the

Tribe's proposal and pointed out that the proposal did indicate that Plaintiff would be taking over

the programs, functions, services and activities ("PFSAs") under the CEO, the Health Center

Director, the Clinical Director, the Chief Pharmacist, and the Administrative Officer. Id. At the

conclusion of this negotiation, the Acting Director stated that, as far as he could tell, no

declination issues existed. Id. Following this negotiation, Plaintiff consented to an additional

extension until June 3, 2005. Pl's. Ex. 10. A second negotiation occurred on June 2, 2005. Pl's.

Ex. 11. After this negotiation, the Acting Director prepared a summary of the agreement between

Plaintiff and IHS which indicated that CSC funding had been discussed as a problem during the

negotiation. Id. With regard to CSC, the summary states that,

---

[2]The precise meaning of this acronym is not made clear in the letter, but based on the
previous statutory reference in the letter, it appears to be short-form for "program, function,
service or activities."

5

EXHIBIT____O____
PAGE__6__OF__20__

the new CSC language that generally states that there are no Start Up Costs or
CSC available for contracting these PFSAs and the tribe will not be able to have
the associated CSC dollar amount for this contract placed on the Que[3] was
discussed with the tribe. They have requested this decision in writing and will
notify the Area of their position following a review. The tribe understands that
refusal to include this language will result in a proposal declination.

Pl's. Ex. 11.

On June 3, Plaintiff consented to another extension of time requested by IHS. Pl's. Ex.

10. In its letter of consent, Plaintiff indicated that it was providing the additional time so that IHS

could complete the summary of agreement from the June 2, 2005 negotiation and to provide time

to resolve issues regarding IHS's position on CSC. Id. The extension was given until June 17,

2005. Id. On June 17, 2005, Plaintiff consented to another extension until June 30, 2005 to

resolve issues regarding IHS's new position on CSC. Id. Plaintiff stated it was unwilling at that

time to agree to inclusion of new CSC language in its contract. Id.

On June 21, 2005, the Acting Director sent Plaintiff an email with IHS's new required

CSC language for contracts involving new or expanded PSFA's. Pl's. Ex. 13. The email included

forwarded messages that made clear that contracts must include language that IHS will not pay

CSC, does not promise to pay CSC, that the tribes cannot rely on any promise to pay, and tribes

cannot report a failure to receive CSC as a shortfall. Id. The IHS policy regarding the CSC

language was apparently never formally published or adopted in any formal manner. The email

indicates that the Acting Director "assumes" that the attached forwarded messages containing the

new CSC language reflect the official position of IHS. Id. One of the forwarded attached

messages from an IHS employee in Maryland indicates that Area Offices had received several

---

[3]There is no indication of the meaning of this term.

6

Case 1:06-cv-02173-CKK   Document 22-3   Filed 07/27/2007   Page 7 of 20
Case 1:05-cv-00988-WJ-LAM   Document 50   Filed 06/15/2007   Page 7 of 20

EXHIBIT____O____

PAGE _7_ OF _20_

versions of the proposed CSC language, and it was not clear what language the Director had

approved. Nonetheless, IHS insisted this language be included in Plaintiff's contract. The Acting

Director indicated that he would prepare a declination of Plaintiff's proposal. Id.

On June 24, 2005, the Acting Director sent Plaintiff an email indicating that HQ[4] wanted

the Area to decline Plaintiff's proposal based on a failure to agree on finances as well as other

elements of the proposal. Pl's. Ex. 14. The Area Director indicated he preferred to decline solely

on the issue of the CSC language. Id.

