## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ALEUTIAN PRIBILOF ISLANDS ASSOCIATION, INC.** 1131 E. International Airport Rd. Anchorage, Alaska 99518 <br><br> PLAINTIFF, <br><br> v. <br><br> **DIRK KEMPTHORNE**, in his official capacity as Secretary of the Interior, U.S. Department of the Interior 1849 C. Street, N.W. Washington, DC 20240 <br><br> **NILES CESAR**, in his official capacity as Regional Director, Alaska Region, Bureau of Indian Affairs, U.S. Department of the Interior; 709 W. 9th St. Juneau, Alaska 99802 <br><br> **BUREAU OF INDIAN AFFAIRS OFFICE OF SELF-GOVERNANCE,** U.S. Department of the Interior, 1849 C. Street, N.W., MS 4140 MIB Washington, DC 20240 <br><br> DEFENDANTS. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No. 06-2173 (CKK) |

## PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF
## MOTION FOR PARTIAL RECONSIDERATION

## INTRODUCTION AND SUMMARY

The Federal Defendants' response to APIA's motion demonstrates why reconsideration is appropriate and necessary in this case. The Aleutian Pribilof Islands Association ("APIA") initiated this action to challenge the Bureau of Indian Affairs ("BIA") decision to withhold Annual Funding Agreement ("AFA") funds in violation of the provisions of the Indian Self-Determination and Education Assistance Act ("ISDEAA"), which places strict procedural and substantive limitations on agency discretion to decline contracts. The Court held that BIA's failure to properly decline was "arbitrary and capricious" and remanded to the BIA for further proceedings to approve or decline APIA's request for funds after applying the appropriate statutes and regulations. Memorandum Opinion and Order dated February 11, 2008 ("Mem. Op.") at 17. The Court held APIA's ISDEAA claims in abeyance. Mem. Op. at 1, 17 and 18.

Defendants and APIA agree that the dispute now involves three fiscal years, 2006-2008, and that changed circumstances, some anticipated and some not, mean that different considerations apply to the resolution of each year's funding. *See* Defendants' Report to the Court and Opposition to Plaintiff's Motion for Partial Reconsideration ("Def. Opp.") at 1. We disagree about what should be done, but it is clear that remand as presently structured will not resolve all issues.[1]

Defendants argue that funds for FY 2006 are no longer available and APIA is without remedy. Not true. FY 2006 funding was approved as a matter of law upon BIA's failure to comply with its regulations. *See Cheyenne River Sioux Tribe v. Kempthorne*, 496 F. Supp. 2d 1059 (D.S.D. 2007) (BIA's failure to follow the declination procedures requires approval of the contract by operation of law). In this case the appropriate remedy for failure to award and fund

---

[1] We request that there be no remand for issues related to any of the three years. For different reasons, Defendants agree that remand is not an appropriate remedy with regard to 2006 funding, suggesting that the Court "remove" the subject from the remand order. Def. Opp. at 8.

the AFA under the ISDEAA is money damages.  *See Shoshone-Bannock v. Shalala*, 988 F. Supp.

1306, 1315 (D. Or. 1997).

Defendants report that FY 2007 funds were included in APIA's AFA, but claim that the

award should be regarded as "provisional," subject to declination on remand if the BIA applies

the declination criteria.  Def. Opp. at 9.  Not true.  The ISDEAA's strict time limit for declination

has clearly passed for FY 2007 and FY 2008 as well, and when the BIA failed to act within the

required time frame, the AFAs were deemed approved as proposed—i.e., including the ANCSA

funding.  In this circumstance remand is unnecessary and inappropriate because it would give the

BIA a second bite of the apple and render the strict procedural and substantive requirements of

the ISDEAA a nullity.  Thus, the Court should grant APIA's motion for reconsideration and rule

on APIA's FY 2006-2008 ISDEAA claims.  If, as we contend, the AFAs were approved by

operation of law, remanding to the BIA to apply declination criteria will only cause further delay

in achieving final resolution of the dispute.

We first review the current status of APIA Compact and AFAs discussed in Defendants'

Memo, before we turn to consideration of the appropriate remedy for resolution of pending

claims for funding each year, FY 2006-2008.

