UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ALEUTIAN PRIBILOF ISLANDS** )<br>**ASSOCIATION, INC.** )<br>     )<br>PLAINTIFF, )<br>     )<br>v.     ) <br>     )<br>**DIRK KEMPTHORNE**, in his official capacity as )<br>Secretary of the Interior, U.S. Department of the )<br>Interior, et al.,     )<br>     )<br>DEFENDANTS.     )<br>     ) | Civ. No. 06-2173 (CKK) |

## JOINT STATUS REPORT

In its Memorandum Opinion and accompanying Order of February 11, 2008, this Court stayed the above-captioned case until the Bureau of Indian Affairs ("BIA"), acting for Defendant Secretary Kempthorne, issued a decision on the request of the Plaintiff Aleutian Pribilof Islands Association ("APIA") to include in its funding agreements ("FAs") funds to carry out activities authorized by Section 14(h)(1) of the Alaska Native Claims Settlement Act ("ANCSA"). Mem. Op. [Docket #29] at 18. The BIA issued its decision, a copy of which is attached to this report as Plaintiff's Exhibit P, on May 14, 2008.

The Court further directed the parties to file a Joint Status Report within 7 business days after the BIA issued a decision, indicating how the parties want to proceed, including a proposed briefing schedule, if necessary. *Id*.; Order [Docket #35]. The Court noted in its Memorandum Opinion of March 14, 2008 that "[i]f outstanding issues remain following the BIA's decision, an expedited briefing schedule and an expedited decision by the Court may be appropriate." Mem. Op. [Docket # 36] at 3 n.1.

In its decision, the BIA has declined to award APIA any 14(h)(1) funding for FYs 2006, 2007, or 2008. APIA continues to believe it was, and is, entitled by law to assume 14(h)(1) activities and associated funding under the ISDEAA. Accordingly, outstanding issues remain and an expedited briefing schedule is necessary to allow the Court to decide these issues in advance of final negotiations on the FY 2009 FA.

The parties propose the following briefing schedule:

- June 10, 2008: APIA files brief responding to May 14 declination.
- June 24, 2008: Defendants file response.
- July 1, 2008: APIA files reply.

Respectfully Submitted,

/s/
F. Michael Willis, D.C. Bar # 467462
Geoffrey D. Strommer
HOBBS, STRAUS, DEAN & WALKER, LLP
(202) 822-8282

Attorneys for the Aleutian Pribilof Islands Association

/s/
Jeffrey A. Taylor, D.C. Bar # 498610
United States Attorney

/s/
Rudolph Contreras, D.C. Bar # 434122
Assistant United States Attorney

                     /s/
_____
Marian L. Borum, D.C. Bar # 435409
Assistant United States Attorney
555 Fourth Street, N.W., Civil Division
Washington, D.C. 20530
(202) 514-6531
Counsel for Defendant

DATED: May 21, 2008.

- 3 -



# UNITED STATES DEPARTMENT OF THE INTERIOR
Bureau of Indian Affairs
Alaska Region
3601 C Street, Suite 1100
Anchorage, AK 99503

## FACSIMILE TRANSMITTAL SHEET

TO:
  Dimitri Phelemonof, President/CEO

FROM:
  Margaret Calabaza, Staff Assistant for
  Niles Cesar, Regional Director – Alaska Region

FAX NO.
  907-279-4351

COMPANY:
  Aleutian Pribilof Islands Association

DATE:
  May 14, 2008

SENDER'S PHONE NO.
  (907) 271-1536

NOTES/COMMENTS:

Original will be sent in the mail.

Have a great day! ☺

NOTE: The information contained in the following facsimile message is privileged and confidential information intended for the use of the individual or entity named on this cover sheet. If the reader of this message is not the intended recipient, or the employee/agent responsible to deliver it to the intended receipt, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify sender immediately via telephone and destroy said documents received in error.

Thank you.



UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
Alaska Regional Office
Federal Building
709 W. 9th – Third Floor
Juneau, Alaska 99801

IN REPLY REFER TO:
**Office of the Regional Director**

May 14, 2008

<u>VIA FACSIMILE TO: 279-4351</u>

Dimitri Philemonof, President/CEO
Aleutian Pribilof Islands Association, Inc.
1131 East International Airport Road
Anchorage, Alaska 99518-1408

Dear Mr. Philemonof:

  **Subject: Partial declination of FY 2006, 2007 and 2008 Annual Funding Agreements
(AFAs) under the Office of Self-Governance Compact OSG T811**

  This is our decision concerning the portion of the funding which the Aleutian Pribilof Islands Association, Inc. (APIA) expected to receive to operate a program funded by Congress to carry out activities needed for completion of the Alaska Native Claims Settlement Act (ANCSA) § 14(h)(1) conveyance program. I need not repeat here in detail the long history of the disagreement between our agencies over this problem. This decision is being issued in compliance with United States District Judge Kollar-Kotelly's February 11, 2008, Memorandum of Opinion, in which she directed the Bureau to "decide, in the first instance, whether to approve or decline APIA's request for Section 14(h)(1) funds, after applying the appropriate statutes and regulations." Id. at 17.

