## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **ALEUTIAN PRIBILOF ISLANDS ASSOCIATION, INC.** | ) ) | |
| PLAINTIFF, | ) ) ) | |
| v. | ) ) | Civ. No. 06-2173 (CKK) |
| **DIRK KEMPTHORNE**, in his official capacity as Secretary of the Interior, U.S. Department of the Interior, et al., | ) ) ) | |
| DEFENDANTS. | ) ) ) | |

### PLAINTIFF'S RENEWED AND AMENDED MOTION FOR SUMMARY JUDGMENT

Pending before the Court in the above-captioned case is Plaintiff's Motion for Summary Judgment [Docket #13] (May 2, 2007) ("Pl.'s Mot. Summ. J."). Since that motion was made, three new undisputed facts have come to light that bear on the motion and the relief it requests. To reflect these new developments, Plaintiff Aleutian Pribilof Islands Association ("APIA") submits this Amended Motion for Summary Judgment along with the accompanying Memorandum of Points and Authorities.

### Developments Requiring Amendments to Pending Motion

APIA has moved, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment in APIA's favor. The essential facts of this case are set forth in the parties' Statements of Material Facts Not in Genuine Dispute, and have formed the basis of the Court's Memorandum Opinion of February 11, 2008 [Docket # 29] ("Mem. Op."). Three additional undisputed facts pertinent to the pending motion should be brought to the Court's attention, however.

First, in fiscal year ("FY") 2007, the funds in dispute in this case—annual funding to carry out activities authorized by section 14(h)(1) of the Alaska Native Claims Settlement Act ("ANCSA")—were included in APIA's funding agreement ("FA"), not excluded as both APIA's and Defendants' counsel assumed. *See* Defendants' Report to the Court and Opposition to Plaintiff's Motion for Partial Reconsideration (March 7, 2008) [Docket #32] ("Defs.' Report") at 2; Decl. of Dimitri Philemonof [Docket #33-2] ¶ 10. APIA's original motion requested that the Court enjoin Defendants from withholding the ANCSA funds from APIA's FY 2007 FA. *See* Pl.'s Mot. Summ. J. at 3, ¶ 10. Because the funds were not withheld, the motion below is amended to request a declaration of APIA's right to retain and use the funds.

Second, the passage of time since the original motion has made an additional funding year, FY 2008, part of APIA's claims. In this year, Defendants once again withdrew the ANCSA funding from APIA's FA, a fact which is not disputed. Defs.' Report at 4; *id*. Ex. 5 [Docket #32-6] at 2 and n.11 (FA listing ANCSA line item but explaining that "[d]istribution of ANCSA funds is pending final decision on APIA's appeal"). The motion below is amended to incorporate requests for relief based on Defendants' continuing violations of the ISDEAA in FY 2008.

Third, in the time since APIA's original motion, the FY 2006 appropriation for the ANCSA funding has been obligated to other uses and can no longer be used to award and fund APIA's ANCSA proposal, as requested in the original motion. Pl.'s Mot. Summ. J. at 3, ¶ 9. Once again, this fact is not in dispute. Defs.' Report at 6; *id*. Ex. 6 [Docket # 32-7] ¶ 2. The motion below is amended to seek money damages for FY 2006 rather than injunctive relief.

**Amended Motion for Summary Judgment**

APIA renews its request that the Court grant summary judgment in favor of APIA, amending its requested relief to reflect the developments described above.  Specifically, APIA asks that this Court enter judgment as follows:

(1)     Declaring that the thirteen Alaska Tribes on whose behalf APIA entered a compact and funding agreements with the Secretary are beneficiaries of the cultural heritage preservation activities authorized and funded under ANCSA section 14(h)(1), and therefore those Tribes have the legal right to assume, through APIA, those activities under the ISDEAA;

(2)     Declaring that the Defendants, the Secretary and his delegatees in the Department of the Interior ("Department"), violated the ISDEAA by refusing to include the ANCSA funds in APIA's FY 2006 and FY 2008 FAs;

(3)     Declaring that the Secretary violated the ISDEAA by refusing to follow the declination process, and failing to apply the declination criteria, prescribed in section 102(a)(2) of the ISDEAA, 25 U.S.C. § 450f(a)(2), within the 90-day period prescribed by the statute and the regulations at 25 C.F.R. § 900.16 *et seq.* or the 90-day period prescribed by this Court on remand, Mem. Op at 18;

(4)     Declaring that Defendants' declination decision on remand, dated May 14, 2008, fails to meet the burden of proof imposed by the ISDEAA and its implementing regulations;

(5)     Declaring that the Secretary violated section 106(b)(2) of the ISDEAA, 25 U.S.C. § 450j-1(b)(2), by reducing the amount of funding in APIA's FY 2006 and 2008 FAs when none of the five statutory reasons for reducing funding were present;

(6)     Declaring that Defendants violated section 110(b) of the ISDEAA, 25 U.S.C. § 450m-1(b), by unilaterally amending APIA's FA in FY 2006 and in FY 2008 by revoking the ANCSA funds;

(7)     Declaring that Defendants violated the Department's regulations implementing the ISDEAA by:

      (a)     failing to follow the declination process and apply the declination criteria set forth in 25 C.F.R. Part 900, Subpart E, and

      (b)     partially declining APIA's proposed FY 2006 AFA when APIA's proposed FA was substantially the same as the prior year's AFA, 25 C.F.R. §§ 900.32, 900.33;

(8)     Declaring that Defendants' refusal to apply the Department's longstanding Alaska Order of Contracting Precedence was arbitrary, capricious, and an abuse of discretion in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A);

(9)     Declaring that Defendants' refusal to follow the declination procedures and failure to apply the declination criteria mandated by the ISDEAA exceeded statutory authority in violation of the APA, 5 U.S.C. § 706(2)(C);

(10)     Declaring that Defendants' refusal to follow the declination procedures and failure apply the declination criteria prescribed in the Department's own regulations was arbitrary, capricious, and an abuse of discretion, and without observance of procedure required by law, in violation of the APA, 5 U.S.C. §§ 706(2)(A), (D);

(11)     Awarding APIA money damages, pursuant to the Court's authority under 25 U.S.C. § 450m-1(a), for the Defendants' violations of the ISDEAA for failing to include ANCSA funding in APIA's FY 2006 FA, such damages to include both program funding and associated contract support costs as required by 25 U.S.C. § 450j-1(a);

- 4 -

(12)     Declaring that Defendants properly included the ANCSA funding in APIA's FY

2007 FA, and ordering Defendants to add to the FA contract support costs as required by 25

U.S.C. § 450j-1(a);

(13)     Ordering the Secretary, pursuant to the Court's authority under 25 U.S.C. § 450m-

1(a), to award and fund APIA's FY 2008 FA on a recurring basis as proposed by APIA, along

with required contract support costs;

(14)     Enjoining the Secretary from withholding the ANCSA funds, or any others, from

APIA's AFA for FY 2009 or thereafter, until such time as the Secretary, following the

declination procedures prescribed by the ISDEAA and Department regulations, meets his burden

to clearly establish the validity of the grounds for declining the proposal or any portion thereof;

(15)     Awarding APIA interest on all claims in accordance with the Prompt Payment

Act, attorney fees and expenses under the Equal Access to Justice Act, 28 U.S.C. § 2412, or

other applicable law, and such other relief as the Court deems appropriate.

In support of its Amended Motion for Summary Judgment, APIA submits a

Memorandum of Points and Authorities with exhibits attached or incorporated from the Record.

In addition, APIA requests an oral hearing on this motion pursuant to Local Rule 7(f).

Respectfully Submitted,


_____
                    /s/
F. Michael Willis (D.C. Bar No. 467462)

HOBBS, STRAUS, DEAN & WALKER, LLP
2120 L Street, NW, Suite 700
Washington, DC 20037
(202) 822-8282

_____/s/_____
Geoffrey D. Strommer
HOBBS, STRAUS, DEAN & WALKER, LLP
806 SW Broadway, Suite 900
Portland, Oregon  97205

*Attorneys for the Aleutian Pribilof Islands*
*Association*

Stephen D. Osborne, Of Counsel
HOBBS, STRAUS, DEAN & WALKER, LLP
806 SW Broadway, Suite 900
Portland, Oregon  97205

DATED: June 10, 2008.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **ALEUTIAN PRIBILOF ISLANDS ASSOCIATION, INC.** | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| v. | ) | Civ. No. 06-2173 (CKK) |
| | ) | |
| **DIRK KEMPTHORNE**, in his official capacity as Secretary of the Interior, U.S. Department of the Interior, et al., | ) ) ) | |
| | ) | |
| DEFENDANTS. | ) | |
| | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF PLAINTIFF'S RENEWED**
**AND AMENDED MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................ ii

BACKGROUND AND PROCEDURAL POSTURE ................................................. 2

ARGUMENT ......................................................................................................... 4

    I.  The Standard of Review for ISDEAA Claims Is De Novo ...................................... 6

    II.  The BIA Declination Does Not Cure the Agency's Procedural Violations, and APIA's Proposals Should Be Deemed Approved Regardless of the BIA Declination's Merits.. .................................................................................................................. 8

    *A.  APIA's Proposals Were Approved by Operation of Law when the Secretary Failed to Respond Within 90 Days.* ......................................................................................... 9

    *B.  The BIA's Failure to Meet the Court's Declination Deadline, as well as the Statute's and the Regulations', Reinforces that the Declination Decision is Ineffective.* ............................................................................................................ 10

    III. The BIA Declination Fails to Meet the Burden of Proof Imposed by the ISDEAA. ............................................................................................................... 11

    *A.  BIA Has Not Shown that the 14(h)(1) Activities "Cannot Be Satisfactorily Completed or Maintained" under Subparagraph (C)..* ................................................ 12

        *1.  The Court Correctly Held that ANCSA § 14(h)(1) and Its Regulations Do Not Make Regional Corporations the Only Beneficiaries.* .......................................... 14

        *2.  In Determining the Purpose of the 14(h)(1) Program, the Court Properly Relied on the Department's Own Descriptions in Budget Justifications Requesting Appropriations from Congress for the Program.* .................................................. 15

        *3.  TAC's Resolution Was Not a Contract Proposal and Did Not Authorize the BIA to Decline APIA's "Competing" Proposal.* ......................................................... 18

        *4.  The BIA's "Policy-Based Departure" from the Alaska Order of Precedence Was Inappropriate.* ............................................................................................. 21

        *5.  The BIA's Transfer of the ANCSA Funding to TAC Violated Its Statutory Duties Not to Reduce Funding to APIA or Unilaterally Amend its Contract.* ....... 24

6. *The BIA's Failure to Approve Proposals "Substantially the Same" as the Prior Years' Violated 25 C.F.R. § 900.32.* ....................................................................27

B. *The BIA Has Not Shown that the Level of Funding Proposed by APIA "Exceed[ed] the Applicable Funding Level" under Subparagraph (D), and, in any Event, the ISDEAA Required the BIA to Include the Applicable Amount and Decline Only the Excessive Amount, which the BIA Failed to Do.* ....................................................................28

IV. The Appropriate Remedies for Defendants' Violations of the ISDEAA Include Money Damages and Injunctive Relief. ...................................................................................31

A. *APIA Should Be Awarded Money Damages for FY 2006.* ....................................32

B. *The Court Should Declare APIA Entitled to the ANCSA Funding Included in the FY 2007 FA.* ..........................................................................................................33

C. *The Court Should Order BIA to Add the ANCSA Funds to APIA's FY 2008 FA as Recurring Funds or, in the Alternative, Award Money Damages if FY 2008 Funds Are No Longer Available for that Purpose.* ....................................................................33

CONCLUSION ..................................................................................................................34

**MEMORANDUM OF POINTS AND AUTHORITIES**

**IN SUPPORT OF**

**PLAINTIFF'S RENEWED AND AMENDED**

**MOTION FOR SUMMARY JUDGMENT**

On May 2, 2007, Plaintiff Aleutian Pribilof Islands Association ("APIA") moved this Court for summary judgment on the question of whether the Secretary of the Interior, acting through the Bureau of Indian Affairs ("BIA"), acted lawfully in refusing to include certain funding in APIA's agreements under the Indian Self-Determination and Education Assistance Act ("ISDEAA").  In a Memorandum Opinion dated February 11, 2008 [Docket #29] ("Mem. Op."), this Court held that the BIA's decision to unilaterally revoke those funds from APIA's funding agreement ("FA") without following the ISDEAA's procedures and criteria for declining contract proposals was "clearly erroneous" and "arbitrary and capricious."  Mem. Op. at 14, 17. The Court remanded the case to BIA to decide in the first instance, applying the procedures and criteria set forth in the ISDEAA and the Department's regulations, whether to include in APIA's FA funds to carry out activities authorized by Section 14(h)(1) of the Alaska Native Claims Settlement Act ("ANCSA").  Mem. Op. at 18.

On May 14, 2008, the BIA issued a decision in which the agency declined to include the ANCSA funds. *See* Plaintiff's Exhibit ("Pl.'s Ex.") P. Because APIA continues to believe it was, and is, entitled by law to assume ANCSA § 14(h)(1) activities and associated funding under the ISDEAA, APIA respectfully asks this Court to grant summary judgment in favor of APIA on its ISDEAA claims and to grant APIA appropriate relief as set forth in the enclosed Renewed and Amended Motion for Summary Judgment.