On June 29, 2005, Plaintiff granted another extension until July 15, 2005 and reiterated its

unwillingness to agree to the new CSC language in its contract. Pl's. Ex. 10. On that same date,

Plaintiff sent a letter to Defendant Toya, Director of the Area, stating that the Acting Director had

previously hinted at a new IHS policy on CSC but that there was no disclosure to Plaintiff that the

new policy might lead to declination of its proposal if it did not agree to contractually waive its

statutory rights to CSC. Pl's. Ex. 15. Plaintiff stated that it would not likely have granted

additional extensions if it had been aware that the new policy would be retroactively applied to its

proposal. Id. Plaintiff stated its belief that the CSC policy could not be raised as a declination

issue because the Area did not pursue a timely, good faith review of Plaintiff's proposal and

"dragged its feet." Id. Plaintiff urged that it offended "principles of fundamental fairness to now

make the Tribe's contract proposal retroactively subject to declination issues which did not exist

when it first submitted its contract and only came into play after the Area Office's failure to

review the Tribe's contract proposal in a timely manner." Id. Plaintiff further stated that it would

---

[4]Presumably referring the headquarters, but it is not clear where or whom "headquarters"
is, i.e., whether this is a regional headquarters, the Office of the Secretary or some officer between
these levels.

7

EXHIBIT___O___
PAGE__8__ OF _20_

not agree to the CSC even if it were not being retroactively applied because "IHS has a statutory

duty to provide CSC funds . . .." Id. Plaintiff then stated its position that the declination criteria

in the ISDEA do not give IHS discretion to refuse to enter into a contract if a tribe will not give

up other rights under the ISDEA. Id. Plaintiff noted that the ISDEA includes a model agreement

that provides for CSC, and that published IHS Circulars providing for CSC were not superseded

by any subsequently published Circulars. Id. Plaintiff agreed to include the ISDEA model

agreement language regarding CSC, but stated that it would challenge a declination based on its

refusal to include the new CSC language developed by IHS. Id.

On July 15, 2005, Defendant Toya sent Plaintiff a letter acknowledging receipt of

Plaintiff's June 29 letter and indicating that his staff would research the issues raised by Plaintiff

and develop a response. Pl's. Ex. 16. Defendant Toya never further responded to these issues.

On July 13, 2005, Plaintiff submitted an amendment to its contract proposal in which it

proposed to take over all contractible PFSAs at the Clinic. Pl's. Ex. 17. On July 14, 2005,

Plaintiff consented to an extension until August 15, 2005 to negotiate the amended proposal.

Pl's. Ex. 10. On July 18, 2005, Defendant Grim, Assistant Surgeon General and Director of IHS,

sent a memorandum to all Area Directors stating that the decision of the United States Supreme

Court in Cherokee Nation v. Leavitt interpreted ISDEA agreements as binding similar in nature to

procurement contracts. Pl's. Ex. 18. He then noted that Congress had placed a cap on the

amount of funds that IHS could use for CSC, and the appropriation does not include any funds

for new or expanded program assumption by Indian Tribes. Id. Defendant Grim stated that, in

light of the Supreme Court decision and the lack of appropriations, IHS would require language

in any new or expanded contract indicating that there are no CSC funds available, the Tribe

EXHIBIT___O____

PAGE__9__ OF _20_

wishes to contract the new or expanded PFSAs knowing that CSCs are not available, the Tribe is

able to carry out the new or expanded PFSAs without added CSC funding, the Tribe agrees that

no new need for CSC funding is created under the contract, and there is no promise by IHS to pay

CSC. Id.

On August 8, 2005, Plaintiff and Defendants' representatives met for a final negotiation

session. Pl's. Ex. 9. At the end of this negotiation, the Acting Director indicated that the only

outstanding issue was the disagreement over CSC language and all other potential declination

issues had been resolved. Id. On August 11, 2005, Plaintiff's counsel sent the Acting Director a

letter indicating his understanding that the only remaining issue was the CSC language and

reiterating that the tribe would not agree to the language. Pl's. Ex. 19. The letter specifically

stated that Plaintiff was able to implement the proposal without the CSC funding, but would not

waive the statutory right to the funding.

On August 15, 2005, Defendant Toya sent a letter to Plaintiff declining the proposal.  Pl's.