## CURRENT STATUS OF APIA ANNUAL FUNDING AGREEMENTS

Defendants' opposition to APIA's motion for reconsideration and their current position

regarding the status of the Court's remand are based on certain factual assumptions about the

disposition of relevant ANCSA funds and the activities carried out by APIA in the ANCSA

program.  Defendants acknowledge that the FY 2006 appropriation at issue did not lapse, but

was "obligated to others to save it from lapse."  Def. Opp. at 7.  Apparently the BIA's ANCSA

Program Manager diverted the funds to fund other projects "related" to the ANCSA § 14(h)(1)

land conveyance process in the Aleut Region. See Def. Ex. 6, ¶ 2 (Declaration of Kenneth L. Pratt). Defendants suggest that APIA has not suffered harm as a result of this because it benefited from the program funds diverted to these "related" ANSCA purposes, or because it has not shown that it performed ANCSA activities with its own funds and thus incurred expenses related to the program. Def. Opp. at 7-8. In addition, Defendants have also revealed that the BIA has made the "surprising discovery" that it actually awarded FY 2007 funds in the amount of $73,379 in APIA's 2007 AFA, Def. Opp. at 3, and speculate that these funds remain in APIA's account "or may have been spent on something other than ANCSA § 14(h)(1) related work." *Id.* at 4.

The funding landscape is different than that suggested by the Defendants, and the actual history shows that APIA has acted responsibly to continue carrying out ANCSA § 14(h)(1) activities even after the BIA deleted funding for FY 2006.

The funding at issue in this dispute, authorized by ANCSA § 14(h)(1), has been administered by APIA's Cultural Heritage Department, which carries out programs and services consistent with the Department of the Interior's mission and with the purpose of the funding as described in the BIA "Greenbooks," the budget justification documents the BIA produces each year that describe the agency's funding categories and the intended purposes of those funds. *See* Pl. Ex. P, Declaration of Dimitri Philemonof ("Philemonof Decl.") ¶ 4.

In the ten years prior to FY 2006, when for the first time the BIA and the Office of Self-Governance ("OSG") refused to include the ANCSA funds in APIA's funding agreement, APIA annually received funding in the amount of $73,379.[2] Despite the loss of funds due to BIA's

---

[2] APIA also received, or should have received, contract support costs on this sum each year, in accordance with section 106(a) of the ISDEAA. 25 U.S.C. § 450j-1(a). For example, in FY 2006, APIA's approved indirect cost rate was 37.7 %. Had the BIA and OSG included the ANCSA funding of $73,379,

improper declination, APIA's Cultural Heritage Department has continued to conduct activities and provide services that directly advance the Section 14(h)(1) process of investigating, evaluating, and recording information on cemetery and historical sites of significance to the Aleut people. For example, the Department develops and maintains the Aleutian Archeological Database, verifies location data, and tracks land status as 14(h)(1) claims proceed. *Id.* ¶ 7.

All of these activities continued in FY 2006 despite the BIA's revocation of funds. *Id.* To replace the lost BIA funding, the Cultural Heritage Department has been forced to seek and obtain funding from other sources, including APIA's own funds and those of its member Tribes. For the past three years APIA has allocated approximately $100,000 of its own funds to the Cultural Heritage Department to partially replace funding formerly provided by the BIA. An additional $95,000 has been raised through donations from APIA's member Tribes and other tribal entities in the region. *Id.* ¶ 9.

APIA's Cultural Heritage Department continues to provide programs and services, including those related to the ANCSA 14(h)(1) program, even though BIA and OSG have again refused to disburse the ANCSA funds in APIA's FY 2008 AFA. *Id.* ¶ 12; Def. Ex. 5 at 3 n.11.

Defendants assert that FY 2006 ANCSA 14(h)(1) funds were diverted to ANSCA related projects to avoid lapse of appropriation. However, so far as APIA is aware, these funds were not expended on the section 14(h)(1) activities that APIA carried out in FY 2006-2007 Philemonof Decl. ¶ 8. APIA is able to confirm the Defendants' statement that in FY 2007, BIA and OSG transferred to APIA $73,379 for the section 14(h)(1) program. *Id.* ¶ 10.

Defendants submit an affidavit by Kenneth Pratt who asserts that APIA did not carry out any Section 14(h)(1) functions in FY 2007. Def. Ex. 6 ¶ 4. Mr. Pratt is mistaken. Initially, it is

---

APIA would have been entitled to recover an additional $26,238 for indirect costs, based on application of the approved rate to the ANCSA amount. Philemonof Decl. ¶ 6.

worth noting that **no one** from BIA, OSG or BLM (including Mr. Pratt) contacted APIA during the year to inquire if APIA had received the funds or used them to carry out section 14(h)(1) related activities.  If they had contacted APIA they would have learned that in fact APIA carried out section 14(h)(1) activities from FY 2006 to the present, primarily using funds raised from other sources.  Philemonof Decl. ¶¶ 9-12.