<u>Background of past inclusion of ANSCA § 14(h)(1) funds in prior APIA AFAs</u>

  The Bureau of Indian Affairs (BIA) and Office of Self-Governance (OSG) have had an ongoing contractual relationship with the APIA for a number of years, entered into first under authority of Title I of the Indian Self-Determination and Education Assistance Act (ISDEAA), 25 U.S.C. § 450 *et seq.*, and later continued under authority of Title IV of that legislation, often referred to as Tribal Self-Governance, 25 U.S.C. § 458aa *et seq.*. Because APIA is not itself a federally recognized Indian tribe, its right to contract with the federal government to carry out Indian programs has always rested upon the requests of village-based tribal governments that such contracts be awarded to APIA, in accordance with 25 U.S.C. § 450f(a). Requests have been submitted to the BIA from various village-based tribes in the Aleut Region of Alaska, designating APIA as the tribal organization with which they desire that the BIA (and more recently the OSG) to contract on their behalf. These tribal requests are not resubmitted annually, but are generally worded in such a way as to be open-ended requests encompassing in general language the full range of programs, functions, services and activities (PFSA's) eligible

1

to be included in a contract pursuant to the ISDEAA. Some of these still-operative tribal resolutions date back to at least the mid-1990s.

The sole explicit purpose of the ANCSA § 14(h)(1) program is to provide authority for the conveyance "to the appropriate Regional Corporation [of] fee title to existing cemetery sites and historical places." 43 U.S.C. § 1614(h)(1). The Secretary of the Interior, in carrying out that task adopted regulations in 1973, amended in 1976, to specify the procedures to be implemented. See 43 C.F.R. Part 2653 generally, and subsections 2653.5 and 2653.11 in particular. Both the BIA and the Bureau of Land Management (BLM) had assigned tasks in processing the Regional Corporation applications. The portions of the ANCSA § 14(h)(1) program which was assigned to be carried out by the BIA involve investigating, identifying, locating, evaluating, and ultimately certifying the legal sufficiency of the sites selected, as a prerequisite for conveyance by the BLM. See 43 C.F.R. subsections 2653.5(h) through (l). BIA's operation got up and running in the mid-1970s, after ANCSA Regional Corporations had nominated sites for conveyance under that provision of the 1971 Settlement Act. During the first couple decades that Congress appropriated funds for PFSA's relating to the ANCSA § 14(h)(1) program, those funds were not automatically included in APIA's Title I contracts or Self-Governance AFAs, but were retained by the BIA to fund performance by the BIA of the tasks assigned to it in the regulations.

Unfortunately, in the latter part of the 1990s, through inadvertence, the funds annually appropriated by Congress for the BIA's performance of its ANCSA § 14(h)(1) PFSAs were recategorized as being part of tribes' base funding, to be automatically made available for contracting pursuant to ISDEAA Title I or Tribal Self-Governance agreements. This action was apparently based on the mistaken belief that all ANCSA § 14(h)(1) conveyance-related tasks for which the BIA was responsible had been completed. That assessment was incorrect. A large number of nominated sites still have BIA certification-related work to be completed. It was soon, although belatedly, recognized that automatic transfer of ANCSA § 14(h)(1) funds to contractors such as APIA could be problematic, insofar as there might not be any assurance that they would use the funding to complete the tasks for which the funds were intended by Congress to be spent (i.e, completion of conveyance -related work).

At the time that ANCSA § 14(h)(1) funds started to be included among the funds transferred to APIA and other contracting tribes, tribal organizations, and consortia, there was no notification of the change provided to the individual village-based tribes which by their prior ISDEAA § 102(a) resolutions had authorized APIA and others to contract for BIA programs. Understandably, therefore, the villages did not take any action to modify existing resolutions, either to expressly authorize groups like APIA to undertake the ANCSA § 14(h)(1) program on their behalf, or to exclude that program from their general contracting authorizations. Even to this date, BIA has not seen evidence to indicate whether the villages understand that APIA has been administering the ANCSA § 14(h)(1) program on their behalf, or whether they approve of such an arrangement. The Bureau is aware that at various stages of the past litigation of this matter, APIA has made claims that it is insisting upon continued receipt of the ANCSA §

14(h)(1) funding as an assertion of the villages' statutory rights, but the villages themselves have never been heard from directly. BIA has also received second-hand reports from The Aleut Corporation to the effect that villages they have contacted in fact support The Aleut Corporation's receipt of these funds, as opposed to APIA's. Of course, the BIA cannot base any actions with regard to the 2006 APIA AFA on such reports, but if new ISDEAA § 102(a) resolutions on the subject are submitted by village-based tribes, they will of course be given due consideration.