## BACKGROUND AND PROCEDURAL POSTURE

The material facts of this case are well-established by the extensive record and were succinctly summarized in the Court's February 11 opinion. Briefly, the key facts are as follows:

From 1996 through 2005, Defendants included the ANCSA funds in APIA's Compact of Self-Governance and FAs, as authorized by the tribal resolutions of the thirteen federally recognized Alaska Tribes represented by APIA.[1] In 2004, however, the Regional Solicitor opined that the proper beneficiaries of the 14(h)(1) program are the ANCSA regional corporations, so the longstanding BIA practice of contracting the program to tribes (or tribal organizations authorized by tribes) without the authorizing resolution of a regional corporation was an error. When The Aleut Corporation ("TAC") submitted a resolution of intent to assume the region's 14(h)(1) funding, the BIA unilaterally removed that funding from APIA's FY 2006 FA and eventually transferred it to TAC.[2]

---

[1] In its declination letter, the BIA again calls into question the adequacy of the Villages' resolutions, and refers to "second-hand reports" that some Villages may support transfer of the ANCSA funds to The Aleut Corporation. BIA Declination at 3. As the Court pointed out, however, the Defendants have already stipulated to the legal adequacy of the resolutions supporting APIA's request to compact all BIA programs, functions, services and activities ("PFSAs"), including the ANCSA program. Mem. Op. at 16 n.5.

[2] Defendants' Report to the Court and Opposition to Plaintiff's Motion for Partial Reconsideration (March 7, 2008) [Docket #32] ("Defs.' Report"), Exh. 6 at ¶ 2 (Decl. of Kenneth L. Pratt). The mechanism of the funding transfer was not identified in Mr. Pratt's affidavit, and indeed the record does not indicate that the Defendants ever entered into an ISDEAA contract with TAC for any of the years at issue in this litigation. If the funds were not in fact transferred by the BIA to TAC in the years at issue in this litigation through

As Defendants concede, in revoking APIA's ANCSA funding the BIA did not use the declination procedures and criteria set forth in the ISDEAA, 25 U.S.C. § 450f(a)(2) ("Declination Criteria") and its implementing regulations, based on the agency's position that TAC is the only beneficiary of the 14(h)(1) program, so in the absence of a resolution from TAC authorizing APIA to contract the program on TAC's behalf, the declination procedures were never "triggered."[3]  This Court, however, found that the factual predicate underlying the agency's position—that TAC is the only beneficiary of the 14(h)(1) program—had "no support in the record" and was "clearly erroneous."  Mem. Op. at 14.  The Court went on to hold that the BIA's attempt to bypass the strict statutory and regulatory Declination Criteria and procedures was "arbitrary and capricious" in violation of the Administrative Procedure Act ("APA").  *Id*. at 17.

The Court determined that the appropriate remedy under the APA was to remand to the BIA to "decide, in the first instance, whether to approve or decline APIA's request for Section 14(h)(1) funds after applying the appropriate statutes and regulations."  *Id*.  In its accompanying Order, the Court ordered BIA to make its decision "no later than May 12, 2008."  Order (Feb. 11, 2008) [Docket #28].   This timeline gave the BIA 90 days to issue its declination.

APIA filed a Motion for Partial Reconsideration of the Court's decision to remand. During briefing on this motion, Defendants informed the Court (and APIA's counsel) that the BIA included ANCSA 14(h)(1) funds for FY 2007 in APIA's FY 2007 FA, despite its declared

---

an ISDEAA agreement the BIA's position that TAC had ISDEAA rights to be awarded an ISDEAA contract superior to APIA such that the Agency had no choice but to unilaterally withhold those funds from APIA would be severely undermined since these funds were unquestionably subject to award under the ISDEAA.

[3] Mem. Op. at 12; Defendants' Opposition to Plaintiff's Motion for Summary Judgment and Brief in Support of Defendants' Partial Motion to Dismiss and Cross Motion for Summary Judgment [Docket #19] ("Defs.' Opp.") at 17.

intention to withhold the funds pending the outcome of this litigation.[4]  The Court denied APIA's motion for partial reconsideration on March 14, 2008.  The Court again ordered the BIA to issue its decision on remand "no later than May 12, 2008."  Order (March 14, 2008) [Docket #35].

In a letter dated May 14, 2008—two days after the Court-imposed deadline—Niles Cesar, Director of BIA's Alaska Regional Office, declined APIA's proposal to include the ANCSA funds in its FAs for fiscal years ("FYs") 2006, 2007, and 2008.  Pl.'s Ex. P.  On May 21, 2008, the parties submitted a Joint Status Report apprising the Court that the dispute continues, and proposing a briefing schedule.  The Court issued its Scheduling Order on May 21, 2008.

Before the Court are APIA's claims under the ISDEAA that the Court held in abeyance pending the BIA decision on remand.  Specifically, APIA asserts that the BIA's decision to withhold the funds in FYs 2006 and 2008 violated Sections 102 and 106 of the ISDEAA, the Department's regulations implementing those provisions, and the BIA's policy on contracting priority in Alaska.  APIA asks the Court for money damages for FY 2006 under Section 110 of the ISDEAA, 25 U.S.C. § 450m-1(a), and for declaratory and injunctive relief under Section 110 to award that funding on a recurring basis beginning in FY 2008, or, if FY 2008 funds are no longer available, money damages for that year as well.

## ARGUMENT

Mr. Cesar's letter of May 14, 2008 ("BIA Declination") reflects a BIA regional office that disagrees not only with APIA but *its own Department*—not to mention this Court—about the nature of the 14(h)(1) program and whom it benefits.  Even if the BIA Declination is procedurally adequate, which APIA disputes in Part II below, it must fail substantively because it

---

[4] Defs.' Report at 2 (explaining assumption of counsel, which proved incorrect, that BIA Regional Office would proceed according to its July 7, 2006 letter and omit the funds); *id.*, Ex. 1 (July 7, 2006 letter); Defs.' Opp., Ex. 10 at 3-4 (July 7, 2006 letter).

is based on assumptions already rejected by this Court. Specifically, the BIA relies on the premise that the communities and peoples represented by APIA do not benefit from the program, a proposition this Court has rejected as "clearly erroneous." Mem. Op. at 14. Since the BIA Declination, like the original agency action itself, rests on this erroneous assumption, the BIA's declination decision is fatally flawed.

In addition to repeatedly criticizing this Court's reasoning and conclusions, the BIA erroneously insists that its own Department has mischaracterized the 14(h)(1) program in its Budget Requests to Congress. In direct conflict with the Department's expressed views in the Budget request, the BIA asserts that the program benefits only corporations, not communities; that the program is focused solely on conveyance; and that its funding should not be included within the Tribal Priority Allocation ("TPA") for basic governmental functions. BIA Declination at 6-7. These arguments, like Mr. Cesar's decision to disregard the Department's Alaska Order of Precedence, id. at 7, reflect a regional office intent on following its own ad hoc policies rather than the ISDEAA, the Department's regulations, or the Department's policy.

We begin our discussion below in Part I by addressing the standard of review for ISDEAA claims, an issue this Court did not previously decide. Part II argues that the BIA's declination, issued after the deadline imposed by the ISDEAA, by the regulations, and by this Court, is procedurally defective and must be reversed on that ground alone, regardless of its merits. Part III addresses the particular grounds on which the BIA seeks to support its declination of APIA's ANCSA proposal, both of which fall short of meeting the Secretary's high burden of proof. Finally, Part IV addresses the appropriate remedies for Defendants' violations of the ISDEAA and the Department's regulations and policy.

I.    **The Standard of Review for ISDEAA Claims Is De Novo.**[5]

In previous briefs APIA cited and discussed well-reasoned opinions from the following

three federal courts that have held that the standard of review for ISDEAA claims is *de novo*:[6]

*Shoshone-Bannock Tribes of the Fort Hall Reservation v. Shalala*, 988 F. Supp. 1306, 1313-18

(D. Or. 1997) ("*Shoshone-Bannock*"); *Cherokee Nation of Oklahoma v. United States*, 190 F.

Supp. 2d 1248, 1256-58 (E.D. Okla. 2001) ("*Cherokee Nation*"); *Cheyenne River Sioux Tribe v.

Kempthorne*, 496 F. Supp. 2d 1059, 1067 (D.N.D. 2007) ("*Cheyenne River Sioux*").  Defendants

have presented no authority in support of their argument that this Court should instead apply the

APA "arbitrary and capricious" standard.[7]

The three federal court decisions cited above recognized several compelling reasons to

apply the *de novo* standard.  First, "the plain language of the [ISDEAA], along with its legislative

history, indicates a *de novo* review of an action brought pursuant to the ISD[EA]A was intended

by Congress." *Cherokee Nation*, 190 F. Supp. 2d at 1257.  Second, the U.S. Supreme Court's

interpretation in other contexts of the phrase "civil action," the term employed in Section 110 of

the ISDEAA, requires *de novo* review of agency actions.  *Shoshone-Bannock*, 988 F. Supp. 2d at

1314.  Third, the authorization of money damages for violations of the ISDEAA weighs heavily

in favor of *de novo* review rather than the "arbitrary and capricious" standard of the APA, which

does not allow money damages.  *Id.* at 1315; *Cherokee Nation*, 190 F. Supp. 2d at 1257.  Fourth,

the unusually high burden of proof the ISDEAA imposes on the Secretary makes clear that

---

[5] The Court has already set forth the standard for considering a motion for summary judgment so we do not repeat that here.  Mem. Op. at 5-7.

[6] Plaintiff's Opposition to Defendants' Motion to Dismiss and Cross-Motion for Summary Judgment and Plaintiff's Reply to Defendants' Opposition to Plaintiff's Motion for Summary Judgment [Docket #22] ("Pl.'s Reply") at 9-12 (discussing cases); Pl.'s Mem. at 5.

[7] *See* Defendants' Reply in Support of Partial Motion to Dismiss and Cross Motion for Summary Judgment [Docket # 23] ("Defs.' Reply") at 5-8 (citing no authorities).

Congress intended a higher level of scrutiny than the APA standard would provide. *Cheyenne River Sioux*, 496 F. Supp. 2d at 1067.  Fifth, deferential APA review would be patently inconsistent with the agency's inherent resistance to the ISDEAA and the well-founded "history of Congressional concern with agency malfeasance." *Shoshone-Bannock*, 988 F. Supp. at 1316-17.

Defendants attempt to distinguish these cases on the basis that the tribes in those cases bypassed the agency review process by challenging the agency action directly in federal court, whereas APIA voluntarily pursued an administrative remedy prior to filing this action.  Defs.' Reply at 6-7.  As for why this procedural distinction should make a substantive difference in the standard of review, however, Defendants offer only that *de novo* review would unfairly make the parties "go back to square one and start as if such lengthy, extensive and expensive [administrative] proceedings had never occurred at all." *Id.* at 7.[8]  That is simply not the case, however.

As this Court has pointed out, "Defendants have submitted the lengthy opinion of the ALJ as an attachment to their Cross-Motion, and both Parties have referenced the extensive administrative record throughout their submissions."  Mem. Op. at 10.  The full administrative proceedings are part of the record on the basis of which this Court will make its decision. They cannot be wiped off the slate as though they had "never occurred."[9]  More important, Section 110

---

[8] Defendants also argue in their Reply that *de novo* review is inappropriate because money damages did not lie prior to the lapse of the FY 2006 appropriation, but that argument no longer applies, as Defendants acknowledge the appropriation lapsed on September 30, 2007.  Defs.' Reply at 18 n.7; Defs.' Report at 4. If APIA is to receive any relief for FY 2006, it must be in the form of money damages, as authorized by Section 110 of the ISDEAA, 25 U.S.C. § 450m-1(a).

[9] In this respect, a court's review of an administrative declination decision is similar to its review of a contracting officer's decision under the Contract Disputes Act, which also provides for *de novo* review of the agency's decision.  41 U.S.C. § 609(a)(3); *Wilner v. United States*, 24 F.3d 1397, 1401-02 (Fed. Cir. 1994) (en banc); *Assurance Co. v. United States*, 813 F.2d 1202, 1206 (Fed. Cir. 1987).

of the ISDEAA does not make the distinction Defendants urge, but rather provides the Court

"original jurisdiction over <u>any</u> civil action or claim . . . arising under this subchapter . . . ."  25

U.S.C. § 450m-1(a) (emphasis added).  All of the reasons to apply *de novo* review, as recognized

by the courts and listed above, apply with equal force to review of agency actions that have

already been reviewed internally.  Moreover, applying *de novo* review only in "direct" court

actions would discourage, if not eliminate, the informal conference and administrative appeal as

attractive options, while increasing the load on federal courts.

 As Defendants acknowledge, "[t]here is no dispute that Plaintiff brought this action

pursuant to both the APA and the ISDEAA."  Defs.' Opp. at 9.  The APA claim has been

resolved in favor of APIA, leaving the Court to decide the ISDEAA claims.  The Court should

review the ISDEAA claims not under a standard borrowed from the APA, but under the standard

provided for by the ISDEAA itself.[10]

## II.    The BIA Declination Does Not Cure the Agency's Procedural Violations, and APIA's Proposals Should Be Deemed Approved Regardless of the BIA Declination's Merits.

 This Court has held that the BIA should have employed the ISDEAA's Declination

Criteria and procedures in deciding whether to include the ANCSA funding in APIA's FY 2006

FA, and the BIA's failure to do so was arbitrary and capricious in violation of the APA.  Mem.