Ex. 21.  The letter outlines the five declination criteria from the ISDEA, 25 U.S.C. §

450f(a)(2)(A) through (E), and lists criteria (A), (C), (D), and (E) as the bases for declination.  Id.

In explaining the declination, Defendant Toya noted that Plaintiff was refusing to recognize in the

contract that CSC is not available and that this has the effect of meeting criteria (C), (D) and (E).

Id.  Toya then concluded that criteria (A) was met because Plaintiff had not shown it would be

able to operate and maintain the programs and provide satisfactory services without CSC funds.

Id.  The letter then lists an additional twelve reasons the proposal would have been declined even

if Plaintiff had agreed to the CSC.  There is no evidence in the record that any of these twelve

issues had been discussed with Plaintiff during negotiations.

9

EXHIBIT____O____
PAGE_10_OF_20_

On September 2, 2005, Plaintiff sent a letter to Defendant Toya in response to the declination indicating that the declination of the entire proposal on the stated grounds was unlawful.  Plaintiff noted that none of the twelve additional criteria had ever been raised during negotiations, but that these grounds were irrelevant because Toya expressly stated they were not the actual grounds for declination.  Plaintiff stated that these additional grounds were, however, an indication that IHS had negotiated in bad faith.  Plaintiff urged that the declination of the entire proposal was unlawful, that the actual grounds stated for the declination were not factually accurate, and that the grounds were unlawful under the ISDEA.

Pursuant to 25 U.S.C. § 450f(b)(3) and 450m-1(a), Plaintiff filed a Complaint in this Court for damages and injunctive relief on September 15, 2005.  Before the Court is the legal issue whether Defendants had discretion to decline Plaintiff's proposal on the basis that Plaintiff refused to include new CSC language developed by IHS in its contract.

**LEGAL STANDARD**

Plaintiff's Motion for Preliminary Injunction fully briefs the legal issue whether Defendants had discretion to decline Plaintiff's ISDEA proposal on the basis of Plaintiff's refusal to include new CSC language.  Defendants' Motion for Summary Judgment also fully briefs this issue.  Based on the parties' agreement to consolidate the motion for preliminary injunction with the merits of this case and their representation that the issue is fully briefed and ready for determination, the Court will treat the parties' respective motions as cross motions for summary judgment.

Summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  A fact is "material"

10

EXHIBIT___O___
PAGE__11__OF _20_

if, under the governing law, it could have an effect on the outcome of the lawsuit. <u>Anderson v.</u>

<u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>Hardy v. S.F. Phosphates Ltd. Co.</u>, 185 F.3d

1076, 1079 (10th Cir. 1999). When the parties to an action file cross motions for summary

judgment, a court is entitled to assume that no evidence needs to be considered other than that

filed by the parties. <u>Atlantic Richfield Co. v Farm Credit Bank of Wichita</u>, 226 F.3d 1138 (10th

Cir. 2000). Summary judgment is not appropriate if disputes remain as to material facts. <u>Id.</u>

Under the ISDEA, in any civil action brought pursuant to 25 U.S.C. § 450m-1(a)

challenging the declination of a Tribe's contract proposal, the government bears the burden of

establishing by clear and convincing evidence the validity of the grounds for declination. 25

U.S.C. § 450f(e)(1).

**DISCUSSION**

In their motion for summary judgment, Defendants make clear that for Fiscal Year 2005

(FY 2005) Congress capped the amount of appropriations that could be spent on contract support

costs under the ISDEA and did not increase the appropriation of such funds to cover CSC for

new or expanded self-determination contracts. Defendants argue that entering into new self-

determination contracts that require CSC would violate the Appropriations Clause of the United

States Constitution, art. I, § 9, cl. 7. They also argue that entering into such contracts would

violate the Anti-Deficiency Act, 31 U.S.C. § 1341. Defendants contend that the ISDEA does not

require IHS to enter into contracts that exceed available funding because it permits the Secretary

to decline a proposal if the amount of funds proposed under the contract exceed the applicable

level of funding for the contract.