BIA provided ANCSA funding in the 2007 AFA,[3] and APIA has expended a portion of those funds on 14(h)(1) activities, but out of caution has reserved funds adequate to pay back if necessary as a result of this case.  *Id.* ¶ 11.

BIA has not provided any ANCSA funding to APIA for FY 2008.  Although there is a placeholder in the reprogramming request indicating BIA owes $73,379, it is accompanied by a footnote stating that distribution of the funds "is pending final decision on APIA's appeal."  In fact, APIA has not received these funds.  Philemonof Decl. ¶ 12.[4]

## ARGUMENT

### I.    Summary of Argument.

Remand is not appropriate with respect to the retrospective relief APIA seeks—that is, for funding of contract years already past or currently under way.  APIA believes that the proper remedy is for the Court to address APIA's claims held in abeyance, and 1) award damages for APIA's AFA for FY 2006, and 2) confirm its legal right to retain the funds for FYs 2007 and 2008 that were included in APIA's AFAs.  Finally, the Court should enjoin the Secretary from

---

[3] The BIA did not increase funding for APIA's indirect costs associated with the "provisional" award of the FY 2007 ANCSA funds.  Philemonof Decl. ¶ 10.  If the Court rules that APIA is entitled to retain these funds, Section 106 of the ISDEAA requires that BIA "shall add" to that amount reasonable contract support costs, including indirect costs.

[4] Nor did the BIA include any indirect cost funding for the ANCSA activities.  *Id.* ¶ 12.  As with the 2007 funds, if the Court decides APIA is entitled to retain the FY 2008 ANCSA funds, Section 106 of the ISDEAA requires that BIA also pay contract support costs on that amount.

withholding the ANCSA funds, or any others, from APIA's AFA for FY 2009 or thereafter, until

such time as the Secretary, following the declination procedures prescribed by the ISDEAA and

Department regulations, meets his burden to clearly establish the validity of the grounds for

declining the proposal or any portion thereof.

The Court decided the parties' Cross-Motions for Summary Judgment on the question

whether the BIA is obligated to apply the declination criteria and related regulations to APIA's

funding request, holding that "the BIA's decision not to apply its Declination Criteria and other

applicable regulations to APIA's request [for funding] was arbitrary and capricious." Mem. Op.

at 17. The consequences of this failure are spelled out in the regulations, have been affirmed by

case law directly on point, and are irremediable. APIA submits that remand is inconsistent with

the Court's other rulings on the merits and may subject APIA to significant additional harm if the

BIA is not ordered to award and fund APIA's AFAs consistent with the requirements of the

ISDEAA.

**II.      The Appropriate Remedy is for the Court to Rule on APIA's ISDEAA Claims**

     **A.      *APIA's Claim for 2006 Funds.***

That funds from BIA's appropriation for FY 2006 are no longer available comes as no

surprise. As summarized in Plaintiff APIA's Memorandum of Points and Authorities in Support

of Motion for Partial Reconsideration ("Pl. Memo") at 8, note 6:

> Ultimately, it may be that for FY 2006 and FY 2007, the only available
> remedy is damages. *See Shoshone-Bannock*, 988 F. Supp. 1306, 1315 (D. Or.
> 1997) (if appropriation has lapsed, remedy for failure to award AFA under
> ISDEAA is money damages). The BIA's appropriation for FY 2006 has lapsed,
> as the BIA itself has acknowledged. *See* Dep't of the Interior, Environment, and
> Related Agencies Appropriations Act, 2006, Pub. L. No. 109-54, 119 Stat. 499,
> 513 (Aug. 2, 2005) (appropriating funds for BIA "to remain available until
> September 30, 2007); Defendants' Reply in Support of Partial Motion to Dismiss
> and Cross Motion for Summary Judgment at 18 n.7 (Aug. 6, 2007) (stating that
> "funding for FY 2006 remains available during a window closing at the end of the

current Fiscal Year on September 30, 2007"). Thus the agency cannot provide any relief even if it decides in APIA's favor, an additional compelling reason not to remand.