To deal with perceived concern about whether APIA would in fact utilize ANCSA § 14(h)(1) funds added to its AFAs to complete needed conveyance-related tasks, an agreement was worked out between APIA and The Aleut Corporation, the Native Regional Corporation which made the land selections being processed by the Department of the Interior. That August 7, 1998 memorandum of Agreement laid out a structure and process whereby The Aleut Corporation could be assured that BIA-provided federal funds would be used in furtherance of the completion of the conveyance process, and it further provided that the work-products generated by APIA staff employed using BIA ANCSA § 14(h)(1) funds would belong to The Aleut Corporation. Although the working relationship sought to be established by that agreement has obviously broken down, the BIA continues to regard the 1998 MOA as relevant, insofar as it signifies APIA recognition of The Aleut Corporation's primary proprietary interest in completion of the conveyance process.

It is noted in passing that Section 7 of the agreement provided for utilization of an arbitration-like non-litigation dispute-resolution process. So far as BIA is aware, that process was not formally pursued, but neither did either party to the agreement exercise its agreement termination rights. Instead, when The Aleut Corporation became dissatisfied with APIA's performance, it decided to submit its own ISDEAA § 102(a) resolution to the BIA, and request that it instead of APIA be recognized as the entity eligible to contract the ANCSA § 14(h)(1) program.

<u>BIA handling of the Aleut Region ANCSA § 14(h)(1) funds beginning with the FY 2006 AFA</u>

As already described, the ANCSA § 14(h)(1) funding for the Aleut Region had been included in APIA's AFAs for several years prior to, and including, FY 2005. When The Aleut Corporation submitted its own ISDEAA § 102(a) resolution, dated May 20, 2005, requesting on its own behalf to contract for the ANCSA § 14(h)(1) program for FY 2006, the BIA was confronted with a dilemma. APIA expected to receive the same amount of funding, to carry out the same sorts of activities, that it had received in immediate past years. The Aleut Corporation, like the village-based federally recognized tribes, was also entitled to submit such a resolution, as a matter of statutory definition. See ISDEAA § 450b(e), including ANCSA corporations like The Aleut Corporation in the definition of Indian tribe. The BIA obviously did not have the means to double-fund the program. Therefore, it was necessary to determine which entity should receive the funding.

At the time, in 2005, the BIA obviously made the determination that The Aleut Corporation had the superior claim to the funding, a decision which was made known to APIA at least verbally well before the new contract was to go into effect. However, APIA has long contended that the BIA had a duty to utilize a formal partial declination procedure if it was not going to continue providing the ANCSA § 14(h)(1) funds to the APIA. The Federal District Court, in remanding this matter for issuance of the present decision, has apparently agreed with this procedural proposition. Accordingly, the BIA is now providing this written partial declination decision to explain the basis for its action withholding the FY 2006 ANCSA § 14(h)(1) funding from APIA's FY 2006 AFA.

Partial Declination Decision

ISDEAA § 102(a)(2)(A)-(E) set forth five allowable grounds under which a tribal organization proposal to contract may be declined. The potentially relevant ones are (A), (C), and (D):

> (A) the service to be rendered to the Indian beneficiaries of the particular program or function will not be satisfactory;
>
> \* \* \* \*
>
> (C) the proposed project or function to be contracted for cannot be satisfactorily completed or maintained by the proposed contract;
>
> (D) the amount of funds proposed under the contract is in excess of the applicable funding level for the contract, as determined under section 106(a)[.]

Each of these will be discussed in turn.

(A) <u>Services will not be satisfactory</u>. At earlier stages in the administrative and judicial litigation, the BIA conceded that APIA's past performance in relation to the ANCSA § 14(h)(1) program had not been unsatisfactory. However, more recent events have undermined our confidence that APIA, if it continues to receive ANCSA § 14(h)(1) funding, will concentrate its efforts on the intended completion of conveyance-related work. Specifically, in connection with its March 14, 2008 Reply Brief Motion for Reconsideration, APIA asserts that it has performed ANCSA § 14(h)(1) activities during the three year period covered by this dispute. However, for such work to effectively advance the conveyance process, one would have expected APIA to have some interaction with the BIA, the BLM or The Aleut Corporation. None of these entities report any contact with APIA regarding such ANCSA § 14(h)(1) work at any point over these past three years, casting doubt on whether activities in furtherance of completion of the conveyance process have been accomplished. That observation notwithstanding, the BIA did not base its declination of APIA's 2006 proposal for continued receipt of § 14(h)(1) funding on that criterion.

4

In contrast, The Aleut Corporation is apparently dissatisfied with APIA's performance, since that was an apparent motivation for its decision to submit its own May 20, 2005 ISDEAA § 102(a) resolution requesting to contract the same PFSAs.

(C) <u>Function cannot be satisfactorily completed or maintained by the proposed contract.</u> This declination criterion would arguably be applicable, in light of the BIA's analysis as to what tribe is the beneficiary of the ANCSA § 14(h)(1) program. As you are no doubt aware, the BIA believes that ANCSA Regional Corporations, not the village-based tribes, are the intended beneficiaries of the program. All the statutory and regulatory provisions defining what the program is relate solely to the ANCSA land selection and conveyance process. Therefore, the BIA continues to believe that the village-based tribes, on whose resolutions APIA relies, are either (1) not beneficiaries eligible to contract the program at all, as Administrative Law Judge Sweitzer held in his August 31, 2006 Recommended Decision, or (2) beneficiaries who would be eligible to contract, but only in the absence of, of in conformity with, an ISDEAA § 102(a)(1) resolution submitted by an ANCSA Regional Corporation, such as in this case, The Aleut Corporation.