Op. at 17.  The appropriate remedy for the APA violation, the Court held, was to remand for a

decision in accordance with the statutory and regulatory Declination Criteria.  The BIA has now

made its decision, but the BIA Declination came too late to cure the agency's procedural

violations in any of the years at issue.  First, the statute and regulations do not allow the

---

[10] APA's Renewed and Amended Motion for Summary Judgment retains the requests for relief under the APA, as Defendants' violations of the ISDEAA were also actions taken in excess of statutory authority under the APA.  5 U.S.C. § 706(2)(C).  Defendants' unexcused failure to meet this Court's deadline for issuing its decision on remand (discussed next) could also be deemed arbitrary and capricious under the APA.  *Id.* § 706(2)(A).

Secretary a second chance to review proposals; if not declined within 90 days, they are deemed

approved by operation of law.  25 C.F.R. § 900.18; *Cheyenne River Sioux Tribe*, 496 F. Supp. 2d

at 1068.  Second, the BIA failed to issue its declination decision even within the second 90-day

window provided by this Court, reinforcing its lateness and ineffectiveness.

    A.    *APIA's Proposals Were Approved by Operation of Law when the Secretary Failed to Respond Within 90 Days.*

Under Section 102(a)(2) of the ISDEAA, the Secretary has 90 days to review a proposal.

*See* 25 U.S.C. § 450f(a)(2) ("the Secretary shall, within ninety days after receipt of the proposal,

approve the proposal and award the contract" unless one of the declination criteria applies).  The

statutory 90-day limit is so important that it is repeated and reemphasized in four separate

regulations.  *See* 25 C.F.R. § 900.16 (90 days to decide); *id*. § 900.17 (period can be extended

with written consent of Tribe, but "[i]f consent is not given, the 90-day deadline applies"); *id*. §

900.18 (proposal not declined within 90 days "is deemed approved and the Secretary shall award

the contract"); *id*. § 900.21 ("a proposal can only be declined within 90 days," absent voluntary

and express consent of Tribe).

APIA submitted its proposal for FY 2006, including the ANCSA funds, on June 23,

2005.  Pl.'s Statement of Facts ("Pl.'s Stmt.") ¶ 11.   It is undisputed that the Secretary never

issued a written decision declining APIA's proposal to include the ANCSA funding, until Mr.

Cesar's declination on May 14, 2008.  Mem. Op. at 12 (citing pleadings).[11]  The Secretary did

not request, nor did APIA grant, an extension of the deadline.  Thus the Secretary declined

APIA's FY 2006 proposal almost three years too late.  Similarly, the Secretary did not decline

---

[11] *See also* Pl.'s Stmt. ¶ 13; Defs.' Response to Pl.'s Stmt. ¶ 13 ("Undisputed.").

the FY 2007 proposal until almost two years had passed,[12] or the FY 2008 proposal until nearly a year later.

The consequences of the Secretary's failure to meet the deadlines for declining or approving the proposals are spelled out in the regulations: the proposal "is deemed approved and the Secretary shall award the contract."  25 C.F.R. § 900.18.  Even if the BIA Declination has merit (and it does not, as shown in Part III), the procedural defect of not providing the declination decision timely is fatal.  *Cheyenne River Sioux Tribe*, 496 F. Supp. 2d at 1068 (proposal deemed approved by operation of law, regardless of merits of agency's position, where agency failed to comply with declination statutes and regulations).

> B.    *The BIA's Failure to Meet the Court's Declination Deadline, as well as the Statute's and the Regulations', Reinforces that the Declination Decision is Ineffective.*

In its February 11 Order the Court effectively rewound the clock and gave the BIA the full statutory 90 days in which to make its decisions: "This case shall be stayed until the BIA issues its decision . . . a period which shall not exceed 90 days."  Mem. Op. at 18.  The Court's mandatory language echoed language in the ISDEAA and its implementing regulations discussed above.[13]  The 90th day of BIA's second opportunity to decline APIA's proposals fell on May 12, 2008, a deadline the Court repeated in two separate Orders.  Order (Feb. 11, 2008) [Docket #28]; Order (March 14, 2008) [Docket #35].  The BIA failed to meet this deadline as well, issuing its declination on May 14.

Thus the Secretary violated not only the 90-day statutory deadline set by Congress and by his own Department's regulations, he also ignored the deadline set by this Court.  These repeated

---

[12] Indeed, the Secretary included the funds in APIA's FA, albeit inadvertently.

[13] *See* 25 U.S.C. § 450f(a)(2) ("the Secretary shall, within ninety days after receipt of the proposal, approve the proposal and award the contract" unless one of the declination criteria applies); 25 C.F.R. § 900.16 (90 days to approve or decline).

and unexcused violations of hard deadlines should not be accepted by this Court. The Court should rule the BIA Declination procedurally defective and order the Secretary to award and fund the contracts as required by his own regulations. 25 C.F.R. § 900.18; *Cheyenne River Sioux*, 496 F. Supp. 2d at 1068.

**III.     The BIA Declination Fails to Meet the Burden of Proof Imposed by the ISDEAA.**

Even if the BIA Declination were to be considered procedurally adequate, the Secretary's decision fails to meet the burden of proof imposed by the ISDEAA. When declining all or part of a proposed ISDEAA agreement, "the Secretary shall have the burden of proof to establish by clearly demonstrating the validity of the grounds for declining the contract proposal (or portion thereof)." 25 U.S.C. § 450f(e)(1); *see also* 25 C.F.R. § 900.163 (Department regulation establishing same burden on Secretary).

This burden is not the usual civil one of showing a preponderance of evidence. Instead, the Secretary must approve an ISDEAA proposal unless, within 90 days of receiving the proposal, "the Secretary provides written notification to the applicant that contains a specific finding that clearly demonstrates that, or that is supported by a controlling legal authority that--

    **(A)**   the service to be rendered to the Indian beneficiaries of the particular program or function to be contracted will not be satisfactory;
    **(B)**   adequate protection of trust resources is not assured;
    **(C)**   the proposed project or function to be contracted for cannot be properly completed or maintained by the proposed contract;
    **(D)**   the amount of funds proposed under the contract is in excess of the applicable funding level for the contract, as determined under section 450j-1(a) of this title; or
    **(E)**   the program, function, service, or activity (or portion thereof) that is the subject of the proposal is beyond the scope of programs, functions, services, or activities covered under paragraph (1) because the proposal includes activities that cannot lawfully be carried out by the contractor."

25 U.S.C. § 450f(a)(2); *see also* 25 C.F.R. § 900.22 (explaining that "[t]he Secretary may only decline to approve a proposal for one of five specific reasons," and echoing the statutory criteria of section 102(a)(2)).

In the BIA Declination, the BIA cites two of the statutory criteria for declination in support of its decision: subparagraphs (C) and (D).[14] Neither statutory provision, however, supplies a basis for the BIA to decline APIA's proposal.

A.    *BIA Has Not Shown that the 14(h)(1) Activities "Cannot Be Satisfactorily Completed or Maintained" under Subparagraph (C).*

In remanding the case, the Court noted that Defendants had warned that remand would likely result in declination, but the Court remarked, "that statement appears to be grounded in the erroneous belief that TAC is the only beneficiary of Section 14(h)(1) funds. The BIA must examine APIA's request for Section 14(h)(1) funds having been disabused of that belief." Mem. Op. at 17. The Declination decision makes clear that the BIA chose not to follow the Court's direction. *See, e.g.*, BIA Declination at 9 ("I still disagree with Judge Kollar-Kotelly's conclusion that the villages are tribes benefitted by the § 14(h)(1) program."). Indeed, the BIA bases its entire subparagraph (C) argument (that the contract cannot be properly completed or maintained by the proposed contract) on the mistaken belief that TAC is the only beneficiary of the section 14(h) program.

---

[14] The letter discusses a third declination criterion, 25 U.S.C. § 450f(a)(2)(A), quoted above, which allows the Secretary to decline a proposal when he can clearly demonstrate that the service provided by the contractor will not be satisfactory. However, the letter concludes that "the BIA did not base its declination of APIA's 2006 proposal for continued receipt of § 14(h)(1) funding on that criterion." BIA Declination at 4. The letter is not clear but we presume that the BIA did not decline the FY 2007 or 2008 proposals on that basis either. If our presumption is wrong we note that the BIA Declination contains nothing remotely resembling "specific findings" that "clearly demonstrate" APIA's 14(h)(1) work will be unsatisfactory. Moreover, the letter expressly acknowledges that "the BIA [has] conceded that APIA's past performance in relation to the ANCSA § 14(h)(1) program had not been unsatisfactory." BIA Declination at 4. *See also* Defs.' Opp., Ex. 5 [Docket # 18-6] at 24 (acknowledging that adequacy of APIA's work has never been at issue during appeal and citing recommended decision to same effect).

Subparagraph (C) of the Declination Criteria allows the BIA to decline a proposal when the "function to be contracted for cannot be properly completed or maintained by the proposed contract." 25 U.S.C. § 450f(a)(2)(C). This means that, for some practical or legal reason, the contract cannot be carried out by one party or the other. *See, e.g.*, *Pascua Yaqui Tribe of Arizona v. Acting Director, Tucson Area Office, Indian Health Service*, Docket No. IBIA 98-61-A (Aug. 18, 1999) at 5-6 (upholding declination under subparagraph (C) where Tribe proposed to contract for dental staffing which Area Office did not have or fund); *Redding Rancheria v. Acting Sacramento Area Director, Bureau of Indian Affairs*, Docket No. IBIA 94-110-A (May 20, 1994) at 1 (describing declination under subparagraph (C) when available funding was insufficient for contractor to properly carry out contract objectives).

In declining APIA's proposal on the basis of subparagraph (C), however, the BIA does not mean that APIA is incapable of performing the proposed work—which would be difficult to argue given BIA's ten-year history of contracting the program to APIA, and the agency's repeated stipulations that APIA's performance of the services has been satisfactory. *See supra* note 14. Instead, the BIA means that the contract itself cannot properly be entered into, because the "village-based tribal governments [APIA represents] do not benefit from the program as institutions." BIA Declination at 5. This assertion has already been rejected by this Court as lacking any evidence in the record. Mem. Op. at 16 (finding that Alaska Native communities and individuals benefit from the program); *id*. at 17 (concluding "there is no support in the record for a finding that TAC is the only beneficiary").

Without supporting evidence in the record the BIA can only repeat this mistaken assertion in various formulations throughout its subparagraph (C) discussion, as though mere repetition could take the place of the missing evidence and logic needed to turn the assertion into

an argument. *See, e.g.*, BIA Declination at 5 ("village-based tribes are not tribes benefitted by the program"); *id*. ("the villages are not in fact direct beneficiaries of the ANCSA § 14(h)(1) cemetery and historical site conveyance-related work or conveyances"); *id*. ("the village-based tribes as entities are not targeted beneficiaries of the ANCSA § 14(h)(1) program in any direct way"); *id* at 9 ("I still disagree with Judge Kollar-Kotelly's conclusion that the villages are tribes benefitted by the § 14(h)(1) program."). Regardless of the Regional Director's views, the Court's rulings control the outcome of this declination appeal.

1.     *The Court Correctly Held that ANCSA § 14(h)(1) and Its Regulations Do Not Make Regional Corporations the Only Beneficiaries.*

The BIA acknowledges that the Court found the communities and peoples represented by APIA benefit from the 14(h)(1) program. BIA Declination at 6. Nonetheless, the agency insists that the Court erred in so doing and challenges the Court's reasoning. For example, the BIA asserts as "overly broad" the Court's ruling that investigating, reporting and certifying information concerning the 14(h)(1) sites benefits Aleut communities and individuals, not just TAC. BIA Declination at 6 (citing Mem. Op. at 14). The BIA misreads the Court as saying APIA benefits only because "it gets paid to do something it may be capable of doing." *Id*. The Court's reasoning, according to BIA, "could lead to a free-for-all, with any tribe seeking to "poach" any other tribe's programs, using the rationale that it is capable of doing the work, and would benefit from doing it." *Id*. This argument completely misses a critical point: the Court did not say that a tribe unconnected with a particular section 14(h)(1) program could contract the ANCSA program merely by showing its technical capability and a financial benefit, as the BIA suggests. Instead, the Court noted that the statute is silent as to intended beneficiaries, and the tasks assigned to the BIA in the regulatory scheme—investigating, reporting, and certifying information concerning the sites—are not tasks associated with holding title, and are thus not for

- 14 -

the exclusive benefit of TAC. The information gleaned from these investigations benefits

everyone of Aleut heritage, not just TAC shareholders. Mem. Op. at 16-17.