EXHIBIT ___O___
PAGE _12_ OF _20_

I.       ISDEA STATUTORY SCHEME FOR FUNDING AND DECLINATION

Under the ISDEA, the Secretary[5] "is directed, upon request of any Indian tribe by tribal

resolution, to enter into a self-determination contract . . ." 25 U.S.C. § 450f(a)(1).  An Indian

tribe may submit a proposal for a self-determination contract to the Secretary,

> and the Secretary shall, within ninety days after receipt of the proposal, approve
> the proposal and award the contract unless the Secretary provides written
> notification to the applicant that contains a specific finding that clearly
> demonstrates that, or that is supported by a controlling legal authority that –
>       (A) the service to be rendered to the Indian beneficiaries of the particular
> program or function to be contracted will not be satisfactory;
>       (B) adequate protection of trust resources is not assured;
>       (C) the proposed project or function to be contracted for cannot be
> properly completed or maintained by the proposed contract;
>       (D) the amount of funds proposed under the contract is in excess of the
> applicable funding level for the contract, as determined under section 450j-1(a) of
> this title; or
>       (E) the program, function, service, or activity (or portion thereof) that is
> the subject of the proposal is beyond the scope of programs, functions, services, or
> activities covered under paragraph (1) because the proposal includes activities that
> cannot lawfully be carried out by the contractor.

25 U.S.C. § 450f(a)(2).

As both parties note, Section 450f(a)(2)(D) allows the Secretary to decline a proposal if

the amount of funds are in excess of the applicable funding level for the contract.  However, the

meaning of "applicable funding level" is not open to broad interpretation and is specifically

defined by cross reference to Section 450j-1(a).  Section 450j-1(a) provides that the amount of

funds provided under a self-determination contract shall not be less than the Secretary would have

provided for the operation of the program, and added to this required amount shall be contract

---

[5]Secretary is defined in the ISDEA as the Secretary of Health and Human Services or the
Secretary of the Interior.  25 U.S.C. § 450b(i).  In this case, the relevant Secretary is the
Secretary of Health and Human Services.

EXHIBIT____O____
PAGE_13_ OF _20_

support costs. 25 U.S.C. § 450j-1(a)(1) and (2).

The ISDEA provides model contract language in 25 U.S.C. § 450l. Every self-

determination contract must contain or incorporate by reference the provisions of the model

agreement. 25 U.S.C. § 450l(a)(1). The model agreement terms for funding state:

> Subject to the availability of appropriations, the Secretary shall make available to
> the Contractor the total amount specified in the annual funding agreement
> incorporated by reference in subsection (f)(2). Such amount shall not be less than
> the applicable amount determined pursuant to [25 U.S.C. § 450j-1].

25 U.S.C. § 450l(c)

The government notes that Section 450j-1(b) states in part that:

> Notwithstanding any other provision in this subchapter, the provision of funds
> under this subchapter is subject to the availability of appropriations and the
> Secretary is not required to reduced funding for programs, projects, or activities
> serving a tribe to make funds available to another tribe or tribal organization under
> this subchapter.

25 U.S.C. § 450j-1(b).

II.    DEFENDANTS DID NOT HAVE DISCRETION UNDER THE ISDEA TO DECLINE
       PLAINTIFF'S PROPOSAL FOR A SELF-DETERMINATION CONTRACT

The language of 25 U.S.C. § 450f(a)(2) clearly limits the discretion of the Government to

decline an Indian Tribe's proposal for a self-determination contract to those specific criteria listed.

In this case, the Government relies on Section 450f(a)(2)(D) arguing that the amount of funds

proposed by Plaintiff was in excess of the applicable funding level because it included CSC when

Congress had not appropriated sufficient funds for CSC for the fiscal year in which the contract

was proposed. The Government notes that language in Section 450j-1(b) states that the provision

of funds for self-determination contracts is subject to the availability of appropriations.