Section 110 of the ISDEAA, which was specifically incorporated into APIA's complaint, makes it clear that this court has the authority to grant "appropriate relief, including money damages." 25 U.S.C. § 450m-1(a); *see also* Complaint, ¶ 51 (Prayer for Relief); Plaintiff's Motion for Summary Judgment, ¶¶ 2-5, 7-8; and Plaintiff's Memorandum of Points and Authorities in Support of Motion for Summary Judgment at 15-22; Plaintiff's Opposition to Defendants' Motion to Dismiss and Cross-Motion for Summary Judgment and Plaintiff's Reply to Defendants' Opposition to Plaintiff's Motion for Summary Judgment at 12, 19 n.20. Defendants acknowledge that BIA did not follow proper declination procedure for 2006, and that, based on the reasoning in *Cheyenne River Sioux Tribe v. Kempthorne*, 496 F. Supp. 2d 1059 (D.S.D. 2007), APIA would be entitled to the $73,379 withheld. Defendants argue, however, that those funds are no longer available, because of either 1) the expiration of the Congressional appropriation, or 2) the fact that BIA diverted the funds to "other program related activities." Def. Opp. at 6. However, it is clear that unavailability of the appropriated funds does not affect APIA's claim for damages under the ISDEAA, the very claims the Court has held in abeyance in the remand order. Because the remedy of damages is within this court's authority, the FY 2006 claim is not moot, as Defendants argue, and should be decided by the Court.

First, Defendants cite *City of Houston v. HUD*, 24 F.3d 1421 (D.C. Cir. 1994) and *Ramah Navajo Sch. Bd., Inc. v. Babbitt*, 87 F.3d 1338 (D.C. Cir. 1996), for the proposition that "lapsed" appropriations are not available for award in circumstances like this.[5] Those cases provide a

---

[5] In fact, Defendants acknowledge that the appropriation at issue did not lapse, but was "obligated to others to save it from lapse." Def. Opp. at 7. Apparently the BIA's ANSCA Program Manager diverted the funds to fund other projects "related" to the ANCSA § 14(h)(1) land conveyance process in the Aleut Region. See Def. Opp. Ex. 6 ¶ 2 (Declaration of Kenneth L. Pratt). Whatever the merits of those projects

- 7 -

statement of federal appropriations law, but they have no relevance to APIA's ISDEAA claims. Both cases sought injunctive relief only—namely, payment of specific funds from a given appropriation. In *City of Houston*, the City sued under the Administrative Procedure Act, which does not allow recovery of damages. Once the appropriation lapsed, the City's only form of relief vanished. In *Ramah Navajo*, the Tribe sought to enjoin the distribution of a given appropriation in accordance with the Secretary of Health and Human Services' policy that the Tribe believed (and the court held) violated the ISDEAA. Although damages were available to the Tribe under the ISDEAA, the Tribe sought injunctive, prospective relief because it challenged an ongoing agency policy, not just its own funding level for the fiscal year.

In this case, the unavailability of funds from the FY 2006 appropriation does not limit BIA's liability for damages under ISDEAA, which expressly authorizes an award of damages for violation of the Act. 25 U.S.C. § 450m-1(a). Defendants do not cite or discuss *Shoshone-Bannock v. Shalala*, 988 F. Supp. 1306, 1315 (D. Or. 1997), which holds that in an ISDEAA declination case where the appropriation has lapsed, the remedy for an agency's failure to award and fully fund an AFA is money damages. Section 450m-1(a) of the ISDEAA grants district courts "original jurisdiction" over "civil actions," with authority to not only to enjoin or compel agency action, but to "order appropriate relief including money damages." The court in *Shoshone-Bannock v. Shalala* noted that this provision affords tribes alternate remedies for violation of ISDEAA:

> A tribe generally will seek an order to force an agency to enter into and fund a self-determination contract. However, in some situations, an order to reverse, enjoin, or compel certain agency action may be insufficient. For example, when an appropriation has lapsed or is not sufficient, the appropriate remedy will be money damages rather than injunctive relief. Potential damages also may include interest on a loan obtained by a tribe to fund a program pending the

---

and their relation to the § 14(h)(1) process in broad prospect, they are not a substitute for the APIA's continuing 14(h)(1) program as included in APIA's AFAs the past several years.