With respect to the proposition that village-based tribes are not tribes benefitted by the program, and are therefore ineligible as a threshold matter to request a contract for ANCSA § 14(h)(1) PFSAs, the BIA continues to hold the view that such a conclusion is defensible. After all, in other ANCSA Regions, the BIA has encountered the situation where the ANCSA 14(h)(1) funding including in tribal organization contracts or AFAs has not been utilized to do conveyance-related work.. And in no instance of which we are aware have the village-based tribes taken any action to control the tribal organization's use of the § 14(h)(1) funds for unrelated purposes, or to otherwise assure that progress is made on completion of the conveyance-related work. This is understandable because of the fact that the villages are not in fact direct beneficiaries of the ANCSA § 14(h)(1) cemetery and historical site conveyance-related work or conveyances. As pointed out on numerous previous occasions, the cemeteries and other sites in proximity to villages are already owned by locally-controlled village corporations, and it is only the sites more remote from village locations that were available for selection by Regional Corporations under ANCSA § 14(h)(1). That it may not be the case that APIA has failed to use the funds for the intended purposes, under the obligation of its 1998 Memorandum of Agreement with The Aleut Corporation, does not change the fact that village-based tribes as entities are not targeted beneficiaries of the ANCSA § 14(h)(1) program in any direct way.

As Judge Sweitzer recognized, and the BIA has argued in numerous briefs, the village-based tribal governments do not benefit from the program as institutions. Congress, in setting up the ANCSA cemetery and historical place selection and conveyance program, consciously chose to put ANCSA Regional Corporations at the heart of it, knowing that at the time of its implementation those corporations were far and away the most broad-based Native institutions, numbering among their shareholders virtually every Alaska Native alive as of the time of passage of ANCSA. Moreover, contrary to APIA's past claims that the ISDEAA is really only for the benefit of governmental entities, it must be pointed out that only four years after enactment of the

ANCSA, Congress in enacting the ISDEAA explicitly defined tribes for contracting purposes to include ANCSA Regional Corporations. 43 U.S.C. § 450b(e). In contrast, the governmental status of the tribes, upon whose generic ISDEAA § 102(a) resolutions APIA relies, was not even confirmed until more than two decades later, with the October 21, 1993 publication of the list of Federally Recognized Tribes in Alaska. 58 Federal Register 54364. With the passage of time, there are now certainly many Alaska Native individuals who are *both* Regional Corporation shareholders and village-based tribal members, as well as many who are one or the other, but not both. But the question as to what entities should be considered to be the tribes benefitted by the ANCSA § 14(h)(1) program for purposes of the ISDEAA should be considered as a question of congressional intent as of the time the two statutes were enacted, not from the revisionist perspective of an evolving landscape over three decades later. It was Congress which chose in December 1971 to make ANCSA Regional Corporations the initial selectors and permanent custodians of the § 14(h)(1) lands, and also Congress which decided just over three years later in January 1975 to include those Regional Corporations in the definition of tribes eligible to contract under the 2005 ISDEAA for programs for their benefit. The BIA continues to believe that a contract for the ANCSA § 14(h)(1) program should be supported by the resolution of the affected ANCSA Regional Corporation, and therefore partially declines the proposed FY 2006 APIA AFA on the basis that it could not be supported by the resolutions of the village-based tribes alone.

The BIA acknowledges that Judge Kollar-Kotelly concluded otherwise in her February 11, 2008 Memorandum Opinion, in which she ruled that the § 14(h)(1) statute and regulations do not in and of themselves compel the conclusion that investigating, reporting and certifying tasks are only for the benefit of the Regional Corporations. Id. at 14. No disrespect is intended by reconsideration of this conclusion. The Court's reasoning strikes the BIA as overly broad, because in applying it one could qualify any tribe as a beneficiary of a program, regardless of who the end product was designed to serve. It is certainly true that any contractor who contracts to perform any BIA PFSA is benefitted in the sense that it gets paid to do something it may be capable of doing. However, such a broad interpretation could lead to a free-for-all, with any tribe seeking to "poach" any other tribe's programs, using the rationale that it is capable of doing the work, and would benefit from doing it.

The Judge also relied on BIA Budget Justification language speaking in broad generalities about serving "communities" through the ANCSA § 14(h)(1) program. Such language seems to be a pretty unreliable guide in this context to the purpose of a program, insofar as "communities" are not eligible to contract under the ISDEAA–only tribes as defined in that Act are. Moreover, it should not be overlooked that the 2009 Budget Justification language has been tightened up to clarify that "The primary emphasis of program work is focused on ensuring completion of the ANCSA conveyance process." A copy of the new language is included herewith for your convenience. The Judge also cited the language of the 1998 MOA is support of the conclusion that others besides the ANCSA Regional Corporation, including "communities" and "Alaska Natives who support the preservation of such sites" are benefitted by the ANCSA § 14(h)(1) conveyance program. Id. at 16-17. While this observation may be true in some very broad

sense, such "beneficiaries" do not by enjoying that status acquire any right to contract to operate the ANCSA § 14(h)(1) program under the ISDEAA, a right which is extended only to tribes as defined in the Act. Accordingly, and notwithstanding the Judge's initial holding, the BIA does reiterate Administrative Law Judge Sweitzer's conclusion as a basis for partial declination of APIA's proposal to contract for the § 14(h)(1) funding for FY 2006.