In its efforts to argue that TAC is the sole beneficiary of the ANCSA program, the BIA

focuses narrowly on the benefit to TAC and its shareholders of the *conveyance itself*—of holding

bare title to the land. *See, e.g.*, BIA Declination at 5 ("the villages are not in fact direct

beneficiaries of the ANCSA § 14(h)(1) cemetery and historical site conveyance-related work or

conveyances"). This is incorrect. The BIA's narrow focus on the conveyance itself ignores the

process of investigating, reporting and certifying information concerning the 14(h)(1) sites—

information of value to all Aleuts before and after the conveyance. It is this process—not the

conveyance itself—that the regulations assign to the BIA, that APIA carried out for ten years

through its Compact and FAs and that the BIA now claims "cannot be satisfactorily completed or

maintained" by APIA. This position lacks any basis in the record, the statute or the regulations,

as the Court has already held, and thus cannot form the basis of a declination under subparagraph

(C).[15]

> 2.     *In Determining the Purpose of the 14(h)(1) Program, the Court Properly
>        Relied on the Department's Own Descriptions in Budget Justifications
>        Requesting Appropriations from Congress for the Program.*

The BIA also questions the Court's reliance on the Department of the Interior Budget

Justifications for BIA, which characterize the ANCSA program as "Serving Communities by

---

[15] The BIA Declination also seeks to introduce a number of conclusory designations into contracting
eligibility: only the "direct" or "primary" or "targeted" beneficiaries "as institutions" may contract for a
program. *See, e.g.*, BIA Declination at 5 ("the villages are not in fact direct beneficiaries"); *id.* ("village-
based tribes as entities are not targeted beneficiaries of the ANCSA program in any direct way"); *id.* ("the
village-based tribal governments do not benefit from the program as institutions"); *id.* at 8 ("ANCSA
Regional Corporations are more directly affected—and benefitted—by the ANCSA § 14(h)(1) program
than are the village-based tribes"). As this Court has noted, however, "[t]hese qualifications (e.g.,
primary or direct beneficiaries) are not present in, nor supported by, 25 U.S.C. § 450(f) and its
implementing regulations . . . ." Mem. Op. at 15.

fulfilling Indian fiduciary trust responsibilities." Pl.'s Ex. B at BIA-TPA 47 to 48. As APIA has

pointed out, and the Court recognized, the oral history collection, historical site data, and

museum archives developed through the 14(h)(1) program confer benefits far more broad and

enduring than the conveyance of title to the corporation. Mem. Op. at 16-17; Pl.'s Mem. at 26-28.

The Regional Director remarks in his declination letter that the Budget Justifications' description

of "serving 'communities'"—the description offered to Congress as justifying the 14(h)(1)

appropriation—"seems to be a pretty unreliable guide in this context to the purpose of a program,

insofar as 'communities' are not eligible to contract under the ISDEAA." BIA Declination at 6.

This is not true, since federally recognized tribes—which are in fact the communities affected by

these "Indian fiduciary trust activities"—are eligible to contract under the ISDEAA. Moreover,

the Regional Director's comments give the impression that he believes the Department justified

its budget request for these program funds to "Serv[e] Communities by fulfilling Indian fiduciary

trust responsibilities," but once the funds were appropriated intended to use the funds on a

program that has nothing to do with the trust responsibility and the affected communities but is

only intended to convey land to the regional corporations. That may be the Alaska Regional

Office's intent for the program, but it clearly is neither Congress's nor the Department's.

Further, by conflating beneficiaries of the program with the entities that can contract it,

the Regional Director missed the point that the true beneficiaries of the cultural heritage

resources protected and generated by these activities are the Aleut communities and people,

*regardless* of whether APIA or TAC contracts to perform the BIA-assigned program tasks. This

does not mean that it makes no difference which entity carries out these ANCSA activities. In

fact, cultural heritage protection is a central role of tribal governments, while at most an ancillary

role of the corporations, so APIA's member Tribes have a greater stake in the cultural resources

- 16 -

generated through the program, and more accountability to the ultimate beneficiaries of the program, than does TAC.  *See* Pl.'s Mem. at 22-28.

It is worth noting that the Regional Director's interpretation of the 14(h)(1) program's purpose does not appear to reflect the Department's current official position.  More than four years after the Regional Solicitor's memorandum concluded that the 14(h)(1) program benefits only regional corporations, must be narrowly focused on conveyance, and should never have been included in the Tribal Priority Allocation ("TPA") category to begin with, the Department's Budget Justifications do not reflect the Regional Solicitor's views.  For example, in its FY 2008 Budget Justification the Department continues to include the ANCSA program in Trust Services within the TPA,[16] it explains that the "program supports the Departmental goals of Serving Communities and Resource Protection," and it describes a wide range of program activities benefiting all Aleut communities and peoples, including historical, archeological, and ethnographic research."  Pl.'s Ex. Q at IA-RES-19 (describing program).  The Department continues to include ANCSA funding in the "FY 2008 TPA Base Funding."  *Id.* at App. 4-6.

The BIA argues that for FY 2009 the Budget Justification language has been "tightened up," and quotes part of that language out of context: "The primary emphasis of program work is focused on ensuring completion of the ANCSA conveyance process."  BIA Declination at 6.  The BIA fails to quote the remainder of that sentence, which reads: "however, this program also

---

[16] Tribal Priority Allocation, or TPA, funds are a unique category of recurring funds that provide the main source of resources to provide basic government services for most tribes.  As the Court of Federal Claims has recently explained, TPA funding provides "tribal government support, human services, education, public safety and justice, community development, resource management, trust services, and general administration."  *Samish Indian Nation v. United States*, No. 02-1383 L, 2008 WL 2220685, at *5 (Fed. Cl. May 27, 2008).  The court goes on to point out that TPA funding is recurring: "Once an Indian tribe receives TPA funds, the amount of those funds comprises the 'base amount' of funds for subsequent years."  *Id.  See also* Pl.'s Memo. at 2-3 and 26-27 (describing role of TPA and of ANCSA program within TPA).  The Department's choice to repeatedly request and justify the ANCSA 14(h) funds as TPA funds supports the view that the Department's intent has always been for these funds to be available for Tribal governments to carry out activities aimed at "Serving Communities."

manages the ANCSA museum property collection in a manner that ensures its long-term

preservation."  Pl.'s Ex. R at IA-RES-21.  Emphasizing the broad benefits to Native

communities, the FY 2009 Budget Justification goes on to state that the ANCSA collection will

be "shared to support Alaska Native cultural heritage and educational programs, Federal and

State subsistence management programs, and the protection of Alaska's cultural resources," and

cooperative agreements have been developed to index and transcribe the voluminous ANCSA

oral history tapes.  *Id.*  These are the kind of activities the Regional Director characterizes as "a

pretty unreliable guide" to the purpose of the 14(h)(1) program, but the Court was right to

consider them in determining who benefits from, and thus who could authorize APIA to contract,

the program.

> 3.    *TAC's Resolution Was Not a Contract Proposal and Did Not Authorize the
> BIA to Decline APIA's "Competing" Proposal.*

In both its subparagraph (C) and (D) discussions,[17] the BIA argues that TAC's 2005

resolution changed the entire legal landscape and required BIA to depart from its decade-long

practice of contracting the 14(h)(1) program directly to APIA without a resolution from TAC.

BIA was required, the Regional writes, to immediately revoke the ANCSA funding from

APIA—notwithstanding Sections 102 and 106 of the ISDEAA, the Department's regulation at 25

C.F.R. § 900.32, and the Alaska Order of Precedence.  The TAC resolution created a "dilemma,"

as the BIA did not have the means to "double-fund the program" for both APIA and TAC.  BIA

Declination at 3.  But TAC submitted only a resolution expressing its desire to contract the

ANCSA program, not a contract proposal sufficient to trigger the review and approval process.

The record shows no indication TAC submitted a proposal, let alone was awarded an ISDEAA

---

[17] *See* discussion of subparagraph D in Part III.B below.

contract, so the BIA "dilemma" was purely hypothetical and provided no basis to even consider declining APIA's ANCSA proposal.

Section 102(a)(1) of the ISDEAA directs the Secretary, "upon the request of any Indian tribe by tribal resolution, to enter into a self-determination contract or contracts with a tribal organization . . . ." 25 U.S.C. § 450f(a)(1). Section 102(a)(2) states that, once authorized by tribal resolution, "a tribal organization may submit a proposal for a self-determination contract . . . to the Secretary for review." *Id.* § 450f(a)(2). The Secretary then must, "within ninety days after receipt of the proposal, approve the proposal and award the contract" unless one of the five declination criteria applies. *Id.* An authorizing resolution, such as TAC submitted, is not the same as a contract proposal, an interpretation of the statute shared by the Department itself.[18]

The Department's regulations at 25 C.F.R. Part 900 remove any doubt on this score. Subpart C–Contract Proposal Contents carefully defines what a contract proposal must contain. An "initial contract proposal," such as TAC would have to submit to assume the ANCSA program, must include fairly extensive documentation. *See* 25 C.F.R. § 900.8. While an authorizing resolution is one of the required documents, *see* paragraph (d), it is not the only one required to constitute a contract proposal, *see* paragraphs (a)-(c) and (e)-(m). Among other things, the proposal must include a statement that describes the activities to be performed and contains a description of the service area; the estimated number of persons to be served; a description of the proposed program standards; an identification of the program reports, data and financial reports that the tribe or tribal organization will provide; proposed staff qualifications; and an assurance of meeting minimum procurement, property, and financial management standards. *Id.* § 900.8(g). Another required component is a budget, including program funds,

---

[18] *See* 25 C.F.R. § 900.3(a)(8) ("Congress has declared that all self-determination contract *proposals* must be supported by the *resolution* of an Indian tribe(s).") (emphases added).

direct contract support costs, indirect costs (along with a copy of the tribal organization's most recent negotiated indirect cost rate agreement), and any preaward or startup costs. *Id*. § 900.8(h).

Upon receipt of a proposal, the Secretary must "notify the applicant in writing of any missing items required by § 900.8" and give the applicant an opportunity to cure the defects. *Id*. § 900.15(b). If the required information is not provided, the proposal must be rejected.[19]

Defendants have presented no evidence to date in this case that TAC ever submitted a contract proposal that satisfied these statutory and regulatory requirements, or indeed that an ISDEAA contract was ever awarded to TAC. The Regional Director's declination letter references TAC's resolution, but as shown above that document alone falls far short of a proposal. Thus, the evidence in the record indicates that the BIA never had before it more than one proposal to contract the ANCSA 14(h)(1) program: APIA's. The purported "dilemma" cited by BIA never materialized.

The BIA should have evaluated APIA's proposal for a successor FA on its own merits, according to the letter of the ISDEAA and its regulations, and not in competition with an inadequate and technically non-existent proposal. The BIA's approach from the outset was thus very much at odds with both the letter and the spirit of the declination process and criteria set forth in the ISDEAA and its implementing regulations, which limit the Secretary's discretion to

---

[19] 25 C.F.R. § 900.8 ("An initial contract proposal *must* contain the following information….") (emphasis added); 61 Fed. Reg. 32481, 32485 (June 24, 1996) (stating, in preamble to published Part 900 rules, that "it is the consensus of the [Negotiated Rulemaking] Committee that the information included in the final version of § 900.8 is … essential information required by the Departments in order to be able to review or decline a contract proposal, to determine whether any of the statutory declination criteria exist"); *Shawn Wasson, Thomas Wasson, Andrea Davidson, and Elverine Castro v. Western Regional Director, Bureau of Indian Affairs*, Docket Nos. IBIA 04-81-A, IBIA 05-93-A (Jan. 24, 2006) at 141, 149, 153 (affirming Regional Director's rejection of contract proposal for failure to include information required by § 900.8).

deny contract proposals and require him to justify his decisions "by clearly demonstrating the validity of the[ir] grounds." 25 U.S.C. § 450f(a)(2); Mem. Op. at 15-16.[20]

             4.      *The BIA's "Policy-Based Departure" from the Alaska Order of Precedence Was Inappropriate.*

Even if TAC did submit a legally sufficient proposal to contract the ANCSA program the BIA should have employed its longstanding policy for dealing with competing proposals: the Alaska Order of Precedence. Instead, the BIA departed from this policy, just as it departed from the statute and regulations, based on "an exercise of judgment." BIA Declination at 8.

While the Regional Director resists the Court's conclusion that regional corporations are not the only beneficiaries of the ANCSA 14(h)(1) program, he argues that even if the Aleutian region's Tribes and their members do benefit, TAC should receive contracting priority. This position requires him to ignore the Alaska Order of Precedence, a longstanding agency policy that would (and should) have given APIA's member Tribes contracting priority over TAC. Consequently, according to the Regional Director, "[e]ven assuming that Judge Kollar-Kotelly were to stick by her guns with respect to rejection of Administrative Law Judge Sweitzer's conclusion" that TAC is not the sole beneficiary of the ANCSA program, TAC's 2005 resolution gave it priority over APIA's Tribes, requiring a "policy-based departure" from the Alaska Order of Precedence. BIA Declination at 7. This departure was not justified, because it is based on the mistaken premise that TAC benefits more from the 14(h)(1) program than do the communities and peoples APIA's member Tribes represent. Moreover, the Regional Director's "policy" and "judgment," BIA Declination at 8, are not reasons to decline APIA's legitimate proposal because

---

[20] *See also Ramah Navajo Sch. Bd. v. Babbitt*, 87 F.3d 1338, 1344 (D.C. Cir. 1996) (recognizing Congressional intent in the ISDEAA "to circumscribe as tightly as possible the discretion of the Secretary").

the established Alaska Order of Precedence cannot be set aside by ad hoc exercises of purported agency discretion.