The basis on which the Government relies for declining Plaintiff's proposal specifically

EXHIBIT____C____
PAGE _14_ OF _20_

cross-references Section 450j-1(a) to define "applicable funding level." The language of 450j-1(a)(2) provides that the applicable funding level includes CSC. Thus, the fact that Plaintiff's proposal included CSC was not a proposal for funds "in excess of the applicable funding level," and Section 450f(a)(2)(D) cannot provide the basis for the Government's declination of the contract. The language in Section 450j-1(b) that the provision of funds is subject to the availability of appropriations does not change this result. This subsection is not cross-referenced in the declination criteria and cannot form the basis for declining the Plaintiff's proposal.

III.    ENTRY BY THE GOVERNMENT INTO THE ISDEA CONTRACT WILL NOT VIOLATE THE APPROPRIATIONS CLAUSE OR ANTI-DEFICIENCY ACT

Notwithstanding the clear statutory mandate to enter into a self-determination contract unless one of the specific declination criteria applies to a Tribe's proposal, the Government argues that it is prohibited from entering into the contract by the Appropriations Clause of the United States Constitution, art. I, § 9, cl. 7. Similarly, it argues that it is prohibited from entering into the contract by the Anti-Deficiency Act, 31 U.S.C. § 1341(a)(1)(A) and (B).

Under the Appropriations Clause, "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. In cases cited by the Government decided on the basis of the Appropriations Clause, claimants were seeking payment from the government that had no underlying substantive authorizing statute. For instance, in Flick v. Liberty Mut. Fire Ins. Co., 205 F.3d 386 (9th Cir. 2000), a plaintiff's claim for coverage under a policy of flood insurance issued pursuant to and funded by the National Flood Insurance Act was denied. Federal regulations required that any claim for payment under such policy must be by a sworn proof of loss submitted within 60 days of loss, and the plaintiff

EXHIBIT___O___

PAGE__15_ OF _20_

failed to submit a sworn proof of loss within that time period. Id. at 389. In determining that

plaintiff was not entitled to payment, the court concluded that the Appropriations Clause

precludes payment out of the Treasury in a **manner** not authorized by Congress. Id. at 391

(emphasis added).

In Office of Personnel Management v. Richmond, 496 U.S. 414 (1990), a federal statute

concerning eligibility for disability annuity payments to retired federal employees expressly

provided that persons who earned more than a certain percentage of their pre-disability pay in any

calendar year would lose their disability annuity payments for the following year. An employee of

the Office of Personnel Management ("OPM") had incorrectly informed an annuitant that he

would keep his payments unless he earned above the percentage in two consecutive years. The

annuitant lost his payment for the year following the first year in which he earned above the

percentage, and he sued OPM arguing that the Government was estopped from denying his

payments. The Supreme Court determined that the annuitant was seeking payment of money that

was not authorized by any substantive law and any such payment would violate the

Appropriations Clause. Id. at 424. The Court noted that an award in favor of the annuitant

"would be in direct contravention of the federal statute upon which his ultimate claim to the funds

must rest." Id. The Court referred to any such payment as an "extrastatutory payment." Id. at

430.

The Anti-Deficiency Act prohibits government officers or employees to authorize

expenditures or incur obligations in excess of Congressional appropriations. 31 U.S.C. §§ 1341.

In Richmond, the Supreme Court noted that allowing the annuitant to recover payment in

contravention of the underlying authorizing statute would violate the Anti-Deficiency Act. 496

U.S. at 430.

EXHIBIT___O___
PAGE_16_ OF _20_

In Richmond and Flick, the payment sought from the Treasury was not authorized by any substantive statute, and the payment would have violated the Appropriations Clause. In the instant case, Plaintiff seeks a contract that is not only authorized but mandated by statute. Because the contract is not an extrastatutory authorization or obligation, it does not violate the Appropriations Clause.