> receipt of funding. Congress' specific authorization of money damages signals
> that tribes may hold the Secretary accountable for injuries caused by her
> violations of the ISDEA[A] and are not merely limited to equitable relief under
> the APA.

*Id*. at 1315 (footnote omitted).[6]  Because this Court may award damages for BIA's violation of

the ISDEAA in FY 2006, APIA's claim is not moot, as Defendants assert, and this Court should

rule on the claim.

Defendants do not discuss *Shoshone-Bannock v. Shalala*, or this Court's clear authority to

award money damages for BIA's failure to award or properly decline FY 2006 funding, yet they

do suggest that APIA has not suffered practical harm because either 1) it benefited from the

program funds diverted to other ANSCA purposes, or 2) it has not shown that it performed AFA

activities with its own funds and thus incurred expenses related to the program. Def. Opp., at 7-8.

In fact, so far as APIA is aware, these funds were not expended on the section 14(h)(1) activities

that APIA carried out in FY 2006. *See* Philemonof Decl. ¶ 8.  Defendants have provided no

evidence that the funds were used for the purposes authorized in APIA's AFA.  Moreover, APIA

continued its § 14(h)(1) activities since FY 2006 despite the BIA's revocation of funds.  *Id*. ¶ 7.

To replace the lost BIA funding, the Cultural Heritage Department has been forced to seek and

obtain funding from other sources, including APIA's own funds and those of its member Tribes.

For the past three years APIA has allocated approximately $100,000 of its own funds to the

Cultural Heritage Department to partially replace funding formerly provided by the BIA.  An

additional $95,000 has been raised through donations from APIA's member Tribes and other

tribal entities in the region. *Id*. ¶ 9.

The fact remains that APIA did not receive the funds it was entitled to under its AFA.

The BIA withheld those funds in violation of the ISDEAA. The Court has authority to consider

---

[6] The court also notes that: "[i]t is noteworthy that § 450m-1 does not specifically authorize the court to remand back to the Secretary." 988 F.Supp. at 1315, n.5.

APIA's ISDEAA claims on the merits and award damages in lieu of the appropriated funds no longer available. Thus, it is appropriate for the Court to reconsider its order of remand and address APIA's claims that are now held in abeyance.[7]

**B.      *APIA's Claim for 2007 Funds.***

The BIA transferred FY 2007 funds in the amount of $73,379 in APIA's 2007 AFA. Defendants argue that this award should be regarded as "provisional" and subject to potential future declination based on a decision the BIA might make pursuant to the Court's remand order. This argument has a number of problems.[8]

First, the BIA can point to no evidence that the parties understood or intended this transfer of funds to be "provisional." Moreover, there is no authority in the ISDEAA or implementing regulations for the BIA to unilaterally deem a transfer of funds under a compact "provisional." Further, as Mr. Philemonoff's declaration indicates, APIA carried out its responsibilities related to the section 14(h) program in FY 2007. The BIA's novel theory that it can retroactively withdraw funds from a mutually negotiated agreement with a tribal contractor because they were awarded on a "provisional" basis—after the fiscal year has lapsed—is not supported by the statute or its implementing regulations and should be rejected.

Second, the time has long passed for BIA to make a declination decision regarding APIA's 2007 funding. The BIA did not follow proper declination procedure for 2007, and, based on the reasoning in *Cheyenne River Sioux Tribe v. Kempthorne*, the BIA's failure to follow the declination procedures requires approval of the contract by operation of law, thus entitling APIA

---

[7] Defendants effectively reach the same conclusion that remand is not an appropriate remedy with regard to 2006 funding, suggesting that the Court "remove" the subject from the remand order. Def. Opp. at 8.

[8] APIA of course agrees with Defendants that it is not entitled to a "double recovery" of FY 2007 ANCSA funds, Def. Opp. at 10. Now that it has been established that the funds were included in the FY 2007 AFA, APIA asks the Court affirm APIA's right to retain those funds and be paid associated indirect costs.

to the $73,379 actually included in the AFA (plus indirect costs associated with that sum).  There is no basis in the ISDEAA for the BIA to obtain a second chance to make a declination decision.  The BIA has proceeded on the erroneous assumption that it did not have to apply the declination criteria and other ISDEAA regulations to APIA's funding request, an assumption this Court has held "arbitrary and capricious."  Mem. Op. at 17.  The consequences of this failure are spelled out in the regulations and have been affirmed by case law directly on point.  Thus, the Court should grant APIA's motion for reconsideration and address APIA's ISDEAA claims, and affirm its right to retain the funds that have been provided in the 2007 AFA.