Even assuming that Judge Kollar-Kotelly were to stick by her guns with respect to rejection of Administrative Law Judge Sweitzer's conclusion, the BIA now informs you of its conclusion that the receipt of The Aleut Corporation's May 20, 2005 Resolution justified partial declination of APIA's FY 2006 AFA with regard to the ANCSA § 14(h)(1) funding. This brings us to the question of the so-called Alaska Order of Precedence. As noted before, that policy is not set forth in any statute or regulation having the force of law. And again, as Judge Sweitzer noted, the Secretary of the Interior has departed from it before in special circumstances, specifically involving the ANCSA. In particular, in regard to ANCSA land conveyance surveying activity, the BLM has adopted the practice of affording priority to ISDEAA § 102(a) contracting requests submitted by ANCSA Corporations, in preference to competing requests that might be submitted by, or supported by, village-based tribes. This policy-based departure from the more common order of preference is relied upon as another basis for the BIA's partial declination of APIA's proposal to receive the FY 2006 ANCSA § 14(h)(1) funding for the Aleut Region.

In relation to the Order of Precedence policy, it should be noted that the BIA Alaska Region has under consideration adoption of an explicit ANCSA-related exception to the normal order, which affords tribal governmental entities priority over ANCSA corporate entities in the rare case of competing requests to contract. I am in receipt of your May 7, 2008 letter objecting to the lack of tribal consultation with regard to my formal adoption of an exception to the BIA Alaska Region traditional Order of Preference, which would recognize ANCSA Regional Corporations as having the first priority for contracting to perform PFSAs relating to the ANCSA § 14(h)(1) program. In that letter, you object to any effort on my part to apply this announced policy change to the declination issues addressed in this decision. Let me put your mind at ease on that issue. I am not relying on the recent policy announcement in support of my partial declination of APIA's FY 2006 proposal to contract for the ANCSA § 14(h)(1) funds. However, as has been argued before during the proceedings related to this issue, the BIA believes that such a departure was and is within its discretion. The fact that an ANCSA Regional Corporation did not previously receive such a priority simply reflects the circumstance that The Aleut Corporation's May 20, 2005 resolution was the first one that has been submitted by an ANCSA Regional Corporation under ISDEAA § 102(a).

Although APIA may not have been deficient in its pre-2006 performance, my declination of renewal of your ANCSA § 14(h)(1) funding proposal is based on the broader policy determination that the ANCSA Regional Corporations are the ones with the direct interest and the incentive to ensure completion of the conveyance process. Other Alaska Self-Governance tribes or consortia have in fact failed to use ANCSA § 14(h)(1) funds for the purposes intended,

and they have not directly violated any law by that failure. Therefore, it is my determination that if an ANCSA Regional Corporation chooses to act to ensure completion of the conveyance process in its region in a timely fashion by formally requesting to contract directly or otherwise dictate who is to perform the conveyance-related PFSAs, that ISDEAA § 102(a) request will be honored. My recently announced modification of the Alaska Order of Precedence is intended to let that state of affairs be known to all affected parties. I still have under advisement your request that I rescind my announced change until I have conducted preliminary tribal consultations. However, as I mentioned above, my decision to partially decline APIA's 2006 AFA by giving priority to The Aleut Corporation contracting request is an exercise of judgment that does not depend on any formal announcement of a modification of the order of precedence. Rather, it is a policy decision based on my conclusion that ANCSA Regional Corporations are more directly affected–and benefitted–by the ANCSA § 14(h)(1) program than are the village-based tribes which have submitted resolutions on which APIA's contracting rights depend.

In my view Congress has very clearly expressed its intent that the ANCSA conveyance process, begun over three decades ago, be brought to a conclusion as soon as possible. See generally the 2004 Alaska Land Transfer Acceleration Act, Public Law 108-452, 118 Stat. 3575. The ANCSA Regional Corporations in particular are highly motivated as operating entities to see to that outcome, whereas village-based tribes may be less so. The overall land conveyance scheme cannot be completed until the ANCSA § 14(h)(1) conveyances are finished, and the Regional Corporations are anxious to complete them, not only to obtain transfer of the cemetery and historical sites, but also for the positive impact that such accomplishment will have on the completion of other land conveyance provisions of the ANCSA. Because Congress in the ISDEAA consciously chose to give ANCSA Regional Corporations the right to contract for programs for their benefit, it is my determination that they should have first priority if they elect to request a contract for the performance of the ANCSA § 14(h)(1) program. Accordingly, my partial declination of APIA's 2006 AFA, insofar as it related to the § 14(h)(1) program, is based on my decision that The Aleut Corporations ISDEAA § 102(a) request, like any that I might receive from another ANCSA Regional Corporation, should be given precedence.