As detailed in APIA's previous briefs, the BIA long ago developed the Alaska Order of Precedence to govern those situations in which more than one Alaska tribe or tribal organization may be eligible to contract a particular program.  Pl.'s Mem. at 7-10; Pl.'s Reply at 16-17.  As the BIA itself has stated, "[u]nder longstanding BIA policy, priority for contracts and services in Alaska is given to reorganized and traditional governments over non-tribal corporations."[21] Described as "longstanding" fifteen years ago, the Order of Precedence reflects the underlying policy of the ISDEAA: to build "strong and stable tribal *governments*, capable of administering quality programs and developing the economies of their respective *communities*."  25 U.S.C. § 450a(b) (emphases added); *see also* 25 C.F.R. § 900.3(a)(2) (recognizing same Congressional policy).

If the BIA was in fact faced with the "dilemma" of competing proposals, as the Regional Director asserts, this is precisely the kind of "dilemma"  that the Order of Precedence was designed to resolve.  A straightforward application of the contracting hierarchy would give the tribal governments represented by APIA priority over the corporation TAC.  The BIA, however, believes a "policy-based departure from the more common order of preference" is justified.  BIA Declination at 7.  Why?  Because, in "an exercise of judgment," the Regional Director has made "a policy decision based on my conclusion that ANCSA Regional Corporations are more directly

---

[21] Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 58 Fed. Reg. 54364, 54366 n.2 (Oct. 21, 1993).  It is worth noting that the BIA's  Order of Precedence has been accepted as the correct means of sorting through competing ISDEAA contracting proposals in Alaska by the Indian Health Service (IHS), the other federal agency that regularly contracts under the ISDEAA with tribes and tribal organizations.  In fact, the IHS has not only adopted the exact same priority rules, it has also incorporated them into binding contractual agreements with Tribes and tribal organizations.  *See, e.g.*, Alaska Tribal Health Compact, Preamble (citing *Alaska Area Guidelines for Tribal Clearances for Indian Self-Determination Contracts*, 46 Fed. Reg. 27178).

affected—and benefitted—by the ANCSA § 14(h)(1) program than are the village-based tribes."
*Id*. at 8.    This unilateral ad hoc decision has numerous problems.

First, the premise of the decision is incorrect.  While the corporations may benefit from
the ultimate conveyance of title, the BIA responsibilities in the 14(h)(1) process involve
investigation, reporting, and certification of the historical significance of the sites (not
conveyance),[22] as well as the collection, preservation, and dissemination of the resulting cultural
resource information, as described in the Budget Justifications.  Those BIA activities are the ones
APIA proposed to contract, and the ones that benefit the Aleut communities and peoples
represented by APIA's member Tribes.

Second, even if the Regional Director's policy judgment is defensible, it does not provide
a basis to decline APIA's proposal to contract the 14(h)(1) program as it had done for years.
APIA's FA renewal proposal was supported by the tribal resolutions of the communities this
Court has found to be beneficiaries of the ANCSA program, so the Declination Criteria apply.
Mem. Op. at 17.  A policy judgment that another potential contractor is somehow more worthy is
not one of the declination criteria. *See* 25 U.S.C. § 450f(a)(2); *supra* Part III.  To the extent that a
policy judgment between APIA and TAC must be made, the Department already made that
judgment in the Alaska Order of Precedence.  The Regional Director's asserted authority to
unilaterally and on an ad hoc basis depart from longstanding and well-established Department
policy reflects a desire for unlimited discretion that the ISDEAA simply does not provide.

Finally, it is worth noting that the Alaska Regional Office recently "modified" the Order
of Precedence to incorporate an express exception for the 14(h)(1) program.  *See* Pl.'s Ex. S.
While the established Order will continue to apply to "BIA programs designed to serve

---

[22] *See* 43 C.F.R. § 2653(h)–(k).

individuals or Native communities," the regional corporations move to the top of the hierarchy
for the 14(h)(1) program since that program benefits only the corporations. *Id*. at 2. This recent
action by the BIA underscores two important points. First, the "exception," like the "policy-
based departure," is based on the same premise about program beneficiaries rejected by this
Court as "clearly erroneous." Second, the "exception" was not in place during the time when the
BIA evaluated APIA's proposals. If the "modified" Order of Precedence was developed in
accordance with Department policy and with Department approval, perhaps it could apply to FY
2009 proposals, but not to earlier ones.[23]

In summary, to the extent that the ISDEAA statutory and regulatory scheme leaves the
BIA discretion, it must be exercised in accordance with established agency policy, which the
BIA failed to do by departing from the Alaska Order of Precedence.

      5.      *The BIA's Transfer of the ANCSA Funding to TAC Violated Its Statutory*
                   *Duties Not to Reduce Funding to APIA or Unilaterally Amend its*
                   *Contract.*

Congress recognized that stable funding levels are critical to effective tribal planning and
delivery of services. In 1988, Congress enacted a new section 106 of the ISDEAA to provide
that funding for a given contract "shall not be reduced by the Secretary in subsequent years"
unless one of five narrow exceptions applies. 25 U.S.C. § 450j-1(b)(2). The intent of this
provision, as described in the Senate Report, was "to protect and stabilize tribal programs by
protecting and stabilizing the funds for those programs from inappropriate administrative
reduction by Federal agencies." S. Rep. No. 100-274, 1988 U.S.C.C.A.N. 2620, 2649 (Dec. 21,
1987). Such stability "will contribute to better tribal planning, management and service
delivery." *Id*. The flip side of the no-reduction clause appears at the end of Section 106(b): "the

---

[23] APIA and other Alaska Tribes and tribal organizations have objected to the Regional Office's unilateral
"modification" of the Order of Precedence on the grounds that the BIA failed to consult with Tribes as
required by Department's consultation policy and Executive Order 13175. *See* Pl.'s Ex. S at 3-6.

Secretary is not required to reduce funding for programs, projects, or activities serving a tribe to make funds available to another tribe or tribal organization under this subchapter." 25 U.S.C. § 450j-1(b). Yet this is precisely what the BIA Declination would do: reduce funding to APIA to make it available to TAC, in direct contravention of Section 106(b).

Even assuming that TAC would otherwise be eligible to assume the 14(h)(1) program, *and* that TAC submitted a proper contract proposal (but see Part III.A.3 above), Section 106(b) would require the BIA to decline TAC's proposal. The IHS [already used] recognized this in the *Pit River* case, discussed in APIA's previous briefs.[24] In that case, there was no question that the Pit River Tribe had the legal right to provide the services it proposed—except for the fact that other tribal contractors were already doing so. To approve Pit River's proposal would have inevitably required the IHS to unilaterally modify the contracts of the other tribal contractors and reduce their funding in violation of the ISDEAA. Therefore the IHS declined Pit River's proposal under subparagraph (C)—the same criterion BIA invokes here. Because the IHS could not award the contract without violating the statute, the proposed services could not be "properly completed or maintained by the proposed contract." *Pit River* at *1.

The Department of Health and Human Services Departmental Appeals Board ("DAB") upheld the IHS's decision. Citing Section 106(a)(2), the DAB recognized that "IHS cannot reduce funding for other contractors—the inevitable consequence of accepting Appellant's proposal—without violating [the ISDEAA]." *Pit River* at *11. The DAB also cited Section 110 of the ISDEAA: "[t]he Secretary shall not revise or amend a self-determination contract with a tribal organization without the tribal organization's consent." 25 U.S.C. § 450m-1(b). As the DAB remarked, "[t]his is an unequivocal prohibition against unilateral substantive changes in

---

[24] *Pit River Health Service, Inc. v. Indian Health Service*, DAB CR333, 1994 WL 596859 ; Pl.'s Mem. at 12-15; Pl.'s Reply at 24-25.

contracts by IHS." *Pit River* at *11. Therefore the DAB affirmed the IHS's decision to decline Pit River's proposal under subparagraph (C).

The stable-funding provisions of Section 106(b) and the prohibition on unilateral modification in Section 110 result in a temporal priority when contracting rights overlap. For the BIA to approve TAC's proposal (assuming TAC submitted one), the BIA would necessarily have to unilaterally amend APIA's contract and reduce its ANCSA funds to zero. This the agency cannot do without violating the ISDEAA. Therefore, the proper course of action, as illustrated by the IHS in *Pit River*, was to decline *TAC's* proposal, not APIA's, under subparagraph (C) on the ground that the ANCSA program cannot be properly completed or maintained by an illegal contract.

The BIA objects to the "first-come, first served" principle, and protests that "we don't think that outright declination of The Aleut Corporation's contracting request would be consistent with … the basic spirit of Indian self-determination." BIA Declination at 10. BIA actions must comply with the letter of the ISDEAA and its implementing regulations, however, not with the agency's misguided notion of the self-determination "spirit." However much it might comport with the Regional Office's ideal of self-determination, the BIA Declination unilaterally amended APIA's contracts and reduced its funding in violation of the ISDEAA.

Defendants seeks to distinguish *Pit River*, where it was "lawful" for each of the competing tribes to contract the services in question, with this case, in which Defendants broke the law for ten straight years by including the ANCSA program in APIA's contracts. Defs.' Reply at 16-17. But this Court has already rejected the premise of that argument, which is that only TAC benefits from the 14(h)(1) program, so only TAC could provide a resolution authorizing APIA to contract the program. Mem. Op. at 17  If TAC's resolution was indeed a

contract proposal, then the BIA, just like the IHS in *Pit River*, had to decline the second proposal

(TAC's) or else violate the stable-funding and no-unilateral-amendment provisions of the

ISDEAA. Unfortunately, the BIA has chosen the latter.

> 6.    *The BIA's Failure to Approve Proposals "Substantially the Same" as the Prior Years' Violated 25 C.F.R. § 900.32.*

When a contractor proposes to do the same thing, for the same amount of money that it

did in the preceding contract year, the ISDEAA regulations flatly prohibit declination.

> **§ 900.32    Can the Secretary decline an Indian tribe or tribal organization's proposed successor annual funding agreement?**
>
> No. If it is *substantially the same as* the prior annual funding agreement (except for funding increases included in appropriations acts or funding reductions as provided in section 106(b) of the Act) and the contract is with DHHS or the BIA, the Secretary shall approve and add to the contract the full amount of funds to which the contractor is entitled, and *may not decline, any portion of a successor annual funding agreement*.

25 C.F.R. § 900.32 (emphases added).  This carefully worded regulation supplements the

Declination Criteria and implements both the stable-funding and no-unilateral-amendment

provisions of the ISDEAA discussed above.  *See* Pl.'s Mem. at 18-20; Pl.'s Reply at 23-24.

APIA's FY 2006 proposal was substantially the same as its approved FY 2005 FA with

respect to the ANCSA program and associated funding.  *Compare* Pl.'s Ex. I and K.  Defendants

do not dispute this obvious fact.  Amended Answer ¶ 30 (admitting FY 2006 proposal

substantially identical to prior year's); Defs.' Response to Pl.'s Stmt. ¶ 11.  And the FY 2007 and

2008 FAs proposed the exact same amount, to do substantially the same ANCSA work.  Had the

FY 2006 FA been approved as proposed, the BIA would have been required by § 900.32 to

approve the substantially identical FY 2007 proposal, and a year later the substantially identical

FY 2008 proposal.

Defendants argue that APIA's FY 2006 proposal "was *not* the same as its proposal for prior years, because of the intervening submission of TAC's May 2005 tribal resolution." Defs.' Opp. at 18 (italics in original). But the comparison is an objective one between two proposals, not a subjective one that compares the agency's *views* of the two proposals based on some intervening event. *See* Pl.'s Reply at 23-24. Moreover, the TAC resolution had no legal effect on APIA's proposal, as shown above in Part III.A.3. Because APIA's proposals with respect to the ANCSA program were substantially the same each and every year, the BIA's failure to approve them all violated 25 C.F.R. § 900.32.

> **B.**     *The BIA Has Not Shown that the Level of Funding Proposed by APIA "Exceed[ed] the Applicable Funding Level" under Subparagraph (D), and, in any Event, the ISDEAA Required the BIA to Include the Applicable Amount and Decline Only the Excessive Amount, which the BIA Failed to Do.*

The BIA's second argument for declination rests on 25 U.S.C. § 450f(a)(2)(D) ("subparagraph D"), which allows the BIA to decline when it can make "a specific finding that clearly demonstrates that … the amount of funds proposed under the contract is in excess of the applicable funding level for the contract." The Defendants' argument is as follows: APIA does not have a supporting resolution from one of the benefitted "tribes" in the region, TAC, so APIA is entitled only to "the village-based tribes' share of the program, or the program must be deemed uncontractable." BIA Declination at 9. Because APIA proposed to include the entire region's allocation, the BIA concludes, the proposed level of funding was excessive and the BIA had to decline the proposal altogether. *Id*. There are several problems with this reasoning.

First, APIA already had resolutions from all of the tribes eligible to contract the program: the region's Village tribal governments at the top of the Alaska Order of Precedence. Because the federally recognized tribes in the region wished to contract the ANCSA program through APIA, and did so, entities lower on the contracting hierarchy such as TAC had (and have) no

right to contract the program.  As BIA has consistently applied the Order of Precedence, the regional corporation's right to contract arises only when there is no tribal government (or village corporation) in the region requesting to contract.  As the Interior Board of Indian Appeals ("IBIA") has said, in implementing the ISDEAA in Alaska the BIA will "recognize and require supporting resolutions from, the four local entities" in the following order of priority:

1. Active Indian Reorganization Act (IRA) Council.
2. In the absence of an IRA, the formally established Traditional Council.
3. In the absence of either of the first two, the local ANCSA village/urban for-profit corporation.
4. In absence of all above, the ANCSA Regional for-profit corporation.