Because the statutory scheme in the ISDEA does not give the Secretary discretion to decline a proposal on the basis of underfunding in Congressional appropriations, the executive branch officers and employees will not be in violation of the Anti-Deficiency Act by carrying out their statutory obligations to approve Plaintiff's proposal. It is not the executive branch that has obligated the government; rather, it is Congress through the ISDEA that has obligated the Government. Moreover, the Government's concerns with regard to the Anti-Deficiency Act are satisfied by the model contract language within the ISDEA that funding is subject to the availability of appropriations which language Plaintiff agreed should be included in its contract.

The Government's argument that its statutory duty to approve Plaintiff's proposal has been alleviated by the lack of sufficient Congressional appropriations is, in essence, an assertion that the appropriations law amends or repeals the substantive provisions of the ISDEA. "The mere failure of Congress to appropriate funds, without further words modifying or repealing, expressly or by clear implication, the substantive law, does not in and of itself defeat a Government obligation created by statute." Greenlee County, Ariz. v. United States, -- F.3d --, 2007 WL 1391389 *4 (Fed. Cir. 2007); see also Whatley v. District of Columbia, 447 F.3d 814, 819 (D.C. Cir. 2006) (noting the presumption that appropriations acts do not amend substantive law). When appropriations acts conflict with underlying substantive law, their effect must be

16

EXHIBIT___O___
PAGE_17_ OF _20_

narrowly construed. Calloway v. District of Columbia, 216 F.3d 1, 9 (D.C. Cir. 2000). "When

two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed

congressional intention to the contrary, to regard each as effective." Highland Falls - Fort

Montgomery Central Sch. Dist., 48 F.3d 1166, 1171 (Fed. Cir. 1995) (citing Morton v. Mancari,

417 U.S. 535, 551 (1974)). In this case, the Secretary's obligations to approve proposals under

the ISDEA have not been amended or repealed by any heretofore enacted annual appropriations

act, and the Secretary's obligation to accept proposals from Indian Tribes remains what it has

always been. Additionally, the appropriations acts have not amended the ISDEA by expanding

the declination criteria or the Secretary's discretion to decline proposals.

The Government's interpretation of its discretion under the ISDEA in light of annual

appropriations is actually contrary to the very purpose of the Appropriations Clause. Under the

Appropriations Clause, only the legislative branch and not the executive branch of government

may make ultimate decisions regarding public funds. The IHS may not unilaterally amend the

ISDEA by altering the declination criteria in the ISDEA, eliminating an element of the funding

scheme for Self-Determination contracts, or developing new contract language that contradicts

the statutory model language developed by Congress.

The Government's reaction to the Supreme Court decision in Cherokee Nation of Okla v.

Leavitt, 543 U.S. 631 (2005) is not unreasonable. In Cherokee, the Court made clear that the

Government is obligated to pay its contract obligations under the ISDEA even when there are

insufficient specific appropriations so long as there are sufficient unrestricted appropriations. Id.

at 643. It seems the Government is between a rock and a hard place if it has no discretion to

decline contracts, no discretion to pay less than full CSC on all outstanding contracts, and

EXHIBIT___*O*___
PAGE_*18*_ OF _*20*_

receives inadequate appropriations to meet its obligations. However, the Supreme Court did not

decide what the Government's obligations to pay CSC would be if Congress explicitly prohibited

the use of unrestricted funds to meet these obligations. Furthermore, the Supreme Court hinted

that the Government's obligation to pay CSC might be different if Congress did not appropriate

adequate unrestricted funds. Accordingly, the Government cannot speculate that the Supreme

Court will require it to pay obligations for which there are no unrestricted funds available and

engage in self-help statutory amendment to avoid the anticipated result of such a decision.