      C.     *APIA's Claim for 2008 Funds.*

      The same reasoning that applies to the FY 2007 claim applies to the FY 2008 funds.  We are almost six months into the fiscal year, well beyond the BIA's 90-day window for reviewing APIA's proposal under the statutory declination criteria and timeline.  Remanding would allow the agency to escape its failure to decline APIA's proposal to award funds in 2008 that the BIA awarded in 2007 in violation of the law with no consequences.  Moreover, as reflected in Mr. Philomonoff's affidavit, APIA has been carrying out these activities despite the BIA's failure to transfer funds.  Philemonof Decl. ¶¶ 9-12.

      Finally, remanding to give the BIA a second bite of the apple at this juncture of the fiscal year would needlessly and inappropriately extend the period of uncertainty surrounding the funding for this fiscal year.  APIA is certainly open to discussions of a "creative" resolution to the section 14(h)(1) issue moving forward in FY 2009 and beyond.  Def. Opp. at 11 n.2.  Those discussions will take place over the upcoming months in connection with APIA's proposal to renew its FY 2009 FA.  If, at the end of those discussions, BIA continues to believe that the funds cannot be transferred to the Tribe lawfully, then the agency will have the option at that

point to follow the statutory and regulatory provisions that the BIA has to date chosen to ignore to issue a proper declination.  But the agency's suggestion that these discussions should take place now for FY 2008, after six months have passed during which APIA carried out 14(h)(1) activities, after the Agency has failed to follow the declination procedures mandated by the statute and regulations, and after the decision on the FY 2008 funding has already been made by operation of law, is not appropriate.

In sum, this court can, and should, rule that the FY 2008 funding, like that for FY 2007, should rightfully be paid to APIA.

## CONCLUSION

This case involves three funding years, and we believe remand will result in further delays in resolving the issues in dispute.   The BIA's acknowledged failure to make proper declination decisions renders APIA's requests approved by operation of law, a conclusion directly supported by the *Cheyenne River Sioux* case.

APIA respectfully requests that the Court grant its request for partial reconsideration and modify its Memorandum Opinion and Order to find that APIA's funding requests for FYs 2006-2008, where the BIA has not made proper declinations, were approved by operation of law consistent with the requirements of the ISDEAA.

We respectfully request that the Court issue an order that addresses APIA's claims that have been held in abeyance, and: 1) award damages for APIA's AFA for FY 2006 in the amount of $73,379 for the ANCSA funds that the BIA should have transferred to APIA, indirect costs that APIA would have been paid associated with these program funds, and interest thereon; 2) confirm APIA's legal right to retain the funds for FY 2007 that were included in APIA's AFA and direct BIA to pay APIA indirect costs associated with these program funds; and 3) order the

BIA to transfer to APIA the FY 2008 ANCSA funds now being withheld and indirect costs that

APIA is entitled to be paid associated with these program funds.  Finally, the Court should enjoin

the Secretary from withholding the ANCSA funds, or any others, from APIA's AFA for FY 2009

or thereafter, until such time as the Secretary, following the declination procedures prescribed by

the ISDEAA and Department regulations, meets his burden to clearly establish the validity of the

grounds for declining the proposal or any portion thereof.

Respectfully Submitted,


_____/s/_____
F. Michael Willis (D.C. Bar No. 467462)
Geoffrey D. Strommer
HOBBS, STRAUS, DEAN & WALKER, LLP

Attorneys for the Aleutian Pribilof Islands
Association


DATED: March 14, 2008.

## DECLARATION OF DIMITRI PHILEMONOF

Dimitri Philemonof hereby deposes and states:

1. My name is Dimitri Philemonof. I am over 18 years of age. I am making this declaration on behalf of the Aleutian Pribilof Islands Association's (APIA's) Motion for Partial Reconsideration. I am fully competent to make this declaration. I have personal knowledge of the facts stated herein, and, if called to do so, could and would competently testify to the facts set forth herein. To my knowledge, all of the facts stated in this declaration are true and correct.

2. I am the President and Chief Executive Officer of APIA, positions in which I have served since 1984. In that capacity, I am charged with ensuring that APIA carries out its mission to promote the self-sufficiency and independence of the Unangax (Aleut) people and their communities by providing health care, economic development, technical assistance, and cultural resource preservation. APIA undertakes these activities on behalf of, and with the authorization of, thirteen federally recognized Aleut Tribal Governments in the region.