(D) <u>Amount of funds proposed is in excess of the applicable funding level.</u> The third statutory declination criterion on which I rely is ISDEAA § 102(a)(2)(E). Prior to receipt of The Aleut Corporation's May 2005 § 102(a) request to contract, I had not given a lot of thought to whether it was proper for APIA to receive *all* the ANCSA § 14(h)(1) funding for the Aleut region, based on the assumption that such an allocation of funds was justified by the supporting resolutions of the region's village-based tribes. (As noted earlier, I am also skeptical as to whether such tribes all knowingly or consciously support APIA's receipt of those funds.) However, in giving renewed consideration to these difficult issues, it has come to my attention that neither APIA nor any of the other similarly-situated ANCSA § 14(h)(1) program contractors should have been receiving their regions' full allotment of § 14(h)(1) funding in the first instance, *unless their contracts were supported by ISDEAA § 102(a) requests from their respective ANCSA Regional Corporations.* (Over the past several years, since attention began to be focused on the ANCSA § 14(h)(1) program, some contractors have secured resolutions from

8

their ANCSA Regional Corporation, but several others besides APIA have not. As we head into the negotiations for the next fiscal year, this issue will have to be addressed across the board.)

The reason that I conclude that APIA is not entitled to the full amount of ANCSA § 14(h)(1) is that it does not have a supporting resolution from The Aleut Corporation, which is obviously *at least* as much a tribe benefitted by the program as the village-based tribes on whose ISDEAA § 102(a) contracting requests APIA relies. (Of course, as I indicated above, I still disagree with Judge Kollar-Kotelly's conclusion that the villages are tribes benefitted by the § 14(h)(1) program.) However, even *assuming* that the villages are benefitted tribes, that does not alter the fact that The Aleut Corporation is too. The ISDEAA regulations squarely address this situation where more than one tribe is benefitted by a particular program. See 25 C.F.R. § 900.8(d). When the ANCSA § 14(h)(1) program was added to the APIA contract, it should only have been added to the degree that it served those ISDEAA-defined tribes which had submitted requests that the BIA contract with APIA on their behalf. The inclusion of the ANCSA § 14(h)(1) program funds in the amounts provided to APIA should have been limited to an amount associated with the benefit to the tribes whose ISDEAA § 102(a) requests supported APIA's receipt of those funds. As 25 C.F.R. § 900.8(d)(1) provides in pertinent part:

**§ 900.8 What must an initial contract proposal contain?**

\* \* \* \*

(d) A copy of the authorizing resolution form the Indian tribe(s) to be served.

(1) If the Indian tribe or tribal organization proposes to serve a specific geographic area, it must provide authorizing resolution(s) from all Indian tribes located within the specific area it proposes to serve.

It is understandable, and APIA cannot be faulted, for the historic fact that this process was not followed in the normal fashion when the ANCSA § 14(h)(1) funding was first added to APIA's funding, because APIA did not affirmatively seek to add it, and did not support such an initiative with tribal resolutions. However, with the benefit of hindsight, it seems to me that it was improper for the BIA to have provided all the § 14(h)(1) funds for the Aleut region to APIA without having received a supporting resolution from The Aleut Corporation.

I would note that during the legal proceedings to date, no one--not even APIA--has questioned the obvious point that The Aleut Corporation is a tribe benefitted by the ANCSA § 14(h)(1) program in the Aleut region. If the BIA is not in receipt of The Aleut Corporation's ISDEAA resolution supporting APIA's receipt of all the funding for that program in that geographic region, the funding to APIA must be reduced to the village-based tribes' share of the program, or the program must be deemed uncontractable. Far from submitting an ISDEAA § 102(a) request that the BIA contract the § 14(h)(1) program to APIA, The Aleut Corporation submitted a competing resolution asking that it be awarded an ISDEAA contract to perform the

9

same program.

APIA's position as we understand it is that the BIA should ignore or reject the contracting request received from The Aleut Corporation, either on the principle of "first come, first served," or on account of application of the so-called "Alaska Order of Precedence." In light of the history of the administration of the ANCSA § 14(h)(1) program as it pertains to the Aleut region, as well as to other regions more generally, we don't think that outright declination of The Aleut Corporation's contracting request would be consistent with either the basic spirit of Indian self-determination, or the BIA's general obligation to try to assure completion of the Congressional objective behind appropriation of funds to complete the ANCSA conveyance program.

The BIA's judgment is that under the totality of the circumstances, the course most consistent with the underlying purposes of the ISDEAA and ANCSA is to award the contract to The Aleut Corporation alone, by removing the funding proposed to be included in APIA's FY 2006 AFA. The District Court has now ruled that it was erroneous for us to do so without explaining the basis of our action in this regard by issuance of a declination decision, as we do herein. Because we continue to believe that The Aleut Corporation is the primary (if not the only) tribe benefitted by the ANCSA § 14(h)(1) program, we believe it would be improper to provide all the available funding to the APIA when we are in receipt of a contracting request from that primary (if not the sole) beneficiary entity. Therefore we think the excessive funds ISDEAA declination criterion has applicability to this situation as well. 25 U.S.C. § 450f(a)(2)(D). The amount of funds APIA seeks are in excess of the applicable funding level for the contract.