*Douglas Indian Ass'n v. BIA*, 27 IBIA 292, 293 (1995) (emphasis added).[25]  There was (and is) no "absence" of supporting resolutions from the tribal governments in the Aleutian-Pribilof Islands region authorizing APIA to contract the ANCSA program, so TAC's "right" to do so never came into being.

Second, despite no authorizing resolution from TAC, the BIA had always included the full allocation in APIA's previous FAs.  The BIA now characterizes this as yet another agency mistake: "The inclusion of ANCSA § 14(h)(1) program funds in the amounts provided to APIA should have been limited to an amount associated with the benefit to the tribes whose ISDEAA § 102(a) requests supported APIA's receipt of those funds."  BIA Declination at 9; *cf*. Defs.' Opp. at 15-23 (recounting "erroneous," "imprudent" history of contracting ANCSA program to APIA).

---

[25] *Cf*. Pl.'s Ex. S at 2 (under Order of Precedence, BIA "recognizes and requires supporting resolutions" from ANCSA for-profit corporations only "[i]n the absence of all [other tribal entities] above").  The "modified" Order of Precedence would establish an exception for the 14(h)(1) program), placing regional corporations at the top of the hierarchy with respect to that single program.  APIA questions whether the Regional Office has the authority to rewrite longstanding Department policy without adhering to the Department's tribal consultation policy or Executive Order 13175, but in any event one thing is clear: the "modified" Order of Precedence, issued on April 16, 2008, did not apply to any of the years at issue here. BIA Declination at 7 (recognizing that recent policy change provides no basis to justify agency actions taken from one to three years before).

But as noted above, no resolution is required from an entity like TAC eligible to contract only in the absence of resolutions from tribes and tribal organizations higher up in the priority list.

Third, APIA's proposed FY 2006 (and 2007 and 2008) ANCSA funding level was exactly what it was in FY 2005, and thus did not exceed the applicable level. The stable-funding provisions of the ISDEAA protect contractors' funding levels against shifting agency interpretations. *See* 25 U.S.C. § 450j-1(b)(2) (prohibiting reduction in funding level from year to year unless one of five narrow exceptions applies); 25 C.F.R. § 900.32 (requiring approval of proposals "substantially the same" as the prior year's contract).

Finally, even if TAC were entitled to a portion of the ANCSA § 14(h)(1) program funds, APIA's request to receive them all was not grounds for declining APIA's entire ANCSA proposal. Section 102(a)(4) of the ISDEAA requires that the Secretary "approve any severable portion of a contract proposal that does not support a declination finding . . . ." 25 U.S.C. § 450f(a)(4). Specifically, if the contractor "proposes a level of funding that is in excess of the applicable level," the Secretary must "approve a level of funding authorized under section 450j-1(a) of this title." *Id*. § 450f(a)(4)(B); *see also* 25 C.F.R. § 900.26 (stating same requirement of approval to extent of authorized funding level).

In sum, APIA proposed exactly the same level of ANCSA funding in FY 2006 (and in 2007 and 2008) that the BIA had approved in FY 2005 and preceding years. Prior to the Regional Director's most recent declination letter BIA had never discussed nor required that APIA, as a condition of full ANCSA funding, present an authorizing resolution from TAC. The reason is clear: the ISDEAA, as implemented by the Order of Precedence, does not require one. The BIA's declination on the basis of Section 102(a)(2)(D) is without merit; APIA's proposed funding level was appropriate.

**IV.     The Appropriate Remedies for Defendants' Violations of the ISDEAA Include Money Damages and Injunctive Relief.**

The consequences of violating the ISDEAA are spelled out in the statute.  Section 110 states that:

> "district courts may order appropriate relief including money damages, injunctive relief against any action by an officer of the United States or any agency thereof contrary to this subchapter or regulations promulgated thereunder . . . (including immediate injunctive relief to reverse a declination finding under section 450f(a)(2) of this title or to compel the Secretary to award and fund an approved self-determination contract)."

25 U.S.C. § 450m-1(a).  Typically the remedy for an improper declination is an injunction to reverse the finding and to award and fund the contract as proposed.

As shown above, however—and as alleged in the Complaint—Defendants have violated not only the Declination Criteria and procedures in Section 102(a)(2), but also several other provisions of the ISDEAA and its regulations: 25 U.S.C. § 450j-1(b)(2) (stable-funding provision generally prohibiting reduction in funding from year to year); 25 U.S.C. § 450m-1(b) (prohibition against unilateral agency amendment of contract without tribal organization's consent); 25 C.F.R. § 900.32 (prohibition against declining proposals that are substantially the same as the approved prior year's); *id.* § 900.33 (agency "will not" review proposals to renew contract for declination issues where no material or substantial change in scope or funding has been proposed).  Where the defendants can be directed by the Court to cure these violations by awarding and funding the contract(s) as proposed, injunctive relief under Section 110 is appropriate.  Where this relief is inadequate, money damages lie.

The circumstances of the three fiscal years at stake require the Court to craft different remedies for each year.

A.    *APIA Should Be Awarded Money Damages for FY 2006.*

The parties agree that the BIA's appropriation for FY 2006 has lapsed, and the agency has

no funds to include in the FY 2006 contract.  Pl.'s Reply at 19 n.20; Defs.' Reply at 18 n.7; Defs.'

Report at 4.  Contrary to Defendants' assertion, however, that does not mean that all of APIA's

claims for violations of the ISDEAA in that year are "moot," because this Court can award

damages for those violations when injunctive relief is unavailable or insufficient.

In a case involving alleged violations of the ISDEAA, the court discussed the various

remedial options available to a court under Section 110.

> [I]n some situations, an order to reverse, enjoin, or compel certain agency action
> may be insufficient.  For example, when an appropriation has lapsed or is not
> sufficient, the appropriate remedy will be money damages rather than injunctive
> relief…. Congress' specific authorization of money damages signals that tribes
> may hold the Secretary accountable for injuries caused by her violations of the
> ISDEA[A] and are not merely limited to equitable relief under the APA.

*Shoshone-Bannock*, 988 F. Supp. at 1315.  For FY 2006, Defendants violated the Declination

Criteria as well as the stable-funding and other ISDEAA statutory and regulatory provisions

noted above.  Because the violations can no longer be remedied by injunctive relief, this Court

should award money damages in the amount of $73,319, the recurring amount of ANCSA

funding proposed but never funded, plus $26,238 in indirect costs associated with the ANCSA

program.  25 U.S.C. § 450m-1(a); *id.* § 450j-1(a)(2) & (3) (requiring addition of contract support

costs, including indirect costs, to program funding).  APIA performed ANCSA work in FY 2006

using other funds and suffered damages in the amounts claimed.  Decl. of Dimitri Philemonof

[Docket #33-2] ¶¶ 7-9 (describing use of alternative funding to carry on (14(h)(1) activities in

FYs 2006-2008).  In addition, the Court should award payment of interest pursuant to the Prompt

Payment Act from the date the agreement was deemed approved by operation of law, 90 days

after APIA's proposal on October 3, 2005.  *See* Mem. Op. at 4 (citing Pl.'s Stmt. ¶ 12).

     B.    *The Court Should Declare APIA Entitled to the ANCSA Funding Included in the FY 2007 FA.*

As noted above and in Defendants' Report to the Court [Docket #32], the BIA inadvertently included ANCSA funding in APIA's FY 2007 FA, despite its letter advising APIA it would not do so pending the outcome of this litigation. Therefore neither damages nor injunctive relief is necessary for this year. However, APIA requests that the Court declare that APIA is entitled to retain and use the included ANCSA funds and related contract support cost funds for their intended purpose. In addition, the Court should order Defendants to include contract support costs associated with the ANCSA funding, as required by the ISDEAA but not paid in FY 2007. 25 U.S.C. § 450m-1(a); Decl. of Dimitri Philemonof [Docket #33-2] ¶ 10.

     C.    *The Court Should Order BIA to Add the ANCSA Funds to APIA's FY 2008 FA as Recurring Funds or, in the Alternative, Award Money Damages if FY 2008 Funds Are No Longer Available for that Purpose.*

In FY 2008, the BIA once again removed the ANCSA funding from APIA's FA, with a footnote to the zeroed-out line item stating that "Distribution of ANCSA funds is pending final decision on APIA's appeal." Defs.' Report, Ex. 5 at 3 and n.11. This appears to mean that the BIA is holding the funds and will distribute them to APIA should the Court rule favorably to APIA. If so, the injunctive relief authorized in Section 110(a)—"to compel the Secretary to award and fund" the declined program, along with associated contract support costs—would be appropriate and adequate. If FY 2008 funds are not available, for whatever reason, the Court should award money damages. In either case, APIA should receive (1) the $73,379 in ANCSA program funding; (2) indirect costs at APIA's negotiated rate of 59.1% (*see* Decl. of Dimitri Philemonof [Docket #33-2] ¶ 12); and (3) interest under the Prompt Payment Act from the date the proposal including ANCSA funds was deemed approved by operation of law. And in either

case, the Court should enjoin Defendants from reducing these recurring funds in future FAs except in compliance with Section 106(b)(2).

Finally, the Court should award fees and expenses pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, or other applicable law.

## CONCLUSION

The BIA's belated declination fails to cure its procedural violations; the contracts at issue were deemed approved by operation of law long ago, and the BIA failed to issue its decision even within the renewed period prescribed by the Court.  Substantively, the declination fares no better.  The BIA's declination under subparagraph (C) relies on a premise already rejected by this Court: that TAC is the only beneficiary of the 14(h)(1) program in the ANCSA region. The BIA's subparagraph (D) argument relies on APIA's lack of an authorizing resolution from TAC, but under the ISDEAA, as implemented by the Alaska Order of Precedence, APIA did not need a resolution from an entity lower down on the priority list, and indeed, the BIA never required such a resolution during its ten-year history of contracting the 14(h)(1) program to APIA.  The BIA Declination, like the original agency actions it seeks to rationalize, has no basis in the law.

Therefore, APIA respectfully requests that this Court grant APIA's motion for summary judgment on its ISDEAA claims and afford the remedies described above and such other relief as the Court deems appropriate.

Respectfully Submitted,


_____/s/_____
F. Michael Willis (D.C. Bar No. 467462)
HOBBS, STRAUS, DEAN & WALKER, LLP
2120 L Street, NW, Suite 700
Washington, DC 20037
(202) 822-8282

_____/s/_____
Geoffrey D. Strommer
HOBBS, STRAUS, DEAN & WALKER, LLP
806 SW Broadway, Suite 900
Portland, Oregon  97205

*Attorneys for the Aleutian Pribilof Islands
Association*

Stephen D. Osborne, Of Counsel
HOBBS, STRAUS, DEAN & WALKER, LLP
806 SW Broadway, Suite 900
Portland, Oregon  97205

DATED: June 10, 2008.

# DEPARTMENT OF THE INTERIOR
# INDIAN AFFAIRS

## Budget Justifications
## Fiscal Year 2008

## Table of Contents

Table of Contents ............................................................................................................... IA-i
Explanatory Note ............................................................................................................ IA-iii
General Statement ...................................................................................................... IA-OVW-1
Organization Chart ..................................................................................................... IA-OVW-5
Overview of FY2008 Budget Request ........................................................................ IA-OVW-9
    Unified Trust Budget .............................................................................................. IA-OVW-13
    FY2008 Budget Summary Table ............................................................................. IA-OVW-21
FY2008 Comprehensive Budget Table ....................................................................... IA-COMP-1
Goal Performance Summary Table ............................................................................... IA-GPT-1
    Funding by Goals Table ............................................................................................ IA-GPT-6
Authorizing Statutes ...................................................................................................... IA-AUTH-1
Administrative Provisions ............................................................................................. IA-PROV-1

**Appropriation:  Operation of Indian Programs (OIP)**
    Appropriation Language – Operation of Indian Programs ........................................... IA-OIP-1
    Summary of OIP Requirements .................................................................................... IA-OIP-2
    Justification of Fixed Costs and Related Changes ....................................................... IA-OIP-4
    Fiscal Year 2008 OIP Program and Financing Schedule ............................................. IA-OIP-6

**Justification of Program and Performance by Activity:**
    Tribal Government .................................................................................................... IA-TG-1
    Human Services ......................................................................................................... IA-HS-1
    Trust – Natural Resources Management .................................................................. IA-TNR-1
    Trust – Real Estate Services .................................................................................... IA-RES-1
    Public Safety and Justice ......................................................................................... IA-PSJ-1
    Community and Economic Development .................................................................. IA-CED-1
    Executive Direction and Administrative Services .................................................... IA-ADM-1
    Bureau of Indian Education ..................................................................................... IA-EDUC-1

**Appropriation:  Construction**
    Appropriation Language ...................................................................................... IA-CON-SUM-1
    Appropriation Language Citations ....................................................................... IA-CON-SUM-2
    Summary of Requirements .................................................................................. IA-CON-SUM-7
    Justification of Fixed Costs and Related Changes .............................................. IA-CON-SUM-8
    Construction Summary ........................................................................................ IA-CON-SUM-9
    Five Year Deferred Maintenance and Construction Plan ................................... IA-CON-SUM-11
    Construction Program and Financing Schedules ............................................... IA-CON-SUM-21
    Analysis of Budgetary Resources by Activity .................................................... IA-CON-SUM-23