On a final note, the Government argues that the Supreme Court "warned" it that it must

refrain from making commitments it cannot fulfill. In <u>Cherokee</u>, the Supreme Court stated:

> We recognize that agencies may sometimes find that they must spend unrestricted
> appropriated funds to satisfy needs they believe more important than fulfilling a
> contractual obligation. But the law normally expects the Government to avoid
> such situations, for example, by refraining from making less essential contractual
> commitments; or by asking Congress in advance to protect funds needed for more
> essential purposes with statutory earmarks; or by seeking added funding from
> Congress; or, if necessary, by using unrestricted funds for the more essential
> purpose while leaving the contractor free to pursue appropriate legal remedies
> arising because the Government broke its contractual promise.

543 U.S. at 642. This language is not a warning to the Government not to enter into contracts.

Refraining from less essential contractual commitments is merely one of several examples of ways

an agency might reserve its unrestricted funds for uses other than paying on contracts. The Court

did not address the Government's obligations to enter into contracts under the ISDEA and was

not suggesting that the Government attempt to redefine its statutory obligations. Interestingly,

one of the Court's suggestions is that the Government seek protection of funds by requesting

statutory earmarks. This appears to be another suggestion that the Government's obligation to

pay CSC may be different when there are no unrestricted funds available to pay them. I note that

EXHIBIT __O__
PAGE _19_ OF _20_

the funding for FY 2005 specified that the money earmarked for CSC was the only money to be

used to pay for CSC.  See P.L. 108-447, 118 Stat. 2089, 3084.[6]

## CONCLUSION

Based on the above analysis, I conclude that Defendants did not have discretion to decline

Plaintiff's proposal on the basis of insufficient Congressional appropriations to pay CSC and did

not have discretion to condition approval of Plaintiff's proposal on new contract language

contradicting statutory model language or on Plaintiff's waiver of funding specifically provided

under the ISDEA.  Accordingly, Plaintiff is entitled to summary judgment on this issue and its first

and second causes of action in its Complaint and is entitled to injunctive relief in accordance with

25 U.S.C. § 440m-1(a).  Plaintiff is directed to prepare a form of order for injunctive relief,

submit it to Defendants for approval as to form, and then submit it to the Court through the email

address indicated on my web page for proposed orders.  The proposed order must be submitted in

WordPerfect or Rich Text format.  If parties are unable to reach agreement as to the form of an

order, Plaintiff shall file a motion for a presentment hearing.

---

[6]While decided ten years before the decision in Cherokee, the decision in Highland Falls-Fort Montgomery Central Sch. Dist. v. United States, 48 F.3d 1166 (Fed. Cir. 1995), suggests that caps on funds available to pay entitlements results in the Government's obligation to alter its allocation of funds in order to abide by both the substantive law as well as the Anti-Deficiency Act.  In that case, the court addressed entitlement payments under the Impact Aid Act ("IAA").  The IAA provided assistance to school districts financially burdened by federal ownership of real property within the school district.  Id. at 1168.  Congress had not appropriated sufficient funds in fiscal years 1989 through 1993 to fully fund entitlements under the IAA; it had earmarked insufficient funds for that entitlement, and all other appropriations were earmarked for other entitlements.  Id. at 1169.  The Secretary of Education had allocated funds for the entitlements based on the earmarked appropriations, and the plaintiff school district received less than its full entitlement for those years.  Id.  The plaintiff school district sought its full entitlement arguing that the Department of Education ("DOE") had erred in concluding that the earmarked appropriations had priority over the formula for entitlements in the underlying authorizing statute.  Id. at 1170.  The Federal Circuit concluded based in part on the Anti-Deficiency Act that the DOE had not erred in paying its entitlement obligations by allocating from the earmarked funds rather than paying the full amount of entitlements.

EXHIBIT _____O_____
PAGE _20_ OF _20_

The remaining issues are those raised in Plaintiff's third cause of action with regard to the

Administrative Procedures Act, and any issue of damages.  The Court shall hold a pre-trial

conference in the near future to hear from counsel on what type of hearing or trial will be required

to resolve the remaining issues.

**IT IS SO ORDERED**.


_____
UNITED STATES DISTRICT JUDGE