3. Central to APIA's mission is its Cultural Heritage Department. This Department administers programs and provides services dedicated to preserving and advancing the Aleut culture and language for the present and future benefit of the Aleut people and the Tribal Governments representing them.

4 Prior to FY 2006, the funding at issue in this dispute, authorized by Section 14(h)(1) of the Alaska Native Claims Settlement Act (ANCSA), was administered by APIA's Cultural Heritage Department to carry out programs and services consistent with the Department's mission and with the purpose of the funding as described in the Bureau

of Indian Affairs (BIA) "Greenbooks," the budget justification documents the BIA

produces each year that describe the agency's funding categories and the intended

purposes of those funds.

     5. In FY 2006, APIA proposed, as it had for the previous ten years, to include in

its funding agreement ANCSA 14(h)(1) funding, in the amount of $73,379. The BIA and

the Office of Self-Governance (OSG), however, refused to include the ANCSA funds in

APIA's funding agreement, as it had done for the previous ten years.

     6. In FY 2006, APIA's approved indirect cost rate was 37.7%. Had the BIA and

OSG included the ANCSA funding of $73,379, APIA would have been entitled to

recover an additional $26,238 for indirect costs, based on application of the approved rate

to the ANCSA amount.

     7. APIA's Cultural Heritage Department carries out programs, services and

activities related to the preservation and growth of Aleut culture. With non-ANCSA

funds, the Department coordinates repatriation of remains and artifacts, conducts culture

camps and language programs, and maintains the Aleut Heritage Library and Archive.

Despite the loss of the ANCSA funds due to the BIA's improper declination, the

Department has also continued to conduct activities and provide services that directly

advance the Section 14(h)(1) process of investigating, evaluating, and recording

information on cemetery and historical sites of significance to the Aleut people. For

example, the Department develops and maintains the Aleutian Archeological Database,

verifies location data, and tracks land status as 14(h)(1) claims proceed. In addition, the

Department maintains ANCSA 14(h)(1) files and provides data and information upon

request. All of these activities continued in FY 2006 despite the BIA's revocation of funds; and they remain ongoing in FY 2007 – 2008.

8. We have been told that the FY 2006 ANCSA 14(h)(1) funds were transferred to The Aleut Corporation to develop its ANCSA Site Management Plan. We do not know if these funds were expended on the section 14(h)(1) activities that APIA carried out in FY 2006-2007.

9. To replace the lost BIA funding, the Cultural Heritage Department has been forced to seek and obtain funding from other sources, including APIA's own funds and those of its member Tribes. For the past three years APIA has allocated approximately $100,000 of its own funds to the Cultural Heritage Department to partially replace funding formerly provided by the BIA. An additional $95,000 has been raised through donations from APIA's member Tribes and other tribal entities in the region.

10. In FY 2007, BIA and OSG transferred to APIA $73,379 for the section 14(h) program, a fact I was not aware of until the Government pointed it out in its filing of March 7, 2008. Tribal Priority Allocation funding, including the ANCSA funds, is paid as part of a cumulative line item. Especially when the funds are paid out in increments pursuant to a series of Continuing Resolutions, as they were in FY 2007, it is difficult to tell how much is being paid for each item. No one from BIA, OSG or BLM contacted APIA during the year to inquire if we had received the funds and if we were carrying out section 14(h)(1) related activities. As set forth above, APIA did carry out section 14(h)(1) activities during this period using funds raised from other sources. Despite the fact that the BIA added $73,379 in ANCSA base funding, the BIA did not add any

indirect cost funding to support that base amount. APIA's 2007 negotiated indirect cost rate was 38.8%.

11. APIA recognizes that, depending on the court's ruling, the FY 2007 ANCSA funds may need to be returned to BIA, and APIA has funds available to return if necessary.

12. In FY 2008, BIA and OSG have again refused to distribute the ANCSA funds in APIA's funding agreement, and no such funding has been provided in this fiscal year. Nonetheless, APIA's Cultural Heritage Department continues to provide programs and services, including those related to the ANCSA 14(h)(1) program, as described above. In addition no indirect costs have been included on this amount. Our indirect rate for FY 2008 is 59.1%.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 13 day of March , 2008.

Dimitri Philemonof