If there was some logical and equitable way to split the functions and the available funding between The Aleut Corporation and the APIA, and resolutions supporting such a split of the functions and funding were submitted, the BIA could of course approve that consensual division. There is little to indicate that such a rapprochement is in the immediate offing, although the BIA is encouraged by the references in APIA's February 15 and March 14, 2008 memoranda, to the effect that you are open to discussion of a creative solution to the ANCSA § 14(h)(1) solution for FY 2009 and beyond. In the meantime, the BIA hereby partially declines APIA's FY 2006 AFA insofar as it proposes to include all of the ANCSA § 14(h)(1) funding for the Aleut region, on the further grounds that the amount sought is in excess of PAIA's share of the total applicable funding level available.

Funding for FY 2007 and FY 2008.

The factual situation with respect to all three contract years in question was described in the Defendants' March 7, 2008 Report to the Court and Opposition to Plaintiff's Motion for Partial Reconsideration. As the Court in effect recognized in its February 11 and March 14, 2008 Memorandum Opinions, the BIA should be afforded this chance to explain the reasons for withholding form APIA the funding for the ANCSA § 14(h)(1) program. Once it became clear, by virtue of The Aleut Corporation's submission of its August 25, 2006 Resolution No. 06-11,

Exhibit 2 to the March 7, 2008 court filing, that the Aleut Corporation was requesting a contract for the ANCSA § 14(h)(1) program for the years 2007, 2008, and beyond, the same reasoning set forth above comes into play with regard to my instant partial denial of the APIA AFA proposals with respect to that program for those years.

Procedural Issues.

In her February 11, 2008 Memorandum Opinion, the Judge rejected the BIA's position, as articulated in Administrative Law Judge Sweitzer's August 31, 2006 Recommended Decision, that the declination process was inapplicable because the village-based tribes were not eligible to request a contract to perform the ANCSA § 14(h)(1) program. She therefore ruled that the BIA had to follow that declination process if it was to deny APIA the funding for that program. In rejecting both parties' arguments concerning her remand order, in connection with APIA's Motion for Partial Reconsideration, Judge Kollar-Kotelly seemed clearly to be indicating that if the BIA now meets the declination standard, my actions can be upheld with respect to all three contract years, notwithstanding the argument made by APIA's lawyers, to the effect that BIA's failure in past years to issue a partial declination decision within 90 days requires that APIA receive the ANCSA § 14(h)(1) funding for those years.

Therefore, we are explaining in this decision why we think that the receipt of The Aleut Corporation ISDEAA § 102(a) resolutions in May 2005 and August 2006 has changed the situation, and justifies our declination of APIA's AFA proposals for 2006, 2007, and 2008 with respect to the ANCSA § 14(h)(1) funding.

We also recognize that APIA has argued that 25 C.F.R. §900.32 precludes us from even utilizing the declination procedure. However, it is hard to conceive that the Court would have put the parties through this exercise on remand if she found that reasoning conclusive. We also note that your lawyers have argued in numerous briefs that the BIA should use the declination process in connection with the withholding of funds, so we have provided this present decision in good faith, with the expectation that the exercise is not an entirely futile one.

Conclusion.

For the reasons explained in greater detail above, I am advising you that APIA's FY 2006, 2007, and 2008 AFAs are partially declined in the limited respect that the ANCSA § 14(h)(1) funding is deleted. The event triggering these partial declinations was The Aleut Corporation's submission of its own request to contract for that program and funding for the years in question, pursuant to ISDEAA § 102(a)(1).

I readily acknowledge that this situation has presented difficult legal issues, and that some hard feelings have been engendered. Please be assured that this decision is based solely on my estimate as to how to best carry out the broad goals of maximizing self-determination while also expediting the completion of the ANCSA conveyance process, which are the basic underlying

goals towards which I believe the BIA has been charged to work. I continue to hold APIA, The Aleut Corporation, and the villages of the Aleut region in high regard, and look forward to a productive future relationship, no matter how the present issues are resolved by the parties or the Court.

*signature*
Niles C. Cesar
Alaska Regional Director, Bureau of Indian Affairs

attachment:
    excerpt from FY 2009 Department of the Interior Budget Justifications

cc:    Office of Self-Governance
    The Aleut Corporation



# BUDGET JUSTIFICATIONS

The United States Department of the Interior

and Performance Information
Fiscal Year 2009

# INDIAN AFFAIRS

NOTICE: These budget justifications are prepared for the Interior, Environment and Related Agencies Appropriations Subcommittees. Approval for release of the justifications prior to their printing in the public record of the Subcommittee hearings may be obtained through the Office of Budget of the Department of the Interior.