**Justification of Program and Performance by Activity:**
Education Construction ................................................................IA-CON-ED-1
Public Safety and Justice Construction ........................................IA-CON-PSJ-1
Resources Management Construction ...........................................IA-CON-RM-1
General Administration Construction.............................................IA-CON-GA-1

**Appropriation:  Indian Land and Water Claim Settlements**
**and Miscellaneous Payments to Indians** ........................................................IA-SET-1

**Loan Accounts**:
Appropriation:  Indian Guaranteed Loan Program Account....................................IA-LOAN-1
Appropriation:  Indian Guaranteed Loan Financing Account .................................IA-LOAN-8
Appropriation:  Indian Loan Guaranty and Insurance Fund
Liquidating Account ..............................................................................IA-LOAN-12
Appropriation:  Indian Direct Loan Program Account...........................................IA-LOAN-15
Appropriation:  Indian Direct Loan Financing Account..........................................IA-LOAN-17
Appropriation:  Revolving Fund for Loans Liquidating Account ..........................IA-LOAN-21

**Permanent Appropriations:**
Appropriation:  White Earth Settlement Fund .........................................IA-MISP-1
Appropriation:  Indian Water Rights Habitat Acquisition Program Account............ IA-MISP-3
Appropriation:  Miscellaneous Permanent Appropriations ......................................IA-MISP-5
Appropriation:  Operation and Maintenance of Quarters .........................................IA-MISP-8

**Section 405 Compliance**..........................................................................IA-S405-1
Direct Billings ......................................................................... IA-S405-2
Centralized Billings .............................................................. IA-S405-6

**Appendices:**
Employee Count by Grade............................................................ Appendix-1
ISEP Formula by School............................................................... Appendix-2
Student Transportation by School................................................. Appendix-3
Tribal Priority Allocations by Location......................................... Appendix-4
Bureau Region Allocations by Location........................................ Appendix-5
Self Governance Compacts Participation ...................................... Appendix-6
Self Governance Compacts by Tribe/Consortium ......................... Appendix-7
Consolidated Tribal Government Program (CTGP) by Location........................... Appendix-8
Bureau of Indian Affairs Regional Map......................................... Appendix-9

**Performance Overview Table: Environmental Quality**

| Program Performance Overview | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **End Outcome Goal 4.3: Serving Communities: Fulfill Indian Fiduciary Trust Responsibilities** | | | | | | | | | |
| **End Outcome Goal**<br>**End Outcome Measure / Intermediate**<br>**or PART Measure / PART Efficiency**<br>**or other Outcome Measure** | **2004**<br>**Actual** | **2005**<br>**Actual** | **2006**<br>**Plan** | **2006**<br>**Actual** | **2007**<br>**President's**<br>**Budget** | **2007 Plan** | **2008**<br>**Plan** | **Change**<br>**from 2007**<br>**to 2008** | **Long-term**<br>**Target 2012** |
| Percent of collections in DOI inventory in good condition (i.e., maintained according to DOI museum property management collection standards). SP | 17% | 22% | 34.1% | 34.1% | 20% | 35% | 36% | +1% | 69% |
| Percent of archaeological sites in DOI inventory in good condition. SP | N/A | N/A | 88% Baseline Established | 88% Baseline Established | N/A | 90% | 90% | 0% | 71% |
| Percent of historic structures in DOI inventory in good condition. SP | N/A | N/A | Baseline Not Established | Baseline Not Established | 100% | Establish Baseline | TBD | 0% | 47% |
| **Note:** The 2007 plan is the performance level based upon a projection of 2007 likely enacted made during the first quarter of 2007. The 2008 plan and 2012 long-term targets build on the 2007 plan. To the extent Congress enacts a 2007 appropriation that is different from the 2007 projection, the 2008 plan and 2012 targets may require revision. | | | | | | | | | |

## Subactivity:   Alaska Native Programs (FY 2008: $1,022,000; FTE 5);

**Program Overview:**

ANILCA Programs:  This program supports the Departmental goal of Serving Communities by fulfilling Indian Trust responsibilities by protecting and preserving trust lands and trust resources. This program upholds the directives prescribed in the Alaska National Interest Lands Conservation Act (ANILCA), which provides for the coordination and consultation with land managing agencies and the State of Alaska on subsistence preference for Alaska Natives and the administration of programs affecting Native allotments under the 1906 Native Allotment Act.

> Subsistence – The Bureau is a member of the Federal Subsistence Board and Federal Staff Committee and is an advocate to ensure that Native subsistence users, as rural Alaskans, are accorded a priority use of shared fish and wildlife resources (ANILCA Title VIII).

> Native Allotments – The Bureau assists Native allotment applicants in acquiring title to their lands and subsequent management.

ANCSA Historical Places and Cemetery Sites:  This program supports the Departmental goals of Serving Communities and Resource Protection by satisfying the requirements of Sections 14(h)(1), 14(h)(2), and 14(h)(5) of the Alaska Native Claims Settlement Act (ANCSA) of 1971 (*P.L. 92-203*). The program provides for the thorough investigation and certification of Alaska Native historical places and cemetery sites, native groups, and native primary places of residence. The program produces fair and legally valid certifications that are based on field investigations of the claimed lands and associated historical, archeological, and ethnographic research; the combined findings of which are presented in final reports of investigation.

The completion of ANCSA reports and certifications is ongoing. Implementation of Secretarial Order No. 3220, which provides for the potential reopening of 188 ANCSA 14(h)(1) case files that are presently closed will significantly increase the program's workload (e.g., requiring the reinvestigation and/or re-certification of associated ANCSA 14(h)(1) claims).

**2008 Program Performance:**

Subsistence:
- Work with federal and tribal biologists and/or anthropologists from the Office of Subsistence Management in the development of staff analyses for an estimated 20-30 regulatory proposals.
- Prepare and compile Interagency Staff Committee comments on all proposals for delivery at an anticipated 20 Regional Advisory Council meetings.
- Attend and participate in 20 Regional Advisory Council (RAC) Meetings.
- Assist the Office of Subsistence Management in the review of 120 new/revised Federal Subsistence Management Regulations.
- Provide new grants to Alaska Tribes, to assist in addressing important subsistence issues and needs (number dependent on funding).
- Provide fisheries and wildlife subsistence-related technical assistance to an estimated 30 Alaska Tribes and native organizations.

Native Allotments: Program activities in FY 2007 will continue at a level similar to FY 2006, along with an increase of certificate issuance from the continuing thrust of the Alaska Land Transfer Acceleration Act. By 2008, the BLM has proposed completion of allotment adjudication per ANILCA. This will require intense levels of activity in both Bureau and tribal Realty offices through FY 2009. In addition, the program will: provide counseling information to 500–1,000 beneficiaries and tribal compact/contract inquiries regarding BLM actions and decision level documents; and assess 500 closed cases for re-opening and possible application of ANILCA authority for approval/conveyance.

ANCSA Historical Places and Cemetery Sites:
- Perform 50 ANCSA 14(h)(1) field investigations
- Complete 225 ANCSA 14(h)(1) case file reviews
- Complete 40 ANCSA 14(h)(1) certifications and site reports
- Continue performing museum property inventory and indexing tasks
- Provide technical assistance, training and outreach programs to clients and other interested parties as needed.

**Subactivity- Rights Protection (FY 2008: $12,468,000; FTE 24):**

**Program Overview:**

This program supports the Department's goal of Serving Communities by fulfilling Indian trust responsibilities. Under the Rights Protection (TPA) program, Bureau field staff provides advice and technical assistance to tribes and other agency personnel in various rights protection issues.

# APPENDIX – 4
# TRIBAL PRIORITY ALLOCATIONS BY LOCATION

FY 2008 TPA BASE FUNDING

| ALASKA REGION PROGRAM TITLE | ALASKA TOTAL | ALASKA FIELD OPS | ANCHORAGE TOTAL | BETHEL TOTAL | FAIRBANKS TOTAL | NOME TOTAL | SOUTHEAST | CHILKOOT (IIA&IES) | HOONAH | KLUKWAN | DOUGLAS | HYDABURG |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Aid to Tribal Government | 4,815,550 | 252,793 | 1,353,414 | 1,523,317 | 1,111,597 | 468,235 | | 51,763 | 215,918 | 164,761 | 54,455 | 206,841 |
| Consolidated Tribal Gov't Prgm-CTGP | 6,665,381 | | 3,135,434 | 1,727,488 | 892,448 | 315,662 | | | | | 8,029 | |
| Self Governance | | | | | | | | | | | | |
| New Tribes | | | | | | | | | | | | |
| TRIBAL GOVERNMENT | 11,481,931 | 252,793 | 4,488,848 | 3,250,805 | 2,004,045 | 783,897 | | 51,763 | 215,918 | 164,761 | 62,484 | 206,841 |
| Social Services | 1,718,397 | 915,726 | 383,347 | 129,586 | 277,110 | 2,524 | | 1,512 | | | 17,592 | |
| Indian Child Welfare Act | 1,757,346 | | 452,427 | 578,234 | 375,351 | 323,014 | | | | | 28,320 | |
| Welfare Assistance | | | | | | | | | | | | |
| Other, Human Services | | | | | | | | | | | | |
| Housing Improvement Program | | | | | | | | | | | | |
| HUMAN SERVICES | 3,475,743 | 915,726 | 835,774 | 698,820 | 652,461 | 325,538 | | 1,512 | | | 45,912 | |
| Natural Resources, General | 185,148 | 45,216 | 12,200 | 106,088 | 17,880 | 0.095 | | | 3,869 | | | |
| Agriculture | 139,977 | 76,060 | 11,068 | 21,950 | 14,693 | 16,206 | | | | | | |
| Forestry | 317,099 | 316,808 | | | | | | | | | | 0.006 |
| Water Resources | 8,911 | | | | | 0.464 | | | | 0.285 | | 1.664 |
| Wildlife and Parks | 139,714 | 82,603 | 3,820 | 1.103 | 1,448 | | | | | 0.876 | | |
| Minerals and Mining | 0.083 | 0.083 | 0.714 | | 56,397 | | | | | | | |
| TRUST-RESOURCES MANAGEMENT | 790,932 | 520,770 | 27,802 | 129,141 | 90,418 | 18,301 | | | 3,869 | 1.161 | | 1.670 |
| Trust Services | 498,863 | 491,378 | | 5,836 | 1,649 | | | | | | | |
| Rights Protection | 148,962 | 126,183 | 0.140 | 0.369 | | 21,001 | | 0.649 | | | | |
| Real Estate Services | 1,499,597 | 819,267 | 224,487 | 272,035 | 242,941 | 34,969 | 18,804 | 11,878 | 44,968 | 21,633 | 0.854 | 7.761 |
| Probate | 201,111 | 201,076 | | | | 0.035 | | | | | | |
| Environmental Quality Services | 239,088 | 235,104 | 2,581 | 0.252 | 0.088 | 0.464 | | 0.113 | | 0.571 | | |
| Alaskan Native Programs | 1,000,825 | 987,114 | 10,576 | 0.955 | 0.808 | 1.372 | | 0.921 | | | | |
| ANILCA | 575,776 | 562,458 | 10,576 | 0.955 | 0.808 | 0.979 | | | | | | |
| ANCSA | 425,049 | 424,656 | | | | 0.303 | | | | | | |
| TRUST-REAL ESTATE SERVICES | 3,588,446 | 2,860,152 | 237,804 | 279,447 | 245,484 | 58,441 | 18,804 | 11,878 | 45,617 | 22,204 | 0.854 | 7.761 |
| Scholarships and Adult Education | 531,053 | | 308,016 | 107,034 | 79,255 | 22,131 | | 1,034 | | | 13,583 | |
| Scholarships | 512,132 | | 308,016 | 104,416 | 74,382 | 12,593 | | 0.113 | | | 12,832 | |
| Adult Education | 18,921 | | | 2,618 | 4,893 | 9,538 | | 0.921 | | | 0.551 | |
| Other, Education | | | | | | | | | | | | |
| Johnson O'Malley | | | | | | | | | | | | |
| Tribal Colleges and Universities | | | | | | | | | | | | |
| EDUCATION | 531,053 | | 308,016 | 107,034 | 79,255 | 22,131 | | 1,034 | | | 13,583 | |
| Tribal Courts | 15,682 | | | 15,682 | | | | | | | | |
| Community Fire Protection | | | | | | | | | | | | |
| PUBLIC SAFETY & JUSTICE | 15,682 | | | 15,682 | | | | | | | | |
| Job Placement & Training | 768,822 | 171,788 | 332,197 | 52,888 | 156,102 | 16,467 | | 20,088 | | | 19,292 | |
| Economic Development | 183,412 | 145,304 | | 22,337 | 14,687 | | | | | | 1.084 | |
| Road Maintenance | | | | | | | | | | | | |
| COMMUNITY & ECON. DEVELOPMENT | 952,234 | 317,092 | 332,197 | 75,225 | 170,789 | 16,467 | | 20,088 | | | 20,376 | |
| Executive Direction | 486,100 | 19,995 | 242,084 | | 140,265 | 81,327 | | | | | 2.719 | |
| Administrative Services | 561,495 | 21,714 | 288,349 | | 148,602 | 70,054 | 52,476 | | | | | |
| Safety Management | 561,495 | 21,714 | 288,349 | | 148,602 | 70,054 | 52,476 | | | | | |
| Common Support Services | | | | | | | | | | | | |
| EXEC DIRECTION & ADMINISTRATION | 1,047,595 | 41,409 | 510,733 | | 288,867 | 151,391 | 55,195 | | | | | |
| ** GRAND TOTAL ** | 21,883,616 | 4,707,918 | 6,741,174 | 4,556,154 | 3,531,319 | 1,373,986 | 73,999 | 86,275 | 265,204 | 188,128 | 143,209 | 216,272 |

*Note: Does not include pay-related adjustments



# BUDGET JUSTIFICATIONS

The United States
Department of the Interior

# JUSTIFICATIONS

and Performance Information
Fiscal Year 2009

# INDIAN AFFAIRS

NOTICE: These budget
justifications are prepared
for the Interior, Environment
and Related Agencies
Appropriations Subcommittees.
Approval for release of the
justifications prior to their
printing in the public record of
the Subcommittee hearings
may be obtained through
the Office of Budget of the
Department of the Interior.