# DEPARTMENT OF THE INTERIOR
# INDIAN AFFAIRS

**Budget Justifications**
**Fiscal Year 2009**

## Table of Contents

Table of Contents ................................................................................................ IA-i
General Statement ......................................................................................... IA-GS-1
   Organization Chart ..................................................................................... IA-GS-5
Overview of Budget Request ......................................................................... IA-OVW-1
   Budget Changes At A Glance ................................................................... IA-OVW-4
   Unified Trust Budget ............................................................................... IA-OVW-5
   Tribal Priority Allocation ......................................................................... IA-OVW-9
   Budget Summary Table ........................................................................... IA-OVW-11
Comprehensive Budget Table ......................................................................... IA-CFT-1
Goal Performance Summary Table .................................................................. IA-GPT-1
   Funding by Goals Table ........................................................................... IA-GPT-29
Authorizing Statutes ........................................................................................ IA-AUTH-1
Administrative Provisions ................................................................................. IA-PROV-1

**Appropriation: Operation of Indian Programs (OIP)**
   Appropriation Language – Operation of Indian Programs .......................... IA-OIP-1
   Summary of OIP Requirements ............................................................... IA-OIP-3
   Justification of Fixed Costs and Related Changes .................................... IA-OIP-4
   OIP Program and Financing Schedule ..................................................... IA-OIP-6

**Justification of OIP Program and Performance by Activity:**
   Tribal Government ................................................................................... IA-TG-1
   Human Services ....................................................................................... IA-HS-1
   Trust – Natural Resources Management ................................................. IA-TNR-1
   Trust – Real Estate Services .................................................................... IA-RES-1
   Public Safety and Justice ......................................................................... IA-PSJ-1
   Community and Economic Development ................................................. IA-CED-1
   Executive Direction and Administrative Services .................................... IA-ADM-1
   Bureau of Indian Education ..................................................................... IA-EDU-1

**Appropriation: Construction**
   Appropriation Language - Construction .................................................. IA-CON-SUM-1
   Appropriation Language Citations .......................................................... IA-CON-SUM-2
   Summary of Construction Requirements ................................................. IA-CON-SUM-7
   Justification of Fixed Costs and Related Changes .................................... IA-CON-SUM-8
   Construction Summary ........................................................................... IA-CON-SUM-9
   Five Year Deferred Maintenance and Construction Plan .......................... IA-CON-SUM-11
   Construction Program and Financing Schedules ...................................... IA-CON-SUM-21
   Analysis of Budgetary Resources by Activity .......................................... IA-CON-SUM-23

applications are being reinstated; therefore, the number of parcels remaining to be adjudicated has increased. Acquisition services include collecting evidence of use and occupancy within prescribed timeframes; accompanying applicant and the Bureau of Land Management (BLM) staff on field exams; performing probates and contacting heirs to notify them of inherited claims; contesting appeals to the Interior Board of Land Appeals; and approving easements for trespass abatement. Of the work being completed in partnership with the BLM, Tribal Realty offices will address much of the work for Native allotment parcels.

The Native Allotment Program provides assistance to Native allotment applicants in acquiring title to his/her lands applied for prior to December 1971. Of the 15,000 parcels applied for, there are approximately 1,000 parcels that remain pending issuance of a Certificate of Allotment. Of the 1,000 parcels, approximately 300 are Alaska Native Veteran allotments. These lands are subject to negotiation of recovery of title through the adjudication process with the Bureau of Land Management (BLM), with the State of Alaska or the Regional and Village Native Corporations. Furthermore, through this process the BIA provides assistance that includes training and technical assistance to approximately 30 Realty Service Providers in Alaska that have either a P.L. 93-638 contract or a P.L. 103-314 compact agreement to operate the trust realty program on the BIA's behalf.

ANCSA Historical Places and Cemetery Sites: This program supports the Departmental goal of Resource Protection by protecting cultural and natural heritage resources, and by increasing knowledge of cultural and natural heritage resources managed or influenced by the Department. The program will provide for the thorough investigation of Alaska Native historical places and cemetery sites, native groups, and native primary places of residence; and produce fair and legally valid certifications for all such claims. Certifications are based on field investigations of the claimed lands and associated historical, archeological, and ethnographic research—the combined findings of which are presented in final reports of investigation. The current known backlog of field investigations and certifications is about 200, but this workload is expected to increase due to three factors: (i) legal appeals and critical reviews of past program work; (ii) implementation of Secretarial Order No. 3220, which provides for the potential reopening of dozens of ANCSA 14(h)(1) case files that are presently closed; and (iii) requirements of the Alaska Land Transfer Acceleration Act of 2004 (P.L. 108-452). The primary emphasis of program work is focused on ensuring completion of the ANCSA land conveyance process; however, this program also manages the ANCSA museum property collection in a manner that ensures its long-term preservation. To the maximum extent possible, data contained in the ANCSA collection are shared to support Alaska Native cultural heritage and educational programs, Federal and State subsistence management programs, and the protection of Alaska's cultural resources. Toward this end, digital copies of ANCSA site records have been transferred to the Alaska State Historic Preservation Officer, and cooperative agreements have been developed with various parties to produce topical indexes and transcripts of ANCSA oral history tapes.