Printed on
Recycled Paper

applications are being reinstated; therefore, the number of parcels remaining to be adjudicated has increased. Acquisition services include collecting evidence of use and occupancy within prescribed timeframes; accompanying applicant and the Bureau of Land Management (BLM) staff on field exams; performing probates and contacting heirs to notify them of inherited claims; contesting appeals to the Interior Board of Land Appeals; and approving easements for trespass abatement. Of the work being completed in partnership with the BLM, Tribal Realty offices will address much of the work for Native allotment parcels.

The Native Allotment Program provides assistance to Native allotment applicants in acquiring title to his/her lands applied for prior to December 1971. Of the 15,000 parcels applied for, there are approximately 1,000 parcels that remain pending issuance of a Certificate of Allotment. Of the 1,000 parcels, approximately 300 are Alaska Native Veteran allotments. These lands are subject to negotiation of recovery of title through the adjudication process with the Bureau of Land Management (BLM), with the State of Alaska or the Regional and Village Native Corporations. Furthermore, through this process the BIA provides assistance that includes training and technical assistance to approximately 30 Realty Service Providers in Alaska that have either a P.L. 93-638 contract or a P.L. 103-314 compact agreement to operate the trust realty program on the BIA's behalf.

<u>ANCSA Historical Places and Cemetery Sites:</u> This program supports the Departmental goal of Resource Protection by protecting cultural and natural heritage resources, and by increasing knowledge of cultural and natural heritage resources managed or influenced by the Department. The program will provide for the thorough investigation of Alaska Native historical places and cemetery sites, native groups, and native primary places of residence; and produce fair and legally valid certifications for all such claims. Certifications are based on field investigations of the claimed lands and associated historical, archeological, and ethnographic research—the combined findings of which are presented in final reports of investigation. The current known backlog of field investigations and certifications is about 200, but this workload is expected to increase due to three factors: (i) legal appeals and critical reviews of past program work; (ii) implementation of Secretarial Order No. 3220, which provides for the potential reopening of dozens of ANCSA 14(h)(1) case files that are presently closed; and (iii) requirements of the Alaska Land Transfer Acceleration Act of 2004 (P.L. 108-452). The primary emphasis of program work is focused on ensuring completion of the ANCSA land conveyance process; however, this program also manages the ANCSA museum property collection in a manner that ensures its long-term preservation. To the maximum extent possible, data contained in the ANCSA collection are shared to support Alaska Native cultural heritage and educational programs, Federal and State subsistence management programs, and the protection of Alaska's cultural resources. Toward this end, digital copies of ANCSA site records have been transferred to the Alaska State Historic Preservation Officer, and cooperative agreements have been developed with various parties to produce topical indexes and transcripts of ANCSA oral history tapes.



**UNITED STATES**
**DEPARTMENT OF THE INTERIOR**
BUREAU OF INDIAN AFFAIRS
ALASKA REGION
P.O. Box 25520
Juneau, Alaska 99802-5520



16 April 2008

Dear Tribal Leader:

The purpose of this letter is to notify you that the Bureau of Indian Affairs (BIA), Alaska Region, has modified its "Order of Precedence" to incorporate an exception for the unique circumstances of the ANCSA 14(h)(1) Program. The Alaska "Order of Precedence" is a BIA-developed policy intended to apply in the case where there are competing requests by eligible tribes to contract under the Indian Self-Determination and Educational Assistance Act (ISDEAA) to carry out the same programs, functions, services and activities.

A copy of the modified Order of Precedence is attached.

Sincerely,

Niles Cesar
Regional Director

(Attachment)

**Order of Precedence**

The Alaska "Order of Precedence" is a BIA-developed policy intended to apply in the case where there are competing requests by eligible tribes to contract under the Indian Self-Determination and Educational Assistance Act (ISDEAA) to carry out the same programs, functions, services and activities (PFSAs). Pursuant to this longstanding policy, BIA recognizes and requires supporting resolutions from ISDEAA-defined tribes in the following order of priority:

1. Active Indian Reorganization Act (IRA) Council.
2. In the absence of an IRA, the formally established Traditional Council.
3. In the absence of either of the first two, the local ANCSA village/urban for-profit corporation.
4. In the absence of all above, the ANCSA Regional for-profit Corporation.

Exception

The Alaska "Order of Precedence" is normally applied with respect to BIA programs designed to serve individuals or Native communities. In these instances, it is logical that contracts would be prioritized beginning at the most local tribal government level. The ANCSA Section 14(h)(1) program constitutes an exceptional case, however, in that it is specifically intended to benefit a broader group: ANCSA Regional Corporations and the shareholder class they represent.

Because they are the direct beneficiaries of ANCSA Section 14(h)(1), ANCSA Regional Corporations and the shareholder class they represent have the first claim with respect to the right to contract to perform ANCSA Section 14(h)(1) PFSAs. Accordingly, the "Order of Precedence" is hereby amended as follows.

In the case where there are competing requests by eligible tribes to contract under the ISDEAA to perform ANCSA Section 14(h)(1) PFSAs, BIA recognizes and requires supporting resolutions from ISDEAA-defined tribes in the following order of priority:

1. The relevant ANCSA Regional Corporation.
2. In the absence of a resolution from the ANCSA Regional Corporation, then one from an active Indian Reorganization Act (IRA) Council.
3. In the absence of either of the first two, then a resolution from the formally established Traditional Council.
4. In the absence of all above, a resolution from the local ANCSA village/urban for-profit corporation.

♡ St. Paul

↘ St. George

# Aleutian/Pribilof Islands Association, Inc.

1131 E. International Airport Rd.
Anchorage, Alaska 99518-1408
Phone (907) 276-2700
Fax (907) 279-4351

Nelson Lagoon

False Pass    Sand Point
King Cove    Belkofski

Akutan

Unalaska

Nikolski

Atka

May 7, 2008

Niles Cesar, Regional Director
Bureau of Indian Affairs, Alaska Region
P.O. Box 25520
Juneau, AK 99802-5520

   **Re:**  *Alaska "Order of Precedence"*

Dear Mr. Cesar:

We recently received your letter to tribal leaders, dated April 16, 2008, regarding your
agency's modification of its longstanding policy on the order of contracting precedence
among tribes and tribal organizations seeking to carry out federal programs under the
Indian Self-Determination and Education Assistance Act (ISDEAA).[1]

As described in your letter, the Bureau of Indian Affairs (BIA) has modified its "Order of
Precedence" by creating an exception for activities carried out pursuant to Section
14(h)(1) of the Alaska Native Claims Settlement Act (ANCSA). Whereas tribal
governments have always occupied the top tier of the Order of Precedence, the newly
minted "exception" will give priority to ANCSA regional corporations with respect to the
14(h)(1) program. As you are well aware, the Aleutian Pribilof Islands Association
(APIA) and the BIA are currently litigating the issue of the appropriate party to contract
the 14(h)(1) program—APIA, which has the backing of the tribal governments in the
region, or the ANCSA regional corporation. In this context, your unilateral change in
policy is troubling, both for its apparent attempt to impact the ongoing litigation and for
its complete lack of tribal consultation. For these reasons, we request that you rescind the
modification immediately.

The Alaska Order of Precedence followed by the BIA for decades gives contracting
priority to tribes, then to village corporations, and last to regional corporations.[2] This
policy makes sense because the ISDEAA is premised on the government-to-government

---

[1] 25 U.S.C. § 450 et seq.

[2] *See* Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian
Affairs, 58 Fed. Reg. 54364, 54366 n.2 (Oct. 21, 1993) ("Under longstanding BIA policy, priority for
contracts and services in Alaska is given to reorganized and traditional governments over non-tribal
corporations.").

relationship between federal and tribal governments.  Because of this relationship, federal agencies are required by Executive Order 13175 to consult with affected tribes when adopting or amending "policies that have tribal implications"—not just legislative or regulatory proposals, but "policy statements or actions that have substantial direct effects" on tribes.[3]

The BIA's own policy requires consultation on all "federal actions"—again defined broadly as including "policy statements or actions that have substantial direct effects on one or more Indian tribes."[4]  Consultation involves "government to government dialogue," including timely notification of the proposed action, a meaningful chance for tribes to respond, and serious consideration of tribal comments and, suggested alternatives, and other recommendations.  The BIA alteration of its Order of Precedence clearly is a change in policy with "substantial direct effects" on all Alaska tribes, yet tribes received no notice of this action at all until after the fact, let alone any chance to engage in government-to-government dialogue.  Tribal leaders were merely notified by your letter that the BIA "has modified" its policy, a copy of which you attached.  That is dictation, not consultation.

The timing of the policy change is as troubling as its process.  As you know, the District Court for the District of Columbia recently held that BIA's failure to employ the ISDEAA's declination criteria and procedure in evaluating APIA's proposal to carry out the 14(h)(1) program was "arbitrary and capricious," and remanded to the agency to apply the statutory criteria and procedure.  Changing the agency's rule on contracting priority after the contract proposal was submitted, in order, apparently, to support the BIA's decision to reject the proposal, is inappropriate, fundamentally unfair, and may violate APIA's due process of law.

For these reasons, we request that you immediately rescind the modified Order of Precedence until such time as (1) Alaska tribes have been afforded consultation on this issue, as is their right under the Executive Order and BIA policy; and (2) BIA has issued its decision approving or declining APIA's proposal to include the 14(h)(1) program in its FY 2008 funding agreement.

Sincerely,

Dimitri Philemonof, President/CEO
Aleutian Pribilof Islands Association, Inc.

---

[3] Exec. Order No. 13175 §§ 1(a), 3(c).
[4] Bureau of Indian Affairs Government-to-Government Consultation Policy § IV (Dec. 13, 2000).

Central Council

**Tlingit and Haida**

Indian Tribes of Alaska

CENTRAL COUNCIL
*Tlingit and Haida Indian Tribes of Alaska*
Office of the President
320 West Willoughby Avenue • Suite 300
Juneau, Alaska 99801-1726

May 12, 2008

Niles Cesar
Director
BIA Alaska Region
P.O. Box 25520
Juneau, AK 99802-5520

Re:    Tribal consultation on change to Alaska "order of precedence"

Dear Mr. Cesar:

We are concerned by the lack of tribal consultation evidenced in your letter
announcement to tribal leaders of April 16, 2008 regarding your modification of the
longstanding BIA policy on the order of precedence for tribal organizations seeking to
carry out federal programs under the Indian Self-Determination and Education Assistance
Act (ISDEAA or Pub.L. 93-638, as amended).

Your letter described the change as giving regional corporations, rather than tribal
governments, the first opportunity to assume the administration of ANCSA Section
14(h)(1) activities under Pub.L. 93-638.

For decades, BIA has administered Pub.L. 93-638 in Alaska by keeping tribal
governments in the top tier of the order of precedence. Central Council, as a regional
tribe, has always supported this order of precedence, and has agreed as a matter of
Central Council policy and practice to allow any village or IRA tribe in our region to
have precedence over Central Council.

Your unilateral change in this BIA policy is disturbing because its proposal and
implementation completely lacked any tribal consultation. Accordingly, we ask that you
rescind your modification immediately and begin the proper consultation process.

The Alaska order of precedence always has given contracting priority to tribes, then to
village corporations, and last to regional corporations.[1] It is premised on the government-
to-government relationship between federal and tribal governments. BIA is required by

---

[1] *See* Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian
Affairs, 58 Fed. Reg. 54364, 54366 n.2 (Oct. 21, 1993) ("Under longstanding BIA policy, priority for
contracts and services in Alaska is given to reorganized and traditional governments over non-tribal
corporations.").

Niles Cesar, Director
May 12, 2008
Page 2


Executive Order 13175 to consult with affected tribes when adopting or amending "policies that have tribal implications", including "policy statements or actions that have substantial direct effects" on tribes.[2]

Consultation involves "government to government dialogue," including timely notification of the proposed action, a meaningful chance for tribes to respond, and serious consideration of tribal comments and, suggested alternatives, and other recommendations. Your modification of the order of precedence should have been proposed and considered within the constraints of the BIA's consultation process. Yet tribes received no notice of your action at all until after the fact.

For these reasons, we ask that you immediately rescind your modification of the order of precedence. And that you accord Central Council and other tribal governments an opportunity to review and consult with you on the proposed modification.

Sincerely,

William Martin
President


cc:     Hon. Carl Artman, Assistant Secretary – Indian Affairs
        Jerry Gidner, BIA Director
        Philip Baker-Shenk

---

[2] Exec. Order No. 13175 §§ 1(a), 3(c); Bureau of Indian Affairs Government-to-Government Consultation Policy § IV (Dec. 13, 2000).